1
2
3
4
5
6
7          UNITED STATES DISTRICT COURT
8
9            EASTERN DISTRICT OF CALIFORNIA

10  COLIN RAKER DICKEY,                    Case No. 1:06-cv-00357-AWI-SAB

11              Petitioner,                DEATH PENALTY CASE

12         v.                              MEMORANDUM AND ORDER:

13  RON DAVIS, Warden of San Quentin State (1) DENYING REQUEST TO STRIKE
    Prison,                                SECOND AMENDED ANSWER (DOC.
14                                         NO. 128); (2) DENYING REQUEST FOR
                Respondent.[1]             FACTUAL DEVELOPMENT (DOC. NOS.
15                                         116, 128); (3) DENYING GUILT PHASE
                                           CLAIMS (DOC. NOS. 51, 51-1); (4)
16                                         SETTING CASE MANAGEMENT
                                           CONFERENCE; and (5) DIRECTING THE
17                                         COURT CLERK TO SUBSTITUTE
                                           WARDEN RON DAVIS AS
18                                         RESPONDENT

19                                         Case To Remain Open

20                                         Case Management Conference:
                                            Date:  February 17, 2017
21                                          Time: 10:00 a.m.
                                            Courtroom 9
22                                          Judge: Stanley A. Boone
23

24        Petitioner Colin Raker Dickey is a state prisoner, sentenced to death, proceeding with a

25  petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He is represented in this action

26  by appointed counsel David Senior, Ann Tria and Matthew Weston.

27  _____
    [1] Pursuant to Fed. R. Civ. P. 25(d), Ron Davis, Warden of San Quentin State Prison, is substituted as respondent in
28  place of his predecessor wardens.

                                           1

Respondent Ron Davis is named as Warden of San Quentin State Prison.   He is represented in this action by Brian Smiley and Justain Riley of the Office of the California Attorney General.

Before the court for decision are i) petitioner's request to strike respondent's second amended answered filed September 10, 2014, ii) petitioner's record based guilt phase claims I, II (portions), IV, VIII, XII (portions), XIII, XIV, XV, XVI, XVII, XVIII, XIX, XXI, XXII, XXIII, XXIV, XXVI and XXVIII, including subclaims,[2] and iii) petitioner's request for factual development of claims II(B), II(C), II(F), II(G), II(H), II(S), II(T), II(V), XIII, XIV, XV and XXIV.[3]

Having carefully reviewed the parties' filings and the relevant case law and for the reasons set out below, the undersigned finds that respondent's second amended answer filed as an opposition brief shall not be stricken; the petition's noted guilt phase claims shall be denied on the merits; and petitioner's motion for factual development of the noted guilt phase claims shall be denied.

The court sets a case management conference to discuss proceedings on the penalty phase claims and for ex parte budgetary discussions with petitioner's counsel.

## I. BACKGROUND

Petitioner was charged in Fresno County with counts 1 and 2 for murder (Penal Code § 187), with allegations of robbery-murder and burglary-murder special circumstances (Penal Code §§ 190.2(a)(17), 211, 459/460); counts 3 and 4 for robbery (Penal Code § 211); count 5 for burglary (Penal Code §§ 459/460); and allegations of multiple murder special circumstance (Penal Code §§ 190.2(a)(3) and aider and abettor liability (Penal Code § 190.2(b)).[4]  (CT 297-301, 303-307.)  Petitioner pleaded not guilty to all the charges.  (RT 126; CT 232, 302.)

---

[2] The parties do not argue and the court does not reach nominal guilt phase claims II(I) (alleged *Marsden* error following the guilt phase verdicts - *see* Doc. No. 51-1 ¶¶ 342-364) and  II(U) (regarding victim family reactions to the jury verdict - *see* Doc. No. 51-1 ¶¶ 409-414), both of which claims address penalty phase issues (*People v. Dickey*, 35 Cal. 4th  884, 916-22 (Cal. 2005)).

[3] Although petitioner's motion for factual development does not include claims II(V), XIII, XV and XXIV (Doc. No. 116 at 396:10-399:5), his reply brief in support of factual development does references these claims (Doc. No. 128 at 30:4-5).  The court has considered these claims in ruling on the motion for factual development.

[4] Any reference to state law is to California law unless otherwise noted.

2

Petitioner's jury trial began on January 7, 1991 in Fresno County Case No. 416903-3. (CT 295-296.)  On March 15, 1991, the jury found petitioner guilty of the murders of Marie Caton and Louis Freiri with special circumstances of felony-murder robbery and felony-murder burglary and multiple murder and found petitioner guilty of first degree robbery of each victim and first degree burglary of their residence.  (CT 380-385, 463-468, 610-614.)

On March 19, 1991, petitioner admitted a prior felony conviction (CT 472) and purported to waive presence at the penalty phase.  (CT 472-76.)  On March 22, 1991, the jury returned a penalty phase verdict of death.  (CT 478-82, 504; *see also* Penal Code, § 190.2, subds. (a)(3), (17)(A)(G).)

On March 26, 1991, responsive to petitioner's dissatisfaction with trial counsel Schultz, the trial court appointed Katherine Hart to represent petitioner on motion for new trial and motion to modify the verdict.  (CT 505; RT 5181-87.)  Therein Ms. Hart alleged insufficiency of evidence, prosecutorial misconduct, instructional error, improper waiver of prior felony conviction, trial court error and ineffective assistance of counsel at the guilt and penalty phases. (CT 525-589.)  The motion for new trial was denied on January 17, 1992.  (CT 516-518.)  The motion for modification of the verdict was denied on February 21, 1992 and petitioner was sentenced to death.  (CT 609-615; Feb. 21, 1992 Transcript, at 50.)[5]

On April 14, 2003, petitioner filed a state habeas petition, *In re Dickey*, S115079 (Lod. Doc. 7), which the California Supreme Court denied on November 30, 2005.  (Lod. Doc. 10.)

The California Supreme Court affirmed petitioner's conviction on direct appeal on May 23, 2005.  *People v. Dickey*, 35 Cal. 4th 884 (2005).  That court denied petitioner's request for rehearing on July 13, 2005.  *People v. Colin Raker Dickey*, CSC Case No. S025519.

On February 21, 2006, the United States Supreme Court denied petitioner's writ of

---

[5] Unless otherwise indicated, throughout this order, "CT" refers to the clerk's transcript on appeal; "SCT" refers to the supplemental clerk's transcript on appeal regarding juror questionnaires; "SSCT" refers to the supplement to the supplemental clerk's transcript; "CCT" refers to the corrected clerk's transcript; "RT" refers to the reporter's transcript on appeal;  "CRT" refers to the corrected reporter's transcript on appeal; "CSC" refers to the California Supreme Court; "SHCP" refers to the first state habeas corpus petition; and "SSHCP" refers to the second state habeas petition.  Other transcripts are referenced by date.  References to page numbering are to the page numbering in the original documents except that Bates numbering is used where available and ECF system numbering is otherwise used for electronically filed documents.

certiorari. *Dickey v. California*, 546 U.S. 1177 (2006).

On March 30, 2006, petitioner began this federal habeas proceeding under 28 U.S.C. § 2254 by filing a combined request for appointment of counsel and temporary stay of execution. On October 4, 2007, petitioner filed his federal petition for writ of habeas corpus.[6]  On May 21, 2008, this court ordered federal proceedings held in abeyance pending state exhaustion of certain claims.  (Doc. No. 69.)

On July 21, 2008, petitioner filed his second state habeas petition, *In re Dickey*, S165302. (Lod. Doc. 30.)  On May 23, 2012, the California Supreme Court summarily denied the second state petition on the merits as to all claim and on procedural grounds as to certain claims. (Lod. Doc. 31.)

Respondent filed his answer in this proceeding (Doc. No. 103) and amended answer correcting clerical error (Doc. No. 105), on August 29, 2013.  Therein respondent admitted the jurisdictional allegations and asserted exhaustion and procedural defenses and denied all claims 1 through 29.[7]

On November 18, 2013, this court ordered bifurcated briefing with the guilt phase claims briefed separately from and prior to the penalty phase claims.  (Doc. No. 111.)

On April 16, 2014, petitioner filed his brief in support of guilt phase claims which includes his noted initial request for factual development.  (Doc. No. 116.)

On September 10, 2014, respondent filed a second amended answer as his brief in response to petitioner's brief.  (Doc. No. 125.)

On November 7, 2014, petitioner filed his brief in reply to respondent's brief including the noted request that respondent's second amended answer be stricken and for further factual development.  (Doc. No. 128.)

## II. STATEMENT OF FACTS

The following factual summary is taken from the California Supreme Court's opinion in

---

[6] The court takes judicial notice of the state record on appeal, *People v. Colin Raker Dickey*, CSC Case No. S025519 and the related state habeas proceedings, *In re Colin Dickey*, CSC Case No. S115079 and *In re Colin Dickey*, CSC Case No. S165302.

[7] The amended answer is the operative answer.  (*See* Doc. No. 114 at 1:20-21.)

*People v. Dickey,* 35 Cal. 4th 884 (2005), and is presumed correct.   28 U.S.C. § 2254(d)(2), (e)(1).   Petitioner does not present clear and convincing evidence to the contrary; thus, the court adopts the factual recitations set forth by the state court.   *See Vasquez v. Kirkland*, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

I. Facts

A. Guilt Phase

*1. The Prosecution Case*

The murder victims were Fresno residents—Marie Caton, 76, and Louis Freiri, 67, a friend and boarder of Mrs. Caton's. Their bodies were discovered by one of Mrs. Caton's daughters, Lavelle Garratt. Mrs. Garratt or her sister checked on their mother every day, "[b]ecause she was lonely, because she was our mother, because we loved her and we wanted to see her."

Late in the afternoon of November 8, 1988, when Mrs. Garratt could not reach her mother by telephone, she drove to her house. She found Mrs. Caton on the floor of her bedroom, covered with a bloodstained blanket. Mrs. Caton had been beaten so badly her eyes bulged out of their sockets like golf balls. Mrs. Caton also had knife wounds on her chest and a jagged cut on her back. She lingered for 11 days, but never regained consciousness. The cause of death was respiratory failure associated with "shock lung syndrome," the shock having been caused by her injuries.

Mr. Freiri wore a brace on his right leg and required a cane. Mrs. Garratt found him facedown, stretched across the archway between the dining room and the living room. A chair, wall, and window blinds near his body were bloodstained. Pieces of his cane were found in the living room and one of the bedrooms. Mr. Freiri had been stabbed in the chest, armpit, and forearm; he also had a bone-deep laceration on his forehead. He was stabbed with such force that two of his ribs were broken. He died of blood loss.

Mrs. Garratt told the police she suspected her son, Richard Cullumber. Cullumber was, Mrs. Garratt believed, a drug addict, and he asked his grandmother Mrs. Caton for money—cash she would take out of a buffet drawer—almost every day. Mrs. Caton "grew up during the Depression and she was afraid of being hungry again, I guess, and so she hid money all over." Among other caches, Mrs. Caton kept at least $6,000 in cash in a metal box placed inside a suitcase stored under her bed. She also kept a smaller sum in another suitcase.

Cullumber, also known as "R.C.," lived in an apartment in Fresno, along with defendant, Gail Goldman, Richard Buchanan, and two other men. The night of the murders Cullumber packed his bag and left the apartment. He returned several days later but fled again when informed the police were looking for him. On November 12, 1988, after a high-speed police chase, Cullumber, cornered, killed himself.

5

The pistol Cullumber used to shoot himself was registered to Mr. Freiri. He had earlier warned the driver of a car he commandeered, "I need the car; I've already killed a woman."

Two knives possibly linked to the murders were discovered in Mrs. Caton's kitchen—a butcher knife and a steak knife. The steak knife (People's exhibit No. 18) was, in the opinion of defendant's housemates Gail Goldman and Richard Buchanan, identical to a knife belonging in their apartment.

In addition to his knife wounds, Mr. Freiri had a four-inch-long ligature wound, caused by a cord that was wrapped around his neck. It was a cotton cord of the color, weave, and texture used in venetian blinds. The venetian blinds in Mrs. Caton's house were intact, but a venetian blind kept in the hall closet of the apartment defendant shared with Cullumber and the others was missing its cord. On the night of the murders, Gene Buchanan saw defendant remove a venetian blind from the closet of their apartment, walk into the bedroom with it, and then replace it in the closet. Goldman testified it was Cullumber who had done that. Defendant's thumbprint was found on a slat from the venetian blind found by the police in the apartment closet. n.2.

---------------------------------------FOOTNOTE----------------------

n.2 No usable prints were found at the scene of the crime, not even those of Mrs. Caton or Mr. Freiri.

-------------------------------------END FOOTNOTE------------------

The case against defendant rested on the testimony of Gail Goldman and Gene Buchanan. n.3.

---------------------------------------FOOTNOTE----------------------

n.3 Defendant impeached Buchanan on the grounds, among others, that his testimony against defendant was motivated by revenge and a desire to collect the reward offered by Mrs. Caton's relatives. Defendant was less successful in attacking Goldman's credibility. If not a hostile witness for the prosecution, she was clearly reluctant to testify against defendant, both because she was fond of him and because she feared the consequences of informing on anyone. A critical question, then, is to what extent Goldman's testimony corroborates Buchanan's. To facilitate consideration of that question, we have set out their testimony separately.

-------------------------------------END FOOTNOTE------------------

a) The Testimony of Gail Goldman n.4.

---------------------------------------FOOTNOTE----------------------

n.4 Because she died before the trial began, Goldman's preliminary hearing testimony was read into the record. (See Evid. Code, § 240, subd. (a)(3).)

-------------------------------------END FOOTNOTE------------------

6

Goldman shared a one-bedroom apartment in Fresno with defendant, Cullumber, Buchanan, and two other men. According to Detective Doug Stokes, Goldman told him "about a venetian blind that had been in the hall closet that was ... taken by the suspect, Dickey, ... into a bedroom and that the cord was removed from that venetian blind and then the venetian blind was placed back inside the hall closet." However, when she testified, Goldman said it was Cullumber who took the venetian blind out of the closet and went into the bedroom with it. Later, she testified, the blind had been replaced in the closet, but the cord was missing from a blind in the bedroom.

At approximately the same time that Cullumber was engaged with the venetian blind, defendant walked into the kitchen and opened a drawer containing knives and other silverware. n.5 According to Detective Stokes, Goldman told him defendant removed a knife from the drawer and left the kitchen with it. Again according to Detective Stokes, when he came to the apartment investigating the murders, he showed Goldman a knife. She told him, "I have a knife exactly like that knife, or they are twins."

---------------------------------------FOOTNOTE---------------------

n.5 Goldman later testified she did not know which drawer defendant had opened.

-----------------------------------END FOOTNOTE------------------

After the activity just described, Goldman testified, defendant and Cullumber left the apartment. They had no money, Goldman believed, when they left. If Cullumber had money, he spent it on drugs; before defendant left he asked Goldman for money to buy cigarettes. However, when they returned, Cullumber gave Goldman $40 or $50 in cash, saying it was in partial payment of what he owed her. Cullumber then packed his clothes and left.

Sometime thereafter, while Goldman and defendant were watching the news on television, they saw a story about this crime. Defendant became upset when he learned Mr. Freiri was dead and that Mrs. Caton, while near death, was still alive. He told Goldman to come into the bedroom, that he wanted to talk to her. Buchanan followed them into the bedroom.

Defendant told them he had accompanied Cullumber to the home of Mrs. Caton. On the one hand, defendant said that Cullumber had assured him "nothing was going to happen." On the other hand, defendant admitted he had gone with Cullumber "[t]o help [him] get the money." With Mrs. Caton present, defendant looked for money in her bedroom, where Cullumber told him it could be found. When defendant stepped out of the bedroom and saw Mr. Freiri slumped over in a chair, he "knew something had happened." Cullumber "went berserk. He came into the bedroom and started beating up on his grandmother." Defendant and Cullumber found $700, which they split.

Defendant was crying, "like he was sad," when he confessed to Goldman and Buchanan. Later, when defendant learned Mrs. Caton had died, "he wasn't as depressed as he was before." While he was confessing, defendant said maybe he should turn himself in. Goldman advised him against it. When Detective Stokes first asked Goldman whether she knew anything about these crimes, Goldman denied that she did. Defendant was a good friend of hers, she still liked him, and she did not want to do anything to get him into trouble. She did not want to tell on anyone, especially someone she liked as much as she liked defendant. Buchanan

7

told her he was going to turn defendant in for the reward. By contrast, Goldman testified at the preliminary hearing only because she had been subpoenaed. During a break, Goldman told the prosecutor she wanted to make sure defendant knew she was not the one who turned him in. She was afraid for her life. "I always felt that if you would inform on somebody they would kill you or have you killed."

Defendant said he was not concerned that someone would betray him, "because if they did, they wouldn't do it again." On the other hand, Goldman thought that her relationship with defendant was such that "it would take an awful lot to make him hurt me."

Goldman had "had 20 surgeries on [her] stomach," and depending on how much pain she was in, she used "speed ball cocaine and heroin" or other "street drugs" to kill the pain.

*b) The Testimony of Gene Buchanan*

One evening in November 1988, defendant took a venetian blind from the hall closet of the apartment he shared with Buchanan, Cullumber, Goldman, and two others. Defendant took the blind into the bedroom and shortly thereafter replaced it in the closet. Buchanan looked into the bedroom. On the bed was a knife belonging to Gail Goldman, a knife with a bone handle and a serrated edge. People's exhibit No. 18 was that knife, or else it looked exactly like Goldman's knife.

Defendant and Cullumber left the apartment around 9:00 p.m. That night everyone living in the apartment was broke, or claimed to be. However, when defendant and Cullumber returned, defendant opened his wallet and said, "I got $350," and, "call the connection."

Buchanan ordered drugs, which were injected by defendant, Cullumber, Goldman, and Buchanan. Afterwards, Cullumber asked Buchanan to take him for a drive; defendant went along. Defendant directed Buchanan to a canal, and as they drove over it, defendant threw in a pair of shoes. After looking for a good place to do it, defendant also threw his jacket out of the window.

About two days later, Buchanan and defendant were in the living room of the apartment; defendant was watching the news on television. Defendant jumped up and ran into the bedroom to Goldman. Buchanan heard Goldman say, " 'Oh, my God, how low can you go,' or 'get'; something to that effect." Buchanan went into the bedroom to find out what was going on. Defendant said to him, "I've already told her, so I might as well tell you." Defendant told Buchanan that "him and R.C. had been over to R.C.'s grandmother's house, and that they had entered the house—how he had done it, how he had walked up to the door, knocked, faked like R.C. was going to be in jail, needed to use the phone, and then R.C. sneaked in, they were supposed to tie them up, get this money and everything. And while the defendant is supposedly in the bedroom looking for the money he hears a commotion, looked out the bedroom door, sees an elderly man with his head slumped down, considers him dead, and that if you kill one you might as well kill them both." In response to the prosecutor's questions, Buchanan clarified his testimony. "[Defendant] said that he—only what he thought, he didn't say what he did. He said that, 'If you kill one you might as well kill them both.' " "[H]e didn't say he said it to R.C., he just said it as that was his opinion." Defendant did not tell Buchanan what happened after he had this thought.

8

Defendant also told Buchanan that what prompted his confession was a television story saying that Mrs. Caton "was still alive when she should have been dead."

Buchanan did not speak to the police until several months after defendant's confession to him. At a convenience store he saw a flyer announcing a reward, and he left his name with the clerk. He was then contacted by a grandson of Mrs. Caton's, and he agreed to speak to Detective Stokes. However, his willingness to do so was not motivated by the reward; it was his "Christian upbringing." He did not tell Goldman he was going to turn defendant in for the reward.

Defendant had torn up Buchanan's one photograph of his youngest daughter, which made Buchanan angry. He wanted to throw defendant off the balcony of a motel, but Goldman stopped him.

Buchanan used drugs "[a]s often as I can get them." He injected "speedballs," a heroin/cocaine mixture. He used drugs an hour or two before defendant confessed to him, and he continued to do so as recently as the day before his testimony.

*2. The Defense Case*

Defendant testified he did not make the statements attributed to him by Goldman and Buchanan, and that he did not have anything to do with these crimes. He got along well with Goldman, but not with Buchanan, who was "just a snake; a deceitful person." His fingerprint was on the venetian blind because it had fallen off the back door and he had put it into the closet; he did not know why the cord was missing from it. He did rip up the photograph of Buchanan's daughter.

John Inderrienden had known Goldman for five or six years, and they had once lived in the same apartment building. He "wouldn't trust her as far as I could throw her, and she weighed quite a bit."

Goldman once lived in a house owned by Harry Arax. She did not pay her rent, nor did she pay her bill at his market.

Goldman, a former neighbor of Peter Najarian's, told him she was going to be a witness in a murder case, but that she "didn't know nothing about no murder." Magadelena Desumala, who ran a halfway house in which Goldman lived on and off for about 10 years, was "like a sister" to Goldman. She said Goldman told her it was the grandson of the murder victim who had confessed to her.

### B. Penalty Phase

The only witness who testified at the penalty phase, Detective Stokes, was called by the prosecution to provide a foundation for the admission of the autopsy photographs. No other evidence, aside from a stipulation to defendant's prior burglary conviction, was introduced.

*Dickey*, 35 Cal. 4th at 894-900.

### III. JURISDICTION

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

or treaties of the United States.  28 U.S.C. §§ 2241(c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §§ 2241(d), 2254(a).

This action was initiated after April 24, 1996.  Therefore the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, apply.  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir. 2000), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

## IV. STANDARDS OF REVIEW

### A.    Legal Standard - Habeas Corpus

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Lockyer,* 538 U.S. at 70-71; *Williams*, 529 U.S. at 413.

"[A] state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits."  *Brown v. Walker*, Case No. C 09-04663 JSW, 2014 WL 4757804, at *5 (N.D. Cal. Sept. 24, 2014), *citing Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).

As a threshold matter, this court must "first decide what constitutes clearly established Federal law, as determined by the Supreme Court of the United States."  *Lockyer*, 538 U.S. at 71,

1   *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

2   court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

3   of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.  "In other words,

4   'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

5   set forth by the Supreme Court at the time the state court renders its decision." *Id.*  In addition,

6   the Supreme Court decision must "squarely address [] the issue in th[e] case; otherwise, there is

7   no clearly established Federal law for purposes of review under AEDPA." *Moses v. Payne*, 555

8   F.3d 742, 754 (9th Cir. 2009), *quoting Wright v. Van Patten*, 552 U.S. 120, 125 (2008); *see also*

9   *Panetti v. Quarterman*, 551 U.S. 930, 949 (2007); *Carey v. Musladin*, 549 U.S. 70, 74 (2006).

10        If no clearly established Federal law exists, the inquiry is at an end and the court must

11   defer to the state court's decision. *Carey*, 549 U.S. 70; *Wright*, 552 U.S. at 126; *Moses*, 555 F.3d

12   at 760.  In addition, the Supreme Court has recently clarified that habeas relief is unavailable in

13   instances where a state court arguably refuses to extend a governing legal principle to a context

14   in which the principle should have controlled. *White v. Woodall*, --- U.S. ---, 134 S. Ct. 1697,

15   1706 (2014).  The Supreme Court stated: "[I]f a habeas court must extend a rationale before it

16   can apply to the facts at hand, then by definition the rationale was not clearly established at the

17   time of the state-court decision." *Id., quoting Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004).

18        If the court determines there is governing clearly established Federal law, the court must

19   then consider whether the state court's decision was "contrary to, or involved an unreasonable

20   application of, [the] clearly established Federal law." *Lockyer*, 538 U.S. at 72, *quoting* 28 U.S.C.

21   § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

22   state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

23   of law or if the state court decides a case differently than [the] Court has on a set of materially

24   indistinguishable facts." *Williams*, 529 U.S. at 412-13; *see also Lockyer*, 538 U.S. at 72.  "The

25   word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character

26   or nature,' or 'mutually opposed.'" *Williams*, 529 U.S. at 405, *quoting Webster's Third New*

27   *International Dictionary* 495 (1976)).  "A state-court decision will certainly be contrary to

28

[Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id.*

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see also Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101, *citing Yarborough*, 541 U.S. at 664. The Supreme Court stated:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.

*Id.* at 101-05. In other words, so long as fair-minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. *Id.* at 98-99. In applying this standard, "a habeas court must determine what arguments or theories supported ... or could have supported the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id.* at 101-03. This objective standard of reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d). *Hibbler v. Benedetti*, 693 F.3d 1140, 1146-47 (9th Cir. 2012). If the court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to

or involved an unreasonable application of United States Supreme Court precedent.  *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.6 (9th Cir. 2000); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

The AEDPA requires considerable deference to the state courts.  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), and "evidence introduced in federal court has no bearing on 2254(d)(1) review."  *Id.* at 185.  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), *citing* 28 U.S.C. § 2254(e)(1).  However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review.  *Townsend v. Sain*, 372 U.S. 293, 319 (1963), *overruled by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

If a petitioner satisfies either subsection (1) or (2) of § 2254 for a claim, then the federal court considers that claim *de novo*.  *See Panetti*, 551 U.S. at 953 (when § 2254(d) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires."); *see also Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008) (same).

In this case, some of petitioner's claims and allegations were raised and rejected by the California Supreme Court on direct appeal while others were raised in his state habeas petitions to that court and summarily denied on the merits.  In the latter case, where the state court decision is unaccompanied by an explanation, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  *Richter*, 562 U.S. at 98.  The Supreme Court stated that "a habeas court must determine what arguments or theories supported or ... *could have supported*, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  *Id.* at 101-03 (emphasis added).  Petitioner

1  bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny

2  relief.'"  *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013), *quoting Richter*, 562 U.S. at 98.

3  "Crucially, this is not a *de novo* review of the constitutional question," *id.*, as "even a strong case

4  for relief does not mean the state court's contrary conclusion was unreasonable." *Id., quoting*

5  *Richter,* 562 U.S. at 102; *see also Murray v. Schriro*, 745 F.3d 984, 996-97 (9th Cir. 2014).

6       When reviewing the California Supreme Court's summary denial of a petition, this court

7  must consider that the California Supreme Court's summary denial of a habeas petition on the

8  merits reflects that court's determination that:

9
10       [T]he claims made in th[e] petition do not state a prima facie case entitling the
         petitioner to relief. It appears that the court generally assumes the allegations in
11       the petition to be true, but does not accept wholly conclusory allegations, and will
         also review the record of the trial ... to assess the merits of the petitioner's claims.

12

13  *Pinholster*, 563 U.S. 181 n.12, *quoting In re Clark*, 5 Cal. 4th 750, 770 (1993); *see also Johnson*

14  *v. Williams*, 133 S. Ct. 1088, 1094-96 (2013) (holding that even where the state court does not

15  separately discuss a federal claim there is a presumption that that state court adjudicated the

16  federal claim on the merits).  Accordingly, if this court finds petitioner has unarguably presented

17  a prima facie case for relief on a claim, the state court's summary rejection of that claim would

18  be unreasonable.  *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *Nunes v. Mueller*, 350

19  F.3d 1045, 1054-55 (9th Cir. 2003).

20       For any habeas claim that has not been adjudicated on the merits by the state court, the

21  federal court reviews the claim *de novo* without the deference usually accorded state courts under

22  28 U.S.C. § 2254(d)(1).   *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v.*

23  *Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).  In such instances, however, the provisions of 28

24  U.S.C. § 2254(e) still apply.  *Pinholster*, 563 U.S. 185 ("Section 2254(e)(2) continues to have

25  force where § 2254(d)(1) does not bar federal habeas relief."); *Pirtle*, 313 F.3d at 1167–68

26  (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal

27  review is *de novo*).

28

14

1

## V. PROCEDURAL BARS

2        Some of petitioner's claims were alternatively denied by the California Supreme Court as

3 procedurally barred.  As to those claims, respondent has invoked the independent state ground

4 doctrine, pursuant to which a federal court will not review a question of federal law decided by a

5 state court "if the decision of that court rests on a state law ground that is independent of the

6 federal question and adequate to support the judgment."  *Vang v. Nevada*, 329 F.3d 1069, 1072

7 (9th Cir. 2003), *quoting Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

8        Since "cause and prejudice" can excuse a procedurally defaulted claim, *Smith v. Baldwin*,

9 510 F.3d 1127, 1139 (9th Cir. 2007), *quoting Coleman*, 501 U.S. at 750, and "prejudice"

10 essentially requires a merits analysis, the court will proceed to the merits of claims found to be

11 procedurally defaulted without determining whether the state procedural default is adequate and

12 independent to bar relief in federal court.  *Id.*, *quoting Coleman*, 501 U.S. 732-35.  A district

13 court may exercise discretion to proceed to the merits in advance of litigation of procedural

14 default.  *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (courts empowered to reach

15 the merits if on their face the allegations are clearly not meritorious despite asserted procedural

16 bar); *see also Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005) (an application for habeas corpus may

17 be denied on the merits even if unexhausted in state court); *Loggins v. Thomas*, 654 F.3d 1204,

18 1215 (11th Cir. 2011) (relief may be denied on the merits where petition is clearly not

19 meritorious despite asserted procedural bar).

20

## VI. MOTION TO STRIKE

21        Petitioner moves that the second amended answer be stricken and respondent directed to

22 refile the document as an opposition to petitioner's merits brief.  He asserts as grounds that

23 respondent has not complied with court orders and Rule 15 such that the second amended answer

24 is a nullity.  (*See* Doc. No. 128 at 57:5-58:24.)

25 **A.        Legal Standard – Motion to Strike**

26

27        Rule 12(f) authorizes the court to strike from the pleadings "any redundant,
immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to

28 strike are generally viewed with disfavor, and will usually be denied unless the

allegations in the pleading have no possible relation to the controversy, and may cause prejudice to one of the parties." *Champlaie v. BAC Home Loans Servicing, LP*, 706 F.Supp.2d 1029, 1039 (E.D. Cal. 2009) (Karlton, J.) [Citations]. "If the court is in doubt as to whether the challenged matter may raise an issue of fact or law, the motion to strike should be denied, leaving an assessment of the sufficiency of the allegations for adjudication on the merits." [Citation]

*Carolina Cas. Ins. Co. v. Oahu Air Conditioning Serv., Inc.*, 994 F. Supp. 2d 1082, 1090–91 (E.D. Cal. 2014).

**B.    Analysis**

Rule 15 provides that:

> A party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

> In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave....

Fed. R. Civ. P. 15(a)(1-2).  Generally service of an amendment that does not comply with Rule 15 has no legal effect.  *Hardin v. Wal-Mart Stores, Inc.*, 813 F. Supp. 2d 1167, 1181 (E.D. Cal. 2011) ("If an amended pleading cannot be made as of right and is filed without leave of court or consent of the opposing party, the amended pleading is a nullity and without legal effect.")

Here, respondent's opposition brief is captioned as a second amended answer (Doc. No. 125) and purports to amend the amended answer filed August 29, 2013 (Doc. No. 105) "pursuant to this [c]ourt's November 18, 2013 order."  (Doc. No. 125 at 25:23-24.)

Petitioner correctly argues the court's November 18, 2013 order did not direct or allow respondent to file an amended answer.  (*See* Doc. No. 111.)  That order directed respondent to file his "responsive brief and opposition to factual development."  (*Id.* at 2:13-14.)  Respondent was not therein or subsequently allowed or directed to amend his previously filed amended answer.  (Doc. No. 105; see also Doc. No. 124 (September 9, 2014 clerk's notice that directed the purported second amended answer be re-filed as an opposition brief.)

Petitioner correctly argues that a second amended answer would be unauthorized as untimely, unconsented to by petitioner and lacking court approval.  However, the purported

16

second amended answer was re-filed as an opposition brief.  (Doc. No. 125.)  It responds to petitioner's merits brief and to that extent serves as an opposition thereto.  Moreover, petitioner has not demonstrated prejudice from respondent's filing of the purported second amended answer.  The court has held that:

> The absence of prejudice is a sufficient reason to deny moving defendants' motion to strike. *See, e.g., N.Y.C. Emps.' Ret. Sys. v. Berry,* 667 F.Supp.2d 1121, 1128 (N.D. Cal. 2009) ("Where the moving party cannot adequately demonstrate ... prejudice, courts frequently deny motions to strike even though the offending matter was literally within one or more of the categories set forth in Rule 12(f).") .

*Carolina Cas. Ins. Co.,* 994 F. Supp. 2d at 1091.

For the reasons stated, the court will not strike under Rule 12(f) as an improper amendment the purported second amended answer, refiled as an opposition brief.  The motion to strike shall be denied.

## VII. REVIEW OF GUILT PHASE CLAIMS

**A.     Ineffective Assistance of Trial Counsel Claims**

1.     <u>Clearly Established Law – Ineffective Assistance of Counsel</u>

The Sixth Amendment right to effective assistance of counsel, applicable to the states through the Due Process Clause of the Fourteenth Amendment, applies through the sentencing phase of a trial.  U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; *see also Gideon v. Wainwright*, 372 U.S. 335, 343–45 (1963); *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002); *Murray*, 745 F.3d at 1010-11.

The clearly established federal law for ineffective assistance of counsel claims is *Strickland v. Washington*, 466 U.S. 668 (1984).  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687.  The petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and must identify counsel's alleged acts or omissions

17

1  that were not the result of reasonable professional judgment considering the circumstances.

2  *Richter*, 562 U.S. at 104, *citing Strickland*, 466 U.S. at 688.

3      Petitioner must show that counsel's errors were so egregious as to deprive him of a fair

4  trial, one whose result is reliable.  *Strickland*, 466 U.S. at 688.  Judicial scrutiny of counsel's

5  performance is highly deferential, and the habeas court must guard against the temptation "to

6  second-guess counsel's assistance after conviction or adverse sentence."  *Id.* at 689.  Instead, the

7  habeas court must make every effort "to eliminate the distorting effects of hindsight, to

8  reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

9  counsel's perspective at the time."  *Id.; see also Richter*, 562 U.S. at 106-08.  A court indulges a

10  "'strong presumption' that counsel's representation was within the 'wide range' of reasonable

11  professional assistance."  *Richter*, 562 U.S. at 104, *quoting Strickland*, 466 U.S. at 687; *see also*

12  *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (same).   This presumption of

13  reasonableness means that not only do we "give the attorneys the benefit of the doubt," we must

14  also "affirmatively entertain the range of possible reasons [defense] counsel may have had for

15  proceeding as they did."  *Pinholster*, 563 U.S. at 196.

16      The Supreme Court has "declined to articulate specific guidelines for appropriate

17  attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney

18  performance remains simply reasonableness under prevailing professional norms.'"  *Wiggins v.*

19  *Smith*, 539 U.S. 510, 521 (2003), *quoting Strickland*, 466 U.S. at 688.   However, "general

20  principles have emerged regarding the duties of criminal defense attorneys that inform [a court's]

21  view as to the 'objective standard of reasonableness' by which [a court must] assess attorney

22  performance, particularly with respect to the duty to investigate."  *Summerlin v. Schriro*, 427

23  F.3d 623, 629 (2005).  "[S]trategic choices made after thorough investigation of law and facts

24  relevant to plausible options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690. It

25  follows that:

26

27      [S]trategic choices made after less than complete investigation are reasonable
        precisely to the extent that reasonable professional judgments support the
28      limitations on investigation. In other words, counsel has a duty to make

18

1  reasonable investigations or to make a reasonable decision that makes particular
2  investigations unnecessary. In any ineffectiveness case, a particular decision not
   to investigate must be directly assessed for reasonableness in all the
   circumstances, applying a heavy measure of deference to counsel's judgment.

3  *Wiggins*, 539 U.S. at 521, *quoting Strickland*, 466 U.S. at 690–91; *see also Thomas v. Chappell*,

4  678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be

5  considered tactical if he had "sufficient information with which to make an informed decision");

6  *Reynoso v. Giurbino*, 462 F.3d 1099, 1112–1115 (9th Cir. 2006) (counsel's failure to cross-

7  examine witnesses about their knowledge of reward money cannot be considered strategic where

8  counsel did not investigate this avenue of impeachment); *Jennings v. Woodford*, 290 F.3d 1006,

9  1016 (9th Cir. 2002) (counsel's choice of alibi defense and rejection of mental health defense not

10 reasonable strategy where counsel failed to investigate possible mental defenses).

11        Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a

12 reasonable probability that, but for counsel's unprofessional errors, the result ... would have been

13 different." *Strickland*, 466 U.S. at 694.  "It is not enough 'to show that the errors had some

14 conceivable effect on the outcome of the proceeding.'"  *Richter*, 562 U.S. at 104, *quoting*

15 *Strickland*, 466 U.S. at 693.  "Counsel's errors must be 'so serious as to deprive the defendant of

16 a fair trial, a trial whose result is reliable.'"  *Richter*, 562 U.S.at 104, *quoting Strickland*, 466

17 U.S. at 687.  Under this standard, we ask "whether it is 'reasonably likely' the result would have

18 been different." *Richter*, 562 U.S. at 112, *quoting Strickland*, 466 U.S. at 696.

19        That is, only when "[t]he likelihood of a different result [is] substantial, not just

20 conceivable," *id.*, has the defendant met *Strickland's* demand that defense errors were "so serious

21 as to deprive the defendant of a fair trial." *Id.*, at 103-105, *quoting Strickland*, 466 U.S. at 687.

22 A court need not determine whether counsel's performance was deficient before examining the

23 prejudice suffered by the petitioner as a result of the alleged deficiencies.  *Strickland,* 466 U.S. at

24 697.  Since the petitioner must affirmatively prove prejudice, any deficiency that does not result

25 in prejudice must necessarily fail.

26        Under AEDPA, the court does not apply *Strickland de novo*.  Rather, the court must

27 determine whether the state court's application of *Strickland* was unreasonable.  *Richter*, 562

28

U.S. at 100-101.  Establishing that a state court's application of *Strickland* was unreasonable under 28 U.S.C. § 2254(d) is very difficult.  *See Richter*, 562 U.S. at 102, (on deferential (2254(d)) review relief is granted only for "extreme malfunctions" in the state criminal justice system, not for ordinary errors that can be corrected on appeal).

Since the standards created by *Strickland* and § 2254(d) are both "highly deferential," when the two are applied in tandem, review is "doubly so."  *Id., quoting Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  Further, because the *Strickland* rule is a "general" one, courts have "more leeway ... in reaching outcomes in case-by-case determinations" and the "range of reasonable applications is substantial."  *Id.* at 101; *see also Premo v. Moore*, 562 U.S. 115, 122-23 (2011).

2.   <u>Review of Claim I</u>

Petitioner alleges that trial counsel was ineffective in the process of selecting jurors, denying him a fair and impartial jury, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 51-1 ¶¶ 173-207.)

**a.   Clearly Established Law – Impartial Jury**

The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury.  *Skilling v. United States*, 561 U.S. 358, 377-78 (2010); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  *Irvin*, 366 U.S. at 722; *see also Skilling*, 561 U.S. at 377-78.  In a capital case, "a prospective juror may be excluded for cause because of his or her views on capital punishment ... if the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), *citing Adams v. Texas*, 448 U.S. 38, 45 (1980).  Thus, "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause."  *Morgan v. Illinois*, 504 U.S. 719, 728 (1992).  Likewise, a juror who would automatically impose the death penalty if a defendant is found

guilty is not impartial and must be removed for cause.  *Id.* at 733; *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988).

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors."  *Morgan*, 504 U.S. at 729.  "Voir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" *Ristaino v. Ross*, 424 U.S. 589, 594 (1976), *quoting Connors v. United States*, 158 U.S. 408, 413 (1895).  "[T]he trial court retains great latitude in deciding what questions should be asked on voir dire." *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991).  No hard-and-fast formula dictates the necessary depth or breadth of voir dire, *see United States v. Wood*, 299 U.S. 123, 145–146 (1936), and "[t]he Constitution ... does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." *Morgan*, 504 U.S. at 729.  A trial court's failure to ask certain questions does not violate the Constitution unless it "render[s] the defendant's trial fundamentally unfair." *Mu'Min*, 500 U.S. at 426.

"[T]he trial court retains great latitude in deciding what questions should be asked on voir dire." *Id.* at 424.  A trial court's failure to ask certain questions does not violate the Constitution unless it "render[s] the defendant's trial fundamentally unfair." *Id.* at 426.

Only two specific inquires of voir dire are constitutionally compelled: inquiries into racial prejudice against a defendant charged with a violent crime against a person of a different racial group, *id.,* at 424, and, in a capital case, inquiries into a juror's views on capital punishment. *Morgan*, 504 U.S. at 730-32.

**b.      State Court Direct and Collateral Review**

Petitioner presented some of these allegations to the California Supreme Court in his first state habeas petition.  (Lod. Doc. 7 at 42-52.) That court summarily denied the allegations on the merits. (Lod. Doc. 10.)  Petitioner presented other of these allegations to the California Supreme Court in his second state habeas petition.  (Lod. Doc. 30 at 89-100.)  That court summarily denied the allegations on the merits and on procedural grounds.  (Lod. Doc. 31.)

**c.      Analysis of Claim I**

1    *(i)      List of Randomly Selected Jurors*

2         Petitioner alleges that defense trial counsel, Fresno County public defender Marvin

3    Schultz, who was appointed to represent him in February 1989, was deficient by stipulating that

4    counsel for both sides would be provided with a computer generated random list of the jurors in

5    the order they would be called for *Hovey* voir dire.  (Doc. No. 51-1 ¶ 177.)

6         The record reflects that jury qualification and selection began on January 14, 1991 with

7    approximately three hundred fifty prospective jurors appearing.  (RT 92.)  Petitioner alleges that

8    the noted stipulation impinged upon the "random selection" of the jury [because] [o]nce death

9    qualification was complete, and seating of the jury began, both counsel knew, with the preprinted

10   random list in hand, if they exercised a peremptory challenge, which jurors were in line to take

11   the vacant seat." (Doc. No. 51-1 ¶ 177, *citing* RT 112-115; *see also* RT 3854, 3873.)

12        Petitioner also alleges that given the list, Schultz was deficient by not using all of his

13   peremptory challenges, resulting in selection of a pro death jury partial to the prosecution.  (Doc.

14   No. 51-1 ¶¶ 200-207; *see also Morgan*, 504 U.S. at 728-29 (capital defense has a right to

15   adequate voir dire to identify unqualified jurors and to an impartial jury).   Petitioner also faults

16   Schultz for failing to rehabilitate prospective jurors who voiced initial opposition to the death

17   penalty.  (Doc. No. 51-1 ¶ 205 *citing 1989 ABA Guidelines for the Appointment and*

18   *Performance of Counsel in Death Penalty Cases ("ABA Guidelines"),  Commentary to*

19   *Guideline 10.10.2(B)(3).*)

20        Here, the state supreme court could reasonably have concluded that Schultz used the

21   random list of jurors and his peremptory challenges strategically.  *See e.g., Davis v. Woodford*,

22   333 F.3d 982, 995-96 (9th Cir. 2003), *amended and superseded* 384 F.3d 628, 643 (9th Cir.

23   2004) (no ineffectiveness in failing to use peremptory challenges where jurors' statements did

24   not demonstrate actual or implied bias; each said they could "follow the judge's instructions and

25   decide the case impartially"); *United States v. Quintero-Barraza*, 78 F.3d 1344, 1349-50 (9th

26   Cir. 1995) (where juror stated it would be "difficult" for him to be impartial because he believed

27   persons to be guilty until proven innocent, no ineffectiveness in failing to strike juror because

28

1   decision was manifestly tactical and due respect was paid to juror's oath); *Denham v. Deeds*, 954
2   F.2d 1501, 1505 (9th Cir. 1992) (where juror stated that defendant may have told her about the
3   charged crime while she waited on them at work, no ineffectiveness to fail to challenge her
4   because she said she could be fair and where decision could be tactical).

5       The record reflects that neither side exercised all its available peremptory challenges.
6   (RT 4075, 4094.)   The prosecution exercised eight of twenty peremptory challenges in selecting
7   the twelve member jury.  (RT 3955, 3970, 4012, 4025, 4049, 4054, 4057, 4062.)  Schultz
8   exercised seven of twenty peremptory challenges in selecting this jury as well as one peremptory
9   challenge in selecting the three alternates.  (RT 3959, 3973, 3980, 3997, 4019, 4042, 4059,
10  4090.)

11      Petitioner suggests that the juror questionnaire responses of the jurors ultimately selected
12  did not support Schultz's selection strategy by showing an inclination to require a higher
13  standard of prosecutorial proof at the guilt phase.  (Doc. No. 51-1 ¶195 (c); Doc. No. 116 at
14  381:1-5.)  However, as petitioner acknowledges (Doc. No. 51-1 ¶ 192), Schulz made "for cause"
15  or peremptory challenges of prospective jurors who were so in favor of the death penalty that
16  they were not impartial and receptive to defense evidence. *(Id.*)

17      Moreover, peremptory challenges are not necessarily of constitutional dimension.  *Ross*,
18  487 U.S. at 88; *Gray v. Mississippi*, 481 U.S. 648, 663 (1987).  The Supreme Court has upheld
19  use of peremptory challenges that do not discriminate on a constitutionally suspect basis.  *See*
20  *Holland v. Illinois*, 493 U.S. 474, 478 (1990) (rejecting argument that "a prosecutor's use of
21  peremptory challenges to eliminate a distinctive group in the community deprives the defendant
22  of a Sixth Amendment right to the 'fair possibility' of a representative jury").

23      (ii)    *Strategy of Selecting Pro-Death Jury*

24      Petitioner alleges Schultz was deficient by selecting a pro-death jury, i.e., jurors "who
25  were predisposed to impose the death penalty" (Doc. No. 51-1 ¶ 185) in the hope that at the guilt
26  phase these jurors "would be more critical of the prosecution's case and less likely to convict."
27  (*Id.*; *see also* SHCP, Ex. B ¶ 3.)

28

1     Petitioner alleges that Schultz's above noted "pro death" jury strategy led to selection of a

2   jury that was not impartial.  He claims the jury selected was more prone both to convict and

3   impose the death penalty thus aiding the prosecution.  (Doc. No. 116 at 379:10-14.)   He argues

4   that is evident in the approximately four hours of deliberation required by the jury to convict and

5   find all special circumstances true. (CT 380-85, 463-68.)   He   argues   that   "[a]   criminal

6   defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor

7   of capital punishment by selective … challenges for cause."  (Doc. No. 116 at 386:27-387:2); *see

8   also Uttecht v. Brown*, 551 U.S. 1, 9 (2007), *citing Witherspoon v. Illinois*, 391 U.S. 510, 521

9   (1968).

10     Petitioner   argues   Schultz's   strategy   fell   below   the   experience   and   competency

11   requirements for jury selection established by *ABA Guidelines*.  *ABA Guidelines, Commentary to

12   Guideline 1.1*; *see also Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) ([A]n "uninformed

13   strategy is not a reasoned strategy. It is, in fact, no strategy at all.").

14     Petitioner   argues   Schultz's   strategy   was   essentially   uninformed   and   therefore

15   unreasonable.  *Correll,* 539 F.3d at 949.  He argues Schultz, who had no death penalty case

16   experience   and   had   not   researched   this   strategy   or   discussed   with   jury   selection   experts,

17   unreasonably based the strategy upon his own deduction and personal opinion.  (SHCP, Ex. B ¶¶

18   2, 3.)  He argues that had Schultz investigated this theory he would have discovered empirical

19   evidence discounting it.  *See e.g., Hovey v. Superior Court*, 28 Cal. 3d 1, 40 (1980), *superseded

20   by statute as stated in People v. Jackson*, 1 Cal. 5th 269, 360 (2016) (jurors with scruples against

21   the death penalty vote to acquit more frequently than pro-death jurors).

22     However, the state supreme court was not unreasonable in rejecting this claim.   As

23   respondent notes, Schultz stated that his strategy was to pick jurors who would require the

24   prosecutor to carry his burden of proof, i.e., "to select jurors who demanded they be absolutely

25   positively convinced of the defendant's guilt. [I wanted] [j]urors who said they had to be

26   completely convinced of the guilt of the accused before they could vote to convict."  (SHCP, Ex.

27   B ¶ 3.)  Schultz's posited theory finds support in the record.  Some prospective jurors who felt

28

1  death penalty was appropriate where guilt was certain also felt the converse was true.  (*See e.g.*,

2  prospective juror Driscoll, RT 1158-65; prospective juror Sasaki, RT 2825-41; prospective juror

3  Whiteman, RT 3425-30; and prospective juror Kincade (RT 3800-3803.)   Moreover, the

4  Supreme Court has suggested that death qualified jurors can be more demanding of proof at the

5  conviction phase.  *Lockhart v. McCree*, 476 U.S. 162, 168-73 (1986) (the Constitution does not

6  prohibit the States from death qualifying juries in capital cases).

7      Petitioner's citation to *ABA Guidelines* does not necessarily suggest otherwise.   He

8  argues the *ABA Guidelines* "advise counsel to design a jury selection strategy crafted to

9  minimize the problem of death qualified juries that result from exclusion of prospective jurors

10  whose opposition to capital punishment effectively skews the jury pool not only as to imposition

11  of the death penalty but [also] as to conviction."  (Doc. No. 51-1 ¶ 203 *citing ABA Guidelines,*

12  *Commentary to Guideline 10.10.2(B)(1).*)   However, the *ABA Guidelines* are not "inexorable

13  commands" with which all attorneys must comply to avoid a finding of ineffectiveness.  *Bobby*

14  *v. Van Hook*, 558 U.S. 4, 8 (2009).  "*Strickland* stressed ... that American Bar Association

15  standards and the like are only guides to what reasonableness means, not its definition.  *Id."*

16  (Doc. No. 125 at 75:5-8.)

17      Especially so where, as here, counsel could reasonably focus on the guilt phase and

18  gaining acquittal given the alleged weakness of the physical evidence against the petitioner.

19  Defense counsel Schultz had "full authority to manage the conduct of the trial."   *Taylor v.*

20  *Illinois*, 484 U.S. 400, 417-18 (1988); *New York v. Hill*, 528 U.S. 110, 114-15 (2000).  Petitioner

21  was "bound" by the acts of his counsel and, "[a]bsent a demonstration of ineffectiveness,

22  counsel's word on such matters is the last." *Hill*, 528 U.S. at 115; *Allum v. Twomey*, 484 F.2d

23  740, 745 (7th Cir. 1973) ("assuming the lawyer's competence, the client must accept the

24  consequences of his trial strategy").

25      "[W]hen counsel focuses on some issues [and excludes] others, there is a strong

26  presumption that he did so for tactical reasons rather than through sheer neglect."  *Jacobs v.*

27  *Horn*, 395 F.3d 92, 118 (3d Cir. 2005), *citing Yarborough v. Gentry*, 540 U.S. 1, 8 (2003); *cf.*

28

1   *People v. Lucas*, 12 Cal. 4th 415, 482-84 (1995) (rejecting defendant's claim that he needed a

2   new penalty jury to avoid potential prejudice caused by court's voir dire statements that defense

3   would present evidence in mitigation at penalty trial).

4          That Schultz's jury selection strategy may have proved unsuccessful is not alone

5   ineffective assistance.  *Sloan v. Delo*, 54 F.3d 1371, 1384 (8th Cir. 1995) ("Although the

6   [defense] closing apparently was not persuasive, a strategy need not be successful to be

7   reasonable."). "The mere criticism of trial tactics is insufficient to establish ineffectiveness or

8   prejudice."  *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1254 (9th Cir. 1986).

9          *(iii)    Prejudice*

10         Petitioner alleges these deficiencies resulted in a complete lack of representation under

11  *United States v. Cronic*, 466 U.S. 648, 658 (1984) (no showing of prejudice required).

12  However, for the reasons stated, the state supreme court could reasonably have found petitioner

13  was not denied "counsel acting in the role of an advocate" for purposes of *Cronic* because, for

14  the reasons stated Schultz's jury selection process could reasonably be seen as strategic in nature.

15  *Cronic*, 466 U.S. at 656.

16         Petitioner also alleges prejudice under *Strickland*.  He argues that Schultz's strategy

17  resulted in a jury that was potentially pro-conviction and less diverse than the one that might

18  have been chosen absent Schultz's noted strategy.  (RT 3855-4095.)  However, the state supreme

19  court could reasonably have found no prejudice under *Strickland, i.e.,* no reasonable probability

20  of a different outcome.

21         As noted, Schultz removed seven prospective jurors and one alternate juror by

22  peremptory challenge.  (Prospective juror Christiansen, RT 3959; prospective juror Lung,  RT

23  3973; prospective juror Neville, RT 3980; prospective juror Kruse, RT 3997; prospective juror

24  Clark, RT 4019; prospective juror Zulim, RT 4042; prospective juror Slater, RT 4059; and

25  prospective juror Snyder, RT 4090.)

26         The record reasonably could suggest that none of these prospective jurors appeared

27  strongly in favor of a proposed life without parole sentence, or inclined to raise the prosecution's

28

26

burden at the guilt phase.  (SSCT 3042-57 (prospective juror Christiansen); SSCT 3163-79 (prospective juror Lung); SSCT 3210-26 (prospective juror Neville); SSCT 3103-17 (prospective juror Kruse); SSCT 3058-72 (prospective juror Clark); SSCT 3009-25 (prospective juror Zulim); SSCT 2746-60 (prospective juror Slater); SSCT 2793-2809 (prospective juror Snyder).

Moreover, the record could reasonably suggest that none of the selected jurors were strongly in favor of a possible death sentence or inclined to lower the prosecution's burden at the guilt phase.  (RT 3855-4095; *see also* SSCT 43-47, RT 3342-57 (juror Velluntini); SSCT 48-62, RT 2777-96 (juror Rye);   SSCT 63-78, RT 1787-97  (juror Kozakowski);   SSCT 79-94, RT 3415-29, (juror Whiteman); SSCT 112-128, RT 2824-41 (juror Sasaki); SSCT 129-145, RT 3801-13 (juror Kincade); SSCT 163-179, RT 392-402 (juror Allen); SSCT 180-196, RT 750-64 (juror Bystrom); SSCT 197-213, RT 1147-65 (juror Driscoll);   SSCT 214-230, RT 2609-29 (juror Ploharz); SSCT 248-264, RT 2052-72 (juror Magyer); SSCT 265-281, RT 2700-10 (juror Rocholz).

All of the selected jurors stated they could follow the law and the trial court's instructions; put aside personal feelings and remain open-minded and consider all facts and circumstances of the crimes in making the penalty determination; and stated that the possibility of a death sentence would not affect his or her guilt phase determination.  (*See* RT 3855-4095; SSCT 43-47, RT 3342-57; SSCT 48-62, RT 2777-96; SSCT 63-78, RT 1787-97; SSCT 79-94, RT 3415-29; SSCT 112-128, RT 2824-41; SSCT 129-145, RT 3801-13; SSCT 163-179, RT 392-402; SSCT 180-196, RT 750-64; SSCT 197-213, RT 1147-65; SSCT 214-230, RT 2609-29; SSCT 248-264, RT 2052-72; SSCT 265-281, RT 2700-10); *see also Leavitt v. Arave*, 383 F.3d 809, 826-27 (9th Cir. 2004) (giving weight to jurors' assurances of impartiality).

Petitioner argues that Schultz's strategy resulted in a jury that was biased because it was predominantly male (eleven of twelve jurors were male).  He reasons that males are more likely to support the death penalty.  (*See* SSHCP ¶ 196.)  He argues that had Schultz exercised his available peremptory challenges he would have achieved better gender balance because the list of jurors provided to counsel showed the higher concentration of women was in the second half

of the jury panel.  (Doc. No. 116 at 382:11-15.)

But the state supreme court would not have been unreasonable in finding such allegations to be speculative.  Petitioner does not cite to clearly established law that the gender of jurors is a basis to find bias.  Rather the opposite appears the case.  A juror selection strategy that discriminates based on gender would appear to run counter to the rule of *Batson v. Kentucky*, 476 U.S. 79 (1986), and its state law corollary, *People v. Wheeler*, 22 Cal. 3d 258 (1978), *rejected by Johnson v. California*, 545 U.S. 162, 170 (2005).  *See J.E.B. v. Alabama*, 511 U.S. 127, 146 (1994) (extending *Batson* protections to gender-based peremptory challenges).

Petitioner argues that Schultz's jury selection strategy resulted in a jury that included individuals with law enforcement backgrounds.  One juror selected worked for the Fresno County Probation Department (SSCT 32-47.)  Petitioner observes that the spouse of a juror was a retired Fresno policeman (SSCT 214-230) and that the brothers of another juror worked for police departments in the Central Valley and Southern California (SSCT 63-78).  Here again the state supreme court would not have been unreasonable in finding such allegations of bias to be speculative.

Petitioner has not demonstrated on the record that the jurors selected included individuals biased by relatives employed in law enforcement.  All of the jurors selected stated during voir dire that they could remain impartial, even though some of these individuals admitted connections to, or past run-ins with law enforcement authorities.  (*See* RT 3855-4095;  SSCT 43-47, RT 3342-57; SSCT 48-62, RT 2777-96;  SSCT 63-78, RT 1787-97;  SSCT 79-94, RT 3415-29;  SSCT 112-128, RT 2824-41;  SSCT 129-145, RT 3801-13;  SSCT 163-179, RT 392-402; SSCT 180-196, RT 750-64;  SSCT 197-213, RT 1147-65;  SSCT 214-230, RT 2609-29;  SSCT 248-264, RT 2052-72; SSCT 265-281, RT 2700-10); *see also Leavitt*, 383 F.3d at 826-27 (giving weight to jurors' assurances of impartiality); *Quintero-Barraza*, 78 F.3d at 1350 & n.5 (trial court's conclusion regarding "juror impartiality" is a "factual issue" given "special deference" under AEDPA).

*(iv)    Conclusions*

1    For the reasons stated, the state supreme court could reasonably have found that defense

2    counsel Schultz was not objectively unreasonable in the process of selecting jurors and that there

3    was no reasonable probability of a different outcome absent counsel's alleged unprofessional

4    errors. *Strickland*, 466 U.S. at 687-98.

5    Accordingly, the California Supreme Court's rejection of this claim was not contrary to,

6    or an unreasonable application of, clearly established federal law, or an unreasonable

7    determination of the facts in light of the evidence presented in the state court proceeding.  28

8    U.S.C. § 2254(d).

9    Claim I is denied.

10    3.    Review of Claim II

11    Claim II includes subclaims alleging pre-trial and trial ineffectiveness of counsel relating

12    to the investigation, preparation and presentation of guilt phase defenses violating petitioner's

13    rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 51-1 ¶¶ 208-420.)

14    Petitioner contends that he was wrongfully convicted of aiding and abetting felony

15    murders in which he did not participate, notwithstanding his alleged confession to his drug addict

16    roommates Gail Goldman and Gene Buchanan.  (*Id.*)  Additionally he contends no robbery of the

17    victims was intended or took place because valuables and cash remained at the crime scene.  (*Id.;*

18    *see also Doc. No. 116*17:1-12.)  He contends the crime scene was ransacked by the actual killer,

19    Richard Cullumber ("RC") searching for victim Freiri's gun (which RC used to kill himself four

20    days later following a police chase in San Jose, California) after RC killed the victims in a drug

21    induced rage.  (*Id.*)

22    In these claims, petitioner argues that Schultz failed to investigate potential defenses,

23    locate and interview witnesses, collect available records, seek out and utilize expert witnesses,

24    adequately review the physical and impeachment evidence, familiarize himself with the rules of

25    evidence and object to inadmissible evidence.

26    **a.    State Court Direct and Collateral Review**

27    Petitioner presented these claims to the California Supreme Court in his second state

28

habeas petition.  (Lod. Doc. 30 at 105-99.)  That court summarily denied the claims on the merits (Lod. Doc. 31) and found claims II(A), II(B), II(C), II(D), II(F),  II(G), II(H), II(J), II(L), II(Q), II(R), II(S), II(T), II(U), II(V), and II(W) to be procedurally barred.  (*Id.*)

Additionally, as discussed in the individual claim II subclaims, *post*, the California Supreme Court rejected certain of the allegations on direct appeal.

### b. Analysis of Claim II(A)

*(i)      "Defense Team"*

Petitioner alleges that Schultz was ineffective by failing to use a "defense team" concept, resulting in a breach of the duty of loyalty and a breakdown of the adversarial process.  *Cronic*, 466 U.S. at 656-57 & n.20.

Petitioner faults Schultz for not using a defense team composed of two attorneys, an investigator, mitigation specialist and a mental defense expert as recommended by the *ABA Guidelines.  ABA Guidelines Nos.*  2.1, 4.1, 5.1 and 104.

Petitioner also argues that Schultz, the only attorney assigned to the case was not adequately assisted by the defense team he did assemble which for the most part was composed of an assistant attorney in his office to conduct legal research and private investigator Willard Temple and Temple's employee Mel King.  (Doc. No. 51-1, *citing* SHCP, Ex. B ¶ 2.)  Mr. King, who lacked capital case experience and was on administrative leave from the Fresno Police Department while working for Mr. Temple was tasked with investigating key prosecution witness Buchanan and the penalty defense.  (*See* RT 4848-59.)  King worked on petitioner's case until it went to trial at which time King returned to employment with the Fresno Police Department.

Petitioner argues that King ended up harming his defense by providing favors to Buchanan.  He alleges that King was conflicted by his relationship with the Fresno Police Department, the agency which investigated the crimes and arrested petitioner.  He alleges that when King left the case he was replaced by Rick Runcie, a first year law student.  (*See* Doc. No. 51-1 ¶ 213(O); *see also* SSHCP ¶ 323.)  He alleges that Runcie, who assisted Schultz at trial, was

1    similarly inexperienced and inadequate as a capital case investigator.  (*Id.*)

2         However, the state supreme court could reasonably have found Schultz was not deficient

3    in assembling his defense team.  Petitioner has not demonstrated clearly established law entitling

4    a capital defendant to additional counsel and experts.  *See Allen v. Woodford*, 395 F.3d 979, 998

5    (9th Cir. 2004) (failure to seek second counsel not deficient performance).

6         Under state law in effect at the time of petitioner's proceeding the decision to appoint a

7    second attorney for an indigent capital defendant was within the trial court's sound discretion,

8    *Keenan v. Superior Court*, 31 Cal. 3d 424, 430 (1982), and required a showing of "genuine

9    need" for second counsel, *People v. Lucky*, 45 Cal. 3d 259, 280 (1988).  Petitioner has not

10   demonstrated the *ABA Guidelines* are authority otherwise.  Nor may petitioner rely upon the

11   April 11, 2014 declaration of prosecutor Hahus, wherein Hahus  states "[i]t was my

12   understanding at the time of trial that capitally charged defendants were entitled to two defense

13   counsel at trial."  (Doc. No. 116-1 ¶ 2.)  This declaration, first filed in this federal proceeding, is

14   not part of the state record and cannot be considered by this court absent a showing sufficient

15   under 28 U.S.C. § 2254(d).[8]  *See Pinholster*, 563 U.S. at 185 n.7.

16        Petitioner has not demonstrated that Schultz and his defense team failed to maintain pre-

17   trial "close contact" with him as required by *ABA Guidelines* (*see ABA Guideline* No. 11.4.2)

18   ("Counsel shall maintain a close contact with the client throughout the preparation of a case,

19   discussing (inter alia) the investigation, potential legal issues that exist or develop and the

20   development of a defense theory.").  Significantly, Schultz in his April 7, 2003 habeas

21   declaration does not state that he needed second counsel.  (SHCP, Ex. B.)  As noted, his

22   assembled defense team assisted him with legal research and preparation of the defense

23   including investigation of witnesses and generation of a social history for petitioner.  (*Id.*; Lod.

24   Doc. 30 at 111; *see also* SHCP, Ex. O-1.)  In any event, for the reasons stated the *ABA*

25   *Guidelines* do not alone set the standard of objectively reasonable conduct under *Strickland*.

26   ───────────────

27   [8] The parties refer to the declaration of Hahus (Doc. No. 116-1) in arguing other claims.  However, for the reasons stated, it is not included in the state record and the court does not consider it.  Even if the court had considered it, the declaration is essentially cumulative of evidence otherwise in the record and the court's disposition hereunder would

28   not change.

Petitioner also argues that Schultz acted under a conflict of interest because he "simultaneously represent[ed] other felony defendants in jury trials at a rate of approximately one case per month" (Doc. No. 116 at 393:6-7, 19-21, *citing* SHCP, Ex. B ¶ 2) preventing Schultz from complying with the noted *ABA Guidelines*.  (Doc. No. 116 at 393:17-21); *Cronic*, 466 U.S. at 656-57; *United States ex rel. Green v. Washington,* 917 F. Supp. 1238, 1275 (N.D. Ill. 1996) (holding that excessive caseload forcing public defender to choose from among rights of his various clients inevitably creates a conflict of interest).

However, petitioner does not demonstrate on the evidentiary record that Schultz's obligations in other cases impacted his defense, or that Schultz ever stated as much.  (*See* SHCP, Ex. B.)  Instead, the record reflects that Schultz engaged in the noted pre-trial preparations including consultation with two mental health experts – psychiatrist Dr. John Hackett who concluded petitioner was possibly suicidal, and psychologist Larry Thompson who concluded petitioner mildly depressed.  (Doc. No. 51-1 ¶ 523; *see also* SSHCP, Ex. 19 ¶ 9.)  Schultz could reasonably have relied upon these experts in making strategic decisions not to assert mental defenses at the guilty phase or conduct further related investigation.  (*See e.g.,* claims II(B), II(C).)

Additionally, Schultz and his team discussed petitioner's background with petitioner's mother.  The state supreme court could reasonably have found that Schultz had concerns relating to potentially unfavorable behavioral, character and bad acts evidence and that such were an objectively reasonable basis not to further pursue such matters during the guilt phase.  (SHPC, Ex. B ¶ 13.)

*(ii)    Prejudice*

Petitioner alleges that had the work on petitioner's case been split among two attorneys and a proper defense team there is a reasonable probability the result would have been more favorable.  (Doc. No. 116-1 ¶¶ 2-4; Doc. No. 128 at 169:9-14; *see also* SHCP, Ex. B. ¶¶ 2-3.) He argues that Schultz was unreasonable in not requesting second counsel; a request he contends would have been granted.

However, petitioner has not shown these alleged deficiencies were prejudicial under *Strickland*. Petitioner's habeas proffer does not suggest what different or additional defense preparation and presentation would have taken place upon appointment of a second attorney. Schultz's habeas declaration is uninformative in these regards. (SHCP, Ex. B.)  Petitioner has not demonstrated that Schultz's reliance upon his defense team was unreasonable. *See Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (no ineffective assistance where attorney was well-informed and defendant fails to show what additional information would have been gained had counsel acted differently); *LaGrand v. Stewart*, 133 F.3d 1253, 1274 (9th Cir. 1998) (defense counsel need not personally conduct interviews where he had transcripts of prosecution interviews).  Furthermore, "[a] lawyer may make reasonable decisions that render particular investigations unnecessary." *Frye v. Warden, San Quentin State Prison*, No. 2:99-CV-0628 KJM CKD, 2015 WL 300755, at *18 (E.D. Cal. Jan. 22, 2015).

The state supreme court reasonably could have rejected these allegations as speculative. The issues in this case were relatively straight forward, with the guilt phase focusing on petitioner's involvement in the crimes.

*(iii)    Conclusions*

For the reasons stated, the state supreme court could reasonably have found that defense counsel Schultz was not objectively unreasonable in assembling and utilizing the defense team, and that there was not a reasonable probability of a different outcome absent counsel's alleged unprofessional errors. *Strickland*, 466 U.S. at 687-98.

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim II(A) is denied.

**c.    Analysis of Claims II(B) and II(C)**

Petitioner alleges that Schultz was ineffective in impeaching the primary prosecution

1   witnesses, Buchanan and Goldman, and that he ignored and failed to present exculpatory and

2   expert testimony and evidence of third party liability.  (Doc. No. 51-1 ¶¶ 219-262.)

3       Petitioner argues that the prosecution case was built around the impeachable testimony of

4   Buchanan and Goldman.  (Doc. No. 116 at 178:2-9.)  He claims that Schultz was deficient by

5   failing to develop and present the case for petitioner's actual innocence.  Petitioner's arguments

6   are discussed separately below.

7           *(i)*     *Timeline of the Murders*

8       Petitioner alleges that the trial testimony of Buchanan and Goldman and the prosecution

9   timeline for the crimes were inconsistent with the crime scene evidence.  He notes that Schultz

10  was aware the testimony of Goldman and Buchanan placed the time of the assaults on the

11  evening of November 7, 1988.  (*Id.*)  He faults Schultz for not retaining a forensic pathologist to

12  develop evidence in the police and autopsy reports to discount the prosecution theory, based

13  upon the testimony of Buchanan and Goldman that the crime occurred between 6:00 and 10:00

14  p.m. on November 7, 1988.

15      Petitioner argues a defense expert could have used the crime scene police reports

16  (SSHCP, Ex. 9 at 320; *id.* at Ex. 11 at 345), the coroner's certificate and verdict (*id.* at Ex. 22 at

17  390-93), and crime scene witness statements in the police report (*id.*, Ex. 10 at 333) to opine that

18  the crimes occurred after lunch on November 8, 1988 rather than during the evening of

19  November 7, 1988 as argued by the prosecution.  He points to autopsy evidence, victim Freiri's

20  post-mortem liver temperature and stomach contents and argues the actual time of the assault

21  upon Ms. Caton and Mr. Freiri was not the evening of November 7, 1988 as theorized by the

22  prosecution but rather the afternoon of November 8, 1988.  (*See* SSHCP, Ex.'s 9, 11, 22.)

23      However, Schultz reasonably could have decided not to contest the prosecution timeline.

24  The liver temperature of victim Freiri taken by the deputy coroner at the crime scene may have

25  been affected by ambient conditions.  Although the coroner's certificate of death stated that

26  Freiri died "[b]etween November 7, 1998 and November 8, 1988, at an unknown time" (SSHCP,

27  Ex. 22), the deputy coroner who took Freiri's liver temperature opined that an operating floor

28

34

furnace proximal to victim Freiri impacted the liver temperature reading (SSHCP, Ex. 9 at 320).

As to Freiri's stomach contents, the deputy coroner opined that Freiri had eaten 1 to 2 hours prior to his death.  (SSHCP, Ex. 11 at 345.)  But that does not alone suggest Freiri died after eating lunch on November 8th (as petitioner asserts) rather than following dinner on November 7th (as the prosecution theorized).  (*See* SSHCP, Ex. 11 at 346-47.)  Statements from victim Caton's daughter, Ms. Garrett, to police suggest the victims ate a rice dinner at approximately 5:30 p.m. on November 7th, 1988.  (*Id.*)  This would be consistent with the coroner's findings regarding victims' stomach contents, (*Id.*; SSHCP, Ex. 9 at 320), and the coroner's stated time of death as "between November 7, 1988 and November 8, 1988, at unknown time." (SSHCP, Ex. 22 at 390.)

Petitioner also alleges that Schultz failed to develop witness testimony that the assaults likely took place on November 8, 1988.  Petitioner points to a statement by Ms. Frutos, a neighbor of the victims, who reported seeing Caton at a local market at noon on November 8, 1988.  (SSHCP, Ex. 10 at 333.)  However, the record reflects that the market's owner stated he "had not seen either of the victims in his store." (*Id.*)

Petitioner also points to a statement by 15 year old neighbor, Valerie Montez, that at 4:00 p.m. on the afternoon of November 8, 1988 she saw what appeared to be a female standing behind the screen door at the crime scene and assumed it was Caton.  (*Id.*)  However, petitioner appears to concede that the assaults could not have occurred later than the 2:00 p.m. on November 8th, the time mail remaining the mail slot was delivered that day.  (Lod. Doc. 30 at 118.)

For the reasons stated, the state supreme court could reasonably have found that Schultz was tactically motivated when he decided not to further investigate an alternative timeline for the crimes, and that the habeas proffer does not suggest a reasonable probability of a different outcome.

  *(ii)*  *Physical Evidence at the Crime Scene*

      *Petitioner not linked to Crime Scene*

Petitioner alleges that Schultz failed to investigate and develop evidence of a single hair found in victim Freiri's hand, a hair that did not match either the victims or petitioner. (Doc. No. 51-1 ¶ 803.) Petitioner faults Schultz for failing to follow-up to exclude RC as a source of the hair and thereby possibly exculpate petitioner as RC's accomplice and potentially inculpate other likely suspects such as Buchanan, Long, Goldman, Sandoval and/or Flores.

However, as respondent suggests, the state supreme court could reasonably have concluded that Schultz determined to forgo further forensic testing because petitioner had already been excluded as a match (*id.*) and any retest risked a contrary result, tying petitioner to the crime scene.

As to RC, he was bald (RT 4309; Doc. No. 128 at 101) and an unlikely source of the hair. As to noted third party suspects, Buchanan, Long, Goldman, Sandoval and Flores, petitioner speculates that one or more of them might have been an accomplice to the crimes. But he does not cite to facts in the evidentiary record connecting any one of them to the crimes.

The state supreme court could reasonably have determined that further investigation as suggested by petitioner would not have advanced petitioner's primary defense theory that RC acted alone in the crimes and petitioner was not present at the crime scene. (RT 4981-95; SHCP, Ex. B, ¶ 5.)

*Physical Evidence of Robbery or Burglary*

Petitioner faults Schultz for failing to discount the prosecution's robbery/burglary motive given the dearth of supporting physical evidence. (The record reflects the perpetrator(s) entered the victim's home without force. (*See* SSHCP, Ex. 9; RT 4248-56.) Petitioner argues that RC was a frequent and welcome visitor of Caton and Freiri (RT 4311-12) who often borrowed money from Ms. Caton (RT 4312-13; SSHCP, Ex. 10 at 2-3) and who may have permissively possessed Freiri's gun.

Petitioner's argument finds some support in the record. Money (some bloodstained) and valuables remained at the crime scene after the murders. (*See* SSHCP, Ex. 9.) Furthermore, Goldman testified that she did not see petitioner with any money on the night of the murders.

1  (RT 4353.)   In the days after the murders RC stayed with a friend, Ms. Hansen, seemingly

2  because he had no money.  (RT 4834-35.)

3       However, Schultz's primary defense strategy that Buchanan and Goldman were not

4  credible and petitioner did not admit to or participate in the crimes could be seen as objectively

5  reasonable on the facts of this case.  As noted, the significant evidence against petitioner was the

6  testimony of Buchanan and Goldman regarding petitioner's conduct around the time of the

7  crimes and petitioner's admission to them that he participated in the crimes with RC.  Schultz's

8  tactic of impeaching these witnesses was not objectively unreasonable.  Any attempt to discount

9  criminal motive by pointing to sparse physical evidence might reasonably undermine the primary

10  defense that petitioner was not a participant in the crimes and was not even present at the crime

11  scene.

12       Moreover, the evidence of criminal motive seems mixed.  Victim Caton was known to

13  keep large sums of cash in her home.  (RT 4277-86, 4298-4307.)  Ms. Garrett (RC's mother and

14  victim Caton's daughter) initially stated that $6000 (RT 4283-84) and her mother's ring were

15  missing from the crime scene. (*See* SSHCP, Ex. 9, 326-27.)  Goldman testified that after the

16  crimes petitioner told her "they took $700 from Caton's house" (RT 4361) and that RC partially

17  repaid her "around $40 or $50" on the night of the crimes (RT 4352).  (*See* Doc. No. 116 at

18  183:18-23.)   There also was testimony at trial that Freiri's wristwatch was taken by the

19  perpetrator(s).  (RT 4325.)  The coroner apparently did check the victim (Freiri) for valuables

20  and found none.  (*See* SSHCP, Ex. 9 at 321.)

21       *Insufficient Evidence Defense*

22       Petitioner faults Schultz for not investigating and developing a defense of insufficient

23  evidence to counter the prosecution theory that petitioner aided or abetted RC in felony murder

24  and that petitioner's intent to kill allegedly arose from a spontaneous unspoken thought

25  following the apparent death of the first victim, Mr. Freiri.  (*See* Doc. No. 116 at 259:14-18.)

26       Petitioner in his direct appeal alleged that there was insufficient evidence that he intended

27  to kill Caton and Freiri.  The California Supreme Court rejected the allegation by stating that:

28

As proof of defendant's intent to kill, the prosecution relied on his confession to Buchanan that, upon seeing the apparently lifeless body of Mr. Freiri, defendant thought to himself, "If you kill one you might as well kill them both."

Defendant contends his statement to Buchanan is susceptible to the interpretation, not that he intended to kill the victims, but that he realized the penalty provided by law would be the same whether both or only one of them were killed. While that is true, defendant did not urge the less damning interpretation below. At trial, he denied having made the statement to Buchanan at all, and claimed to have had nothing to do with these crimes. More to the point, although the language used by defendant was susceptible to more than one reasonable interpretation, the interpretation urged by the prosecution, that defendant intended to kill his victims, was certainly one reasonable jurors could reach.

In the alternative, and assuming arguendo the evidence of his intent to kill was sufficient with regard to Mrs. Caton, defendant contends it was insufficient as to Mr. Freiri. The statement the prosecution relies upon, defendant points out, concerned a thought—"If you kill one you might as well kill them both"—that occurred to defendant after he discovered Mr. Freiri had apparently been killed by Cullumber. "The very basis for the thought was the assumption that Mr. Freiri was dead.... If one thinks that a person is dead, there can be no intent to kill that person."

However, Buchanan's testimony as to defendant[']s statement did not occur in a vacuum. While the prosecution did not rely upon it, there was ample evidence defendant formed the intent to kill Mr. Freiri before he discovered his body. [Citation]

Under the evidence, the jury was entitled to reach the following conclusions: The cord found around Mr. Freiri's neck came from the venetian blind in defendant's apartment, and defendant was responsible for bringing it to Mrs. Caton's house. Defendant was also responsible for bringing the knife used to stab Mrs. Caton and Mr. Freiri. Defendant knew his intended victims were elderly and that Mr. Freiri was partially paralyzed, and so he could not have believed he and Cullumber, both younger men, needed the knife to commit the robberies. Therefore, defendant intended to kill, and not just rob, Mrs. Caton and Mr. Freiri. Moreover, defendant knew he could not escape justice if Mr. Freiri were left alive. Defendant had gained entry by saying he needed to use the phone because Cullumber was going to jail. Even if Mr. Freiri did not recognize defendant, he must have known Cullumber, who was an almost daily visitor to his grandmother's home. Mr. Freiri would have led the police to Cullumber, and Cullumber would have led them to defendant.

*Dickey*, 35 Cal. 4th at 903-04.

Petitioner argues the evidence pointed to RC as the actual killer.  RC allegedly stated to witness Flores while commandeering witness Sandoval's car shortly after the crimes, that he had killed a woman.  (RT 4562-63, 4801-02.)  RC later killed himself with Freiri's gun.  (RT 4318-19, 4472-74, 4481-84.)  The evidence at the crime scene included the perpetrator's covering the

body of Caton and the lack of forced entry.  (RT 4161-68, 4205.)  This suggested to authorities that the perpetrator might be a family member.  (RT 4554-55, 4587-88.)  As noted, on the night of the murders RC moved out of the Harvard Avenue apartment he shared with petitioner, Buchanan, Goldman and others.  (RT 4339, 4683-85, 4735.)

Petitioner alleges that Schultz was deficient in not conducting his own investigation of the charged crimes and the prosecution evidence.  Especially so, he claims given that no physical evidence linked petitioner to the crime scene; police had closed the case until 3 months later when Buchanan implicated petitioner; and the prosecution case rested almost entirely upon the statements and testimony of witnesses Buchanan and Goldman.

However, the state supreme court could reasonably have found Schultz was not deficient in formulating a defense theory focused on impeaching the testimony of Buchanan and the testimony and statements of Goldman, with a view toward casting RC as the single perpetrator.  (*See e.g.*, RT 4553-56, 4985.)  To this end Schultz variously attempted to show that the $5,000 private reward motivated Buchanan and possibly Goldman to come forward; that Goldman and Buchanan were routine abusers of street drugs with a penchant for lying; and that Buchanan in particular wanted revenge against petitioner for tearing up the only photo Buchanan had of his youngest daughter.  (RT 4704-05, 4709-10.)  Petitioner, in furtherance of the primary defense strategy took the stand to deny the admissions attributed to him by Goldman and Buchanan and to deny any involvement in the crimes.  (RT 4870-71.)

Moreover, prior to and during trial, Schultz consulted with Dr. Peter Barnett, a forensic expert who examined certain crime scene evidence.  (Doc. No. 51-1 ¶¶ 786, 803; Doc. No. 116 at 25-26; Lod. Doc. 30 at 121.)  Although Schultz did not call Dr. Barnett as a trial witness, the record reasonably suggests that Schultz's guilt phase defense considered and was consistent with Dr. Barnett's findings regarding fingerprint and cordage evidence – findings that in essential part appear to confirm the DOJ laboratory findings discussed in claims that follow.  (RT 4981-95; *See also* claims II(F), II(S), II(T), XIV; Doc. No. 116 at 158-59.)

Schultz also appears to have considered the possibility of mental state defenses to the

1   charged crimes.   Petitioner concedes that Schultz's pre-trial preparations included noted

2   consultation with two mental health experts – psychiatrist Dr. John Hackett who found petitioner

3   possibly suicidal (Doc. No. 51-1 ¶ 523), and psychologist Larry Thompson (id.; SSHCP, Ex. 19)

4   who found petitioner mildly depressed.   The state supreme court could reasonably have found

5   Schultz's decision not to pursue guilty phase mental state defenses was objectively reasonable.

6         Additionally, petitioner's allegation that Schultz deficiently failed to investigate and

7   present an insufficiency of the evidence defense fails for reasons discussed below in claim

8   XXVI.  To summarize that discussion, the state supreme court could reasonably have concluded

9   that the crimes resulted from the joint motive of RC and petitioner to obtain money and property

10  from victims Caton and Freiri (RT 4325, 4352, 4360-62); that RC and petitioner armed

11  themselves (RT 4343-50) with the intent to kill victims who were frail and aged, (RT 4239-41);

12  that the victims knew the perpetrators and could have identified them to authorities (RT 4311-

13  13); and that the jury was properly instructed on the charges.  (*See* claims XII and XXVI, *post*.)

14        Accordingly, the state supreme court was not unreasonable in finding a rational trier of

15  fact could have found the essential elements of the crimes charged beyond a reasonable doubt.

16        *Actual Innocence*

17        Petitioner faults Schulz for failing to develop and present an actual innocence defense.

18  He argues in essence that his actual innocence is established by the insufficient and unreliable

19  evidence of his guilt and the prosecution's misconduct regarding the evidence.

20        This claim fails for the reasons stated in claims XXVI and XXVIII, *post*.  In sum, it is not

21  likely any reasonable juror would have reasonable doubt that the essential elements of the

22  criminal counts could have been found beyond a reasonable doubt, for reasons stated in claims

23  XXVI and XXVIII.  Petitioner's allegations that false evidence was presented, evidence was

24  suppressed and destroyed and third parties were involved in the crimes appear insufficiently

25  supported in the evidentiary record at a level greater than harmless error.  (*See* claims II(B),

26  II(C), II(S), XIII.)  Moreover, no facts or discrepancies in the testimony and physical evidence

27  establish or compel the conclusion that Buchanan was motivated to and did testify falsely or

28

1   inaccurately (*see* claims II(E), XIII and XVII), or that Goldman, by virtue of her alleged

2   substance addiction, was motivated to and did testify falsely or inaccurately (*see* claims II(L),

3   XXI).

4       Significantly, petitioner's confession to Buchanan and Goldman and the uncontroverted

5   testimony of Buchanan and Goldman inculpating petitioner is consistent with the noted physical

6   evidence (*see* claims II(B), II(C), II(L), II(S), XIII, XIV, XXI, XXVI and XXVIII).

7       A fair-minded jurist could have found that petitioner failed to establish his actual

8   innocence sufficient to pass through the *Schlup v. Delo* gateway and even if he had his record

9   claims fail for the reasons stated.  513 U.S. 298, 326 (1995) (procedurally defaulted petitioner

10  must show that a constitutional violation has probably resulted in the conviction of one who is

11  actually innocent); *cf.*, *Smith*, 510 F.3d at 1139-40 (procedural default excused upon a showing

12  of actual innocence of his conviction).

13      *(iii)    Impeachment Evidence*

14      Petitioner alleges that Schultz did not make use of certain then available evidence

15  impeaching Goldman and Buchanan.

16      *Statement of Intent to Kill*

17      Petitioner argues that Schultz failed to impeach Buchanan's testimony of petitioner's

18  statement "if you kill one, you might as well kill them both" (RT 4689) with Goldman's failure

19  to corroborate that petitioner made that statement even though Goldman was then present.

20      However, the fact Goldman's preliminary hearing testimony, which occurred months

21  before trial, does not mention this statement is not necessarily a failure to corroborate.  Petitioner

22  has not demonstrated on the record that either attorney asked Goldman about such a statement.

23  (*See e.g.*, RT 4334-4403.)  Nor has petitioner demonstrated that Goldman ever denied petitioner

24  made the statement.  (*Id.*)

25      *Taped Defense Interview*

26      Petitioner argues that Schultz failed to impeach Goldman with her June 1989 taped

27  statements to a defense investigator that contrary to her preliminary hearing testimony (RT

28

4349), petitioner and RC did not return to their apartment together on the night of November 7, 1988.  (Doc. No. 116 at 22:1-5.)  Petitioner also argues that a roommate in the apartment, Jerry Hodgeboom, would have testified, consistent with his statements to police that petitioner was at the apartment with Hodgeboom and Goldman all evening on November 7, 1988, the night the prosecution contends the crimes occurred.  (Doc. No. 116 at 23:27-24:2.)

However, as discussed in claim XXII, the trial record shows that Schultz, at the preliminary hearing, considered and confronted Goldman with the noted 1989 tape recorded statements and gave her the opportunity to explain.  (RT 4384-87.)  Goldman's taped statement that RC returned to the apartment alone on the night of the crimes is equivocal given that RC apparently made two trips from the apartment on the evening of November 7, 1988.  (*See id.*)  Goldman's later testimony at the preliminary hearing appears to clarify in these regards; suggesting that  although she could not remember making the taped statement that "[RC] and [petitioner] did not come back to the [apartment] together after they had left" (RT 4388), RC and petitioner made two trip from the apartment that night, the first to the nearby mini-store and the second after they apparently armed themselves as discussed above; and that she saw RC and petitioner return to the apartment "later on when they came back into the house and [RC] got --- or started packing his clothes" (RT 4393).

Statements to police by Jerry Hodgeboom, a roommate in the apartment, suggesting that petitioner was at the apartment with Hodgeboom and Goldman all evening on November 7, 1988, appear otherwise unsupported by and contrary to the record including the statements under oath by Buchanan and Goldman and petitioner's own admission to them.  The state supreme court would not have been unreasonable in finding Schultz not to be deficient for failure to further investigate and develop Hodgeboom's note statements.  Especially so given Goldman's testimony that she liked petitioner and that she did not want to testify against him.  (RT 4364.)

*Other Defense Witnesses*

Petitioner argues that Schultz failed to impeach Buchanan and Goldman with testimony from other witnesses.  However, the record reasonably could suggest otherwise.  In addition to

1   petitioner, nine defense witnesses were called.  (Lod. Doc. No. 24.)  Defense witnesses, Messrs.

2   Inderrienden, Araz, Najarian, gave testimony potentially impeaching Goldman.  They each

3   testified that Goldman had been untruthful about debts she owed and did not pay her debts and

4   that she had a poor reputation for truthfulness.  (RT 4776-95.)  Witness Najarian also testified

5   that in June of 1989 Goldman told him that she had been called as a witness in a murder and that

6   "she didn't know nothing about no murder."  (RT 4793.)

7       Witness Sandoval gave testimony potentially impeaching Goldman and Buchanan.

8   Sandoval testified about events surrounding the alleged killer, RC, that shortly after the crimes,

9   RC stated he had "killed a woman" (RT 4801), making no mention of an accomplice.

10       Witness Desumala gave testimony potentially impeaching Goldman's testimony of

11   petitioner's admission to her.  Desumala testified that Goldman told her a boy living with her

12   "killed his grandmother" (RT 4809), that "the grandparents of the boy … were killed" (RT 4825)

13   and that Goldman would "be given some kind of reward for her [preliminary hearing] testimony"

14   (RT 4809).

15       Witness Hansen gave testimony potentially suggesting that, contrary to Goldman and

16   Buchanan's testimony, RC acted alone in the crimes.  Hansen testified that she found a

17   newspaper article about the murders stuffed under a chair at her apartment after RC stayed with

18   her for several days following the murders (RT 4831-35); that he seemed worried (RT 4840);

19   that he arranged to meet a roommate twice while staying there (RT 4841), a roommate whose

20   name was "something close to Dickey" (RT 4843) but she was not sure (*id.*).

21       Witness Heuter testified that he owned the store where the poster regarding the $5000

22   reward was placed in a window (RT 4846), but denied any further knowledge.

23       Witness King, a defense investigator, gave testimony potentially undermining the

24   credibility of Buchanan.  King testified that Buchanan told him he did not like petitioner (RT

25   4849); that he was "living room and board free" with those costs being deducted from this $5000

26   reward (RT 4851); and that Buchanan stated he used drugs daily and appeared to be under the

27   influence during the majority of King's meetings with him (RT 4856-57).

28

1    Petitioner for his part took the stand and testified about his roommates at the Harvard

2    Avenue apartment (RT 4873-77); admitted his prior 1982 conviction for second degree burglary

3    (RT 4870); denied he made the admission to which Buchanan and Goldman testified (RT 4870-

4    71); and stated he had nothing to do with events at the crime scene on November 7th (RT 4871-

5    4927).

6    Based thereon, a fair-minded jurist could have found that petitioner failed to establish

7    Schultz was deficient by failing to present defense witness testimony impeaching Buchanan and

8    Goldman.  Notably, Schultz in his habeas declaration does not suggest presentation of these

9    witnesses including petitioner was the result of anything other than trial tactics.  *See Strickland*,

10   466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially

11   influenced by the defendant's own statements or actions.").

12       *(iv)    Social History and Mental Defenses*

13   Petitioner faults Schultz for not investigating social history and presenting mental

14   defenses at the guilt phase.

15       *The Trial Record*

16   Petitioner argues that Schultz failed to investigate and present evidence that the murders

17   of Caton and Freiri were not the result of a planned robbery or burglary, but rather an unplanned

18   and sudden drug induced and mental illness related outburst by RC, who along with petitioner,

19   Goldman and Buchanan routinely used street drugs.  (RT 4171-79, 4314-16, 4369-71, 4640-41.)

20   He contends in particular that RC had no motive to steal from Caton because she voluntarily

21   gave him money.  (RT 4312-13.)

22   However, the record could reasonably suggest Schultz investigated and developed such

23   evidence including as to petitioner's social and family history and drug use.  Schultz had defense

24   investigator King prepare such a report derived from interviews with petitioner's family and

25   friends.    (Lod. Doc. 30 at 111; *see also* SHCP, Ex. B.)  Schultz also personally interviewed

26   petitioner's mother and contemplated calling her to the stand at the penalty phase. (SHCP, Ex. B

27   ¶ 13; *id.*, Ex. O.)

28

1    As noted, prior to petitioner's trial Schultz consulted with defense psychiatrist John

2    Hackett and defense psychologist Larry Thompson.  Petitioner was interviewed in jail by Dr.

3    Hackett, ((Doc. No. 51-1 ¶ 523; SSHCP, Ex. 2 at 119-120), who diagnosed him with antisocial

4    personality disorder but nonetheless found him competent to assist in his defense (*id.*).  Petitioner

5    also was evaluated by Dr. Thompson[9] (*id.* at 114), who found petitioner mildly depressed

6    (SSHCP, Ex. 2 at 121-23; *id.* at Ex. 19) but showing no obvious symptoms of psychosis either

7    manifest or latent. (SSHCP, Ex. 2 at 122).  Dr. Thompson opined that a psychiatric defense

8    would be of no value (*id.*).

9    Additionally, in August of 1991, counsel on the new trial motion, Ms. Hart, retained

10   psychiatrist Dr. Callahan to examine petitioner with a view toward possible sympathetic or

11   character mitigation evidence including as to petitioner's prior felony involving alleged

12   necrophilia.  (SSHCP, Ex. 2 at 121.)  Dr. Callahan testified that petitioner by age 17 "was

13   manifesting grossly defective interpersonal functioning and poor impulse control, which are all

14   factors in necrophilia behavior."  (SSHCP, Ex. 2 at 131)  Dr. Callahan diagnosed petitioner as an

15   unstable and depressed personality exacerbated by self-medication with drugs and alcohol.  (*Id.*

16   at 130.)

17   Here, the state supreme court reasonably could have found that Schultz did reasonably

18   develop a social history and investigate mental defenses.  The noted record suggests Schultz

19   reasonably relied upon his investigation and expert consultations in deciding not to further

20   develop and present mental state defenses at the guilt phase.  (*See* SHCP, Ex. B ¶ 5); *see also*

21   *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) ("It is certainly within the 'wide range of

22   professionally competent assistance' for an attorney to rely on properly selected experts.");

23   *Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2004) (holding counsel's decision not to

24   investigate mental defense further was reasonable in light of conclusions of mental health

25   experts).

26   *The Habeas Proffer*

27

28   [9]  Soon after Dr. Thompson's evaluation of petitioner, Thompson was found to be practicing without a license. (SSHCP, Ex. 2 at 222.)

1    Petitioner argues the following information offered in his state habeas proceedings shows
2    Schultz's prejudicially deficient investigation and presentation of guilt phase social history and
3    mental defenses.

4        In 2005, defense habeas expert, clinical psychologist Dr. Natasha Khazanov examined
5    petitioner over two days looking for brain damage and cognitive impairment.  (SSHCP, Ex. 2 at
6    265.)  Dr. Khazanov determined that petitioner had an IQ in the average range and exhibited
7    multiple indicia of serious organic brain damage and impairment exacerbated by substance abuse
8    disorder, affecting his ability to plan and rationally respond to his environment and function in
9    everyday life (*id.* at 287-89).  Dr. Khazanov suggests the damage to petitioner's brain was
10   present at the time of his trial as was the need for a neurological assessment.  (*Id*.)  She suggests
11   the neurological evidence would have been mitigating at petitioner's penalty phase.  (*Id.*)

12       Dr. Khazanov faults trial experts, Drs. Hackett and Thompson for not addressing the
13   possibility of neuropsychological defenses including frontal lobe deficits.  (*Id.* at 273-74.)
14   Especially so given then existing multiple risk factors of brain damage including childhood
15   trauma and post-traumatic stress disorder ("PTSD"), hyperactivity and probable attention
16   deficient and hyperactivity disorder ("ADHD"), chronic motor tic disorder, a predisposition to
17   polysubstance abuse, depression, and related clinical symptoms in petitioner's social history.
18   (*Id.* at 265-89.)  She stated that these mental conditions impaired petitioner's ability to perceive,
19   plan and make decisions and control impulses.  (*Id.*)

20       In 2007, defense habeas expert, Dr. Barbara Counter, a clinical and forensic psychologist,
21   reviewed petitioner's social history documents and interviewed him in prison for about 8 hours.
22   She provided habeas counsel with a psychosocial history that found indicia of childhood ADHD,
23   chronic motor tic disorder, depression, and post-traumatic stress disorder.  (*See* SSHCP, Ex. 2 at
24   27-28.)  Dr. Counter's report chronicles petitioner's family history of mental illness, abuse (drug,
25   alcohol, physical and sexual), domestic violence and crime.  (*Id.* at 14-20.)   She notes
26   petitioner's prior felony conviction in Nevada involving apparent necrophilia during the course
27   of which petitioner received a psychiatric evaluation by Dr. William Terry, who found

28

1  petitioner's history to be compatible with a diagnosis of ADHD and depression (*id.* at 23-24, 94-
2  98) and recommended psychiatric treatment of petitioner's difficulties relating to other people.

3      However, the state supreme court reasonably could have found the habeas proffer
4  insufficient to suggest Schultz was prejudicially deficient in investigating and presenting social
5  and mental state history and defense information.  The record could reasonably suggest that
6  petitioner then functioned at a level inconsistent with a significant mental state deficit or
7  impairment.  Petitioner graduated from high school in June of 1983 (*id.* at 102), approximately 5
8  years prior to the instant crimes.  Later, while incarcerated in Nevada for the noted prior felony,
9  he received certificates for education courses taken while in prison.  (*Id.* at 108.)  Several months
10 before the instant crimes, he graduated from truck driving school at the top of his class.  (*Id.* at
11 110.)  Petitioner worked as a roofer and at an auto parts store just prior to his arrest for the
12 instant crimes.  (*Id.* at 112.)

13     Notably, the habeas experts examined petitioner 17 or more years after the instant crimes.
14 The state supreme court reasonably could have found the habeas experts' conclusions as to
15 petitioner's mental state at the time of the crime to be speculative.  Especially so given the
16 contrary conclusions reached by experts examining petitioner more proximal to his trial.   In this
17 regard, the state supreme court presumptively considered a 1992 examination of petitioner by
18 prison psychologist M. Lyons, who found "no signs or symptoms of psychosis, organicity or
19 serious psychological impairment in social functioning."  (*Id.* at 135.)   Around that time
20 petitioner also was examined by prison psychiatrist Dr. John Geiger, who also found "no mental
21 disorder ... or condition of functioning which would indicate additional psychiatric concern."
22 (*Id.* at 136.)

23     Petitioner does not demonstrate that any of the defense mental health professionals who
24 evaluated petitioner prior to trial requested or required then existing information that was not
25 provided to them by the defense team.  Furthermore, the state supreme court reasonably could
26 have rejected petitioner's argument that Schultz was or should have been on notice of the need to
27 further investigate petitioner's mental state defenses.  Petitioner bases this argument on his

28

1    habeas experts' suggestion that the need for such further investigation would have been evident

2    to mental health professionals at the time of trial.  But disagreement among experts is not alone a

3    basis to find Schultz deficient.  *See e.g., Toler v. Troutt*, 2015 WL 1408490 at *9 (W.D. Okla.,

4    Feb. 20, 2015) (medical difference of opinion not actionable under the Eighth Amendment).

5         Additionally, the state supreme court could reasonably have found that the primary

6    defense theory, that petitioner was not present during or involved in the crimes, would not have

7    been advanced by further investigation and consideration of matters relating to petitioner's social

8    and mental history.  (*See* claim XXVI, XXVIII.)  Petitioner has not otherwise shown facts and

9    circumstances surrounding the crimes reasonably placed Schultz on notice of any need for

10   further social history and mental state defense investigation.

11        Accordingly, a fair-minded jurist could have found that petitioner failed to overcome the

12   strong presumption that Schultz made decisions relating to investigation and presentation of

13   petitioner's social history and mental state in the exercise of professional judgment.  *Strickland*,

14   466 U.S. at 690; *see also United States v. Farr*, 297 F.3d 651, 658 (7th Cir. 2002) (counsel "is

15   not obligated to ... personally investigate every conceivable lead"); *Morris v. State of California*,

16   966 F.2d 448, 456 (9th Cir. 1991) (a defendant seeking to prove ineffective assistance of counsel

17   "must overcome the presumption that, under the circumstances, the challenged action might be

18   considered sound trial strategy).  "The mere criticism of trial tactics is insufficient to establish

19   ineffectiveness or prejudice."  *Ferreira-Alameda*, 815 F.2d at 1254.  Here, counsel's noted

20   primary defense theory could be seen as reasonably furthered by the guilt phase investigation and

21   presentation.

22             *(v)    Mishandled Crime Scene Evidence*

23        Petitioner faults Schultz for failing to develop and present defenses relating to crime

24   scene evidence.  He argues that the Fresno Police Department Identification ("I") Bureau

25   collected at the crime scene a scant "six reference samples (from the victims and from petitioner)

26   and 12 other items of biologic evidence."  (Doc. No. 51-1 ¶¶ 230-236.)  Moreover, he argues that

27   some of this crime scene evidence was mishandled.  (*Id.*)

28

1    However, as noted, Schultz obtained discovery of the available crime scene evidence and

2 retained defense forensic expert, Dr. Barnett, to examine it.  (*See* Doc. No. 51-1 ¶¶ 230,786, 803;

3 Doc. No. 116 at 25-26; Lod. Doc. 30 at 121.)  Dr. Barnett apparently confirmed the DOJ

4 laboratory findings regarding fingerprint and ligature (cordage) evidence.  (RT 4981-95; *see also*

5 claims II(F), II(S), II(T), XIV; Doc. No. 116 at 158-59.)  The state supreme court would not have

6 been unreasonable in concluding that Schultz considered the findings of his expert.  Moreover,

7 Schultz's cross-examination of prosecution fingerprint expert Hall did elicit testimony regarding

8 the existence of additional ridge detail, not sufficient for print comparison, found on the venetian

9 blind from which the ligature was allegedly taken (RT 4575); and that no other prints were found

10 on that venetian blind or its casing (RT 4576).

11    Furthermore, petitioner has not demonstrated prejudice.  He argues the crime scene

12 evidence, had it been properly collected, preserved and examined would have exculpated him.

13 But the state supreme court would not have been unreasonable in concluding that none of this

14 evidence inculpated him, discounting any argued necessity for exculpation.

15    Petitioner's further argument this evidence might have inculpated potential accomplices

16 Buchanan, Sandoval, Flores, Long and Goldman is speculative and fails for the reasons that

17 follow.

18    For the reasons stated above and those discussed in claims II(D), II(F) and XIV, the state

19 supreme court could reasonably have rejected these allegations relating to allegedly mishandled

20 crime scene evidence.

21    *(vi)    Alternative Potential Accomplices*

22    Petitioner faults Schultz for not developing a defense theory under which someone other

23 than petitioner acted as RC's accomplice.  Especially so he argues, given that detective Stokes

24 believed more than one perpetrator was involved in the crimes in light of the distance between

25 the victims and the brutal nature of their wounds (RT 4626-30) and that petitioner denied he was

26 present at and participated in the crimes.    (RT 4871-4927); *see also Jones (Jerry) v. Wood*, 207

27 F.3d 557 (9th Cir. 2000) (ineffective assistance where counsel failed to investigate and present

28

1   circumstantial evidence of alternative murder suspect).

2       *Mr. Buchanan*

3       Petitioner argues that Buchanan may have been RC's accomplice in the murders of Caton

4   and Freiri.  He points out that Buchanan fled the apartment shortly after the murders and knew

5   too much about the crimes not to be involved.  He further argues that:

6       •    RC's accomplice probably had a car because the crime scene was 1.5 miles from

7           the Harvard Ave. apartment; Buchanan was the only roommate who had ready

8           access to a car (RT 4683);

9       •    Buchanan could have been motivated by a need for money and drugs and a desire

10          to put the blame on petitioner for tearing up Buchanan's only picture of his

11          daughter  (RT 4704-05);

12      •    Buchanan's prescription bottle was found in RC's belongings after his suicide

13          (RT 4541-42);

14      •    When Buchanan learned of the reward (RT 4698-4702), he first went to Dean

15          Long (victim Caton's other grandson and RC's cousin) who put Buchanan in

16          contact with detective Stokes (RT 4702-03);

17      •    Buchanan was likely the roommate RC met and phoned during RC's time with

18          Ms. Hansen (RT 4841-45) because Buchanan had ready access to a car and a

19          phone (RT 4661).

20      However, the state supreme court would not have been unreasonable in discounting these

21  allegations given the weight of the noted evidence including the uncontroverted testimony of

22  Goldman and Buchanan linking petitioner to the crimes.  Buchanan told the police that on the

23  day the murders occurred, petitioner and RC removed a blind in their apartment and took it into

24  the bedroom; that petitioner and RC then left, walking toward downtown; that the two later

25  returned with $350 to buy drugs; that RC then packed and fled the apartment; that petitioner

26  disposed of his shoes and jacket shortly after the crimes; and that a few days later petitioner

27  confessed to Goldman and Buchanan that he participated with RC in robbing the victims when

28

1  RC went berserk and beat the victims to death.  (*See* Doc. No. 51-1 ¶ 241-42.)

2      Furthermore, Goldman statements to police and her preliminary hearing testimony could

3  reasonably corroborate Buchanan's testimony, that on the evening of November 7, 1988,

4  petitioner and RC left the apartment together (RT 4339-40); before leaving they armed

5  themselves with a cord and a knife (RT 4343-50); when they returned RC packed up and left the

6  apartment (RT 4350); petitioner later admitted that he was present when RC killed his

7  grandmother and Louis Freiri (RT 4357-58); and that after petitioner found out RC and Caton

8  were dead, he appeared less depressed  (RT 4378).

9      It follows that a fair-minded jurist could have concluded that Buchanan's testimony

10 reflected what petitioner had admitted to him and that the record does not support an inference

11 Buchanan aided and abetted the crimes in order to inculpate petitioner and commit robbery and

12 burglary.  Moreover, the argument attempting to inculpate Buchanan appears contrary to the

13 noted primary defense theory that RC acted alone.

14     *Ms. Goldman*

15     Petitioner argues that Goldman may have been RC's accomplice in the murders of Caton

16 and Freiri.  He suggests that Goldman was motivated by self-interest and drug use.  He suggests

17 Goldman may have been the woman that witness Montez said she saw standing in the crime

18 scene doorway on the afternoon of November 8, 1988. (SSHCP, Ex. 10 at 333.)  However, any

19 inference that Goldman was aware of a plan to commit the crimes and that she was motivated to

20 and physically able to participate and that she did so is unsupported by the weight of the

21 evidentiary record.  Witness Montez's testimony is uncorroborated, contrary to Buchanan's

22 testimony and asserts a time of death later than that supported by the noted record.  Moreover,

23 the argument attempting to inculpate Goldman appears contrary to the primary defense theory

24 that RC acted alone.

25     *Messrs. Sandoval and Flores*

26     Petitioner argues that witnesses Sandoval and/or Flores may have been RC's

27 accomplice(s) in the murders of Caton and Freiri.  He argues detective Stokes investigated this

28

possibility because RC previously purchased drugs from them; and RC's co-worker, Ms. Hemseth, told Stokes that on the morning of November 7, 1988 she saw RC in the company of a Mexican male who might have been either Sandoval or Flores.  (*See* Doc. No. 105 at 69:22-23; SSHCP, Ex. 11 at 347.)  Petitioner suggests it is inculpating that Sandoval and Flores initially denied knowing RC and that after the crime RC apparently stole Sandoval's car from Flores to leave Fresno.  (*Id.*; *see also* Doc. No. 116 at 230; RT 4803-04; RT 4561-63, 4582-87.)

However, petitioner has not cited evidence in the record suggesting that detective Stokes concluded either Sandoval or Flores was involved in the crimes against Caton and Freiri. Moreover, Schultz appears to have investigated Flores and Sandoval prior to trial.  Although Flores had by then been deported to Mexico (*see* claim XV), the defense team interviewed Sandoval and Schultz called him as a witness at trial.  (Doc. No. 116 at 220-21.)  Schultz elicited testimony from Sandoval inculpating RC, that RC stated "I've already killed a woman. I've got to get away."  (RT 4800-06; *see also* Doc. No. 51-1 ¶¶ 252-59.)  This could reasonably be viewed as consistent with the defense theory that RC acted alone in the crimes.

Furthermore, the state supreme court would not have been unreasonable in concluding that neither Sandoval nor Flores had a motive to and participated in the robbery/burglary of Caton and Freiri.  Even if Sandoval and Flores were drug dealers who may have been seen with RC around the time of the crimes, petitioner has not demonstrated the weight of the evidentiary record shows that either of them acted as RC's accomplice in the murders.  Especially so as RC was a routine drug user of street drugs and presumably associated with drug dealers.  (RT 4314-16, 4369-71.)  To the extent Sandoval and Flores denied knowing RC, Schultz could reasonably have considered this a reflection of their desire to avoid police scrutiny of their drug dealing enterprise, rather than evidence they were involved in the crimes against Caton and Flores.  RC's absconding with Sandoval's car is not alone a reasonable basis to find either Sandoval or Flores was involved in these crimes.

For the reasons stated, a fair-minded jurist could have found Schultz was not deficient by failing to develop an accomplice theory as to Sandoval and Flores and that petitioner was not

1    prejudiced thereby.

2        Moreover, the argument attempting to inculpate these witnesses appears contrary to the

3    primary defense theory that RC acted alone.

4        *Mr. Long*

5        Petitioner faults Schultz for not developing a defense theory that Dean Long (victim

6    Caton's other grandson and RC's cousin) acted as RC's accomplice.  He argues that Ms. Garret,

7    victim Caton's daughter, told detective Stokes that she suspected Long was involved in the

8    crimes. (SSHCP, Ex. 10, at 334.)  He argues that Long lived near the crime scene and allegedly

9    was a drug user who may have purchased drugs from Buchanan.  He argues that Long knew too

10   much about the crimes not to have been involved; (*see* RT 4253-67); for example petitioner

11   notes that Long, who along with Ms. Garrett discovered the victims at the scene around 6 p.m.

12   on November 8, 1988, purported to quickly pronounce Freiri dead and Caton still alive. (*Id.*)  He

13   argues that Long fit the police belief the perpetrator was a family member.  (RT 4587-88.)

14       However, the state supreme court could reasonably have concluded that Schultz's failure

15   to develop Long as an accomplice was not unreasonable.    Petitioner's surmise is not alone

16   evidence that Long planned and participated in the crimes.  Such surmise is contrary to the

17   weight of witness testimony and evidence in the record including petitioner's admission to

18   Buchanan and Goldman.

19       For the reasons stated, a fair-minded jurist could have found Schultz was not deficient by

20   failing to develop an accomplice theory as to Long and that petitioner was not prejudiced

21   thereby.  Moreover, the argument attempting to inculpate Long appears contrary to the primary

22   defense theory that RC acted alone.

23       *(vii)    Alternative Unknown Female Suspect*

24       Finally, petitioner faults Schultz for failing to develop a defense theory that an unknown

25   female acted as RC's accomplice.  He points to the noted statement by a 15 year old neighbor of

26   the victims, Valerie Montez, that in the late afternoon of November 8, 1988 she saw what

27   appeared to be a female standing behind the screen door at the crime scene (Pet. Ex. No. 10 at

28

333) whom she "assumed ... was the lady ... that lived at that location." (*Id.*)

Petitioner argues this statement suggests the possibility that RC may have had a female accomplice in the murders – something he argues Schultz should have investigated.

But the record reflects that Ms. Montez was uncertain whether she actually saw a female in the doorway. (*Id.*)  The noted evidence in the record suggests the crimes occurred the day before Ms. Montez's alleged observation.  Schultz could reasonably have discounted the possibility that Goldman, or any perpetrator was seen standing in the doorway of the crime scene at the time Ms. Montez passed by.

For the reasons stated, a fair-minded jurist could have found Schultz was not deficient by failing to develop an accomplice theory as to an unknown female and that petitioner was not prejudiced thereby.   Here again, a theory attempting to inculpate a third party accomplice appears contrary to the primary defense theory that RC acted alone.

(*viii*)   *Conclusions*

For the reasons stated, a fair-minded jurist could have found that petitioner failed to establish that Schultz acted unreasonably regarding impeachment of Buchanan and Goldman and that he otherwise failed to develop and present exculpatory evidence and expert testimony and evidence of third party liability and that because of such errors there is a reasonable probability of a different outcome of petitioner's proceeding.  *Strickland*, 466 U.S., at 687-98.  Moreover, the police investigation file did not discount the possibility that RC acted alone, which was Schultz's primary defense theory.

It does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

Claims II(B) and II(C) are denied.

**d.   Analysis of Claim II(D)**

Petitioner faults Schultz for inadequately investigating the destruction of crime scene evidence and by failing to prepare and file related motions. Petitioner also faults Schultz for inadequately responding to crime scene evidence (i.e., fingernail scrapings, saliva, debris from a wound on Mr. Freiri's head, blood evidence and hair found at the crime scene) that went missing for 5 months while in custody of the authorities only to subsequently re-appear in partially degraded form.

The record reflects that on May 10, 1989, Schultz filed a written request for the results of comparative testing conducted by the state crime lab on physical evidence collected from the crime scene and samples collected from petitioner and the victims. (CT 15.) The trial court granted Schultz's request. (CT 6.)

However, prior to the preliminary hearing, the prosecution informed Schultz that the state crime laboratory could not locate the samples to be tested. (CT 6, 14-16, 95-98.) The missing evidence inexplicably re-appeared months later. As more fully discussed in claim XIV, some of the biologic samples had not been preserved and degraded such that test results were inconclusive. (RT 4565-69; *see also* SHCP, Ex. L.) The results that were obtained served to exclude petitioner as the source of the biologic materials and the hair collected from the crime scene. (RT 4413-16, 4565-69.) Schultz argued as much as trial. (RT 4970-87, 4917, 4987; Doc. No. 51-1 ¶¶ 801-804; Doc. No. 103 at 37, 68.) Schultz's cross-examination of the state serology expert emphasized that petitioner was not a match for any sample that could be tested (RT 4565-69), i.e., the undegraded evidence did not link petitioner to the crime scene.

Petitioner contends that had Schultz investigated the disappearance of this evidence, he might have been able to get the charges dismissed on grounds of the state's bad faith destruction of potentially exculpatory evidence. *See Arizona v. Youngblood,* 488 U.S. 51, 58 (1988) (bad faith of police to preserve potentially useful evidence denied defendant due process).

However, the state supreme court would not have been unreasonable in concluding petitioner merely speculates that degradation of the evidence was due to the state's bad faith. Petitioner has not demonstrated on the record that the blood swabs were testable when collected,

or that the state failed to preserve the swabs, or that the swabs were potentially exculpatory. *Youngblood*. 488 U.S. at 53-58. Though the noted evidence apparently degraded while in the custody of the state crime lab, petitioner has not demonstrated on the record how and why the evidence degraded and that the state was anything more than negligent. A merely negligent degradation is not a due process violation. *Youngblood*, 488 U.S. at 58 ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").

Furthermore, as in *Youngblood*, the evidence and the state's test results were made available to the defense – suggesting an absence of bad faith. *Id.* The state supreme court could reasonably have determined that petitioner was not denied access to potentially favorable evidence material to guilt. *See California v. Trombetta*, 467 U.S. 479, 489 (1984) ("Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense."). At bottom, all the noted evidence was ultimate located prior to trial and to the extent testing was possible, petitioner was not implicated.

Even if Schultz was deficient as alleged, the state supreme court could reasonably have found no reasonable probability of a different outcome absent such deficient conduct. Neither the undegraded evidence nor the degraded evidence linked petitioner to the crime scene. This coupled with petitioner's failure to attribute bad faith to the state could suggest no reasonable probability of a different outcome absent the allegedly deficient conduct. Moreover, absent bad faith, petitioner's argument the degraded evidence might have implicated third party accomplices is speculative and fails for the reasons stated. Absent bad faith on the part of the police, a mere failure to preserve potentially useful evidence does not constitute a denial of due process of law. *See Trombetta*, 467 U.S. at 488.

A fair-minded jurist could have found that petitioner failed to establish that Schultz acted unreasonably in investigating and responding to the crime scene evidence, and that absent the allegedly deficient conduct a different outcome was reasonably probable. *See Strickland,* 466

1  U.S., at 687-98.

2   It does not appear that the California Supreme Court's rejection of the claim was contrary

3  to, or an unreasonable application of, clearly established federal law, as determined by the

4  Supreme Court, or that the state court's ruling was based on an unreasonable determination of

5  the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. §

6  2254(d).

7   Claim II(D) is denied.

8   **e.**  **Analysis of Claim II(E)**

9   Petitioner alleges that Schultz was deficient by failing to investigate and present evidence

10  of prosecution inducements to witness Buchanan.

11   *(i)*  *Buchanan's Housing Arrangement with Ms. Strickland*

12   Petitioner alleges that Schultz was ineffective by failing to impeach Buchanan with a

13  room and board agreement facilitated by the prosecution which he claims served as an

14  inducement for Buchanan to testify at trial.

15   Petitioner points to March 29, 1989 agreement between Buchanan and boarding house

16  operator Margie Strickland.  The agreement was memorialized by and witnessed by prosecution

17  investigators William Martin and A. Braga.  (SHCP, Ex. G; RT 5266-5330; *see also* SHCP, Ex.

18  H; RT 5324-25.)  Petitioner alleges that under this agreement the prosecution or the police

19  department promised to pay Strickland $350 per month for Buchanan's room and board out of

20  the private reward money Buchanan expected to receive upon petitioner's conviction.  (RT 5266-

21  83, 5324-25.)

22   Petitioner alleges that Schultz failed to develop this impeachment evidence even though

23  he had a copy of the document memorializing the agreement prior to trial (Doc. No. 116 at

24  107:19-22; SHCP, Ex. B ¶ 6; *Id.* at Ex. G) and was aware Ms. Strickland was sending copies of

25  bills thereunder to the prosecution, bills which Schultz allegedly declined the opportunity to

26  review.  (RT 5406; *see also* SHCP, Ex.'s G, I.)

27   Petitioner argues that agreement was strong evidence that Buchanan was dishonest; that

28

1    Martin and Strickland so distrusted Buchanan that they put the agreement in writing.  This

2    dishonesty, petitioner asserts was demonstrated when Buchanan testified falsely that he had not

3    received anything from the prosecution in return for his testimony (RT 4765-67); and that he

4    worked as a manager and maintenance man at the boarding house and owed Ms. Strickland

5    nothing, but that she owed him $25,000 (RT 4715-16, 5322-25).

6        Petitioner argues that failure to impeach Buchanan with the Strickland agreement was

7    particularly harmful to the defense for several reasons.  The jury was aware defense investigators

8    had purchased a few beers, lunch and a pair of shoes for Buchanan (RT 4714-15, 4765), while

9    Buchanan denied the prosecution had purchased anything for him (RT 4766, 5002, 5409).  The

10   other primary prosecution witness, Ms. Goldman, was untrustworthy and had been characterized

11   as a liar by other witnesses.  (*See e.g.,* RT 4783-93.)  Petitioner argues the Strickland agreement

12   gave Buchanan a financial incentive to see to it that petitioner was convicted.

13        However, the state supreme court could reasonably have determined petitioner failed to

14   demonstrate Buchanan's testimony was dependent upon or biased by the prosecution's

15   involvement in the housing arrangement.  The housing agreement on its face was solely between

16   Buchanan and Strickland.  The agreement as memorialized provided that Buchanan would pay

17   Strickland $350/month in the form of an IOU.  (SHCP, Ex. G.)

18        Petitioner has not demonstrated that the prosecution was a party to the housing

19   agreement. He has not demonstrated that the prosecution financed or guaranteed the agreement.

20   He has not demonstrated that the prosecution was to pay or paid any portion of the noted reward

21   that funded the agreement.  The record reflects that the Fresno District Attorney's Office

22   expressly advised Buchanan that it lacked funds to pay his living expenses pending his

23   testimony. (SHCP, Ex. H.)  The record reflects that the reward was paid by the victim families

24   directly to Buchanan and that no public funds were involved; nor did Ms. Strickland hold or

25   assert a lien or prior entitlement to the private reward funds.  (RT 5310-38.)  Petitioner has not

26   demonstrated that the agreement stated or was intended to provide otherwise.  (*See e.g.,* SHCP,

27   Ex.'s G, H.)

28

1    The record reasonably supports respondent's contention that the Strickland agreement

2  was facilitated in the normal course and in order to ensure Buchanan would be and remain

3  available to testify at petitioner's proceeding.  (RT 5293-94.)  For her part, Strickland testified

4  that the agreement was not unprecedented; she had taken in boarders on an IOU basis on 30 to 40

5  other occasions.  (RT 5314-25.)

6    Moreover, the jury was aware from the noted testimony that Buchanan was seeking the

7  private reward offered by the victim families.  Schultz argued to the jury that Buchanan may

8  have implicated petitioner in order to get the reward.  (RT 4990-91.)  Schultz cross-examined

9  Buchanan about the housing arrangement in the context of Buchanan's expectation of receiving

10  the wholly private reward money.  (RT 4715-16.)  Notably, the trial court denied these same

11  allegations when raised on the motion for new trial.  (RT 1/17/92 9-15.)

12    Nor does the record reasonably suggest the prosecution was chargeable with any

13  relationship or arrangement between Buchanan and Strickland not set forth in the agreement as

14  memorialized.  Although Buchanan testified, apparently falsely, that he worked for Strickland as

15  a manager and maintenance man and that she owed him $25,000 under this relationship (RT

16  4615-16; 5322-25), prosecutor Hahus testified at the motion for new trial that he knew nothing of

17  any such arrangement.  (RT 5449, CT 583.)

18    Accordingly, petitioner has not demonstrated on the record that the prosecution had any

19  involvement in any Buchanan-Strickland relationship apart from merely facilitating the

20  agreement.  Petitioner's suggestion that Strickland acted on behalf of the prosecution appears

21  unsupported by the record.  To the contrary, Ms. Strickland testified at trial that pursuant to the

22  agreement Buchanan owed her over $5000; she also testified to her concern that Buchanan was

23  not a trustworthy person.  (RT 5325-28.)

24    (ii)    *Buchanan's Criminal Charges*

25    Petitioner alleges that Schultz was ineffective by failing to impeach Buchanan's

26  testimony with evidence the prosecution agreed to provide and provided assistance on separate

27  felony and misdemeanor charges brought against Buchanan around the time of petitioner's trial.

28

1   (Doc. No. 51-1 ¶¶ 299-313; SSHCP, Ex. 12 ¶ 7; Doc. No. 116 at 113:2-6.)

2   Petitioner points to dismissal of two felony drug possession counts against Buchanan

3   after he was identified as a witness and prior to petitioner's trial.  (SHCP, Ex. J.)   Additionally,

4   he points to a separate misdemeanor drug possession charge that arose prior to Buchanan's trial

5   testimony (RT 5396-5403; *see also* SHCP, Ex. K) that was dismissed at the request of prosecutor

6   Hahus after petitioner's trial.  (*Id.*; *see also* Supp. CT. 68-83.)  Petitioner argues the dismissals

7   suggest a plea bargain connected to Buchanan's testimony in petitioner's capital trial.  (*See* RT

8   5341-79); *see Reynoso*, 462 F.3d at 1114 (counsel ineffective in murder case for failing to cross-

9   examine state witnesses about their motivation for testifying); *Thompson v. Calderon*, 120 F.3d

10  1045, 1053-55 (9th Cir. 1997) (en banc), *reversed on other grounds*, *Calderon v. Thompson*, 523

11  U.S. 538 (1998) (counsel's failure to discover and present impeaching evidence against jailhouse

12  informants was deficient).

13  The state supreme court reviewed and rejected some of these allegations on direct appeal.

14  That court conceded the information tended to impeach Buchanan's credibility, but nevertheless

15  determined the information "was not material because it would have added little to the

16  cumulative impact of the other impeachment evidence."  *Dickey*, 35 Cal. 4th at 908, 909 n.9.

17  The state supreme court's rejection of these allegations was not unreasonable.  Prosecutor

18  Hahus, at the new trial hearing, testified to Buchanan's June 1989 assertion that he had a deal for

19  dismissal of the felony drug case due to his status as prime witness against petitioner in the

20  capital case.  (RT 5380-82, 5394.)  However, Hahus did not believe Buchanan.  (RT 5385-88.)

21  The district attorneys who were involved in Buchanan's felony drug case, Ms. Dotta and Mr.

22  Hoff, denied a deal existed, stating the drug charges were dismissed on the merits because of a

23  lack of proof; problems with the search warrant.  (RT 5341-79; *see also* RT 1/17/92 at 14-16.)

24  Petitioner argues a deal nonetheless implicitly existed, pointing to the time and effort the district

25  attorney's office devoted to the felony drug case (*id.*; Supp. CT 8-84), and to the guilty plea by

26  Buchanan's co-defendant in that case.  (*Id.*)

27  However, the state supreme reasonably could have given weight to the direct testimony

28

60

over petitioner's surmise.  Especially so, given Schultz's statement in his habeas declaration that he was aware of the pending charges and dismissal prior to trial, but did not believe this information would be beneficial to the defense.  (SHCP, Ex. B ¶ 7.)

For the reasons it stated, the state supreme court could reasonably have concluded that this alleged impeachment evidence had it been presented would not in reasonable probability have resulted in a different outcome.

Accordingly, a fair-minded jurist could have found that petitioner failed to establish that Schultz acted deficiently by failing to investigate and present evidence of prosecution inducements to witnesses Buchanan and Goldman, and that absent the allegedly deficient conduct a different outcome was reasonably probable.  *Strickland*, 466 U.S., at 687-98.

It does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

Claim II(E) is denied.

**f.      Analysis of Claims II(F) and II(S)**

Petitioner next claims that Schultz was ineffective by failing to retain an expert to investigate the venetian blind evidence and by failing to object to related prosecution testimony and argument.  (Doc. No. 51-1 ¶¶ 314-20; 403-05.)

*(i)      Chain of Custody and Admissibility*

Petitioner faults Schultz for failing to object to the venetian blind from which a cord found around victim Freiri's neck (People's Ex. 19) was allegedly taken.  He argues Schultz should have objected to Stokes's seizure of the blind from the landlady of the Harvard Avenue apartment, Ms. Hays, without a search warrant and proper authentication and foundation.  He suggests the blind retrieved by detective Stokes from Hays may have been altered by Hays when she removed and stored it and then voluntary delivered it to detective Stokes at his request.  (*See*

RT 4519-22.)

Petitioner also argues that Schultz was ineffective by failing to object to the prosecution's alleged failure to link the cord found at the crime scene (*see* SSHCP, Ex. 11 at 345); People's Ex. 19) to that particular venetian blind, pointing out the state supreme court unreasonably concluded police (rather than Ms. Hays) removed the venetian blind from the hall closet of the apartment. *Dickey*, 35 Cal. 4th at 895-96.

Here, it appears that Hays evicted the remaining roommates from the Harvard Avenue apartment shortly after the murders and then cleaned the apartment, removing a blind without attached cord from the hall closet. (RT 4521-37.)  She stored the blind and when later contacted by detective Stokes delivered the blind to him.  (RT 4519-37.)

The state supreme court could reasonably have found that petitioner failed to demonstrate a search warrant was required on these facts. *See e.g., U.S. v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000) (Fourth Amendment rights waived by voluntary consent to warrantless search). Additionally, foundation, authentication and chain of custody supporting the venetian blind admitted into evidence (People's Ex. 28) reasonably could be found in the trial testimony of Hays.  She testified that the subject blind was originally on the (Hollywood) back door of the apartment; she removed it from the apartment closet without any attached cord; stored it in her garage; delivered it to Stokes; and identified the blind, People's Exhibit 28, at trial.  (RT 4521-30.)  Detective Stokes confirmed as much in his testimony.  (RT 4530-39.)  Both Buchanan and Goldman testified the blind was last seen in the hall closet of the apartment.  (RT 4534-37, 4666.)

(ii)     *Fingerprint Evidence*

Petitioner faults Schultz for not developing and presenting expert testimony discounting the evidentiary value of petitioner's thumb print that prosecution expert Mike Hall found on a slat of the subject venetian blind from the Harvard Avenue apartment where petitioner lived with Goldman and Buchanan.

Petitioner presented a portion of this claim on direct appeal which the California Supreme

Court rejected, stating that:

> [A] prosecutor is given wide latitude during argument ... includ[ing] stating matters not in evidence, but which are common knowledge. It is a matter of common knowledge that, assuming an object is of the sort that takes fingerprints, and that one is barehanded, the harder one presses on it with one's fingers, the more likely one is to leave a fingerprint. Therefore, the prosecutor's argument was not misconduct, and, a fortiori, it was not ineffective assistance for defense counsel not to object it. In any event, the jury was instructed that statements made by counsel were not evidence, and that they were to reject interpretations of the evidence they found to be unreasonable.

*Dickey*, 35 Cal. 4th at 915.

Petitioner discounts the evidentiary value of his print on the venetian blind which had been in the apartment for 29 years. (RT 4515-19); *see also Mikes v. Borg*, 947 F.2d 353, 356-357 (9th Cir. 1991) (in fingerprint only cases, prosecution must present evidence sufficient to permit the jury to conclude that the objects on which the fingerprints appear were inaccessible to the defendant prior to the time of the commission of the crime.) Petitioner argues he had access to and may have touched a slat of the blind during his time as a resident of the apartment, unconnected to the crimes. He notes that detective Hall found other ridge detail on the venetian blind which was insufficient for comparison. (RT 4575.)

However, the state supreme court could reasonably have given weight to the fingerprint evidence in the context of the evidentiary record as a whole. The testimony of prosecution fingerprint expert Hall suggested that fingerprint details are left by gripping an object. (RT 4577.) Hahus's argument could have relied thereon, and upon common experience as suggested by the state supreme court. *See Dickey*, 35 Cal. 4th at 914-15.

The jury was aware of and presumably considered petitioner's testimony that he put the venetian blind in the closet after it fell off the back door (RT 4883-84; *see also* RT 4345-46) and his suggestion his fingerprint may have been left at this time. Nothing in this testimony or the opinion of petitioner's forensic expert, Dr. Peter Barnett, or the existence of additional fingerprint details on the venetian blind (acknowledged by both experts Hall and Barnett) necessarily controverts Hall's conclusions and Hahus's noted argument. (*See* RT 4981-95; *see*

*also* claims II(F), II(S), II(T), XIV; Doc. No. 116 at 158-59.)  Moreover, Schultz acknowledged the additional print detail and argued it as a basis to discount the evidentiary value of petitioner's print.  (*See* RT 4985-86.)

Petitioner's surmise that firm pressure on the blind would have left a print on the top frame of the blind rather than a slat (where petitioner's print was found) is alone unpersuasive. (Doc. No. 51-1 ¶ 319; RT 4576.)  Although Goldman testified that she saw RC handle the venetian blind, Goldman's testimony in this regard was equivocal.  (*See* claim XXI.)

Petitioner's reliance on *Mikes* is misplaced because there, unlike here the conviction was based upon the fingerprint evidence alone.  *See Mikes*, 947 F.2d at 356-57.  Furthermore, Schultz offered the jury reasons to discount the fingerprint evidence.  He cross-examined prosecution witnesses regarding this evidence, offered an alternative theory for petitioner's fingerprint being on the blind and argued the location of the fingerprint on the blind was inconsistent with the prosecution theory of the crime.  (*See e.g.,* RT 4575-80, 4985-86.)

Petitioner also faults Schultz for failing to develop and present evidence of an unreasonable crime scene investigation by the authorities wherein investigators recovered no useable fingerprints.   (*See* RT 4226-33, 4332.)  He points out that not one print from RC was found at the crime scene even though RC has been to the crime scene multiple times prior to the crimes.  (RT 4311-12.)   But petitioner's own forensic expert, Dr. Barnett, though finding the noted details of other prints apparently found no identifiable prints on the subject blind other than petitioner's fingerprint.  (Doc. No. 116 at 133:27-134:10.)  Petitioner has not shown that the state's processing of the crime scene and the venetian blind resulted in the failure to recover additional identifiable fingerprints.  (RT 4981-95; *See also* claims II(F), II(S), II(T), XIV; Doc. No. 116 at 158-59.)  Petitioner's speculation that such prints existed, but due to prosecution bad faith were not developed (Doc. No. 116 at 134:11-12, *citing* Doc. No. 116-1 ¶¶14-17) is not supported in the record.

It follows the state supreme court could reasonably have found that Schultz could properly have refrained from making what would have been a meritless objection to the

prosecution's fingerprint evidence. That Schultz stated in his habeas declaration that "[he] did not object to [the prosecution's fingerprint argument] because he did not recognize the basis for an objection, not as a tactical choice" (SHCP, Ex. B ¶ 10), does not alone suggest the state supreme court was unreasonable in finding as much. *See Strickland*, 466 U.S. at 688 (whether counsel's performance was deficient inquires into the objective reasonableness of counsel's performance, not counsel's subjective state of mind).

Additionally, the state supreme court could reasonably have found no prejudice from Schultz's alleged deficiencies. For the reasons stated, petitioner has not demonstrated facts suggesting reasonable probability of a different outcome had unspecified fingerprint evidence been presented to the jury. The jury was instructed to "reject interpretations of or inferences from the evidence they found to be unreasonable" (RT 5010; CT 392-94) and that "statements made by the attorneys during the trial are not evidence." (RT 5008; *see also* 5146; CT 390). Jurors are presumed to follow instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), *citing Richardson v. Marsh*, 481 U.S. 200, 211, (1987) ("A jury is presumed to follow its instructions.").

### (iii)    Cord Evidence

Petitioner faults Schultz for failing to object to testimony by prosecution criminalist Cortner that the cord found tied around victim Freiri's neck was similar to "the part still on the venetian blind." (RT 4414; *see also* SSHCP, Ex. 11 at 345.) This testimony was false, petitioner contends because as noted no cord remained on the subject blind recovered by detective Stokes. (RT 4537.) He argues that the prosecution, by referring to reference samples of cord taken from other venetian blinds in the apartment as "attached to a (subject) venetian blind" (RT 4413-14) and "left on the (subject) venetian blind" (RT 4415) misrepresented that the cord used in the murder was compared to cord taken from that (subject) venetian blind retrieved by Stokes. (RT 4415-16.) He suggests Hahus made this false argument to the jury. (RT 4965-68.)

Petitioner argues that based in part on this false testimony and argument, the state supreme court unreasonably determined that "[t]he cord found around Mr. Freiri's neck came

from the [v]enetian blind in defendant's apartment, and defendant was responsible for bringing it to Mrs. Caton's house."  (Doc. No. 116 at 168:12-15, *citing Dickey*, 35 Cal. 4th at 904.)  He highlights prosecutor Hahus's related argument that "[t]he only thing that the lab can tell us is [the crime scene cord] ... appears to be from the same material; same dimensions and the same weave [as the samples taken by Stokes from other blinds in the apartment]."  (RT 4966.)

However, the state supreme court could reasonably have found Schultz was not objectively unreasonable by failing to object to Cortner's noted testimony.  The record is clear that Stokes took three reference samples not from the subject venetian blind but rather from other blinds hanging in the then vacant Harvard Street apartment, (*id.*; RT 4413-14; 4538) and that it was these three samples that Cortner compared to the crime scene ligature.  (*Id.*)  Any suggestion by petitioner that the three samples were irrelevant could reasonably be rejected given the equivocal testimony of Goldman that the cord may have been taken from the blind hanging in the bedroom (RT 4347) and that multiple blinds were in the apartment at times relevant (RT 4518-19).

It follows that the jury was aware the reference samples were taken from blinds contemporaneously in the Harvard Avenue apartment.  Cortner testified at trial that the cord from Freiri's neck was similar to these reference samples but "[he] was not able to make a physical match to positively say it came from that particular cord that came from the venetian blind."  (RT 4416.)  Cortner opined that cord from Freiri's neck (SSHCP, Ex. 11 at 345; RT 4532) and the reference cords are consistent with each other in color, weave, pattern and thickness; that they are both made of cotton; but that a positive match could not be made due to the fibrous nature of the cord.  (RT 4416; SHCP, Ex. L; RT 4203-04, 4346-47, 4413-16; People's Exhibits 26, 28, 30.)

The cord analysis of defense forensic expert Barnett was not necessarily inconsistent with Cortner's noted analysis.  Prior to trial, Barnett determined the ligature around Mr. Freiri's neck could have come from the venetian blind introduced at trial and that the reference samples collected by Stokes from the other blinds in the apartment were in some ways inconsistent with

the neck ligature.  (Doc. No. 51-1 ¶ 803.)

A fair-minded jurist could conclude that in context, the noted testimony of Cortner was not materially misleading.  Moreover, Cortner's testimony that the cord from the murder scene did not match any cord samples from the apartment was seemingly helpful to the defense and not prejudicial.  The jury was presumably aware no comparison was made to cordage from the venetian blind admitted in evidence because they knew that blind had no cord on it when retrieved by Stokes.  Cortner did not testify otherwise.

As noted, the jury was instructed to reject inferences from the evidence they found to be unreasonable and that "statements made by the attorneys during the trial are not evidence."  The state supreme court could reasonably have concluded that the fact the subject blind had no cord on it when retrieved by Stokes did not discount the materiality of that venetian blind admitted as evidence at petitioner's trial.

For the reasons stated, Schultz's statement in his habeas declaration that "he did not object to this argument because he did not recognize the basis for an objection, not as a tactical choice" (SHCP, Ex. B ¶ 10) is not necessarily evidence that his failure to object was unreasonable.  In assessing his performance, there is a "strong presumption" that counsel did not object "for tactical reasons." *Yarborough*, 540 U.S. at 8.  Schultz does not appear to concede the basis for an objection.

*(iv)    Conclusions*

Accordingly, a fair-minded jurist could have found that petitioner failed to establish Schultz acted deficiently by failing to retain an expert to investigate the venetian blind evidence; and by failing to object to related testimony and argument; and that absent this allegedly deficient conduct a different outcome was reasonably probable.  *Strickland*, 466 U.S., at 687-98.

It does not appear that the California Supreme Court's rejection of these claims was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. §

1    2254(d).

2            Claims II(F) and II(S) are denied.

3        **g.       Analysis of Claims II(G) and II(H)**

4            Petitioner alleges that Schultz was ineffective in preparing, calling and examining

5    defense witnesses, Maxine Hansen and petitioner.  (Doc. No. 51-1 ¶¶ 321-341.)

6            *(i)      Testimony of Maxine Hansen*

7            Petitioner alleges that Schultz inadequately investigated and prepared witness testimony

8    of Hansen, a friend of RC's with whom he briefly stayed following the murders.  Petitioner

9    complains Schultz called Hansen even though he knew or should have known that her testimony

10   was mostly hearsay and harmful to the defense by suggesting RC may have contacted petitioner

11   during this time.   (Doc. No. 51-1 ¶¶323-325; RT 4829-44.)

12           Petitioner  agues  the  defense  team  interviewed  Hansen  only  once,  when  defense

13   investigator Runcie spoke with her for less than an hour.  (Doc. No. 51-1 ¶ 322.)  Schultz,

14   according to petitioner largely ignored Runcie's report that RC had said nothing to Hansen about

15   the crimes; that a person named Boyd Anderson who was staying with Hansen at the time might

16   have more information than Hansen; and that Hansen could not hear very well (RT 4843) and

17   "tends to run on and get side tracked."  (Doc. No. 116 at 319:15-19.)

18           Schultz nonetheless called Hansen to testify.  Hansen testified that while RC was staying

19   with her, he contacted a roommate, as follows:

20

21           Q. Do you remember the name?
             A. Well, I thought it was something close to Dickey
22           because when I was a kid I remember this name Dukie,
             that's what put me in mind of it when RC said the name …Q. Right. And you
23           think that was ... the name of the
             roommate that he called?
24           A. That's what I thought. That's what I thought, I'm not
             sure.

25   (RT 4843:7-44:1.)

26           Petitioner argues this testimony allowed the jury to speculate that petitioner was involved

27   in the crimes – speculation encouraged by prosecutor Hahus during argument where he

28
                                                    68

1  emphasized that Hansen was the least likely of the witnesses to be lying.  (RT 5003-04.)

2      However, as petitioner seems to concede, based on the defense team's interview of

3  Hansen, Schultz reasonably could have called her in support an argument that RC's accomplice,

4  if there was one, was Buchanan or some other third party.  The record provides some support for

5  such a tactic.  Petitioner apparently was not called "Dickey" by others, suggesting it is unlikely

6  RC would have referred to him in this manner.  (RT 4362, 4657, 4718.)  Buchanan's personal

7  items were found in RC's hotel room after the crimes.  (RT 4541-42.)  Buchanan was known to

8  use the phone at the nearby Circle K Market (RT 4661), whereas petitioner had no access to a

9  phone at the Harvard Avenue apartment (*id.*).

10      For these reasons, the state supreme court could reasonably have concluded that Schultz

11  anticipated Hansen's testimony would be exculpating of petitioner and that Schultz was not

12  objectively unreasonable in calling Hansen to the stand.

13      Additionally, Schultz may have believed the prosecution would call Hansen and desired

14  the defense be the first to elicit any potentially harmful testimony.  Especially so in that Hansen's

15  testimony was equivocal as to whether the contacted roommate was petitioner or one of the other

16  roommates – offering the initial opportunity to the defense to focus the jury on Buchanan as

17  RC's accomplice.  Notably, petitioner has not offered Schultz's reasons for calling Hansen.

18      In any event, petitioner has not demonstrated prejudice.  The state supreme court

19  reasonably could have found petitioner has not shown a reasonable probability that absent

20  Hansen's testimony the outcome of petitioner's trial would have been different.  The jury was

21  aware of petitioner's admission to Buchanan and Goldman.  To the extent Hansen's direct

22  testimony did not support the primary defense theory that RC acted alone, her testimony

23  nonetheless could have been exculpating of petitioner for the reasons stated.   Moreover, that RC

24  checked into a Fresno hotel after the crimes does not necessarily conflict with Ms. Hansen's

25  testimony that RC stayed with her.   Petitioner has not pointed to facts suggesting otherwise.

26      *(ii)*    *Testimony of Petitioner*

27      Petitioner alleges that Schultz failed to adequately consult with and prepare him to take

28

69

1    the stand.  He contends Schultz visited him at most six times during the approximately two years

2    between his arrest and trial and that during these visits Schultz merely reassured him without

3    discussing the charges or the defense, or soliciting petitioner's assistance with the defense.  (Doc.

4    No. 51-1 ¶¶ 331-341; Doc. No. 116 at 311.)  He argues he was prejudicially unprepared to

5    testify.

6         Here, the record suggests Schultz's decision to call petitioner to testify could have been

7    strategically motivated.   Petitioner concedes he wanted to testify and told Schultz as much.

8    (Doc. No. 116 at 302.)   Defense psychologist, Dr. Thompson, examined petitioner 6 month

9    before trial and found him credible and consistent in denying any involvement in the crimes, (*see*

10   SSHCP, Ex. 19 at 381-84), and believed that if properly coached petitioner could perform well

11   on the stand.  (*Id.*)

12        The state supreme court reasonably could have found petitioner failed to demonstrate the

13   defense team as a whole failed to consult with him, or that he was denied participation in his

14   defense.   Significantly, petitioner does not appear to address or account for the number of

15   appearances and hearings he had with Schultz during the trial.  *See Daniels v. Woodford*, 428

16   F.3d 1181, 1197 (9th Cir. 2005) (complete breakdown in communication between defendant and

17   counsel is constructive denial of counsel); *Crandell v. Bunnell*, 144 F.3d 1213, 1217 (9th Cir.

18   1998), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000),

19   *quoting ABA Guidelines,  Guideline* 11.4.2, ("counsel shall maintain close contact with the client

20   throughout preparation for the case, discussing (inter alia) the investigation, potential legal issues

21   that exist or develop and the development of a defense theory.").

22        Schultz could reasonable have made a tactical decision to avoid too much preparation and

23   the risk petitioner would sound rehearsed on the stand.  Moreover, brevity in testimony could

24   serve to limit the risk of contradictions and harmful cross-examination.   Here again, it is notable

25   that petitioner has not provided any declaration of Schultz regarding his reasoning in these

26   matters.

27        The state supreme court also could have found no reasonable probability of a different

28

70

1   outcome absent Schultz's alleged deficiencies.  Petitioner claims prejudice from Schultz's failure

2   to elicit foundational facts supporting petitioner's complete denial of involvement in the crimes.

3   He complains Schultz briefly asked him about his prior conviction for burglary (RT 4870) and

4   elicited Petitioner's general denial of involvement in the crimes, as follows:

5

6           Q: Okay. You heard the – you know what you're accused of?
            A: Yes.

7           Q: You heard the testimony of Gene Buchanan?
            A: Yes.

8           Q: And you heard the testimony of Gail Goldman that was
            read into the record?

9           A: Yes.
            Q: Okay. Did you make those statements to Gene and Gail?

10          A: No.
            Q: Did you have anything to do with what happened on

11          Lewis Street on November 7th?
            A: No

12

13  (RT 4870-71.)  Petitioner points out that after a less-than-two-page direct examination, Mr.

14  Schultz turned his client over to the prosecutor for a cross-examination that occupies 54 pages of

15  the reporter's transcript, with no redirect examination.  (RT 4871-4927; *see also* Doc. No. 51-1 ¶

16  213(S).)  Albeit twelve pages were consumed with evidentiary argument outside the jury's

17  presence.  (RT 4888-4901.)

18          However, the state supreme court reasonably could have rejected these allegations.  The

19  primary defense theory was consistent with petitioner's testimony denying any involvement in

20  the crimes.  Significantly, petitioner's testimony was directly contrary to the primary prosecution

21  witnesses, Goldman and Buchanan.  Moreover, a terse up front admission of the prior felony,

22  which the prosecution was going to introduce in any event might suggest candor and be tactically

23  advantageous. Petitioner's disagreement with counsel's strategy is not alone a basis to find

24  deficient performance.  *See Strickland*, 466 U.S. at 690-91; *see also Lord v. Wood,* 184 F.3d

25  1083, 1095 (9th Cir. 1999) (observing that "few decisions draw so heavily on professional

26  judgment as whether or not to proffer a witness at trial").

27          Furthermore, petitioner's suggestion that Schultz should have elicited social and mental

28

history testimony at the guilt phase (*see* Doc. No. 116 at 304-309) appears contrary to the noted primary defense and fails to consider potentially negative information which motivated Schultz not to put petitioner's mother on the stand during the penalty phase (*see* SHCP, Ex. B ¶¶ 13-14). Petitioner's suggestion such additional testimony would have furthered alternative third party accomplice and timeline defenses fails for reasons discussed in claims II(B), II(C).

Petitioner has not demonstrated a reasonable probability of a different outcome had he not testified, or had he testified differently.  Especially so given the evidence supporting conviction including petitioner's admission to Buchanan and Goldman.  (*See* claims XXVI, XXVIII.)  Likewise the habeas proffer regarding facts and circumstances surrounding the Harvard Avenue apartment, the crimes and their aftermath.  (*Id.*)

(iii)    *Conclusions*

Accordingly, a fair-minded jurist could have found that petitioner failed to establish Schultz was ineffective in preparing, calling and examining trial witnesses, Maxine Hansen and petitioner, and that absent this allegedly deficient conduct a different outcome was reasonably probable.  *Strickland*, 466 U.S., at 687-98.

It does not appear that the California Supreme Court's rejection of these claims was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

Claims II(G) and II(H) are denied.

**h.    Analysis of Claim II(J)**

Petitioner alleges that Schultz was ineffective by failing to object to holding jury instruction discussions off the record and outside of petitioner's presence.  (Doc. No. 51-1 ¶¶ 365-373.)  He claims prejudice to the extent post-conviction counsel was left with an incomplete record to review and analyze.

(i)    *Off the Record Jury Instruction Conference*

Petitioner alleges that Schultz should have objected to the trial court's holding guilt phase jury instruction discussions off the record. (RT 4938-49.) He argues the lack of such a complete record deprived petitioner of meaningful appellate review. *See Coppedge v. United States*, 369 U.S. 438, 446 (1962) ("the Court of Appeals must provide the would-be appellant with ... a record of sufficient completeness[.]"; *People v. Howard*, 1 Cal. 4th 1132, 1166 (Cal. 1992) ("[u]nder the Fourteenth Amendment, the record of the proceedings must be sufficient to permit adequate and effective appellate review."). Specifically, petitioner argues the summary record does not show "what arguments his counsel made regarding jury instructions, and what errors the court made with respect to handling such requests, issues which could have been raised on appeal." (Doc. No. 116 at 270:26-271:1.)

It appears then applicable California law required death penalty proceedings to be conducted on the record, *viz.*:

> In any case in which a death sentence may be imposed, all proceedings conducted in the superior court, including all conferences and proceedings, whether in open court, in conference in the courtroom, or in chambers, shall be conducted on the record with a court reporter present. The court reporter shall prepare and certify a daily transcript of all proceedings commencing with the preliminary hearing.

Penal Code § 190.9(a)(1).

The record reflects that on March 14, 1991, the trial judge, the prosecutor and Schultz had an unrecorded conference on jury instructions outside the presence of petitioner and the jury. (RT 4938-49.) This, according to the trial judge was to avoid an "awkward record." (RT 4938.) Subsequently, in petitioner's presence the trial judge and counsel for both sides placed on the record a summary of the conference including objections by the parties. (RT 4938-46.) The court at that time specifically invited counsel to:

> [S]peak up if you think that something should be added or stricken, if there's some disagreement with the form of the instruction that the Court has indicated it will give. And I invite both of you to let me know if there's any instruction that you think ought to be given after we're through ....

1  (RT 4939), and the trial court invited:

2      Any comment concerning our instruction conference that either of you feel we
3      ought to put on the record?

4  (RT 4946.)   The court and counsel with petitioner present walked through each of the

5  instructions to be given including modifications.  (RT 4938-49).  The court stated and the parties

6  agreed that no theory of murder other than felony murder with aider and abettor liability was in

7  issue.  (RT 4946-47.)  Petitioner was given a copy of the proposed instructions and Schultz

8  discussed them with him.  (RT 4947-49.)

9      The court finds that the state supreme court would not have been unreasonable in

10  determining the erroneous failure to record the jury instruction conference to be harmless error.

11  Petitioner concedes that to show prejudice he must demonstrate the resulting appellate record

12  was inadequate to permit meaningful appellate review.  (Doc. No. 116 at 270:5-9, *citing People*

13  *v. Frye*, 18 Cal. 4th 894, 941 (Cal. 1998).)   A fair-minded jurist could have found that

14  petitioner has failed to make such a showing.

15      Petitioner has not demonstrated on the record that the instructions were constitutionally

16  infirm.  (*See* claims II(N), II(O), II(P), II(Q), XII.)  The state supreme court would have been

17  reasonable in finding off the record discussion regarding otherwise proper instructions did not

18  deny petitioner adequate appellate review.  That is, absent constitutional error there is no basis

19  for federal habeas relief and no prejudice under *Strickland*.  *See Estelle v. McGuire*, 502 U.S. 62

20  at 67-68 (1991) (it is not the province of a federal habeas court to reexamine state court

21  determinations of state law questions).  Notably, petitioner's allegations in these regards are not

22  supported by a declaration of trial counsel Schultz.  Petitioner's speculation alone is not

23  sufficient to entitle him to habeas relief.  *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th

24  Cir. 2001), *quoting Aldrich v. Wainwright,* 777 F.2d 630, 636 (11th Cir. 1985) ("Speculation that

25  [a] missing witness[] would have been helpful ... is insufficient to carry the burden of a habeas

26  corpus petitioner.";  *see also Dickey*, 35 Cal. 4th at 905, *citing Estelle*, 502 U.S. 62 at 71-75

27  ("Mere instructional error under state law regarding how the jury should consider evidence does

28

1 | not violate the United States Constitution.").

2 |        *(ii)*     *Jury Instruction Conference Without Petitioner Present*

3 |      Petitioner alleges that Schultz failed to object to jury instruction discussions held without

4 | petitioner being present.  (RT 4938-48.)  He argues the jury instruction conference was a "critical

5 | stage" of his trial proceeding that required his assistance and that he had a right to be present,

6 | *citing United States v. Gagnon*, 470 U.S. 522, 526 (1985) (a criminal defendant has the right to

7 | be present for all critical stages of his trial).  He argues this error denied him a sufficient

8 | opportunity to assist in his defense because he might have raised concerns that could have been

9 | addressed by the trial court.

10 |      However, petitioner has not demonstrated that jury instruction discussions presented a

11 | critical phase of his proceeding.  *See Moore v. Campbell*, 344 F.3d 1313, 1323 (11th Cir. 2003)

12 | ("the issue of whether a defendant must be present at all times in a capital trial has not yet been

13 | settled by the Supreme Court").  "It has long and clearly been held that criminal defendants are

14 | entitled to effective assistance of counsel during all critical stages of the criminal process."

15 | *Nunes*, 350 F.3d at 1052.  "[I]t is counsel's dut[y] to consult with the defendant on important

16 | decisions and to keep the defendant informed of important developments in the course of the

17 | prosecution.  Those obligations ensure that the ultimate authority remains with the defendant to

18 | make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a

19 | jury, testify in his or her own behalf, or take an appeal."  *Id.* at 1053.

20 |      Petitioner has not demonstrated clearly established law that he be present during jury

21 | instruction discussions.  A defendant has a right to be present "whenever his presence has a

22 | relation, reasonably substantial, to the fullness of his opportunity to defend against the charge."

23 | *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987), *quoting Snyder v. Massachusetts,* 291 U.S. 97,

24 | 105-06 (1934).  But he need not be present "when presence would be useless, or the benefit but a

25 | shadow."  *Id., quoting Snyder,* 291 U.S. at 106-07; *see Rice v. Wood*, 77 F.3d 1138, 1140 at n.2

26 | (listing cases finding right to presence not violated).  A defendant's "absence from various court

27 | proceedings, even without waiver, may be declared non-prejudicial in situations where his

28 |

presence does not bear a reasonably substantial relation to the fullness of his opportunity to defend against the charge." *People v. Johnson*, 6 Cal. 4th 1, 18 (1993), *citing People v. Garrison*, 47 Cal. 3d 746, 782 (1989), *quoting People v. Bloyd*, 43 Cal. 3d 333, 359-60 (1987), *abrogated on other grounds by People v. Rogers*, 39 Cal. 4th 826, 879 (2006).  For the reasons stated, the state supreme court could reasonably have found this to be such a case.

Even if petitioner could demonstrate absence during a critical phase, the state court could reasonably have found petitioner waived presence at the instructional conference.  The California Supreme Court has "repeatedly rejected the argument that the Sixth Amendment [C]onfrontation [C]lause of the United States Constitution or the due process clause of the California Constitution prevents a criminal defendant from waiving the right of presence at a critical stage of a capital trial." *People v. Bolin*, 18 Cal. 4th 297, 325 (Cal. 1998).  Defense counsel Schultz represented petitioner at the instructional conference.  Both Schultz and petitioner acquiesced in petitioner's absence from the instructional conference.  (RT 4938-49.)

In any event, that state supreme court could reasonably have found that petitioner has not demonstrated a reasonable probability of a different outcome had he been present at the instruction conference.  As noted, the trial court reviewed the final instructions with counsel and petitioner present.  (*Id.*)  The court allowed petitioner to review the instructions overnight and provide any comments or issues to counsel.  (*Id.*)  Petitioner apparently had none.  (*Id.*)  Instead, petitioner stated on the record that he was "satisfied" with proceedings as to the instructions.  (RT 4948.)

Petitioner's argument that the summary record of the instructional conference is insufficient to determine unspecified errors which could have been raised on appeal, could reasonably be seen as speculative.  Petitioner does not support any such errors on the record.

*(iii)    Conclusions*

Accordingly, a fair-minded jurist could have found that petitioner failed to establish Schultz was ineffective by failing to object to holding jury instruction discussions off the record and outside of petitioner's presence, and that absent this allegedly deficient conduct a different

outcome was reasonably probable.  *Strickland*, 466 U.S. at 687-98.

It does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

Claim II(J) is denied.

### i.        Analysis of claims II(K) and VIII

Petitioner alleges Schultz was ineffective by failing to object when the trial court erroneously took notice of Penal Code section 128 and read it to the jury, and by failing to address the resultant harm in closing argument.  (Doc. No. 51-1 ¶¶ 374-375, 678-682.)

The record shows the prosecutor was allowed elicit testimony from prosecution witness Buchanan that the prosecutor had made him aware of Penal Code section 128, which at that time provided that:

> Every person who, by willful perjury or subornation of perjury, procures the conviction and execution of any innocent person, is punishable by death or life imprisonment without possibility of parole. The penalty shall be determined pursuant to Sections 190.3 and 190.4.

*See Dickey*, 35 Cal. 4th at 911; (*see also* RT 4759-65).

### (i)        Ineffective Assistance of Counsel

Petitioner argues that Schultz should have objected because section 128 is not a meaningful deterrent to perjury and the chance of a successful prosecution under section 128 is so remote as to make that statute irrelevant to petitioner's proceeding.  *See Dickey*, 35 Cal. 4th at 912.  Respondent counters that these allegations are unexhausted.[10]

The California Supreme Court considered and rejected these allegations on direct appeal,

---

[10]  The record reflects respondent has stipulated and admitted that petitioner's record claims are exhausted (*see* Doc. No. 69 at 12;13-13:4; Doc. No. 105 at 11:7-8; Lod. Doc. 31).  The court rejects respondent's arguments to the contrary.  (*See e.g.,* Doc. No. 125 at 27:1-9; 28, 84:11-13,  147:3, 149 n.48, 164 n.55, 173:19; *see also* 28 U.S.C. 2254(b)(1-2),(c)); *Robinson v. Schriro*, 595 F.3d 1086, 1102 (9th Cir. 2010) (petitioner required only to present to the state court the legal and factual basis of his federal constitutional claim in order to exhaust the claim).

stating that:

> Defendant contends reference to section 128 by the court and prosecutor constituted prejudicial error. The contention lacks merit. [*People v. Harris*, 47 Cal.3d 1047, 1083, fn.17 (1989)]
>
> …
>
> On redirect, the prosecutor asked Buchanan whether he recalled being informed by the prosecutor of a Penal Code section dealing with testimony in a capital case. Buchanan responded, "Oh, yes, sir, yes; definitely remember that one." Defense counsel objected, without specifying any ground. Outside the presence of the jury, the prosecutor supported the propriety of this line of questioning by citing [*People v. Harris*, 47 Cal.3d 1047 (1989).].
>
> In *Harris,* the defendant claimed "the prosecutor ... improperly attempted to establish [a witness's] credibility by eliciting testimony that [the witness] was aware of Penal Code section 128, and that the section provided for the death penalty for a witness who gave perjured testimony leading to a conviction in a capital case. Again, there was no objection, *and the question was proper.*" [*Harris,* 47 Cal.3d at 1083 n.17.]
>
> After he had an opportunity, along with the court, to read *Harris,* defense counsel did not renew his objection. Rather, he said the prosecutor should be limited to asking Buchanan whether he was "aware" of section 128. The prosecutor so confined his query, and after Buchanan again testified he was aware of the section, the court read it to the jury. Finally, during his closing argument, the prosecutor asked the jury, "Do you think Gene Buchanan would lie to send a man to prison? Perhaps. Do you think Gene Buchanan would lie to send a man to prison that he doesn't like? Even more perhaps. Do you think that Gene Buchanan would lie to send a man to prison behind a murder charge where Gene Buchanan himself could face a capital case for it?"
>
> Defendant argues section 128 is not a meaningful deterrent to perjury. "Given the inevitable time lapse between potential conviction and execution, and the remote prospect of conclusive exonerating evidence being discovered after an execution, the chances of a successful prosecution under Penal Code section 128 in any case are so remote as to make the proffered evidence wholly irrelevant."
>
> We decline to second-guess the Legislature, which in enacting the section, clearly believed it would have a meaningful deterrent effect. Admittedly, the delay between conviction and execution has grown exponentially since section 128 was enacted in 1872. However, by 1997, when the Legislature amended and thereby reaffirmed the section, the notion of swift justice in capital cases was already a thing of the past. Moreover, with the advent of DNA testing, "the prospect of conclusive exonerating evidence being discovered after an execution" is, if anything, less "remote." In any event, the stakes under section 128, "death or life imprisonment without possibility of parole," are so high a potential perjurer may well decide it is not worth the risk, however small.
>
> ---------------------------------------FOOTNOTE----------------------

n.11   The 1977 amendment added the phrase "or life imprisonment without possibility of parole," as well as the second sentence. (Stats. 1977, ch. 316, § 3, p. 1256, eff. Aug. 11, 1977.)

------------------------------------END FOOTNOTE------------------

*Dickey*, 35 Cal. 4th at 911-12.

The state supreme court's rejection of these allegations on grounds stated by that court was not unreasonable.  Petitioner has not demonstrated on the clearly established federal law that Schultz erred by not objecting to Penal Code section 128, a then effective state statute. Schultz's statement in his habeas declaration that he did not object because he "did not recognize undue prejudice to the defense" rather than as a "tactical choice" (*see* SHCP, Ex. B ¶ 8) does not demonstrate he was objectively unreasonable by withholding objection to proper questions by the prosecutor or to judicial notice of the then effective statute.  *See Vieira v. Chappell*, 2015 WL 641433, at *53 (E.D. Cal. February 5, 2015), *citing Dickey*, 35 Cal. 4th at 911-12 (prosecutor's establishing witness aware of Penal Code section 128 not improper, but rather an accurate statement of then prevailing state law).

Even if Schultz did err as alleged, petitioner has not demonstrated prejudice, a reasonable probability of a different outcome absent the error.  Buchanan's testimony was largely corroborated by Goldman (*see* claims XXVI, XXVIII) and the jury otherwise was aware of the parties' substantial direct and indirect evidence and argument relating to Buchanan's credibility (*see* claims II(P), XIII, XVII, XXVI, XXVIII).

Accordingly, a fair-minded jurist could have found that petitioner failed to establish Schultz was ineffective by failing to object to and argue against the trial court's notice of Penal Code section 128 and reading of that statute to the jury, and that absent this allegedly deficient conduct a different outcome was reasonably probable.  *Strickland*, 466 U.S., at 687-98.

   (ii)   *Trial Court Error*

Petitioner alleges the trial court erred in taking judicial notice of section 128 for the same reasons stated above.

As discussed more fully in claims that follow, trial court error violates due process where

it renders the resulting criminal trial fundamentally unfair. *Chambers v. Mississippi*, 410 U.S. 284, 294, 303 (1973). Here, the trial court's reference to and notice of section 128 was not prejudicially erroneous for the reasons discussed above including those stated by the California Supreme Court in denying these allegations.

    *(iii)    Conclusions*

    For the reasons stated, the state supreme court could reasonably have found the trial court properly took notice of and read to the jury section 128, and that defense counsel Schultz was not objectively unreasonable by failing to object to such and by failing to address such in closing argument.

    Accordingly, the California Supreme Court's rejection of these claims was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

    Claims II(K) and VIII are denied.

    **j.    Analysis of Claim II(L)**

    Petitioner alleges that Schultz was ineffective by failing to object to detective Stokes trial testimony of statements of then deceased prosecution witness, Ms. Goldman, that were allegedly inconsistent with Goldman's preliminary hearing testimony. (Doc. No. 51-1 ¶¶ 376-379.) He argues that Stokes's testimony should not have been admitted under the state law hearsay exception for inconsistent statements (Evid. Code §§ 770, 1235) because doing so violated the Confrontation Clause. He argues that Goldman was not given the opportunity at the preliminary hearing to explain or deny her alleged prior statements to Stokes. He points out that Goldman was not a witness at trial and could not have given further trial testimony. (*See* Doc. No. 116 at 338:23-27, Doc. No. 128 at 150:25-151:5.)

    *(i)    Clearly Established Law – Confrontation of Testimonial Hearsay*

    The Supreme Court held in *Crawford v. Washington* that "[o]ur cases have thus remained faithful to the Framers' understanding: [t]estimonial statements of witnesses absent from trial

have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. 36, 59 (2004).

"Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law - as does [*Ohio v.*] *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68; *see also Williams v. Illinois*, 132 S.Ct. 2221, 2223 (2012) ("[B]efore *Crawford* [ ], this Court took the view that the Confrontation Clause did not bar the admission of out-of-court statements that fell within a firmly rooted exception to the hearsay rule. In *Crawford,* the Court held that such statements could be "admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."

*Crawford* abrogated the rule *Ohio v. Roberts*, prevailing at the time of petitioner's trial that "[the prosecutor] was permitted to elicit hearsay testimony if the declarant was unavailable and there was a firmly-rooted hearsay exception (or indicia of reliability) that applied to the testimony." 448 U.S. 56, 66 (1980), *abrogated by Crawford*, 541 U.S. at 68 (2004); *see also* Doc. No. 125 at 97:20-22.)

*(ii)    California Supreme Court Summary of Facts:*

According to Detective Doug Stokes, Goldman told him "about a venetian blind that had been in the hall closet that was ... taken by the suspect, Dickey, into a bedroom and that the cord was removed from that venetian blind and then the venetian blind was placed back inside the hall closet." However, when she testified, Goldman said it was Cullumber who took the venetian blind out of the closet and went into the bedroom with it. Later, she testified, the blind had been replaced in the closet, but the cord was missing from a blind in the bedroom.

At approximately the same time that Cullumber was engaged with the venetian blind, defendant walked into the kitchen and opened a drawer containing knives and other silverware.n.5

----------------------------------------FOOTNOTE----------------------
n.5 Goldman later testified she did not know which drawer defendant had opened.

-------------------------------------END FOOTNOTE------------------

According to Detective Stokes, Goldman told him defendant removed a knife from the drawer and left the kitchen with it. Again according to Detective Stokes, when he came to the apartment investigating the murders, he showed Goldman a knife. She told him, "I have a knife exactly like that knife, or they are twins."

After the activity just described, Goldman testified, defendant and Cullumber left the apartment. They had no money, Goldman believed, when they left. If Cullumber had money, he spent it on drugs; before defendant left he asked Goldman for money to buy cigarettes. However, when they returned, Cullumber gave Goldman $40 or $50 in cash, saying it was in partial payment of what he owed her. Cullumber then packed his clothes and left.

Sometime thereafter, while Goldman and defendant were watching the news on television, they saw a story about this crime. Defendant became upset when he learned Mr. Freiri was dead and that Mrs. Caton, while near death, was still alive. He told Goldman to come into the bedroom, that he wanted to talk to her. Buchanan followed them into the bedroom.

Defendant told them he had accompanied Cullumber to the home of Mrs. Caton. On the one hand, defendant said that Cullumber had assured him "nothing was going to happen." On the other hand, defendant admitted he had gone with Cullumber "[t]o help [him] get the money." With Mrs. Caton present, defendant looked for money in her bedroom, where Cullumber told him it could be found. When defendant stepped out of the bedroom and saw Mr. Freiri slumped over in a chair, he "knew something had happened." Cullumber "went berserk. He came into the bedroom and started beating up on his grandmother." Defendant and Cullumber found $700, which they split.

Defendant was crying, "like he was sad," when he confessed to Goldman and Buchanan. Later, when defendant learned Mrs. Caton had died, "he wasn't as depressed as he was before."

While he was confessing, defendant said maybe he should turn himself in. Goldman advised him against it. When Detective Stokes first asked Goldman whether she knew anything about these crimes, Goldman denied that she did. Defendant was a good friend of hers, she still liked him, and she did not want to do anything to get him into trouble. She did not want to tell on anyone, especially someone she liked as much as she liked defendant. Buchanan told her he was going to turn defendant in for the reward. By contrast, Goldman testified at the preliminary hearing only because she had been subpoenaed. During a break, Goldman told the prosecutor she wanted to make sure defendant knew she was not the one who turned him in. She was afraid for her life. "I always felt that if you would inform on somebody they would kill you or have you killed." Defendant said he was not concerned that someone would betray him, "because if they did, they wouldn't do it again." On the other hand, Goldman thought that her relationship with defendant was such that "it would take an awful lot to make him hurt me."

*Dickey*, 35 Cal. 4th at 896-97.

    *(iii)*    *Goldman's Preliminary Hearing Testimony*

82

As noted, Goldman testified at the August 1989 preliminary hearing.  (CT 19-98.)  She died on December 17, 1990, two months before the start of petitioner's trial.  (RT 4289, 4807.)  Goldman's preliminary hearing testimony was admitted at trial as the prior testimony of an unavailable witness.  (RT 4289-97, 4335-4403, 4417-4420.)

Goldman testified in pertinent part at the preliminary hearing that:

- She saw petitioner and RC leave the apartment right around the day of the Presidential election.  (RT 4339-40.)
- Before they left "[t]he only thing [petitioner] did was walk into the kitchen and he looked in the drawer. That's all he did." (RT 4343.)
- She saw RC open the hallway closet, and "get a cord." (RT 4345.)
- She saw that a cord on one of the venetian blinds in the apartment's bedroom, not the hallway closet, was gone.  (RT 4347.)
- She did not know how long [petitioner and RC] were gone.  (RT 4349.)
- When they returned, RC packed his bags and left.  (RT 4350.)
- Petitioner admitted to her that he was present when RC killed his grandmother and Louis Freiri, but that "Gail, I swear I had nothing to do with this." (RT 4357.)
- Petitioner made the "general statement" that "he wasn't afraid of anyone saying anything about him, because if they did, they wouldn't do it again." (RT 4375.)
- After petitioner found out RC and Caton had died, "he wasn't as depressed as he had been before." (RT 4378.)

*(iv)    Goldman's Statements to Detective Stokes*

At trial, the prosecutor elicited testimony from detective Stokes that prior to the preliminary hearing Goldman told him:

- She saw petitioner remove a knife from a drawer in the apartment kitchen before he and RC left the apartment on the night of the crimes.  (RT 4602-04.)
- Two days later petitioner "asked her to go into the bedroom with him, he want -- he wanted to tell her something." (RT 4606.)
- Buchanan followed them in (RT 4607) and petitioner stated "he had been involved in something bad." (RT 4608.)
- "[Petitioner] had said that he would kill her if she or anyone else talked about what he had told them." (RT 4615.)
- After the deaths of Ms. Caton and RC petitioner "became aggressive toward her and Buchanan, and made statements regarding the fact that if they revealed what he had told them that they would be hurt and killed, as would anyone else." (RT 4616.)
- Goldman told him about "a venetian blind that had been in the hall closet that was removed from the hall closet the night of the homicide, and that that venetian blind was - taken by [petitioner] ... into a bedroom and that the cord was removed from that venetian blind and then the venetian blind was placed back inside the hall closet." (RT 4534.)

83

1      (v)      *Crawford Applies to Petitioner's Proceeding*

2          Petitioner argues that *Crawford* should apply retroactively to his proceeding.  Respondent

3  disagrees, arguing the trial court could not have anticipated the *Crawford's* abrogation of the rule

4  in *Roberts*.

5          However, the state supreme court could reasonably have applied *Crawford* to petitioner's

6  case.  *Crawford* has been retroactively applied to cases which were pending on direct review

7  when it was decided, because it repudiated *Roberts* and announced a new rule on the effect of the

8  Confrontation Clause on hearsay statements.  *Colon v. Paramo*, 2014 WL 1330562, at *13 (E.D.

9  Cal. Apr. 2, 2014).)  *Crawford* has been found not retroactively applicable to cases on collateral

10  review.  *See Whorton v. Bockting, 549 U.S. 406, 420 (2007*).

11          Here, the California Supreme Court did not affirm petitioner's conviction until May 23,

12  2005, *Dickey*, 35 Cal. 4th 884 (2005), and the United States Supreme Court did not deny

13  petitioner's writ of certiorari until February 21, 2006.  *Dickey*, 546 U.S. 1177.  The Supreme

14  Court's decision in *Crawford* issued on March 8, 2004.  Direct review of petitioner's conviction

15  was pending when the *Crawford* decision issued.  *See Griffith v. Kentucky*, 479 U.S. 314, 322-23

16  (1987) (new rule of constitution criminal procedure applies to all similar cases pending on direct

17  review).  Accordingly, the new rule of *Crawford* applies to petitioner's case.

18      (vi)      *Petitioner did not Waive Confrontation*

19          The state supreme court would not have been unreasonable in determining that Schultz's

20  failure to object to Stokes's noted testimony was not a waiver of petitioner's right to confront

21  this testimony.   The record does not appear to suggest that Schultz intentionally waived

22  confrontation as a matter of trial tactics.  *See* e.g., *Wilson v. Gray*, 345 F.2d 282, 286 (9th Cir.

23  1965) ("the accused may waive his right to cross-examination and confrontation and that the

24  waiver of this right may be accomplished by the accused's counsel as a matter of trial tactics or

25  strategy"; *see also Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2534 at n.3 (same).

26  Schultz has not provided a declaration stating why he did not object.  Petitioner was present in

27  court during Stokes's testimony and apparently did nothing that might suggest such a waiver.

28

1  Respondent has not pointed to evidence in the record showing such a waiver.

2  Moreover, Schultz may not have anticipated *Crawford's* new rule. *See Colon*, 2014 WL

3  1330562 at *14 *citing People v. Johnson,* 121 Cal. App. 4th 1409, 1411 at fn. 2 (2004) (*Roberts*,

4  the governing law at the time "afforded scant grounds for objection."). Especially so as "[t]he

5  right of an accused to cross-examine and confront prosecution witnesses in a state criminal trial

6  is an essential ingredient of a fair trial. As such it is necessarily a right embodied in the due

7  process clause of the Fourteenth Amendment." *Gray*, 345 F.2d at 286, *citing Pointer v. State of*

8  *Texas*, 380 U.S. 400, 403 (1965).

9  (vii)  *Goldman's Statements were Testimonial*

10  Petitioner argues that noted statements were testimonial in nature.

11  Witness statements are nontestimonial when made in the course of police interrogation

12  under circumstances objectively indicating that the primary purpose of interrogation is to enable

13  police assistance to meet an ongoing emergency. *Davis v. Washington,* 547 U.S. 822 (2006).

14  Witness statements are testimonial when the circumstances objectively indicate that there is no

15  such ongoing emergency, and that the primary purpose of the interrogation is to establish or

16  prove past events potentially relevant to later criminal prosecution. *Id.*

17  In *People v. Geier*, the California Supreme Court "reviewed *Crawford* and *Davis* as to

18  the determination of whether a statement is testimonial under the Sixth Amendment and held:

19  [W]hat we extract from those decisions is that a statement is testimonial if (1) it is made to a law

20  enforcement officer or by or to a law enforcement agent and (2) describes a past fact related to

21  criminal activity for (3) possible use at a later trial. Conversely, a statement that does not meet

22  all three criteria is not testimonial." 41 Cal. 4th 555, 605 (2007), *overruled on other grounds by*

23  *People v. Seumanu*, 61 Cal. 4th 1293, 1320 (2015).

24  The record in this case reasonably suggests Goldman's statements were testimonial in

25  nature. Goldman's statements were made during detective Stokes's investigation of Buchanan's

26  statements implicating petitioner in the crimes against Freiri and Caton. (RT 4494-4503.)

27  Stokes apparently interrogated Goldman to confirm past events. That is, he "wanted to talk to

28

1   Gail Goldman as a result of some information that Mr. Buchanan had given." (RT 4592.)   There

2   was no apparent ongoing emergency because Buchanan implicated petitioner several months

3   after the murders and RC's suicide.  *See Dickey*, 35 Cal. 4th at 894-900.    Testimonial

4   statements under *Crawford* would typically include such statements during police interrogation

5   under circumstances where an objective witness would reasonably believe the statement would

6   be available for use later at trial.  *See Crawford*, 541 U.S. at 51-51, 68.  Given the circumstances

7   surrounding Goldman's interrogation, an objective witness would have expected he statements to

8   be available for use at petitioner's trial.

9           *(viii)   No Opportunity to Cross-Examine Goldman*

10           Petitioner argues that Schultz had no opportunity to cross-examine Goldman's statements

11   to detective Stokes.

12           The state supreme court reasonably could have found that Goldman was an unavailable

13   witness whom petitioner was denied the opportunity to cross-examine.  Petitioner's allegation

14   that the prosecution intended to and succeeded in making Goldman unavailable for defense

15   cross-examination by failing to make a good faith effort to set his trial before Goldman's death

16   reasonably could have been denied.   Petitioner supports this allegation by arguing the

17   prosecution did not oppose two continuances of trial (CT 241-46, 250) even though Goldman's

18   health problems were a matter of record as early as the preliminary hearing (CT 22-24; RT

19   4369).  Such surmise by petitioner is largely unsupported by the record and not alone a sufficient

20   basis for relief.  Nevertheless, that court could reasonably have found Goldman unavailable upon

21   her death prior to trial.  (RT 4289, 4807.)

22           The state supreme court also could reasonably have found that Schultz was denied the

23   opportunity to cross-examine Goldman on her statements to Stokes.  *See Ocampo v. Vail*, 649

24   F.3d 1098, 1113 (9th Cir. 2011) (a non-testifying declarant is not subject to cross-examination).

25   Respondent argues Schultz could have cross-examined Goldman at the preliminary hearing on

26   the gist of her statements to Stokes because prosecutor Hahus asked Goldman about statements

27   she made to Stokes.   However, it appears Goldman denied making and did not specifically

28

1   discuss her statements to Stokes during her preliminary hearing testimony.  (*See e.g.*, RT 4346-

2   47, 4363-67, 4373-77, 4396-4403.)

3          The state supreme court could reasonably have found that Schultz was not afforded the

4   opportunity to cross-examine Goldman at the preliminary hearing about her prior statements to

5   Stokes.

6          *(ix)     Stokes Testimony Admissible as Non-Hearsay*

7          Petitioner argues that Stokes's testimony included hearsay admitted for the truth of

8   Goldman's statements to him.  But the state supreme court could have found Goldman's noted

9   statements went toward impeaching her credibility.

10          The Confrontation Clause also does not bar statements introduced for a non-hearsay

11   purpose.  *Tennessee v. Street,* 471 U.S. 409, 414 (1985) (defendant's rights under Confrontation

12   Clause not violated by introduction of accomplice's confession for non-hearsay purpose); *see

13   also Gonzales v. Virga*, 2012 WL 6004520, at **16-17 (E.D. Cal. Nov. 30, 2012) (the rule of

14   *Crawford* only applies to testimonial statements that were introduced to establish the truth of the

15   matter asserted); *Crawford,* 541 U.S. at 59 n. 9, *citing Street*, 471 U.S. at 414 ("The

16   (Confrontation) Clause ... does not bar the use of testimonial statements for purposes other than

17   establishing the truth of the matter asserted.").

18          In California, inconsistent statements are admissible to attack credibility of the declarant

19   even without any giving the declarant an opportunity to explain or deny the inconsistent

20   statement.  *See Gonzales*, 2012 WL 6004520, at *13, *citing* Evid. Code § 1202.  The rule of

21   *Crawford* "only applies to testimonial statements that were introduced to establish the truth of

22   the matter asserted."  *Id.; accord, Davis,* 547 U.S. at 823 (Confrontation Clause applies only to

23   testimonial hearsay).

24          Here, the state supreme court could reasonably have determined Stokes's testimony was

25   offered to impeach Goldman's preliminary hearing testimony, a non-hearsay purpose.  *See

26   People v. Marquez*, 88 Cal. App. 3d 993, 998-99 (1979) (police officer's trial testimony of

27   hearsay declarant's statements impeaching declarant's preliminary hearing testimony was

28

admissible as non-hearsay).  Goldman's credibility was a significant issue at trial and was argued by both petitioner and respondent.  (*See e.g.,* claims II(P), XXVI, XXVIII.)  Both parties invoked Stokes's testimony in arguing Goldman's credibility (directly) and Buchanan's credibility (indirectly).  (*See e.g.*, RT 4767-76 4964-74, 4989.)  The state supreme could would have been reasonable in concluding that Schultz, as a result of Stokes's testimony reasonably hoped the jury would discount Goldman as a witness and discount Buchanan at least to the extent his testimony was consistent with Goldman's.

Furthermore, the jury was instructed regarding consideration of Stokes's testimony for purposes of determining the believability of trial witnesses as follows:

> [Y]ou may consider anything that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness, including but not limited to … the character and quality of that testimony ... a statement previously made by the witness that is [consistent] [or] [inconsistent] with the testimony of the witness ... the character of the witness for honesty or truthfulness or their opposites.

(CT 400-01, CALJIC 2.20.)  The jury was also instructed as to witness credibility that:

> Evidence that on some former occasion, a witness made a statement or statements that were inconsistent …with … testimony in this trial, may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on such former occasion.

(CT 399, CALJIC 2.13.)

The court is unpersuaded by petitioner's passing argument that Goldman's statements to Stokes lacked foundation.  Goldman testified as an eye witness to petitioner's actions and words around the time of the crimes.  Petitioner points to Goldman's alleged statement to her friend, Ms. Desumala around the time of the preliminary hearing, seemingly controverting Goldman's statements by suggesting a grandson of the victims (rather than petitioner) may have confessed to Goldman.  But Desumala's testimony could reasonably be seen as vague and in the nature of generalities and not necessarily contrary to Goldman's testimony of petitioner's admission to her.  Nor does Desumala's testimony necessarily controvert the noted foundational facts for Goldman's statements to Stokes.  (RT 4807-29); *see also Dickey*, 35 Cal. 4th at 907, n.8.

1    Additionally, petitioner's brief argument that Stokes coerced Goldman's statements has

2    scant support when considered in context.  Goldman testified that during her February 1989

3    interview by Stokes she was scared of him because he threatened to take her to jail as an

4    accessory if she did not tell him what she knew.  (RT 4374.)  However, the record reflects that

5    months earlier, when detective Stokes was seeking information in the immediate wake of the

6    crimes, he had explained to Goldman and others at the Harvard Avenue apartment about being

7    an accessory after the fact.  (RT 4595-97).  Stokes denied making such statements or threatening

8    to arrest Goldman during the February 1989 interview.  (*Id.*)  Instead, according to Stokes,

9    Goldman then admitted "Detective Stokes, I'm sorry, I lied to you.  I'm sorry I lied to you.  I

10   want to tell you the whole truth right now."  (*Id.*)  The state supreme court reasonably could have

11   found Goldman's statements to Stokes during the interrogation were not coerced, but voluntary.

12        *(x)    Prejudice*

13        Petitioner alleges that Stokes's noted testimony regarding Goldman's statements to him

14   was prejudicial because it attributed to petitioner possession of murder weapons (a knife - RT

15   4228, 4603, 4640-49; and a cord -RT 4416, 4532-34); and a consciousness of guilt (threats to

16   those who might expose him - RT 4375-77, 4616; his hiding in the attic of the Harvard Avenue

17   apartment when detective Stokes showed up wanting to question him - RT 4367, albeit petitioner

18   denied hiding in the attic - RT 4901).  (*See also* Doc. No. 51-1 ¶ 863; Doc. No. 116 at 370:19-

19   22; RT 4595-4616.)  Petitioner argues that absent Stokes's testimony there is a reasonable

20   probability he would not have been convicted.

21        But even if Schultz was ineffective by failing to object to detective Stokes trial testimony

22   of Goldman's statements to him, the state supreme court reasonably could have found it not to be

23   prejudicial.  Stokes's testimony of Goldman's statements appears significantly cumulative of and

24   corroborated by Buchanan's testimony.  *Cf., Ocampo*, 649 F.3d at 1114 (inquiry into

25   Confrontation Clause error considers whether errantly admitted evidence was cumulative).  For

26   example, Buchanan testified that on the night of the murders, he saw petitioner take the venetian

27   blind out of the hall closet and go into the bedroom (RT 4665-66), and then exit the bedroom and

28

1   return the venetian blind to the closet; he also saw a kitchen knife in the bedroom (RT 4706-07).

2   *See also Dickey*, 35 Cal. 4th at 898.  He also testified that RC and petitioner returned later than

3   night and bought drugs for the roommates with money RC and petitioner did not have earlier that

4   evening and that petitioner then disposed of some of his clothing by throwing it into a canal.

5   (RT 4682-85.)

6        Significantly, petitioner's admission of his role in the crimes to Goldman and Buchanan

7   and discussion of events surrounding the crimes (*see* RT 4355-79; 4606-08, 4687-93) were

8   consistently in the record and not implicated in Stokes's testimony of Goldman's statements.

9        Furthermore, petitioner's admission was corroborated by Goldman's consistent testimony

10  that RC and petitioner left the apartment together the night of the crimes and returned together

11  later that evening whereupon RC acted strangely; *(*RT 4349-79); *see also Dickey*, 35 Cal. 4th at

12  898; and by petitioner's initial depression following the crimes (RT 4352-54, 4378).  Goldman's

13  testimony about petitioner being essentially fearless and aggressive also was not necessarily

14  controverted by Stokes's testimony (RT 4398) or by Buchanan's testimony that petitioner "never

15  threatened my life in my presence."  (RT 4745.)

16       For the same reasons, the state supreme court could reasonably have concluded there was

17  no reasonable probability of a more favorable result had the jury been given an instruction

18  limiting use of Stokes's testimony to non-hearsay purposes.

19       Finally, petitioner's suggestion that Stokes, by testifying as a police detective effectively

20  vouched for Buchanan's consistent testimony could reasonably be seen as speculative.  Petitioner

21  does not demonstrate on the evidentiary record that Stokes either expressed his personal belief in

22  Goldman's veracity or suggested information not known to the jury supported Goldman's

23  testimony.  *See United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002) (prosecutor's

24  reference to being a participant in the underlying criminal investigation during closing argument

25  constituted improper vouching); *see also U.S. v. McKoy*, 771 F.2d 1207, 1210-11 (9th Cir. 1985)

26  ("The rule that a prosecutor may not express his personal opinion of the defendant's guilt or his

27  belief in the credibility of witnesses is firmly established.").

28

*(xi)     Conclusions*

Accordingly, a fair-minded jurist could have found that petitioner failed to establish Schultz was ineffective by failing to object to detective Stokes trial testimony of statements made by then deceased prosecution witness, Ms. Goldman, and that absent this allegedly deficient conduct a different outcome was reasonably probable. *Strickland*, 466 U.S., at 687-98.

It does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claim II(L) is denied.

**k.     Analysis of Claims II(M), II(N), II(O), II(P) & II(Q)**

Petitioner alleges that Schultz was deficient in requesting and failing to object to guilt phase instructions.  (Doc. No. 51-1 ¶¶ 380-399.)

*(i)     CALJIC 8.80 - Actus Reus Requirement*

Petitioner alleges that Schultz was deficient by failing to object to the prosecutor's modified CALJIC 8.80 which he claims deleted the act in aid of first degree murder ("actus reus") requirement.   He claims this error was prejudicial because the prosecutor argued in closing that the state was not required to prove actus reus on the part of petitioner for purposes of proving special circumstances.  (RT 4952-4975, 4979-80.)  He argues that absent this error there was a reasonable probability the result of the proceedings would have been different.

*State Law – Aider and Abettor of Felony Murder*

Petitioner was charged as an aider and abettor of the two murders, robbery of each victim, burglary, four felony murder special circumstances, and one multiple murder special circumstance.  (CT 297-301; *see also* RT 4952, 4975, 4979-80.)  At the time of his trial, Penal Code section 190.2, former subdivision (b), under which petitioner was charged, stated:

Every person whether or not the actual killer found guilty of intentionally aiding,

abetting ... or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in [specified paragraphs covering, among others, the crimes of burglary and robbery] of subdivision (a) of this section has been charged and specially found under Section 190.4 to be true.

Penal Code § 190.2(b) (eff. Nov. 8, 1978). The standard CALJIC 8.80 special circumstance instruction (for murder committed before June 5, 1990) read in relevant part:

If you find beyond a reasonable doubt that the defendant was an aider or abettor, then you must also find beyond a reasonable doubt that the defendant with intent to kill aided and abetted an actor in the commission of the murder in the first degree, in order to find the special circumstance to be true.

(SHCP, Ex. A.)

*Prosecution Theory*

Petitioner argues the prosecution's primary theory was that "petitioner aided or abetted in the underlying felonies making him guilty of felony-murder, and that he formed an intent to kill in a spontaneous, unspoken thought following the apparent death of the first victim [Mr. Freiri] making him liable for five special circumstances, including three with regard to the first victim." (Doc. No. 51-1 ¶¶ 381, 385.) Petitioner points to the prosecution argument that petitioner confessed to Buchanan that after he saw Mr. Freiri apparently dead, slumped over in a chair, he formed the spontaneous thought "if you kill one, you might as well kill them both." (Doc. No. 51-1 ¶ 385; RT 4691-93.) The prosecutor argued this unspoken thought to the jury as mens rea, as follows:

Now, the evidence of the intent, his intent, is there from Gene Buchanan's relating to you his statement in the bedroom ... he says he saw what looked like Louis the old man slumped over and dead, he said or thought--it makes no difference, because intention is a state of mind—'If you kill one you might as well kill the other.' That's an intention that someone die.

(RT 4980.)

*Modified CALJIC 8.80*

Petitioner argues the prosecution improperly modified CALJIC 8.80 to omit any

component of the actus reus in aid of first degree murder.  The record reflects that the trial court

instructed the jury with a modified CALJIC 8.80 instruction, in relevant part as follows:

> If you find beyond a reasonable doubt that the defendant was an aider or abettor, then you must also find beyond a reasonable doubt that the defendant intended either to kill a human being or to aid another in the killing of a human being in order to find the special circumstance to be true.

(CT 425; *see also* RT 5021-22.)

Petitioner argued on direct appeal that the modified instruction was inconsistent with then

applicable Penal Code § 190.2(b) because the modified instruction erroneously relieved the

prosecution of this requirement to show petitioner assisted in the actual killings.  That is, he

argued Penal Code § 190.2(b) required the prosecution to prove not only that he aided or abetted

the burglaries and robberies, but also that he assisted in the actual killings themselves.  *See*

*Dickey*, 35 Cal. 4th at 900.  The California Supreme Court disagreed, stating that:

> Section 190.2, former subdivision (b) is not helpful to defendant because, under the felony-murder doctrine, he was found guilty of aiding or abetting first degree murders. All persons aiding or abetting the commission of burglary or robbery are guilty of first degree murder when one of them kills while acting in furtherance of the common design

*Dickey*, 35 Cal. 4th at 900.

Petitioner, in his direct appeal relied upon *People v. Anderson*, 43 Cal. 3d 1104 (Cal.

1987), *superseded by statute as stated in People v. Mil*, 53 Cal. 4th 400, 408-09 (Cal. 2012), for

the proposition that the "actus reus of a special circumstance requires that a defendant aid or abet

the actual killing, not just the underlying felony."   Specifically, petitioner pointed to the

statement in *Anderson* that:

> [G]iven a realistic reading the statutory requirement that the aider and abetter intentionally aid, abet, counsel, command, induce, solicit, request, or assist any acts in the commission of first degree murder—even when applied to felony murder—is not ambiguous: the aider and abetter must intentionally aid in a killing.

*Anderson*, 43 Cal. 3d at 1145.  The state supreme court again disagreed, stating that:

1

2
    [Petitioner's] reliance on *Anderson* is unfounded. It is axiomatic a decision does
not stand for a proposition not considered by the court ... The proposition

3
advanced by defendant—for a felony—murder special circumstance, the aiding or
abetting has to relate to the act of killing itself, rather than just the underlying

4
felony was not considered by the court in *Anderson.* The question we considered
in *Anderson*—reconsidered, actually—was "whether and under what

5
circumstances intent to kill is an element of the felony—murder special
circumstance." [Citation]

6 *Dickey*, 35 Cal. 4th at 901. That court further noted that recasting the sufficiency of the evidence

7 argument (*see* claim XXVI*)* as an instructional claim, that the trial court prejudicially erred by

8 failing to instruct the jury that petitioner had to have aided or abetted the actual killings not just

9 the underlying felonies, also failed. For the reasons stated above and in claims XII and XXVI,

10 *post*, such is the case here. *See also Dickey*, 35 Cal. 4th at 903-4.

11     The modified CALJIC 8.80 instruction could reasonably be seen as sufficient under then

12 applicable state felony murder analysis. A felony murderer jointly engaged in the underlying

13 felony commits first degree murder. *See e.g., People v. Pulido*, 15 Cal. 4th 713, 716 (1997).

14 Petitioner has not demonstrated the clearly established law dictates otherwise.

15     The jury also was instructed regarding felony murder that an aider and abettor must

16 intend to kill before a special circumstance can be found true. The state supreme court's

17 rejection of petitioner's *Anderson* argument need not be seen as a retroactive expansion of his

18 criminal liability. As that court concluded, the *Anderson* holding did not reach issues of actus

19 reus and the challenged instruction correctly stated California law. This court is not in a position

20 to conclude otherwise. *See Bradshaw v. Richey*, 546 U.S. 74, 98 (2005) (state supreme court's

21 authoritative interpretation of state law is controlling of sufficiency of evidence claim). It is not

22 enough for habeas relief that "[an] instruction was allegedly incorrect under state law." *Estelle*,

23 502 U.S. at 71-72. "In the absence of a federal constitutional violation, no relief can be granted

24 even if the instruction given might not have been correct as a matter of state law." *Mitchell v.*

25 *Goldsmith*, 878 F.2d 319, 324 (9th Cir. 1989).

26     For the reasons stated, petitioner has not demonstrated he was denied due process rights

27 under his cited *Bouie v. City of Columbia*. 378 U.S. 347, 350 (1964) (criminal statute must give

28

fair warning of the conduct it makes a crime). Schultz's statement in his habeas declaration that was unaware the modified instruction prejudicially omitted any required element (*see* SHCP, Ex. B ¶ 5(a)) does not suggest an objection to the modified instruction would have been other than futile. Notably, Schultz stated on the record that he was happy with the modified CALJIC 8.80 that was ultimately read to the jury. (RT 4944; *see also* Doc. No. 116 at 280:4-6.)

(ii)   *Concurrence of Act and Intent in Felony Murder Rule Aiding and Abetting*

Petitioner cites *Bouie* and alleges Schultz was deficient by failing to request an instruction or argue that the special circumstances charged for victim Mr. Freiri required a concurrence of intent to kill and an act in aid of the actual killings. 378 U.S. at 352.

Petitioner argues prejudice, that had the omitted instruction been given the jury would have determined that the special circumstances involving Mr. Freiri were not proven. That is, he argues that Freiri was seemingly already dead when Petitioner allegedly formed the intent to kill attributed to him by Buchanan. (Doc. No. 51-1 ¶ 388; *see also* CT 159-60.)

Ms. Hart, petitioner's counsel on motion for new trial, argued as much; that the special circumstance instructions failed to inform jurors that specific intent to kill must precede or accompany the act of killing. (RT 5243-46; *see also* CT 556.) The trial court rejected the argument by noting the lack of certainty as to when Freiri died as well as evidence in the record suggesting petitioner brought murder weapons to the crime scene, the cord found wrapped around Freiri's neck and the knife. (*See* RT 1/17/92 21-24.)

The California Supreme Court on direct appeal also considered and rejected these allegations, stating that:

> The jury was properly instructed on concurrence of act and intent with regard to the special circumstances. In accordance with CALJIC No. 3.31, the jury was instructed that, with regard to each of the crimes charged in the information, "there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists, the crime to which it relates is not committed. [¶] The specific intent required is included in the definition of the crimes charged. [¶] All of the special circumstances allegations require an intent to kill."

*Dickey*, 35 Cal. 4th at 904-05; *see also* CT 395.

The state supreme court was not unreasonable in rejecting these allegations. The instructions given in their totality are sufficient to cover concurrence of act and intent, for the reasons discussed above. Although Schultz stated in his habeas declaration that he was unaware the approved special circumstance instructions prejudicially lacked a specific instruction on the required concurrence of intent to kill and an act in aid of the murders, (SHCP, Ex. B ¶ 5(b); SHCP, Ex. C ¶ 1), for the reasons stated his failure to make a futile objection was not objectively unreasonable and prejudicial.

        *(iii)*     *Oral Confession to be viewed with Caution*

Petitioner alleges that Schultz was deficient by failing to request CALJIC No. 2.70 or 2.71 which would have instructed the jury to view evidence of Petitioner's alleged oral admissions or confessions with caution, and by failing to argue the inherent principles thereof to the jury. (Doc. No. 51-1 ¶ 391; SHCP, Ex. B ¶ 5(c).)

The record shows that Ms. Hart raised these allegations on motion for new trial. (CT 547-51.) Prosecutor Hahus conceded that a cautionary instruction was not requested by either party and should have been given sua sponte. (CT 595-99; RT 5226-31.) Hahus went on to argue the error was harmless. (CT 595-99.) The trial court found the error non-prejudicial, stating that because petitioner denied the substance of his alleged admission, the jury "of necessity would have viewed his admission with caution … they could only convict in this case if they found that Goldman and Buchannan were being truthful and not the defendant." (RT January 17, 1992 at 20.)

The California Supreme Court reviewed and also rejected these allegations on direct appeal, finding only harmless error. *Dickey*, 35 Cal. 4th at 905. That court stated:

> Mere instructional error under state law regarding how the jury should consider evidence does not violate the United States Constitution. [Citation] Failure to give the cautionary instruction is not one of the "very narrow[ ]" categories of error that make the trial fundamentally unfair.
>
> The purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made. [Citation] Since the cautionary instruction is

intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citation]

Where [as here] there was no such conflict in the evidence, but simply a denial by the defendant that he made the statements attributed to him, we have found failure to give the cautionary instruction harmless.

…

[T]he question for the jury was whether Buchanan and Goldman were credible witnesses or had fabricated their testimony concerning his admissions to them…[T]he court, while neglecting to give the cautionary instruction, did in other respects thoroughly instruct the jury on judging the credibility of witnesses. The jury was instructed on the significance of prior consistent or inconsistent statements of witnesses, discrepancies in a witness's testimony or between his or her testimony and that of others, witnesses who were willfully false in one material part of their testimony being distrusted in other parts, weighing conflicting testimony, evidence of the character of a witness for honesty and truthfulness to be considered in determining the witness's believability, and was given a general instruction on witness credibility that listed other factors to consider, including a witness's bias, interest or other motive, ability to remember the matter in question, and admissions of untruthfulness.

As the Attorney General contends, given these instructions, and given the extensive impeachment of Buchanan and Goldman raising credibility issues to which the instructions were pertinent, n.8 the jury was unquestionably aware their testimony should be viewed with caution.

----------------------------------------FOOTNOTE----------------------

n.8 The jury knew Goldman and Buchanan were drug addicts, that they had been using drugs almost daily around the time of defendant's statements, and that Buchanan had used drugs the day before his testimony. It knew that, even though he had initially denied it, Buchanan was aware of the $5,000 reward, that Buchanan had told others he wanted the reward for turning defendant in, and that he had then testified the reward was not the reason he had come forward. It knew room and board expenses incurred by Buchanan were to be deducted from the reward. (*See post,* 28 Cal.Rptr.3d at pp. 665–667, 111 P.3d at pp. 937–938.) It knew Buchanan disliked defendant, and that he wanted revenge against defendant for tearing up a picture of his daughter.

The jury also knew Goldman had initially lied to the police, disclaiming any knowledge of the crimes. One witness testified he would not trust Goldman as far as he could throw her. Another witness, a former neighbor, testified Goldman told him she had been called as a witness in a murder case, but that she "didn't know nothing about no murder." Another witness, who testified she was "like a sister" to Goldman, said Goldman told her it was the grandson of the murder victim who had confessed to her.

----------------------------------END FOOTNOTE-----------------

For the same reason, we reject defendant's contention that defense counsel was ineffective in having failed to request the cautionary instruction.

...

Even assuming arguendo that defense counsel's performance, in failing to request the cautionary instruction, fell below an objective standard of reasonableness, it is not reasonably probable that, but for counsel's failure, the result of the trial would have been different.

*Dickey*, 35 Cal. 4th at 905-07.

Here, Schultz admitted he was unaware such a cautionary instruction was missing from the instructions approved by the trial court.  (SHCP, Ex. B ¶ 5(c).)   In any event, the respondent conceded the failure to instruct.

The state supreme court acted reasonably in finding non-prejudicial the failure to instruct, for the reasons noted above and stated by that court.

Petitioner goes on to argue that even if the jury was aware of argument by counsel placing the credibility of Buchanan and Goldman in issue, a cautionary instruction to that effect would have carried more weight with the jury.  *See Boyde v. California*, 494 U.S. 370, 384 (1990) (arguments of counsel generally carry less weight with a jury than do instructions from the court).  Especially so, according to petitioner, given the prosecutor essentially vouched for these witnesses.  (Doc. No. 116 at 290:4-6.)  But petitioner has not demonstrated that vouching occurred.  (*See e.g.,* claim XVII.)

Furthermore, as noted the jury was instructed on witness credibility including tests for the veracity of witnesses making prior inconsistent statements.   The jury was instructed a determination of witness believability should consider "the extent of the opportunity or the ability of the witness to see or hear or otherwise become aware of any matter about which the witness has testified ... the ability of the witness to remember or to communicate any matter about which the witness has testified ... [and] the demeanor and manner of the witness while testifying." (CT 400.)  Moreover, Schultz's closing argument emphasized not the wording of the alleged admission but rather that the jury should discount the admission completely because

1  Goldman and Buchanan were untrustworthy.  (*See* RT 4983-95.)

2           *(iv)    Unreliable Testimony by Goldman and Buchanan*

3           Petitioner alleges that Schultz was deficient by failing to request case law based

4  instructions allowing the jury to discount or disregard the testimony of Goldman and Buchanan

5  as alleged drug addicts and drug abusers.  *See People v. Barnett*, 54 Cal. App. 3d 1046, 1050-51

6  (1976) (cautioning instruction proper where a witness was under the influence of alcohol or

7  drugs at the time of his or her testimony); *United States v. Collins*, 472 F.2d 1017, 1018-19 (5th

8  Cir. 1972) (cautionary instruction proper where a witness was then a drug addict).

9           Petitioner argues that both Buchanan and Goldman were drug addicts.  (Doc. No. 51-1 ¶

10  394.)   He argues that Goldman (*see* CT 60-61, 74-75, 78,  92-93; RT 4369, 4382, 4401, 4676,

11  4754,) and Buchanan (*see* CT 81-82, RT 4390,  4717, 4733-37-42, 4856-57) may have been

12  under the influence of drugs at the time of their respective observations and testimony.

13          However, the state supreme court could reasonably have found that Schultz was not

14  deficient in these regards.   The jury was instructed on witness credibility, that they could

15  consider anything that might prove or disprove witness veracity including "the extent of the

16  opportunity or the ability of the witness to see or hear or otherwise become aware of any matter

17  about which the witness has testified ... the ability of the witness to remember or to communicate

18  any matter about which the witness has testified ... [and] the demeanor and manner of the witness

19  while testifying."  (CT 400.)

20          Petitioner claims prejudice by arguing that had *Barnett* and/or *Collins* instructions been

21  given, Schultz could have convincingly argued the testimony of these pivotal witnesses should

22  have been discounted or disregarded.   He argues that Schultz's failure to request such

23  instructions was not tactical because Schultz stated that "he was not aware of the potential use of

24  the *Barnett* or *Collins* instructions in this case, and that his omission of a request for these

25  instructions was not a conscious or strategic choice on his part."  (Doc. No. 116 at 295:23-26;

26  SHCP, Ex. B ¶ 5(d-e).)

27          Even if the *Barnett* and *Collins* instructions should have been given, the failure to do so

28

was not necessarily prejudicial.  The *Barnett* court found the failure to give an instruction on witness intoxication not prejudicial where, as here, the jurors themselves could judge the issue from the demeanor and testimony of the witness.

*Collins*, unlike this case, involved testimony by a witness who was a drug addicted prosecution informant.  Petitioner has not demonstrated concerns of bias and reliability evident in this case rise to the level seen in *Collins.*  (*See* claims II(E) and XIII.)  Also, the *Collins* court suggests prejudice attenuates with presentation of evidence corroborating the witness's statements.  Here, the noted testimony of Buchanan and Goldman was consistent and corroborated in significant part.  Furthermore, petitioner has not shown on the evidentiary record that either Goldman or Buchanan was intoxicated at the time of their testimony.  Rather, the record suggests otherwise.  (RT 4401, 4737, 4742, 4993.)

> *(v)   Cumulative Ineffectiveness Regarding Instructions*

Petitioner argues cumulative prejudice from the above noted instructional claims as well as claim II(J) wherein petitioner faults Schultz for allowing the instruction conference to be held off the record and outside petitioner's presence.  He again argues that the defense closing argument can be no substitute for proper jury instructions, the law the jury is bound to follow. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) (jurors strive to understand, make sense of, and follow the instructions given them).

However, for the reasons stated, claims II(J), II(M), II(N), II(O), II(P) and II(Q) present no individual errors.  Petitioner fails to demonstrate any singular errors for this court to aggregate.  *Thompson v. Calderon*, 86 F.3d 1509, 1521 (9th Cir. 1996), *amended by* 109 F.3d 1358, 1369 (9th Cir. 1997), *rev'd*, 120 F.3d 1045 (en banc), *opinion reinstated, Calderon*, 523 U.S. at 566 ("finding no prejudice from the errors considered separately, we also find no cumulative prejudice"); *see also Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (holding that there was no reason to reverse for cumulative error because there was no violation of federal rights in the guilt phase); *United States v. Chandler*, 2016 WL 4039748 at *2 (9th Cir. July 28, 2016) (absent individual error there can be no cumulative error).

*(vi)*     *Conclusions*

For the reasons stated, a fair-minded jurist could have found that petitioner failed to establish Schultz was ineffective in requesting and failing to object to guilt phase instructions, and that absent this allegedly deficient conduct a different outcome was reasonably probable. *Strickland,* 466 U.S. at 687-98.

It does not appear that the California Supreme Court's rejection of the claims was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claims II(M), II(N), II(O), II(P) and II(Q) are denied.

**l.**    **Review of Claim II(R)**

Petitioner alleges that Schultz was ineffective by failing to object to evidence of the character of both RC and petitioner.  (Doc. No. 51-1 ¶¶ 400-402.)

*(i)*     *Propensity toward Violence*

Petitioner argues that Schultz should have objected to and excluded Goldman's preliminary hearing testimony which suggested that RC had a non-violent character while petitioner had a violent character.  (Doc. No. 116 at 348:27-349:22.)

The record reflects the prosecutor elicited the following testimony from Goldman at the preliminary hearing:

> Q. Was R.C. violent?
> A. No, he was a very funny person. He kept me laughing all the time.
> Q. Was he mean?
> A. No.
> Q. Did he have a temper?
> A. No.
> Q. That you ever saw?
> A. I never seen, he never displayed a temper to me.

(RT 4397-98.)

> Q. How about the defendant, [petitioner]?
> A. Well, [petitioner] didn't let anyone push him around.

Q. Do you remember telling me he would strike like a cobra?
A. Right.
Q. That [petitioner] would strike like a cobra?
A. I saw him whip a man that was over 200 pounds; he whipped him.
Q. [Petitioner] did?
A. Right.
Q. [Petitioner] is not afraid of anybody, right?
A. No.
Q. Colin wouldn't be afraid of R.C., would he?
A. Oh, definitely not, R.C. was small.

(RT 4398.)

The California Supreme Court considered and rejected this allegation on direct appeal, stating that:

[Ms. Goldman's preliminary hearing] testimony must be placed in context. Shortly before, Goldman had testified, in response to the prosecutor's question, that she wanted to make sure defendant knew she wasn't the person who turned him in.

Generally, evidence that a witness is afraid to testify is admissible as relevant to the witness's credibility. [Citations] In apparent recognition of this rule, defendant does not complain of Goldman's earlier testimony that she was afraid defendant might "do something to [her] if [she] talked to the police," nor does he complain of Detective Stokes's subsequent testimony that Goldman told him defendant "had said he would kill her if she or anyone else talked about what he had told [her and Buchanan]. The testimony defendant does complain of simply went to Goldman's belief that defendant was capable of carrying out his threats of retaliation.

...

Defendant complains his trial counsel was also ineffective in failing to object to [the above noted] testimony by Goldman concerning [RC's] … benign character.

Again, to establish ineffective assistance of counsel, a defendant must demonstrate his attorney's performance fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. [Citation] A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation] We do not find it reasonably probable the outcome here would have been different in the absence of this testimony.

*Dickey*, 35 Cal. 4th at 912-13.

The state supreme court was not unreasonable in rejecting these allegations for the reasons stated by that court.  Moreover, the record as a whole does not necessarily demonstrate Goldman's noted testimony was improper evidence of bad character offered to show a propensity to commit crimes of violence or lack thereof.  Goldman's noted testimony does not

appear to contravene petitioner's statements that RC assaulted the victims in sudden drug induced and mental illness related outburst.  (RT 4173-77, 4314-17, 4483, 4640-42.)  Nor does it suggest petitioner was prone to violence when viewed in the context of Schultz's cross-examination of Goldman which elicited the following:

> Q. How long did you know R.C.?
> A. Six or seven months.
> Q. How long did you live together?
> A. Three months.
> Q. You saw Colin and another person get into a fight?
> A. Yes.
> Q. Did you know what the fight was over, what they were fighting about?
> A. The man did something wrong to Colin.
> Q. Do you know what?
> A. No, I don't know what.
> Q. Did you see it start?
> A. I saw the man strike Colin. He - the man was the first one that threw the blow. And I saw Colin, the guy that lived with us, the name was Jerry, he was in the kitchen cooking and he- he is a karate expert and he jumped up in Colin's face and I guess Colin thought that he was fixing to hit him and he hit him so fast I couldn't believe it.
> Q. The first time that you talked about, the man hit Colin first?
> A. Yes.
> Q. And the second time, this Jerry came at him?
> A. Yes.
> Q. Did it appear to you that Jerry was being aggressive?
> A. Well, Jerry is aggressive.

(RT 4398-99.)  Actions taken in self-defense or response to aggression might not suggest an inclination or predisposition toward violence.  Schultz's statement in his habeas declaration that he did not recognize a basis for objection or prejudice to the defense from Goldman's noted testimony (*see* SHCP, Ex. B ¶ 9) does not necessarily suggest otherwise or that he failed to make a valid character evidence objection.  State law error alone is not a basis for relief.  *Estelle*, 502 U.S. at 71 (1991), *citing Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules").

    *(ii)*       *False Testimony – Use of Cocaine*

Petitioner alleges that Schultz failed to object to false evidence in the form of the prosecution's misreading at trial of Goldman's preliminary hearing testimony to attribute

1   Goldman's use of cocaine to petitioner.  (Doc. No. 116 at 352:9-19.)

2       Goldman testified at preliminary hearing that on the day after the crimes she injected

3   cocaine purchased by petitioner.  (RT 4371.)  However, when the prosecution read Goldman's

4   testimony into the record, it stated that petitioner (rather than Goldman) injected cocaine the day

5   after the crimes.  (CT 61.)

6       Nevertheless, the state supreme court could reasonably have denied relief on this basis.

7   Petitioner has not demonstrated and the record seems not to suggest that the prosecution's

8   misstatement was anything more than an errant reading of the passage.  *See Tayborn v. Scott*,

9   251 F.3d 1125, 1130 (7th Cir. 2001) (statements that are merely inconsistent, rather than

10  fabrications fall short of being perjurous statements).

11      In any event, the errant reading considered in context would not suggest a reasonable

12  likelihood that the error could have affected the jury's verdict.  Goldman's testimony both at the

13  preliminary hearing and as read into the record at trial was clear that petitioner used cocaine with

14  Goldman on the day after the crime and that this was the only time Goldman saw petitioner use

15  cocaine.  (RT 4367-71.)  Any error of state law alone is not a basis for federal habeas relief.

16  *Estelle*, 502 U.S. at 71.

17          (iii)    *Prejudice*

18      Petitioner argues that absent the noted bad and false character evidence suggesting

19  petitioner's predisposition to participate in and commit the crimes there is a reasonable

20  probability petitioner would not have been convicted.

21      However, that state supreme court could reasonably have admitted the alleged character

22  evidence as going to Goldman's credibility, a valid purpose under state law.  *See* Evid. Code §

23  1101(c) ("[n]othing in this section affects the admissibility of evidence offered to support or

24  attack the credibility of a witness."); *see also* Evid. Code § 780.  Goldman had testified that she

25  was afraid of petitioner and that he had threatened to kill her (RT 4373-77, 4615-17), such that

26  she wanted assurance petitioner knew she did not turn him in to authorities.  (RT 4397-98.)

27  Similarly, Buchanan testified that he felt both he and Goldman were in danger from petitioner

28

104

following the latter's confession to them.  (RT 4756.)

Furthermore, as noted the alleged false testimony could reasonably be seen as non-prejudicial.  Notwithstanding the errant reading into the record of Goldman's preliminary hearing testimony, the jury reasonably would have been aware petitioner used cocaine only on the day after the crimes given the noted evidence.

(iv)   Conclusions

Accordingly, a fair-minded jurist could have found that petitioner failed to establish Schultz was ineffective by failing to object to evidence of the character of both RC and petitioner and the alleged false testimony regarding petitioner's use of cocaine, and that absent this allegedly deficient conduct a different outcome was reasonably probable.  *Strickland*, 466 U.S., at 687-98.

It does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

Claim II(R) is denied.

**m.    Analysis of Claim II(T)**

Petitioner alleges that Schultz was ineffective by failing to object to prosecutorial misstatements during guilt phase closing argument that were unsupported in the record.  (Doc. No. 51-1 ¶¶ 406-408.)

Petitioner complains that Hahus engaged in improper hyperbole in arguing Penal Code section 128, as follows:

> Do you think Gene Buchanan would lie to send a man to prison? Perhaps. Do you think Gene Buchanan would lie to send a man to prison that he doesn't like? Even more perhaps. Do you think Gene Buchanan would lie to send a man to prison behind a murder charge where Gene Buchanan himself could face a capital case for it?

(RT 4971-72; *see also* claims II(K) and VIII.)

> The California Supreme Court considered and rejected this allegation, stating that:

> Defendant argues section 128 is not a meaningful deterrent to perjury. Given the inevitable time lapse between potential conviction and execution, and the remote prospect of conclusive exonerating evidence being discovered after an execution, the chances of a successful prosecution under Penal Code section 128 in any case are so remote as to make the proffered evidence wholly irrelevant.

> We decline to second-guess the Legislature, which in enacting the section, clearly believed it would have a meaningful deterrent effect. Admittedly, the delay between conviction and execution has grown exponentially since section 128 was enacted in 1872. However, by 1997, when the Legislature amended and thereby reaffirmed the section, the notion of swift justice in capital cases was already a thing of the past. Moreover, with the advent of DNA testing, the prospect of conclusive exonerating evidence being discovered after an execution is, if anything, less "remote." In any event, the stakes under section 128, "death or life imprisonment without possibility of parole," are so high a potential perjurer may well decide it is not worth the risk, however small.

> ---------------------------------------FOOTNOTE----------------------

> n.11 The 1977 amendment added the phrase "or life imprisonment without possibility of parole," as well as the second sentence. [Citation]

> -------------------------------------END FOOTNOTE-----------------

> Finally, since it was proper for the prosecutor to ask Buchanan whether he had been made aware of section 128, defense counsel was not ineffective insofar as he failed to perfect his objections to this line of inquiry.

*Dickey*, 35 Cal. 4th at 912. That court's rejection of the allegation was not unreasonable for the reasons stated and those discussed in claims II(K) and VIII. Petitioner has not demonstrated clearly established law that Schultz erred by not objecting to Penal Code section 128 on the facts of this case. Failure to object is not ineffectiveness where an objection would have lacked merit. *United States v. Aguon*, 851 F.2d 1158, 1172 (9th Cir. 1988), *overruled on other grounds by Evans v. United States*, 504 U.S. 255 (1992); see also *Strickland*, 466 U.S., at 687-698.

Petitioner also complains that Schultz failed to object to Hahus's allegedly false and prejudicial argument that: i) that the cord around Louis Freiri's neck matched the cord on a venetian blind provided to Detective Stokes by Edith Hays; and ii) that the only fingerprint found

on the venetian blind was petitioner's fingerprint.   (Doc. No. 116 at 203:6-205:5; Doc. No. 128 at 104:21-25, *see also* RT 4966-68, 4998.)

The California Supreme Court considered and rejected these allegations, stating that:

Defendant claims the prosecutor, in his closing argument to the jury in the guilt phase of the trial, made two "misstatements amounting to misconduct." His counsel's failure to perfect objections to these instances of alleged misconduct, defendant contends, constituted ineffective assistance.

"As we have noted repeatedly, the mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel. [Citation]

With regard to the first instance of alleged misconduct by the prosecutor, defense counsel did object, and the objection was sustained, and so ineffective assistance cannot be claimed. As to the second, we find no misconduct.

The prosecutor, defendant complains, "took on the role of an unsworn forensics expert in constructing an unreasonable inference that a single fingerprint [belonging to defendant] found on a blind accessible to everyone at the apartment before and after the incident implied some form of special handling by the owner of the print that could only be explained by the act of cutting a cord from the blind. Since there obviously was no expert testimony to support this contrived inference, the argument constituted statements of supposed facts not in evidence, to which counsel failed to object."

In his argument, defense counsel acknowledged that defendant's fingerprint was on one of the slats of the venetian blind. He then raised the question why the fingerprints of others who had handled the blind, including Cullumber and a Jerry Lilliard, were not. "[S]omething to consider," he said.

The prosecutor responded, "[D]efense counsel points out that neither Jerry's fingerprint nor R.C.'s fingerprint was found on there. I submit to you, all they did was pick it up. They didn't have to hold it securely while the cord was cut from it. They didn't have to apply pressure to it. They didn't have to hold it immobile while the cord was being cut from it. That will explain the pressure that results in the oils being left that results in a latent being lifted, that results in finding it was his fingerprint, and not simply being picked up off the floor because it fell off the door. If that's all that happened wouldn't there have been other prints on it?"

It is well settled that a prosecutor is given wide latitude during argument. The scope of this latitude includes stating matters not in evidence, but which are common knowledge. [Citation] It is a matter of common knowledge that, assuming an object is of the sort that takes fingerprints, and that one is barehanded, the harder one presses on it with one's fingers, the more likely one is to leave a fingerprint. Therefore, the prosecutor's argument was not misconduct, and, a fortiori, it was not ineffective assistance for defense counsel not to object it. In any event, the jury was instructed that statements made by counsel were not evidence, and that they were to reject interpretations of the evidence they found to be unreasonable.

107

*Dickey*, 35 Cal. 4th at 914-15.

The state supreme court reasonably rejected the allegation of improper argument regarding whether the crime scene cord matched the venetian blind retrieved by Stokes.   Hahus argued to the jury that the prosecution:

> Can't match the cut [of the ligature to the samples].  There's no magic - - no magic way to put this under a magic microscope and match the cut.  The only thing that the lab can tell us is essentially the same thing your naked eye can tell you, it appears to be from the same material, same dimensions and the same weave. And there's no cord on that [v]enetian blind and that's the [v]enetian blind that was seen taken out of the closet by the [petitioner]; taken into a bedroom, where a knife was found shortly thereafter. A knife that could cut the cord off of it, and the cord was then found around the ne[ck] of Louis Freiri."

(RT 4966.)   This argument was not without support in the record.

Hahus stated that no cord sample was taken from the venetian blind retrieved by Stokes, but rather the samples were taken from the larger blinds remaining in the apartment.  (RT 4413-14; 4536-39.)  He also stated that the cord samples from the larger blinds did not match the cord around Freiri's neck.  (RT 4416, 4966.)

Prosecution expert Cortner's report and testimony was not inconsistent with Hahus's noted argument.  Cortner testified that the cord from Freiri's neck was similar to the reference samples but that "[he] was not able to make a physical match to positively say it came from that particular cord that came from the venetian blind."  (RT 4416; *see also* claims II(F), II(S).)  He opined that cord from Freiri's neck (RT 4532) and reference cords, are consistent with each other in color, weave, pattern and thickness; that they are all made of cotton; but that a positive match between the two samples could not be made due to the fibrous nature of the cord. (RT 4203-04, 4347, 4413-16; *see also* SHCP, Ex. L; People's Exhibits 26, 28, 30.)

The state supreme court also could reasonably have rejected the allegation of improper argument regarding the only fingerprint on the venetian blind being petitioner's fingerprint. Petitioner contends that Hahus improperly argued an inference that only petitioner's print was found on the blind because only he held it with sufficient pressure, while cutting the cord, to

leave a print.  (RT 4573, 4998.)  However, the testimony of prosecution fingerprint expert Hall provided some support for this argument, he suggested that fingerprint details are a function of gripping an object.  (RT 4577.)

Hahus reliance thereon, as well as on common experience as suggested by the state supreme court, could reasonably have supported his argument.  *See Dickey*, 35 Cal. 4th at 914-15.  Furthermore, nothing in the testimony of petitioner's forensic expert, Dr. Barnett, or the existence of additional fingerprint details on the venetian blind as acknowledged by both experts Hall and Barnett, appears to suggest otherwise.  (*See* RT 4981-95; *see also* claims II(F), II(S), II(T), XIV.)  Likewise petitioner's surmise that firm pressure on the blind would have left a print on the top frame of the blind rather than a slat (where petitioner's print was found) could reasonably be seen as unpersuasive.  (*See* Doc. No. 51-1 ¶ 319; RT 4576.)

Additionally, the Ninth Circuit has repeatedly held that, "absent egregious misstatements," failing to object to error during closing argument falls within the "wide range" of reasonable assistance.  *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013), *quoting United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993).

Here, the jury was instructed that counsel's argument was not evidence.  (RT 5008.)

Accordingly, a fair-minded jurist could have found that petitioner failed to establish Schultz was ineffective by failing to object to prosecutorial misstatements during guilt phase closing argument, and that absent this allegedly deficient conduct a different outcome was reasonably probable.  *Strickland*, 466 U.S., at 687-98.

It does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

Claim II(T) is denied.

**n.    Review of Claims II(V) and XXIV**

1    Petitioner alleges that Schultz and all prior counsel were ineffective by failing to object to

2 his pretrial and trial conditions of confinement and that he suffered violation of his rights under

3 the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.  (Doc. No.

4 51-1 ¶¶ 415-418, 892-898.)

5    The California Supreme Court on habeas review summarily denied these allegations on

6 the merits and on procedural grounds.  (Lod. Doc. No. 31.)

7        *(i)     Ineffective Assistance*

8    Petitioner alleges that counsel were deficient by failing to object to his pretrial and trial

9 conditions of confinement that severely limited his ability to concentrate and left him unable to

10 participate in and assist with his defense, denying him due process and a fair trial.  He purports to

11 incorporate all other allegations and claims in the petition.  (Doc. No. 51-1 ¶ 893.)  He argues

12 that counsel knew petitioner was housed with mentally ill prisoners who at all times screamed

13 and were noisy and prevented his sleeping and focusing on his trial, such that he "could not

14 consult with his lawyer with a reasonable degree of rational understanding and did not have a

15 rational as well as factual understanding of the proceedings against him."  (Doc. No. 116 at

16 397:27-398:22 *citing Drope v. Missouri*, 420 U.S. 162, 172 (1975), *quoting Dusky v. United*

17 *States*, 362 U.S. 402, 402 (1960).  He argues that all his prior post-judgment counsel were

18 similarly deficient by failing to bring this claim.

19    However, the state supreme court could reasonably have denied this claim.  Petitioner has

20 not demonstrated by reference to the evidentiary record what Schultz and his post-conviction

21 counsel knew of his housing conditions and any negative impact therefrom on petitioner.

22 Assuming without deciding that petitioner may incorporate into these claims his other claims and

23 allegations, *see Robinson v. Miller*, 2011 WL 2193393, at *1 (N.D. Cal. June 3, 2011) (petitioner

24 must clearly state each ground for relief, and provide sufficient facts to support each claim); *see*

25 *also* Rules Governing § 2254 Cases, Rule 2, 28 U.S.C. foll. § 2254), it remains here that none of

26 petitioner's guilt phase claims passes through the § 2254(d) gateway for the reasons stated.

27    Nor has petitioner shown prejudice, how and why the record suggests he was unable to

28

1    concentrate and participate in and assist with his defense.  Significantly, neither Schultz nor

2    petitioner's prior post-conviction counsel provided a declaration in support of these allegations.

3    His allegation that additional sleep would have resulted in a different outcome reasonably could

4    be seen as only speculative.  The state supreme court would not have been unreasonable in

5    denying the allegation on that basis.

6          *(ii)*     *Due Process*

7          Similarly, the state supreme court could reasonably have found petitioner's alleged

8    conditions of confinement did not deny him due process and a fair trial.  The Supreme Court has

9    stated that a due process claim requires a showing that the error "so infected the entire trial that

10   the resulting conviction violate[d] due process", *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977),

11   *quoting Cupp v. Naughten*, 414 U.S. 141, 147 (1973), making the trial fundamentally unfair.

12   *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991).  As discussed above, petitioner

13   does not point to facts showing a lack of sleep impacted much less denied him a fair trial.

14         Even if there was constitutional error, the federal court must still determine whether there

15   was structure error or actual prejudice.  Petitioner argues the error was structural so as to

16   dispense with any need to show *Brecht* prejudice.  507 U.S. at 637-38 & n.9.  Structural error is

17   error that permeates "[t]he entire conduct of the trial from the beginning to end" or "affect[s] the

18   framework within which the trial proceeds."  *Campbell v. Rice*, 408 F.3d 1166, 1171, *citing*

19   *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991).  The list of structural errors is short and

20   includes "total deprivation of the right to counsel at trial"; "a judge who was not impartial";

21   "unlawful exclusion of members of the defendant's race from a grand jury"; "the right to self-

22   representation at trial"; "the right to[a] public trial"; and "[d]enial of the right to a jury verdict of

23   guilt beyond a reasonable doubt."  *See id.*, at 1172.

24         For the reasons stated the state court could reasonably have found no structural error by

25   virtue of a denial of due process.  The question remaining is then whether any such error "had

26   substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S.

27   at 637.  Petitioner has not pointed to facts in the record demonstrating sleep deprivation impaired

28

1    his abilities to assist in his defense and to comprehend the proceedings so as to deny him due

2    process and a fair trial.  (*See e.g., Doc. No. 116* at 397:18-23, *citing Dillard v. Pitchess*, 399 F.

3    Supp. 1225, 1237 (C.D. Cal. 1975) ("[D]ue process of law requires that a defendant not be

4    denied the opportunity for a reasonable night's sleep before each day of his trial.").)  The state

5    supreme court could reasonably have found allegations that sleep deprivation negatively

6    impacted petitioner's performance at trial to be unsupported in the record and without merit.

7         Accordingly, petitioner has not made any factual showing that his ability to participate

8    and assist with the defense was impacted and that absent such conditions a more favorable result

9    was reasonably probable.

10        A fair-minded jurist could have found that petitioner's pretrial and trial conditions of

11   confinement were not unconstitutional; and that petitioner failed to establish counsel were

12   ineffective by failing to object to such conditions of confinement and that absent this allegedly

13   deficient conduct a different outcome was reasonably probable.  *Strickland*, 466 U.S., at 687-98.

14        It does not appear that the California Supreme Court's rejection of these claims was

15   contrary to, or an unreasonable application of, clearly established federal law, as determined by

16   the Supreme Court, or that the state court's ruling was based on an unreasonable determination

17   of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. §

18   2254(d).

19        Claims II(V) and XXIV are denied.

20        **o.    Analysis of Claim II(W)**

21        Petitioner alleges ineffective assistance of counsel by the cumulative effect of all pretrial

22   and guilt phase errors, violating his rights under the Sixth, Eighth and Fourteenth Amendments

23   to the U.S. Constitution.  (Doc. No. 51-1 ¶¶ 419-420.)

24        The California Supreme Court considered and rejected for lack of merit claimed guilt

25   phase cumulative error as to the claims then before it.  *Dickey*, 35 Cal. 4th at 915.

26        Petitioner alleges *Strickland* prejudice resulting from the cumulative effect of all

27   counsel's pretrial and guilt phase errors including i) failure to investigate and prepare adequately

28

1   for trial; ii) failure to consult adequately with petitioner; iii) failure to conduct proper voir dire;
2   iv) failure to object to evidence; and v) failure to propose, or object to, jury instructions.  He cites
3   to *Harris v. Wood*, a case where the Ninth Circuit found eleven serious errors by counsel
4   suggesting a reasonable probability of a different outcome absent the errors.  64 F.3d 1432, 1438
5   (9th Cir. 1995) ("[T]he plethora and gravity of [counsel's] deficiencies rendered the proceeding
6   fundamentally unfair.").

7       However, for the reasons stated, petitioner presents no individual errors for this court to
8   aggregate.  *See Thompson*, 86 F.3d at 1521, ("finding no prejudice from the errors considered
9   separately, we also find no cumulative prejudice"); *see also Rupe*, 93 F.3d at 1445 (holding that
10  there was no reason to reverse for cumulative error because there was no violation of federal
11  rights in the guilt phase).

12      Accordingly, a fair-minded jurist could have found that petitioner failed to establish that
13  Schultz performed deficiently as a result of the cumulative effect of all alleged pretrial and guilt
14  phase errors, and that absent this allegedly deficient conduct a different outcome was reasonably
15  probable.  *Strickland*, 466 U.S. at 687-98.

16      It does not appear that the California Supreme Court's rejection of the claim was contrary
17  to, or an unreasonable application of, clearly established federal law, as determined by the
18  Supreme Court, or that the state court's ruling was based on an unreasonable determination of
19  the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. §
20  2254(d).

21      Claim II(W) is denied.

22  **B.    Trial Court Error Claims**

23      1.    Clearly Established Law

24      Trial court error violates due process where it renders the resulting criminal trial
25  fundamentally unfair.  *Chambers*, 410 U.S. at 294, 303.

26      2.    Review of claim IV

27      Petitioner alleges that the trial court denied him due process by holding jury instruction

28

1   discussions off the record and outside of his presence, violating his rights under the Fifth, Sixth,

2   Eighth and Fourteenth Amendments to the U.S. Constitution.[11]  (Doc. No. 51-1 ¶ 617-26.)

3        **a.      State Court Direct and Collateral Review**

4        Petitioner presented this claim to the California Supreme Court in his second state habeas

5   petition and that court denied the claim summarily on the merits and on procedural grounds.

6   (Lod. Doc. No. 31.)

7        **b.      Analysis of Claim IV**

8        *(i)     Discussions Off the Record*

9        Petitioner revisits allegations in claim II(J), that California law requires death penalty

10  proceedings be conducted on the record (*see* Penal Code. § 190.9(a)(1)).  He argues this error left

11  an incomplete appellate record and denied him meaningful appellate review.  *See Coppedges*,

12  369 U.S. at 446 ("[a] Court of Appeals must provide the applicant with the assistance of counsel

13  and with a record of sufficient completeness" to effect his appeal); *Draper v. Washington*, 372

14  U.S. 487, 496 (1963) (state must provide the indigent defendant with means of presenting his

15  contention to the appellate court which are as good as those available to a non-indigent defendant

16  with similar contentions); *Frye*, 18 Cal. 4th at 941 (reversal required when the resulting appellate

17  record is not adequate to permit meaningful appellate review).  He argues that as a result the

18  appellate record did not show what arguments and objections his counsel made regarding jury

19  instructions, and what errors the court made with respect to handling such requests, issues which

20  might have been raised on appeal.  He cites to modified CALJIC 8.80 (*see* discussion claim

21  II(M)), as an example of such an incomplete record.  (*See also* RT 4944.)

22       The state supreme court was not unreasonable in denying this claim.  Petitioner does not

23  provide authority that on the facts of this case the failure to record jury instruction discussion

24  resulted in a fundamentally unfair trial.  (*See e.g.,* claim II(M).)  The allegation reasonably could

25  be denied as speculative.  *See e.g.,  Madera v. Risley*, 885 F.2d 646, 648 (9th Cir. 1989) ("There

---

26  [11] Respondent contends this claim is not cognizable because it creates and retroactively applies a "new rule" of
    constitutional law under *Teague v. Lane*, 489 U.S. 288 (1989).  Respondent advances this argument as to numerous

27  other claims as well.  Unless otherwise noted, the court declines to address Respondent's *Teague* arguments where
    the claim lacks merit.

28

is no Supreme Court or Ninth Circuit authority on the due process implications of a state court's failure to record portions of a criminal trial.").  In *Madera*, the Ninth Circuit found no due process violation or ineffective assistance where a reconstructed transcript of unrecorded proceedings considered in the context of the entire trial record did not demonstrate prejudice. *See Id.*, at 649.

Petitioner's citation to *Britt v. North Carolina* is not clear authority otherwise.  404 U.S. 226 (1971).  In *Britt*, the Supreme Court identified two criteria relevant to the determination of need for a transcript without cost: "(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." *Id.* at 227, n.2.  Here, petitioner has not demonstrated how and why the summary record of the jury instruction proceedings, acquiesced in by petitioner and his counsel was inadequate.  (*See e.g.*, claim II(M); *see also Britt*, 404 U.S. at 230 (no prejudice where petitioner concedes sufficiency of alternative record); RT 4947-49.)

*(ii)*     *Discussions Out of Petitioner's Presence*

Petitioner also alleges that the trial court erred by allowing these jury instruction discussions, which he regards as a critical stage of his proceeding to be held while he was absent. (RT 4938-49; *see also* claim II(J).)  He argues that Schultz did not adequately prepare for the jury instruction conference and did not research and discuss the instructions with petitioner prior to the conference.  (*See* claims II(H), II(M), II(N), II(O), II(P), II(Q); SHCP, Ex. C ¶ 1.)  He argues that he was given only a few minutes to review the instructions at proceedings summarizing the conference.  (RT 4948-49.)

*Knowing and Intentional Waiver*

Petitioner argues he was denied his right to be present at all critical states of trial.  *See Stincer*, 482 U.S. at 745 ("[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure."); *Gagnon*, 470 U.S. at 526 (a defendant has a federal due process right to be present at court proceedings if his presence has a reasonably substantial relation to his ability to

defend himself).

However, a capital defendant may validly waive his presence at critical stages of the trial, at least where evidence is not taken.  *See e.g.*, *People v. Weaver* 26 Cal. 4th 876, 966 (2001); *People v. Jackson* 13 Cal. 4th 1164, 1209–1210 (1996).  Such a waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

Here, petitioner was advised why he was not present during the instruction conference, i.e., that the trial court wanted to avoid an "awkward record" and focus on the "end result".  (RT 4938.)  The trial court placed on the record a summary the jury instruction discussions and asked petitioner whether he was satisfied with those proceedings that were conducted outside his presence; petitioner responded in the affirmative.  (RT 4938-49.)  The state supreme court could reasonably have found that Petitioner failed to show on the evidentiary record that his waiver was other than knowing and intentional.

*Critical Stage of the Proceeding*

Petitioner argues the instruction conference was a critical part of his trial.  (Doc. No. 51-1 ¶ 626.)  He points to state law, Penal Code section 190.9(a)(1) discussed in claim II(J), *ante*, and argues that death penalty cases require greater protections to ensure reliability.  *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (death sentence qualitatively different from sentence of imprisonment; there is a corresponding difference in the need for reliability).  However, petitioner fails to identify clearly established law for the proposition that a jury instruction conference is a critical stage of trial.

Respondent points to Ninth Circuit authority suggesting otherwise.  *See e.g. United States v. Sherman*, 821 F.2d 1337, 1338-39 (9th Cir. 1987) (not plain error to exclude federal criminal defendant from jury instruction conference).  Petitioner responds that *Sherman* is distinguishable because in that case defendant was not facing capital charges and did not claim instructional error such as petitioner claims here, citing claims II(M), II(N), II(O), II(P), II(Q), XII and XVIII.

As noted, the Supreme Court has stated that a defendant has a right to be present

"whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Stincer*, 482 U.S. at 745, *quoting Snyder,* 291 U.S. at 105-06. However, he need not be present "when presence would be useless, or the benefit but a shadow." *Id., quoting Snyder,* 291 U.S. at 106-07; *see Rice*, 77 F.3d at 1140 n.2 (listing cases finding right to presence not violated).  Moreover, "the issue of whether a defendant must be present at all times in a capital trial has not yet been settled by the Supreme Court." *Moore*, 344 F.3d at 1323.

California courts are in accord that a defendant's "absence from various court proceedings, even without waiver, may be declared non-prejudicial in situations where his presence does not bear a reasonably substantial relation to the fullness of his opportunity to defend against the charge." *Johnson*, 6 Cal. 4th at 18.

It appears the Supreme Court has not clearly established what would contribute to the fairness of the procedure at a stage critical to [the criminal proceeding's] outcome for purposes of a due process violation). *See Stincer*, 482 U.S. at 745.  Here, for the reasons stated in claims II(M), II(N), II(O), II(P), II(Q), XII, XVIII and XIX, the state supreme court reasonably could have found petitioner has not demonstrated that his presence at the conference on jury instructions could have contributed to the fairness of his trial proceeding.  Petitioner has not demonstrated that any evidence was taken at the conference.  Defense counsel was present at the conference and represented petitioner without objection.  *See Campbell*, 408 F.3d at 1173 (defendant's absence from chambers conference regarding defense counsel's potential conflict of interest not a due process violation where no denial of fair and impartial trial).

(iii)    *Prejudice*

Petitioner alleges these deficiencies had a substantial and injurious effect on the verdict under *Brecht*.  507 U.S. at 637.

However, for the reasons stated, the California Supreme Court could reasonably have found petitioner did not demonstrate that his presence would have prevented alleged instructional errors.  As noted, petitioner, when given the opportunity to do so at trial following review of the final instructions and consultation with Schultz did not object to the final instructions or raise

117

1    any concern with them.  Instead, petitioner concedes that "the court and counsel later met with

2    the reporter and summarized the contents of the conference and any objections by the parties."

3    (RT 4938.)

4           The state supreme court could reasonably have found that petitioner failed to demonstrate

5    the trial record was incomplete in a way that impacted his constitutional rights.  Similarly, that

6    court could reasonably have found petitioner's absence from the jury instruction conference was

7    not substantially related to his ability to completely defend the charges.

8           The state supreme court could reasonably have found that even if the trial court erred as

9    alleged such did not have a substantial impact on the jury's verdict.

10          *(iv)    Conclusions*

11          For the reasons stated, a fair-minded jurist could have found that petitioner failed to

12   establish that the trial court denied him due process by holding jury instruction discussions off

13   the record and outside of his presence, substantially affecting the jury's verdict.

14          It does not appear that the California Supreme Court's rejection of the claim was contrary

15   to, or an unreasonable application of, clearly established federal law, as determined by the

16   Supreme Court, or that the state court's ruling was based on an unreasonable determination of

17   the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. §

18   2254(d).

19          Claim IV is denied.

20   **3.      Review of Claim XII[12]**

21          Petitioner alleges the trial court erred by giving erroneous guilt phase instructions,

22   violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S.

23   Constitution.  (Doc. No. 51-1 ¶¶ 701-721.)

24          **a.      State Court Direct and Collateral Review**

25          The California Supreme Court, on habeas review summarily denied these allegations on

26   the merits and certain of the allegations were denied on procedural grounds.  (Lod. Doc. No. 31.)

27

28   _____
     [12] The court does not reach the penalty phase allegations included in claim XII.

1    Certain of the allegations were also denied on direct appeal.  *Dickey*, 35 Cal. 4th at 900-07.

2          **b.      Clearly Established Law – Instructional Error**

3          Any error in the state court's determination of whether state law supported an instruction

4    in this case cannot form the basis for federal habeas relief.  *See Estelle*, 502 U.S. at 71 ("[T]he

5    Due Process Clause does not permit the federal courts to engage in a finely tuned review of the

6    wisdom of state evidentiary rules").  "Failure to give [a jury] instruction which might be proper

7    as a matter of state law, by itself, does not merit federal habeas relief."  *Menendez v. Terhune*,

8    422 F.3d 1012, 1029 (9th Cir. 2005), *quoting Miller v. Stagner*, 757 F.2d 988, 993 (9th Cir.

9    1985).

10         The Supreme Court has stated instead that a claim that a court violated a petitioner's due

11   process rights by omitting an instruction requires a showing that the error "so infected the entire

12   trial that the resulting conviction violate[d] due process."  *Kibbe*, 431 U.S. at 154.  The burden

13   on petitioner is especially heavy "where ... the alleged error involves the failure to give an

14   instruction."  *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006).

15         Even if constitutional instructional error has occurred, the federal court must still

16   determine whether Petitioner suffered actual prejudice, that is, whether the error "had substantial

17   and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637.  A

18   "substantial and injurious effect" means a "reasonable probability" that the jury would have

19   arrived at a different verdict had the instruction been given.  *Clark*, 450 F.3d at 916.

20         **c.      Analysis of Claim XII**

21         Petitioner revisits allegations in certain of his ineffective assistance of counsel –

22   instructional error claims, *ante*.  Here, he recasts claims II(M), II(N), II(O), II(P), II(Q) as alleged

23   trial court error.  Because petitioner has not demonstrated any prejudicial instructional error for

24   the reasons stated in those claims as summarized below, the following allegations were

25   reasonably rejected as court error claims by the California Supreme Court.

26         *(i)      Actus Reus*

27         Petitioner alleges that former Penal Code section 190.2(b) under which petitioner was

28
                                             119

1    charged required proof of some act by petitioner in aid of the killing(s) to which the five charged

2    special circumstances related.  (Doc. No. 128 at 122:3-9, *citing Sanders*, 51 Cal. 3d at 517,

3    *quoting Anderson*, 43 Cal. 3d at 1145) ("the special circumstance instruction on aiding and

4    abetting mirrors the language in section 190.2, subdivision (b), and thus unambiguously sets

5    forth the rule that the aider and abetter must intentionally aid in a killing.".)

6         Petitioner argues the trial court erred in giving CALJIC 8.80 as modified by the

7    prosecution because the modified instruction omitted an *actus reus* component, i.e., the special

8    circumstance requirement of an act in aid of a killing.  He claims the jury was erroneously

9    instructed that "the only finding required by the instruction for aider or abettor special

10   circumstance liability was an act in aid of the burglary/robbery and an intent to kill or an intent to

11   aid another in a killing."  (Doc. No. 51-1 ¶ 704; *see also* Doc. No. 128 at 122:2-20.)

12        Petitioner argues the instructional error was compounded by the prosecutor's closing

13   argument that the special circumstance could be established without any act in aid of a killing

14   (RT 4973-81) and Schultz's conceded failure to object to the modified instruction (*see* SHCP,

15   Ex. B ¶ 5).

16        In denying these allegations on direct appeal the California Supreme Court stated that:

18        Defendant contends the evidence was insufficient to support the felony-murder
     special-circumstance findings. Defendant does not contend the evidence was
19        insufficient to prove he planned and participated in the burglaries and robberies;
     he concedes it was sufficient. Rather, defendant contends the prosecution was
20        required to prove, not only that he aided or abetted the burglaries and robberies,
     but also that he "assisted in the killings themselves."

21        Defendant relies upon the language we italicize in section 190.2, former
22        subdivision (b). "Every person whether or not the actual killer found guilty of
     intentionally aiding, abetting … or assisting any actor in the commission of
23        murder in the first degree shall suffer death or confinement in state prison for a
     term of life without the possibility of parole, in any case in which one or more of
24        the special circumstances enumerated in [specified paragraphs covering, among
     others, the crimes of burglary and robbery] of subdivision (a) of this section has
25        been charged and specially found under Section 190.4 to be true." (§ 190.2,
     former subd. (b), added by initiative measure Prop. 7, § 6, approved by the
26        electorate Nov. 7, 1978; see now § 190.2, subd. (c).)

27        Section 190.2, former subdivision (b) is not helpful to defendant because, under
     the felony-murder doctrine, he was found guilty of aiding or abetting first degree
28        murders. All persons aiding or abetting the commission of burglary or robbery are

guilty of first degree murder when one of them kills while acting in furtherance of the common design. (§ 189; *People v. Pulido* (1997) 15 Cal.4th 713, 716 [63 Cal. Rptr. 2d 625, 936 P.2d 1235]; *People v. Washington* (1965) 62 Cal.2d 777, 782 [44 Cal. Rptr. 442, 402 P.2d 130].)

Defendant also relies on *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal. Rptr. 585, 742 P.2d 1306] (*Anderson*), to support his argument that the "actus reus of a special circumstance requires that a defendant aid or abet the actual killing, not just the underlying felony." In particular, defendant relies upon the following statement in *Anderson*: "[G]iven a realistic reading the statutory requirement that the aider and abetter intentionally aid, abet, counsel, command, induce, solicit, request, or assist any acts in the commission of first degree murder—even when applied to felony murder—is not ambiguous: the aider and abetter must intentionally aid in a killing." (*Anderson*, at p. 1145.)

Defendant's reliance on *Anderson* is unfounded. It is axiomatic a decision does not stand for a proposition not considered by the court. (*People v. Barker* (2004) 34 Cal.4th 345, 354 [18 Cal. Rptr. 3d 260, 96 P.3d 507]; *People v. Harris* (1989) 47 Cal.3d 1047, 1071 [255 Cal. Rptr. 352, 767 P.2d 619] (*Harris*).) The proposition advanced by defendant—for a felony-murder special circumstance, the aiding or abetting has to relate to the act of killing itself, rather than just the underlying felony—was not considered by the court in *Anderson*.

The question we considered in *Anderson*—reconsidered, actually—was "whether and under what circumstances intent to kill is an element of the felony-murder special circumstance." (*Anderson, supra*, 43 Cal.3d at p. 1141.

*Anderson* overruled *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal. Rptr. 79, 672 P.2d 862] (Carlos). "In *Carlos* …, we held that intent to kill was an element of the felony-murder special circumstance whether or not the defendant was the actual killer." (*Anderson, supra*, 43 Cal.3d at p. 1139.) In *Anderson*, we concluded "the broad holding of *Carlos* that intent to kill is an element of the felony-murder special circumstance cannot stand, and that the following narrow holding must be put in its place: intent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved before the trier of fact can find the special circumstance to be true." (*Id.* at pp. 1138–1139.)

The premise of the decision in *Carlos*, the *Anderson* court explained, "was our determination that section 190.2[, subdivision] (a)(17) is ambiguous. As shown above, on further reflection we now believe that premise was mistaken: given a fair reading, section 190.2[, subdivision] (a)(17) provides that intent is not an element of the felony-murder special circumstance." (*Anderson, supra*, 43 Cal.3d at p. 1143.)

According to *Anderson*, *Carlos*'s mistaken premise rested on two bases. (*Anderson, supra*, 43 Cal.3d at pp. 1143–1145.) The statement relied upon by defendant appears in the context of Anderson's reexamination of the second of the two bases.

"The second basis of our analysis in *Carlos* was our belief that unless section 190.2 [, subdivision] (a)(17) were read to require intent to kill, the meaning and function of section 190.2[, subdivision] (b) would be hard to determine: 'In the first place, paragraph 17, alone of the listed paragraphs, already contains language equating the liability of principal and accomplice. In addition, the requirement

121

that the accomplice "intentionally" aid in the commission of a murder is inherently ambiguous when applied to a felony murder, for it could mean either that the accomplice must intentionally aid in a killing, or that he need only intentionally aid the commission of the underlying felony." ([*Carlos, supra*,] 35 Cal.3d at p. 142.)

"On reexamination we now find this basis, too, to be lacking. First, section 190.2[, subdivision] (a)(17) does not treat the liability of the murderer and his aider and abetter, but rather the liability of the perpetrator of the underlying felony and his aider and abetter. Thus, the statutory provision does nothing more than declare that both the perpetrator of the underlying felony and his aider and abetter are felony murderers. Section 190.2[, subdivision] (b) then declares that the felony-murder aider and abetter is eligible for the death penalty if intent to kill is proved. Second, given a realistic reading the statutory requirement that the aider and abetter intentionally aid, abet, counsel, command, induce, solicit, request, or assist any acts in the commission of first degree murder—even when applied to felony murder—is not ambiguous: the aider and abetter must intentionally aid in a killing." (*Anderson, supra*, 43 Cal.3d at pp. 1144–1145.)

In the paragraph immediately following the statement upon which defendant relies we reiterated the issue we were actually resolving in Anderson. "Thus, in Carlos we mistook the first and crucial step in our analysis by determining that section 190.2[, subdivision] (a)(17) is ambiguous: given a fair reading in conjunction with section 190.2[, subdivision] (b), the provision can realistically be read only to require intent to kill for the aider and abetter but not for the actual killer." (*Anderson, supra*, 43 Cal.3d at p. 1145.) n7

---------------------------------------FOOTNOTE----------------------

n7 Defendant's reliance upon *People v. Sanders* (1990) 51 Cal.3d 471 [273 Cal. Rptr. 537, 797 P.2d 561], is also unavailing. The *Sanders* court quoted the statement in question from *Anderson*. (*Sanders*, at p. 517.) However, like the *Anderson* court, the *Sanders* court did not hold the aiding or abetting underlying a felony-murder special-circumstance finding has to relate to the act of killing itself, rather than just the underlying felony. In *Sanders*, the defendant claimed the evidence did not show whether he or his confederate was the actual killer. Therefore, he contended, two felony-based special-circumstance findings should be reversed because the jury was not instructed to determine whether he intended to kill the victim. (*Id.* at p. 516.) We held the jury had been adequately instructed on this point. (*Id.* at p. 517.)

---------------------------------------END FOOTNOTE-----------------

Finally, defendant recasts this argument as an instructional claim. He contends the trial court prejudicially erred by failing to instruct the jury he had to have aided or abetted the actual killings, not just the underlying felonies. For the reasons stated, this contention lacks merit.

*Dickey*, 35 Cal. 4th at 900-03.

The state supreme court was not unreasonable in finding the modified CALJIC 8.80 to be

1    sufficient.  A felony murderer jointly engaged in the underlying felony commits first degree
2    murder.  *Pulido*, 15 Cal. 4th at 716.  Petitioner has not demonstrated the clearly established law
3    dictates otherwise.  The jury was instructed on felony murder, that an aider and abettor must
4    intend to kill before a special circumstance can be found true.  (RT 5021-22; CT 425.)

5        The *Anderson* holding did not reach issues of actus reus.  The challenged instruction
6    correctly stated California law.  As noted, "the proposition advanced by defendant - for a felony-
7    murder special circumstance the aiding or abetting has to relate to the act of killing itself rather
8    than just the underlying felony - was not considered by the court in *Anderson*."  *Dickey*, 35 Cal.
9    4th at 901.  It follows that that state supreme court's rejection of petitioner's *Anderson* allegation
10    did not expand the reach of Penal Code 190.2(b) as applied to petitioner.  Absent any state error,
11    the state supreme court was not unreasonable in finding no constitutional error, i.e., error that "so
12    infected the entire trial that the resulting conviction violate[d] due process."  *Cupp*, 414 U.S. at
13    147.

14        Petitioner goes on to argue that the state supreme court violated his due process rights
15    because its foregoing determination was an unreasonable application of clearly established
16    Supreme Court law, *citing Bouie*, 378 U.S. at 353-54 (due process precludes a state supreme
17    court from retroactively and unforeseeably enlarging a criminal statute by means of judicial
18    construction).  He argues this error so infected the entire trial that his conviction violated due
19    process under *Cupp*.

20        The state supreme court could reasonably find that petitioner was not denied due process
21    under *Bouie* because his *Anderson* argument is unavailing for the reasons stated.  *See Mitchell*,
22    878 F.2d at 324 ("In the absence of a federal constitutional violation, no relief can be granted
23    even if the instruction given might not have been correct as a matter of state law.").  Schultz's
24    noted statement in his habeas declaration that he was unaware the modified instruction
25    prejudicially omitted any required element (*see* SHCP, Ex. B ¶ 5(a)) does not suggest that an
26    objection to the modified instruction would have been other than futile.

27        As noted, Schultz stated on the record that he was satisfied with the modified CALJIC
28

1  8.80 that was ultimately read to the jury.  (*See* RT 4944; Doc. No. 116 at 280:4-6.)

2      For the same reasons, petitioner has not shown prejudice, that any essential element of

3  each special circumstance (actus reus) was not proven.  *Brecht*, 507 U.S. at 637; *Hedgpeth v.*

4  *Pulido*, 555 U.S. 57, 58 (2008) (*Brecht* standard applicable to instructional error).  The

5  California Supreme Court was not unreasonable in determining as a matter of state law that the

6  special circumstances do not require a showing of an act in aid of the killings.

7      Whether or not the modified CALJIC 8.80 given by the trial court was a correct statement

8  of California law is not a basis for federal relief.  *See Estelle*, 502 U.S. at 67 (whether some

9  action violated a state's law forms "no part" whatsoever (i.e., not a little, not at all) of an inquiry

10  whether that action violated the Constitution.); *see also Richey*, 546 U.S. at 76 ("a state court's

11  interpretation of state law ... binds a federal court sitting in federal habeas").

12      *(ii)    Concurrence of Act and Intent*

13      Petitioner alleges the trial court erred by failing to instruct on the required concurrence of

14  act and intent to kill for each of the murders.  (Doc. No. 51-1 ¶¶ 706-707.)

15      The California Supreme Court considered and rejected this allegation on direct appeal, in

16  stating that:

18      Defendant contends the trial court prejudicially erred by failing to instruct the jury
   that, for purposes of the special circumstances, he had to possess the intent to kill

19  concurrently with his aiding or abetting the actual killings. This contention lacks
   merit because it rests on the premise we earlier rejected, that the prosecution was

20  required to prove not only that defendant aided or abetted the burglaries and
   robberies, but also that he aided or abetted the actual killings. [Citation]

21      The jury was properly instructed on concurrence of act and intent with regard to
   the special circumstances. [Citation] In accordance with CALJIC No. 3.31, the

22  jury was instructed that, with regard to each of the crimes charged in the
   information, "there must exist a union or joint operation of act or conduct and a

23  certain specific intent in the mind of the perpetrator. Unless such specific intent
   exists, the crime to which it relates is not committed. [¶] The specific intent

24  required is included in the definition of the crimes charged. [¶] All of the special
   circumstances allegations require an intent to kill."

26  *Dickey,* 35 Cal. 4th at 904-05.

27      The state supreme court reasonably rejected these allegations because the instructions

28  124

1   given in their totality sufficiently covered concurrence of act and intent for the reasons stated in

2   claims II(M), II(N), II(O), II(P), II(Q), XVI, XVIII and XIX.  In sum, the record demonstrates

3   that for each of the crimes charged and in addition to CALJIC No. 8.80 discussed *ante*, the jury

4   was instructed as follows:

> There must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator ... [T]he specific intent required is included in the definitions of the crimes charged.  All of the special circumstances allegations require an intent to kill.

(CALJIC No. 3.31; RT 5010-11; CT 395.)

> To find that the special circumstances, referred to in these instructions as murder in the commission of robbery, is true, it must be proved:
>
> The murder was committed while the defendant was engaged in the commission of a robbery ...
> The murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection.  In other words, the special circumstance referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder.
>
> To find that the special circumstances, referred to in these instructions as murder in the commission of burglary, is true, it must be proved:
>
> The murder was committed while the defendant was engaged in the commission of a burglary ...
> The murder was committed in order to carry out or advance the commission of the crime of burglary or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the burglary was merely incidental to the commission of the murder.

(CALJIC No. 8.81.17; RT 5017-23; CT 427-28.)

> The specific intent with which an act is done may be shown by the circumstances surrounding its commission.  But you may not find a special circumstance alleged in this case to be true unless the proved circumstances are not only,
> One, consistent with the theory that the defendant had the required specific intent, but
> Two, cannot be reconciled with any other rational conclusion.
> Also, if the evidence as to any such specific intent is susceptible of two reasonable interpretations, one of which points to the existence of the specific intent and the other to the absence of the specific intent, you must adopt that interpretation which points to the absence of the specific intent.
> If, on the other hand, one interpretation of the evidence as to such specific

intent appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

(CALJIC No. 8.83.1; RT 5024-25; CT 430.)

Petitioner argues that the concurrency requirement of CALJIC 3.31 on its face extended only to the crimes charged and not the special circumstances. But on the facts of this case, an objectively reasonable juror considering the instructions in their totality would understand these instructions to require concurrence of act and specific intent as to each of the crimes charged including the charged related special circumstance and aider and abettor allegations. Notably, the concurrence of act and specific intent instruction (CALJIC 3.31, CT 395) specifically includes a reference to the special circumstance requirement for intent to kill. (CT 387-438.)

Moreover, the jury was instructed to consider the instructions as a whole. (RT 5008.) They were instructed that statements by counsel are not evidence and that they must follow the law given them by the court. (RT 5007-08.) They were instructed that for each of the crimes charged in counts 1-5 of the information, there must be a union of act and a specific intent in the mind of the perpetrator. (RT 5010.) They were instructed that the specific intent required was included in the definitions of the crimes charged and that the special circumstance allegations required an intent to kill. (RT 5011.) They were instructed that if they found defendant guilty of first degree murder, they must then find true or not true the charged special circumstances (RT 5021). They were instructed that if they found defendant was an aider and abettor, then they must find beyond a reasonable doubt that the defendant intended either to kill a human being or to aid another in the killing of a human being in order to find the special circumstance to be true. (RT 5022.)

The state supreme court could also reasonably conclude that petitioner failed to show any essential element of the special circumstances upon which the jury was not instructed or that the jury based its verdict upon an essential element of a special circumstance (actus reus) that was not proven. *See Brecht,* 507 U.S. at 637; *Dickey,* 35 Cal. 4th at 904-05.

Petitioner also argues that the trial court erred in allowing the prosecutor to argue,

incorrectly, that concurrence of intent to kill was not required and that the unexpressed thought attributed to petitioner by Buchanan, that "If you kill one you might as well kill them both" was sufficient to prove petitioner intended to kill both victims.  (RT 4691-93; *see also* Doc. No. 51-1 ¶ 706.)  Specifically, he argues the multiple murder special circumstance requires proof of intent to kill concurrent with an act in aid of each murder.   (*See* CT 426, CALJIC 8.81.3; CT 395, CALJIC 3.31.)    He complains the prosecution took advantage of this instructional error at closing by arguing that for purposes of the multiple murder special circumstance petitioner's intent to kill could be shown by the robbery or burglary, as follows:

> I neglected in my opening argument to mention that along with the special circumstance murder during a robbery and murder during a burglary there's the additional special circumstance of multiple murders. That is another special circumstance that will be given to you that -- for you to find that it did or it did not happen. In this case it would be that in this proceeding -- that means that in this trial the defendant has been convicted of more than one first degree murder, essentially. Since felony murders are first degree murders, if you find him responsible for the burglary or the robberies and that the deaths occurred during the – during that burglary or during those robberies, then he's guilty of first degree murders.

(RT 4995.)

Petitioner argues that nothing in the evidentiary record suggests petitioner formed the intent to kill before finding Freiri dead or that he committed any act with the intent to kill that would prove felony murder.  He argues the prosecutor conceded as much in argument to the jury:

> You don't have to have knowledge that a homicide is going to be committed, you have to have knowledge and intend to aid in the burglary or the robbery. You have to stay focused on that. We don't know if, when they went in there, they went in there to kill. There's no evidence of that at all. There's evidence that they had weapons but that could have been to help in the burglary and the robberies. The mental state was to aid and abet in taking the property, the burglary or the robbery.

(RT 4975; s*ee also* RT 4952.)

However, the California Supreme Court could reasonably have denied these allegations. The actus reus allegation based on *Anderson* fail for reasons discussed above and stated in the

1    discussion of claims II(M), II(N), II(O), II(P), II(Q).  Prosecutor Hahus's argument regarding the

2    requirements for felony murder-robbery and felony murder-burglary does not seem to conflate or

3    dispense with special circumstance requirement of intent to kill.  Shortly after he made the above

4    noted argument, Hahus argued to the jury that [t] the special circumstance, the killing of Marie,

5    or the killing of Louis, as a special circumstance killing can only be found true if the defendant –

6    this man – intended to kill … you can't find the special circumstance true unless you find that

7    not only were they killed, but that he intended to kill … that he had in his mind the intent, the

8    desire that one or both of them die."  (RT 4979-80.)

9        Moreover, as discussed more fully in claim XXVI, *post*, the record could reasonably

10   suggest that Freiri died after petitioner formed the above noted intent to kill and that petitioner

11   may have participated in that killing.  A fair-minded jurist could consider RC's alleged statement

12   to third party Flores shortly after the crimes, that RC "had just killed woman" (RT 4801) as also

13   suggesting the possibility that petitioner participated in the killing of Mr. Freiri.

14        *(iii)    Cautionary Instruction Regarding Oral Admissions*

15        Petitioner alleges that trial court erred by failing to instruct the jury with CALJIC No.

16   2.70 or 2.71, that oral admissions or confession must be viewed with caution.  (Doc. No. 51-1 ¶¶

17   708-710.)  He argues this error, conceded by Schultz (SHCP, Ex. B ¶ 5(c)) and the prosecution

18   (CT 595) and the trial court ((RT 1/17//92 at 20) was prejudicial error because the prosecution's

19   case was built around the oral admissions he allegedly made to Goldman and Buchanan.

20        The trial court rejected this allegation as raised in the motion for new trial, finding no

21   prejudicial error.  (RT 1/17/92 at 20-21.)  The California Supreme Court reviewed and also

22   rejected the allegation on direct appeal, finding only harmless error, as follows:

23

24        When the evidence warrants, the court must instruct the jury sua sponte to view
         evidence of a defendant's oral admissions or confession with caution.  [Citation]

25        Failure to give the cautionary instruction here was raised by defendant in his
26        motion for a new trial. The prosecution conceded the error, but contended it was
         harmless, and the trial court agreed.

27        Mere instructional error under state law regarding how the jury should consider
28        evidence does not violate the United States Constitution. [Citation] Failure to give

the cautionary instruction is not one of the "very narrow[ ]" categories of error that make the trial fundamentally unfair.

The purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made.   [Citation] Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citation]

Where [as here] there was no such conflict in the evidence, but simply a denial by the defendant that he made the statements attributed to him, we have found failure to give the cautionary instruction harmless.

…

[T]he question for the jury was whether Buchanan and Goldman were credible witnesses or had fabricated their testimony concerning his admissions to them…[T]he court, while neglecting to give the cautionary instruction, did in other respects thoroughly instruct the jury on judging the credibility of witnesses. The jury was instructed on the significance of prior consistent or inconsistent statements of witnesses, discrepancies in a witness's testimony or between his or her testimony and that of others, witnesses who were willfully false in one material part of their testimony being distrusted in other parts, weighing conflicting testimony, evidence of the character of a witness for honesty and truthfulness to be considered in determining the witness's believability, and was given a general instruction on witness credibility that listed other factors to consider, including a witness's bias, interest or other motive, ability to remember the matter in question, and admissions of untruthfulness.

As the Attorney General contends, given these instructions, and given the extensive impeachment of Buchanan and Goldman raising credibility issues to which the instructions were pertinent, n.8 the jury was unquestionably aware their testimony should be viewed with caution.

----------------------------------------FOOTNOTE----------------------

n.8 The jury knew Goldman and Buchanan were drug addicts, that they had been using drugs almost daily around the time of defendant's statements, and that Buchanan had used drugs the day before his testimony. It knew that, even though he had initially denied it, Buchanan was aware of the $5,000 reward, that Buchanan had told others he wanted the reward for turning defendant in, and that he had then testified the reward was not the reason he had come forward. It knew room and board expenses incurred by Buchanan were to be deducted from the reward. (See *post,* 28 Cal.Rptr.3d at pp. 665–667, 111 P.3d at pp. 937–938.) It knew Buchanan disliked defendant, and that he wanted revenge against defendant for tearing up a picture of his daughter.

The jury also knew Goldman had initially lied to the police, disclaiming any knowledge of the crimes. One witness testified he would not trust Goldman as far as he could throw her. Another witness, a former neighbor, testified Goldman told him she had been called as a witness in a murder case, but that she "didn't know nothing about no murder." Another witness, who testified she was "like a sister"

129

to Goldman, said Goldman told her it was the grandson of the murder victim who had confessed to her.

----------------------------------END FOOTNOTE-----------------

*Dickey*, 35 Cal. 4th at 905-07; *see also* RT 5012-15; CT 399-407.)

The state supreme court's rejection of the allegation was not unreasonable.  As alluded to by that court, the jury was instructed on witness credibility including tests for the veracity of witnesses making prior inconsistent statements.  (RT 5012-15; CT 399-407.)  The jury was specifically instructed that a determination of witness believability should consider "the extent of the opportunity or the ability of the witness to see or hear or otherwise become aware of any matter about which the witness has testified ... the ability of the witness to remember or to communicate any matter about which the witness has testified ... the demeanor and manner of the witness while testifying ... the existence or nonexistence of bias, interest, or other motive ... evidence of the existence or nonexistence of any fact testified to by the witness ... a statement previously made by the witness that is ... inconsistent with the testimony of the witness ... the character of the witness for honesty or truthfulness ... [and] the witness' prior conviction of a felony."  (CT 400-401.)

In these regards, the jury was aware of the significant evidence impacting the credibility of Goldman and Buchanan including that they each routinely used street drugs around the time of petitioner's admission and that the drugs impacted Buchanan's ability to "pay attention"; and that Buchanan had used street drugs the day prior to this testimony in court.  (*See e.g.*, RT 4382-91, 4676-82, 4717, 4737-42.)  The jury was aware that Buchanan testified inconsistently regarding whether he was motivated by the $5000 private reward (RT 4704, 4851); that Buchanan was giving Ms. Strickland IOU's payable from the private reward (RT 4716, 4757, 4851); and that Buchanan did not like petitioner and wanted revenge against him (RT 4387, 4391, 4704-05, 4849-51, 4857).  The jury was also aware that Goldman had a reputation for being untruthful (RT 4777-85) and initially lied to police and delayed speaking to them in order to protect her friend, petitioner (RT 4590-99); that Goldman was aware of the private reward (RT

4809-10, 4820); that Goldman took medication four times on the day she testified (RT 4387); that Goldman has stated she had no knowledge of the murders (RT 4789-93); and that it may have been RC who had confessed to her (RT 4819-25).  The record reflects that Schultz spent substantial time attempting to impeach the credibility of Buchanan and Goldman in these regards.  (*See e.g.,* RT 4809, 4983-95.)

The jury had before it such facts of drug use and presumably considered any impact(s) upon the witnesses' ability to perceive and relate events, lifestyle, trustworthiness, and personal and financial motivation.  It was not unreasonable to conclude these facts would suggest the jury viewed with circumspection and caution testimony regarding petitioner's alleged admission that he participated in the crimes.  On these facts, it was not unreasonable for the state supreme court to conclude that the instructions given the jury on weighing witness credibility were a sufficient substitute for the omitted cautionary admonition.

Furthermore, the thrust of Schultz's argument at trial was not directed to the wording of the alleged admission but rather that the jury should discount the admission completely because Goldman and Buchanan were untrustworthy.  (*See e.g.*, RT 4983-95); *see People v. Bunyard*, 45 Cal. 3d 1189, 1224 (Cal. 2005), *abrogated on other grounds by People v. Diaz*, 60 Cal. 4th 1176, 1190 (Cal. 2015) (failure to give cautionary instruction constituted only state law error where facts in conflict related to witness credibility rather than the oral admission).  In this case, petitioner testified that he never made the admissions attributed to him by Goldman and Buchanan; he claims that those witnesses fabricated their testimony in this regard.  (RT 4870-71; CT 598.)

Additionally, petitioner's argument that a cautionary instruction was needed because of prosecutorial vouching fails for reasons stated in claim XVII.

*(iv)     Conclusions*

For the reasons stated, the state supreme court could reasonably have rejected allegations that the trial court committed prejudicial instructional error at the guilt phase.  Even if petitioner established state law instructional error, such error is not alone a basis for federal habeas relief.

1  *Pulley v. Harris,* 465 U.S. 37, 41 (1984).

2    It does not appear that the California Supreme Court's rejection of the claim was contrary

3  to, or an unreasonable application of, clearly established federal law, as determined by the

4  Supreme Court, or that the state court's ruling was based on an unreasonable determination of

5  the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. §

6  2254(d).

7    Claim XII is denied.

8    **4. Review of Claim XXI**

9    Petitioner revisits allegations in his ineffective assistance of counsel claim II(L), that he

10  was denied the right to confront and cross-examine statements Goldman made to detective

11  Stokes, inconsistent statements that were used to impeach Goldman's preliminary hearing

12  testimony.  He recasts these allegations here as alleged trial court error.  (Doc. No. 51-1 ¶¶ 857-

13  870.)

14    Because petitioner has not demonstrated any error in admitting this testimony for the

15  reasons stated in claim II(L), summarized below, the state supreme court was not unreasonable in

16  rejecting these same allegations brought as trial court error.

17    **a. State Court Direct and Collateral Review**

18    The California Supreme Court summarily denied these allegations presented for habeas

19  review on the merits and on procedural grounds.  (Lod. Doc. No. 31.)

20    **b. Clearly Established Law - Confrontation Clause**

21    "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with

22  the witnesses against him."  U.S. Const. amend. VI.

23    The Supreme Court held in *Crawford* that "[o]ur cases have thus remained faithful to the

24  Framers' understanding: [t]estimonial statements of witnesses absent from trial have been

25  admitted only where the declarant is unavailable, and only where the defendant has had a prior

26  opportunity to cross-examine."  541 U.S. at 59.  A statement is testimonial if made with a

27  primary purpose of creating an out-of-court substitute for trial testimony.  *See Michigan v.*

28

1   *Bryant,* 562 U.S. 344, 358 (2011).

2   "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers'

3   design to afford the States flexibility in their development of hearsay law - as does *Roberts,* and

4   as would an approach that exempted such statements from Confrontation Clause scrutiny

5   altogether.  Where testimonial evidence is at issue, however, the Sixth Amendment demands

6   what the common law required: unavailability and a prior opportunity for cross-examination."

7   *Crawford*, 541 U.S. at 68.

8   As discussed in claim II(L), *Crawford* abrogated the rule *Roberts*, prevailing at the time

9   of petitioner's trial that "[the prosecutor] was permitted to elicit hearsay testimony if the

10  declarant was unavailable and there was a firmly-rooted hearsay exception (or indicia of

11  reliability) that applied to the testimony."  448 U.S. 56, 66 (1980), *abrogated by Crawford*, 541

12  U.S. at 68 (2004); (*see also* Doc. No. 125 at 97:20-22).

13  "The [C]onfrontation [C]lause may be violated by an extra-judicial statement which is

14  admitted as an exception to the hearsay rule."  *U.S. v. King*, 552 F.2d 833, 845 (1976).  The

15  Confrontation Clause does not absolutely require cross-examination, but rather safeguards of

16  reliability.  *Id.*, at 846.  However, where nontestimonial hearsay is at issue, evidence is exempt

17  "from Confrontation Clause scrutiny altogether" and may be admitted pursuant to the hearsay

18  law.  *Crawford*, 541 U.S. at 68.  Similarly, the Confrontation Clause does not bar statements

19  introduced for a non-hearsay purpose. *Gonzales*, 2012 WL 6004520, at *16; *Crawford,* 541 U.S.

20  at 59 n. 9.

21  "A habeas petitioner is entitled to relief only if an alleged error had a substantial and

22  injurious effect or influence in determining the jury's verdict," i.e., only if he can establish actual

23  prejudice.  *Brecht,* 507 U.S. at 623, 637; *see also United States v. Berry,* 683 F.3d 1015, 1020

24  (9th Cir. 2012) (Confrontation Clause violations are subject to harmless error analysis).

25      **c.      Analysis of Claim XXI**

26      Petitioner alleges that the trial court erroneously failed to exclude *sua sponte* Stokes's

27  testimony of unconfronted statements Goldman made shortly before petitioner's arrest.

28

133

On August 31, 1989, months after she made the statements to Stokes, Goldman testified at petitioner's preliminary hearing.  (RT 4334-4403; CT 19-95.)  Goldman died on December 17, 1990, two months before petitioner's trial started.  (Doc. No. 51-1 ¶ 861.)   Her preliminary hearing testimony was admitted at trial as that of an unavailable witness and read into the record on February 27, 1991.

Petitioner alleges that at trial, Hahus elicited from Stokes's certain of Goldman's statements that were allegedly inconsistent with Goldman's preliminary hearing testimony, as follows:

> The prosecutor began by asking the witness whether he had gone over the police reports and reviewed Goldman's preliminary hearing testimony and whether [he] had seen any inconsistencies between the two. Mr. Hahus then questioned Detective Stokes on the details, which included allegations that [Petitioner's] behavior changed when he found out about the deaths of Ms. Caton and R.C. and had made threats against Goldman's life if she or anyone else talked about his involvement in the crime.

(Doc. No. 51-1 ¶ 863; *see also* RT 4591-4617.)   Petitioner points out that at the preliminary hearing, Goldman testified that:

> [S]he saw petitioner and RC leave the apartment "right around the day of the election, the Presidential election." RT 4339-40. She did not know how long they were gone. RT 4349. After they came back, "Colin sit [sic] down on the couch and watched television and RC went into the bedroom and started packing his bags." RT 4350. RC left that night. *Id.* Goldman testified that, before petitioner left the apartment, "[t]he only thing Colin did was walk into the kitchen and he looked in the drawer. That's all he did." RT 4343. Goldman testified that she saw RC open the hallway closet, and "get a cord." RT 4345. She testified that a cord on one of the venetian blinds in the apartment's bedroom was missing, which certainly was different from the one in the hallway closet. RT 4347. Goldman testified that at a later date, petitioner informed her that he was present when RC killed his grandmother and Louis Freiri, but "Gail, I swear I had nothing to do with this." RT 4357. Later, Goldman testified that petitioner made the "general statement" that "he wasn't afraid of anyone saying anything about him, because if they did, they wouldn't do it again." RT 4375. According to Goldman, petitioner was distraught over RC's murders, but after petitioner found out RC and Caton had died, "he wasn't as depressed as he had been before." RT 4378.

(Doc. No. 116 at 361:12-362:11.)   Petitioner points out that at trial, Stokes testified Goldman told him that:

1

2 [P]etitioner and RC "left together" that night and returned around two hours later.
RT 4603, 4604. According to Stokes, Goldman stated that when petitioner and
3 RC returned, "R.C. walked right through the living room, right into his bedroom
and started packing and that – Colin had walked in and just sat down on the
4 couch." RT 4604.  Stokes testified that Goldman "told me about a venetian blind
that had been in the hall closet that was removed from the hall closet the night of
5 the homicide, and that that venetian blind was - taken by the suspect, Dickey, and
taken into a bedroom and that the cord was removed from that venetian blind and
6 then the venetian blind was placed back inside the hall closet." RT 4534. Stokes
testified that Goldman "told me that she saw him [petitioner] go to kitchen
7 drawers [sic] and was looking through the drawers, believed that he removed a
knife." RT 4602. Stokes testified that Goldman "stated that he had said that he
8 would kill her if she or anyone else talked about what he had told them." RT
4615. Stokes testified that Goldman told him that, "[petitioner] was nervous, on
9 the verge of tears quite often prior to learning about the deaths, that after learning
of the grandmother's death that he was not as tearful, wasn't walking and pacing
10 the apartment as much, and that after he learned that RC was dead that he became
aggressive toward her and Buchanan, and made statements regarding the fact that
11 if they revealed what he had told them that they would be hurt and killed, as
would anyone else." RT 4616.

12 (*Id.*, at 362:21-363:19.)

13     Petitioner argues that Stokes's testimony should not have been admitted under the state

14 law hearsay exception for inconsistent statements (Evid. Code §§ 770, 1235) because doing so

15 violated the Confrontation Clause.  *Crawford*, 541 U.S. at 68.  He argues that Goldman was not

16 given the opportunity to explain or deny her alleged statements at the preliminary hearing [and]

17 Goldman was not a witness at trial [and] could not have given further testimony.  (*See* Doc. No.

18 116 at 336:23-348:15; Doc. No. 128 at 150:6-152:11); Evid. Code §§ 770, 1235.

19     *(i)     Goldman's Preliminary Hearing Testimony was Unconfronted but Admissible*

20     As noted, Goldman died shortly before trial.  Her August 1989 preliminary hearing

21 testimony was admitted at trial as testimony of an unavailable witness.  (RT 4334.)

22     It is clear that the Confrontation Clause also does not bar statements introduced for a non-

23 hearsay purpose.  *See Street*, 471 U.S. at 414 (defendant's rights under Confrontation Clause not

24 violated by introduction of accomplice's confession for non-hearsay purpose); *see also Gonzales*,

25 2012 WL 6004520, at *16 (the rule of *Crawford* only applies to testimonial statements that were

26 introduced to establish the truth of the matter asserted); *Crawford,* 541 U.S. at 59 n. 9, *citing*

27 *Street*, 471 U.S. at 414 (same).  For reasons stated in claim II(L), absent any valid waiver by

28

1  petitioner, *Crawford* bars use of Goldman's unconfronted testimonial hearsay statements, but not

2  use of Goldman' statements for the non-hearsay purpose of impeaching Goldman's credibility.

3      In California, inconsistent statements are admissible to attack the credibility of a

4  declarant even without any giving the declarant an opportunity to explain or deny the

5  inconsistent statement. *See Gonzales*, 2012 WL 6004520, at *13, *citing* Evid. Code § 1202.  The

6  rule of *Crawford* "only applies to testimonial statements that were introduced to establish the

7  truth of the matter asserted." *Id.; accord, Davis,* 547 U.S. at 823 (Confrontation Clause applies

8  only to testimonial hearsay).

9      Here, the state supreme court could reasonably have determined Stokes's testimony was

10  offered to impeach Goldman's preliminary hearing testimony.  As discussed in claim II(L),

11  Goldman's credibility was a significant issue at trial and was argued by both petitioner and

12  respondent.  Both parties invoked Stokes's testimony in arguing Goldman's credibility (directly)

13  and Buchanan's credibility (indirectly).  (*See e.g.*, claims II(P), XXVI, XXVIII.)  Schultz, as a

14  matter of tactics may have hoped that as a result of Stokes's testimony the jury would discount

15  Goldman as a witness and discount Buchanan at least to the extent his testimony was consistent

16  with Goldman's.

17      In any event, the jury was instructed regarding consideration of Stokes's testimony

18  including for purposes of determining the believability of Goldman and other trial witnesses.

19  (CT 399-401.)

20      (*ii*)    *No Prejudice*

21      Even if there was trial court error as alleged, the California Supreme Court reasonably

22  could have found such error not prejudicial under *Brecht*.

23      A Confrontation Clause violation is harmless and so does not justify habeas relief unless

24  it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,*

25  507 U.S. at 623.  "[W]hen a habeas court is in grave doubt as to the harmlessness of an error that

26  affects substantial rights, it should grant relief." *O'Neal v. McAninch,* 513 U.S. 432, 445 (1995).

27  In general, the inquiry into whether the constitutionally erroneous introduction of a piece of

28

136

1   evidence had a substantial and injurious effect is guided by several factors: "the importance of

2   the testimony, whether the testimony was cumulative, the presence or absence of evidence

3   corroborating or contradicting the testimony, the extent of cross-examination permitted, and the

4   overall strength of the prosecution's case." *Ocampo*, 649 F.3d at 1114.

5        Here, Stokes's testimony appears significantly cumulative of and corroborated by

6   Buchanan's testimony.  *See e.g., Ocampo*, 649 F.3d at 1114 (inquiry into Confrontation Clause

7   error considers whether errantly admitted evidence was cumulative).  For example, Buchanan

8   testified that on the night of the murders, he saw petitioner take the venetian blind out of the hall

9   closet and go into the bedroom (RT 4665-66), and then exit the apartment bedroom and return

10   the venetian blind to the closet; he also saw a kitchen knife in the bedroom (RT 4706-07).  *See*

11   *Dickey*, 35 Cal. 4th at 898.

12        Buchanan also testified that RC and petitioner returned later than night and bought drugs

13   for the roommates with money they did not have earlier that evening and that petitioner later

14   disposed of some of his clothing by throwing it out of Buchanan's car.   (RT 4675-85.)

15   Significantly, petitioner's admission of his role in the crimes to Goldman and Buchanan and

16   discussion of events surrounding (RT 4352-79; 4606-08, 4687-9494) were consistent in the

17   record and not controverted by Stokes's testimony of Goldman's statements.

18        Petitioner's admission was corroborated by evidence of RC and petitioner leaving the

19   apartment together the night of the crimes and returning together later that evening with RC

20   acting strangely (*id.; see also Dickey*, 35 Cal. 4th at 898) and petitioner initially depressed

21   following the crimes (RT 4352-63).

22        Goldman's testimony about petitioner being essentially fearless and aggressive was not

23   directly controverted by Stokes's testimony (RT 4398) or by Buchanan's testimony that

24   petitioner "never threatened my life in my presence."  (RT 4745.)

25        Petitioner's suggestion that Stokes, by testifying as a police detective effectively vouched

26   for Goldman's consistent (with the preliminary hearing) statements appears to be merely

27   speculative.   Petitioner does not demonstrate on the evidentiary record that Stokes either

28

expressed his personal belief in Goldman's veracity or suggested information not known to the jury supported Goldman's statements. *See Hermanek*, 289 F.3d at 1098; *see also McKoy*, 771 F.2d at 1210-11 ("The rule that a prosecutor may not express his personal opinion of the defendant's guilt or his belief in the credibility of witnesses is firmly established.").

   *(iii) Conclusions*

  Accordingly, a fair-minded jurist could have found that petitioner failed to establish prejudicial trial court error in admitting Stokes's testimony of Goldman statements to him.

  It does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

  Claim XXI is denied.

**C. Prosecutorial Misconduct Claims**

  1. <u>Clearly Established Law</u>

  A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

  To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987), *quoting United States v. Bagley*, 473 U.S. 667, 682 (1985). "Before a federal court may overturn a conviction resulting from a state trial ... it must be established not merely that the [State's action] is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Smith v. Phillips*, 455 U.S. 209, 221 (1982), *quoting Cupp,* 414 U.S. at 146.

  Any claim of prosecutorial misconduct must be reviewed within the context of the

138

entire trial. *Greer*, 483 U.S. at 765-66; *United States v. Weitzenhoff*, 35 F.3d 1275, 1291 (9th Cir. 1994). The court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." *Phillips*, 455 U.S. at 219. "Improper argument does not, per se, violate a defendant's constitutional rights." *Thompson v. Borg*, 74 F.3d 1571, 1576 (9th Cir. 1996), *quoting Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993).

Furthermore, the Supreme Court has stated:

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence ... and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made.

*Boyde*, 494 U.S. at 384-85.

If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in *Brecht*. *See Thompson*, 74 F.3d at 1577 ("Only if the argument were constitutional error would we have to decide whether the constitutional error was harmless."). A petitioner is entitled to relief in this context only where the constitutional violations exerted a "substantial and injurious" effect on the judgment. *Brecht*, 507 U.S. at 620; *Fields v. Woodford*, 309 F.3d 1095, 1109 (9th Cir. 2002) (stating the Ninth Circuit applies *Brecht* if misconduct of constitutional dimension is established), *amended* 315 F.3d 1062 (9th Cir. 2002).

2.     Review of claim XIII

Petitioner alleges prosecutorial misconduct by failing to disclose evidence under *Brady v. Maryland* and by knowingly presenting false and misleading evidence under *Napue v. Illinois*, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S.

1  Constitution.  (Doc. No. 51-1 ¶¶ 722-768.)

2      **a.**    **State Court Direct and Collateral Review**

3      The California Supreme Court summarily denied all these allegations as presented in

4  petitioner's state habeas petition.  *(*Lod. Doc. No. 10.)

5      That court also considered and rejected certain of these allegations on the merits on direct

6  appeal, as discussed, *post*.

7      **b.**    **Analysis of False Testimony Allegations**

8      Petitioner alleges the prosecutor knowingly allowed witnesses to testify falsely.

9      *(i)*    *Clearly Established Law – False Testimony*

10      The knowing use of false or perjured testimony against a defendant to obtain a conviction

11  is unconstitutional.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (prosecutor's knowing

12  presentation of false testimony violates due process); *see also Mooney v. Holohan,* 294 U.S. 103,

13  112 (1935) (conviction contrived by prosecution's deliberate presentation of perjured testimony

14  violated due process).

15      In *Napue*, the Supreme Court held that the knowing use of false testimony to obtain a

16  conviction violates due process regardless of whether the prosecutor solicited the false testimony

17  or merely allowed it to go uncorrected when it appeared.  360 U.S. at 269.  The Court explained

18  that the principle that a state may not knowingly use false testimony to obtain a conviction - even

19  false testimony that goes only to the credibility of the witness - is "implicit in any concept of

20  ordered liberty."  *Id.*

21      A conviction obtained by the knowing use of perjured testimony "must be set aside if

22  there is any reasonable likelihood that the false testimony could have affected the judgment of

23  the jury."  *Bagley*, 473 U.S. at 678.  Nevertheless, simple inconsistencies in testimony are

24  insufficient to establish that a prosecutor knowingly permitted the admission of false testimony.

25  *United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995).  "Discrepancies in ... testimony

26  ... could as easily flow from errors in recollection as from lies."  *Id.*

27      To warrant habeas relief, Petitioner must establish that: 1) the testimony was actually

28

1    false; 2) the prosecution knew or should have known it to be false; and 3) there is a reasonable
2    likelihood that the false testimony could have affected the jury's verdict. *Tayborn*, 251 F.3d at
3    1130.

4                    *(ii)    False Evidence - Room and Board, Personal Loans and Trial Preparation*

5            Petitioner revisits allegation discussed in claim II(E), and alleges that the prosecution
6    allowed false testimony by Buchanan that might reflect on his credibility - testimony regarding
7    the favorable room and board agreement with Ms. Strickland facilitated by the prosecution
8    including alleged personal loans to Buchanan thereunder.   He also alleges the prosecution
9    downplayed the extent of its preparation of Buchanan for trial.   (Doc. No. 116 at 28:21-29:2.)

10           Petitioner points to Buchanan's allegedly false testimony that "he did not receive a single
11   thing" from the prosecution team (RT 4766); that he had been working for Strickland at her
12   boarding house and did not owe her anything and that she owed him $25,000 (RT 4716); and that
13   he met with prosecutor Hahus only a couple times before trial.   (RT 4766.)

14           *Room and Board*

15           Petitioner alleges Buchanan testified falsely about the "[room and board] deal, brokered
16   by the District Attorney's Office, between Buchanan and [boarding house operator] Ms.
17   Strickland" under which Buchanan's room and board payments were deferred and payable from
18   the anticipated private reward monies.   (Doc. No. 51-1 ¶¶ 735-39; RT 5268-81, 5309-29; SHCP,
19   Ex.'s G, H; *see also Brady* allegations, *post*.)   He alleges that prosecution investigator William
20   Martin arranged the deal and memorialized the agreement on Fresno County District Attorney
21   letterhead, for "long-term and (room and board) [on a] deferred basis."   (Doc. No. 51-1 ¶ 736;
22   RT 5276; CT 583.)   The memorializing document was signed by Buchanan and witnessed by
23   Martin and another prosecution investigator in order to "protect Ms. Strickland because [Martin]
24   did not trust Buchanan to fulfill his obligations to her" (RT 5268-5282; *see* CT 582-83), and to
25   ensure Buchanan could be located when needed to testify, (*id.*).

26           Under this deal, petitioner alleges Buchanan received room and board in exchange for a
27   promise to pay $350 per month out of the $5,000 private reward he expected to receive for

28
                                            141

1  helping to convict petitioner.     (RT 5276; SHCP, Ex. G; Doc. No. 116 at 44:11-16.)

2       Petitioner alleges that by the end of trial 24 months later, Buchanan's debt to Strickland

3  had risen to over $9100 covering room, board and personal loans.  (Doc. No. 116 at 44:18.)

4  Strickland herself placed the final debt at a little over $5000 and ultimately reduced it to the

5  $3,500 paid by Buchanan, leaving $1,500 of the private reward money for Buchanan to keep.

6  (RT 5325-28.)  The record reflects that Strickland wrote down the debt because she felt sorry for

7  Buchanan and to help his family.  (*Id.*)

8       The trial court, on motion for new trial rejected petitioner's claim that the foregoing

9  constituted prejudicial prosecutorial misconduct.  (CT 541-47; RT 1/17/92 at 9-17.)  That court

10  viewed the Strickland deal as "a [prosecution] favor."  (RT 5212.)  Prosecutor Hahus agreed that

11  "[w]ell, sure it's something, yeah, absolutely, absolutely."  (*Id.*)  But ultimately, the trial court

12  concluded that:

13

14      Although there was assistance given to Mr. Buchanan, it's true that the District
    Attorney's Office did not buy him anything. He did receive something of value,

15      and I have to agree to that, having a place to stay for who knows how long is
    obviously valuable. It's valuable if it's just one day. It's certainly more valuable
    as time goes on. And Mr. Buchanan benefitted by that. But I do have to find that

16      they only acted as a conduit for Mr. Buchanan, that Mrs. Strickland [the landlady]
    could have thrown him out anytime she wanted to. The fact that she did not was

17      not something that I can find the District Attorney's Office or the Police
    Department was somehow involved in.

18

19  (RT, Jan. 17, 1992, 16-17.)

20       Similarly, the California Supreme Court on direct appeal considered these same

21  allegations and found the noted false testimony to be harmless error, stating that:

22

23      We conclude the prosecutor did knowingly fail to correct a false impression -
    indeed, knowingly exploited the false impression in his argument to the jury - that

24      the prosecution had not done Buchanan any favors that might reflect on his
    credibility.

25      The impression was false because a prosecution investigator facilitated an
    arrangement with the proprietor of a boarding house under which Buchanan

26      received room and board in return for IOU's backed by the reward money he was
    hoping to receive. However, we conclude that, in light of other information the

27      jury had about Buchanan's arrangement with the proprietor of the boarding house,
    as well as other indications of his interest in obtaining the reward, the prosecutor's

28

action was harmless beyond a reasonable doubt.

On cross-examination, Buchanan was asked about his contacts with Melvin King, a defense investigator. Buchanan said, among other things, that King bought him lunch, as well as a beer, and "wanted to take me to church and wanted to take me skydiving and stuff like that."

On redirect, the prosecutor asked Buchanan how many times he had spoken to defense investigator King. Buchanan responded he had done so perhaps a dozen times, in person or on the phone. The prosecutor asked him what King had bought him. Buchanan said King had bought him lunch, beer on three occasions, and a pair of shoes.

...

The prosecutor and Buchanan then engaged in the following colloquy. "Q. At any time have you spoken with anybody who's told you they were from my office, from the D.A.'s office? [¶] A. No, sir, only when they've come to pick me up for court. [¶] Q. You've talked to me a couple of times; is that right? [¶] A. Yes, sir. [¶] Q. At any time have the folks who've come to pick you up from my office or me, have we bought you anything? [¶] A. Not a single thing, sir."

In his argument to the jury, the prosecutor sought to exploit the false impression he had created—that unlike the defense, the prosecution had done nothing for Buchanan that might reflect on his credibility. "His statements to Mel King, the only investigator who supplied him with money or alcohol or food was never to back off of his statement that [defendant] made that confession. Now, he's con-wise. 'This guy has taken me out to lunch. This guy is taking me out buying me beer, why kill the goose that's laying the golden egg? You want to hear something, pal, say whatever you want to hear, let's have another Colt 45.' But did he ever, ever back out of that statement?"

As previously stated, the impression was false because a prosecution investigator facilitated an arrangement with the proprietor of a boarding house under which Buchanan received room and board in return for IOU's, amounting to $3,000 or $4,000, backed by the reward money he was hoping to receive. The prosecution investigator even went so far as to draft a document signed by Buchanan under which he agreed the district attorney's office had his permission to discharge his IOU's before he received the remainder of the reward. The prosecutor was aware of this arrangement; he so testified at the hearing on the motion for a new trial.

That said, we conclude there is no reasonable likelihood the false impression created by Buchanan's testimony could have affected the judgment of the jury. While the jury did not know of the role the prosecution investigator played in facilitating the agreement between Buchanan and the proprietor of the boarding house, the jury knew, through Buchanan's testimony and that of the defense investigator, of the agreement itself. They knew, through the defense investigator's testimony, that Buchanan has said on "many" occasions "[h]e was expecting to receive the reward, deduct what money he owed his landlord, buy himself a pickup truck or a car and leave town and start his life over." Finally, they knew through Goldman's testimony that Buchanan had told her "he was going to turn in [defendant] so he could get the reward."

Defendant contends his trial counsel was ineffective in failing to impeach Buchanan with the room and board agreement backed by his IOU's, as well as

with the role of the prosecutor's investigator in facilitating the arrangement. However, for the reasons stated, it is not reasonably probable that, but for counsel's inaction, the result of the trial would have been different. [Citation]

---------------------------------------FOOTNOTE----------------------

n.10  Defense counsel knew of the arrangement.

--------------------------------------END FOOTNOTE-----------------

*Dickey*, 35 Cal. 4th at 909-11.

The state supreme court's rejection of these allegations for the reasons stated by that court was not unreasonable.   The record suggests Buchanan requested assistance from investigator Martin because he had nowhere to stay upon his noted March 1989 OR release from jail and pending his testimony against petitioner.  (SHCP, Ex. H.)  While the jury may not have known the extent to which the prosecutor's office helped arrange the agreement between Buchanan and Strickland, the jury was aware of the agreement and its terms and conditions.  (*See e.g.*, RT 4387, 4857.)

Investigator Martin testified at the hearing on motion for new trial that this type of agreement was not unusual.  (RT 5293-97.)  He testified that he told both Buchanan and Strickland that issues relating to Buchanan's payment obligation were totally between them.  (RT 5275.)  He testified that notwithstanding Strickland's unsolicited mailing of Buchanan's account statements (bills) to the District Attorney's office, (RT 5288-90, 5309), the parties (Buchanan and Strickland) intended that Buchanan's promise to pay was limited to any reward proceeds that might become available and that no public funds would be used to pay the debt.  (RT 5280-82, 5305-06.)  Strickland acknowledged as much.  (RT 5321-23.)  Strickland testified she did not send the bills to the prosecution with the expectation that the latter was responsible for paying or would pay them.  (*Id.*)

Strickland testified that she sometimes took in boarders on an IOU basis.  (*Id.*)  That she may have periodically phoned Hahus's office asking when she would get paid (*see* e.g., RT 5289, 5321-26, 5326, 5404-06) does not alone demonstrate public funds backstopped the

1  agreement.  Moreover, Hahus confirmed to Strickland that the private reward was contingent

2  upon conviction and Buchanan's entitlement to the reward.  (RT 5404-06.)

3       Petitioner fails to support with evidence his allegation that the prosecution was

4  financially liable under the Buchanan-Strickland agreement.  Petitioner argues, but does not

5  support in the evidence that the prosecution provided $9,100 in benefits and/or participated with

6  Strickland in her decision to write-down Buchanan's debt, (Doc. No. 116 at 74:28-75:2), and/or

7  that Strickland offered benefits to Buchanan as an agent of the prosecution, (*see id.* at 98:11-27).

8       To the contrary, prosecutor Hahus testified at the new trial motion that he was unaware of

9  any relationship or dealing between Buchanan and Strickland apart from the noted agreement

10  facilitated by Martin that was reimbursable from the private reward money.  (RT 5449-50; CT

11  582-583; SHCP, Ex.'s G, H.)  Hahus noted that the room and board agreement with Strickland

12  was in place when he as assigned to the case.  (RT 5394.)  Hahus also testified at the motion for

13  new trial that the only thing he bought Buchanan was lunch once while Buchanan was testifying

14  (RT 5408-09); and that Buchanan refused anything else for fear it would appear the prosecution

15  was trying to buy his testimony (RT 5409-10).

16       In sum, the documentation prepared by investigator Martin memorializing the Strickland-

17  Buchanan arrangement and the noted testimony of Martin, Hahus and Strickland demonstrate the

18  prosecution was not financially responsible under the Buchanan-Strickland agreement and the

19  prosecution was unaware of any dispute between Strickland and Buchanan regarding sums

20  owing between them and/or write-down thereof.[13]

21       *Personal Loans*

22       Petitioner alleges that Buchanan received personal loans from Strickland of at least $760.

23  (Doc. No. 116 at 44:18-23, 98:20-22; RT 5321; SHCP, Ex.'s H, I.)  Petitioner points to line item

24  loan amounts included in the above noted bills Strickland sent to the prosecution, (*see* SHCP, Ex.

25  I), and suggests these loans were an undisclosed inducement for Buchanan's testimony given that

26

27  ---

[13] The court does not reach respondent's argument that petitioner's debt write-down allegations are unexhausted
28  (Doc. No. 125 at 146:22-147:3) because the allegations lack merit.  *See* n.10; *see also Cone*, 543 U.S. at 451 n.3 (an
application for habeas corpus may be denied on the merits even if unexhausted in state court).

1   Buchanan was "a key [prosecution] witness." (RT 5271, 5390.)

2       The record reflects that during the time the agreement was in effect, Strickland sent to the

3   Fresno District Attorney's Office copies of Buchanan's IOU's that included line itemed loans.

4   (SHCP, Ex. I.)   Nonetheless, this allegation fails for the same reasons the immediately above

5   room and board allegations fail.   At bottom, petitioner has not demonstrated on the evidentiary

6   record that prosecution funds were loaned or paid to either Strickland or Buchanan for purposes

7   of the alleged Strickland loans, or otherwise.

8       *Trial Preparation*

9       Petitioner alleges Buchanan testified falsely about the number of times prosecutor Hahus

10   met with him prior to trial.   Petitioner argues the falsely reduced number of meetings Hahus had

11   with Buchanan was prejudicial to the extent it caused Buchanan to appear uncoached and more

12   credible.   (*See* Doc. No. 116 at 29:6-10, 47:19-23, 55:6-10, 62:1-12, 64:19-23.)

13       As noted, Buchanan testified that he had met with Hahus "a couple of times." (RT 4766.)

14   Hahus later admitted at the motion for new trial hearing that he had "met" with Buchanan

15   approximately 12 times prior to trial, had spoken to Buchanan by phone at least once, and his

16   investigators had contacted Buchanan several times.   (RT 5390; SHCP, Ex. N at 1-3.)[14]   Notably,

17   Hahus in his closing argument explaining discrepancies between Buchanan's testimony at

18   preliminary hearing and at trial, stated that "it's pretty clear Buchanan was not prepared to

19   testify, that he was not scripted to testify." (RT 4968.)

20       As an initial matter, the state supreme court reasonably could have rejected respondent's

21   argument that Hahus was speaking in merely colloquial terms – such that there was no false

22   impression or that any impression as to the number of meetings was neither false nor material.

23   (*See* Doc. No. 125 at 138:24-140:24.)   The record reflects that Buchanan significantly

24   understated the number of pretrial meetings he had with Buchanan.

25       Nevertheless, the state supreme court reasonably could have denied this allegation as

26

27   _____

[14] Respondent may suggest the allegation that Buchanan's credibility was bolstered by this false testimony regarding the number of meetings between Buchanan and Hahus was not adjudicated on direct appeal.  See *Dickey*, 35 Cal. 4th at 910; RT 5390).  But in any event, the allegation was summarily denied and thus adjudicated by the California

28   Supreme Court on habeas review for purposes of 28 U.S.C. § 2254(d).

1   harmless error.  (*See e.g.*, RT 4969.)  Petitioner has not demonstrated on the evidentiary record

2   that additional trial preparation would cause jurors to discount the credibility of a witness.

3   Moreover, the jury was well aware of the facts relating to Buchanan's credibility including the

4   testimony and statements of Goldman.  (*See* claim(s) II(E), II(P), XXVI, XXVIII.)

5        The state supreme court concluded in these regards that:

6

7        The jury knew Goldman and Buchanan were drug addicts, that they had been
         using drugs almost daily around the time of defendant's statements, and that
8        Buchanan had used drugs the day before his testimony. It knew that, even though
         he had initially denied it, Buchanan was aware of the $5,000 reward, that
9        Buchanan had told others he wanted the reward for turning defendant in, and that
         he had then testified the reward was not the reason he had come forward. It knew
10       room and board expenses incurred by Buchanan were to be deducted from the
         reward. [Citation]  It knew Buchanan disliked defendant, and that he wanted
11       revenge against defendant for tearing up a picture of his daughter.

12   *Dickey*, 35 Cal. 4th at 907 n.8.  A fair-minded jurist could have concluded that these same facts

13   would be related to the need to prepare Buchanan for trial.

14        *Harmless Error*

15        For the reasons stated, it was not unreasonable for the state supreme court to find

16   pursuant to *Napue* that the foregoing alleged false testimony was harmless rather than material

17   error.  360 U.S. at 269; *see also Dow v. Virga*, 729 F.3d 1041, 1047 (9th Cir. 2013), *quoting*

18   *Giglio v. United States*, 405 U.S. 150, 154 (1972) (a new trial is required if "the false testimony

19   could ... in any reasonable likelihood have affected the judgment of the jury....").

20        The jury was aware of the Strickland-Buchanan room and board agreement and the

21   entirely private reward funding that backed it.  They were aware of Buchanan's desire to get the

22   reward, pay his bill to Strickland and leave town.  They were aware Buchanan's alleged grudge

23   against petitioner.  The jury was aware of other noted facts relating to Buchanan's credibility; his

24   observations on the night of the murders and his statements regarding petitioner's admission of

25   involvement in the murders.

26        The jury was aware that Buchanan had met with Hahus, the prosecution team and the

27   defense team.  They were instructed that the argument of counsel, including Hahus's noted

28

1    closing argument that defense investigators had made several apparently minor purchases for

2    Buchanan and that the prosecution had not purchased "a single thing" for him, was not evidence.

3            For the reasons stated the state supreme court could have found no reasonable likelihood

4    the noted alleged false testimony could have affected the judgment of the jury. *Napue*, 360 U.S.

5    at 269; *see also Dow*, 729 F.3d at 1047 (a new trial is required if "the false testimony could ... in

6    any reasonable likelihood have affected the judgment of the jury....") That same court reasonably

7    could have found that considering the record as a whole, the alleged false testimony did not

8    "falsely buttress" Buchanan's credibility. *Cf., Hayes v. Brown*, 399 F.3d 972, 986 (9th Cir.

9    2005) (reversing conviction under *Napue* because concealment of a leniency deal allowed the

10   State to "falsely buttress[ ]" credibility of a key witness). Petitioner was not denied a fair trial

11   for these same reasons.

12           *(iii)    False Evidence - Penal Code Section 128*

13           Petitioner revisits allegations in claims II(K) (alleging ineffective assistance of counsel)

14   and VIII (alleging trial court error), alleging here that the prosecutor engaged in misconduct,

15   bolstering Buchanan's noted alleged false testimony by making him aware of the potential for

16   perjury provided by Penal Code section 128. (Doc. No. 116 at 40:3-13; RT 4764-66.)

17           Petitioner argues that Buchanan's bolstered testimony was false for the same reasons

18   argued in claims II(K) and VIII, i.e., that section 128 is not a meaningful deterrent to perjury and

19   the chances of a successful prosecution under section 128 are so remote as to be irrelevant. As

20   discussed in those claims, the state supreme court rejected this reasoning on direct appeal. *See,*

21   *Dickey,* 35 Cal. 4th at 912.

22           Respondent contends these allegations are unexhausted (Doc. No. 125 at 146:18-147:3)

23   and lack support in the record (*id.*). The court does not reach respondent's exhaustion argument

24   for the reasons stated in claims II(K) and VIII and because the claim is denied on the merits.[15]

25           As noted, the prosecutor was allowed to elicit testimony from Buchanan that the

26   prosecutor had made him aware of Penal Code section 128, which provided that:

27   _____

28   [15] *See* n.10; *see also Cone*, 543 U.S. at 451 n.3 (an application for habeas corpus may be denied on the merits even if unexhausted in state court).

148

1

2      Every person who, by willful perjury or subornation of perjury, procures the
       conviction and execution of any innocent person, is punishable by death or life
3      imprisonment without possibility of parole. The penalty shall be determined
       pursuant to Sections 190.3 and 190.4.

4    *Dickey*, 35 Cal. 4th at 911.

5         To summarize the discussion in claims II(K) and VIII, the California Supreme Court

6    considered and rejected on direct appeal the allegation that prosecutor Hahus improperly asked

7    Buchanan whether he had been made aware of section 128, as follows:

8

9      Defendant argues section 128 is not a meaningful deterrent to perjury. "Given the
       inevitable time lapse between potential conviction and execution, and the remote
       prospect of conclusive exonerating evidence being discovered after an execution,
10     the chances of a successful prosecution under Penal Code section 128 in any case
       are so remote as to make the proffered evidence wholly irrelevant."

11

12     We decline to second-guess the Legislature, which in enacting the section, clearly
       believed it would have a meaningful deterrent effect. Admittedly, the delay
13     between conviction and execution has grown exponentially since section 128 was
       enacted in 1872. However, by 1997, when the Legislature amended and thereby
14     reaffirmed the section, the notion of swift justice in capital cases was already a
       thing of the past. Moreover, with the advent of DNA testing, "the prospect of
15     conclusive exonerating evidence being discovered after an execution" is, if
       anything, less "remote." In any event, the stakes under section 128, "death or life
16     imprisonment without possibility of parole," are so high a potential perjurer may
       well decide it is not worth the risk, however small.

17     ---------------------------------------FOOTNOTE-----------------------

18

19     n.11 The 1977 amendment added the phrase "or life imprisonment without
       possibility of parole," as well as the second sentence. (Stats. 1977, ch. 316, § 3, p.
20     1256, eff. Aug.11, 1977.)

21     ---------------------------------------END FOOTNOTE------------------

22   *Dickey*, 35 Cal. 4th at 912.

23        For the reasons stated, the state supreme court could have found that considering the

24   record as a whole, the alleged false testimony did not "falsely buttress" Buchanan's credibility,

25   such that there was no reasonable likelihood the noted alleged false testimony could have

26   affected the judgment of the jury.  *Napue*, 360 U.S. at 269; c*f., Hayes,* 399 F.3d at 986.

27   Petitioner was not denied a fair trial because the evidence could be seen as proper.

28

                                         149

*(iv)     False Evidence - Stokes Testimony of Goldman's Statements*

Finally, petitioner largely revisits allegations in claim II(L), (alleging ineffective assistance of counsel), that detective Stokes testified falsely when he described Goldman's statements to him regarding the actions and conversations of RC and petitioner on the day of the murders including as to a knife used the in murders (RT 4397).  (Doc. No. 116 at 31:1-9.)  Here the allegations are framed as prosecutorial misconduct in presenting false evidence relating the following allegedly inconsistent testimony.

Goldman testified at the preliminary hearing that:

- She saw petitioner and RC leave the apartment right around the day of the Presidential election.  (RT 4339-40.)
- Before they left "[t]he only thing [petitioner] did was walk into the kitchen and he looked in the drawer. That's all he did." (RT 4343.)
- She saw RC open the hallway closet, and "get a cord." (RT 4345.)
- She saw that a cord on one of the venetian blinds in the apartment's bedroom, not the hallway closet, was gone.  (RT 4347.)
- She did not know how long [petitioner and RC] were gone.  (RT 4349.)
- When they returned, RC packed his bags and left.  (RT 4350.)
- Petitioner admitted to her that he was present when RC killed his grandmother and Louis Freiri, but that "Gail, I swear I had nothing to do with this." (RT 4357.)
- Petitioner made the "general statement" that "he wasn't afraid of anyone saying anything about him, because if they did, they wouldn't do it again." (RT 4375.)
- After petitioner found out RC and Caton had died, "he wasn't as depressed as he had been before." (RT 4378.)

At trial, the prosecutor elicited testimony from detective Stokes (*see* RT 4590-4616) that Goldman told him:

- She saw petitioner remove a knife from a drawer in the apartment kitchen before he and RC left the apartment on the night of the crimes.  (RT 4602.)
- Two days later petitioner "asked her to go into the bedroom with him, he want -- he wanted to tell her something." (RT 4606.)
- Buchanan followed them in (RT 4607) and petitioner stated "he had been involved in something bad." (RT 4606.)
- "[Petitioner] had said that he would kill her if she or anyone else talked about what he had told them." (RT 4615.)
- After the deaths of Ms. Caton and RC petitioner "became aggressive toward her and Buchanan, and made statements regarding the fact that if they revealed what he had told them that they would be hurt and killed, as would anyone else." (RT 4616.)
- Goldman told him about "a venetian blind that had been in the hall closet that was removed from the hall closet the night of the homicide, and that that venetian blind was - taken by [petitioner] ... into a bedroom and that the cord was removed

150

1    from that venetian blind and then the venetian blind was placed back inside the
     hall closet."  (RT 4534.)

2    The state supreme court would not have been unreasonable in denying these allegations

3    consistent with the discussion in claim II(L).  Stokes's testimony could reasonably be seen as

4    impeaching Goldman's preliminary hearing testimony, a non-hearsay purpose.

5    Petitioner's contention that Stokes coerced Goldman's statements lacks support in the

6    record.  Stokes denied that at the time of the interrogation he threatened to arrest Goldman if she

7    would not talk with him.  (RT 4595-97.)  Goldman stated "Detective Stokes, I'm sorry, I lied to

8    you.  I'm sorry I lied to you.  I want to tell you the whole truth right now."  (*Id.*)  The state

9    supreme court reasonably could have found Goldman's statements to Stokes during the

10   interrogation were voluntary.

11   Furthermore, it was not unreasonable for the state supreme court to find, under *Napue*,

12   and for all the reasons stated above that foregoing alleged false testimony was in any event

13   harmless rather than material error.  360 U.S. at 269; *see also Dow*, 729 F.3d at 1047 (a new trial

14   is required if "the false testimony could ... in any reasonable likelihood have affected the

15   judgment of the jury....").

16   Stokes's testimony could be seen as substantially cumulative of Buchanan's testimony.

17   *Cf., Ocampo*, 649 F.3d at 1114 (inquiry into Confrontation Clause error considers whether

18   errantly admitted evidence was cumulative).  For example, Buchanan testified that on the night

19   of the murders, he saw petitioner take the venetian blind out of the hall closet and go into the

20   bedroom (RT 4665-66), and then exit the bedroom and return the venetian blind to the closet; he

21   also saw a kitchen knife in the bedroom (RT 4706-07).  *See also Dickey*, 35 Cal. 4th at 898.

22   Buchanan testified that RC and petitioner returned later than night; bought drugs for the

23   roommates with money they did not have earlier that evening; and petitioner disposed of some

24   clothing by tossing it out of Buchanan's car.  (RT 4682-85.)

25   Significantly, petitioner's admission of his role in the crimes to Goldman and Buchanan

26   and discussion of events surrounding (RT 4352-79; 4606-08, 4687-94) were consistent in the

27   record and not controverted by Stokes's testimony of Goldman's statements.  Furthermore,

28

1   petitioner's admission was corroborated by Goldman's consistent testimony that RC and

2   petitioner left the apartment together the night of the crimes and returned together later that

3   evening whereupon RC acted strangely; *(*RT 4349-79); *see also Dickey*, 35 Cal. 4th at 898; and

4   by petitioner's initial depression following the crimes (RT 4352-54, 4378).   Goldman's

5   testimony about petitioner being essentially fearless and aggressive also was not directly

6   controverted by Stokes's testimony (RT 4398) or by Buchanan's testimony that petitioner "never

7   threatened my life in my presence."  (RT 4745.)

8       Petitioner, in this claim XIII also alleges that Stokes testified falsely during direct

9   examination about certain of Goldman's statements contained in his investigative report.  (Doc.

10  No. 116 at 31, n.4; RT 4621-22.)  However, it appears that Stokes corrected such misstatements

11  during cross-examination.   (*Id.*)   The state supreme court reasonably could have found no

12  reasonable likelihood these misstatements of Stokes, corrected on the record could have affected

13  the jury's verdict. *Tayborn*, 251 F.3d at 1130.  For these reasons, that court would not have been

14  unreasonable in viewing such misstatements as mere inconsistency or failure of Stokes to

15  recollect what was in his investigation reports, rather than false testimony.  *See Zuno-Arce*, 44

16  F.3d at 1423.

17      For the reasons stated, the state supreme court could have found that considering the

18  record as a whole, the alleged false testimony did not "falsely buttress" Buchanan's credibility,

19  such that there was no reasonable likelihood the noted alleged false testimony could have

20  affected the judgment of the jury.  *Napue*, 360 U.S. at 269; c*f., Hayes,* 399 F.3d at 986.

21  Petitioner was not denied a fair trial for these same reasons.

22          **c.      Analysis of Failure to Disclose Allegations**

23      Petitioner alleges the prosecutor knowingly failed to disclose material evidence to which

24  the defense was entitled.

25          *(i)      Clearly Established Law – Failure to Disclose*

26      The Supreme Court has held that if the state fails to disclose exculpatory evidence in

27  violation of *Brady v. Maryland*, the conviction cannot stand if there is a reasonable probability

28

that the evidence, considered cumulatively, would have produced a different result at trial.  373 U.S. 83 (1963); *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (same).  If a habeas petitioner establishes the "reasonable probability" of a different result, the error cannot subsequently be found harmless.  *Id.* at 436.  In *Brady*, the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady*, 373 U.S. at 87.  There are three components to a *Brady* violation: i) the evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching; ii) the evidence must have been suppressed by the State either willfully or inadvertently; and iii) prejudice must have ensued.  *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  "Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Strickler*, 527 U.S. at 280, *quoting Bagley,* 473 U.S. at 682.  "[T]here is never a real *Brady* violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  *Strickler*, 527 U.S. at 281.

          (ii)     *Analysis of Failure to Disclose Allegations*

Petitioner alleges the prosecution failed to disclose to the defense legally discoverable evidence regarding inducements to and impeachment of witness Buchanan to which the defense was entitled, discussed below.  (Doc. No. 51-1 ¶758-768; *see also* SHCP, Ex.'s G-K, M, N.)

As a preliminary matter, petitioner argues that pursuant to *United States v. Agurs*, 427 U.S. 97, 112 (1976), the *Napue*/*Mooney* prejudice standard should apply when determining *Brady* materiality.  However, the court conducts a cumulative *Brady/Napue* prejudice analysis, *post*.  *See Kyle*, 514 U.S. at 434-37.  *Agurs* is not authority otherwise.

          *Contacts between Prosecutor Hahus and Buchanan*

Petitioner revisits the *Napue* allegations above that prosecutor Hahus failed to disclose the extent of his pre-trial contacts with Buchanan – that Hahus met with Buchanan twelve times,

1   not the two times to which Buchanan testified.  He also alleges that Hahus had spoken to

2   Buchanan by phone at least once and that prosecution investigators had contacted Buchanan

3   several times.

4          Petitioner again argues the failure to disclose these contacts made Buchanan's testimony

5   appear credible, unrehearsed and not impaired by his admitted use of street drugs.  He argues that

6   in fact the higher (actual) number of meetings was necessary to prepare Buchanan's testimony.

7          However, for the same reasons noted in the above *Napue* discussion, the state supreme

8   court could reasonably have rejected these allegations.  In sum, the jury was aware of the facts

9   relating to Buchanan's credibility including testimony and statements of Goldman.  (*See* claim(s)

10  II(E), II(P), XXVI, XXVIII.)  The state supreme court concluded in these regards that:

11

12          The jury knew Goldman and Buchanan were drug addicts, that they had been
            using drugs almost daily around the time of defendant's statements, and that
13          Buchanan had used drugs the day before his testimony. It knew that, even though
            he had initially denied it, Buchanan was aware of the $5,000 reward, that
14          Buchanan had told others he wanted the reward for turning defendant in, and that
            he had then testified the reward was not the reason he had come forward. It knew
15          room and board expenses incurred by Buchanan were to be deducted from the
            reward. [Citation]  It knew Buchanan disliked defendant, and that he wanted
16          revenge against defendant for tearing up a picture of his daughter.

17  *Dickey*, 35 Cal. 4th at 907 n.8.  A fair-minded jurist could have concluded that these same facts

18  would be related to the need to prepare Buchanan for trial.  Also, the jury was instructed on

19  weighing evidence going toward credibility, including that:

20

21          [In] determining the believability of [Buchanan] you may consider anything that
            has a tendency in reason to prove or disprove [his] truthfulness ..." [and] ...
22          [e]vidence of the existence or nonexistence of any fact he testified to ..."

23  (CT 400.)

24          For the reasons stated the state supreme court could reasonably have found that had the

25  prosecutor disclosed the full extent of contacts he and his office had with Buchanan, there would

26  not have been a reasonable probability of a different outcome.

27          *The Strickland-Buchanan Agreement*

28

                                            154

1     Petitioner alleges that prosecutor Hahus did not provide the defense with copies of the

2 noted document memorializing the boarding house agreement between Buchanan and Strickland

3 and bills thereunder.  Such evidence, he claims would have impeached Buchanan's credibility.

4 He alleges that in response to a discovery request by Schultz for "[t]he benefits to be received

5 from the reward, including total monetary and/or any other benefit" (CT 260), the prosecution

6 failed to disclose information by "narrowly limit[ing] its response to the private $5,000 reward."

7 (CT 288-89.)  He alleges that in response to a further discovery request for related documents the

8 prosecution "failed to disclose any documentary evidence of the agreement to use the reward to

9 secure housing and food, the cost of same, the eleven or more documented cash loans, the

10 regular invoicing of the amounts owed and debts incurred, and the ultimate discounts provided

11 by the boardinghouse."  (Doc. No. 116 at 75:19-23, *citing* SHCP, Ex.'s G, H, I.)

12     The trial court in denying the motion for new trial and the state supreme court in denying

13 these allegations on direct appeal each found the prosecution's involvement in the Strickland-

14 Buchanan agreement potentially impeaching.  (*See* RT 1/17/92 at 16-17); *Dickey*, 35 Cal. 4th at

15 910.  Nevertheless, the state supreme court was not unreasonable in finding no prejudice, that

16 there was "no reasonable likelihood the false impression created by Buchanan's testimony

17 [relating to the Strickland room and board agreement] could have affected the judgment of the

18 jury ... [T]he jury knew, through Buchanan's testimony and that of the defense investigator, of

19 the agreement itself."  *Dickey*, 35 Cal. 4th at 910.

20     Any argument by petitioner that the agreement and bills thereunder constituted evidence

21 of "conflicting claims from [Ms.] Strickland" and on that basis *Brady* evidence (*see* Doc. No. 51-

22 1 ¶ 754) fails because the prosecution had no responsibility under the agreement for the reasons

23 stated above.  This was clear from prosecution investigator Martin's memorialization of and

24 report regarding the Strickland-Buchanan agreement (RT 5278-79; SHCP, Ex.'s G, H) and the

25 related testimony of Martin (RT 5280, 5308), Strickland (RT 5323) and Hahus (RT 5405).

26 Petitioner fails to demonstrate on the evidence how benefits from the noted private reward could

27 exceed the total amount of that reward, $5000, or that the prosecution provided any financial

28

1  benefit as a result of the Buchanan-Strickland agreement.  (*See* claim II(E).)

2      It appears that a copy of the document prepared by Martin memorializing the Strickland-

3  Buchanan agreement was provided to defense counsel Schultz prior to trial and that the billings

4  thereunder, sent to prosecution investigator Martin also were shown to the defense team.  (RT

5  5406.)  The state supreme court would not have been unreasonable in finding Schultz's statement

6  that he "does not recall receiving copies of the bills or being apprised of their existence" (SHCP,

7  Ex. B ¶6 at 353) not sufficient evidence otherwise.  Significantly, petitioner has not established

8  that Hahus was aware of any particulars of the Strickland-Buchanan relationship apart from the

9  terms in the memorialized document relating to the private reward.  (*See e.g.*, RT 5403-07.)

10      *Dismissal of Pending Felony and Misdemeanor Charges against Witness Buchanan*

11      Petitioner revisits allegations raised in claim II(E) (ineffective assistance of counsel),

12  recast here as a *Brady* claim that the prosecution failed to disclose an agreement to provide and

13  provided assistance to Buchanan regarding separate felony and misdemeanor charges brought

14  against him around the time of petitioner's trial.  (Doc. No. 51-1 ¶¶ 740-750; Doc. No. 116 at

15  80:18-87:7; see also claim II(E).)

16      Petitioner argues the prosecution failed to disclose the dismissal of felony drug

17  possession counts against Buchanan that arose after he was identified as a witness and prior to

18  petitioner's trial.  (CT 584; SHCP, Ex.'s J, K.)  He contends that on July 18, 1989, prior to his

19  trial, "criminal complaint case number 017993-7 ... charging Buchanan with two felony drug

20  possession counts, was dismissed."  (Doc. No. 51-1 ¶ 741; SHCP, Ex. J; *see also* Supp. CT 8-23,

21  -24, 26-28, 37-39, 51-69.)

22      Petitioner argues the felony dismissals were part of a plea bargain connected to

23  Buchanan's testimony in petitioner's proceeding (*see* RT 5341-58, 5370-79, 5391-94) and that

24  this deal was meant not to be disclosed (RT 5384; SHCP, Ex. N).  He further contends Buchanan

25  told prosecutor Hahus of this deal prior to petitioner's trial (RT 5380-94) and that Hahus did not

26  believe Buchanan and was unaware of any such deal.  (RT 5385-88.)

27      Additionally, petitioner argues 1990 misdemeanor charges were dismissed after

28

156

1    petitioner's trial by Hahus at least in part in return for Buchanan's testimony in petitioner's

2    proceeding.  (RT 5396-5403; *see also* SHCP, Ex. K; Supp. CT. 68-83.)  Specifically, he contends

3    that on April 17, 1991, after petitioner's conviction, Buchanan's criminal case M48975-7

4    charging him with a misdemeanor possession of a controlled substance and hypodermic needle

5    was dismissed "in the interests of justice."  (RT 5396-99; *see also* Doc. No. 51-1 ¶ 741 and n.59,

6    *citing* Supp. CT 68, 71, 77-78.)

7         The California Supreme Court considered and rejected these allegations on direct appeal,

8    stating that:

9

10        When Ken Hahus, the prosecutor in this case, first spoke to Buchanan after the
          case was reassigned to him, Buchanan had been released on his own recognizance
11        (OR) in an unrelated narcotics case and had failed to appear. Barbara Dotta, the
          prosecutor in the narcotics case, had met with defense counsel in chambers, and
12        after defense counsel had pointed out defects in the search warrant, defects which
          made it impossible to then proceed with the preliminary hearing, and which
13        eventually resulted in dismissal of that case, Ms. Dotta had agreed to Buchanan's
          release on OR. However, Buchanan told Mr. Hahus he had been released OR in
14        the narcotics case because he was a prime witness in this case, and that a reporter
          had been present when counsel met in chambers and reached the purported
15        agreement, but that the reporter had been instructed not to report the agreement, in
          order to keep defense counsel in this case from learning of it. Mr. Hahus heatedly
16        informed Buchanan no such agreement could have been made because he was the
          prosecutor in this case, that he would have had to authorize such an agreement,
17        and he had not done so.

18        Mr. Hahus did not inform defense counsel of his conversation with Buchanan
          until shortly before the hearing on the motion for a new trial. The motion for new
19        trial was based on other grounds. This contention was not added to the motion,
          and thus the trial court did not address it.

20        We conclude that while this information would have been *favorable* to defendant
21        insofar as it tended to impeach Buchanan's credibility, it was *not material* because
          it would have added little to the cumulative impact of the other impeachment
22        evidence.

23        The jury knew Buchanan was a drug addict, that he had been using drugs almost
          daily around the time of defendant's statements, and that he had used drugs the
24        day before his testimony. They knew that, even though he had initially denied it,
          Buchanan was aware of the $5,000 reward, that Buchanan had told others he
25        wanted the reward for turning defendant in, and that he had then testified the
          reward was not the reason he had come forward. They knew room and board
26        expenses incurred by Buchanan were to be deducted from the reward. [Citation]
          They knew Buchanan disliked defendant, and that he wanted revenge against
27        defendant for tearing up a picture of his daughter.

28        It is not reasonably probable, we conclude, that whatever confidence the jury

                                        157

placed in Buchanan's testimony would have been fatally undermined by knowing he had made a resoundingly unsuccessful effort to convince Mr. Hahus his testimony entitled him to, in Mr. Hahus's words, "get-out-of-jail-free cards."[9]

---------------------------------------FOOTNOTE----------------------

n.9 Defendant contends his trial counsel was ineffective in failing to impeach Buchanan with the fact that the charges in the unrelated narcotics case had been dismissed. This information would have been of no impeachment value. After hearing the motion for a new trial, the trial court concluded the narcotics case "was dismissed because of its weakness months before Mr. Buchanan testified. So there was really no favor done to Mr. Buchanan, and there was no further hook on Mr. Buchanan at that time."

------------------------------------END FOOTNOTE-----------------

*Dickey*, 35 Cal. 4th at 908-09.

At the outset, the court does not reach respondent's contention that these allegations are unexhausted (Doc. No. 125 at 146:22-147:3) because these allegations are denied on the merits.[16]

This court is not persuaded the state supreme court's rejection of these allegations was unreasonable.  The district attorneys who were involved in Buchanan's felony drug case denied any deal by stating charges were dropped because of problems with the search warrant.  (RT 5341-58, 5370-79, 5391-94.)   The record reflects the felony case was dismissed by the prosecution on July 18, 1989 "due to evidentiary problems" (SHCP, Ex. N-1) and "lack of corpus delicti."  (SHCP, Ex. J-2.)

Petitioner nonetheless argues such a deal to dismiss the felony charges existed, pointing to the time and effort he contends the district attorney's office devoted to the felony case (Supp. CT 24-25, 29-36, 40-50), and to the guilty plea to one (of three) counts by Buchanan's co-defendant in the felony case.  (Supp. CT 24-25.)   However, the state supreme court could reasonably have rejected such surmise by petitioner given the weight of the noted direct testimony.  Notably, the trial court rejected the same allegation on motion for new trial, finding the felony case was dismissed for lack of evidence.  (RT 1/17/92 at 18-19.)

As for the misdemeanor case, the record reflects the Fresno District Attorney's Office dismissed the case for "lack of corpus delicti" and "in the interest of justice."  (SHCP, Ex. K-2.)

---

[16] *See* n.10; *see also Cone*, 543 U.S. at 451 n.3 (an application for habeas corpus may be denied on the merits even if unexhausted in state court).

1  Prosecutor Hahus testified at the new trial motion that it was "hard to say" whether he dismissed

2  the misdemeanor case in reward for Buchanan's testimony in petitioner's case.  (RT 5402.)

3  Even so, Hahus went on to testify that there was no agreement with Buchanan that the

4  misdemeanor case would be dismissed; and that he never told Buchanan before the latter's

5  testimony that the case would be dismissed.  (RT 5393-5403.)  Petitioner has not demonstrated

6  on the facts that Buchanan believed such an agreement to dismiss the misdemeanor charges

7  existed at the time of his testimony.  *Cf.*, *Giglio*, 405 U.S. at 154-55 (evidence of pre-testimony

8  agreement regarding future prosecution of key witness co-conspirator was relevant to credibility

9  of that witness and failure to disclose such evidence was a *Brady* violation).

10       For the reasons stated, the state supreme court could reasonably have found that at the

11  time Buchanan testified in petitioner's proceeding no dismissal deal related to these felony and

12  misdemeanor charges existed with the prosecution and Buchanan did not believe such a deal

13  existed.  That court could reasonably have given weight to the direct testimony in the record over

14  petitioner's surmise and found these allegations not to suggest a reasonable probability of a

15  different result.  Schultz's statement that he was aware of the pending charges and dismissal

16  prior to trial, but did not believe this information would be beneficial to the defense, (SHCP, Ex.

17  B ¶ 7; see also RT 5436), does not suggest otherwise.

18       *Buchanan's Propensity for Lying*

19       Petitioner alleges that prosecutor Hahus failed to disclose, until just prior to the motion

20  for new trial, his file notes regarding the above discussed alleged felony drug charge plea

21  bargain.  (Doc. No. 51-1 ¶¶ 758-768; Doc. No. 116 at 77:2-80:15; SHCP, Ex. N; *see also* RT

22  5380-92.)  Petitioner argues this failure to disclose these notes during pretrial discovery was

23  prejudicial because this evidence was not otherwise in the record and without it the prosecutor

24  was able to argue in closing that Buchanan testified truthfully.  (RT 4969-72.)

25       However, for the same reasons discussed above the state supreme court reasonably could

26  have found these notes by Hahus of his initial contact with Buchanan not to be materially

27  exculpatory or impeaching.  The trial court found Buchanan's statement regarding the alleged

28

1  deal was untrue.  (RT 1/17/92 at 18-19.)  Hahus believed Buchanan's statement to be untrue (RT

2  5388), and merely an attempt to parlay benefit in exchange for testimony.  (RT 5431-36.)

3  Furthermore, Hahus stated that he did not view Buchanan's noted statement as a lie and did not

4  see it as favorable to petitioner.  (*See id.*)  Instead, Hahus viewed the statement merely as a

5  "flag" showing [Buchanan's] "relative sophistication in dealing with district attorneys" (RT

6  5384-88); that the statement simply showed Buchanan was "con-wise."  (RT 4970.)

7        Accordingly, the state supreme court would not have been unreasonable in finding that

8  even if Hahus had produced notes of Buchanan's initial contact with him there was no

9  reasonable probability of a different result.   As noted, the jury was aware of the facts relating to

10  Buchanan's credibility.  The record before the jury included other substantial evidence relating to

11  Buchanan's credibility - including that he was an habitual drug user interested in the reward

12  money and that he held a grudge against petitioner.  The jury also was instructed on weighing

13  evidence going toward credibility.

14        *Illegal Drug Activities*

15        Petitioner alleges that prosecutor Hahus failed to disclose a deal with Buchanan not to

16  prosecute the illegal drug activities to which Buchanan testified at trial.  (Doc. No. 116 at 70:1-

17  5.)  Specifically, petitioner alleges the prosecution failed to pursue criminal charges against

18  Buchanan even though he waived his Fifth Amendment right and admitted under oath at trial that

19  he possessed, used and sold illegal drugs.  (*See* Doc. No. 116 at 87:10-88:15.)  Petitioner argues

20  that there must have been an implicit agreement to this effect because no charges were ever filed.

21  (*Id.*)

22        As a preliminary matter, the court does not reach respondent's argument these allegations

23  are unexhausted (Doc. No. 125 at 146:22-147:3) because the allegations are denied on the merits

24  as discussed below.[17]

25        Petitioner has not made an evidentiary showing that there was an agreement not to

26  prosecute, or that Buchanan believed there was one at the time Buchanan testified at petitioner's

27

28  _____
[17] *See* n.10; *see also Cone*, 543 U.S. at 451 n.3 (an application for habeas corpus may be denied on the merits even if unexhausted in state court).

1    trial.  (RT 4737-42.)  To the contrary, Buchanan testified prior to these drug related admissions

2    that he was not told by Hahus expressly or implicitly that he (Buchanan) would not be

3    prosecuted.  (RT 4741-42, 4754-56.)  Nor has Petitioner demonstrated that Buchanan's waiver of

4    his right against self-incrimination was constitutionally infirm.

5        Even if there was such a deal, the state supreme court could reasonably have determined

6    any failure to disclose it was not prejudicial.  As discussed above, the jury was otherwise aware

7    of Buchanan's drug related activities and presumable considered such in evaluating his

8    credibility and testimony.  Additionally, petitioner has not demonstrated that Buchanan's drug

9    related admissions were inculpating of petitioner or that absent the admissions petitioner would

10   have realized a different outcome in his proceeding.

11       Petitioner's further allegation that Hahus failed to disclose such a deal to post-trial

12   defense counsel similarly fails.  Petitioner contends that at the hearing on the new trial motion,

13   seven months after trail ended, Hahus was obligated to advise Ms. Hart, who had replaced

14   Schultz as counsel for petitioner, that no prosecution has been initiated regarding the noted

15   admissions.  But for the same reasons stated above, petitioner has not demonstrated such a deal

16   existed or if it did that he was prejudiced by it.

17       *(iii)    Cumulative Effect of Napue and Brady Errors*

18       Petitioner finally alleges that the state supreme court was unreasonable in finding no

19   cumulative material violation under *Napue* and *Brady*.  (*See* Doc. No. 116 at 28:4-99:7.)

20       "The Supreme Court has clearly established that the combined effect of multiple trial

21   errors may give rise to a due process violation if it renders a trial fundamentally unfair, even

22   where each error considered individually would not require reversal."  *Parle v. Runnels*, 505

23   F.3d 922, 928 (9th Cir. 2007), *citing Donnelly*, 416 U.S. at 643.

24       Although individual errors looked at separately may not rise to the level of reversible

25   error, their cumulative effect may nevertheless be so prejudicial as to require reversal.

26   *Necoechea*, 986 F.2d at 1282 ("In reviewing for cumulative error, the court must review all

27   errors preserved for appeal and all plain error.").  However, the fact that errors have been

28

committed during a trial does not mean that reversal is required.  "[W]hile a defendant is entitled to a fair trial; [she] is not entitled to a perfect trial, for there are no perfect trials."  *United States v. Payne*, 944 F.2d 1458, 1477 (9th Cir. 1991).

Here, petitioner argues the state supreme court ignored facts that "(1) Buchanan was continuing to rely on the $5,000 reward, not on earnings from property management and maintenance, to pay his debt to the landlady; (2) [Buchanan] was beholden to the state for nailing down the agreement that allowed him to obtain room and board on credit; (3) [Hahus] met with [Buchanan] at least a dozen times prior to the trial; and (4) [Buchanan] had no real concern about being prosecuted – let alone facing the death penalty – for perjury."  (Doc. No. 116 at 61:22-62:1.)

Petitioner argues that confidence in the verdict is undermined by: "1) the jury being deprived of knowing that Buchanan lied to the DA to gain personal advantage with respect to his willingness to testify in this case; 2) the DA's arguments to the jury that Buchanan was honest and reliable; and 3) the propensity of most all juries to disregard the testimony of liars, as they are instructed they can do."  (Doc. No. 128 at 84:7-14.)  He argues that absent these errors prosecutor Hahus would have had to present weaker theories, present less evidence, and refrain from making numerous arguments that vouched for Buchanan's veracity.  This, petitioner argues would have "fueled a withering cross-examination, destroying confidence in Buchanan's story and raising a substantial implication that the DA had coached him during their dozen or more meetings."  (*Id.* at 83:14-18.)

Cumulative prejudice arising from concurrent *Brady* and *Napue* error is analyzed as follows:

> [W]e first consider the *Napue* violations collectively and ask whether there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." If so, habeas relief must be granted.  However, if the *Napue* errors are not material standing alone, we consider all of the *Napue* and *Brady* violations collectively and ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would* have been different." At both stages, we must ask whether the defendant "received ... a trial resulting in a verdict worthy of confidence.

*Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008).

As a preliminary matter, the court is unpersuaded by respondent's argument based upon *Imbler v. Pachtman*, that a claim under *Brady* can be analyzed under the *Napue* standard. *See* 424 U.S. 409, 431 n.34 (1976). The *Imbler* court's holding relates to prosecutorial immunity in the context of *Brady* and *Napue* and does not support respondent's asserted standard of review for cumulative error under *Napue* and *Brady*.

For the reasons discussed above, the state supreme court could reasonably have found no individual and cumulative prejudice under *Napue* and *Brady*. First, considering only the *Napue* allegations, that court could have found no reasonable likelihood that the false testimony could have affected the judgment of the jury. For the reasons stated above, the state supreme court could reasonably have rejected petitioner's allegations regarding the memorialization of the Strickland agreement; Stokes's testimony of Goldman's comments to him; and the court's notice of Penal Code section 128. Nor does it appear the alleged false testimony materially impacted the ability of the jury to evaluate Buchanan's credibility given the noted evidence that was otherwise before the jury.

Second, even when combined with the alleged *Brady* violations, there is no reasonable probability that the result of the proceeding would have been different. For the reasons stated above, the state supreme court could reasonably have rejected allegations regarding prejudicial undisclosed contacts between Buchanan and Hahus including relating to alleged lies by Buchanan; the Strickland agreement; dismissal of criminal charges; and illegal drug use by Buchanan. *Cf.*, *Horton v. Mayle*, 408 F.3d 570, 578–79 (9th Cir. 2005) (holding that failing to disclose a leniency deal was material because the witness's testimony was "central to the prosecution's case" and "the deal would have provided powerful and unique impeachment evidence demonstrating that [the witness] had an interest in fabricating his testimony").

There was no cumulative error under *Napue* and *Brady* because there was no individual constitutional error. *See Thompson*, 86 F.3d at 1521. For the reasons stated, the state supreme court could reasonably have found the alleged *Napue* and *Brady* errors not sufficient to

1   "undermine confidence in the outcome" of the trial.  *See Bagley,* 473 U.S. at 682.

2       *(iv)    Conclusions*

3       For the reasons stated, the state supreme court could reasonably have found petitioner

4   failed to demonstrate prosecutorial misconduct under *Brady* and *Napue*.

5       Accordingly, the California Supreme Court's rejection of this claim was not contrary to,

6   or an unreasonable application of, clearly established federal law, or an unreasonable

7   determination of the facts in light of the evidence presented in the state court proceeding.  28

8   U.S.C. § 2254(d).

9       Claim XIII is denied.

10      3.    Review of Claims XIV and XV

11      Petitioner alleges prosecutorial misconduct by failing to collect and preserve and/or

12  making unavailable and destroying material potentially exculpatory evidence, denying his rights

13  under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

14  (Doc. No. 51-1 ¶¶ 769-825.)

15      **a.    Clearly Established Law**

16      *(i)    Prosecutorial Misconduct*

17      The clearly established law for prosecutorial misconduct is set out in claim XIII, *ante*.

18      *(ii)    Potentially Exculpatory Evidence*

19      The failure of a state to preserve evidence "of which no more can be said than it could

20  have been subjected to tests, the results of which might have exonerated the defendant," is not a

21  denial of due process of the law "unless a criminal defendant can show bad faith on the part of

22  the police." *Youngblood*, 488 U.S. at 57; *Mitchell*, 878 F.2d at 321.

23      Where the government fails to preserve evidence that is only potentially exculpatory, the

24  right to due process is violated only if [the evidence] possesses "an exculpatory value that was

25  apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be

26  unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467

27  U.S. at 489.    The defendant in *Youngblood* failed to establish a due process violation because

28

1  the evidence was only "potentially useful" and the actions of the police could "at worst be

2  described as negligent." *Youngblood*, 488 U.S. at 58.

3    **b.    Analysis of Claim XIV**

4    Petitioner alleges that the prosecution, in knowing bad faith failed to collect and preserve

5  and/or destroyed material physical and biologic exculpating evidence.

6    *(i)    State Court Direct and Collateral Review*

7    The California Supreme Court summarily denied these allegations on the merits and

8  denied certain allegations as procedurally barred, on habeas review.  (Lod. Doc. No. 31.)

9    *(ii)    Failure to Collect and Preserve Physical Evidence*

10    Petitioner alleges the state failed to collect and preserve material physical evidence at the

11  crime scene and elsewhere.

12    *Crime Scene Fingerprint Evidence*

13    Petitioner argues that by virtue of the law enforcement's bad faith failure to conduct a

14  reasonable crime scene examination, no fingerprints from anyone were found at the crime scene

15  notwithstanding the two victims and five witnesses known to have been in the home during the

16  period from the murders until the police examination of the crime scene.  (Doc. No. 116 at

17  121:1-24; RT 4214-33.)   He suggests that such fingerprint evidence would have been

18  exculpatory.

19    Petitioner argues the police failed to collect and examine two disconnected telephones

20  with blood on them (RT 4321, 4330-31) found placed together in the living room.  (RT 4320-21;

21  SSHCP, Ex. 9 at 322.)  He surmises bad faith was involved because i) RC was known to have a

22  fascination with telephones (RT 4320-22) and ii) detective Stokes believed more than one

23  perpetrator was likely involved in the crimes.  (RT 4628-29.)  He cites *Miller v. Vasquez* and

24  argues this alleged bad faith failure to collect and preserve potentially exculpatory evidence

25  violated his due process rights.  868 F.2d 1116, 1120-21 (9th Cir. 1989) (*Youngblood* applies

26  where the state in bad faith fails to collect potentially exculpatory evidence); (*see also* Doc. No.

27  51-1- at 233:9-12).

28

1    However, the state supreme court reasonably could have rejected these allegations.  The

2 record reflects police "I" Bureau officers dusted the crime scene including all areas likely to

3 yield usable latent prints; they simply did not find any usable prints to collect.  (RT 4211-33; *see*

4 *also* Doc. No. 125 at 149:15-17.)  The venetian blinds and window coverings at the crime scene

5 were checked and found not to be missing any cord.  (RT 4326-28.)  Petitioner has not shown the

6 existence of potentially useful fingerprints or other physical evidence that law enforcement failed

7 to recover from the crime scene in bad faith.  *See e.g., United States v. Burdeau*, 168 F.3d 352,

8 356-57 (9th Cir. 1999) (there are many reasons not to find usable prints).

9    The state supreme court reasonably could have found these allegations to be only

10 speculative.

11    *Easy 8 Motel*

12    Petitioner argues that by virtue of the law enforcement's bad faith failure to examine the

13 Fresno hotel room rented by RC shortly after the murders (RT 4420-34), potentially exculpatory

14 evidence was lost including possible forensic evidence linking Buchanan to the crimes.  (Doc.

15 No. 116 at 123:6-124:15.)  He points out that even though RC left his belongings including an

16 empty prescription drug vial belonging to Buchanan at the Easy 8 Motel during his flight after

17 the murders (RT 4541-42), the police did not search for Buchanan or investigate Buchanan's

18 potential involvement in the crimes.   All this, he surmises, deprived him of potentially

19 exculpating evidence.

20    But the state supreme court could have determined the police investigation of the room

21 was reasonable.  Petitioner infers from the prescription drug vial and the fact Buchanan had

22 access to a car that Buchanan was in the room with RC.  Yet the weight of the evidentiary record

23 seems not to support such an inference.  The desk clerk at the Easy 8 Motel, Mr. Yeon, testified

24 at trial that RC registered alone; Yeon makes no mention of anyone accompanying RC while at

25 the Motel.  (RT 4420-34.)  Yeon testified he was interviewed by detective Stokes shortly after

26 RC departed the Motel and that the police collected RC's registration card, entered his room and

27 collected RC's remaining belongings.   (*Id.*)    Detective Stokes's testimony on these events

28

1    tracked Yeon's; Stokes also testified that at the time, police were unfamiliar with Buchanan.

2    (RT 4540-42.)

3        Additionally, petitioner's allegation that Buchanan was RC's accomplice in the crimes

4    fails for the reasons discussed in claim II(B).

5        Accordingly, petitioner has not pointed to facts in the record reasonably suggesting

6    potentially exculpatory evidence at the Easy 8 Motel that was not recovered by law enforcement

7    in bad faith.

8        *Harvard Avenue Apartment*

9        Petitioner argues that law enforcement's bad faith failure to examine the Harvard Avenue

10   apartment RC shared with petitioner and others until three months after the murders resulted in

11   the loss of potentially exculpatory evidence.  (Doc. No. 116 at 128:6-131:5.)  He argues that

12   although law enforcement almost immediately suspected RC and one or more accomplices in the

13   murders, (RT 4628), no warrant was sought to search the apartment for crime scene property or

14   evidence linked to the crimes, such as the bloody knife and the ligature found at the crime scene.

15       However, petitioner has not demonstrated on the evidentiary record that any such

16   potentially exculpating property or evidence existed and was lost.  He argues law enforcement

17   may have allowed the venetian blind recovered by detective Stokes, from which only petitioner's

18   fingerprint was lifted, to be contaminated.  (*See* claims II(F), II(S).)  He suggests this was

19   because of detective Stokes's requested that landlord, Ms. Hays, handle the blind. (*Id.*)  These

20   same allegations were discussed above in claims II(F), II(S) and fail for the reasons stated

21   therein.  Notably, petitioner's own expert was unable to identify on the venetian blind any

22   additional usable latent prints suitable for comparison.  (*Id.*; *see also* Doc. No. 51-1 ¶ 786.)

23       Petitioner argues law enforcement similarly delayed several months investigating the

24   ligature cord used in the murder of Freiri; that it was not until three months after the murders that

25   Stokes returned to the then vacated and cleaned apartment to try and match the cord to a venetian

26   blind.  (RT 4514-30.)  Petitioner argues that the venetian blind recovered by Stokes from Hays

27   had no cord remaining and had been handled and possibly altered by Hays.  (*See Id.*)  Petitioner

28

1  argues that Stokes, without foundation, took and had analyzed cord samples from the other three

2  blinds remaining in the apartment even though those blinds were not missing any cord.

3         However, as noted in claims II(F) and II(S), the jury was informed that the crime scene

4  ligature was not a match for the samples taken by detective Stokes.  For the reasons stated in

5  claims II(F), II(S), the state supreme court could reasonably have rejected these same allegations

6  couched here as prosecutorial error.  Moreover, petitioner has not pointed to facts in the record

7  suggesting Stokes or the prosecution intentionally delayed recovery of potentially exculpatory

8  evidence or otherwise acted in bad faith in such regards.  *See Trombetta*, 467 U.S. at 489.

9  Instead it appears that Stokes's forensic investigation of the Harvard Avenue apartment took

10  place once petitioner was identified by Buchanan as a suspect.

11         *(iii)     Failure to Collect and Preserve Biologic Evidence*

12         Petitioner revisits allegation in claims II(B), II(C), II(D) above, here couched as claimed

13  prosecutorial error.  (Doc. No. 51-1 ¶¶ 807-813.)  He complains of the prosecution's bad faith

14  failure to collect and preserve crime scene biologic evidence.  (Doc. No. 116 at 134:22-145:20.)

15  Specifically, he argues fingernail scrapings, saliva, debris from a wound on Mr. Freiri's head,

16  blood evidence and hair found at the crime scene were not properly preserved for analysis and

17  that some of this evidence was lost at the state crime lab for up to 5 months.  He notes in support

18  that state criminologist Cortner testified at trial that most of blood evidence could not be

19  analyzed.  (RT 4567-69.)

20         However, the state supreme court reasonably could have rejected these allegations.  As

21  discussed in claims II(B), II(C), II(D), the biologic evidence recovered and analyzed by law

22  enforcement was not inculpating of petitioner.  This allowed Schultz to argue at trial the primary

23  defense that RC was the sole perpetrator.  (RT 4985-87.)  Fingernail scrapings tested positive for

24  the presence of blood, but that the samples were insufficient for further analysis, i.e., petitioner

25  was not a match.  A hair found on the hand of victim Freiri was not a match for petitioner;

26  defense forensic expert Barnett's pre-trial analysis confirmed as much.  Of the seven blood

27  swabs taken, three tested positive for blood, but only two could be typed and those excluded

28

168

1   petitioner as a possible source.  Petitioner has not demonstrated that the blood swabs which

2   returned inconclusive results and the unanalyzed wound debris recovered from the scalp of

3   victim Freiri, were testable when collected.

4          Additionally, the state supreme court could reasonably have found any failure to preserve

5   potentially useful biologic evidence resulted from mere negligence and as such not a violation of

6   petitioner's constitutional rights.  *See e.g.*, *Youngblood*, 488 U.S. at 58 ("The failure of the police

7   to refrigerate the clothing and to perform tests on the semen samples can at worst be described as

8   negligent.").  Petitioner has not pointed to facts in the state record suggesting Stokes or the

9   prosecution intentionally failed to recover and preserve potentially exculpating evidence or

10  otherwise acted in bad faith in these regards.  *See Trombetta*, 467 U.S. at 489.

11         It follows that the state supreme court reasonably could have found speculative

12  petitioner's allegations that detective Stokes and state crime lab employees intentionally and in

13  bad faith failed to refrigerate and preserve potentially exculpatory biologic evidence.  *See*

14  *Youngblood*, 488 U.S. at 53-58.  Absent any constitutional error as to the individual pieces of

15  biologic evidence, there is no cumulative error.  *Kyles*, 514 U.S. at 434.

16         **c.      Analysis of Claim XV**

17         Petitioner alleges that the prosecution and/or the state or federal government deported

18  material witness, Ruben Flores, in order to make him unavailable at petitioner's trial, violating

19  petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United

20  States Constitution.  (Doc. No. 51-1 ¶¶ 816-825.)

21         *(i)      State Court Direct and Collateral Review*

22         The California Supreme Court, on habeas review summarily denied these allegations on

23  the merits and denied certain allegations as procedurally barred.  (Lod. Doc. No. 31.)

24         *(ii)     Deportation of Witness Ruben Flores*

25         Petitioner alleges that the state through its subdivision, the prosecution, orchestrated

26  Flores's deportation by transferring him to Immigration and Naturalization Service ("INS")

27  custody in order to make him unavailable at petitioner's trial.  (Doc. No. 128 at 113:4-9.)

28

Petitioner cites *People v. Valencia* and argues that this state action violated due process because he was denied a fair trial. 218 Cal. App. 3d 808, 826-27 (Cal. Ct. App. 1990) (defendant made sufficient showing anticipated testimony of deported witness was arguably material and favorable to the defense).

Petitioner argues that Flores, who was the roommate of testifying witness Miguel Sandoval, was a material and favorable witness for the defense and possibly a suspect in the murders. It appears Flores was a drug dealer from whom RC may have purchased drug in the months leading up to the murders (Doc. No. 105 at 69:22-23), and that Flores may have been with RC on the morning of the murders. (*Id.*; *see also* SSHCP, Ex. 11 at 347.) Additionally, it was from Flores that RC allegedly stole the car he used to flee Fresno for San Jose shortly after the murders and to whom RC allegedly stated that "he had just killed a woman and [ ] needed the car to get away from Fresno." (RT 4801.)

Based thereon, petitioner argues that Flores had "material information regarding RC's drug use, drug addiction, drug purchases [including Flores' alleged statement to RC in the months before the murders that Flores could sell large quantities of drugs], behavior in the months prior to the crimes, and flight from the crimes." (Doc. No. 116 at 232:1-3.) Petitioner argues that Flores was a possible suspect in the murders because Flores falsely denied knowing RC when questioned by the police; it was from Flores that RC allegedly stole [witness Sandoval's] car; and Flores denied recollection of his activities around the time of the murders. (Doc. No. 116 at 232:5-14; Doc. No. 105 at 69:22-23.)

The record reflects that Flores was arrested in Fresno on December 27, 1988, shortly after the murders, on two felony drug counts and placed in jail to await trial. *See* Fresno County Case No. 025824-4. Detective Stokes interviewed him in jail in this case. (*See* RT 4584-87.) Flores was convicted on the drug counts and sent to prison where he remained until April 1990 when he was paroled, transferred to INS custody and deported prior to petitioner's trial. (*See* Doc. 51-1 ¶ 823; Doc. No. 105 at 69:22-23.)

The state supreme court could reasonably have found that the prosecution in petitioner's

1  matter was uninvolved in the decision to deport Flores.  The power to deport lies with the federal

2  government.  *See United States v. Valenzuela–Bernal,* 458 U.S. 858, 876 (1982), *citing* Article I,

3  § 8, cl. 4, (Congress shall have the power "To establish an uniform Rule of Naturalization");

4  *Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("The responsibility for regulating the relationship

5  between the United States and our alien visitors has been committed to the political branches of

6  the Federal Government").

7         Here, petitioner has not demonstrated that the INS was aware of petitioner's case or

8  Flores's alleged involvement in it, distinguishing this case from *Valenzuela-Bernal*.  *See* 458

9  U.S. at 864 ("When the government doesn't know what a witness will say, it doesn't act in bad

10  faith by deporting him."); *see also United States v. Leal-DelCarmen*, 697 F.3d 964, 970 (9th Cir.

11  2012), *citing United States v. Dring*, 930 F.2d 687, 694 (9th Cir. 1991) (same).

12         Furthermore, in order to show denial of due process by deportation of an alien witness, a

13  defendant must make a plausible explanation how such testimony would have assisted his

14  defense.  *Valenzuela–Bernal,* 458 U.S. at 873.  In this case, the state supreme court reasonably

15  could have found that petitioner did not demonstrate Flores was a material and non-cumulative

16  defense witness in this case.  RC's drug use and behavior around the time of the murders was

17  otherwise reflected in the trial record.  Flores apparently had a learning disability that limited his

18  complete recollection of what RC said to him at the time of the car theft.  (RT 4586.)  Petitioner

19  concedes that Sandoval was called by the defense and testified to the alleged car theft and

20  statements made by RC as related to him by Flores shortly after the car theft.  (Doc. No. 51-1 ¶

21  823.)

22         The Sixth Amendment does not guarantee criminal defendants the right to compel the

23  attendance of any and all witnesses.  Rules 17(b) of the Federal Rules of Criminal Procedure

24  requires the Government to subpoena witnesses on behalf of indigent defendants, but only "upon

25  a satisfactory showing ... that the presence of the witness is necessary to an adequate defense."

26  *Valenzuela-Bernal*, 458 U.S. at 867.

27         Here, Flores's anticipated testimony could reasonably have been seen by the state

28

1   supreme court as cumulative of Sandoval's trial testimony regarding events and statements

2   related by Flores to Sandoval.  That the defense team apparently chose not to interview Flores

3   prior to his deportation could reasonably suggest as much.  Deportation of a witness is not

4   sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or

5   the Due Process Clause of the Fifth Amendment absent some showing that evidence lost would

6   be both material and favorable to the defense, in ways not merely cumulative to the testimony of

7   available witnesses.  *Valenzuela–Bernal,* 458 U.S. at 872–873; *cf.*, *Leal-DelCarmen*, 697 F.3d at

8   969 ("The government undermined [defendant's] opportunity to present a complete defense by

9   deporting a witness it knew could give exculpatory evidence.").  Petitioner appears not to have

10   made such a showing.

11   Additionally, petitioner's speculation that Flores was an alternative suspect in the

12   murders is not alone a basis to find him a material and favorable witness.  (*See* claims II(B),

13   II(C).)  Petitioner does not appear to point to any direct evidence linking Flores to the crimes.

14   The state supreme court could reasonably have rejected any suggestion that merely because

15   Flores was an alleged source of drugs for RC, an alleged drug addict, and may have been seen

16   with RC around the time of the murders, Flores was involved in the murders themselves.

17   For the same reasons, petitioner has not shown prejudice from the deportation of Flores.

18   "As in other cases concerning the loss of material evidence, sanctions will be warranted for

19   deportation of alien witnesses only if there is a reasonable likelihood that the testimony could

20   have affected the judgment of the trier of fact."  *Valenzuela-Bernal*, 458 U.S. at 873-74, *citing*

21   *Giglio*, 405 U.S. at 154.

22   **d.     Conclusions**

23   Accordingly, for the reasons stated, a fair-minded jurist could have found that petitioner

24   failed to establish prosecutorial misconduct by failure to collect and preserve and/or making

25   unavailable and destroying material potentially exculpatory evidence including as to the

26   deportation of Flores.

27   It does not appear that the California Supreme Court's rejection of these claims was

28

172

1    contrary to, or an unreasonable application of, clearly established federal law, as determined by

2    the Supreme Court, or that the state court's ruling was based on an unreasonable determination

3    of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. §

4    2254(d).

5         Claims XIV and XV are denied.

6         4.    Review of Claims XVI, XVIII and XIX

7         Petitioner alleges that the prosecution requested and argued an improperly modified

8    CALJIC 8.80 instruction, dispensing with the required actus reus and concurrence of act and

9    intent, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the U.S.

10   Constitution.  (Doc. No. 51-1 ¶¶ 826-833, 839-849.)

11        **a.    Clearly Established Law**

12        *(i)    Instructional Error*

13        The clearly established law for instructional error is set out in claim XII, *ante*.

14        *(ii)    Prosecutorial Misconduct*

15        The clearly established law for prosecutorial misconduct is set out in claim XIII, *ante*.

16        **b.    Analysis of Claims XVI, XVIII and XIX**

17        Petitioner argues that the prosecutor's modified version of CALJIC 8.80 improperly

18   omitted a component for "actus reus" in aid of the commission of first degree felony murder with

19   special circumstances, and omitted concurrence of actus reus and intent to kill as to each of the

20   murders.

21        *(i)    State Court Direct and Collateral Review*

22        The California Supreme Court summarily denied these allegations on the merits and

23   denied the allegations as procedurally barred, on habeas review.  (Lod. Doc. No. 10.)

24        Furthermore, as stated in claim XII, that court rejected on direct appeal petitioner's

25   underlying allegation that the modified instruction was an incorrect statement of California law.

26   The state supreme court rejected on direct appeal petitioner's argument that under then

27   applicable Penal Code § 190.2(b), the prosecution was required to prove not only that he aided or

28

1    abetted the burglaries and robberies, but also that he "assisted in the killings themselves."

2    *Dickey*, 35 Cal. 4th at 900-03.

3         That court reasoned that petitioner was guilty of first degree murder as an aider or abettor

4    of felony murder robbery and felony murder burglary; and that his reliance upon *Anderson* was

5    misplaced because the *Anderson* court did not consider the issue of whether the "actus reus of a

6    special circumstance requires that a defendant aid or abet the actual killing, not just the

7    underlying felony." *See* 43 Cal. 3d at 1141-45.  That court also found petitioner's actus reus

8    argument to fail when re-framed as an instructional claim.  *Dickey*, 35 Cal. 4th at 903.

9         *(ii)    Actus Reus*

10        Petitioner revisits allegations underlying claim XII, that the trial court committed error by

11   giving the modified CALJIC 8.80 instruction.  Here, he argues that the prosecutor committed

12   misconduct by requesting and arguing the modified CALJIC 8.80 instruction.  Petitioner again

13   argues that the modified CALJIC 8.80 given by the trial court as set out in claim XII, cannot be

14   harmonized with then applicable Penal Code section 190.2(b) under which Petitioner was

15   charged and convicted, and that the prosecutor requested the errant instruction because he lacked

16   proof of the charged special circumstances.  Specifically, petitioner argues that the charged

17   special circumstances required "some act by petitioner in aid of the killing(s) to which the

18   special circumstance related." (Doc. No. 116 at 259:22-260:2, *citing Sanders,* 51 Cal. 3d at 517.)

19        However, for the reasons stated in the discussion of claim XII, *ante*, the state supreme

20   court could reasonably have determined the modified CALJIC 8.80 given at trial was a correct

21   statement of then prevailing California law and in any event not a basis for federal relief.  *See*

22   *Estelle*, 502 U.S. at 71 (any error in the state court's determination of whether state law

23   supported an instruction in this case cannot form the basis for federal habeas relief).  Petitioner's

24   re-argument that the charged special circumstances required "some act by petitioner in aid of the

25   killing(s) to which the special circumstance related" (Doc. No. 116 at 259:23-24) remains

26   unsupported by then prevailing state law.  (*See* claim XII.)  That being the case, the jury could

27   reasonably have found true the five special circumstances based on the noted prosecution theory

28

1   that petitioner aided and abetted felony murder robbery and burglary and that according to

2   Buchanan's testimony petitioner formed a spontaneous unspoken intent to kill following his

3   discovery of victim Freiri.

4       *(iii)  Concurrence of Act and Intent*

5     Petitioner alleges the prosecutor improperly argued that a concurrence of act (actus reus)

6   and intent was not required for the Caton and Freiri murders.   (Doc. No. 116 at 266:23-27, *citing*

7   CT 395, CALJIC 3.31; *see also* CT 426, CALJIC 8.81.3.)   He contends the prosecutor Hahus

8   improperly argued that the multiple murder special circumstance did not require a pre-existing

9   intent to kill both victims, as follows:

10

11   > The special circumstance, the killing of Marie, or the killing of Louis, as a special
12   > circumstance killing can only be found true if the defendant -- this man --
13   > intended to kill. Now, he can be guilty and the evidence shows that he is -- of the
14   > first degree murder, simply because Marie and Louis died and were killed during
15   > the burglary of their home. But you can't find the special circumstance true unless
16   > you find that not only were they killed, but that he intended to kill. That is, that he
17   > had in his mind the intent, the desire that one or both of them die.

15   (RT 4979-80.)

16

17   > Now, the evidence of the intent, his intent, is there from Gene Buchanan's relating
18   > to you his statement in the bedroom at Harvard, that when he came out of Marie's
19   > bedroom from the commotion that he heard and he says he saw what looked like
20   > Louis, the old man, slumped over and dead, he said or thought -- it makes no
21   > difference, because intention is a state of mind "If you kill one you might as well
22   > kill the other."   That's an intention that someone die. Marie Caton died 11 days
23   > later.

21   (*Id.*)

22     The California Supreme Court rejected allegations that petitioner did not intend to kill the

23   victims, stating that:

24

25   > The cord found around Mr. Freiri's neck came from the venetian blind in
26   > defendant's apartment, and defendant was responsible for bringing it to Mrs.
27   > Caton's house. Defendant was also responsible for bringing the knife used to stab
28   > Mrs. Caton and Mr. Freiri. Defendant knew his intended victims were elderly and
29   > that Mr. Freiri was partially paralyzed, and so he could not have believed he and
30   > Cullumber, both younger men, needed the knife to commit the robberies.
31   > Therefore, defendant intended to kill, and not just rob, Mrs. Caton and Mr. Freiri.

1    Moreover, defendant knew he could not escape justice if Mr. Freiri were left
     alive. Defendant had gained entry by saying he needed to use the phone because
2    Cullumber was going to jail. Even if Mr. Freiri did not recognize defendant, he
     must have known Cullumber, who was an almost daily visitor to his
3    grandmother's home. Mr. Freiri would have led the police to Cullumber, and
     Cullumber would have led them to defendant.

4    *Dickey*, 35 Cal. 4th at 904.

5        Petitioner argues he was denied a fair trial because there was no evidence of his

6    concurring intent to kill and an act in aid of the actual killing of Freiri and Caton; the case

7    against him was generally weak; and the prosecutor's noted argument was improper.  *See*

8    *Donnelly*, 416 U.S. at 643 (conviction violates due process where prosecutor's improper remark

9    infected the trial with unfairness); *see also Hein v. Sullivan*, 601 F.3d 897, 912 (9th Cir. 2010)

10   (same).

11       However, the state supreme court was not unreasonable in rejecting petitioner's

12   allegation of an absence of concurring act and intent in the murders of Caton and Freiri.  For the

13   reasons it stated, that court could reasonably have discounted prosecutor Hahus's statements that

14   "[w]e don't know if, when they went in there, they went in there to kill", that "[t]here's no

15   evidence of that at all." (*See* RT 4975; *cf.  Dickey*, 35 Cal. 4th at 904) ("While the prosecution

16   did not rely upon it, there was ample evidence defendant formed the intent to kill Mr. Freiri

17   before he discovered his body.")

18       Especially so in that petitioner fails to demonstrate on the record that victim Freiri was

19   dead at the time of petitioner's unspoken thought "[i]f you kill one you might as well kill the

20   other."  (RT 4980.)  The state supreme court would not have been unreasonable in concluding, as

21   Hahus suggested during the motion for new trial, that petitioner upon discovering Freiri

22   approached him and strangled him with the cord, acting on his unexpressed intent to kill.  (*See*

23   *e.g.*, CT 602:6-12.)

24       Moreover, the jurors received instructions on concurrence of act and intent.  The jurors

25   were instructed that in order to find the multiple murder special circumstance true, they must find

26   "petitioner harbored a specific intent to kill for each victim; that each charged special

27   circumstance required there existed in petitioner's mind a "union or joint operation of act or

28

                                        176

1   conduct and a certain specific intent"; that "[u]nless such specific intent exists, the crime to

2   which it relates is not committed."   (CT 424-425; CALJIC Nos. 3.31, 8.80 8.81.17, 8.83.1; RT

3   5010-11, 5021-25.)   The jurors were instructed that they must follow the law given to them by

4   the court (RT 5007), even if counsel's arguments conflicted therewith (RT 5007), and that the

5   arguments of counsel were not evidence (RT 5008).   The jury was also instructed to read the

6   court's instructions as a whole and in light of the other instructions.   (CALJIC No. 1.01; RT

7   5007-08.)

8          *(iv)   Prejudice*

9          Even if there was such prosecutorial misconduct, the state supreme court could

10   reasonably have found petitioner did not suffer prejudice.   The record could reasonably suggest

11   petitioner intended to kill each victim before that victim died.   Given the court's noted

12   instructions, any errant argument by Hahus did not deny petitioner a fair trial.   A fair-minded

13   jurist could conclude that petitioner has not demonstrated substantial and injurious effect on the

14   verdict. *Brecht,* 507 U.S. at 637; see also *Boyde*, 494 U.S. at 384-85 (arguments of counsel, like

15   the instructions of the court, must be judged in the context in which they are made; errant

16   argument is less likely to render a trial unfair than errant instructions); *Weeks*, 528 U.S. at 234

17   (jurors are presumed to follow the court's instructions notwithstanding errant argument by

18   counsel).

19          For the reasons stated above and in claim XII, the modified CALJIC 8.80 instruction was

20   not incorrect under then controlling state law.   The state supreme court's rejection of petitioner's

21   *Anderson* allegation did not expand the reach of then effective Penal Code section 190.2(b) as

22   applied to petitioner.   Furthermore, the jury was properly instructed on, and the trial record

23   supported concurrence of act and intent.   Absent any state error, the state supreme court was not

24   unreasonable in finding no constitutional error, i.e., error that "so infected the entire trial that the

25   resulting conviction violate[d] due process." *Cupp*, 414 U.S. at 147.

26          Accordingly, a fair-minded jurist could reasonably have found that had the prosecutor

27   requested and argued the noted standard CALJIC 8.80 instruction (see claim XII), there would

28

                                                    177

1    not have been a reasonable probability the jury's special circumstances verdict would have been

2    different.  *See e.g., Clark*, 450 F.3d at 916 (habeas relief may be granted only if the instructional

3    error "had a substantial and injurious effect or influence in determining the jury's verdict.").

4         For the same reasons, petitioner's allegation of cumulative error arising from the

5    prosecutor's requesting and arguing the modified CALJIC 8.80 instruction fails as there is no

6    individual error.  *Kyles*, 514 U.S. at 434.  At bottom, petitioner has not demonstrated any error

7    that "so infected the entire trial that the resulting conviction violate[d] due process."  *Cupp*, 414

8    U.S. at 147.

9         *(v)    Conclusions*

10        For the reasons stated, a fair-minded jurist could have found that petitioner failed to

11   establish prosecutorial misconduct by requesting and arguing the modified CALJIC 8.80 so as to

12   omit both "actus reus" in aid of the commission of first degree felony murder with special

13   circumstances, and concurrence of actus reus and intent to kill as to each of the murders of Freiri

14   and Caton.

15        It does not appear that the California Supreme Court's rejection of these claims was

16   contrary to, or an unreasonable application of, clearly established federal law, as determined by

17   the Supreme Court, or that the state court's ruling was based on an unreasonable determination

18   of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. §

19   2254(d).

20        Claims XVI, XVIII and XIX are denied.

21        5.    Review of Claim XVII

22        Petitioner alleges that the prosecutor, in his closing arguments improperly vouched for

23   the veracity of prosecution witness Buchanan, violating petitioner's rights under Fifth, Sixth,

24   Eighth and Fourteenth Amendments of the U.S. Constitution.  (Doc. No. 51-1 ¶¶ 834-838.)

25        **a.    Clearly Established Law**

26        *(i)    Prosecutorial Misconduct*

27   The clearly established law for prosecutorial misconduct is set out in claim XIII, *ante*.

28

Thereunder, the standard of review for claims of prosecutorial misconduct is a "narrow one of due process"; the federal habeas court must determine whether the alleged instances of misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643.

     *(ii)*    *Improper Vouching*

"Improper vouching typically occurs in two situations: (1) the prosecutor places the prestige of the government behind a witness by expressing his or her personal belief in the veracity of the witness, or (2) the prosecutor indicates that information not presented to the jury supports the witness's testimony." *Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002); *see also McKoy*, 771 F.2d at 1210-11 ("The rule that a prosecutor may not express his personal opinion of the defendant's guilt or his belief in the credibility of witnesses is firmly established.").

**b.**    **Analysis of Claim XVII**

Petitioner alleges prosecutor Hahus vouched for Buchanan during the prosecution closing argument, as follows:

> MR. HAHUS:
> Do you think that Gene Buchanan would lie for $5,000?  Maybe.  Do you think Gene Bucanan would lie to send a man to prison?  I don't think so.
>
> MR. SCHULTZ:
> Objection, your Honor.  Personal opinion.
>
> THE COURT:
> Sustained.
>
> MR. HAHUS:
> Strike that.  Would the Court like to give an admonition.
>
> THE COURT:
> That's an improper argument, ladies and gentlemen, Mr. Hahus has stated his personal opinion.  You are to ignore that statement, please.

(RT 4971.)

     *(i)*    *State Court Direct and Collateral Review*

The California Supreme Court considered and summarily rejected these allegations on the merits, on habeas review.  (Lod. Doc. No. 10.)

1    That same court considered and rejected the same allegations on direct appeal, stating

2    that:

3

4    Defendant contends the prosecutor committed prejudicial misconduct by
     vouching for the credibility of Gene Buchanan.

5    A prosecutor is prohibited from vouching for the credibility of witnesses or
     otherwise bolstering the veracity of their testimony by referring to evidence

6    outside the record … However, so long as a prosecutor's assurances regarding the
     apparent honesty or reliability of prosecution witnesses are based on the 'facts of

7    [the] record and the inferences reasonably drawn therefrom, rather than any
     purported personal knowledge or belief,' her comments cannot be characterized

8    as improper vouching. [Citations]

9    The conduct defendant complains of occurred as the prosecutor, in his argument
     to the jury, acknowledged and sought to dispel any doubts they may have had

10   regarding Buchanan's credibility. "He's a drug addict, street-wise, and he's con-
     wise and he doesn't work …. [¶] … But that doesn't mean that the truth cannot

11   come out of the mouth of a drug addict. It can come out of the mouth of a drug
     addict just as well as it can come out of the mouth of a priest. No priests lived at

12   that Harvard address, only drug addicts. This murder was committed in hell. We
     don't have angels for witnesses, we've people that live in hell. [¶] But do you

13   think Gene Buchanan would lie for $5,000? Maybe. Do you think Gene Buchanan
     would lie to send a man to prison? I don't think so."

14
     We need not decide whether the prosecutor's comment amounted to improper
15   vouching because defense counsel objected to the comment, the objection was
     sustained, and the court admonished the jury: "That's an improper argument,

16   ladies and gentlemen, [the prosecutor] has stated his personal opinion. You are to
     ignore that statement, please." We presume the jury heeded the admonition and

17   that any error was cured. [Citations]

18   *Dickey*, 35 Cal. 4th at 913-14.

19       *(ii)    Vouching*

20       Petitioner argues that Hahus stated his personal opinion regarding Buchanan's

21   truthfulness.  But petitioner does not demonstrate Hahus's comments lacked a basis in the record.

22   In this regard, the state supreme court would not have been unreasonable in finding that Hahus's

23   noted comments could have been based on and directed to evidence that was then before the

24   jury.  For example, the jury was aware that Buchanan knew of Penal Code section 128 and that it

25   was a crime to testify falsely in this capital case and that the penalty for doing so included death.

26   (RT 4764-65; *see also* claims II(K) and VIII.)

27       Notably the state supreme court, on direct appeal appears not to have determined whether

28

     180

1    Hahus's statements were improper vouching.  *See Dickey*, 35 Cal. 4th at 913-14; (*see also* Doc.

2    No. 125 at 163 n.54).  Nonetheless, the allegation was summarily denied as a habeas claim and

3    thus adjudicated.  (Lod. Doc. No. 10.)

4            *(iii)    Harmless Error*

5            Even if Hahus did vouch for Buchanan, the state supreme court reasonably could have

6    found the error did not have a "substantial and injurious" effect on the jury's verdict.  *Brecht*,

7    507 U.S. at 620.  Schultz successfully objected to Hahus's comments; Hahus moved to strike;

8    and the trial court issued an admonition that the jury ignore Hahus's comment.  (Doc. No. 51-1 ¶

9    837; RT 4971.)

10           Petitioner nonetheless contends the trial court admonition was insufficient.  He argues

11   prejudice is implicit from the record because at the end of the day, the jury believed Buchanan's

12   (vouched for) testimony of petitioner's unexpressed thought that "if you kill one you might as

13   well kill them both" (RT 4689); petitioner's removal of cord from a venetian blind (RT 4665-

14   66); petitioner's use of a knife to cut the cord that was similar to a knife found at the crime scene

15   (RT 4707); and petitioner's planning the crimes with RC (RT 4689).

16           But a fair-minded jurist could have found petitioner's argument for implicit prejudice to

17   be mere surmise.  Here again, the jury presumptively followed the trial court's admonition and

18   the jury instructions that argument is not evidence and that they were to follow the law as given

19   by the court even where counsel argued otherwise.

20           Petitioner otherwise has not demonstrated on the record that by virtue of Hahus's noted

21   comment, he was denied a fair trial.  *See Bagley*, 473 U.S. at 682 (the prosecutorial misconduct

22   must be "of sufficient significance to result in the denial of the defendant's right to a fair trial.").

23   The jurors had before them noted substantive evidence regarding Buchanan's credibility.  The

24   jury instructions informed jurors how credibility determinations were to be made in relation to

25   such evidence.

26           A fair-minded jurist could have concluded that Hahus's statement amounted to nothing

27   more than ordinary error.  *See Agurs*, 427 U.S. at 108 (ordinary trial errors by a prosecutor do not

28

1   suffice to show a due process violation; the misconduct must be significant enough to deny the

2   defendant a fair trial).

3        It does not appear that the California Supreme Court's rejection of this claim was

4   contrary to, or an unreasonable application of, clearly established federal law, as determined by

5   the Supreme Court, or that the state court's ruling was based on an unreasonable determination

6   of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. §

7   2254(d).

8        Claim XVII is denied.

9   **D.    Ineffective Assistance of Post-Conviction Counsel Claims**

10       1.    Clearly Established Law

11       The applicable legal standard for ineffectiveness of post-conviction counsel is the

12  *Strickland* standard set out in claim II, *ante*.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2002)

13  (*Strickland* provides the proper standard for evaluating a claim that appellate counsel was

14  ineffective); *see also Miller v. Keeney,* 882 F.2d 1428, 1433–34 (9th Cir. 1989) (same); *Hurles v.*

15  *Ryan*, 752 F.3d 768, 785 (9th Cir. 2014) (same).

16       2.    Review of Claim XXII

17       Petitioner alleges that post-trial counsel, Ms. Hart, who replaced Schultz after petitioner's

18  sentencing was herself ineffective by failing to adequately investigate and present evidence at the

19  motion for new trial, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth

20  Amendments of the United States Constitution.  (Doc. No. 51-1 ¶¶ 871-884.)

21       **a.    State Court Direct and Collateral Review**

22       The California Supreme Court summarily denied these allegations on the merits and on

23  procedural grounds, on habeas review.  (Lod. Doc. No. 31.)

24       **b.    Analysis of claim XXII**

25       Petitioner alleges that Hart failed to adequately investigate guilt phase defenses and

26  thereupon "present necessary evidence at the hearing on the motion for new trial" (Doc. No. 116

27  at 400:6-7), including new trial theories (*id.* at 400-06).

28

1    The record reflects that Hart raised eight claims in the motion for new trial (CT 525-91)

2    including alleged insufficiency of the evidence relating both to credibility of Goldman and

3    Buchanan and alleged third party culpability.  (CT 532-565.)

4         *(i)    Right to Post-Trial Counsel and Exhaustion*

5         As a preliminary matter, respondent contends there is no clearly established Supreme

6    Court law that petitioner has a right to counsel on motion for new trial; and that petitioner's

7    allegations in this regard are unexhausted.

8         However, the right to counsel provided under the Sixth Amendment adheres at all critical

9    stages of a criminal proceeding.  *Marshall v. Rodgers*, 133 S. Ct. 1446, 1449 (2013), *quoting*

10   *Iowa v. Tovar*, 541 U. S. 77, 80–81 (2004).  The Ninth Circuit has held that in California, a

11   motion for new trial is a critical stage of prosecution.  *See Menefield v. Borg*, 881 F.2d 696, 699

12   (9th Cir. 1989); *see also Robinson v. Ignacio,* 360 F.3d 1044, 1057 (9th Cir. 2004).

13        Respondent's cited case law is not authority otherwise.  *Cf., Rothgery v. Gillespie*

14   *County, Texas*, 554 U.S. 191, 213 (2008) ("Our holding is narrow ... reaffirm[ing] that

15   [arraignment] trigger[s] attachment of the Sixth Amendment right to counsel."); *Coleman*, 501

16   U.S. at 756-57 (no right to counsel to pursue appeal in state habeas).

17        Additionally, the court does not reach respondent's argument that these allegations are

18   unexhausted because the allegations lack merit for the reasons that follow.[18]

19        *(ii)    Prosecution Theory and Third Party Accomplices*

20        Petitioner alleges that Hart inadequately developed and presented i) Schultz's failure to

21   challenge the prosecution theory including the timeline of the murders; ii) whether RC had an

22   accomplice; and iii) an alternative accomplice defense.  (*See* Doc. No. 51-1 ¶ 877.)  Petitioner

23   argues that Hart merely relied upon the information contained in Schultz's defense file.  (Doc.

24   No. 51-1 ¶ 876.)

25        However, petitioner concedes that Hart discovered and presented previously undisclosed

26   evidence impeaching witness Buchanan and that Hart retained an investigator to look into

27

28   [18] *See* n.10; *see also Cone*, 543 U.S. at 451 n.3 (an application for habeas corpus may be denied on the merits even if
     unexhausted in state court).

183

possible jury misconduct.  (Doc. No. 51-1 ¶ 874.)  The record reflects that Hart argued on the motion for new trial specifically how and why the testimony of Goldman and Buchanan should be seen as inconsistent and not credible.  (*See c*laims II (B), II(C), II(E), II(K), II(L), II(P), VIII, XIII, XXI; *see also* RT 5189-5454, 5507-5528, 5549-69; CT 531-576.)  Furthermore, the record suggests that Hart did investigate possible third party accomplices.  (*See c*laims II(B), II(C), II(E), II(K), II(L), II(P), VIII, XIII, XXI.)

Petitioner argues at some length that Hart failed to develop Schultz's alleged failure to pursue accomplice theory against deported witness Flores.  Especially so, petitioner contends in that Hart represented Flores in his separate felony drug proceeding (Fresno County Case No. 025824-4) wherein Flores was convicted, served part of his sentence and was then deported.

However, petitioner does not explain how and why Hart's noted representation of Flores in the criminal matter reasonably suggests Hart was deficient on petitioner's motion for new trial.  Shortly after the murders, Flores was arrested on felony drug charges, convicted, imprisoned, paroled and deported.  The state supreme court could reasonably have found that petitioner has not demonstrated on the record that Hart was objectively unreasonable by failing to link Flores to the crimes charged against petitioner.  (*See* claims II(C), XV.)

For the reasons discussed in claim XV, the state supreme court could reasonably have found that the prosecution was uninvolved in the decision to deport Flores.  Petitioner has not demonstrated that Flores's separate criminal proceeding and Hart's representation of him in it suggests otherwise, or that the INS was aware of petitioner's case or Flores's alleged involvement in it.  Petitioner suggests Flores could have testified to RC's drug use and behavior around the time of the murders.  But as discussed in claim XV, such was otherwise reflected in Sandoval's testimony and thus not alone a basis to find Flores a material, non-cumulative and favorable witness.  Furthermore, for the reasons discussed above and in claim XV, petitioner's suggestion that Flores was an alternative suspect in the murders is not supported in the record at a level greater than surmise.

For the reasons stated, the state supreme court would not have been unreasonable in

1    concluding that Hart reasonably investigated the motion for new trial and was tactically

2    motivated in her presentation of evidence regarding prosecution theory and third party

3    accomplice defenses.  *See e.g.*, *Robbins*, 528 U.S. at 288 (counsel free to reasonably focus on

4    what she believed to be the strongest claims).

5              *(iii)*      *1989 Taped Defense Interviews of Goldman*

6          Petitioner alleges Hart failed to develop and present evidence of two 1989 tape recorded

7    interviews of Goldman by a defense investigator.  He alleges these tapes contain the following

8    information impeaching Goldman: her "vocal tone, inflections, demeanor, candor, clarity, and

9    sincerity" (Doc. No. 116 at 403:12-13); her statements that RC and petitioner did not return to

10   the apartment together on the purported night of the crimes (Doc. No. 116 at 401:10-21); and her

11   statement that petitioner left the apartment the next day (*id.*).

12         However, the trial record shows that Schultz, at the preliminary hearing, considered and

13   confronted Goldman with the noted 1989 tape recorded statements and gave her the opportunity

14   to explain.  (RT 4384-87.)  Goldman's taped statement that RC returned to the apartment alone

15   on the night of the crimes could reasonably be seen as equivocal given that RC apparently made

16   two trips from the apartment on the evening of the crimes (*see* RT 4385); Goldman later testified

17   that she did not remember telling the investigator who recorded the interview that "[RC] and

18   [petitioner] did not come back to the house together after they had left" (RT 4388); and Goldman

19   later testified that she saw RC and petitioner return to the apartment together "later on when they

20   came back into the house and [RC] got --- or started packing his clothes" (RT 4393).  The state

21   supreme court reasonably could have viewed Goldman's taped statement as suggesting that after

22   the crimes RC left the apartment alone and not (as petitioner asserts) that after the crimes RC

23   arrived back at the apartment without petitioner.

24         Moreover, Goldman's taped statement that petitioner left the apartment the day after the

25   crime could reasonably be seen as inculpating (consciousness of guilt) and as cumulative of the

26   other noted evidence impeaching Goldman – such that there reasonably could have been a

27   tactical motivation in not presenting the statement.  Additionally,  the  inconsistencies  between

28

1    Goldman's preliminary hearing transcript and her statements to Stokes and any impeachment
2    value therefrom were already in the record, as was witness testimony that Goldman had a
3    reputation for lying.  (RT 4592-96, 4783-84, 4789-91.)

4         Petitioner's argument here, that the taped content "provided a far greater picture of the
5    nature of Gail Goldman and her interests" (Doc. No. 116 at 401:2-3), does not identify any taped
6    content not cumulative of impeaching information already in the record.

7         Hart could reasonably have determined not to present additional material from the tapes.
8    Especially so as Hart appears not to have included a declaration explaining the reasons for her
9    actions - giving rise to a presumption she acted strategically and not deficiently.

10        Finally, petitioner's speculation that demeanor evidence in the tape recording should have
11   been presented to the jury (by playing the tapes), is unpersuasive.  Any such evidence of vocal
12   inflection and delivery, reflecting on Goldman's mental state, could have suggested to the jury a
13   basis to discount her allegedly favorable recorded statements.  For example, if she sounded
14   altered by drugs.  Furthermore, the state supreme court could reasonably have determined any
15   such demeanor evidence from the tape recordings would have added little to Goldman's noted
16   preliminary hearing testimony.

17        In sum, petitioner does not point to taped content, contained in the state record, favorable
18   to petitioner and non-cumulative, which Schultz and Hart failed to present in state court.

19        For the reasons stated, a fair-minded jurist could have found any decision by counsel not
20   to further pursue the taped defense interviews of Goldman by investigator Martin to be tactical
21   absent any declaration or statement from counsel otherwise.  Hart, for her part could reasonably
22   have focused on what she believed to be the strongest claims.  *Robbins*, 528 U.S. at 288.

23        (iv)    *Surveillance of Goldman*

24        Petitioner alleges that Hart was deficient by not developing and arguing the contents of a
25   June 1989 report detailing defense investigator surveillance of Goldman.  (Doc. No. 116 at
26   404:5-407:27.)

27        Defense counsel Schultz apparently had a defense investigator live with Goldman at her
28
                                          186

1    "flop house residence" for two weeks.  (*Id.*)  Petitioner argues the report shows Goldman's

2    significant substance abuse; fondness for Buchanan; lying and pimping – all of which serves to

3    impeach her credibility and according to petitioner should have been presented in state court by

4    Schultz and Hart.  (*Id.*)

5         Nonetheless, the state supreme court would have been reasonable in concluding that

6    petitioner has not demonstrated on the record why and how the information in the report was

7    non-cumulative and material.  The jury presumably was aware of such matters from the noted

8    evidence.  (*See e.g.*, RT 4382-93, 4590-99, 4676-82, 4704-05, 4716-17, 4737-42, 4757, 4777-85,

9    4809-25, 4849-57.)  Schultz for his part received daily reports of the surveillance from the

10   investigator.  (Doc. No. 116 at 404:11-13.)  Schultz's decision not to present seemingly

11   cumulative evidence at trial and Hart's decision not to develop it on motion for new trial could

12   reasonably be seen as tactical.  Schultz seems not to have provided a declaration otherwise.

13        The state supreme court could reasonably have rejected this allegation.

14        *(v)    Prosecutorial Favors to Buchanan*

15        Finally, petitioner alleges Hart was ineffective by failing to develop and present evidence

16   that in consideration of his testimony against petitioner, the prosecution declined to investigate

17   and charge Buchanan for his numerous criminal admissions under oath at petitioner's trial.

18   (Doc. No. 116 at 406:19-26.)  He alleges these favors likely were significant and suggest

19   Buchanan's testimony was unreliable.

20        But the state supreme court reasonably could have found unpersuasive these allegations

21   of an implicit "no prosecution" agreement between Buchanan and Hahus for the same reasons

22   discussed in claim XIII.  Petitioner has not made an evidentiary showing that there was an

23   agreement not to prosecute, or that Buchanan believed there was one, at the time Buchanan

24   testified at petitioner's trial.  The trial record reflects Buchanan testified prior to his drug related

25   admissions (RT 4741-56) that "[he] was not told [by Hahus that he] would not be prosecuted."

26   (RT 4741.)  Petitioner has not demonstrated on the record that was before the state supreme court

27   that Buchanan's waiver of his right against self-incrimination was constitutionally infirm.

28

Even if there was such a "no prosecution" deal, the state supreme court could reasonably have determined any failure by Hart to develop and present it was not prejudicial. The jury was otherwise aware of Buchanan's drug related activities and presumable considered such in evaluating his credibility and testimony. Additionally, petitioner has not demonstrated that Buchanan's drug related admissions were inculpating of petitioner. Rather these admissions tend to negatively impact Buchanan's credibility cumulatively of other noted evidence in the record.

Significantly, petitioner does not identify facts in the record that Hart allegedly failed to develop relative to his alleged implicit deal with the prosecution. A fair-minded jurist could have found petitioner has not demonstrated an implicit "no prosecution" deal with the prosecution existed, or if it did that he could show prejudice, i.e., facts in the record which Hart could and should have proffered on the new trial motion suggesting a reasonable probability of a different outcome.

*(vi)    Conclusions*

Accordingly, for the reasons stated, a fair-minded jurist could have found that petitioner failed to establish post-conviction counsel Hart was ineffective by failing to adequately investigate and present evidence on motion for new trial.

It does not appear that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claim XXII is denied.

3.    Review of claim XXIII

Petitioner alleges that his appointed appellate counsel, Mr. Haworth, was ineffective by failing to adequately present claims on direct appeal, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. (Doc. No. 51-1 ¶¶ 885-891.)

1        **a.        State Court Direct and Collateral Review**

2        Petitioner raised this same claim in his second petition for writ of habeas corpus in the

3   California Supreme Court, which that court summarily denied on the merits and on procedural

4   grounds.  (Lod. Doc. No. 31.)

5        **b.        Analysis of claim XXIII**

6        Petitioner alleges that appellate counsel, Mr. Haworth, who was appointed by the

7   California Supreme Court on May 22, 1996, *see People v. Dickey (Colin R.),* Case No. S025519,

8   "inadequately presented and argued issues and failed to recognize and raise several valid

9   constitutional issues apparent from the record, or apparent on reasonable investigation ...

10  [s]pecifically ... the claims and issues raised herein."  (Doc. No. 51-1 ¶ 889; *see also* Doc. No.

11  116 at 409:4-13.)   That is, petitioner alleges Haworth was ineffective to the extent this court

12  determines his guilt phase claims were not adequately presented on appeal.  He alleges that

13  absent Haworth's deficient conduct there is a reasonable probability petitioner would have

14  prevailed on appeal.  (*Id.*); *see also Evitts v. Lucey*, 469 U.S. 387, 396 (1985) (defendant entitled

15  to effective assistance on first appeal as of right).

16       This claim fails to the extent each claim now before the court, having been adjudicated in

17  state court, is denied on the merits under the § 2254(d) standard for reasons stated, *ante* and *post*.

18       Petitioner has not otherwise demonstrated that Haworth was deficient on direct appeal.

19  The record reflects that Haworth filed a 340 page opening brief on August 31, 2001 raising 35

20  claims.  (*See Appellant's Opening Brief lodged Aug. 31, 2001 in People v. Dickey (Colin R.),*

21  *Case No. S025519.*)   He also filed a 93 page reply brief (*see Appellant's Reply Brief lodged*

22  *October 16, 2002 in Dickey, Case No. S025519*), and a 47 page petition for rehearing (*see*

23  *Appellant's Petition for Rehearing lodged June 10, 2005 in Dickey, Case No. S025519).*

24       On May 23, 2005, the California Supreme Court denied the appeal in lengthy merits

25  opinion.  *Dickey*, 35 Cal. 4th 884.  Therein the state supreme court noted Haworth's failure to

26  file certain claims in habeas rather than on appeal, *id.* at 926, and his raising claims on appeal

27  that had consistently been rejected by that court, *id.* at 931.

28

1    In any event, claim XXIII fails to the extent each claim now before this court, having

2  been adjudicated in state court, is denied on the merits under the § 2254(d) standard for reasons

3  stated.  It follows that petitioner has not demonstrated prejudice under the *Strickland* standard as

4  to such claims.

5    Additionally, petitioner has not demonstrated Haworth was prejudicially deficient as to

6  any claims and allegations not raised on direct appeal.  It is settled that appellate counsel has no

7  constitutional obligation to raise every non-frivolous issue, even if requested by the appellant.

8  *Jones v. Barnes*, 463 U.S. 745, 751 (1983) (holding that an attorney need not advance every

9  colorable argument on appeal); *see also Mirzayance*, 556 U.S. at 127 ("Counsel also is not

10  required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal

11  prospects for success—for recommending that a weak claim be dropped altogether.").

12    Petitioner has not demonstrated on the record that Haworth was deficient in claim

13  selection.  The habeas declaration of Haworth stops short of explaining his reasons for raising

14  and not raising claims on appeal (*see* SHCP, Ex. C ¶¶ 1-3), other than to state that Schultz's trial

15  file did not contain work product in support of certain claims.  The Supreme Court has

16  recognized that "since time beyond memory" experienced advocates "have emphasized the

17  importance of winnowing out weaker arguments on appeal and focusing on one central issue if

18  possible, or at most on a few key issues."  *Barnes*, 463 U.S. at 751-52; *cf. Banks v. Reynolds*, 54

19  F.3d 1508, 1515 (10th Cir. 1995) (failure to raise a "dead-bang winner" - an issue obvious from

20  the record which would have resulted in reversal - is ineffective).

21    Even if Haworth was deficient as to any claims and allegations not raised on direct

22  appeal, petitioner has not demonstrated prejudice.  Petitioner has not shown any unpresented

23  non-frivolous issue that was stronger than issues Haworth did present on appeal.  *See Morrison*

24  *v. Estelle*, 981 F.2d 425, 429 (9th Cir. 1992) (appellate counsel not ineffective where argument

25  would lose); *see also Robbins*, 528 U.S. at 288 (same).  The appropriate inquiry is not whether

26  raising a particular issue on appeal would have been frivolous, but whether raising it would have

27  led to a reasonable probability of reversal.  *Miller*, 882 F.2d at 1435 (*Strickland* provides the

28

1   proper standard for evaluating a claim that appellate counsel was ineffective).   Where a

2   petitioner had only a remote chance of obtaining reversal based upon an issue, neither of the

3   *Strickland* prongs is satisfied.  *Id.*  Petitioner has not carried this burden.

4          Accordingly, for the reasons stated, a fair-minded jurist could have found that petitioner

5   failed to establish that appointed appellate counsel Haworth was ineffective by failing to

6   adequately present claims on direct appeal.

7          It does not appear that the California Supreme Court's rejection of this claim was

8   contrary to, or an unreasonable application of, clearly established federal law, as determined by

9   the Supreme Court, or that the state court's ruling was based on an unreasonable determination

10  of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. §

11  2254(d).

12         Claim XXIII is denied.

13  **E.     Claim of Insufficient Evidence**

14         1.     Clearly Established Law

15         A federal habeas court reviews challenges to the sufficiency of the evidence by

16  determining whether in "viewing the evidence in a light most favorable to the prosecution, any

17  rational trier of fact could have found the essential elements of the crime beyond a reasonable

18  doubt." *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990).  "A reviewing court must consider all of the

19  evidence admitted by the trial court, regardless whether that evidence was admitted erroneously."

20  *McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (same).

21         Sufficiency of the evidence claims raised in § 2254 proceedings must be measured with

22  reference to substantive requirements as defined by state law.  *Jackson v. Virginia*, 443 U.S. 307,

23  324 n.16 (1979).  Evidence is sufficient under the due process clause where "after viewing the

24  evidence in the light most favorable to the prosecution, any rational trier of fact could have found

25  the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319; *see*

26  *also Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992) (same).

27         In cases where the evidence is unclear or would support conflicting inferences, the

28

1  federal court "must presume -- even if it does not affirmatively appear in the record -- that the

2  trier of fact resolved any such conflict in favor of the prosecution, and must defer to that

3  resolution." *Jackson*, 443 U.S. at 326.   To prevail here, Petitioner must show "that the

4  prosecution's case against him "was so lacking that the trial court should have entered a

5  judgment of acquittal. *McDaniel*, 558 U.S. at 131.

6       AEDPA adds another layer of deference over the already deferential *Jackson* standard.

7  Under AEDPA, the federal court may not grant a habeas petition unless it finds that the state

8  court unreasonably applied the principles underlying the *Jackson* standard when reviewing the

9  petitioner's claim.  *See Juan H. v. Allen*, 408 F.3d 1262, 1275 n.12 (9th Cir. 2005) (recognizing

10 that "unreasonable application" standard applies to insufficient evidence claim); *Jones v. Wood*,

11 114 F.3d 1002, 1013 (9th Cir. 1997) (same).

12       2.    Review of Claim XXVI

13       Petitioner alleges that the evidence before the jury was insufficient to allow it to find

14 every element charged beyond a reasonable doubt, violating his rights under the Fifth, Sixth,

15 Eighth, and Fourteenth Amendments of the United States Constitution.  (Doc. No. 51-1 ¶¶ 981-

16 989.)

17       a.    **State Court Direct and Collateral Review**

18       Petitioner raised and the state supreme court rejected this same claim on direct appeal.

19 *Dickey*, 35 Cal. 4th at 900-03.

20       The California Supreme Court also summarily denied these allegations on the merits and

21 on procedural grounds, on habeas review.  (Lod. Doc. No. 31.)

22       b.    **Analysis of claim XXVI**

23       Petitioner alleges there was insufficient evidence that he aided and abetted the killings, or

24 that he harbored a specific intent to kill either victim.  As noted, petitioner was tried on two

25 counts of murder; two felony murder special circumstances (robbery-murder and burglary-

26 murder) and a multiple murder special circumstance; robbery; and larceny.  (*See* CT 227-31,

27 303-07.)

28

*(i)      Sufficiency of the Evidence*

Petitioner revisits allegations in claims XII, XVIII and XIX, this time arguing that the evidence was insufficient to prove beyond a reasonable doubt that:

(a) Petitioner aided and abetted the killing itself, not just the underlying felony; and (b) that Petitioner harbored the specific intent to kill or to aid in a killing with regard to each victim prior to or contemporaneously with the killings. [Citation]

(Doc. No. 51-1 ¶ 985.)   Petitioner contends there was "no evidence whatsoever that [he] participated in the killing of Ms. Caton or her boarder, Mr. Freiri, in any way, or that petitioner even knew RC was committing or expected RC to commit the murders.   The only piece of evidence to which the prosecution repeatedly referred, was the oral admission petitioner allegedly made to Gene Buchanan – an admitted drug-addict whose credibility was questionable – that when he later saw the body of Mr. Freiri slumped over, he thought to himself, if you kill one you might as well kill them both."  (*Id.* ¶¶ 986-987.)

At the time of his trial, Penal Code section 190.2, former subdivision (b), under which petitioner was charged, stated:

Every person whether or not the actual killer found guilty of intentionally aiding, abetting ... or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in [specified paragraphs covering, among others, the crimes of burglary and robbery] of subdivision (a) of this section has been charged and specially found under Section 190.4 to be true.

Penal Code § 190.2(b) (eff. Nov. 8, 1978).

A person "aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."  *People v. Beeman*, 35 Cal. 3d 547, 561 (1984); (*see* CT 412, CALJIC 3.01).

The California Supreme Court considered and rejected this claim on direct appeal, stating

that:

a) *Sufficiency of the evidence as to aiding or abetting*

Defendant contends the evidence was insufficient to support the felony-murder special-circumstance findings. Defendant does *not* contend the evidence was insufficient to prove he planned and participated in the burglaries and robberies; he concedes it was sufficient. Rather, defendant contends the prosecution was required to prove, not only that he aided or abetted the burglaries and robberies, but also that he "assisted in the killings themselves."

Defendant relies upon the language we italicize in section 190.2, former subdivision (b). "Every person whether or not the actual killer found guilty of intentionally *aiding, abetting ... or assisting* any actor *in the commission of murder in the first degree* shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in [specified paragraphs covering, among others, the crimes of burglary and robbery] of subdivision (a) of this section has been charged and specially found under Section 190.4 to be true." (§ 190.2, former subd. (b), added by initiative measure Prop. 7, § 6, approved by the electorate Nov. 7, 1978; see now § 190.2, subd. (c).)

Section 190.2, former subdivision (b) is not helpful to defendant because, under the felony-murder doctrine, he *was* found guilty of aiding or abetting first degree murders. All persons aiding or abetting the commission of burglary or robbery are guilty of first degree murder when one of them kills while acting in furtherance of the common design. (§ 189; [Citation].)

Defendant also relies on *People v. Anderson* (1987) 43 Cal.3d 1104 [Citation] (*Anderson*), to support his argument that the "actus reus of a special circumstance requires that a defendant aid or abet the actual killing, not just the underlying felony." In particular, defendant relies upon the following statement in *Anderson:* "[G]iven a realistic reading the statutory requirement that the aider and abetter intentionally aid, abet, counsel, command, induce, solicit, request, or assist any acts in the commission of first degree murder—even when applied to felony murder—is not ambiguous: the aider and abetter must intentionally aid *in a killing.*" (*Anderson,* at p. 1145 [Citation].)

Defendant's reliance on *Anderson* is unfounded. It is axiomatic a decision does not stand for a proposition not considered by the court. [Citation] The proposition advanced by defendant—for a felony—murder special circumstance, the aiding or abetting has to relate to the act of killing itself, rather than just the underlying felony was not considered by the court in *Anderson.*

The question we considered in *Anderson*—reconsidered, actually—was "whether and under what circumstances intent to kill is an element of the felony—murder special circumstance." (*Anderson, supra,* 43 Cal.3d at p. 1141 [Citation].)

*Anderson* overruled *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [Citation] (*Carlos*). "In *Carlos* ..., we held that intent to kill was an element of the felony-murder special circumstance whether or not the defendant was the actual killer." (*Anderson, supra,* 43 Cal.3d at p. 1139 [Citation].) In *Anderson,* we concluded "the broad holding of *Carlos* that intent to kill is an element of the felony-murder

special circumstance cannot stand, and that the following narrow holding must be put in its place: intent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved before the trier of fact can find the special circumstance to be true." (*Id.* at pp. 1138–1139, 240 Cal.Rptr. 585, 742 P.2d 1306.)

The premise of the decision in *Carlos,* the *Anderson* court explained, "was our determination that section 190.2[subdivision] (a)(17) is ambiguous. As shown above, on further reflection we now believe that premise was mistaken: given a fair reading, section 190.2[subdivision] (a)(17) provides that intent is not an element of the felony-murder special circumstance." (*Anderson, supra,* 43 Cal.3d at p. 1143 [Citation].)

According to *Anderson, Carlos's* mistaken premise rested on two bases. (*Anderson, supra,* 43 Cal.3d at pp. 1143–1145 [Citation].) The statement relied upon by defendant appears in the context of *Anderson's* reexamination of the second of the two bases.

"The second basis of our analysis in *Carlos* was our belief that unless section 190.2(a)(17) were read to require intent to kill, the meaning and function of section 190.2(b) would be hard to determine: 'In the first place, paragraph 17, alone of the listed paragraphs, already contains language equating the liability of principal and accomplice. In addition, the requirement that the accomplice "intentionally" aid in the commission of a murder is inherently ambiguous when applied to a felony murder, for it could mean either that the accomplice must intentionally aid in a killing, or that he need only intentionally aid the commission of the underlying felony.'["] ([*Carlos, supra,*] 35 Cal.3d at p. 142 [197 Cal.Rptr. 79, 672 P.2d 862].)

"On reexamination we now find this basis, too, to be lacking. First, section 190.2(a)(17) does not treat the liability of the murderer and *his* aider and abetter, but rather the liability of the perpetrator of the underlying felony and *his* aider and abetter. Thus, the statutory provision does nothing more than declare that both the perpetrator of the underlying felony and his aider and abetter are felony murderers. Section 190.2(b) then declares that the felony-murder aider and abetter is eligible for the death penalty if intent to kill is proved. Second, given a realistic reading the statutory requirement that the aider and abetter intentionally aid, abet, counsel, command, induce, solicit, request, or assist any acts in the commission of first degree murder even when applied to felony murder is not ambiguous: the aider and abetter must intentionally aid *in a killing.*" (*Anderson, supra,* 43 Cal.3d at pp. 1144–1145, 240 Cal.Rptr. 585, 742 P.2d 1306.)

In the paragraph immediately following the statement upon which defendant relies we reiterated the issue we were actually resolving in *Anderson.* "Thus, in *Carlos* we mistook the first and crucial step in our analysis by determining that section 190.2(a)(17) is ambiguous: given a fair reading in conjunction with section 190.2(b), the provision can realistically be read only to require intent to kill for the aider and abetter but not for the actual killer." (*Anderson, supra,* 43 Cal.3d at p. 1145, 240 Cal.Rptr. 585, 742 P.2d 1306.)[7]

Finally, defendant recasts this argument as an instructional claim. He contends the trial court prejudicially erred by failing to instruct the jury he had to have aided or abetted the actual killings, not just the underlying felonies. For the reasons stated, this contention lacks merit.

b) *Sufficiency of the evidence as to intent*

Defendant contends the evidence was insufficient to prove he had the requisite intent to kill his victims.

In reviewing the sufficiency of the evidence for a special circumstance, as for a conviction, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt. [Citation]

As proof of defendant's intent to kill, the prosecution relied on his confession to Buchanan that, upon seeing the apparently lifeless body of Mr. Freiri, defendant thought to himself, "If you kill one you might as well kill them both."

Defendant contends his statement to Buchanan is susceptible to the interpretation, not that he intended to kill the victims, but that he realized the penalty provided by law would be the same whether both or only one of them were killed. While that is true, defendant did not urge the less damning interpretation below. At trial, he denied having made the statement to Buchanan at all, and claimed to have had nothing to do with these crimes. More to the point, although the language used by defendant was susceptible to more than one reasonable interpretation, the interpretation urged by the prosecution, that defendant intended to kill his victims, was certainly one reasonable jurors could reach.

In the alternative, and assuming arguendo the evidence of his intent to kill was sufficient with regard to Mrs. Caton, defendant contends it was insufficient as to Mr. Freiri. The statement the prosecution relies upon, defendant points out, concerned a thought—"If you kill one you might as well kill them both"—that occurred to defendant after he discovered Mr. Freiri had apparently been killed by Cullumber. "The very basis for the thought was the assumption that Mr. Freiri was dead.... If one thinks that a person is dead, there can be no intent to kill that person."

However, Buchanan's testimony as to defendant[']s statement did not occur in a vacuum. While the prosecution did not rely upon it, there was ample evidence defendant formed the intent to kill Mr. Freiri before he discovered his body. [Citation]

Under the evidence, the jury was entitled to reach the following conclusions: The cord found around Mr. Freiri's neck came from the venetian blind in defendant[']s apartment, and defendant was responsible for bringing it to Mrs. Caton's house. Defendant was also responsible for bringing the knife used to stab Mrs. Caton and Mr. Freiri. Defendant knew his intended victims were elderly and that Mr. Freiri was partially paralyzed, and so he could not have believed he and Cullumber, both younger men, needed the knife to commit the robberies. Therefore, defendant intended to kill, and not just rob, Mrs. Caton and Mr. Freiri. Moreover, defendant knew he could not escape justice if Mr. Freiri were left alive. Defendant had gained entry by saying he needed to use the phone because Cullumber was going to jail. Even if Mr. Freiri did not recognize defendant, he must have known Cullumber, who was an almost daily visitor to his grandmother's home. Mr. Freiri would have led the police to Cullumber, and Cullumber would have led them to defendant.

c) *Instruction on concurrence of act and specific intent*

196

1

2      Defendant contends the trial court prejudicially erred by failing to instruct the jury
       that, for purposes of the special circumstances, he had to possess the intent to kill
3      concurrently with his aiding or abetting the actual killings. This contention lacks
       merit because it rests on the premise we earlier rejected, that the prosecution was
       required to prove not only that defendant aided or abetted the burglaries and
4      robberies, but also that he aided or abetted the actual killings. [Citation]

5      The jury was properly instructed on concurrence of act and intent with regard to
       the special circumstances. [Citation] In accordance with CALJIC No. 3.31, the
6      jury was instructed that, with regard to each of the crimes charged in the
       information, "there must exist a union or joint operation of act or conduct and a
7      certain specific intent in the mind of the perpetrator. Unless such specific intent
       exists, the crime to which it relates is not committed. [¶] The specific intent
8      required is included in the definition of the crimes charged. [¶] All of the special
       circumstances allegations require an intent to kill."

9      *Dickey*, 35 Cal. 4th at 900-05.

10          For these reasons and those discussed in claims XII, XVIII and XIX, the state supreme

11     court could reasonably have rejected this claim.  In sum, Buchanan testified that on the night of

12     the murders he overheard RC and petitioner whispering about going to get money from some

13     place, a task for which they armed themselves even though the victims were old and infirmed.

14     (RT 4138-42, 4239-42, 4662-63, 4733.)  At that time neither RC nor petitioner had any money.

15     (RT 4348-52.)  Goldman and Buchanan observed RC and petitioner preparing for the crimes.

16     Goldman (RT 4534) and Buchanan (RT 4663-65) saw petitioner take the venetian blind from the

17     closet to the bedroom where RC was waiting (RT 4534, 4663-65); petitioner returned the blind to

18     the closet after the cord was removed.  (RT 4534-37, 4666.)  Petitioner's fingerprint was found

19     on the blind from which cord used in the crimes was removed.  (RT 4573.)

20          Buchanan saw a knife on the bed in the bedroom just before RC and petitioner left the

21     apartment. (RT 4706-07.)  Buchanan saw RC and petitioner leave the apartment together that

22     night. (RT 4674-75.)  Goldman identified a knife at the murder scene as identical to one in the

23     apartment kitchen; (RT 4396-97); she had seen petitioner looking through the kitchen drawer

24     where the knife was kept.  (RT 4343-44.)  Both Buchanan and Goldman testified that petitioner

25     and RC returned to the apartment together about two hours later (RT 4337-49, 4662-76), with

26     $700 they did not have earlier that evening (RT 4361, 4675-76), and spent some of this money

27     on drugs.  (RT 4348, 4352, 4675-77.)   Buchanan testified that while driving RC to the Easy 8

28

1   Motel hours after the crimes, petitioner disposed of clothing, apparently evidence from the

2   murders.  (RT 4684-85.)

3           Furthermore, Buchanan (RT 4980) and Goldman (RT 4357-62) testified to petitioner's

4   admission that he participated in the crimes with RC.

5           Prosecutor Hahus argued petitioner's intent, his noted unspoken thought during the

6   crimes:

7

8           Now, the evidence of the intent, his intent, is there from Gene Buchanan's relating
            to you his statement in the bedroom at Harvard, that when he came out of Marie's
            bedroom from the commotion that he heard and he says he saw what looked like

9           Louis, the old man, slumped over and dead, he said or
            thought -- it makes no difference, because intention is a state of mind "If you kill

10          one you might as well kill the other." That's an intention that someone die. Marie
            Caton died 11 days later.

11

12  (RT 4980.)

13          Petitioner points out that prosecutor Hahus conceded in argument that:

14

15          There's evidence that they had weapons but that could have been to help in the
            burglary and the robberies. The mental state was to aid and abet in taking the
            property, the burglary or the robbery.

16

17  (RT 4975.)  Petitioner argues an absence of evidence of his intent to kill prior to finding Freiri

18  dead.  He notes in this regard Hahus's argument that "[w]e don't know if, when they went in

19  there, they went in there to kill. There's no evidence of that at all."  (RT 4975.)  However, this

20  argument was not evidence.  While the record suggests that RC and petitioner intended to tie up

21  the victims and steal money known to be in the house (RT 4689-90), an objectively reasonable

22  juror could have found beyond a reasonable doubt what the state supreme court itself surmised,

23  that RC and petitioner armed themselves before going to the crime scene with the intent to kill

24  Caton and Freiri leaving no witnesses.

25          A reasonable juror could have concluded weapons were unnecessary in the absence of

26  intent to kill.  Victim Caton was in her seventies; victim Freiri was partially paralyzed, wore a

27  leg brace and used a cane to get around.  (RT 4138-42, 4239-42.)  Both victims presumably

28

1    knew the perpetrators and could have identified them to the authorities.  During the crimes, RC

2    assaulted Mr. Freiri leaving him apparently dead (RT 4691) and then "went berserk" and

3    assaulted Ms. Caton.  (RT 4360-61.)

4          The evidentiary record otherwise could reasonably support a plan to kill the victims.  The

5    murders appear callous and brutal and were committed with the cord and knife brought to the

6    crime scene by petitioner and RC.  (*See e.g.*, SSHCP, Ex.'s 9-11.)  The lack of proximity

7    between the victims could reasonably suggest some significant amount of time and cooperation

8    between perpetrators was involved.  There is no suggestion in the record that petitioner tried to

9    intervene in the assaults or aid the victims; for example Goldman testified that petitioner did

10   nothing as RC assaulted his grandmother.  (RT 4359-61.)

11         Additionally, the record suggests that RC may have been in contact with petitioner after

12   RC left the Harvard Avenue apartment following the crimes; possibly suggesting the two were

13   involved in the murders. (RT 4841-43.)  After the crimes, petitioner was initially emotional and

14   depressed about his confessed involvement, but petitioner's mood improved when he learned all

15   of the victims and RC were dead.  (RT 4378.)  Even so, petitioner apparently threatened

16   Goldman should she reveal his admitted role in the crimes.   (RT 4375-77, 4616.)

17         Conflicting inferences must be resolved in favor of the prosecution.  *Jackson*, 443 U.S. at

18   326.  The state supreme court could reasonably have found the jury was properly instructed on

19   applying law to the noted facts in the record, including requirements that petitioner have a

20   specific intent to kill each of the two victims (CT 395, 425-430; RT 5010-25); that in order to

21   find the charged special circumstances true, there must have existed a "union or joint operation

22   of act or conduct and a certain specific intent" in petitioner's mind (RT 5010-11); that the jury

23   instructions were to be considered as a whole and in light of each other (CALJIC No. 1.01; RT

24   5007-08); that jurors must follow the law as given by the court (RT 5007); that if anything

25   concerning the law stated by the attorneys in their arguments conflicted with the law stated by

26   the court, the jury must follow the law stated by the court (*id.*); and that counsel's argument is

27   not evidence.  (RT 5008.)

28

1    It follows that petitioner's further argument that "[he] is entitled to correct application of

2    state law by the state courts" could reasonably be rejected.  (Doc. No. 116 at 411:13-16); *cf.*

3    *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (defendant denied due process where jury abused

4    state law sentencing discretion); *Wasko v. Vasquez*, 820 F.2d 1090, 1091 n.2 (9th Cir. 1987)

5    (defendant may be deprived of liberty only to the extent authorized by state statute).  For the

6    reasons discussed above, the state supreme court was not unreasonable in finding no state law

7    error.  Even if there was state law error, that alone would not support federal habeas relief.

8    *Estelle*, 502 U.S. at 71-72.

9    Here, a fair-minded jurist could have concluded beyond a reasonable doubt that

10   petitioner's conviction was supported by the evidence admitted at trial with conflicting

11   inferences resolved in favor of the prosecution.  *Brown*, 558 U.S. at 133 (a federal habeas court

12   can only set aside a state-court decision if the state court's application of clearly established

13   federal law is objectively unreasonable).

14   For the stated reasons, the California Supreme Court reasonably rejected petitioner's

15   constitutional challenge to the sufficiency of the evidence.  *See* 28 U.S.C. § 2254(d).

16   It does not appear that the California Supreme Court's rejection of this claim was

17   contrary to, or an unreasonable application of, clearly established federal law, as determined by

18   the Supreme Court, or that the state court's ruling was based on an unreasonable determination

19   of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. §

20   2254(d).

21   Claim XXVI is denied.

22   **F.    Claim of Actual Innocence**

23       1.    <u>Clearly Established Law</u>

24   The showing required for a free standing claim of actual innocence, i.e., a claim

25   irrespective of constitutional error at trial or sentencing, is "extraordinarily high" and must be

26   "truly persuasive."  *Herrera v. Collins*, 506 U.S. 390, 417, (1993).  To carry this burden

27   Petitioner must affirmatively prove he is innocent.  *See Carriger v. Stewart*, 132 F.3d 463, 476-

28

77 (9th Cir. 1997).

In *Schlup*, the Supreme Court reached actual innocence as a gateway claim to consideration of otherwise barred Constitutional claims.  "If a habeas petitioner ... presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims."  *Schlup*, 513 U.S. at 316.  The *Schlup* court held that the proper standard is that a procedurally defaulted petitioner must show that a constitutional violation has *probably* resulted in the conviction of one who is actually innocent.  513 U.S. at 326.  That is, "[t]he petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  513 U.S. at 327.

It follows that petitioner's burden is to demonstrate that more likely than not, any reasonable juror would have reasonable doubt.  *House v. Bell,* 547 U.S. 518, 538 (2006).  *See Sawyer v. Whitley*, 505 U.S. 333, 346 (1992) (holding that in order to prove actual innocence, petitioner must show fair probability that rational trier of fact would have entertained reasonable doubt regarding the existence of facts which are prerequisites under state or federal law for imposition of the death penalty).

## 2.   Review of Claim XXVIII

Petitioner alleges that he is actually innocent of capital murder such that his conviction, sentence and confinement are unlawful and in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  (Doc. No. 51-1 ¶¶ 995-1005.)

### a.   State Court Direct and Collateral Review

The California Supreme Court, on habeas review summarily denied these allegations on the merits and on procedural grounds.  (Lod. Doc. No. 31.)

### b.   Analysis of claim XXVIII

Petitioner alleges his actual innocence is supported by incorporation of all his above

claims and allegations including noted arguments that the prosecution's timeline was unsupported by the forensic evidence; the physical evidence does not connect petitioner to the crime; key witness testimony against petitioner at trial was false; RC was the actual killer; significant evidence suggests third party culpability; and the prosecution engaged in a pattern of misconduct which skewed the evidence and the fact-finding process.

Petitioner further supports this claim by arguing that respondent has conceded the following facts are undisputed:

1. The biologic evidence collected from the crime scene did not match petitioner.

2. The single hair on victim Freiri's hand did not match petitioner.

3. Law enforcement did not collect any usable fingerprints from the crime scene that matched petitioner.

4. Until Buchanan came forward to implicate petitioner, over three months after the crimes, police had closed the case, concluding that RC, alone, was responsible for the murders.

5. Law enforcement collected petitioner's fingerprint from a venetian blind away from the scene of the crime.

6. There were additional prints on the venetian blind from an unknown source.

7. The case against petitioner rested on the testimony of Gail Goldman and Gene Buchanan.

8. Goldman was under the influence of narcotics at times she made her noted observations.

9. Based on Buchanan's agreement to testify, and his expected receipt of the reward money, the Fresno DA arranged for room and board to be provided for Buchanan on a long-term deferred basis.

10. The DA or his investigators met with or conversed with Buchanan on more than a dozen occasions prior to his trial testimony.

11. Buchanan falsely testified that that he never spoke with anyone from the DA's office, except the DA "a couple of times."

12. Buchanan told the DA that a deal had been worked out in chambers by the lawyers, including a deputy district attorney and a public defender, to dismiss a pending case against him for drug possession, but that no record of the deal was made so that the defense attorney in the Dickey case would not find out about it. Buchanan told the DA that he wasn't worried about his pending case "[b]ecause I'm a prime witness in the Dickey case."

13. The DA did not turn over to the defense notes from his file regarding this telephone conversation.

14. The DA personally asked a judge to dismiss pending charges against Buchanan after petitioner's trial concluded. These charges were dismissed.

(Doc. No. 116 at 412:5-413:24.)

Respondent counters by arguing there is no clearly established Supreme Court law recognizing a free standing actual innocence claim for habeas relief. *See e.g., House*, 547 U.S. at 554 (declining to resolve open question of whether free standing actual innocence claims are available on habeas review); *Herrera*, 506 U.S. at 400 (claimed actual innocence based on newly discovered evidence is not a basis for federal habeas relief absent an independent constitutional violation in the underlying state criminal proceeding); *Saddler v. Evans*, 2011 WL 9150943, *8 (S.D. Cal. Dec. 20, 2011) ("In the absence of Supreme Court authority establishing the cognoscibility of a free standing actual innocence claim on federal habeas review, the California Supreme Court's rejection of Saddler's claim cannot be contrary to, or involve an unreasonable application of, clearly established Supreme Court authority.").

Here, the state supreme court reasonably could have rejected petitioner's actual innocence claim as a gateway claim to the extent his noted guilt phase claims all fail on the merits. Notably, petitioner has not demonstrated insufficiency of the evidence, i.e., it is not likely any reasonable juror would have reasonable doubt that the essential elements of the criminal counts could have been found beyond a reasonable doubt. (*See* claim XXVI.) His allegations that false evidence was presented, evidence was suppressed and destroyed and a third party was involved in the crimes are not sufficiently supported in the evidentiary record at a level greater than harmless error. (*See* claims II(B), II(C), II(S), XIII.)

No facts or discrepancies in the testimony and physical evidence establish or compel the conclusion that Buchanan, by virtue of his alleged substance addiction, inducements including in other criminal matters, or otherwise, was motivated to and did testify falsely or inaccurately. (*See* claims II(E), XIII and XVII.) No facts or discrepancies in the testimony and physical evidence establish or compel the conclusion that Goldman, by virtue of her alleged substance

1   addiction, was motivated to and did testify falsely or inaccurately.  (*See* claims II(L), XXI.)  Nor

2   does the noted physical evidence controvert petitioner's admission to Buchanan and Goldman

3   that he participated in the crimes and the consistent testimony of Buchanan and Goldman

4   inculpating petitioner.  (*See* claims II(B), II(C), II(L), II(S), XIII, XIV, XXI,  and XXVI.)

5        Accordingly, for the reasons stated, a fair-minded jurist could have found that petitioner

6   failed to establish his actual innocence sufficient to pass through the *Schlup* gateway and that

7   even if he had his record guilt phase claims fail on the merits for the reasons stated.  (*See e.g.,*

8   *Smith*, 510 F.3d at 1139-40 (9th Cir. 2007) (no actual innocence where petitioner failed to show

9   that it was more likely than not that no reasonable juror would convict him of the relevant

10  crime).

11        It does not appear that the California Supreme Court's rejection of this claim was

12  contrary to, or an unreasonable application of, clearly established federal law, as determined by

13  the Supreme Court, or that the state court's ruling was based on an unreasonable determination

14  of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. §

15  2254(d).

16        Claim XXVIII is denied.

## VIII. REQUEST FOR FACTUAL DEVELOPMENT

18        On April 16, 2014, petitioner filed in conjunction with his merits brief a motion for

19  development of facts relating to claims II(B), II(C), II(F), II(G), II(H), II(S), II(T), II(V), XIII,

20  XIV, XV and XXIV.[19]  (*See* Doc. Nos. 116, 128.)

21  **A.     Legal Standard**

22        As noted, § 2254(d), as amended by AEDPA, provides:

24  An application for a writ of habeas corpus on behalf of a person in custody
    pursuant to the judgment of a State court shall not be granted with respect to any
    claim that was adjudicated on the merits in State court proceedings unless the
25  adjudication of the claim--

26        (1) resulted in a decision that was contrary to, or involved an unreasonable
27        application of, clearly established Federal law, as determined by the

---

[19] Petitioner does not appear to argue for factual development of claims XIII and XV.

Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Pinholster*, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and thus "evidence introduced in federal court has no bearing on § 2254(d)(1) review." 563 U.S. at 181, 185. Although the central holding of *Pinholster* pertained to § 2254(d)(1), the Supreme Court observed that "§ 2254(d)(2) includes the language 'in light of the evidence presented in the State court proceeding,'" providing "additional clarity" that review under § 2254(d)(2) is also limited to the record before the state court. *Id.* at 185 n.7. Therefore, for claims that were adjudicated on the merits in state court, a petitioner can only rely on the record that was before the state court to satisfy the requirements of § 2254(d).

A petitioner who seeks to expand the record without a hearing must meet the same requirements as a petitioner seeking to obtain an evidentiary hearing under 28 U.S.C. § 2254(e)(2). *See e.g., Holland v. Jackson,* 542 U.S. 649, 653 (2004) (finding that the restrictions of § 2254(e)(2) "apply *a fortiori* when a prisoner seeks relief based on new evidence without an evidentiary hearing"); *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007) (district court not required to hold evidentiary hearing where state record refutes petitioner's allegations); *Colegrove v. Hoshino*, No. 13-CV-00096-BLF, 2014 WL 4421393, at *2 (N.D. Cal. Sept. 5, 2014) (petitioner who seeks to expand the record without a hearing must meet the same requirements as a petitioner seeking to obtain an evidentiary hearing under 28 U.S.C. § 2254(e)(2)).

Accordingly, where a state court denies the claim on the merits, an expanded record cannot be considered in determining whether the state court's decision was objectively unreasonable. *Rogovich v. Ryan*, 694 F.3d 1094, 1096-97 (9th Cir. 2012), *citing Pinholster,* 563 U.S. at 180).

**B.     Analysis of Motion for Factual Development**

Petitioner seeks the following factual development:

1.   Twenty-five requests for admission (pursuant to Rule 6 of the Rules Governing §
2254 Cases In the United States District Courts, and Rule 36 of the Federal Rules
of Civil Procedure) relating to allegations that the state failed to collect, destroyed
and/or failed to preserve material exculpatory evidence.  (Doc. No. 116 at 150:13-
156:15).

2.   Seventeen requests for admission (pursuant to Rule 6 of the Rules Governing §
2254 Cases In the United States District Courts, and Rule 36 of the Federal Rules
of Civil Procedure) relating to allegations that Schultz was ineffective regarding
the venetian blind evidence.  (Doc. No. 116 at 174:23-177:3.)

3.   Thirteen requests for admission (pursuant to Rule 6 of the Rules Governing § 2254
Cases In the United States District Courts, and Rule 36 of the Federal Rules of
Civil Procedure) relating to allegations that Schultz was ineffective regarding
exculpatory evidence and expert testimony.  (Doc. No. 116 at 200:12-202:3.)

4.   One request for admission (pursuant to Rule 6 of the Rules Governing § 2254
Cases In the United States District Courts, and Rule 36 of the Federal Rules of
Civil Procedure) relating to allegations that Schultz was ineffective regarding
prosecutor's guilt phase closing argument.  (Doc. No. 116 at 211:14-16.)

5.   Sixteen requests for admission (pursuant to Rule 6 of the Rules Governing § 2254
Cases In the United States District Courts, and Rule 36 of the Federal Rules of
Civil Procedure) relating to allegations that Schultz was ineffective regarding
prosecutor's guilt phase closing argument.  (Doc. No. 116 at 225:6-226:28.)

6.   Eighteen facts to which petitioner states he can attest relating to allegations that
Schultz was ineffective regarding petitioner's testimony at trial. [20]  (Doc. No. 116
at 312:17-316:8.)

7.   One request for admission (pursuant to Rule 6 of the Rules Governing § 2254

---

[20] See Rule 7 of the Rules Governing § 2254 Cases In the United States District Courts (affidavits may  be submitted and considered as part of the record).

Cases In the United States District Courts, and Rule 36 of the Federal Rules of Civil Procedure) relating to allegations that Schultz was ineffective regarding the testimony of Maxine Hansen at trial.  (Doc. No. 116 at 331:20-23.)

8.  Oral deposition and document production (pursuant to Rule 6 of the Rules Governing § 2254 Cases In the United States District Courts and Federal Rules of Civil Procedure, Rules 30 and 34) by custodians of the noted crime scene evidence.  (Doc. No. 116 at 156:18-157:14.)

9.  Four requests for admission (pursuant to Rule 6 of the Rules Governing § 2254 Cases In the United States District Courts, and Rule 36 of the Federal Rules of Civil Procedure) relating to allegations that conditions of confinement violated petitioner's constitutional rights.  (Doc. No. 128 at 174:7-15.)

However, all the above requests relate to factual development of claims that were adjudicated on the merits in the state court.  These claims do not survive 28 U.S.C. § 2254(d) analysis for reasons discussed above.  *See Richter*, 562 U.S. at 99 ("[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

As noted, "review under [§] 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Pinholster*, 563 U.S. at 181; *accord Stokely v. Ryan*, 659 F.3d 802, 809 (9th Cir. 2011) (same).  To this extent, new evidence in federal court simply cannot assist petitioner.

Petitioner may claim that he is entitled to a hearing under 28 U.S.C. § 2254(e)(2). However, *Pinholster* suggests otherwise.  "Section 2254(e)(2) continues to have force where [§] 2254(d)(1) does not bar federal habeas relief."  *Id.* at 185.  Analysis of the claims under § 2254(d) must precede the granting of an evidentiary hearing under § 2254(e)(2).  *Id.*  Thus, only if a petitioner overcomes § 2254(d) can the court consider a hearing under § 2254(e)(2).  As Justice Breyer stated: "If the federal habeas court finds that the state-court decision fails [§

207

2254](d)'s test or if [§ 2254](d) does not apply), then an [§ 2254](e) hearing may be needed." *Id.* at 205 (Breyer, J., concurring in part and dissenting in part).

As discussed above, § 2254(d) applies to claims II(B), II(C), II(F), II(G), II(H), II(S), II(T), II(V), XIII, XIV, XV and XXIV since they were adjudicated on the merits.  Petitioner has not overcome § 2254(d) with respect to these claims.

For the reasons stated, petitioner's motion for factual development of claims II(B), II(C), II(F), II(G), II(H), II(S), II(T), II(V), XIII, XIV, XV and XXIV shall be denied.

## **IX. ORDER**

Accordingly, for the reasons stated, it is HEREBY ORDERED that:

1.    Petitioner motion to strike respondent's second amended answer (Doc. No. 128) is DENIED.

2.    Petitioner's motion for factual development for claims II(B), II(C), II(F), II(G), II(H), II(S), II(T), II(V), XIII, XIV, XV and XXIV (Doc. Nos. 116, 128) is DENIED.

3.    Record based guilt phase claims I, II (portions), IV, VIII, XII (portions), XIII, XIV, XV, XVI, XVII, XVIII, XIX, XXI, XXII, XXIII, XXIV, XXVI, and XXVIII (Doc. No. 51-1) are DENIED.

4.    The court sets a case management conference for February 17, 2017 at 10:00 a.m. in Department 9, before U.S. Magistrate Judge Stanley A. Boone.

5.    The Clerk of the Court is directed to substitute RON DAVIS, Warden of San Quentin State Prison, as the Respondent warden in this action.

6.    The Clerk of the Court is directed that this case shall remain open.

IT IS SO ORDERED.

Dated:   January 13, 2017

_____

SENIOR  DISTRICT  JUDGE