# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLIN RAKER DICKEY, | Case No. 1:06-cv-00357-AWI-SAB |
| Petitioner, | <u>DEATH PENALTY CASE</u> |
| v. | MEMORANDUM AND ORDER: |
| RON DAVIS, Warden of San Quentin State Prison, | (1) DENYING PENALTY PHASE CLAIMS, (2) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (3) ISSUING A CERTIFICATE OF APPEALABILITY FOR CLAIMS I, II(E), II(I), V, and XIII, and (4) DENYING AS MOOT PETITIONER'S MOTION FOR STAY, ENTRY OF PARTIAL JUDGMENT, and for CERTIFICATES OF APPEALABILITY |
| Respondent.[1] | |
| | (Doc. Nos. 51, 51-1, 145) |
| | CLERK TO VACATE ANY AND ALL SCHEDULED DATES AND SUBSTITUTE RON DAVIS AS RESPONDENT WARDEN AND ENTER JUDGMENT |

Petitioner Colin Raker Dickey is a state prisoner, sentenced to death, proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is represented in this

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Ron Davis, warden of San Quentin State Prison, is substituted as Respondent in place of his predecessor wardens.

1

action by appointed counsel David Senior, Ann Tria and Matthew Weston.

Respondent Ron Davis is named as Warden of San Quentin State Prison. He is represented in this action by Justain Riley of the Office of the California Attorney General.

Before the Court for decision are: (i) the petition (Doc. Nos. 51, 51-1); (ii) record based penalty phase claims II(I), II(U), III(A), III(B), III(C), III(D), III(E), III(F), III(G), III(H), V, VI, VII, IX, X, XI, XII(D), XII(E), XII(F), XII(G), XII(H), XX, XXV(A), XXV(B), XXV(C), XXV(D), XXV(E), XXV(F), XXV(G), XXV(H), XXV(I), XXV(J), XXV(K), XXV(L), XXVII, and XXIX (*id.*); and (iii) Petitioner's motion filed April 29, 2019 seeking stay of penalty phase claims, entry of partial judgment on the previously denied guilt phase claims, and issuance of Certificate of Appealability on claims I, II, XII-XIX, and XXI (Doc. No. 145).

Having previously denied guilt phase claims I, II (portions), IV, VIII, XII (portions), XIII, XIV, XV, XVI, XVII, XVIII, XIX, XXI, XXII, XXIII, XXIV, XXVI, and XXVIII (*see* Doc. No. 135), and upon careful review of the parties' filings and the relevant case law and for the reasons set out below, the undersigned finds that: (i) the penalty phase claims shall be denied on the merits, (ii) the petition for writ of habeas corpus shall be denied, (iii) Petitioner's pending motion for stay of penalty phase claims and entry of partial judgment on guilt claims shall be denied as moot, and (iv) Certificate of Appealability shall issue only for claims I, II(E), II(I), V, and XIII.

## I. BACKGROUND

Petitioner was charged in Fresno County with: counts 1 and 2 for murder (Penal Code § 187); counts 3 and 4 for robbery (Penal Code § 211); count 5 for burglary (Penal Code §§ 459/460); special circumstances of felony-murder robbery, felony-murder burglary, and multiple murder (Penal Code §§ 190.2(a)(3), (17), 211, 459/460); and aider and abettor liability (Penal Code § 190.2(b)).[2] (RT 122-26; CT 297-301, 303-307.) Petitioner pleaded not guilty to all the charges. (RT 126; CT 232, 302.)

Petitioner's jury trial began on January 7, 1991 in Fresno County Case No. 416903-3.

---

[2] Reference to state law is to California law unless otherwise noted.

1  (CT 295-296.)  On March 15, 1991, the jury found Petitioner guilty of the murders of Marie

2  Caton and Louis Freiri with special circumstances of felony-murder robbery and felony-murder

3  burglary and multiple murder; and found Petitioner guilty of first-degree robbery of each

4  victim and first-degree burglary of their residence.  (Case No. 416903-3; *see also* CT 380-385,

5  463-468, 610-614.)

6        On March 19, 1991, Petitioner admitted a prior felony conviction (CT 472) and waived

7  personal presence at the penalty phase.  (CT 472-476.)  On March 22, 1991, the jury returned a

8  penalty phase verdict of death.  (CT 478-482, 504.)

9        On March 26, 1991, the trial court appointed Katherine Hart to represent Petitioner on

10  motions for new trial and to modify the verdict due to Petitioner's dissatisfaction with lead trial

11  counsel Marvin Schultz (hereinafter "Schultz") expressed following the guilt phase verdict.[3]

12  (CT 505; RT 5181-87.)

13        Ms. Hart raised issues of insufficiency of evidence, prosecutorial misconduct,

14  instructional error, Petitioner's erroneous admission of his prior felony conviction, trial court

15  error and ineffective assistance of counsel at the guilt and penalty phases. (CT 525-589.)  The

16  motion for new trial was denied on January 17, 1992. (CT 516-518.)   The motion for

17  modification of the verdict was denied on February 21, 1992 and Petitioner was sentenced to

18  death.  (CT 609-615; Feb. 21, 1992 Transcript, at 50.)[4]

19        On April 14, 2003, Petitioner filed his first state habeas petition, (hereinafter "SHCP")

20  *In re Dickey*, S115079 (Lod. Doc. 7), which the California Supreme Court summarily denied

21  on November 30, 2005.  (Lod. Doc. 10.)

22        The California Supreme Court affirmed Petitioner's conviction on direct appeal on May

23  23, 2005.  *People v. Dickey*, 35 Cal. 4th 884 (2005). That court denied Petitioner's request for

24  rehearing on July 13, 2005. *People v. Dickey*, California Supreme Court Case No. S025519.

25  ───────────────
   [3] Schultz was sometimes assisted by Fresno County deputy public defender Ann Burtner.  (*See* Pet. Ex. 23 at
26  SH002051.)
   [4] Unless otherwise indicated, throughout this order, "CT" refers to the clerk's transcript on appeal; "SCT" refers to
27  the supplemental clerk's transcript on appeal; "RT" refers to the reporter's transcript on appeal; and "CRT" refers
   to the corrected reporter's transcript on appeal.  Other transcripts are referenced by date.  References to page
28  numbering are to internal page numbering in the original documents except that ECF system numbering is used
   for electronically filed documents and Bates numbering is used for the CT and SCT.

On February 21, 2006, the United States Supreme Court denied Petitioner's writ of certiorari. *Dickey v. California*, 546 U.S. 1177 (2006).

On March 30, 2006, Petitioner began this federal habeas proceeding under 28 U.S.C. § 2254 by filing a combined request for appointment of counsel and temporary stay of execution. (Doc. Nos. 1 & 2.)

On October 4, 2007, Petitioner filed his federal petition for writ of habeas corpus (hereinafter "Petition"). (Doc. No. 51, 51-1.)

On May 21, 2008, this Court ordered federal proceedings held in abeyance pending state exhaustion of certain claims. (Doc. No. 69.)

On July 21, 2008, Petitioner filed his second state habeas petition (hereinafter "SSHCP"), *In re Dickey*, S165302. (Lod. Doc. 30.) On May 23, 2012, the California Supreme Court summarily denied the second state petition on the merits as to all claim and on procedural grounds as to certain claims, Order Denying Cal. Pet., In re Colin Raker Dickey, No. S165302 (May 29, 2012). (Lod. Doc. 31.)

Respondent filed his answer in this proceeding (Doc. No. 103) and amended answer correcting clerical error (Doc. No. 105), on August 29, 2013. Therein Respondent admitted the jurisdictional allegations and asserted exhaustion and procedural defenses and denied all claims 1 through 29.[5]

On November 18, 2013, this Court ordered bifurcated briefing with the guilt phase claims briefed separately from and prior to the penalty phase claims. (Doc. No. 111.)

On April 16, 2014, Petitioner filed his brief in support of guilt phase claims including request for factual development. (Doc. No. 116.)

On September 10, 2014, Respondent filed a second amended answer as his brief in response to Petitioner's brief. (Doc. No. 125.)

On November 7, 2014, Petitioner filed his brief in reply to Respondent's brief including request that Respondent's second amended answer be stricken and for further factual

---

[5] The amended answer is the operative answer. (*See* Doc. No. 114 at 1:20-21.)

4

development.  (Doc. No. 128.)

On January 13, 2017, the Court denied Petitioner's requests to strike the second amended answer and for factual development of certain guilt phase claims and denied on the merits the noted guilt phase claims.  (Doc. No. 135.)

On February 17, 2017, the Court scheduled briefing of the penalty phase claims.  (Doc. No. 139.)

On April 17, 2017, Petitioner filed his penalty phase merits brief.  (Doc. No. 142.)

On June 19, 2017, Respondent filed his penalty phase merits brief in opposition.  (Doc. No. 143.)

On July 17, 2017, Petitioner filed his brief in reply to the opposition.  (Doc. No. 144.)

On April 29, 2019, Petitioner filed his noted motion for stay of penalty phase claims, entry of partial judgment on guilt phase claims, and partial Certificate of Appealability.  (Doc. No. 145.)  Respondent filed his response to the motion on June 27, 2019.  (Doc. No. 147.) Petitioner replied to the response on June 28, 2019.  (Doc. No. 148.)

On July 8, 2019, the Court vacated the July 15, 2019 hearing on the motion and took the matter under submission.  (Doc. No. 149.)

No date has been set for Petitioner's execution.

## II. STATEMENT OF FACTS

The following factual summary is taken from the California Supreme Court's opinion in *People v. Dickey,* 35 Cal. 4th 884 (2005), and is presumed correct.  28 U.S.C. § 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the court adopts the factual recitations set forth by the state court.  *See Vasquez v. Kirkland*, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

I. Facts

A. Guilt Phase

*1. The Prosecution Case*

The murder victims were Fresno residents—Marie Caton, 76, and Louis Freiri, 67, a friend and boarder of Mrs. Caton's. Their bodies were discovered by one of Mrs. Caton's daughters, Lavelle Garratt. Mrs. Garratt or her sister checked on their mother every day, "[b]ecause she was lonely, because she was our mother, because we loved her and we wanted to see her."

Late in the afternoon of November 8, 1988, when Mrs. Garratt could not reach her mother by telephone, she drove to her house. She found Mrs. Caton on the floor of her bedroom, covered with a bloodstained blanket. Mrs. Caton had been beaten so badly her eyes bulged out of their sockets like golf balls. Mrs. Caton also had knife wounds on her chest and a jagged cut on her back. She lingered for 11 days, but never regained consciousness. The cause of death was respiratory failure associated with "shock lung syndrome," the shock having been caused by her injuries.

Mr. Freiri wore a brace on his right leg and required a cane. Mrs. Garratt found him facedown, stretched across the archway between the dining room and the living room. A chair, wall, and window blinds near his body were bloodstained. Pieces of his cane were found in the living room and one of the bedrooms. Mr. Freiri had been stabbed in the chest, armpit, and forearm; he also had a bone-deep laceration on his forehead. He was stabbed with such force that two of his ribs were broken. He died of blood loss.

Mrs. Garratt told the police she suspected her son, Richard Cullumber. Cullumber was, Mrs. Garratt believed, a drug addict, and he asked his grandmother Mrs. Caton for money—cash she would take out of a buffet drawer—almost every day. Mrs. Caton "grew up during the Depression and she was afraid of being hungry again, I guess, and so she hid money all over." Among other caches, Mrs. Caton kept at least $6,000 in cash in a metal box placed inside a suitcase stored under her bed. She also kept a smaller sum in another suitcase.

Cullumber, also known as "R.C.," lived in an apartment in Fresno, along with defendant, Gail Goldman, Richard Buchanan, and two other men. The night of the murders Cullumber packed his bag and left the apartment. He returned several days later but fled again when informed the police were looking for him. On November 12, 1988, after a high-speed police chase, Cullumber, cornered, killed himself.

The pistol Cullumber used to shoot himself was registered to Mr. Freiri. He had earlier warned the driver of a car he commandeered, "I need the car; I've already killed a woman."

Two knives possibly linked to the murders were discovered in Mrs. Caton's kitchen—a butcher knife and a steak knife. The steak knife (People's exhibit No. 18) was, in the opinion of defendant's housemates Gail Goldman and Richard Buchanan, identical to a knife belonging in their apartment.

In addition to his knife wounds, Mr. Freiri had a four-inch-long ligature wound, caused by a cord that was wrapped around his neck. It was a cotton cord of the color, weave, and texture used in venetian blinds. The venetian blinds in Mrs. Caton's house were intact, but a venetian blind kept in the hall closet of the apartment defendant shared with Cullumber and the others was missing its cord. On the night of the murders, Gene Buchanan saw defendant remove a venetian blind from the closet of their apartment, walk into the bedroom with it, and then

6

replace it in the closet. Goldman testified it was Cullumber who had done that. Defendant's thumbprint was found on a slat from the venetian blind found by the police in the apartment closet. n.2.

---------------------------------------FOOTNOTE----------------------

n.2 No usable prints were found at the scene of the crime, not even those of Mrs. Caton or Mr. Freiri.

---------------------------------------END FOOTNOTE-----------------

The case against defendant rested on the testimony of Gail Goldman and Gene Buchanan. n.3.

---------------------------------------FOOTNOTE----------------------

n.3 Defendant impeached Buchanan on the grounds, among others, that his testimony against defendant was motivated by revenge and a desire to collect the reward offered by Mrs. Caton's relatives. Defendant was less successful in attacking Goldman's credibility. If not a hostile witness for the prosecution, she was clearly reluctant to testify against defendant, both because she was fond of him and because she feared the consequences of informing on anyone. A critical question, then, is to what extent Goldman's testimony corroborates Buchanan's. To facilitate consideration of that question, we have set out their testimony separately.

---------------------------------------END FOOTNOTE-----------------

a) The Testimony of Gail Goldman. n.4.

---------------------------------------FOOTNOTE----------------------

n.4 Because she died before the trial began, Goldman's preliminary hearing testimony was read into the record. (See Evid. Code, § 240, subd. (a)(3).)

---------------------------------------END FOOTNOTE-----------------

Goldman shared a one-bedroom apartment in Fresno with defendant, Cullumber, Buchanan, and two other men. According to Detective Doug Stokes, Goldman told him "about a venetian blind that had been in the hall closet that was ... taken by the suspect, Dickey, ... into a bedroom and that the cord was removed from that venetian blind and then the venetian blind was placed back inside the hall closet." However, when she testified, Goldman said it was Cullumber who took the venetian blind out of the closet and went into the bedroom with it. Later, she testified, the blind had been replaced in the closet, but the cord was missing from a blind in the bedroom.

At approximately the same time that Cullumber was engaged with the venetian blind, defendant walked into the kitchen and opened a drawer containing knives and other silverware. n.5 According to Detective Stokes, Goldman told him defendant removed a knife from the drawer and left the kitchen with it. Again according to Detective Stokes, when he came to the apartment investigating the murders, he showed Goldman a knife. She told him, "I have a knife exactly like that knife, or they are twins."

---------------------------------------FOOTNOTE--------------------

n.5 Goldman later testified she did not know which drawer defendant had opened.

-----------------------------------END FOOTNOTE------------------

After the activity just described, Goldman testified, defendant and Cullumber left the apartment. They had no money, Goldman believed, when they left. If Cullumber had money, he spent it on drugs; before defendant left he asked Goldman for money to buy cigarettes. However, when they returned, Cullumber gave Goldman $40 or $50 in cash, saying it was in partial payment of what he owed her. Cullumber then packed his clothes and left.

Sometime thereafter, while Goldman and defendant were watching the news on television, they saw a story about this crime. Defendant became upset when he learned Mr. Freiri was dead and that Mrs. Caton, while near death, was still alive. He told Goldman to come into the bedroom, that he wanted to talk to her. Buchanan followed them into the bedroom.

Defendant told them he had accompanied Cullumber to the home of Mrs. Caton. On the one hand, defendant said that Cullumber had assured him "nothing was going to happen." On the other hand, defendant admitted he had gone with Cullumber "[t]o help [him] get the money." With Mrs. Caton present, defendant looked for money in her bedroom, where Cullumber told him it could be found. When defendant stepped out of the bedroom and saw Mr. Freiri slumped over in a chair, he "knew something had happened." Cullumber "went berserk. He came into the bedroom and started beating up on his grandmother." Defendant and Cullumber found $700, which they split.

Defendant was crying, "like he was sad," when he confessed to Goldman and Buchanan. Later, when defendant learned Mrs. Caton had died, "he wasn't as depressed as he was before."

While he was confessing, defendant said maybe he should turn himself in. Goldman advised him against it. When Detective Stokes first asked Goldman whether she knew anything about these crimes, Goldman denied that she did. Defendant was a good friend of hers, she still liked him, and she did not want to do anything to get him into trouble. She did not want to tell on anyone, especially someone she liked as much as she liked defendant. Buchanan told her he was going to turn defendant in for the reward. By contrast, Goldman testified at the preliminary hearing only because she had been subpoenaed. During a break, Goldman told the prosecutor she wanted to make sure defendant knew she was not the one who turned him in. She was afraid for her life. "I always felt that if you would inform on somebody they would kill you or have you killed."

Defendant said he was not concerned that someone would betray him, "because if they did, they wouldn't do it again." On the other hand, Goldman thought that her relationship with defendant was such that "it would take an awful lot to make him hurt me."

Goldman had "had 20 surgeries on [her] stomach," and depending on how much pain she was in, she used "speed ball cocaine and heroin" or other "street drugs" to kill the pain.

8

*b) The Testimony of Gene Buchanan*

One evening in November 1988, defendant took a venetian blind from the hall closet of the apartment he shared with Buchanan, Cullumber, Goldman, and two others. Defendant took the blind into the bedroom and shortly thereafter replaced it in the closet. Buchanan looked into the bedroom. On the bed was a knife belonging to Gail Goldman, a knife with a bone handle and a serrated edge. People's exhibit No. 18 was that knife, or else it looked exactly like Goldman's knife.

Defendant and Cullumber left the apartment around 9:00 p.m. That night everyone living in the apartment was broke, or claimed to be. However, when defendant and Cullumber returned, defendant opened his wallet and said, "I got $350," and, "call the connection."

Buchanan ordered drugs, which were injected by defendant, Cullumber, Goldman, and Buchanan. Afterwards, Cullumber asked Buchanan to take him for a drive; defendant went along. Defendant directed Buchanan to a canal, and as they drove over it, defendant threw in a pair of shoes. After looking for a good place to do it, defendant also threw his jacket out of the window.

About two days later, Buchanan and defendant were in the living room of the apartment; defendant was watching the news on television. Defendant jumped up and ran into the bedroom to Goldman. Buchanan heard Goldman say, " 'Oh, my God, how low can you go,' or 'get'; something to that effect." Buchanan went into the bedroom to find out what was going on. Defendant said to him, "I've already told her, so I might as well tell you."

Defendant told Buchanan that "him and R.C. had been over to R.C.'s grandmother's house, and that they had entered the house—how he had done it, how he had walked up to the door, knocked, faked like R.C. was going to be in jail, needed to use the phone, and then R.C. sneaked in, they were supposed to tie them up, get this money and everything. And while the defendant is supposedly in the bedroom looking for the money he hears a commotion, looked out the bedroom door, sees an elderly man with his head slumped down, considers him dead, and that if you kill one you might as well kill them both."

In response to the prosecutor's questions, Buchanan clarified his testimony. "[Defendant] said that he—only what he thought, he didn't say what he did. He said that, 'If you kill one you might as well kill them both.' " "[H]e didn't say he said it to R.C., he just said it as that was his opinion." Defendant did not tell Buchanan what happened after he had this thought.

Defendant also told Buchanan that what prompted his confession was a television story saying that Mrs. Caton "was still alive when she should have been dead."

Buchanan did not speak to the police until several months after defendant's confession to him. At a convenience store he saw a flyer announcing a reward, and he left his name with the clerk. He was then contacted by a grandson of Mrs. Caton's, and he agreed to speak to Detective Stokes. However, his willingness to do so was not motivated by the reward; it was his "Christian upbringing." He did not tell Goldman he was going to turn defendant in for the reward.

Defendant had torn up Buchanan's one photograph of his youngest daughter, which made Buchanan angry. He wanted to throw defendant off the balcony of a motel, but Goldman stopped him.

Buchanan used drugs "[a]s often as I can get them." He injected "speedballs," a heroin/cocaine mixture. He used drugs an hour or two before defendant confessed to him, and he continued to do so as recently as the day before his testimony.

*2. The Defense Case*

Defendant testified he did not make the statements attributed to him by Goldman and Buchanan, and that he did not have anything to do with these crimes. He got along well with Goldman, but not with Buchanan, who was "just a snake; a deceitful person." His fingerprint was on the venetian blind because it had fallen off the back door and he had put it into the closet; he did not know why the cord was missing from it. He did rip up the photograph of Buchanan's daughter.

John Inderrienden had known Goldman for five or six years, and they had once lived in the same apartment building. He "wouldn't trust her as far as I could throw her, and she weighed quite a bit."

Goldman once lived in a house owned by Harry Arax. She did not pay her rent, nor did she pay her bill at his market.

Goldman, a former neighbor of Peter Najarian's, told him she was going to be a witness in a murder case, but that she "didn't know nothing about no murder."

Magadelena Desumala, who ran a halfway house in which Goldman lived on and off for about 10 years, was "like a sister" to Goldman. She said Goldman told her it was the grandson of the murder victim who had confessed to her.

### B. Penalty Phase

The only witness who testified at the penalty phase, Detective Stokes, was called by the prosecution to provide a foundation for the admission of the autopsy photographs. No other evidence, aside from a stipulation to defendant's prior burglary conviction, was introduced.

*Dickey*, 35 Cal. 4th at 894-900.

## III. JURISDICTION

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. §§ 2241(c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Fresno County Superior

Court, which is located within the jurisdiction of this Court. 28 U.S.C. §§ 2241(d), 2254(a).

This action was initiated after April 24, 1996. Therefore, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, apply. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir. 2000), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Mann v. Ryan*, 828 F.3d 1143, 1151 (9th Cir. 2016).

## IV. STANDARDS OF REVIEW

### A.   Habeas Corpus

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Lockyer*, 538 U.S. at 70-71; *Williams*, 529 U.S. at 413.

"[A] state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits." *Brown v. Walker*, Case No. C 09-04663 JSW, 2014 WL 4757804, at *5 (N.D. Cal. Sept. 24, 2014) (citing *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004)).

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer*, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "In

other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case'; otherwise, there is no clearly established Federal law for purposes of review under AEDPA." *Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009) (quoting *Wright v. Van Patten*, 552 U.S. 120, 125 (2008)); *see also Panetti v. Quarterman*, 551 U.S. 930, 949 (2007); *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. *Musladin*, 549 U.S. at 77; *Wright*, 552 U.S. at 126; *Moses*, 555 F.3d, at 760. In addition, the Supreme Court has clarified that habeas relief is unavailable in instances where a state court arguably refuses to extend a governing legal principle to a context in which the principle should have controlled. *White v. Woodall*, 572 U.S. 415, 426 (2014). The Supreme Court stated: "[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

If the Court determines there is governing, clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." *Lockyer*, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13; *see also Lockyer*, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Williams*, 529 U.S. at 405 (quoting *Webster's Third New International Dictionary* (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the

12

state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id.*

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see also Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citing *Yarborough*, 541 U.S. at 664). The Supreme Court stated:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.

*Id.* at 103. In other words, so long as fair-minded jurists could disagree on the correctness of the state courts decision, the decision cannot be considered unreasonable. *Id.* at 101. In applying this standard, "a habeas court must determine what arguments or theories supported [. . .] or could have supported the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id.* at 102. This objective standard of reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d). *See Hibbler v. Benedetti*, 693 F.3d 1140, 1146-47 (9th Cir. 2012). If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a "substantial and injurious effect or influence" in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also*

13

*Fry v. Pliler*, 551 U.S. 112, 114 (2007).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. *See LaJoie v. Thompson*, 217 F.3d 663, 669 n.6 (9th Cir. 2000); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), and "evidence introduced in federal court has no bearing on 2254(d)(1) review." *Id.* at 185. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)). However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review. *Townsend v. Sain*, 372 U.S. 293, 319 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superseded by statute as stated in Williams*, 529 U.S. at 433-34.

If a petitioner satisfies either subsection (1) or (2) for a claim, then the federal court considers that claim *de novo*. *See Panetti*, 551 U.S. at 953 (when § 2254(d) is satisfied, "a federal court must then resolve the claim without the deference AEDPA otherwise requires."); *see also Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008) (same).

In this case, some of Petitioner's claims and allegations were raised and rejected by the California Supreme Court on direct appeal while others were raised in his state habeas petitions to that court and summarily denied on the merits.

In the latter case of summary denial, where the state court decision is unaccompanied by an explanation, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. The Supreme

Court stated that "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 101-03. Petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98). "Crucially, this is not a *de novo* review of the constitutional question," *id.*, as "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id. (*quoting *Richter*, 562 U.S. at 102); *see also Murray v. Schriro*, 745 F.3d 984, 996-97 (9th Cir. 2014).

When reviewing the California Supreme Court's summary denial of a petition, this Court must consider that the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that:

> [T]he claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief. It appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also review the record of the trial ... to assess the merits of the petitioner's claims.

*Pinholster*, 563 U.S. 181 n.12 (quoting *In re Clark*, 5 Cal. 4th 750, 770 (1993), *superseded by statute as stated in Briggs v. Brown*, 3 Cal. 5th 808, 841, 845, 848 (2017)); *see also Johnson v. Williams*, 568 U.S. 289, 300 (2013) (holding that even where the state court does not separately discuss a federal claim there is a presumption that that state court adjudicated the federal claim on the merits).

> [A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004), *abrogated on other grounds by Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014). Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *accord Mann v. Ryan*, 828 F.3d 1143, 1153 (9th Cir. 2016) [Citation].

*Navarro v. Holland*, 698 F. App'x 541, 542 (9th Cir. 2017).

If this Court finds Petitioner has clearly made out a prima facie case for relief on a claim, the state court's summary rejection of that claim would be unreasonable. *Nunes v. Mueller*, 350 F.3d 1045, 1054 (9th Cir. 2003).

For any habeas claim that has not been adjudicated on the merits by the state court, the federal court reviews the claim *de novo* without the deference usually accorded state courts under 28 U.S.C. § 2254(d)(1). *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). In such instances, however, the provisions of 28 U.S.C. § 2254(e) still apply. *Pinholster*, 563 U.S. 185 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); *Pirtle*, 313 F.3d, at 1167-68 (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is *de novo*).

## V. PROCEDURAL BARS

Certain of Petitioner's claims were alternatively denied by the California Supreme Court as procedurally barred. As to those claims, Respondent has invoked the independent state ground doctrine, pursuant to which a federal court will not review a question of federal law decided by a state court "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Vang v. Nevada*, 329 F.3d 1069, 1072 (9th Cir. 2003) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

Since "cause and prejudice" can excuse a procedurally defaulted claim, *Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007) (quoting *Coleman*, 501 U.S. at 750), and "prejudice" essentially requires a merits analysis, the Court will proceed to the merits of claims found to be procedurally defaulted without determining whether the state procedural default is adequate and independent to bar relief in federal court. *Id.* (quoting *Coleman*, 501 U.S. 732-35).

A district court may exercise discretion to proceed to the merits in advance of litigation

of procedural default. *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (courts empowered to reach the merits if on their face the allegations are clearly not meritorious despite asserted procedural bar); *see also Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005) (an application for habeas corpus may be denied on the merits even if unexhausted in state court); *Loggins v. Thomas*, 654 F.3d 1204, 1215 (11th Cir. 2011) (relief may be denied on the merits where petition is clearly not meritorious despite asserted procedural bar).[6]

## VI. PRELIMINARY MATTERS

The Court takes judicial notice of the certified record on appeal to the California Supreme Court, all documents on file in the California Supreme Court in the case of *People v. Colin Raker Dickey,* California Supreme Court Case No. S025519 and all declarations, witness statements, and records filed on Petitioner's behalf in his state habeas corpus proceedings before the California Supreme Court, *In re Colin Dickey,* California Supreme Court Case No. S115079, and *In re Colin Dickey*, California Supreme Court Case No. S165302.

## VII. REVIEW OF PENALTY PHASE CLAIMS

### A.    Claims Relating to Ineffective Assistance of Counsel

1.    Legal Standards

The Sixth Amendment right to effective assistance of counsel, applicable to the states through the Due Process Clause of the Fourteenth Amendment, applies through the sentencing phase of a trial. *See Murray*, 745 F.3d, at 1010-11: U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; *Gideon v. Wainwright*, 372 U.S. 335, 34345 (1963); *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002).

The Supreme Court explained the legal standard for assessing a claim of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 685-87 (1984). *Strickland* propounded a two-prong test for analysis of claims of ineffective assistance of counsel. The first prong focuses upon whether counsel performed deficiently. The second prong focuses

---

[6] Respondent contends certain claims are not cognizable because they create and retroactively apply a "new rule" of constitutional law under *Teague v. Lane*, 489 U.S. 288 (1989). (*See* Doc. No. 105 at 27-28; Doc. No. 143 at 42-43.) Unless otherwise noted, the Court declines to address Respondent's *Teague* arguments where the claim lacks merit.

1    upon whether the petitioner suffered prejudice from counsel's deficient performance.

2         Conclusory allegations are insufficient to raise a cognizable claim of ineffective

3    assistance. *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) (conclusory suggestions that

4    counsel provided ineffective assistance "fall far short of stating a valid claim of constitutional

5    violation").

6         If the petitioner makes an insufficient showing as to either one of the two *Strickland*

7    components, the reviewing court need not address the other component. *Strickland*, 466 U.S.

8    at 697.

9         **a.    Deficient Performance**

10        The petitioner must show that counsel's performance was deficient, requiring a

11   showing that counsel made errors so serious that he or she was not functioning as the "counsel"

12   guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The petitioner must show

13   that "counsel's representation fell below an objective standard of reasonableness," and must

14   identify counsel's alleged acts or omissions that were not the result of reasonable professional

15   judgment considering the circumstances. *Richter*, 562 U.S. at 104 (citing *Strickland*, 466 U.S.

16   at 688); *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).

17        Petitioner must show that counsel's errors were so egregious as to deprive him of a fair

18   trial, one whose result is reliable. *Strickland*, 466 U.S. at 688. Judicial scrutiny of counsel's

19   performance is highly deferential, and the habeas court must guard against the temptation "to

20   second-guess counsel's assistance after conviction or adverse sentence." *Id.* at 689. Instead,

21   the habeas court must make every effort "to eliminate the distorting effects of hindsight, to

22   reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct

23   from counsel's perspective at the time." *Id.*; *see also Richter*, 562 U.S. at 107.

24        The Supreme Court has "declined to articulate specific guidelines for appropriate

25   attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney

26   performance remains simply reasonableness under prevailing professional norms.'" *Wiggins v.*

27   *Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688).

28

However, "general principles have emerged regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective standard of reasonableness' by which [a court must] assess attorney performance, particularly with respect to the duty to investigate." *Summerlin v. Schriro*, 427 F.3d 623, 629 (9th Cir. 2005). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. *Strickland* permits counsel to "make a reasonable decision that makes particular investigations unnecessary." *Richter*, 562 U.S. at 106 (citing *Strickland*, 466 U.S. at 691).

However, strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment. *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690–91); *see also Thomas v. Chappell*, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"); *Jennings v. Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of alibi defense and rejection of mental health defense not reasonable strategy where counsel failed to investigate possible mental defenses).

Counsel may formulate a strategy, reasonable at the time, and balance limited resources consistent with effective trial tactics and strategies. *See Richter*, 562 U.S. at 107. Counsel is not required to pursue an investigation that would be fruitless, or harmful to the defense. *Id.* at 108. A reviewing court "need not determine the actual explanation for counsel's [strategic choices], so long as his [choices fall] within the range of reasonable representation." *Morris v. State of California*, 966 F.2d 448, 456 (9th Cir. 1991).

A court indulges a "'strong presumption' that counsel's representation was within the

'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). This presumption of reasonableness means that not only do we "give the attorneys the benefit of the doubt," we must also "affirmatively entertain the range of possible reasons counsel may have had for proceeding as they did." *Pinholster*, 563 U.S. at 196.

The basic requirements of *Strickland* apply with equal force in the penalty phase. Petitioner must show that counsel's actions fell below an objective standard of reasonableness, and that the alleged errors resulted in prejudice. *Strickland*, 466 U.S. at 687-88.

### b. Prejudice

The petitioner also must demonstrate prejudice, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different." *Strickland*, 466 U.S. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). Under this standard, we ask "whether it is 'reasonably likely' the result would have been different." *Richter*, 562 U.S. at 111 (quoting *Strickland*, 466 U.S. at 696).

That is, only when "the likelihood of a different result [is] substantial, not just conceivable," has the petitioner met *Strickland's* demand that defense errors were "so serious as to deprive [him] of a fair trial." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 687). A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner because of the alleged deficiencies. *Strickland*, 466 U.S. at 697. Since the petitioner must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693-94. To assess that probability, the reviewing court must consider the totality of the available

mitigation evidence and reweigh it against the evidence in aggravation. *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (citing *Williams*, 529 U.S. at 397-398). The court must consider whether the likelihood of a different result is "sufficient to undermine confidence in the outcome" actually reached at sentencing. *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) (quoting *Strickland*, 466 U.S. at 694).

Assessing prejudice at the penalty phase implicates a three-step inquiry: First, the court evaluates and weighs the totality of the available mitigating evidence; second, it evaluates and weighs the aggravating evidence and any rebuttal evidence that could have been adduced by the government had the mitigating evidence been introduced; and third, it reweighs the evidence in aggravation against the totality of available mitigating evidence to determine whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Apelt v. Ryan*, 878 F.3d 800, 832 (9th Cir. 2017); *see also Andrews v. Davis*, 866 F.3d 994, 1020 (9th Cir. 2017), *reh'g en banc granted by* 888 F.3d 1020 (9th Cir. 2018); *Strickland*, 466 U.S. at 695.

"The defendant bears the highly demanding and heavy burden of establishing actual prejudice." *Livaditis v. Davis*, No. 14-99011, 2019 WL 3756064, at 11 (9th Cir. Aug. 9, 2019) (quoting *Bible v. Ryan*, 571 F.3d 860, 870 (9th Cir. 2009)).

Counsel has an "obligation to conduct a thorough investigation of the defendant's background," *Williams*, 529 U.S. at 396, and a duty to investigate, develop, and present mitigation evidence during penalty phase proceedings. *Wiggins*, 539 U.S. at 521-23. "At the very least, counsel should obtain readily available documentary evidence such as school, employment, and medical records, and obtain information about the defendant's character and background." *Robinson v. Schriro*, 595 F.3d 1086, 1108-09 (9th Cir. 2010) (citing *Boyde v. California*, 494 U.S. 370, 382 (1990)).

c.    **Application of *Strickland* under AEDPA**

Under AEDPA, the court does not apply *Strickland de novo*. Rather, the court must

determine whether the state court's application of *Strickland* was unreasonable. *Richter,* 562 U.S. at 99-100. Establishing that a state court's application of *Strickland* was unreasonable under 28 U.S.C. § 2254(d) is very difficult. *Richter*, 562 U.S. at 100. Since the standards created by *Strickland* and § 2254(d) are both "highly deferential," when the two are applied in tandem, review is "doubly" so. *Richter*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (quoting *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)). Further, because the *Strickland* rule is a "general" one, courts have "more leeway . . . in reaching outcomes in case-by-case determinations" and the "range of reasonable applications is substantial." *Richter*, 562 U.S. at 101; *see also Premo v. Moore*, 562 U.S. 115, 127 (2011) (noting the leeway afforded state courts under AEDPA in applying general standards).

Here again, *Strickland* dictates a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687). AEDPA, acting in tandem with *Strickland* asks whether the state court's application of *Strickland* was unreasonable. *Richter,* 562 U.S. at 99-100.

    2.    Claims III(C-E)

Petitioner alleges counsel Schultz was ineffective by failing to investigate, develop, and present mitigating psychosocial evidence (i.e. claim III(C)) including opinion by social history and mental health experts (i.e. claim III(D)), and lay witness testimony (i.e. claim III(E)), violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 51-1, ¶¶ 433-568.)

    a.    **Supplemental Legal Standards**

The Eighth Amendment requires that the sentencer not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Eddings v. Oklahoma,* 455 U.S. 104, 110 (1982) (trial court deficient by refusing to consider mitigating evidence of defendant's violent family history and mental/emotional

disturbance); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (sentencer in a capital case shall not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense).

To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins*, 539 U.S. at 523; *See also Rompilla*, 545 U.S. at 381; *Strickland*, 466 U.S. at 699 (counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"); *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (limited investigation reasonable because all witnesses brought to counsel's attention provided predominantly harmful information).

**b.    State Court Direct and Collateral Review**

Petitioner presented in the SSHCP claim III including all subclaims (Lod. Doc. No. 30, SSHCP, at 200-302) which was summarily denied on the merits with certain subclaims including subclaims C, D and E denied on procedural grounds (Lod. Doc. No. 31, Order Denying Cal. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

Petitioner also claimed on direct appeal that trial counsel was ineffective by failing to present any mitigating evidence.  (Lod. Doc. No. 1, Appellant's Opening Brief, hereinafter "AOB", at claim XXI.)  The California Supreme Court denied the claim on the merits.  *Dickey*, 35 Cal. 4th at 926-27.

**c.    Analysis**

*i.    Deficient Performance*

Petitioner argues that Schultz's decision to forego presentation of then available mitigating psychosocial evidence was not supported by a reasonable investigation and trial tactics.  (Doc. No. 51-1, ¶¶ 433-568; *see also* RT 5108-13; *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007) (counsel has a duty to investigate all potentially mitigating evidence); *see also* Penal Code § 190.3(k)); *Lockett*, 438 U.S. at 604 ("[I]n capital cases the

23

fundamental respect for humanity underlying the Eighth Amendment . . . requires

consideration of the character and record of the individual offender and the circumstances of

the particular offense as a constitutionally indispensable part of the process of inflicting the

penalty of death).

Particularly, he argues Schultz could not have made an informed tactical decision

without consideration of his habeas proffered evidence of: (i) pervasive physical and sexual

abuse, mental illness, neglect and poverty, (ii) organic brain and mental impairments, (iii)

substance abuse including drugs and alcohol, and (iv) and his positive attributes.  (Doc. No.

142 at 63-140 (citing *Daniels v. Woodford*, 428 F.3d 1181, 1206 (9th Cir. 2005)) (counsel

ineffective for failure to investigate and present mitigating evidence of mental disorder); *see

also* Penal Code section 190.3(d, h, k); Doc. No. 144 at 19 n.3, 22-23.)

The record reflects Schultz did not present any mitigating evidence at the penalty trial,

opting instead to briefly argue his penalty defense theory to the jury.  (CT 478-480.)   Schultz's

primary penalty defense relied upon lingering doubt raised by guilt phase evidence of

circumstances surrounding Petitioner's participation in the crimes as a mere aider and abettor

of felony murder.  (Pet. Ex. 12 ¶ 5.)  Schultz argued this primary defense to the jury at penalty

closing.  (RT 5139-40.)

The California Supreme Court denied claimed ineffectiveness arising from counsel's

failure to present any mitigating evidence at the penalty trial, stating that:

> Defendant contends he received ineffective assistance of counsel because
> counsel presented no mitigating evidence in the penalty phase.
>
> "On a silent record ... we will not assume that the defense counsel's failure to
> present mitigating evidence rendered his assistance ineffective. Any assertion
> that counsel was inadequate in this regard must be raised on habeas corpus."
> (*People v. Diaz* (1992) 3 Cal. 4th 495, 566, 11 Cal.Rptr.2d 353, 834 P.2d 1171
> (*Diaz* ); see *People v. Anderson* (2001) 25 Cal. 4th 543, 598, 106 Cal.Rptr.2d
> 575, 22 P.3d 347.)
>
> The record is not silent here. However, insofar as it speaks, it undercuts
> defendant's ineffectiveness claim.
>
> Defendant contends his mother should have been called to testify as to the
> "awful conditions of [his] upbringing." A declaration by defendant's mother was

attached to the motion for a new trial filed by defendant's new counsel appointed for the purpose of preparing the motion. In the declaration, defendant's mother states she had been available to testify that when defendant was growing up he "suffered abusive beatings" by his father, and that at times she had taken out her "rage" on defendant, beating him with a belt.

Prior to the penalty phase, defense counsel discussed with the court his concern that such "abuse" could be viewed as harsh punishment, raising the question, on rebuttal, whether defendant had done something to provoke such punishment. This was a concern because defendant had, indeed, done something deserving of severe punishment—he had sexually molested his little sister. The abuse occurred over a period of two years, starting when defendant was 12 and his sister was only 5.[16] Noting such rebuttal would be "devastating," defense counsel said he would have to decide whether the risk was too great. In the end, defense counsel called neither defendant's mother nor any other witness.

---------------------------------------FOOTNOTE--------------------

n.16 In her declaration filed in support of defendant's new trial motion, defendant's mother acknowledged defendant was "accused" of molesting his sister, but stated she "had no personal knowledge" of it. However, the probation report reveals defendant was adjudged guilty of the conduct by a juvenile court.

-----------------------------------END FOOTNOTE-----------------

When defense counsel's reasons are not readily apparent from the record, we will not assume he was ineffective unless his challenged conduct could have had " ' "no conceivable tactical purpose." ' " (*Earp, supra,* 20 Cal. 4th at p. 896, 85 Cal.Rptr.2d 857, 978 P.2d 15; *People v. Hines* (1997) 15 Cal. 4th 997, 1065, 64 Cal.Rptr.2d 594, 938 P.2d 388; *Diaz, supra,* 3 Cal. 4th at p. 558, 11 Cal.Rptr.2d 353, 834 P.2d 1171.)

Here, defense counsel's tactical purpose is readily apparent from the record. Indeed, in arguing the motion for a new trial, defendant's substitute counsel expressly acknowledged defense counsel made a "strategic and tactical decision" in not calling defendant's mother. Accordingly, we reject this assignment of ineffectiveness of counsel.

*Dickey*, 35 Cal. 4th at 926–27.

The California Supreme Court reasonably rejected these claims, for the reasons stated by that court and those that follow.

### (1)  Reasonable Defense Investigation Supported Trial Tactics

#### Aggravating Value of Petitioner's Criminal History

Prior to the start of the penalty trial, the prosecutor stated the aggravating evidence

would consist of autopsy photos of the victims (as circumstances of the crime); and Petitioner's prior conviction in Nevada for second degree burglary without going into details of that conviction.  (RT 5081-83, 5085.)

Schultz had a longstanding concern that presentation of mitigating evidence might open the door to prosecution rebuttal with aggravating evidence of Petitioner's prior criminal conduct, i.e. molestation of his sister and the Nevada burglary which involved sexual assault of the corpse of a seven-year-old girl.  (Pet. Ex. 12 ¶ 13.)  As early as August 1989, Schultz and Petitioner discussed the possibility the Nevada burglary might be used against Petitioner at sentencing.  (Pet. Ex. 23 at SH002090.)

Prior to the penalty trial, Schultz, the prosecutor and the trial judge discussed *in limine* whether and the extent to which presentation of mitigating character evidence might open the door details of Petitioner's criminal history.  (RT 5080-82, 5108-13.)  Schultz discussed his concern that details of Petitioner's prior criminal acts might come before the jury, particularly if Petitioner's mother were to testify at the penalty trial.  (RT 5108-09.)

The trial court and prosecutor suggested that evidence of the prior criminal conduct could not come in as long as Schultz avoided eliciting from Petitioner's mother, Ms. Walters, character or opinion testimony about Petitioner.  (*See* RT 5108-12.; Doc. No. 51-1, ¶ 556-57; *see also People v. Ramirez,* 50 Cal. 3d 1158, 1191-1193 (1990) (absent defense presentation of good character evidence the prosecution may not introduce evidence of prior misconduct).  In the course thereof, the prosecutor conceded the risk that a trial witness might stray during testimony even if instructed not to do so, and that "I'm not gonna say that I'm not going to try to get that sexual escapade in front of the jury, if I feel it's proper, and if I feel I'm entitled to do it under the laws of evidence."  (RT 5112.)

Schultz took the matter under consideration, stating that "I have to review the available information and decide whether – discuss the problem with my witness and decide whether or not the risk is too great."  (*Id.*)

The trial court informed Schultz that:

> [I]f you want, and if you determine asking certain questions, I'm happy to listen to what you have to say further and then give you an option as to whether or not I'm inclined to let – Mr. Hahus ask questions concerning this particular incident or not.

(Doc. No. 51-1, n.39, citing RT at 5113.)

Schultz replied:

> I understand what the Court's position is, I just have to make a – make a determination based after – just on a conversation with the witness and with the – the information available and see if I can – if I can structure it narrow enough to avoid the pitfalls.

(RT 5113.)

Petitioner argues Schultz unreasonably failed to accept the trial court's offer to more specifically "investigat[e] the matter with the court[.]" (Doc. No. 51-1 ¶ 558, citing RT 5112-13; *see also* Doc. No. 142 at 132-34, citing RT 5108-13.) He argues Schultz was not tactically motivated in this regard, but rather operated under a:

> [T]otally stigmatized misunderstanding and profoundly debilitating lack of knowledge and denial of the myriad ways in which Colin's chronic, torturous, sadistic and perverse childhood victimization not only contributed to the multiple undiagnosed mental illnesses and serious organic brain damage that deformed his character, but defined his abnormal and perverse sexual behavior. With no understanding of the sexual torment within which Colin was embedded as a child and adolescent, his trial counsel "rested" rather than allow any "character" evidence at all to be presented.

(Pet. Ex. 2, at 6.)]]

However, the record reasonably suggests Schultz attempted to structure the mitigation defense to "avoid the pitfalls," upon consideration of the guidance provided by the trial court and the prosecutor during the *in limine* hearing. (RT 5113; *see Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998) (the relevant inquiry is not what counsel could have pursued, but whether the choices counsel made were reasonable).

For example, Schultz was aware the prosecutor had indicated he would not impeach

Petitioner's mother with negative evidence of Petitioner's character if her testimony avoided

evidence of his good character. (*See* Doc. No. 51-1, ¶ 461; RT 5111-13; *see also* Pet. Ex. 15 ¶

5.) Still nothing therein allayed Schultz's concern the mother might be "baited" into character

testimony on cross-examination, as discussed below. (Pet. Ex. 12 ¶ 13.) Schultz recounted his

thought process and rationale in his habeas declaration, as follows:

> Prior to the penalty phase, at an in limine hearing with the judge and prosecutor,
> we discussed the admissibility of character evidence regarding the defendant,
> including evidence of sexual molestations by the defendant of his sister in his
> early adolescence and an act of necrophilia at age 17 that resulted in his felony
> prior in adult court for second degree burglary in Nevada. The court confirmed
> that this character evidence could not be broached in the penalty phase as long
> as the defense did not place the defendant's character in issue in its case in
> chief. As a result of this ruling, I decided not to use a mental health defense in
> the mitigation case. I knew that the prosecution case for aggravation would
> consist only of the defendant's felony prior, and photographs of the victims. I
> did not feel that this evidence would weigh heavily in aggravation. I planned to
> argue that the defendant was not a participant in the actual killings, and
> therefore that the photographs did not depict circumstances attributable to his
> role in the underlying felonies. I felt that evidence of the defendant's difficult
> childhood and abusive treatment by his parents could be effectively presented
> through the repentant testimony of his mother, and that she could be coached to
> avoid raising the issue of her son's character.

> As a result, approximately two weeks before the penalty phase, I contacted the
> defendant's mother, Linda Walters, at her home in Washington and arranged to
> have her attend the penalty phase and to testify. We had approximately four
> telephone conversations, lasting a total of two hours, before she arrived in
> Fresno the afternoon before her scheduled testimony. I met with Ms. Walters
> twice for approximately two hours total to prepare her for her testimony. In my
> conversations with her, Ms. Walters appears to have a good grasp of the
> relevant family history. She appeared ready, willing and able to testify to her
> culpable role in her son's abusive upbringing. But, she indicated to me that
> whether she was asked or not asked whether or not her son was a good boy, she
> would have to respond that he was or volunteer the information given the
> opportunity. This scared me because, while I felt that I could pose the questions
> to her in a narrow enough fashion to avoid her reference to character evidence, I
> felt that the prosecutor could easily bait her into making a positive character
> statement about her son, and that he then could introduce evidence of the
> defendant's past misdeeds. I determined that the risk of Ms. Walters testifying
> was too great in comparison to the potential benefit. I told her this at our second
> meeting at breakfast on the morning scheduled for her testimony. She did not
> attend the penalty phase proceedings and left Fresno later that day without
> seeing or speaking to [Petitioner]. No evidence was presented by the defense at
> the penalty phase.

(Pet. Ex. 12 ¶ 13.)

<u>Defense Social History Investigation</u>

Petitioner argues the defense social history investigation was inadequate because it was started late; denied Petitioner the opportunity to assist in the defense; did not involve experts; and was incomplete.  (Doc. No. 51-1, ¶¶ 441, 459, 471-472, 534.)

"The failure to timely prepare a penalty-phase mitigation case is . . . error."  *Kayer v. Ryan,*  923 F.3d 692, 714 (9 th Cir. 2019) (citing *Allen v. Woodford*, 395 F.3d 979, 1001 (9th Cir. 2005)).  The *Kayer* court held that the failure of trial counsel to begin the penalty phase investigation promptly upon appointment, instead delaying until after the guilty verdict, fell below an objective standard of reasonableness.  923 F.3d at 715 (citing *Strickland*, 466 U.S. at 688).

"[T]he scope of a counsel's pretrial investigation necessarily follows from the decision as to what the theory of defense will be."  *Soffar v. Dretke,* 368 F.3d 441, 473 (5th Cir. 2004).  In determining whether counsel made reasonable tactical decisions about certain evidence, a court focuses on whether the investigation supporting counsel's decision to introduce or omit certain evidence was itself reasonable.  *Wiggins*, 539 U.S. at 523.  Limited investigation may be reasonable when it demonstrates that presenting certain evidence "would have been counterproductive, or that further investigation would have been fruitless."  *Id.* at 525.

The record reflects that the defense investigation of guilt and penalty issues began well before Petitioner's April 1990 arraignment.  (CT 232.)  As early as April 1989, the defense team including Schultz began a series of interviews with Petitioner.  (*See* Pet. Ex. 23 at SH002038-2137.)  Petitioner appears to concede as much.  (*See* Doc. No. 51-1 ¶ 441.)  Schultz and defense team garnered information including the identities and whereabouts of Petitioner's family members.  (Pet. Ex. 23 at SH002038-2137; *see also* Pet. Ex. 2 at 106-09.)  Petitioner told the team of beatings and abuse he received at home and of his juvenile molestation adjudication involving his sister, albeit he denied molesting her.  (*Id.*)  He told the defense team about his father's criminal activity; his drug use; living with various relatives and sometimes running away; traveling to Reno, Nevada, and enrolling in and then dropping out of

1 Reno High School.

2        Petitioner also provided information relating to his own criminal history including that:

3 he participated as a teenager in various burglaries (Pet. Ex. 23 at SH002076-77) and was

4 arrested in Nevada and convicted as an adult of second-degree felony burglary relating to an

5 act of necrophilia. (*Id.*, at SH002090). Notably, during an August 1989 interview, Schultz

6 specifically discussed in some detail the potential use of the Nevada conviction against

7 Petitioner at the penalty phase; that Schultz had seen newspaper articles regarding that crime

8 and that Schultz did not want to delay assembling information on Petitioner's criminal record.

9 (Pet. Ex. 23 at SH002091-94.)

10        At that early stage, Petitioner himself expressed concern the Nevada conviction might

11 come in and bias the jury. Petitioner suggested a possible motion to change venue. (*Id.*)

12 Schultz confirmed his trial strategy of keeping the Nevada conviction from the jury. (*Id.*)

13 Noting Petitioner's hesitance to talk about the burglary and related necrophilia, Schultz

14 specifically explained to him why the defense team need detailed information on such matters.

15 (*See* Pet. Ex. 2 at 109.) Petitioner went on to provide certain details of his sentence and his

16 time in a Nevada prison. (*Id.*)

17        Significantly, defense investigator King interviewed Petitioner's mother, Linda Dickey,

18 and four months prior to trial prepared Schultz with an August 1990 written social history that

19 included the following information:

20

21       Petitioner was healthy growing up, with no unusual diseases or medical
      problems; he was sometimes hyperactive and developed a nervous twitch

22       around age 9 or 10 years;

23       Petitioner's family life included physical abuse, particularly, the father beat
      Petitioner severely, but also included family vacations to places such as

24       Disneyland and the San Diego Zoo;

25       Petitioner's parents drank and used drugs, passed bad checks, were sometimes
      without housing arrangements, living with relatives or others, the father had
      difficulty holding a job due to his drinking, at times the father was in jail or

26       otherwise absent from the home, and the family lived on welfare;

27       Petitioner and his siblings witnessed and were victims of violence in the home;

28

The mother started working in fast food, became heavily addicted to drugs, engaged in sexual liaisons and severe beatings of the children including Petitioner;

The father, Donald Dickey, engaged in sexual misconduct with relatives including the repeated rape of mother's 13-year-old sister while the children including Petitioner watched;

Petitioner sometimes acted strangely, abusing his younger bother;

Petitioner sexually molested his younger sister for a period of years;

In 1979, Petitioner's mother divorced his father noting repeated criminal conduct, beatings and the father's abuse of the children and sexual molestation of her daughter, whereupon they lost their home to foreclosure, Petitioner remained with his father;

The mother had little contact with Petitioner after he turned 14 years old noting that she feared him and her husband but did visit Petitioner while he was in prison in Nevada on the burglary charge stemming from the necrophilia event (*id.*);

The father became a fugitive following the molestation conviction in 1979 and his whereabout since then are unknown.

(Pet. Ex. 23 at SH002040-49; *see also* Pet. Ex. 2 at 110-20; Pet. Ex. 15 ¶¶ 2, 5.)

Schultz, contemplating possible presentation of social history evidence in mitigation, personally contacted Ms. Walters about two week before the penalty phase and engaged in multiple phone conversations over the course of approximately four hours relating to her appearance and testimony. (Pet. Ex. 12 at ¶¶ 13; Pet. Ex. 15 ¶¶ 2-5; *see also* Doc. No. 142 at 65-66.) He also provided in-person witness preparation of about the same length. (*Id.*)

Defense Mental State Investigation

Petitioner argues the mental state investigation was inadequate because it was started late; denied Petitioner the opportunity to assist in the defense; did not involve experts; and was incomplete. (Doc. No. 51-1, ¶¶ 441, 459, 471-472, 534.) However, the record reflects the defense team counsel consulted with two mental health experts in preparation for the guilt phase. Neither expert opined in favor of a mental state defense.

Defense psychiatrist Dr. John Hackett, who interviewed Petitioner in jail during August 1989, found him oriented and of average intelligence. (Pet. Ex. 23 at SH04457.) Dr. Hackett

found Petitioner unlikely to be honest, with an "angry…self-defeating personality style [that] will get in the way" of the defense. (Pet. Ex. 2 at 112; *see also* Pet. Ex. 23 at SH04452-56.) Dr. Hackett stated his belief that although Petitioner was possibly suicidal, he was not incompetent. (Pet. Ex. 23 at SH04453, 4457; *see also* Pet. Ex. 2 at 21.)

Dr. Hackett also extensively reviewed records supplied by the defense team including of Petitioner's necrophilia which presumptively included probation reports of his dysfunctional family background, aberrant upbringing and sexual molestation of his sister. (*Id.*) Dr. Hackett described Petitioner's perverse sexual excitement over the young girl's corpse, necrophilia, and ultimate depositing of the corpse in a dumpster. (*Id.*) Dr. Hackett suggested Petitioner had an aberrant and traumatic upbringing that could be developed in mitigation. (*Id.*, at 113.) Dr. Hackett diagnosed Petitioner with severe antisocial personality disorder and atypical psychosexual disorder. (*Id.*)

Psychologist Dr. Larry "Buzz" Thompson examined Petitioner in jail and provided a July 1990 report finding that Petitioner was anxious, mildly depressed and cynical (Pet. Ex. 2 at 114-15; Pet. Ex. 23 at SH002287-90), with no obvious symptoms of psychosis (*id.*). Dr. Thompson noted Petitioner's drug use and criminal past. (*Id.*) Dr. Thompson opined that "in the absence of any evidence of psychotic thought process coupled with [Petitioner's] firmly stated intention not to plea bargain, I believe a psychiatric defense would be of no value." (*Id.*)

Dr. Thompson found Petitioner to be "fairly sophisticated at anticipating the questions that would be asked of him in an interview setting and his answers [to be] reasonable and well structured, if very pat." (*Id.* at 3.)

Dr. Thompson averred that "[w]hile [Petitioner] may qualify for a diagnosis in the area of character (personality) disorder . . . I can see no point in pursuing one for the purpose of his legal defense." (*Id.*, at 4; *see also* Pet. Ex. 2 at 115.) Dr. Thompson suggest that Petitioner "should be used as a witness in his own behalf." (Pet. Ex. 19 attachment "A" at 3.)

This Court observed the findings of these defense experts in its prior order denying guilt phase claims, as follows:

Schultz engaged in the noted pre-trial preparations including consultation with two mental health experts – psychiatrist Dr. John Hackett who concluded petitioner was possibly suicidal, and psychologist Larry Thompson who concluded petitioner mildly depressed. (Doc. No. 51-1 ¶ 523; *see also* SSHCP, Ex. 19 ¶ 9.) Schultz could reasonably have relied upon these experts in making strategic decisions not to assert mental defenses at the guilty phase or conduct further related investigation. (*See e.g.,* claims II(B), II(C).)

Additionally, Schultz and his team discussed petitioner's background with petitioner's mother. The state supreme court could reasonably have found that Schultz had concerns relating to potentially unfavorable behavioral, character and bad acts evidence and that such were an objectively reasonable basis not to further pursue such matters during the guilt phase. (SHCP, Ex. B ¶ 13.)

(Doc. No. 135 at 32.)

Petitioner concedes that Schultz's pre-trial preparations included noted consultation with two mental health experts – psychiatrist Dr. John Hackett who found petitioner possibly suicidal (Doc. No. 51-1 ¶ 523), and psychologist Larry Thompson (id.; SSHCP, Ex. 19) who found petitioner mildly depressed. The state supreme court could reasonably have found Schultz's decision not to pursue guilty phase mental state defenses was objectively reasonable.

(Doc. No. 135 at 39-40.)

Petitioner was interviewed in jail by Dr. Hackett, ((Doc. No. 51-1 ¶ 523; SSHCP, Ex. 2 at 119-120), who diagnosed him with antisocial personality disorder but nonetheless found him competent to assist in his defense (*id.*). Petitioner also was evaluated by Dr. Thompson (*id.* at 114), who found Petitioner mildly depressed (SSHCP, Ex. 2 at 121-23; *id.* at Ex. 19) but showing no obvious symptoms of psychosis either manifest or latent. (SSHCP, Ex. 2 at 122). Dr. Thompson opined that a psychiatric defense would be of no value (*id.*).

(Doc. No. 135 at 45.)

Additionally, Petitioner's argument he was denied the ability to assist in his defense fails for the reasons stated in the discussion of claims II(I), III(B), V, VI, and VII, *post*.

<u>Decision to Forego Further Social History Investigation was Reasonable</u>

The state supreme court reasonably could find Petitioner's habeas proffered social history evidence was not a basis for further penalty defense investigation. (Doc. No. 51-1, ¶ 563; *see* Doc. No. 142 at 139.)

1    Petitioner points to habeas proffered evidence from family members and acquaintances

2  of familial: mental illness (Pet. Ex. 1 ¶ 11; Pet. Ex. 3 ¶¶ 19, 20, 21); physical and sexual abuse

3  (Pet. Ex. 1 ¶¶ 4-10, 12-13, 18, 21; Pet., Ex. 3 ¶ 12; Pet. Ex. 4 ¶¶ 5, 8, 9, 17, 19, 29; Pet. Ex. 5

4  ¶¶ 5, 6, 10; Pet. Ex. 6 ¶¶ 4, 5; Pet. Ex. 7 ¶¶ 5, 7, 9; Pet. Ex. 8 ¶¶ 4, 6, 7, 8, 10, 11, 13, 15; Pet.

5  Ex. 15 ¶ 7; Pet. Ex. 17 ¶ 4; Pet. Ex. 18 ¶ 4; Pet. Ex. 20 ¶¶ 5-6; Pet. Ex. 21 ¶ 9); violent and

6  immoral activity (Pet. Ex. 1 ¶¶ 16, 19; Pet. Ex. 3 ¶ 5; Pet. Ex. 7 ¶¶ 14, 18, 19; Pet. Ex. 8 ¶ 16;

7  Pet. Ex. 15 ¶ 7; Pet. Ex. 21 ¶¶ 2, 3, 7); deprivation, neglect and poverty (Pet. Ex. 4 ¶¶ 12, 14,

8  15, 16; Pet. Ex. 5 ¶¶ 4, 14, 15; Pet. Ex. 6 ¶ 7; Pet. Ex. 8 ¶ 5; Pet. Ex. 16 ¶ 2; Pet. Ex. 17 ¶ 9);

9  and alcohol and substance abuse (Pet. Ex. 1 ¶¶ 15, 17, 20; Pet. Ex. 3 ¶¶ 2-3, 5, 13, 14, 18; Pet.

10  Ex. 4 ¶¶ 18, 28, 30; Pet. Ex. 5 ¶¶ 11, 16; Pet. Ex. 6 ¶ 8; Pet. Ex. 7 ¶¶ 6, 8; Pet. Ex. 8 ¶¶ 5, 9, 17;

11  Pet. Ex. 17 ¶ 4; Pet. Ex. 21 ¶ 8).

12    Petitioner argues further investigation and development of Petitioner's social history as

13  such is reflected in his habeas proffer would have been mitigating and fostered residual doubt,

14  humanizing him and explaining his adverse life history, particularly his habitual drug use and

15  addiction.  He argues this evidence would have overcome the aggravating value of his prior

16  criminal conduct by explaining how and why he came to commit such acts.

17    However, for the reasons discussed in the prejudice analysis below (*see* section VII, A,

18  2, c, ii, *post*), summarized here, Petitioner's psychosocial history proffer is significantly

19  cumulative of the above noted defense investigation and information known to Schultz and

20  considered by him.  The state supreme court reasonably could find such evidence essentially

21  cumulative of noted information discovered during the defense investigation including as

22  summarized by investigator King's memorandum to Schultz and presumably considered by

23  Schultz.  (*See* Pet. Ex. 23 at SH002040-49; *see also* Pet. Ex. 12 ¶ 13; Pet. Ex. 15 ¶¶ 2-5.)

24    The state supreme court reasonably could find Schultz was aware of Petitioner's

25  difficult and dysfunctional upbringing and that Schultz was not unreasonable in determining

26  the mitigating value thereof did not outweigh the aggravating value of Petitioner's prior

27  criminal acts.  Particularly, the lay testimony proffer on habeas of family members who

28

thought well of Petitioner reasonably could present the same risk of rebuttal with evidence of

Petitioner's prior criminal acts as the proposed testimony of his mother. (RT 5545.)

Schultz reasonably could have determined further investigation unwarranted as

presentation of such mitigating evidence risked opening the door to rebuttal evidence of his

prior criminal acts, for the reasons discussed above. *See Frye v. Warden, San Quentin State*

*Prison*, No. 2:99-CV-0628 KJM CKD, 2015 WL 300755, at *18 (E.D. Cal. Jan. 22, 2015) ("A

lawyer may make reasonable decisions that render particular investigations unnecessary.").

For example, Schultz reasonably could have discounted the mitigating weight of mental state

evidence given the paucity of evidence in the record that Petitioner was suffering from mental

impairment or substance abuse at the time of the capital crimes.

Petitioner's further argument regarding uninvestigated evidence relating to Petitioner's

efforts at education, self-reform and religious conversion while in jail awaiting trial (Doc. No.

51-1, ¶ 530; Doc. No. 142 at 93) is not persuasive otherwise. The state supreme court

reasonably could find such uninvestigated social history evidence was largely cumulative of

information known to the defense (*see* Pet. Ex. 23 at SH002038-2137) and presented the same

risk of rebuttal with criminal history evidence.

<u>Decision to Forego Further Mental History Investigation was Reasonable</u>

The state supreme court reasonably could find Petitioner's habeas proffered mental

state evidence was not a basis for further penalty defense investigation. (Doc. No. 51-1, ¶¶

435-442, 472-473, 532-568.)

Petitioner faults Schultz for failure to retain and utilize mental health experts in the

penalty defense including to "deconstruct" his prior criminal conduct. (Doc. No. 51-1 ¶¶ 473,

532-552.) Particularly, he argues his conduct with the corpse of a young girl was a single

impulsive act, not qualifying as necrophilia, and that an expert at the penalty phase could have

made that clear. (Pet. Ex. 2 at 224-26.) He argues such mental state evidence would have been

mitigating and fostered residual doubt: humanized him, explaining his adverse life history,

particularly his habitual drug use and addiction. He argues this evidence would have overcome

the aggravating value of Petitioner's noted prior criminal conduct by explaining how and why he came to commit such crimes.

Petitioner points to habeas proffered expert opinion explaining the "childhood traumas Petitioner's parents inflicted upon him; the horrifying conditions Petitioner was subjected to growing up; his parents' moral bankruptcy and the associated mental, emotional, and moral damage it inflicted upon Petitioner; and the concomitant psychological injuries he sustained." (Doc. No. 142 at 15; *see also* RT 5454-85.)

As above, Petitioner suggests that Schultz's allegedly deficient conduct was not tactically motivated, but rather that he operated under a:

> [T]otally stigmatized misunderstanding and profoundly debilitating lack of knowledge and denial of the myriad ways in which [Petitioner's] chronic, torturous, sadistic and perverse childhood victimization not only contributed to the multiple undiagnosed mental illnesses and serious organic brain damage that deformed his character, but defined his abnormal and perverse sexual behavior. With no understanding of the sexual torment within which Colin was embedded as a child and adolescent, his trial counsel "rested" rather than allow any "character" evidence at all to be presented.

(*Id.*, citing Ex. 2, at 13; *see also* Doc. No. 142 at 123-24.)

However, as discussed in more detail in the section on prejudice below, (*see* section VII, A, 2, c, ii, *post*), the state supreme court reasonably could find further mental state investigation unwarranted. *See Frye,* 2015 WL 300755, at *18 ("A lawyer may make reasonable decisions that render particular investigations unnecessary."). That court would not have been unreasonable in finding the noted conclusions of Drs. Hackett and Thompson reasonably informed Schulz as to Petitioner's then mental state such that further development and pursuit of a mental health mitigation defense was unwarranted. (Doc. No. 135 at 32, 40, 45-48 ; *see also* Pet. Ex. 12 ¶ 13.)

Petitioner discounts the penalty phase value of Drs. Hackett and Thompson. He argues these mental health experts were not retained to assist with mitigation or provide opinions in mitigation. (Doc. No. 51-1 ¶ 541; *see also* Ex. 19 ¶¶ 3-5.) He argues they were not provided

with and did not consider Petitioner's psychosocial history. (*Id.*)

Petitioner points to the habeas declaration Dr. Thompson that Schultz failed to provide evaluation parameters and that investigators King and Temple failed to respond to his requests for additional social and mental health history. (Doc. No. 51-1 ¶ 537; Pet. Ex. 19 ¶¶ 3-5; *see also* Doc. No. 142 at 122); *Caro v. Woodford*, 280 F.3d 1247, 1254-55 (9th Cir. 2002) (duty to provide penalty phase experts with pertinent information); *Hendricks v. Calderon,* 70 F.3d 1032, 1043 (9th Cir. 1995) (1981 trial) ("where counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance."). In this regard, Dr. Thompson avers this led him to give no thought to specifically assessing mitigation or any mitigation factors. (Pet. Ex. 19 ¶ 5.)

Even so, Dr. Thompson does not state his review of the habeas proffer evidence caused him to change the findings and opinions he reached at trial. (*See* Pet. Ex. 19 and attachment "A" thereto.) Dr. Thompson stated that while he was not provided with any psychological or physiological data pertaining to Petitioner, he did review "copious police reports" provided to him by defense investigator King and considered limited life history information provided by Petitioner including as to childhood and developmental issues. (Pet. Ex. 19 attachment "A" at 1.)

Notably, Petitioner's habeas proffer does not show he was examined by a mental health professional in relation to the molestation of his sister which occurred when Petitioner was 14 years old. (Pet. Ex. 23 at SH0000177.) To the extent Petitioner was examined in 1981 by Dr. William Terry, a psychiatrist appointed by the state court during proceedings in Nevada on the burglary charge involving necrophilia (Pet. Ex. 2 at 87-89), Dr. Terry found that Petitioner's previous history was "compatible with a diagnosis of attention deficit disorder with hyperactivity and a continual depressive state which is often found in adolescents who previously have met the criteria for being hyperactive[.]" (Pet. Ex. 2 at 89; Pet. Ex. 23 SH002284.) Dr. Hackett presumably reviewed Dr. Terry's conclusions as part of his noted

examination of Petitioner.  (*See e.g.*, Pet. Ex. 23 at SH04453, 4457; *see also* Pet. Ex. 2 at 21.)

Furthermore, Petitioner apparently did not have mental health problems or receive medication for such while imprisoned in Nevada.  (Pet Ex. 23 at SH002105.)   Upon his release from prison, Petition held down two jobs at once, reasonably suggesting a level of functionality consistent with the findings of the defense trial experts.  (*Id.*)

Given the findings of the defense trial experts and the other information known to him from the defense investigation, Schultz reasonably could have decided pursuit of mitigating mental state defenses using these or other trial experts lacked tactical value.  Especially so given the risk that presentation of such mitigating evidence could open the door to rebuttal evidence of his prior criminal acts.

Petitioner heavily relies upon his habeas experts Drs. Khazanov and Counter.  But their evaluations and opinions of organic and mental deficiencies rendered more than a decade after trial can be discounted on that basis.  *See Boyde v. Brown*, 404 F.3d 1159, 1168-69 (9th Cir. 2005), *amended by* 421 F.3d 1154 (9th Cir. 2005) (holding that if new mental health evidence, obtained after the trial, were sufficient to establish a petitioner's innocence, the petitioner could "always provide a showing of factual innocence by hiring psychiatric experts who would reach a favorable conclusion.").  Especially so, as Petitioner's mother stated on habeas that she was prepared to testify at the penalty phase that he "had no physical problems at birth . . . was a healthy child while growing up and did not suffer any unusual diseases or medical problems." (Pet. Ex. 15 ¶ 7.)

Petitioner's habeas proffer is only minimally probative of mitigating factors that he may have acted under extreme mental or emotional disturbance, or was impaired by mental disease or defect, for the reasons stated.   The jury was instructed in these regards and considered the prosecutor's argument at closing which noted the absence of such evidence. (Doc. No. 51-1, n.37, n.38, citing RT 5135-36.)

Additionally, this Court in its prior order denying guilt claims observed that Petitioner was evaluated by a mental health professional in conjunction with his motion for new trial.

1 Counsel on that motion, Ms. Hart, retained psychiatrist Dr. Callahan to examine Petitioner with

2 a view toward evidence that might have been presented in mitigation at the penalty phase in

3 support of catchall sentencing factor "k" (regarding any extenuating and sympathetic

4 circumstances of defendant's character or record).  (RT 5463.)

5     Dr. Callahan found mitigating evidence in the form of Petitioner's chaotic upbringing

6 by unstable, abusive parents who engaged in degenerate and criminal behavior.  While Dr.

7 Callahan suggested Petitioner's act of necrophilia demonstrated his "significant

8 psychopathology" (RT 5481), Dr. Callahan found no evidence Petitioner suffered from a

9 thought disorder or mental disease of defect.   Dr. Callahan also found Petitioner not to show

10 remorse for the capital crime.

11     Mere Criticism of Trial Tactics

12     Petitioner argues in the alternative that psychosocial evidence could have been

13 presented without implicating Petitioner's character and without opening the door to his prior

14 criminal acts.  (Doc. No. 51-1 ¶¶ 467, 556-557, citing *Ramirez*, 50 Cal. 3d at 1191-93); *see*

15 *also* RT 5112-13.)  However, as noted, his primary penalty defense was lingering doubt based

16 on guilt phase evidence that he did not aid and abet the capital crime; a defense Schultz could

17 have viewed as inconsistent with a mitigation defense based upon psychosocial evidence

18 explaining his participation in the crime.

19     Moreover, Schultz reasonably could have believed penalty phase experts and lay

20 witnesses suggested and identified in Petitioner's habeas proffer would have presented the

21 same risk of rebuttal evidence of prior criminal act to the extent his psychosocial history was

22 relevant to Petitioner's criminal history.   (*See e.g.*, Pet. Ex. 5 ¶¶ 5-6; Pet. Ex. 2 at Ex. H at 10-

23 12; Pet. Ex. 4 ¶ 29.)

24     Petitioner also faults Schultz for his decision not to enlist Petitioner's assistance in

25 preparing his mother to testify.  (Doc. No. 142 at 135.)   He notes Ms. Walters surprise and

26 disappointment at Schultz's decision not to present her testimony at the penalty phase, and her

27 statement that:

28

> I would have been able to recount the circumstances of [Petitioner's] upbringing accurately and sympathetically without discussing his character. I made this clear to Mr. Schultz.

(Pet. Ex. 15 ¶ 6,) Ms. Walter's habeas declaration goes on to detail a homelife of poverty, deprivation, physical, emotional and sexual abuse, violence, drug use, and neglect with frequent displacement of Petitioner and his siblings. (*See Id.* ¶¶ 7; Petition, Ex. 1 ¶¶ 13, 15-24.)

Still, Petitioner does not support this argument with facts suggesting how he might have fostered and facilitated such testimony while avoiding the risk of rebuttal. The record reflects Petitioner's indifference to and hatred of his mother expressed during pre-trial defense interviews. (Pet. Ex. 23 at SH002055, SH002136; SH004453.) Petitioner's mother, while he was incarcerated in Nevada, expressed her fear of him and desire that he not contact her or know her whereabouts upon release. (Pet. Ex. 23 at SH003963.) Also, Petitioner was in the courtroom during the *in limine* hearing when this issue of his criminal history was discussed and presumably he could have assisted Schultz were he willing and able to do so. (*See* RT 5113.)

Generally, the mere criticism of trial tactics is insufficient to establish ineffectiveness or prejudice. *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1254 (9th Cir. 1986); *see also Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (counsel's tactical decisions are given great deference and need only be objectively reasonable). The state supreme court reasonably could find that to be the case here. As this Court previously observed in its guilt phase order:

> [T]he state supreme court reasonably could have found that Schultz did reasonably develop a social history and investigate mental defenses. The noted record suggests Schultz reasonably relied upon his investigation and expert consultations in deciding not to further develop and present mental state defenses at the guilt phase. (*See* SHCP, Ex. B ¶ 5); *see also Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) ("It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts."); *Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2004) (holding counsel's decision not to investigate mental defense further was reasonable in light of conclusions of mental health experts).

1  (Doc. No. 135 at 45.)

2      For the reasons stated, the state supreme court reasonably could find unpersuasive

3  Petitioner's suggestion the defense did not investigate the root facts underlying Petitioner's

4  personal history. (*See* Doc. No. 51-1 ¶ 445.)  The decision to forego presentation of mitigation

5  evidence was both in furtherance of the noted primary penalty defense, and not inconsistent

6  with Petitioner's stated desire to forego a mitigation defense.  Ms. Hart, counsel for Petitioner

7  on the motion for new trial, conceded Schultz made a tactical decision not to present mitigating

8  evidence at the penalty phase.  (RT 5454.)  Ms. Hart conceded that a failure to present any

9  mitigating evidence is not ineffective assistance where the decision is "fully responsible and

10  informed[.]"  (RT 5532.)  The trial court agreed in denying the motion for new trial by finding

11  that Schultz acted tactically and that "there was [mitigating evidence] available to [Schultz]

12  and [Schultz] was well aware of that."  (RT January 17, 1992 at 25-26.)  That court found that

13  Schultz it was not ineffective by failing to present mitigating evidence.  (*Id.*)

14      Accordingly, the state supreme court reasonably could find the defense investigation to

15  be timely and sufficient to inform Schultz's choice of penalty defense and tactical decision not

16  to present mitigating evidence during the penalty phase.  *See Correll v. Ryan,* 539 F.3d 938,

17  947, citing *Smith v. Stewart*, 189 F.3d 1004, 1008-09 (9th Cir. 1999) ("The failure to present

18  mitigating evidence during the penalty phase of a capital case, where there are no tactical

19  considerations involved, constitutes deficient performance, since competent counsel would

20  have made an effective case for mitigation."); *Gerlaugh v. Stewart,* 129 F.3d 1027, 1033 (9th

21  Cir. 1997) ("A reasonable tactical choice based on an adequate inquiry is immune from attack

22  under Strickland."); *Lang v. Cullen*, 725 F.Supp.2d 925, 962 (C.D. Cal. 2010) (trial counsel's

23  strategic choices must be respected if they are based on professional judgment following a

24  reasonable investigation); *cf. Sanders*, 21 F.3d at 1457 (an attorney "can hardly be said to have

25  made a strategic choice when s/he [sic] has not yet obtained the facts on which such a decision

26  could be made").  Petitioner has not rebutted *Strickland's* presumption of reasonableness.

27  *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687).  His stated desire not to present

28

any mitigation evidence (RT 5101-02) credits the presumption.

  *ii. Prejudice*

  Petitioner argues a reasonable probability of a different sentencing outcome had the jury been presented with the proffered humanizing psychosocial mitigating evidence.  (Doc. No. 51-1, ¶¶ 433-568.)

  Particularly, he argues his criminal history evidence could have been mitigating if tied to his noted personal history evidence.  (Doc. No. 51-1 ¶¶ 445-446, 455, 466, 513; *see also* Pet. Ex. 2 at 27-28, 208.)  For example, he argues his sexual activity with the corpse of seven-year-old Katherine Higgins had mitigating value to the extent it resulted from "his own history of sexual victimization, exacerbated by drug and alcohol abuse[.]"  (Id.)  He argues that absent Schultz's noted deficiencies:

> The jury would have discerned the symptoms of significant brain impairments and other impairments, including PTSD, ADHD, severe physical and sexual trauma, and alcohol and substance abuse. Had Schultz investigated and retained experts, and thereafter provided them with adequate information, they would have concluded that Petitioner's history contained sufficient indicia of organic brain damage to warrant complete and thorough neuropsychological testing for various neurological and/or psychiatric disorders.

(Doc. No. 142 at 125.)

  However, the California Supreme Court reasonably could find otherwise, as follows.

  **(1) Aggravating and Rebuttal Evidence**

  The prosecution presented aggravating evidence consisting Petitioner's stipulation to his 1983 second-degree felony burglary conviction, and five autopsy photographs of the capital crime victims.   (CT 291; RT 5127-31; Doc. No. 51-1, ¶¶ 460, 554); *see also Dickey*, 35 Cal. 4th at 894-900.  The only penalty phase witness was police detective Stokes, who was called by the prosecutor to provide foundation for the autopsy photographs.  *Dickey*, 35 Cal. 4th at 894-900.

  The jury had before it the circumstances of petitioner's conviction for the capital crime and special circumstances found true.  (*See* Doc. No. 135 denying guilt phase claims.)

Furthermore, the noted facts underlying Petitioner's prior criminal acts were available in rebuttal of any character defense at the penalty trial.

### (2) Totality of Evidence in Mitigation

The defense did not present evidence in mitigation at the penalty phase. Petitioner points to his habeas proffer, discussed below, as suggesting:

> [T]he extraordinary, horrific stressors to which [he] was exposed; the migratory factors, poverty, violence, sexual perfidy and victimization that characterized his life; the failure of doctors to properly diagnose him, of police to protect him, of social workers to provide him safe haven, of family law and juvenile courts to make decisions based on a realistic totality of factors, of probation officers to understand and monitor his living conditions, or of prison authorities to provide psychotherapy, rehabilitation or other transition services.

(Doc. No. 51-1 at ¶ 477; *see also* Pet. Ex. 2 at 25.)

Predisposition to Mental Illness

Petitioner points to evidence of a family history of mental illness, criminal and violent conduct and substance and sexual abuse. (Doc. No. 51-1 ¶¶ 447-448; Pet. Ex. 1 ¶ 11; Pet. Ex. 2 at 7, 39-41; Pet. Ex. 3 ¶¶ 19-21; Pet. Ex. 23 at SH001685, SH003450-53.) He observes "schizophrenia, bipolar and suicidal depressive disorders, delusions" and "nervous breakdowns" on his mother's side. (Pet. Ex. 3 ¶ 21.)

Petitioner points to evidence that his great aunt was delusional, schizophrenic and bipolar, and spent time in a mental institution. (Doc. No. 51-1, ¶ 485, citing Pet. Ex. 3 ¶¶ 1, 19-20.) Another aunt suffered paranoid schizophrenia. (Doc. No. 51-1 ¶ 488.) His grandmother was institutionalized following a "nervous breakdown", and another extended relative once contemplated suicide. (Doc. No. 51-1 ¶ 486, citing Pet. Ex. 3 ¶¶ 1, 19-20.) Petitioner alleges his father suffered unspecified mental disorders and obsessions and was sadistic. (*Id.;* Pet. Ex. 6 ¶¶ 4-10.)

Physical and Sexual Abuse

Petitioner points to evidence of multigenerational physical and sexual abuse. (Doc. No. 51-1 ¶¶ 501-508; Pet. Ex. 23 at SH001636-84, SH001713-16.) He observes cruel and sexual

43

abuse by his father, Donald Dickey.  (*Id.*, citing *Boyde*, 404 F.3d at 1176) (trial counsel's failure in death case to present evidence of physical abuse and family history of sexual abuse requires evidentiary hearing).)  He observes evidence of multigenerational forcible rape and incest including by his father whom he describes as a sexual predator.  (*See* Pet. Ex. 1 ¶¶ 4-7; Pet. Ex. 2 at 10-13, 21-23, 37, 40, 49, 58; Pet. Ex. 3 ¶ 12; Pet. Ex. 5 ¶¶ 5-6; Pet. Ex. 6 ¶¶ 4-5; Pet. Ex. 7 ¶¶ 7, 14; Pet. Ex. 8 ¶¶ 6-7.)  He points to evidence his father sexually molested and assaulted relatives and his own daughter.  (Pet. Ex. 2 at 49; Pet. Ex. 4 ¶ 5; Pet. Ex. 5 ¶¶ 5-6; Pet. Ex. 15 at 91; Pet. Ex. 23 at SH000747-49, SH04459-61.)  He notes his father's 1979 conviction of molesting his daughter Melissa.  (Pet. Ex. 23 at SH002709.)  He points to evidence his father enlisted him and his brothers in the molestation of his sister Melissa.  (*See* Pet. Ex. 5 ¶ 5.)

He points to evidence he and his cousins and possibly others became sexually active with each other during their youth.  (Pet. Ex. 2 at 22-24, 49, 56-60.)

He points to evidence his father and mother physically abused each other as well as Petitioner and his siblings.  (*See* Pet. Ex. 1 ¶ 4; Pet. Ex. 2 at 10-11, 22-26, 46-49, 59, 91, 98; Pet. Ex. 4 ¶¶ 8, 10, 19; Pet. Ex. 5 ¶¶ 5-6; Pet. Ex. 7 ¶¶ 8-9, 19; Pet. Ex. 8 ¶ 4; Pet. Ex. 15 ¶ 7; Pet.  Ex. 17 ¶¶ 5-7.)

He points to evidence his mother had sex with another man in front of her children including Petitioner.  (Pet. Ex. 15 ¶ 7.)

He points to his own act of necrophilia at age seventeen which included sexual contact with the corpse of a seven-year-old girl he took from a Reno, Nevada mortuary, for which he received an adult conviction of second-degree burglary.  (Pet. Ex. 2, at 26-27.)

<u>Poverty and Neglect</u>

Petitioner, born in 1964 in Tulare County, California, is one of four children of Linda and Donald Dickey.  (Pet. Ex. 23 at SH002709.)  His parents divorced in 1979.  (*Id.*)

Petitioner points his Dust Bowl heritage and history of multigenerational poverty.  (Pet. Ex. 2 at 23; *id.* at SH003282.)

Petitioner points to evidence that as a child he and his siblings experienced extreme poverty and neglect.  (Pet. Ex. 2 at 6-7, 17-18, 29-38; Pet. Ex. 4 ¶¶ 14-16; Pet. Ex. 5 ¶¶ 14-16; Pet. Ex. 15 ¶ 7; Pet. Ex. 16 ¶ 2; Pet. Ex. 17 ¶ 10; Pet. Ex. 18 ¶ 3.)  He and his siblings went to grade school in tattered clothes, dirty and covered in bruises; the school provided food and clothes to him and his family.  (Doc. No. 51-1, ¶ 478, citing Pet. Ex. 16  ¶ 2.)

Petitioner and his siblings were teased about such things and viewed as the trash of the town (*id.*, ¶ 479, citing Pet. Ex. 17 ¶ 10), and as outsiders (*id.*, ¶ 480, citing Pet. Ex. 18 ¶ 3).  His family was socially isolated, disliked, and deprived.  (*Id.*, ¶ 481-82, citing Pet. Ex. 4 ¶¶ 14-16; Pet. Ex. 5 ¶¶ 14-16; Pet. Ex. 2 at 141.)

In 1971, Petitioner and his siblings were subject of a petition for juvenile dependency due to parental neglect.  (Pet. Ex. 23 at SH000002-10.)  This even though it was noted therein the children did not appear malnourished, neglected or abused.  (*Id.*)  Petitioner suggests conditions for him did not improve during times he was in institutional care as a youth and adolescent.  (Doc. No. 51-1, ¶ 477.)

Petitioner points to his parents' 1979 divorce as evidence of parental dysfunction and disinterest, as a result of which he was placed in the custody of his paternal grandparents.  (Pet. Ex. 23 at SH001283.)

Criminal Activity and Domestic Violence

Petitioner points to his family's criminal history including his father's repeated arrests and absences from the home while in jail.  (Pet. Ex. 2 at 8, 25, 34; Pet. Ex. 15 ¶ 7; Pet. Ex. 23 at SH003423-26.)

Petitioner points to evidence of multigenerational domestic violence.  (Doc. No. 51-1 ¶ 498; *see also* Pet. Ex. 3 ¶ 2.)  He points to the noted violence within his family and that his father beat his mother in front of Petitioner and his siblings and demanded she have sex with other men while he watched (Pet. Ex. 23 at SH001260); and that his mother beat him and his siblings.  (Doc. No. 51-1 ¶ 500; *see also* Pet. Ex. 1 ¶¶ 18-22.)

Substance Abuse

Petitioner points to evidence of multigenerational alcohol abuse.  (Pet. Ex. 2 at 30, 33.) He points to evidence of alcoholism and drug abuse within his immediate family.  (Doc. No. 51-1, ¶ 490; Pet. Ex. 2 at 8, 13; *see also* Pet. Ex. 3 ¶¶ 3, 5, 13, 18.)  He points to his predisposition for these conditions.  (Doc. No. 51-1, ¶ 550, citing Pet. Ex. 2 at 152-53.)

Particularly, he observes his father and mother used drugs and drank alcohol (Doc. No. 51-1, ¶¶ 491, 496, citing Pet. Ex. 3 ¶¶ 13-14); Pet. Ex. 4 ¶ 18; Pet. Ex. 8 ¶ 9) and that his mother and aunt were drug dealers (Doc. No. 51-1, ¶¶ 492-93;  Pet. Ex. 1 ¶¶ 13, 15, 17; Pet. Ex. 2 at 24, 55; Pet. Ex. 4 ¶ 18.).

Petitioner suggests his predisposition to substance addiction manifested during his youth and that he continued substance abuse to the time of the capital crime.  (Doc. No. 51-1 ¶¶ 549-551; *see also* Pet. Ex. 2 at 152-53.)  He points to evidence he and his siblings used drugs and alcohol while growing up.  (Doc. No. 51-1, ¶¶ 496-97, citing Pet. Ex. 5 ¶¶ 11, 16; *see also* Pet. Ex. 2 at 78-79; Pet. Ex. 8 ¶¶ 9, 17.)  Particularly, he points to his use of alcohol and marijuana at age 14, progressing to use of LSD by age 16 and cocaine by age 22.  (Doc. No. 51-1, ¶¶ 524-526; *see also* Pet. Ex. 2 at 33, 47-48; *People v. Lanphear II*, 36 Cal. 3d 163, 168-169 (1984) (alcohol and drug use constitute mitigating evidence).  He suggests such substance abuse exacerbated his alleged brain and mental impairments.  (Doc. No. 51-1 ¶¶ 524-529; Pet. Ex. 2 at 29.)

Organic Brain and Mental Impairments

Petitioner argues his habeas mental health experts found evidence of frontal and left lobe damage to his brain as well as mental impairments affecting his overall cognitive and neurological functioning.  (Doc. No. 51-1 ¶ 450.)  Noting his adverse childhood experiences and psychosocial stressors (*see* Pet. Ex. 2 at 181-87), he claims attention deficit and hyperactivity disorder ("ADHD") and a complicated and severe form of Post-Traumatic Stress Disorder ("PTSD").  (*Id.*)

Petitioner supports the argument by pointing to evidence of depression, severe physical and sexual trauma, alcohol and substance abuse, and nervous tic disorders developed during

childhood.  (Doc. No. 51-1 ¶¶ 542-547; Pet. Ex. 2 at 27-30, 45, 50-51, 152-53; *see id.*, Ex. H at 3-25; Pet. Ex. 19 ¶¶ 450, 509-516; Doc. No. 142 at 33, citing Pet. Ex. 4 ¶ 11.)  He contends his mother described him as a "disruptive and rebellious youngster that was causing control problems both in the home and school setting."  (Pet. Ex. 23 at SH002333.)  He points to evidence that he struggled academically in high school, but graduated in 1983 placing 182 out of 291 students, with an ending high school GPA of 2.37.  (Pet. Ex. 23 at SH002270, SH002344.)

Petitioner observes the findings of his noted habeas experts, neuropsychologist Dr. Natasha Khazanov who evaluated him in 2005, and psychologist Dr. Barbara Counter who evaluated him in 2007.

Dr. Khazanov measured Petitioner's full-scale IQ at 109, but with some impairment in memory, concentration and reading.  (Pet. Ex. 2 at Ex. H at 4-6.)

Dr. Khazanov found that Petitioner demonstrated multiple indicia of brain damage and impairment particularly in the frontal lobe suggesting impulse control and aggression issues. (Doc. No. 142 at 106; *see also* Pet. Ex. 2 at 19-20, 31, 220-21; Pet. Ex. 2 at Ex. H at 7, 23-25.) Dr. Khazanov opined that Petitioner suffered serious organic brain damage and underlying mental impairments that left him unable to respond rationally to situations facing him, especially so when combined with substance abuse.  (Pet. Ex. 2 at Ex. H at 23.)

Particularly, Dr. Khazanov reported:

> [P]ossible cognitive, psychiatric and behavioral deficits which could significantly affect [Petitioner's] capacity to accurately perceive, store, retain, and relate critical information.  The deficits suggested in these records (primarily affecting the frontal lobes), especially in combination with other conditions or impairments, would most likely render [Petitioner] severely impaired in many areas of functioning.

(Pet. Ex. 2 at Ex. H at 2.)

Dr. Khazanov opined that at the time of the capital crime, Petitioner suffered "from the cumulative effects of longstanding brain damage, childhood trauma, depression, chronic

1  substance abuse and dependence and post traumatic stress disorder.  (*Id.* at 24.)  She opined

2  that a competent neuropsychologist could have and should have presented such evidence as

3  part of the mitigating factors identified in [Penal Code section] 190.3."  (*Id.* at 25.)

4       Dr. Khazanov averred that decompensation from organic brain damage and mental

5  illnesses "contributed directly to [Petitioner's] incompetency to proceed at the penalty phase

6  of the trial [and that Petitioner] was unable to assist his counsel in a rational manner in the

7  presentation and defense of the penalty phase of the trial" (*id.*),  including as to the breakdown

8  in communication with Schultz and the waiver the presence in the courtroom (*id.*).

9       Finally, Dr. Khazanov faulted defense trial experts Drs. Hackett and Thompson for

10  failing to address the possibility of neuropsychological deficits despite the presence of risk

11  factors and motor tic symptoms noted in the habeas psychosocial history proffer.  (Pet. Ex. 2 at

12  Ex. H at 9-12.)  She discounted their opinions as uninformed by accurate data of Petitioner's

13  emotional, cognitive and behavioral limitations, which she suggests implicates the possibility

14  of organic brain damage.  (*Id.* at 10.)

15       Dr. Counter prepared a psychosocial history based upon her 2007 examination of

16  Petitioner.  (Pet. Ex. 2.)  Therein, Dr. Counter detailed Petitioner's near life-long symptoms of

17  organic brain damage and dysfunction noted by Dr. Khazanov.  (Doc. No. 51-1 ¶ 514; Pet. Ex.

18  2 at 26.)  These symptoms included Petitioner's obvious motor tic disorder which presented as

19  nervous facial twitches, rapid blinking, sniffing, repeated lip licking, snorting and "Ah"

20  sounds, as well as other odd, self-stimulatory behaviors, and possibly related adolescent

21  ADHD (Pet. Ex. 2 at 5, 9, 27-32) and PTSD (*id.*, at 208).  Relatedly, Dr. Counter noted

22  evidence that during his teens, Petitioner was described as anxious and jittery, moving

23  continuously.  (*Id.*, at 31; *see also* Pet. Ex. 2 at 211-14.)  The record includes habeas

24  declarations from family members and acquaintances who observed Petitioner's nervous tic.

25  (*See* Pet. Ex. 4 ¶ 11; Pet. Ex. 8 ¶ 12; Pet. Ex. 16 ¶ 5.)

26       Dr. Counter included in her social history the above opinions of Dr. Khazanov.  (Pet.

27  Ex. 2 and Ex. H thereto.)

28

Dr. Counter also included reference to Petitioner's 1981 examination by court appointed psychiatrist, Dr. William Terry, during proceedings in Nevada on the burglary charge. (Pet. Ex. 2 at 87-89.) Dr. Terry felt Petitioner was in need of some kind of psychiatric attention. (Pet. Ex. 23 at SH000191.) Dr. Terry concluded that Petitioner's previous history was "compatible with a diagnosis of attention deficit disorder with hyperactivity and a continual depressive state which is often found in adolescents who previously have met the criteria for being hyperactive[.]" (Pet. Ex. 2 at 89; Pet. Ex. 23 SH002284.)

Criminal and Institutional History

Petitioner suggests mitigation value from noted evidence of: (i) his juvenile adjudication relating to the multi-year molestation of his younger sister, (Pet. Ex. 23 at SH000013-85), and (ii) his adult conviction for theft and sexual abuse of the corpse of a seven-year-old girl (Pet. Ex. 23 SH000086-00543). (*See* Doc. No. 51-1 ¶¶ 443-444.)

Incarceration and Attempts to Reform

Petitioner argues mitigating aspects of his incarceration in Nevada and California pending the capital trial. As to the former, he points to evidence of the harsh effects of imprisonment. (Pet. Ex. 2 at 172-79.) As to the latter, he points to evidence of his detoxification from cocaine and religious conversion while in jail awaiting trial, including work with a pastor at the jail. (Doc. No. 51-1 ¶ 530; *see also* Pet. Ex. 2 at 5, 23, 34.)

(3) **Petitioner Has Not Shown Prejudice**

Petitioner argues prejudice from Schultz's alleged deficiencies because the jury would have seen from his unpresented proffered evidence the mitigating effects of his extreme mental or emotional disturbance and impairment by mental disease, defect and intoxication. (*See* Doc. No. 142 at 125-26, citing Penal Code section 190.2(d), (h), (k); *see also* RT 5135-36; Pet. Ex. 2 at 19.) He argues that jury would have seen that he was depressed and had thoughts of hurting himself on the day of his act of necrophilia. (*See* Pet. Ex. 2 at 28.)

Petitioner supports these arguments by pointing out that even without presentation of mitigating evidence, the jury found the sentencing determination to be a close call. The jury

deliberated five hours over two days during the course of which they submitted questions to the trial court and had testimony re-read. (CT 477-480.) He suggests this shows and that "at least one juror would have struck a different balance between life and death" had the mitigating proffer evidence been presented. (Doc. No. 142 at 131, citing *Wiggins*, 539 U.S. at 537.)

However, the state supreme court reasonably could find the totality of the mitigation evidence to be insubstantial and outweighed by the aggravating and rebuttal evidence in the record, such that there does not remain a reasonable probability of a different outcome. (Doc. No. 142 at 131, citing *Porter*, 558 U.S. at 44 (quoting *Strickland,* 466 U.S. at 693–94); *see also Apelt*, 878 F.3d at 815-16 (denying habeas relief even though trial counsel failed to uncover mitigating evidence that the defendant grew up very poor, had an alcoholic and violent father who beat his children with an iron rod, was raped twice as a child, and suffered from mental illness); *Cain v. Chappell*, 870 F.3d 1003, 1021 (9th Cir. 2017) (denying habeas relief despite new mitigating evidence that the defendant was severely beaten and punished by his stepmother, had an untreated childhood head injury, and had learning disabilities).

Only when "the likelihood of a different result [is] substantial, not just conceivable," has the petitioner met *Strickland's* demand that defense errors were "so serious as to deprive [him] of a fair trial." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 687). The state supreme court reasonably could find Petitioner did not carry this burden, as follows.

Aggravating and Rebuttal Evidence was Substantial

The circumstances surrounding Petitioner's participation the capital crimes, that he aided and abetted the killings with an intent to kill, suggest substantial aggravating weight. (*See* Doc. No. 135.) As this Court previously observed:

> Buchanan testified that on the night of the murders he overheard RC and petitioner whispering about going to get money from some place, a task for which they armed themselves even though the victims were old and infirmed. (RT 4138-42, 4239-42, 4662-63, 4733.) At that time neither RC nor petitioner had any money. (RT 4348-52.) Goldman and Buchanan observed RC and petitioner preparing for the crimes. Goldman (RT 4534) and Buchanan (RT 4663-65) saw petitioner take the venetian blind from the closet to the bedroom where RC was waiting (RT 4534, 4663-65); petitioner returned the blind to the closet after the cord was removed. (RT 4534-37, 4666.) Petitioner's fingerprint

50

was found on the blind from which cord used in the crimes was removed. (RT 4573.)

Buchanan saw a knife on the bed in the bedroom just before RC and petitioner left the apartment. (RT 4706-07.) Buchanan saw RC and petitioner leave the apartment together that night. (RT 4674-75.) Goldman identified a knife at the murder scene as identical to one in the apartment kitchen; (RT 4396-97); she had seen petitioner looking through the kitchen drawer where the knife was kept. (RT 4343-44.) Both Buchanan and Goldman testified that petitioner and RC returned to the apartment together about two hours later (RT 4337-49, 4662-76), with $700 they did not have earlier that evening (RT 4361, 4675-76), and spent some of this money on drugs. (RT 4348, 4352, 4675-77.) Buchanan testified that while driving RC to the Easy 8 Motel hours after the crimes, petitioner disposed of clothing, apparently evidence from the murders. (RT 4684-85.)

Furthermore, Buchanan (RT 4980) and Goldman (RT 4357-62) testified to petitioner's admission that he participated in the crimes with RC.

[…]


A reasonable juror could have concluded weapons were unnecessary in the absence of intent to kill. Victim Caton was in her seventies; victim Freiri was partially paralyzed, wore a leg brace and used a cane to get around. (RT 4138-42, 4239-42.) Both victims presumably knew the perpetrators and could have identified them to the authorities. During the crimes, RC assaulted Mr. Freiri leaving him apparently dead (RT 4691) and then "went berserk" and assaulted Ms. Caton. (RT 4360-61.)

The evidentiary record otherwise could reasonably support a plan to kill the victims. The murders appear callous and brutal and were committed with the cord and knife brought to the crime scene by petitioner and RC. (*See e.g.*, SSHCP, Ex.'s 9-11.) The lack of proximity between the victims could reasonably suggest some significant amount of time and cooperation between perpetrators was involved. There is no suggestion in the record that petitioner tried to intervene in the assaults or aid the victims; for example Goldman testified that petitioner did nothing as RC assaulted his grandmother. (RT 4359-61.)

Additionally, the record suggests that RC may have been in contact with petitioner after RC left the Harvard Avenue apartment following the crimes; possibly suggesting the two were involved in the murders. (RT 4841-43.) After the crimes, petitioner was initially emotional and depressed about his confessed involvement, but petitioner's mood improved when he learned all of the victims and RC were dead. (RT 4378.) Even so, petitioner apparently threatened Goldman should she reveal his admitted role in the crimes. (RT 4375-77, 4616.)

(Doc. No. 135 at 197-99 [regarding guilt claim XXVI].)

The noted character rebuttal evidence that Petitioner molested his younger sister over a

period of years and engaged in sexual activity with the corpse of a young girl reasonably

suggests substantial aggravating weight, as Petitioner and Schultz both recognized. (*See* Pet. Ex. 12 ¶ 13; Pet. Ex. 23 at SH002091-94.) Moreover, the habeas proffer includes evidence Petitioner threatened his little sister Melissa, whom he molested for a number of years, with violence if she refused intercourse with him. (Pet. Ex. 2 at 65.)

<u>Total Mitigating Evidence was Insubstantial</u>

Schultz argued lingering doubt to the penalty phase jury based on guilt phase defenses raised and rejected. (See Doc. No. 135.) The state supreme court reasonably could find minimal mitigating value in the lingering doubt defense.

The social history proffer provides context to Petitioner's difficult circumstances at the time of the crime, but these circumstances were largely known to the jury. The jury heard evidence that Petitioner was unemployed and lacked funds and regularly used drugs around the time of the capital crime. Petitioner testified at the guilt phase to his use of cocaine during the summer of 1988. (RT 4901-07; *see also* Pet. Ex. 2 at 29.) The jury was also aware of testimony that no one in the Harvard Avenue apartment had money to buy drugs at the time of the crime; that the crime was committed to get money to buy drugs. (*See* RT 4675-76; CT 19-24; *see also* RT February 21, 1992 at 19-20; *see* Doc. No. 135 at 90; RT 4875.)

The social history proffer also is equivocal. Noted evidence of Petitioner's abused and dysfunctional upbringing appears countered by his mother's proposed testimony that he "had no physical problems at birth . . . was a healthy child while growing up and did not suffer any unusual diseases or medical problems." (Pet. Ex. 15 ¶ 7.) Petitioner's claimed efforts are reform appear diminished by evidence he showed no remorse for the capital crimes. (*See e.g.*, RT 5488.)

The mental state proffer appears subject to discount and lacks mitigating weight. This Court, in its order denying guilt phase claims, observed that:

> In 2005, defense habeas expert, clinical psychologist Dr. Natasha Khazanov examined petitioner over two days looking for brain damage and cognitive impairment. (SSHCP, Ex. 2 at 265.) Dr. Khazanov determined that petitioner had an IQ in the average range and exhibited multiple indicia of serious organic brain damage and impairment exacerbated by substance abuse disorder,

affecting his ability to plan and rationally respond to his environment and function in everyday life (*id.* at 287-89). Dr. Khazanov suggests the damage to petitioner's brain was present at the time of his trial as was the need for a neurological assessment. (*Id.*) She suggests the neurological evidence would have been mitigating at petitioner's penalty phase. (*Id.*)

Dr. Khazanov faults trial experts, Drs. Hackett and Thompson for not addressing the possibility of neuropsychological defenses including frontal lobe deficits. (*Id.* at 273-74.) Especially so given then existing multiple risk factors of brain damage including childhood trauma and post-traumatic stress disorder ("PTSD"), hyperactivity and probable attention deficient and hyperactivity disorder ("ADHD"), chronic motor tic disorder, a predisposition to polysubstance abuse, depression, and related clinical symptoms in petitioner's social history. (*Id.* at 265-89.) She stated that these mental conditions impaired petitioner's ability to perceive, plan and make decisions and control impulses. (*Id.*)

In 2007, defense habeas expert, Dr. Barbara Counter, a clinical and forensic psychologist, reviewed petitioner's social history documents and interviewed him in prison for about 8 hours. She provided habeas counsel with a psychosocial history that found indicia of childhood ADHD, chronic motor tic disorder, depression, and post-traumatic stress disorder. (*See* SSHCP, Ex. 2 at 27-28.) Dr. Counter's report chronicles petitioner's family history of mental illness, abuse (drug, alcohol, physical and sexual), domestic violence and crime. (*Id.* at 14-20.) She notes petitioner's prior felony conviction in Nevada involving apparent necrophilia during the course of which petitioner received a psychiatric evaluation by Dr. William Terry, who found petitioner's history to be compatible with a diagnosis of ADHD and depression (*id.* at 23-24, 94-98) and recommended psychiatric treatment of petitioner's difficulties relating to other people.

However, the state supreme court reasonably could have found the habeas proffer insufficient to suggest Schultz was prejudicially deficient in investigating and presenting social and mental state history and defense information. The record could reasonably suggest that petitioner then functioned at a level inconsistent with a significant mental state deficit or impairment. Petitioner graduated from high school in June of 1983 (*id.* at 102), approximately 5 years prior to the instant crimes. Later, while incarcerated in Nevada for the noted prior felony, he received certificates for education courses taken while in prison. (*Id.* at 108.) Several months before the instant crimes, he graduated from truck driving school at the top of his class. (*Id.* at 110.) Petitioner worked as a roofer and at an auto parts store just prior to his arrest for the instant crimes. (*Id.* at 112.)

Notably, the habeas experts examined petitioner 17 or more years after the instant crimes. The state supreme court reasonably could have found the habeas experts' conclusions as to petitioner's mental state at the time of the crime to be speculative. Especially so given the contrary conclusions reached by experts examining petitioner more proximal to his trial. In this regard, the state supreme court presumptively considered a 1992 examination of petitioner by prison psychologist M. Lyons, who found "no signs or symptoms of psychosis, organicity or serious psychological impairment in social functioning." (*Id.* at 135.) Around that time petitioner also was examined by prison psychiatrist Dr. John Geiger, who also found "no mental disorder ... or condition of functioning

which would indicate additional psychiatric concern." (*Id.* at 136.)

Petitioner does not demonstrate that any of the defense mental health professionals who evaluated petitioner prior to trial requested or required then existing information that was not provided to them by the defense team. Furthermore, the state supreme court reasonably could have rejected petitioner's argument that Schultz was or should have been on notice of the need to further investigate petitioner's mental state defenses. Petitioner bases this argument on his habeas experts' suggestion that the need for such further investigation would have been evident to mental health professionals at the time of trial. But disagreement among experts is not alone a basis to find Schultz deficient. *See e.g., Toler v. Troutt*, 2015 WL 1408490, at *9 (W.D. Okla., Feb. 20, 2015) (medical difference of opinion not actionable under the Eighth Amendment).

Additionally, the state supreme court could reasonably have found that the primary defense theory, that petitioner was not present during or involved in the crimes, would not have been advanced by further investigation and consideration of matters relating to petitioner's social and mental history. (*See* claim XXVI, XXVIII.) Petitioner has not otherwise shown facts and circumstances surrounding the crimes reasonably placed Schultz on notice of any need for further social history and mental state defense investigation.

Accordingly, a fair-minded jurist could have found that petitioner failed to overcome the strong presumption that Schultz made decisions relating to investigation and presentation of petitioner's social history and mental state in the exercise of professional judgment. *Strickland*, 466 U.S. at 690; *see also United States v. Farr*, 297 F.3d 651, 658 (7th Cir. 2002) (counsel "is not obligated to ... personally investigate every conceivable lead"); *Morris v. State of California*, 966 F.2d 448, 456 (9th Cir. 1991) (a defendant seeking to prove ineffective assistance of counsel "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy). "The mere criticism of trial tactics is insufficient to establish ineffectiveness or prejudice." *Ferreira-Alameda*, 815 F.2d at 1254. Here, counsel's noted primary defense theory could be seen as reasonably furthered by the guilt phase investigation and presentation.
(Doc. No. 135 at 47-48.)

(Doc. No. 135 at 46-48; *see also* Pet. Ex 2 at 19-27, 77-79, 201-02.)

Petitioner, in arguing the penalty phase claims has not demonstrated otherwise. *See Boyde*, 404 F.3d at 1168-69 (holding that if new mental health evidence, obtained after the trial, were sufficient to establish a petitioner's innocence, the petitioner could "always provide a showing of factual innocence by hiring psychiatric experts who would reach a favorable conclusion.").

Defense expert evaluation of Petitioner at the time of the new trial motion is in material part consistent with the opinions of the defense trial experts (*see e.g.,* Doc. No. 135 at 45) and Petitioner's demeanor at trial. Counsel on the motion for new trial, Ms. Hart, retained

psychiatrist Dr. Callahan to examine Petitioner with a view toward evidence that might have been presented in mitigation at the penalty phase in support of sentencing factor "k". (RT 5463.)

Dr. Callahan examined Petitioner during the summer of 1991, several months after the jury's death verdict. (RT 5461.) Dr. Callahan found mitigating evidence in the form of Petitioner's chaotic upbringing by unstable, abusive parents who engaged in degenerate and criminal behavior (RT 5471); a home life where Petitioner was surrounded by and engaged in sexual psychopathy (RT 5475-78); and Petitioner's history of alcohol and substance abuse (RT 5478). Dr. Callahan found Petitioner's act of necrophilia demonstrative of "significant psychopathology." (RT 5481.)

Even so, Dr. Callahan found no evidence Petitioner suffered from a thought disorder. (RT 5486.) He found no mental disease of defect other than Petitioner's sexual preoccupations. (*Id.*) He found Petitioner with only a passive inadequate personality. (RT 5483.) He found Petitioner not to show remorse for the capital crime, but rather to deny involvement in the crime. (RT 5488.)

The state supreme court reasonably could discount the habeas proffered evidence that Petitioner was mentally impaired or altered by substance abuse at the time of the crimes. Petitioner has not pointed to evidence of such in the trial record. *See Martinez v. Ryan*, 926 F. 3d 1215, 1234 (9th Cir. 2019) ("a sentencing court may not treat mitigating evidence of a defendant's background or character as irrelevant or non-mitigating as a matter of law just because it lacks a causal connection to the crime [citations]. The sentencer may, however, consider causal nexus ... as a factor in determining the weight or significance of mitigating evidence."); *see also Hedlund v. Ryan*, 854 F.3d 557, 587 n.23 (9th Cir. 2017) (stating that, under *Eddings*, "a court is free to assign less weight to mitigating factors that did not influence a defendant's conduct at the time of the crime").

It follows that the state supreme court reasonably could find Petitioner's proffer to be only minimally probative of mitigating circumstances that he may have acted under extreme

mental or emotional disturbance, or was impaired by mental disease or defect, or presents a sympathetic character.  The jury was instructed in these regards and considered the prosecutor's argument at closing which noted the absence of such evidence.   (Doc. No. 51-1, n.37, n.38, citing RT 5135-36.)

The California Supreme Court has acknowledged Supreme Court authority that the "high requirement of reliability" required in capital sentencing "is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of the penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present. A judgment of death entered in conformity with these rigorous standards does not violate the Eighth Amendment reliability requirements." *People v. Bloom*, 48 Cal. 3d 1194, 1228 (1989).

Accordingly, the state supreme court reasonably could find the aggravating circumstances of the capital crime and special circumstances found true and the noted rebuttal evidence substantially outweigh the totality of the mitigating evidence.  Especially so given the primary defense theory that Petitioner played a passive aider and abettor role in a crime meant to gain money for drugs, the lingering doubt value of which might be discounted by a mitigation defense that included details of his prior criminal acts and a *post hac* mental state defense.

### iii.    Conclusions

A fair-minded jurist could find that Petitioner failed to establish counsel's performance fell below an objective standard of reasonableness and that absent counsel's alleged deficiencies, there remains a reasonable probability of a different outcome.  *Strickland*, 466 U.S. at 694.

The California Supreme Court's rejection of these claims on the merits was neither contrary to, nor an unreasonable application of *Strickland*, nor based upon an unreasonable

56

determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claims III(C-E) shall be denied.

3.      Claim II(I)

Petitioner alleges counsel Schultz was ineffective by failing to disclose the complete breakdown of the attorney-client relationship, declare an irreconcilable conflict, request a hearing pursuant to *People v. Marsden*, 2 Cal. 3d. 118 (1970), and move to withdraw, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 51-1 ¶¶ 208-214, 342-64.)

a.      **Supplemental Legal Standards**

It is clearly established that the right to the assistance of counsel, as guaranteed by the Sixth Amendment of the United States Constitution entitles a defendant to representation that is free from conflicts. *Wood v. Georgia*, 450 U.S. 261, 271 (1981).

A breakdown in the attorney-client relationship can result in a denial of the right to effective assistance of counsel. *Frazer v. United States*, 18 F.3d 778, 782-83, 785 (9th Cir. 1994); *see also Brown v. Craven*, 424 F.2d 1166, 1169-70 (9th Cir. 1970) (trial court's failure to conduct inquiry into irreconcilable conflict arising from the client's refusal to communicate or cooperate with counsel resulted in denial of effective assistance of counsel); *Schell v. Witek*, 218 F.3d 1017, 1025, (9th Cir. 2000) (citing *Smith v. Lockhart,* 923 F.2d 1314, 1320 (8th Cir. 1991)) (the overarching constitutional question is whether the attorney-client conflict has become so great that "[i]t resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment.").

In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). The Supreme Court has defined an "actual conflict" by the effect a potential conflict had on counsel's performance.

*Houston v. Schomig*, 533 F.3d 1076, 1081 (9th Cir. 2008) (citing *Mickens v. Taylor,* 535 U.S. 162, 171 (2002)).

Prejudice may be presumed in cases where a "serious conflict" between defendant and counsel gives rise to constructive denial of counsel. *Perry v. Leeke*, 488 U.S. 272, 278-79 (1989); *see also Schell*, 218 F.3d 1027 ("In the event that the trial court determines that a serious conflict did exist that resulted in the constructive denial of assistance of counsel, no further showing of prejudice is required; and *Schell's* trial shall be presumed to have been unfair."); *see also Strickland,* 466 U.S. at 692 ("Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.").

A lawyer's violation of ethical norms does not make the lawyer per se ineffective. *Burt v. Titlow*, 571 U.S. 12, 18 (2013).

**b.      State Court Direct and Collateral Review**

Petitioner presented claim II and all its subclaims in the second state exhaustion petition (*see* Lod. Doc. No. 30 at 105-99) and it was summarily denied on the merits (Lod. Doc. No. 31, Order Denying Cal. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

Relatedly, Petitioner's claim the trial court erred by not holding a *Marsden* hearing was considered and denied on the merits on direct appeal. *Dickey*, 35 Cal. 4th at 917-22.

**c.      Analysis**

*i.      Deficient Performance*

Petitioner argues Schultz was deficient by failing to disclose to the trial court that a post-guilt phase breakdown in his relationship with Petitioner was so serious that it prevented effective assistance of counsel, and by failing to withdraw as counsel. Petitioner supports the argument by observing that he was dissatisfied with Schultz's incompetent performance at the guilt phase and that following the guilt phase verdict there was a complete breakdown of the attorney-client relationship resulting in no communication between the two. (Doc. No. 51-1 ¶¶ 343-345.)

Petitioner argues these impediments, combined with Schultz's lack of preparation for

58

the penalty phase resulted in constructive denial of assistance of counsel at the penalty phase.[7]

*See Daniels*, 428 F.3d at 1201 (irreconcilable conflict found where distrust resulted in complete

breakdown in communication between counsel and client).

Petitioner argues the irreconcilable conflict was apparent in: (i) Schultz's actions at an

*in limine* hearing just prior to the penalty trial, where Schultz incorrectly characterized

Petitioner's *Marsden* request as a matter to be raised in a subsequent new trial motion; (ii)

Schultz's failure to advise Petitioner on the latter's request not to be personally present at the

penalty trial; and (iii) Schultz's failure to present any mitigating evidence at the penalty trial.

(Doc. No. 51-1 ¶ 346; *see also* RT 5045-49; Pet. Ex. 12 ¶ 12.)

The California Supreme Court on direct appeal denied claimed *Marsden* error by the

trial court, stating that:

> In [*People v.*] *Marsden* [(1970) 2 Cal. 3d 118], we said: [A] judge who denies a
> motion for substitution of attorneys solely on the basis of his courtroom
> observations, despite a defendant's offer to relate specific instances of
> misconduct, abuses the exercise of his discretion to determine the competency
> of the attorney. A judicial decision made without giving a party an opportunity
> to present argument or evidence in support of his contention is lacking in all the
> attributes of a judicial determination. (*Spector v. Superior Court* (1961) 55 Cal.
> 2d 839, 843 [13 Cal.Rptr. 189, 361 P.2d 909].) (*Marsden, supra,* 2 Cal. 3d at p.
> 124 [84 Cal.Rptr. 156, 465 P.2d 44].)" (*People v. Jones* (2003) 29 Cal. 4th
> 1229, 1244, 131 Cal.Rptr.2d 468, 64 P.3d 762.)
>
> A defendant is entitled to have appointed counsel discharged upon a showing
> that counsel is not providing adequate representation or that counsel and
> defendant have become embroiled in such an irreconcilable conflict that
> ineffective representation is likely to result. (*People v. Earp* (1999) 20 Cal. 4th
> 826, 876 [85 Cal.Rptr.2d 857, 978 P.2d 15] (*Earp* ); *People v. Memro* (1995) 11
> Cal. 4th 786, 857 [47 Cal.Rptr.2d 219, 905 P.2d 1305] (*Memro* ).) (*People v.
> Jones, supra,* 29 Cal. 4th at pp. 1244–1245, 131 Cal.Rptr.2d 468, 64 P.3d 762.)
>
> Defendant contends that, following the guilt phase of the trial, he sought to
> make a motion for the appointment of different counsel to assist him in the
> penalty phase, and the court, without conducting the hearing required by
> *Marsden,* prejudicially erred by declining to rule on his motion until the penalty
> phase was concluded.
>
> The Attorney General responds that defendant was not making a motion for the
> appointment of substitute counsel to represent him in the penalty phase. Rather,
> the Attorney General contends, defendant moved for the appointment of

---

[7] Petitioner's claim Schultz's lack of preparation for the penalty phase denied him counsel fails for reasons stated above in claims III(C-E).

*separate* counsel for the purposes of preparing a *motion for a new trial* based on, among other grounds, incompetence of counsel during the guilt phase. Once the court ascertained that defendant was seeking the appointment of separate counsel to prepare a new trial motion, the Attorney General argues, the court properly declined to rule on it until the trial was over, at which time separate counsel for that purpose was appointed.

While the matter is not entirely free from doubt, doubt engendered largely by the court's confused and confusing references to *Marsden,* we agree with the Attorney General's characterization of defendant's motion.

Defendant's trial counsel, Marvin F. Schultz, clearly framed the matter as, not a motion for substitute counsel to represent defendant in the penalty phase, but rather as a motion for the appointment of separate counsel to represent defendant in the preparation of a motion for a new trial, which motion, counsel said, was likely to include, among other grounds, allegations \*\*\* that he acted incompetently in the guilt phase. The disagreements between defendant and himself, counsel said, regarded "trial tactic decisions that were made on witnesses who were called and not called and the way some things were presented." The idea for the appointment of separate counsel for this limited purpose, according to counsel, was his, not defendant's.[12]

--------------------------------------FOOTNOTE--------------------

n.12 "MR. SCHULTZ: I have explained to Mr. Dickey the ground—the types of things that could be presented to the Court as part of *a motion for a new trial* when the time is appropriate for that motion, and that there are some disagreements between Mr. Dickey and I as to some trial tactic decisions that were made on witnesses who were called and not called and the way some things in the case were presented.

In terms of including in *a motion for new trial* any issues of incompetency of counsel I advised Mr. Dickey that, obviously, I think my decisions were correct. And I understand why he would disagree with that. But in terms of being able to present that issue as *a motion for a new trial,* it was my advice to Mr. Dickey that the request should be made to the Court for an attorney to—a separate attorney to review the record, considering we do have an existing transcript that somebody can review at this point, and determine whether or not he can consult with that attorney on the issues that he disagreed with me on, to determine whether or not there was a legitimate basis or any basis for making *a motion for new trial* based on incompetence of counsel.

And I was concerned when Mr. Dickey presented the request to the Court that it would include conversations that we had discussing the trial tactics and witnesses and things might come up. And I thought it was—it's not really a pure *Marsden* hearing, but there are obviously disagreements as to tactics. And I think the only way that I can think of to resolve that issue was to have Mr. Dickey request of the Court that the transcripts be reviewed by a separate attorney to determine whether or not there's basis for the *motion for new trial* on the incompetency issue." (Italics added.)

-----------------------------------END FOOTNOTE-----------------

60

The court asked defense counsel when defendant wished the matter to be heard. Counsel responded, "Well, my understanding procedurally is that the motion for new trial would have to wait until after the penalty phase." The court replied, "That was my thinking."

The court then addressed defendant. It referred to *Marsden,* and it stated, incorrectly, that *Marsden* hearings are not to be conducted "in the middle of a trial." (Cf. *Memro, supra,* 11 Cal. 4th at p. 856, 47 Cal.Rptr.2d 219, 905 P.2d 1305 [the defendant made several *Marsden* motions, including one just before the penalty trial began].) However, the court added, "I'll hear whatever you have to say. I may have to tell you at the end of the statement that this is not the time to get into that, but I don't know until I hear you out."[13] The following colloquy ensued.

---------------------------------------FOOTNOTE--------------------

n.13 "THE COURT: Mr. Dickey, we don't constantly have *Marsden* hearings during the course of a trial. We normally will hear a *Marsden* motion preceding the trial if the issue arises. And the trial is had, and if there's a subsequent—not a *Marsden* motion—well, you could have a *Marsden* motion before sentencing if—once we get to that stage. But we don't do it in the middle of a trial. And we still are—we're not through with your case, we still have the second part, the penalty phase, to get out of the way, if we get to that. I've been advised there are some motions counsel want[s] to make before we get to the penalty phase. So I'll have to hear them out and determine whether or not this is a case where we are going to get to the penalty phase.

> "I'll hear whatever you have to say. I may have to tell you at the
> end of the statement that this is not the time to get into that, but I
> don't know until I hear you out."

-----------------------------------END FOOTNOTE------------------


"THE DEFENDANT: Well, if this is not the time then this is not the time.
"THE COURT: I can't tell. See, you apparently want to make some statements concerning what you believe to be—I don't know, unwise choice[s] on the part of Mr. Schultz concerning calling witnesses, questions asked of them. I don't know what you're getting to. That would be the sort of thing we'd want to hear after the trial is over with, and before sentencing.
"THE DEFENDANT: Yes, I'm not satisfied with the competency of my attorney. There are witnesses that are—that were available that [were] not called that I feel [were] crucial to my defense, and issues that were not raised that I feel [were] crucial, and questions that [were] not asked of me while I was on the stand that should have been raised.
"THE COURT: That sounds like the sort of thing that you'd want to raise after—before sentencing rather than at this time.
"THE DEFENDANT: Okay, I'll leave that to your discretion, you know.
"THE COURT: From what you've just stated, that seems like the sort of thing you'd want to discuss then.
"THE DEFENDANT: *There's other issues of motions for new trial other than that. But I don't believe this is the appropriate time.*

61

"THE COURT: Once we get to the end of the trial, a transcript will be provided to another attorney, to review the case and determine whether or not he feels there's grounds for new trial based on incompetency of counsel. We have to be through with the trial.
"THE DEFENDANT: Yes." (Italics added.)

The court did appoint separate counsel, Katherine Hart, to assist defendant in the preparation of a motion for a new trial. Ms. Hart's new trial motion, which was heard following the penalty phase of the trial, was based on the grounds, among others, that (1) defendant's trial counsel, Mr. Schultz, was ineffective in the guilt phase, and (2) the court erred in failing to conduct a *Marsden* hearing following the guilt phase.

The new trial motion was denied. As to defendant's *Marsden* claim, the court said, "I think at the time you were arguing this, that in my view there was a poor choice of words on the Court's part. I know Mr. Schultz let me know that it was not strictly a *Marsden* motion, and then I started to talking about a *Marsden* motion. And I do, of course, know the law, that you can have a *Marsden* motion at any stage of the proceedings. [¶] Mr. Dickey was not asking that the Court have that *Marsden* hearing. He, of course, was dissatisfied with the results after the jury returned the verdict of guilty and found the special circumstances to be true. [¶] So I do find that [the prosecutor] is absolutely correct, it was a poor choice of words on the Court's part, and there was no reason to have a *Marsden* hearing at the time. It was not asked for."

We conclude the court did not commit *Marsden* error. Although no formal motion is necessary, there must be "at least some clear indication by defendant that he wants a substitute attorney. (*People v. Mendoza* (2000) 24 Cal. 4th 130, 157 [99 Cal.Rptr.2d 485, 6 P.3d 150], quoting *People v. Lucky* (1988) 45 Cal. 3d 259, 281, fn. 8 [247 Cal.Rptr. 1, 753 P.2d 1052].) (*People v. Valdez* (2004) 32 Cal. 4th 73, 97, 8 Cal.Rptr.3d 271, 82 P.3d 296.) Defendant did *not* clearly indicate he wanted substitute counsel appointed for the penalty phase. To the extent he made his wishes known, he wanted to use counsel's assertedly incompetent performance in the guilt phase as one of the bases of a motion for new trial, and he wanted to have separate counsel appointed to represent him in the preparation of such a motion. As his expressed wishes were honored, he has no grounds for complaint now.[14]

---------------------------------------FOOTNOTE---------------------

n.14 Defendant contends his comments the following day, when he stated he did not wish to be present in the courtroom during the penalty phase, manifested an irreconcilable conflict with counsel. We disagree. Defendant's remarks suggested he had lost confidence, not in counsel, but in the jury. "I would just as soon that the defense not even say nothing, just rest. I don't intend to plead nothing to the jury. I'd just as soon sit in the cell. I have no intentions or desire to try to have any sympathy or pity from the jury that convicted me of these crimes. I don't intend to be present, neither; I don't wish to be."

-----------------------------------END FOOTNOTE-----------------

Moreover, it is clear a *Marsden* motion would have been baseless.

62

Again, in his colloquy with the court at the time he made the motion, defendant stated, "There are witnesses that are—that were available that [were] not called that I feel [were] crucial to my defense, and issues that were not raised that I feel [were] crucial, and questions that [were] not asked of me while I was on the stand that should have been raised."

The one point in Ms. Hart's new trial motion that appears relevant to these complaints is her claim that Mr. Schultz failed to accede to defendant's request that he present a defense of "third-party culpability," i.e., that Gene Buchanan was "the real perpetrator."[15] Buchanan disappeared right after the crime, and Buchanan's truck, which he owned with Gail Goldman, was abandoned. The truck was later located by the repossessor. After R.C. committed suicide, Buchanan reappeared. Buchanan's disappearance was unusual, because Buchanan had lived with Goldman for five years, and during the time defendant was residing with Goldman and Buchanan, Buchanan did not disappear for days at a time. Defendant's theory is that Buchanan was the real perpetrator, that Buchanan had the same motive to commit the killing as the prosecution imputed to defendant (that is, a motive to rob or steal to obtain money for drugs), that Buchanan disappeared right after the crime because he was guilty of the crime and wished to avoid detection, and reemerged once R.C.'s suicide was publicized.

---------------------------------------FOOTNOTE--------------------

n.15 Whether defendant was claiming Buchanan was the lone killer or Cullumber's accomplice is not clear from Ms. Hart's moving papers.


-----------------------------------END FOOTNOTE-----------------

In a preface to this portion of her written motion, Ms. Hart stated, "Defendant requests a separate hearing on this issue only if his motion for new trial on the basis of the actual record is denied. That is, there will be no need to conduct a separate, detailed hearing on the issue of whether his defense was appropriately presented if his motion for new trial is granted on other grounds. Also, at the time this motion was being prepared, defendant was still investigating facts supporting the claim of third-party culpability.... Defendant expects to present, at the hearing on third-party culpability, declarations and witnesses not available for submission at the time this motion was filed."

Ms. Hart was appointed on March 26, 1991. She filed the motion for new trial almost five months later, on August 16, 1991. The hearing on the motion was held five months after that, on January 17, 1992. At the hearing, the court stated it had been informed by Ms. Hart she was not abandoning the contention that Buchanan was the killer, but that she had nothing further to present to support the theory.

In denying the new trial motion, the court observed there did not appear to have been "sufficient evidence available to Mr. Schultz to present a credible theory that Mr. Buchanan would have been the person who went with RC that night and who was responsible for the killing. [¶] So I don't find that there was any error on Mr. Schultz's part in failing to present this theory, and that it was not ineffective assistance of counsel to fail to do that."

63

We do not find *Marsden* error where complaints of counsel's inadequacy involve tactical disagreements. (*People v. Cole* (2004) 33 Cal. 4th 1158, 1192, 17 Cal.Rptr.3d 532, 95 P.3d 811; *People v. Welch* (1999) 20 Cal. 4th 701, 728– 729, 85 Cal.Rptr.2d 203, 976 P.2d 754 (*Welch* ); *People v. Barnett* (1998) 17 Cal. 4th 1044, 1107, fn. 37, 74 Cal.Rptr.2d 121, 954 P.2d 384.) The conflict between defendant and counsel, over whether defendant's theory that Buchanan was the real killer should have been presented to the jury, was a tactical disagreement, and in the apparent absence of any evidence supporting the theory, a disagreement in which counsel seems to have taken the wiser view.

*Dickey*, 35 Cal. 4th 884, 917–22.

### (1) No Irreconcilable Conflict Necessitating Substitute Counsel

Petitioner argues Schultz failed to fully apprise the trial court that a complete breakdown in his relationship with Petitioner required substitute counsel. (Doc. No. 51-1, ¶ 356.)

Petitioner points to his belief Schultz was incompetent (RT 5045-48); his refusal to appear in court with Schultz as his attorney (RT 5100); and his waiver of personal presence at the penalty trial and refusal to use a personal presence waiver form because it was prepared by Schultz (RT 5114-15).

Petitioner argues the relationship breakdown was such that it was unlikely Schultz could provide effective representation at the penalty phase and that Schultz was obligated to withdraw. (Doc. No. 51-1 ¶¶ 359-62, citing California Rule of Professional Conduct 3-700 (C)(1)(d), (an attorney may withdraw from representing a client if the client "renders it unreasonably difficult for the member to carry out the employment effectively.").)

*Marsden* provides that the trial court has discretion to appoint substitute counsel if "the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." *People v. Smith,* 6 Cal. 4th 684, 696 (1993) (citing *People v. Marsden*, 2 Cal. 3d. 118 (1970)).

The state supreme court reasonably could find unpersuasive Petitioner's arguments in

64

1  support of an irreconcilable conflict, as follows.

2  <u>Petitioner Did Not Request Substitute Counsel under *Marsden*</u>

3  The state supreme court reasonably could find Petitioner did not make a *Marsden*

4  request to the trial court. Petitioner argues his irreconcilable conflict was apparent in Schultz's

5  mischaracterization of Petitioner's desire for substitute counsel as a mere disagreement over

6  guilt phase tactics, allowing Schultz to avoid a *Marsden* proceeding. (*See* Doc. No. 142 at 49,

7  citing *People v. Lucky*, 45 Cal. 3d 259, 281 (1988) ("The mere fact that there appears to be a

8  difference of opinion between a defendant and his attorney over trial tactics does not place a

9  court under a duty to hold a *Marsden* hearing.").

10  At the *in limine* hearing, Schultz told the trial court that "in terms of being able to

11  present [incompetency of counsel] as a motion for a new trial, it was my advice to [Petitioner]

12  that the request should be made to the court for an attorney to – a separate attorney to review

13  the record … to determine whether or not there is a legitimate basis or any basis for making a

14  motion for new trial based on incompetence of counsel." (RT 5045-46.)

15  Schultz explained he requested the in limine hearing because "[he] was concerned

16  [Petitioner would raise] conversations that we had discussing the trial tactics and witnesses and

17  things might come up. And I thought it was – it's not really a pure *Marsden* hearing, but there

18  are obvious disagreements as to tactics." (RT 5046.)

19  Schultz contends he advised Petitioner on the procedure for a post-penalty phase new

20  trial motion because he believed Petitioner meant to raise incompetency of counsel issues. (RT

21  5047.)

22  The trial court acknowledged that the matter raised by Schultz "may be in the form of a

23  *Marsden* motion" and that Schultz "wanted to have [Petitioner] to have a chance to tell the

24  court as to his feelings." (RT 5045.) The trial court left open the question whether Petitioner

25  might be seeking relief under *Marsden*. (RT 5047.)

26  The trial court then engaged Petitioner on the communication breakdown raised by

27  Schultz, telling Petitioner that: "I'll hear whatever you have to say. I might have to tell you at

28

the end of your statement that this is not the time to get into that, but I don't know until I hear you out." (RT 5047.)

Petitioner, during *in limine* colloquy agreed with the trial court that the issue he wanted to raise involved guilt phase trial tactics, stating that:

> [Y]es, I'm not satisfied with the competency of my attorney. There was witnesses that are – that were available that was not called that I feel was crucial to my defense, and issues that were not raised that I feel was crucial, and questions that was not asked of me while I was on the stand that should have been raised.
>
> […]
>
> [T]here's other issues of motions for new trial other than that. But I don't believe this is the appropriate time.

(RT 5048.)

The trial court considered the matter and concluded that what Petitioner wanted was substitute counsel on a new trial motion, stating that "[o]nce we get to the end of the trial, a transcript will be provided to another attorney, to review the case and determine whether or not he feels there's grounds for a new trial based on incompetency of counsel. We have to be through with the trial." (RT 5048-49.) Petitioner responded "[y]es."

The state supreme court reasonably could find the record to suggest that Petitioner took issue with Schultz's guilt phase decisions, rather than raising *Marsden* rights regarding Schultz's continued representation at the penalty phase. (*See* Doc. No. 142 at 51); *cf. Schell*, 218 F.3d at 1025 ("It is well established and clear that the Sixth Amendment requires on the record an appropriate inquiry into the grounds for such a [*Marsden*] motion, and that the matter be resolved on the merits before the case goes forward.").

Subsequently, on reaching the motion for new trial, the trial court conceded that it "used the wrong words" when telling Petitioner that "we don't conduct *Marsden* hearing in the middle of the trial." (RT 5533.) Yet the trial court went on to confirm its belief that it did not appear "[Petitioner] was really asking for a *Marsden* type hearing. (RT 5533); that although

66

1  that court "used the words *Marsden* hearing [ ] in truth it doesn't appear [ ] that he was asking

2  for a *Marsden* hearing."  (*Id.*)

3      The state supreme court found as a matter of state law "[w]e do not find *Marsden* error

4  where complaints of counsel's inadequacy involve tactical disagreements."  *Dickey*, 35 Cal. 4th

5  at 922.  That court could reasonably find that Petitioner did not motion under *Marsden* for

6  substitute counsel, but rather sought substitute counsel for a new trial motion to be heard after

7  the penalty trial, such that Schultz's failure to request a *Marsden* hearing was not deficient.

8  (Doc. No. 51-1 at ¶¶ 346-347, citing *Schell*, 218 F.3d at 1026; *see also* RT 5045-49, 5533; CT

9  571-576; Pet. Ex. 12 ¶ 12.)

10      <u>Petitioner Was not Denied Effective Assistance of Counsel</u>

11      The state supreme court could reasonably find the noted breakdown in relationship

12  between Schultz and Petitioner did not deny effective assistance of counsel.  The record

13  suggests Schultz discussed Petitioner's concerns over the guilt phase defense and advised him

14  as to redressing those concerns.  Schultz told the trial court of Petitioner's dissatisfaction with

15  the guilt phase defense and that he had advised Petitioner to seek substitute counsel on a new

16  trial motion.  Schultz told the trial court that:

17

18      I didn't anticipate having that motion heard before the second part of the trial.
        Obviously, that's up to the court. But that's not the procedure that I explained to
19      him.

20  (RT 5047.)  Specifically, Schultz "explained to [Petitioner] the ground – the types of things

21  that could be presented to the court as part of a motion for a new trial when the time is

22  appropriate for that motion, and that there are some disagreements between [Petitioner] and I

23  as to some trial tactic decisions…."  (RT 5045.)  Notably, Schultz characterized the issues he

24  felt includable in a motion for new trial included "any issues of incompetency of counsel."

25  (*Id.*).  The Court observes these appear to be the same issues Petitioner raised during his

26  colloquy with the trial court.

27      Schultz confirmed in his habeas declaration the nature and extent of the breakdown in

28

his relationship with Petitioner; that it had its genesis in guilt phase tactics, stating that:

> Following the guilt phase verdicts, there was a breakdown in the communication between the [Petitioner] and myself. [Petitioner] advised me that he felt I had rendered ineffective assistance during the trial. Without being specific, he told me that he disagreed with several of my tactics. He told me that he would no longer talk to me or participate in any proceedings at which I was his attorney. He told me that he would not be attending the penalty phase of the proceedings. I informed the court that the defendant had questioned my competency at an in limine hearing outside the presence of the prosecutor. I advised the judge that I felt that the complaints of [Petitioner] concerning ineffectiveness were the proper subject of a motion for new trial following the penalty phase of the proceedings. I did tell the judge that the defendant had advised me that he would no longer be talking to me, cooperating with me, or attending further proceedings in the trial.

(Pet. Ex. 12 ¶ 12.)

Still, the state supreme court reasonably could find Schultz continued to provide effective assistance to Petitioner. The record reflects that Schultz continued to advise Petitioner prior to the start of the penalty trial. Schultz was present when the trial court took Petitioner's oral waiver of personal presence. (RT 5102-03.) Subsequently, when it became apparent state law required a written waiver and Petitioner refused Schultz's proffered form waiver, (RT 5114-15), Schultz nonetheless approved as defense counsel the written waiver provided by the trial court and signed by Petitioner. (CT 475-476; *see also* Penal Code § 977(b)(2); RT 5116-20.) Schultz advised Petitioner regarding his stipulation to the prior Nevada conviction charged in the information. (RT 5073-74.) Schultz also represented Petitioner in court at the penalty trial in which Petitioner participated remotely. (RT 5124-41.)

Moreover, the state supreme court reasonably could find Petitioner's absenting himself from the penalty trial was not a manifestation of an irreconcilably broken relationship with Schultz, but rather dissatisfaction at being convicted and disinclination to present any penalty defense. (*See* claims III(B), VI and VII, *post*.) The state supreme court observed Petitioner's statement to the trial court that:

> I would just as soon that the defense not even say nothing, just rest. I don't intend to plead nothing to the jury. I'd just as soon sit in the cell. I have no intentions or desire to try to have any sympathy or pity from the jury that

68

convicted me of these crimes. I don't intend to be present, neither; I don't wish to be.

*Dickey*, 35 Cal. 4th at 923; RT 5101-02.)  Significantly, this statement is consistent with Petitioner's pre-trial defense interviews, wherein he stated that he was not interested in anyone saving his life if a jury should be so stupid as to convict him.  (Pet. Ex. 23 at SH002137.)

In this context, the state supreme court reasonably could find Schultz's statement to the trial court that he did not oppose the waiver of personal presence (RT 5100); that he had "discussed it with [Petitioner] and I think that decision is his" and that "I was not going to make a recommendation one way or the other" (*id.*) is not suggestive of a denial of assistance of counsel.  Especially so given that following his waiver of personal presence, Petitioner nonetheless monitored proceedings from a holding cell and had ready access to the courtroom and to Schultz.  (*See* RT 5101; CT 475-476.)

Furthermore, Petitioner's expressed distrust of Schultz and doubts as to Schultz's competency appear equivocal on the record.  While Petitioner questioned guilt phase trial tactics and refused to sign a form waiver of personal presence prepared by Schultz, he nonetheless agreed to proceed to the penalty phase with Schultz as his attorney and accepted representation thereat by Schultz.  *See Daniels*, 428 F.3d at 1197 (citing *Morris v. Slappy,* 461 U.S. 1, 3-4 (1983)) ("[T]he right to counsel does not guarantee a right to counsel with whom the accused has a 'meaningful attorney-client relationship.'").

Petitioner has not demonstrated that he had any objection to Schultz's penalty defense or the penalty phase evidence or that he was denied opportunity to consult with Schultz thereon.  The penalty defense theory did not involve contesting the aggravating evidence placed before the jury, i.e. the fact of Petitioner's felony burglary conviction and the five autopsy photographs.  As noted, during pretrial interviews with the defense team, Petitioner expressed his desire that facts underlying his burglary conviction be kept from the jury, something the penalty defense accomplished.

Additionally, Petitioner participated in the penalty phase proceedings by audio and video feed to his holding cell and had the option of returning to court and consulting Schultz at

any time. (RT 5101-02.) Significantly, Petitioner was not denied access to and advice from Schultz. (*See* Lod. Doc. No. 8, Response to SHCP, at 123-26); *see Morris,* 461 U.S. at 13-14 (holding that the Sixth Amendment requires only competent representation and does not guarantee a meaningful relationship between a defendant and counsel). As noted, Petitioner allowed Schultz to continue advising and representing him up through sentencing.

ii. *Prejudice*

Petitioner argues Shultz's allegedly deficient conduct denied him effective assistance of counsel at the penalty phase and was presumptively prejudicial. (Doc. No. 51-1, ¶ 354, citing *Brown,* 424 F.2d at 1170 (trial court's failure to inquire into defendant's dissatisfaction with counsel and failure to communicate with counsel denied effective assistance of counsel).

Even if Schultz was deficient as alleged, Petitioner has failed to show prejudice, for the reasons that follow.

(1) **Presumed Prejudice**

Petitioner argues he was constructively denied counsel at the penalty trial such that prejudice can be presumed. (Doc. No. 51-1, ¶ 363, citing *Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000) (no specific showing of prejudice is required in instances where the reliability of the judicial process itself is implicated such as the actual or constructive denial of the assistance of counsel); *United States v. Cronic*, 466 U.S. 648, 658 (1984) (a presumption of prejudice is warranted if the failures of counsel make the adversary process presumptively unreliable); *Holloway v. Arkansas*, 435 U.S. 475, 485-86 (1978) (defendant has a constitutional right not to be represented by an attorney with whom he has developed an irreconcilable conflict); *see also* Doc. No. 142 at 52-53, citing *Strickland*, 466 U.S. at 692.)

Petitioner supports alleged denial of counsel by pointing out Schultz's failure to: (i) properly advise Petitioner regarding the waiver of presence at the penalty phase; (ii) develop and present an adequate mitigation defense; and (iii) argue adequately at penalty phase closing. (Doc. No. 51-1 ¶¶ 356-58, citing RT 5114-18; *see also* Doc. No. 142 at 52, citing RT 5134.) Particularly, Petitioner argues that "he was not able to communicate with Schultz to formulate

a defense" and that "[a]s a result, no evidence was presented by [him] at the penalty phase, and a death verdict was assured." (Doc. No. 142 at 53.)

However, the state supreme court reasonably could find Petitioner was not constructively denied counsel at the penalty phase entitling him to a presumption of prejudice, for the reasons stated. *See Perry*, 488 U.S. at 278-79. That court reasonably could find Petitioner did not seek substitute counsel for the penalty phase; acquiesced in Schultz's continuing as penalty phase counsel and retained access to those proceedings and to Schultz; and participated in and did not object to the penalty defense and argument or demonstrate such was constitutionally inadequate. As noted, on the eve of the penalty trial Petitioner stated his desire that no mitigation defense be presented.

### (2) Specific Prejudice

Alternatively, Petitioner alleges Schultz's conflict adversely impacted the penalty phase representation. To the extent the presumed prejudice standard does not apply, Petitioner must meet the *Strickland* prejudice standard by establishing a reasonable probability that, but for counsel's deficient conduct, the result of the proceedings would have been different. *See Strickland*, 466 U.S. at 694; *see also Chaidez v. Knowles*, 258 F. Supp. 2d 1069, 1082-83 (N.D. Cal. 2003), *aff'd*, 111 F. App'x 899 (9th Cir. 2004) (*Strickland* applicable where no constructive denial of assistance of counsel).

However, the state supreme court reasonably could find that Petitioner has not shown *Strickland* prejudice arising from the penalty defense, for the same reasons discussed above and summarized below. That court reasonably could find the totality of the proffered mitigation evidence and that apparent in the record to be insubstantial and outweighed by the aggravating and potential rebuttal evidence, such that there does not remain a reasonable probability of a different outcome. *(See* the discussion of claims III(C-E) above.)

Additionally, Petitioner does not point to evidence in the record suggesting disagreement or dissatisfaction with the penalty defense mounted at trial. Petitioner was on record that he did not want to present any penalty defense to the jury that had just convicted

71

him. (RT 5101-02.) Petitioner has not demonstrated he was denied adequate consultation on the penalty defense. *See Lang*, 725 F.Supp.2d at 1054 (adequate consultation between counsel and client is an essential elements of competent representation). Similarly, he does not point to facts suggesting he was unable to assist in his penalty defense. *Id.* Rather the record shows his expressed desire not to present a penalty defense and not to be present in court during the penalty defense. (RT 5101-02.)

Petitioner suggests that absent Schultz's alleged deficient conduct, he would have personally attended and participated in the penalty trial. However, Petitioner participated in penalty phase proceedings remotely by audio and video feed and had access to Schultz who continued to represent him during the penalty phase. *See Sullivan*, 446 U.S. at 346 (reasonably appeared that counsel and defendant accepted any conflict by proceeding). He has not shown on the factual record that in the course thereof he was denied the opportunity to assist counsel in his defense or any particular input he was denied.

"It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). That is, only when "the likelihood of a different result [is] substantial, not just conceivable," has the petitioner met *Strickland's* demand that defense errors were "so serious as to deprive [him] of a fair trial." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 687).

iii. *Conclusions*

A fair-minded jurist could find that Petitioner failed to establish counsel's performance fell below an objective standard of reasonableness and that absent counsel's alleged deficiencies, there remains a reasonable probability of a different outcome. *Strickland*, 466 U.S. at 694.

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim II(I) shall be denied.

4.      Claim II(U)

Petitioner alleges counsel Schultz was ineffective by failing to accept the trial judge's offer to deliver an admonition to the jury regarding an outburst by the family of victim Marie Caton, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 51-1 ¶¶ 409-414.)

**a.      Supplemental Legal Standards**

"[I]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar.  A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.  There is no reason to treat such evidence differently than other relevant evidence is treated." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).

**b.      State Court Direct and Collateral Review**

Petitioner presented claim II and all its subclaims in the second state exhaustion petition (see Lod. Doc. No. 30 at 105-99) and it was summarily denied on the merits with certain subclaims including subclaim U also denied on procedural grounds (Lod. Doc. No. 31, Order Denying Cal. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

Petitioner also presented claim II(U) on direct appeal and it was denied on the merits. *Dickey*, 35 Cal. 4th at 916-17.

**c.      Analysis**

*i.      Deficient Performance*

Petitioner argues that Schultz, following the trial court's denial of his motion to discharge the jury, failed to respond to the trial court's offer of a special instruction admonishing the jury to disregard the outburst and show of emotion in court by victim family

73

members.  (*See* RT 5072-73.)

The record reflects that following reading of the guilt phase verdict on March 15, 1991, Ms. Garratt, daughter of victim Marie Caton and mother of perpetrator R.C. (RT 4238, 4308), exclaimed in open court "yes, yes" whereupon family members also reacted less emphatically to the hoped-for verdict.  (RT 5051.)  The trial court immediately directed Ms. Garratt to "keep it down, ma'am."  (RT 5053, 5051.)  Prosecutor Hahus also told Ms. Garratt to "remain silent." (RT 5053.)

Schultz's motion four days later to discharge the jury, on grounds the outburst was an inflammatory and improper victim impact statement that biased the jury, was denied by the trial court.  (Doc. No. 51-1, ¶ 410; RT 5050; CT 470-71.)   That court, while expressing regret in not earlier instructing those in the courtroom not to display emotions during reading of the guilt phase verdict (RT 5051), suggested "instruct[ing] the jury to disregard any display by any spectators in the courtroom and any – the statement made by any spectator in the courtroom when the verdicts were being read, unless the defendant does not want me to do that."  (RT 5072-73.)   Schultz stated "[he would] have to make a decision on that." (RT 5073.) Ultimately, Schultz did not request the admonition and the trial court did not give it.  (RT 5107-08.)

The California Supreme Court considered and denied the claim, stating that:

At the conclusion of the guilt phase of the trial, when the jury's verdicts and findings were read in open court, Lavelle Garratt, the daughter of victim Marie Caton, said in a loud voice, "Yes, yes." The court admonished her to "[k]eep it down, ma'am"; and the prosecutor also loudly instructed her to remain silent. Other members of Mrs. Caton's family embraced one another, cried, and whispered among themselves.

The following week defense counsel moved to discharge the jury on the ground it had been exposed to constitutionally impermissible victim impact evidence under *Booth v. Maryland* (1987) 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440. In denying the motion, the court expressed doubt as to whether any prejudice occurred, but offered to admonish the jury to disregard the outburst and not let it influence their penalty deliberations, unless the defense preferred that an admonition not be given, as it might serve to highlight the incident in the minds of the jurors. Defense counsel said he would have to decide whether to ask for such an admonition. As it turned out, no admonition was given. While the record does not reflect whether defense counsel expressly declined the court's

74

offer, it strongly suggests he did. The next day the court stated that "some matters had been discussed in chambers and we've gone over" the penalty phase instructions. After the court listed the instructions it intended to give, it asked whether either counsel wanted other instructions. Defense counsel stated, "I have no other requests." Earlier, defense counsel had stated he felt no admonition could be effective—that the proverbial bell could not be unrung.

Assuming arguendo an admonition would have cured any prejudice, defendant contends his trial counsel was ineffective in failing to request an admonition. Again, we disagree.

The brief, spontaneous reaction of the members of Marie Caton's family to the jury verdicts did not constitute victim impact *evidence* of the sort proscribed in *Booth v. Maryland, supra,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440. Moreover, while this case has been on appeal, the United States Supreme Court, partially overruling *Booth* and *South Carolina v. Gathers* (1989) 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876, held that "[i]n a capital trial, evidence showing the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendments to the federal Constitution. (*Payne v. Tennessee* (1991) 501 U.S. 808, 825–827 [111 S.Ct. 2597, 115 L.Ed.2d 720] [(*Payne* )].)" (*People v. Pollock* (2004) 32 Cal. 4th 1153, 1180, 13 Cal.Rptr.3d 34, 89 P.3d 353.) *Payne* applies retroactively. (*People v. Clair* (1992) 2 Cal. 4th 629, 672, 7 Cal.Rptr.2d 564, 828 P.2d 705 (*Clair*).)

"Under California law, victim impact evidence is admissible at the penalty phase under section 190.3, factor (a), as a circumstance of the crime, provided the evidence is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case. (*People v. Boyette, supra,* 29 Cal. 4th at p. 444 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Edwards* (1991) 54 Cal. 3d 787, 835–836 [1 Cal.Rptr.2d 696, 819 P.2d 436].)" (*People v. Pollock, supra,* 32 Cal. 4th at p. 1180, 13 Cal.Rptr.3d 34, 89 P.3d 353.) It would come as no surprise to a jury that a victim's family was anguished by her murder, relieved that part of the trial was over, and satisfied with the guilty verdicts. The relatively muted reaction of Marie Caton's family to the jury verdicts was certainly not "so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case." (*Ibid.*) Finally, defense counsel may have made a reasonable tactical decision that an admonition was not, on balance, desirable, because it would remind the jury of the incident.

*Dickey*, 35 Cal. 4th at 916–17.

### (1) Foregoing Admonition Was a Reasonable Trial Tactic

Petitioner argues Schultz's failure to request an admonition left unmitigated the extreme prejudice resulting from the outburst and left unpreserved the related due process and cruel and unusual punishment violations. (Doc. No. 51-1, ¶ 411-13.) He suggests that for the reasons asserted in claim II(I) above, Schultz had effectively abandoned him by the time the

trial court offered the admonition such that Schultz's failure to respond was not tactical, denying him an adequate penalty phase defense.  (*See* Doc. No. 142 at 56-57; *see also* Pet. Ex. 12 at ¶ 12.)

However, Schultz expressly stated his tactical reasoning in his habeas declaration, that:

> When the court agreed to provide an admonition to the jury on the outburst from the family members following rendition of the guilty verdicts, my decision to forego such an admonition was a reasoned decision not to again ring the bell regarding this emotional victim impact information.

(Pet. Ex. 12 ¶ 11.)  This is consistent with Schultz's statements during hearing on the motion to discharge the jury prior to the penalty phase, that admonition would be ineffective; that the outburst was "constitutionally impermissible information" and "there's no way that they cannot have that information at this point … you can't unring the bell."  (RT 5052.)  Schultz also observed that four days had passed for the jury to think about the outburst.  (RT 5062.)  Moreover, the trial court itself discussed the possibility of such a tactic.  (RT 5066-67.)

The state supreme court reasonably could find the tactical underpinning was as stated by Schultz.  (*See* Pet. Ex. 12 at ¶ 11.)  The admonition would have re-directed the jurors' attention to an event that occurred days before.  An event a reasonable juror might find unremarkable, that a murder victim's child might agree with a verdict for the prosecution. *People v. Pollock,* 32 Cal. 4th 1153, 1180 (2004) ("[E]vidence showing the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendments to the federal Constitution.")

### ii.      *Prejudice*

Petitioner argues the outburst was highly inflammatory and necessarily considered by the jury during their penalty deliberations.  (Doc. No. 51-1, ¶ 409.)  Particularly, he complains he was unable to "confront [Ms. Garratt] as a witness or cross-examine her during the coliseum-style proceedings."  (Doc. No. 142 at 57.)

However, the California Supreme Court reasonably could find the outburst not prejudicial under *Strickland*.  The jury was charged with considering in aggravation the facts

76

1    and circumstances of the capital crime which included guilt phase evidence relating to Ms.

2    Garratt's discovery of her gravely injured mother; Ms. Garratt's statements and testimony; and

3    Ms. Garratt's offer of reward money.  As the trial court observed, the jury might reasonably

4    consider the outburst a "natural display" of emotion by victim family members.  (RT 5064.)

5            The outburst occurred after the jury had rendered all its guilty verdicts; consisted only

6    of the words "yes, yes" appearing in the record along with murmured sobbing reaction from

7    family members; and was condemned on the record by the trial court and the prosecutor.  (*See*

8    RT 5057.)  The state supreme court reasonably could have viewed any prejudice therefrom as

9    attenuated and quickly waning, distinguishable from the situation in *Booth*, relied upon by

10   Petitioner, where victim impact statements described family members opinions of the crimes

11   and petitioner and the severe emotional impact of the crimes.  *Booth* v. Maryland, 482 U.S.

12   496, 498-99 (1987) *overruled by Payne*, 501 U.S. at 829.

13           Additionally, Petitioner argues but fails to demonstrate how the non-testimonial

14   outbursts, even if arguendo evidentiary in nature, could have been effectively confronted at the

15   penalty trial.[8]

16           Here, the jury presumably followed instruction that it consider only evidence presented

17   in court, as noted by the trial court in denying the motion.  (CT 489; RT 5072.)  The state

18   supreme court reasonably could find Petitioner failed to demonstrate otherwise.

19       *iii.    Conclusions*

20           A fair-minded jurist could find that Petitioner failed to establish counsel's performance

21   fell below an objective standard of reasonableness and that absent counsel's alleged

22   deficiencies, there remains a reasonable probability of a different outcome.  *Strickland*, 466

23   U.S. at 694.

24           Accordingly, the California Supreme Court's rejection of this claim was not contrary

25   to, or an unreasonable application of, clearly established federal law, or an unreasonable

26   determination of the facts in light of the evidence presented in the state court proceeding.  28

27

28   _____
     [8] The Court does not reach Respondent's argument that Petitioner's claim he was denied the opportunity to
     confront the outburst is unexhausted (*see* Doc. No. 143 at 51 n.14) because the claim is denied on the merits.

1    U.S.C. § 2254(d).

2           Claim II(U) shall be denied.

3           5.      Claim III(A)

4           Petitioner alleges that Schultz was ineffective by failing to make appropriate pre-trial

5    motions regarding the death penalty, violating his rights under the Fifth, Sixth, Eighth, and

6    Fourteenth Amendments.  (Doc. No. 51-1, ¶¶ 421-27.)

7           a.      **Supplemental Legal Standards**

8           During the sentence selection stage, the Supreme Court has imposed a requirement that

9    the jury make "an individualized determination on the basis of the character of the individual

10   and the circumstances of the crime."  *Tuilaepa v. California*, 512 U.S. 967, 972-73 (1994)

11   (citing *Zant v. Stephens*, 462 U.S. 862, 879 (1983)); *see also Woodson v. North Carolina*, 428

12   U.S. 280, 303-304 (1976)).   This "requirement is met when the jury can consider relevant

13   mitigating evidence of the character and record of the defendant and the circumstances of the

14   crime."  *Id.* (citing *Blystone v. Pennsylvania*, 494 U.S. 299, 307 (1990)) ("[The] requirement of

15   individualized sentencing in capital cases is satisfied by allowing the jury to consider all

16   relevant mitigating evidence").

17          The court may not "impede [] the sentencing jury's ability to carry out its task of

18   considering all relevant facets of the character and record of the individual offender" by

19   excluding "relevant mitigating evidence."  *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986).

20   Nevertheless, the court retains "the traditional authority of a court to exclude, as irrelevant,

21   evidence not bearing on the defendant's character, prior record, or the circumstances of his

22   offense."  *Lockett,* 438 U.S. at 605 n.12.

23          b.      **State Court Direct and Collateral Review**

24          Petitioner presented claim III including all subclaims in the second state exhaustion

25   petition (Lod. Doc. No. 30 at 200-302) and it was summarily denied on the merits with certain

26   subclaims including subclaim A denied on procedural grounds (Lod. Doc. No. 31, Order

27   Denying Cal. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

28

c.    **Analysis**

*i.    Deficient Performance*

Petitioner alleges that Schultz was deficient by failing to (i) object to pursuit of the death penalty in this case on grounds California's death penalty violates international law and is arbitrary and capricious because it fails to narrow its reach and is disproportionate and discriminatory; (ii) seek timely and full discovery of relevant evidence; and (iii) seek admission of evidence of third-party culpability in support of mitigating lingering doubt and evidence of involvement of another.  (Doc. No. 142 at 59-60.)

The state supreme court reasonably could find the claim lacks internal factual support and is reliant upon Petitioner's "other penalty claims."  (Doc. No. 142 at 60.)  Also, that court reasonably could find the claim to be vague and conclusory on its face.  *See Campbell v. Wood*, 18 F.3d 662, 679 (9th Cir. 1994) (citing *Boehme v. Maxwell*, 423 F.2d 1056, 1058 (9th Cir. 1970) (an evidentiary hearing is not required on allegations that are "conclusory and wholly devoid of specifics)); *see also* Habeas Rule 2 (the petition must state the facts supporting each ground).  Particularly, the state supreme court reasonably could deny the claim, as follows.

(1)    **Reasonable Investigation, Development and Presentation of the Trial Defense**

This Court previously denied guilt phase claims II(B) and II(C) alleging ineffective assistance in the investigation, development and presentation of the guilt phase defense including as to exculpatory evidence, third-party culpability, expert opinion, and claim XXVI alleging insufficiency of the prosecution's guilt phase case.  (*See* Doc. No. 135.)  Petitioner's reargument of those claims is unpersuasive.

Additionally, the California Supreme Court reasonably could find Schultz was not prejudicially deficient in the investigation, development and presentation of the mitigation defense for the reasons stated above in the discussion of claims III(C-E).

(2)    **Schultz Was Not Unreasonable by Failing to Contest the Constitutionality of California Death Penalty Statute**

The California Supreme Court reasonably could have rejected Petitioner's constitutional challenges to California's death penalty statute, for the reasons stated in the discussion of claims XXV(A-L) below, summarized here.

<u>Narrowing and Prosecutorial Charging Discretion</u>

The California Supreme Court, on direct appeal stated that:

> The death penalty law adequately narrows the class of death-eligible offenders. (*People v. Brown* (2004) 33 Cal. 4th 382, 401, 15 Cal.Rptr.3d 624, 93 P.3d 244 (*Brown* ); *Prieto, supra,* 30 Cal. 4th at p. 276, 133 Cal.Rptr.2d 18, 66 P.3d 1123.)

*Dickey*, 35 Cal. 4th at 931. That court was not unreasonable in finding the state's death penalty statute satisfies clearly established constitutional requirements. *See Karis v. Calderon*, 283 F.3d 1117, 1141 n.11 (2002) (California's sentencing scheme adequately narrows the class of persons eligible for death). First, the subclass of defendants eligible for the death penalty is rationally narrowed to those who have the predicate felony of robbery. *Tuilaepa*, 512 U.S. at 969-73. The robbery special circumstance sufficiently guides the sentencer and is not unconstitutionally vague. *See Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (the sentencer's discretion must be guided by "clear and objective standards.").

In *California v. Ramos*, the United States Supreme Court stated that "once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty" the jury's consideration of a myriad of factors and exercise of "unbridled discretion" in determining whether death is the appropriate punishment is not arbitrary and capricious. 463 U.S. 992, 1008-09 (1983). At the selection stage, an individualized determination includes consideration of the character and record of the defendant, the circumstances of the crime, and an assessment of the defendant's culpability. *Tuilaepa*, 512 U.S. at 972-73. However, the jury "need not be instructed how to weigh any particular fact in the capital sentencing decision." *Id.* at 979.

The California Supreme Court reasonably determined that California's death penalty scheme in effect in 1990 did not fail to genuinely narrow the class of murderers eligible for the

death penalty. California's scheme, which narrows the class of death eligible offenders to less than the definition of first-degree murder and permits consideration of all mitigating evidence, has been approved by the Supreme Court, *Tuilaepa*, 512 U.S. at 972-79; P*ulley v. Harris,* 465 U.S. 37, 38 (1984).

California's death penalty process does not fail to sufficiently narrow the class of offenders who are eligible for death penalty and does not deny due process. *Atkins v. Virginia*, 536 U.S. 304, 319 (2002); *Furman*, 408 U.S. at 313 (White, J., concurring); *see also Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (plur. opn.) ("[D]iscretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.").

Furthermore, the mere existence of prosecutorial discretion over charging decisions does not deny equal protection or render a capital punishment scheme unconstitutional absent some showing that a particular decision was based on a discriminatory standard. *McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987).

<u>Sentencing Factors</u>

California's death penalty process is not unconstitutional on grounds it fails to require the jury's death determination and weighing of aggravating and mitigating factors be made unanimously and beyond a reasonable doubt. "[A] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa,* 512 U.S. at 979. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Id.* (quoting *Ramos,* 463 U.S. at 1008).

The jury instructions were not erroneous because they: included inapplicable sentencing factors; included vague terms and limiting mitigation terms such as "extreme" and "substantial;" provided the existence of a special circumstance be considered an aggravating circumstance; failed to identify which sentencing factors were aggravating and which were mitigating; and failed to include any burden of proof at the penalty phase. *See, e.g., Ayers v.*

*Belmontes*, 549 U.S. 7, 24 (2006) (the jury heard mitigating evidence, the trial court directed the jury to consider all the evidence presented, and the parties addressed the mitigating evidence in their closing arguments); *Brown*, 544 U.S. at 133; *Boyde*, 494 U.S. at 370; *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (1988). The Eighth Amendment does not require that a jury be instructed on particular statutory mitigating factors. *Buchanan v. Amgelone.,* 522 U.S. 269, 275-77 (1998) (the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence). "[I]t must be recognized that the States may adopt capital sentencing processes that rely upon the jury, in its sound judgment, to exercise wide discretion." *Tuilaepa*, 512 U.S. at 974.

Particularly, the Supreme Court has stated that factor (k) directed the jury to consider "any other circumstance that might excuse the crime. . . ." *Boyde*, 494 U.S. at 382; *see also Hendricks v. Vasquez*, 974 F.2d 1099, 1109 (1992) (the jury was advised it could consider any other mitigating matter).

Moreover, to the extent Petitioner raises only state law errors, he fails to state a basis for federal habeas relief. 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law."). "In the absence of a federal constitutional violation, no relief can be granted even if the instruction given might not have been correct as a matter of state law." *Mitchell v. Goldsmith,* 878 F.2d 319, 324 (1989).

<u>International Law</u>

Petitioner fails to point to clearly established Supreme Court precedent at the time his conviction became final that capital punishment was illegal in this country based on International Law. In *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001), the Sixth Circuit explained that "the claim that international law completely bars this nation's use of the death penalty is unsupportable since the United States is not party to any treaty that prohibits capital punishment per se, and since total abolition of capital punishment has not yet risen to the level of customary international law." *Id., at* 443 n.12; *Medellin v. Dretke*, 544 U.S. 660, 664

(2005) (Vienna Convention did not create individual judicially enforceable rights); *see also*

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 734-35 (2004) (UN Charter, Universal Declaration of

Human Rights, and International Convention on Civil and Political Rights do not create

obligations enforceable in federal court); *Jamison v. Collins*, 100 F. Supp. 2d 647, 766 (2000)

(International Covenant on Civil and Political Rights is not self-executing); *People v. Ghent*,

43 Cal. 3d 739, 778-79 (1987) (United Nations charter does not supersede domestic

legislation); People v. *Brown*, 33 Cal. 4th 382, 404 (2004) ("International law does not prohibit

a sentence of death rendered in accordance with state and federal constitutional and statutory

requirements. [Citations.]").

Furthermore, Petitioner lacks standing to invoke the jurisdiction of international law.

The principles of international law apply to disputes between sovereign governments and not

between individuals. *Hanoch Tel-Oren v. Libyan Arab Republic*, 517 F. Supp. 542, 545-47

(D.D.C. 1981).

Proportionality

The California Supreme Court reasonably could find Petitioner's intra-case and inter-

case proportionality claims to be foreclosed by the Supreme Court's decision in *Pulley v.*

*Harris*. *See* 465 U.S. at 41. Therein, the Supreme Court reviewed California's death penalty

procedure and considered the fact that California did not require any sort of comparative

proportionality review. The Supreme Court found that the Eighth Amendment did not require

a "state appellate court, before it affirms a death sentence, to compare the sentence in the case

before it with the penalties imposed in similar cases if requested to do so by the prisoner."

*Pulley*, 465 U.S. at 43-44.

The Supreme Court also held that "on its face, [California's] system, without any

requirement or practice of comparative proportionality review, cannot be successfully

challenged under *Furman v. Georgia*, [408 U.S. 238 (1972)] and our subsequent cases."

*Pulley*, 465 U.S. at 53. The Supreme Court considered and upheld California's scheme where

"a person convicted of first-degree murder is sentenced to life imprisonment unless one or

more special circumstances are found, in which case the punishment is either death or life imprisonment without parole", *Pulley*, 465 U.S. at 51; "the judge is required to state on the record the reasons for his findings [denying a] motion for modification [of the verdict]", *id.* at 53; and "there is an automatic appeal [from denial of a motion for modification]", *id.* at 53.

Appellate Review

Written findings by the jury regarding the death penalty are not required by the United States Constitution. *Walton v. Arizona*, 497 U.S. 639, 647-48 (1990), *rev'd on other grounds, Ring v. Arizona*, 536 U.S. 584, 589 (2002)); *see also Williams*, 52 F.3d, at 1484-85. Especially so as "the United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed." *Harris*, 692 F.2d at 1195.

Rather, all that is federally required is an "adequate basis for appellate review." *Id.* In California, the trial court's express reasons for its findings in ruling on the automatic motion for modification provide the "adequate basis" for appellate review. *Id.*; *see also People v. Diaz*, 3 Cal. 4th 495, 571-573 (1992). The California Supreme Court reasonably could find the record in this case is sufficient for appellate review under this standard.

*ii.* *Prejudice*

The state supreme court reasonably could find Petitioner failed to show *Strickland* prejudice. Petitioner supports the claim by citing to "other penalty claims." (Doc. No. 142 at 60.) Yet his various constitutional challenges to California's death penalty statute fail for the reasons stated in the discussion below of claims XXV(A-L).

The California Supreme Court reasonably could find that absent counsel's alleged deficiencies, there does not remain a reasonable probability of a different outcome. *Strickland*, 466 U.S. at 694; *see also Apelt*, 878 F.3d at 815-16 (denying habeas relief even though trial counsel failed to uncover mitigating evidence that the defendant grew up very poor, had an alcoholic and violent father who beat his children with an iron rod, was raped twice as a child, and suffered from mental illness); *Cain*, 870 F.3d at 1021 (denying habeas relief despite new

84

1    mitigating evidence that the defendant was severely beaten and punished by his stepmother,

2    had an untreated childhood head injury, and had learning disabilities).  The assertion of these

3    unmeritorious constitutional challenges would not have increased the probability of a more

4    favorable sentencing determination.  Moreover, "[t]he mere criticism of trial tactics is

5    insufficient to establish ineffectiveness or prejudice."  *Ferreira-Alameda*, 815 F.2d at 1254.

6              *iii.*     *Conclusions*

7             A fair-minded jurist could find that Petitioner failed to establish counsel's performance

8    fell below an objective standard of reasonableness and that absent counsel's alleged

9    deficiencies, there remains a reasonable probability of a different outcome.  *Strickland*, 466

10   U.S. at 694.

11            Accordingly, the California Supreme Court's rejection of this claim was not contrary

12   to, or an unreasonable application of, clearly established federal law, or an unreasonable

13   determination of the facts in light of the evidence presented in the state court proceeding.  28

14   U.S.C. § 2254(d).

15            Claim III(A) shall be denied.

16            6.       Claim III(B)

17            Petitioner alleges that Schultz was ineffective by failing to investigate and declare a

18   doubt as to Petitioner's competency at the penalty trial and during his waiver of personal

19   presence thereat, violating his rights under Fifth, Sixth, Eighth, and Fourteenth Amendments.

20   (Doc. No. 51-1, ¶¶ 428-32.)

21            **a.        Supplemental Legal Standards**

22            "A criminal defendant may not be tried unless he is competent."  *Pate v. Robinson*, 383

23   U.S. 375, 378 (1966); *accord Medina v. California*, 505 U.S. 437, 439 (1992).  He may not

24   waive his right to counsel or plead guilty unless he does so "competently and intelligently[.]"

25   *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938); *see also Godinez v. Moran*, 509 U.S. 389, 396

26   (1993) (same).

27            The trial or conviction of a person who is legally incompetent is a substantive due

28

process violation.  *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *see also Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010) (quoting *Robinson*, 383 U.S. at 378) ("It is undisputed that 'the conviction of an accused person while he is legally incompetent violates due process.'").

"[T]he standard for competence to stand trial is whether a defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *Moran*, 509 U.S. at 396 (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960)); *see also Clark v. Arnold*, 769 F.3d 711, 729 (9th Cir. 2014).  Mental competence requires only that a criminal defendant "has the capacity to understand the proceedings and to assist counsel." *Moran*, 509 U.S. at 402.  "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Anderson v. Gipson*, 902 F.3d 1126, 1133 (2018) (citing *Drope v. Missouri*, 420 U.S. 162, 171 (1975)).  Factors relevant to the competency determination include courtroom demeanor, prior irrational behavior, and mental health history. *Drope*, 420 U.S. at 180.

A "substantive" competency claim focuses on whether the defendant was actually incompetent at trial. *Boyde*, 404 F.3d at 1165.  "Even where the evidence before the trial judge was insufficient to raise a good faith doubt with respect to Steinsvik's competency, he would still be entitled to relief if it now appears that he was in fact incompetent." *Steinsvik v. Vinzant*, 640 F.2d 949, 954 (9th Cir. 1981) (citing *Zapata v. Estelle*, 588 F.2d 1017, 1021 (5th Cir. 1979)).

Petitioner bears the burden of proof by a preponderance of the evidence. *Hayes v. Woodford*, 301 F.3d 1054, 1078 at n.28 (9th Cir. 2002) (citing *Simmon v. Blodgett*, 110 F.3d 39, 41 (9th Cir. 1997)) (*rehearing en banc Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005)) (panel decision reversed on other grounds).

Trial incompetency, if demonstrated, is structural error not amenable to harmless error analysis under *Brecht*, but rather necessitating automatic reversal. *United States v. Walters*,

309 F.3d 589, 593 (9th Cir. 2002) (*quoting Neder v. United States*, 527 U.S. 1, 7 (1999)).

**b.        State Court Direct and Collateral Review**

Petitioner presented claim III including all subclaims in the second state exhaustion petition (Lod. Doc. No. 30 at 200-302) and it was summarily denied on the merits with certain subclaims including subclaim B denied on procedural grounds (Lod. Doc. No. 31, Order Denying Cal. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

The California Supreme Court on direct appeal also considered and denied on the merits Petitioner's claim his absence from the penalty phase proceedings violated his constitutional rights. *Dickey*, 35 Cal. 4th at 922-24.

**c.        Analysis**

*i.     Deficient Performance*

Petitioner alleges that Schultz was deficient by failing to declare a doubt as to his competence. (Doc. No. 142 at 61-63; *see also* the discussion of claim II(I) above and claims VI and VII below.)

Petitioner faults Schultz for not investigating competency and requesting a Penal Code section 1368 *et seq.* hearing to present the habeas proffered evidence that Petitioner's organic brain damage, PTSD, mental illness, depression, and chronic substance abuse must have left him incompetent by the start of the penalty trial. (Doc. No. 51-1 ¶¶ 428-429; Doc. No. 142 at 61-63.) He argues that he was unable to competently assist in the penalty defense and validly waive presence at the penalty trial. (*Id.*) He argues his incompetence was readily apparent in the noted breakdown in his relationship with Schultz. (*Id.*; *see also* the discussion of claim II(I) above and claims VI and VII below.)

The California Supreme Court rejected on direct appeal Petitioner's claim that his absence from the penalty trial violated federal rights, stating that:

> At his request and pursuant to his written waiver, defendant absented himself from the courtroom during the penalty phase of the trial and observed the proceedings on a television monitor in the holding cell. Defendant now contends his absence violated the federal Constitution and sections 977 and 1043. We conclude defendant validly waived his constitutional right to be

present, and although sections 977 and 1043 were violated, the error was harmless under *People v. Watson* (1956) 46 Cal. 2d 818, 836, 299 P.2d 243.

Before the penalty phase began, defense counsel informed the court defendant did not wish to be in the courtroom during the proceeding. Counsel advised the court he had discussed the issue with defendant, and that he did not oppose defendant's wishes in this regard. He observed, "with the video setup that's available in the holding area, obviously there's no confrontation issue."

The court confirmed "we have a holding cell right next to this courtroom, we have a TV monitor in there ... so that you will both be able to see and hear what is going on in this courtroom." While stating he was prepared to comply with defendant's wish to be absent, the court advised defendant "it would probably be wiser to be in the courtroom during the taking of the testimony," and if defendant changed his mind at any time, "we'll bring you back immediately."

Defendant responded, "I would just as soon that the defense not even say nothing, just rest. I don't intend to plead nothing to the jury. I'd just as soon sit in the cell. I have no intentions or desire to try to have any sympathy or pity from the jury that convicted me of these crimes. I don't intend to be present, neither; I don't wish to be."

Having readvised defendant of his confrontation and cross-examination rights, the court took an oral waiver in which defendant confirmed he understood his right to be present, that he was voluntarily asking to absent himself, and that he understood he could return to the courtroom "anytime you want to come back." The oral waiver was confirmed in a written waiver signed in open court after defendant himself actively participated in its wording.

A defendant has the right, under the Sixth Amendment of the federal Constitution, to be present at trial during the taking of evidence. Nonetheless, as a matter of both federal and state constitutional law, a capital defendant may validly waive his presence at critical stages of the trial. (*People v. Weaver* (2001) 26 Cal. 4th 876, 966, 111 Cal.Rptr.2d 2, 29 P.3d 103 (*Weaver* ); *People v. Jackson* (1996) 13 Cal. 4th 1164, 1209–1210, 56 Cal.Rptr.2d 49, 920 P.2d 1254 (*Jackson* ).) Defendant's waiver was valid; accordingly, his constitutional rights were not violated.

A capital defendant cannot voluntarily waive his rights under sections 977 and 1043 to be present at trial. (*Weaver, supra,* 26 Cal. 4th at pp. 967–968, 111 Cal.Rptr.2d 2, 29 P.3d 103; *Jackson, supra,* 13 Cal. 4th at p. 1210, 56 Cal.Rptr.2d 49, 920 P.2d 1254.) However, permitting defendant to waive those rights was merely statutory error, and thus we should reverse the judgment on this ground only if we conclude the error was prejudicial. (*Weaver,* at p. 968, 111 Cal.Rptr.2d 2, 29 P.3d 103; *Jackson,* at p. 1211, 920 P.2d 1254.) The standard for reviewing error in permitting a defendant to absent himself from the *penalty* phase of a capital case is whether there is a " 'reasonable *possibility* ' " the jury would have reached a different result had the error not occurred. (*People v. Hernandez* (2003) 30 Cal. 4th 835, 877, 134 Cal.Rptr.2d 602, 69 P.3d 446, italics added; *People v. Brown* (1988) 46 Cal. 3d 432, 448, 250 Cal.Rptr. 604, 758 P.2d 1135.) *Weaver* and *Jackson* were also capital cases, and we used the reasonable *probability* standard in those cases. (*Weaver,* at p. 968, 111 Cal.Rptr.2d 2, 29 P.3d 103; *Jackson,* at p. 1211, 56 Cal.Rptr.2d 49, 920 P.2d 1254.) However, the error in *Weaver* occurred in the sanity phase of the trial (*Weaver,* at p. 965, 111 Cal.Rptr.2d 2, 29 P.3d 103), and in the guilt phase in

*Jackson* (*Jackson,* at p. 1209, 56 Cal.Rptr.2d 49, 920 P.2d 1254).

We conclude it is not reasonably possible a result more favorable to defendant would have been reached in the absence of the error. First, the television monitor in the holding room enabled defendant to see and hear the proceedings, and the court made it clear defendant would be brought back into the courtroom the moment defendant decided he wanted to return. Second, the only witness who testified during the penalty phase was the detective who provided the foundation for the admission of the autopsy photographs of the victims. The admissibility of the autopsy photographs had already been vigorously contested by defense counsel, and it is not apparent what value defendant's presence during the detective's testimony would have been to defense counsel. (See *Weaver, supra,* 26 Cal. 4th at p. 968, 111 Cal.Rptr.2d 2, 29 P.3d 103.) Third, given defendant's professed lack of any desire to receive "sympathy or pity from that jury that convicted me of these crimes," his demeanor, had he been present in the courtroom, might have undermined his counsel's argument. Finally, the court advised the jury that defendant had exercised his option of not being present, but that he was following the proceedings on a television screen in the holding cell, and that they were not to consider his absence in their deliberations.

*Dickey*, 35 Cal. 4th 884, 922–24.

### (1)     No Reasonable Doubt as to Petitioner's Competency

Petitioner argues his "serious organic brain damage, PTSD, chronic underlying mental illness, depression and chronic substance abuse and dependency," considered in the context of the stress of trial and the breakdown in his relationship with Schultz, were sufficient to raise a reasonable doubt as to his competency.  (Doc. No. 51-1 ¶¶ 428-29; *see also* Doc. No. 142 at 61; discussion of claim II(I)) above and claims VI and VII below.)

Petitioner argues these illnesses and impairments prevented him from (i) rationally assisting counsel, and (ii) making any knowing, intelligent and voluntary waiver of his right to be present during the penalty trial.  (Doc. No. 51-1 at ¶¶ 430-31, citing *Miranda v. Arizona*, 384 U.S. 436, 444-445 (1996) (waiver of constitutional rights is valid only if knowing, intelligent and voluntary, and the person making the waiver is competent to do so); *Withrow v. Williams*, 507 U.S. 680, 688-89 (1993) (validity of waiver turns on the totality of the circumstances).   He argues Schultz's failure to raise a doubt as to his competency was unreasonable and not  motived by trial tactics.  (Doc. No. 51-1, ¶ 432.)

However, the state supreme court reasonably could find Petitioner's ability to understand the proceedings against him, assist counsel, and waive constitutional rights were

1   not reasonably in doubt, as follows.  *See Moran*, 509 U.S. at 402.

2   <u>The Defense Investigation</u>

3           Petitioner's argument that Schultz did not reasonably investigate his mental state and

4   thereupon declare a doubt as to his trial competency (*see* Doc. No. 51-1 ¶ 428) fails for the

5   reasons discussed in claims III(C-E) above.  Although the defense investigation revealed

6   Petitioner's possible personality and psychosexual disorders, his drug use history, and criminal

7   history which included juvenile acts of sexual molestation and an act of necrophilia for which

8   he was charged and convicted as adult, (*see* Pet. Ex. 23 at SH002051-2137), the investigation

9   did not reasonably suggest Petitioner was unable to rationally understand and assist in his

10  defense.  Notably, Petitioner expressed concern over the impact the admission of his criminal

11  history might have on the jury.  He unilaterally suggested a change of venue strategy in this

12  regard.  (Pet. Ex. 23 at SH002091-94.)

13          Furthermore, Petitioner's undiscounted psychosocial history does not suggest he was

14  ever diagnosed or found incompetent, or that his competency had been or reasonably could

15  have been placed in doubt.  The defense investigation as detailed to Schultz did not uncover

16  facts suggesting Petitioner's abusive and dysfunctional upbringing left him, by the time of the

17  penalty phase, unable to understand proceedings in court and assist with his defense.  (*See*

18  section VII, A, 2, c, *ante*.)  Notably, during pretrial defense interviews with Petitioner's

19  mother, she described his level of functionality in terms not suggesting incompetency, as

20  follows:

21          Petitioner was health growing up with no unusual diseases or medical problems;
            he was sometimes hyperactive and developed a nervous twitch around age 9 or
22          10 years;

23          Petitioner's family life included physical abuse, particularly, the father beat
            Petitioner severely, but also included family vacations to places such as
24          Disneyland and the San Diego Zoo;

25          Petitioner's parents drank and used drugs, passed bad checks, were sometimes
            without housing arrangements, living with relatives or others, the father had
26          difficultly holding a job due to his drinking, at times the father was in jail or
            otherwise absent from the home, and the family lived on welfare;
27
28          Petitioner and his siblings witnessed and were victims of violence in the home;

The mother started working in fast food, became heavily addicted to drugs and engaged in sexual liaisons and severe beatings of the children including Petitioner;

The father engaged in sexual misconduct with relatives including the repeated rape of the mother's 13-year-old sister while the children including Petitioner watched;

Petitioner sometimes acted strangely, abusing his younger brother;

Petitioner sexually molested his younger sister.

(Pet. Ex. 23 at SH002040-49.)

Guilt phase psychiatrist Dr. Hackett did not opine Petitioner was incompetent. Guilt phase psychologist Dr. Thompson, while acknowledging a possible character disorder, found no basis for a psychiatric defense. As this Court previously observed in its order denying guilt phase claims:

Petitioner was interviewed in jail by Dr. Hackett, ((Doc. No. 51-1 ¶ 523; SSHCP, Ex. 2 at 119-120), who diagnosed him with antisocial personality disorder but nonetheless found him competent to assist in his defense (*id.*).

Petitioner also was evaluated by Dr. Thompson (*id.* at 114), who found petitioner mildly depressed (SSHCP, Ex. 2 at 121-23; *id.* at Ex. 19), but showing no obvious symptoms of psychosis either manifest or latent. (SSHCP, Ex. 2 at 122). Dr. Thompson opined that a psychiatric defense would be of no value (*id.*).

(Doc. No. 135 at 45.)

The state supreme court reasonably could find Schultz, given the facts and circumstances he faced, was entitled to rely upon these experts that a competency defense was not in play.[9] *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (1998) (counsel has no duty to contact other experts when he reasonably thought those consulted were well-qualified and no duty to ensure the trustworthiness of an expert's conclusions); *see also Murtishaw v. Woodford*, 255 F.3d 926, 947-48 (9th Cir. 2001) (based on information from experts including that petitioner's EEG was within normal limits, counsel reasonably could have concluded that further investigation of his possible brain damage was unwarranted); *Ortiz v. Stewart*, 149 F.3d 923,

---

[9] The record reflects Thompson may have practiced marriage family, or child counseling on a revoked state license. (*See* Pet. Ex. 23 at SH002297-98.)

933 (9th Cir. 1998), *overruled on other grounds by Apelt*, 878 F.3d at 827-28 (alleged lack of preparation for sentencing in capital case failed prejudice prong where petitioner failed to show how insufficient preparation prejudiced him).

Similarly, Dr. Callahan, mental health expert on the new trial motion, aware of Petitioner's "extremely chaotic…highly stressful…abusive" background and its possible impact upon his necrophilia, diagnosed Petitioner only with a "passive inadequate" and "avoidant" personality and did not suggest Petitioner was incompetent. (RT 5461-83.)

For the reasons stated, Schultz reasonably could have decided the defense investigation did not suggest a reasonable doubt as to competency and that further mental state investigation as to penalty phase competency was not warranted. *See Ake v. Oklahoma*, 470 U.S. 68, 83-84 (1985) (in capital sentencing proceeding, due process requires access to psychiatric examination on relevant issues, testimony of psychiatrist, and assistance in preparation at sentencing phase).

Demeanor at Trial

Petitioner argues his conduct following the guilty verdict reasonably placed his competency in doubt. He points to the breakdown in his relationship with Schultz and refusal to personally be present at the penalty trial. (Doc. No. 51-1 ¶ 428.)

However, Schultz, prior to and during the trial proceedings, was able to observe Petitioner's demeanor in court and while testifying. He had first-hand information as to Petitioner's ability to understand proceedings in court and assist with the defense. Petitioner has not shown that Schultz at any time questioned Petitioner's competency to rationally understand and assist with his trial and defense. (*See* Pet. Ex. 12; *see also* discussion of claim II(I) above.)

Trial counsel's assessment of a defendant's competency is significant and relevant evidence. *See Hernandez v. Ylst,* 930 F.2d 714, 718 (9th Cir. 1990); *Williams v. Woodford*, 384 F.3d 567, 606 (9th Cir. 2004). Especially so where there is not uncontradicted evidence of a history of pronounced irrational behavior. *See Robinson*, 383 U.S. at 384-86; *Odle v.*

*Woodford*, 238 F.3d 1084, 1088 (9th Cir. 2001); cf. *de Kaplany v. Enomoto*, 540 F.2d 975, 979 (9th Cir. 1976) ("[O]rientation as to time and place and some recollection of events is not enough [to show trial competence].")

Petitioner's guilt phase testimony reflected an understanding of the proceedings in court and ability to assist and further the defense theory, recollection of events perceived, and an understanding he was under oath at trial. (*See* RT 4869-85, 4900-27.) Moreover, he was able to rationally discuss with Schultz and the trial court his issues with Schultz's guilt phase performance and desire to absent himself from the courtroom during penalty proceedings. The noted record suggests that Petitioner exhibited a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Moran*, 509 U.S. at 396.

As discussed above, the state supreme court reasonably could find Petitioner's decision to discontinue communication with Schultz and absent himself from the courtroom during penalty phase proceedings suggested his dissatisfaction with guilt phase tactics and verdicts rather than incompetency. Particularly, Petitioner's colloquy with the trial court regarding such matters and his detailed requests for limiting language in the written waiver of personal presence reasonably suggest he understand the nature and purpose of the penalty phase and that he did not wish to mount and assist in a penalty defense. Petitioner has not demonstrated on the record that his decisions in these regards were indicative of or attributable to incompetence.

Furthermore, the trial court did not suggest Petitioner's conduct during trial raised doubt as to his competency. To the contrary, that court observed during post-trial motions that Petitioner "has been an absolutely model defendant. Not once did he get out of hand, even in the slightest." (RT February 21, 1992 at 50.)

Defense Habeas Experts

Petitioner argues his habeas experts raised a reasonable doubt as to his competency at the time of the penalty trial.

As noted, Dr. Khazanov found that Petitioner demonstrated multiple indicia of brain

93

1  damage and impairment particularly in the frontal lobe variously suggesting impulse control

2  and aggression issues. (Doc. No. 142 at 106; *see also* Pet. Ex. 2 at 19-20, 31, 220-21; *id.*, Ex. 2

3  at Ex. H at 7, 65.) Particularly, Dr. Khazanov observed Petitioner to suffer PTSD, depression,

4  physically and emotionally self-destructive behaviors, and organic brain damage including

5  frontal lobe deficits relevant in mitigation. (Pet. Ex. 2 at Ex. H at 25.)

6      Dr. Khazanov opined Petitioner's serious organic brain damage and underlying mental

7  impairments left him unable to respond rationally to situations facing him, especially so when

8  combined with substance abuse. (Pet. Ex. 2 at Ex. H at 23.) She opined Petitioner's brain

9  damage was present at the time of trial (*id.*) and would have been evident to a

10 neuropsychologist had one then been retained (*id.* at 24).

11     Dr. Khazanov further opined that decompensation from Petitioner's organic brain

12 damage and mental illnesses "contributed directly to [his] incompetency to proceed at the

13 penalty phase of the trial [and that he] was unable to assist his counsel in a rational manner in

14 the presentation and defense of the penalty phase of the trial" (*id.*) including as to the

15 breakdown in communication with Schultz and the waiver the presence in the courtroom (*id.*).

16     Dr. Khazanov based her findings on "possible" deficits which "could" affect

17 Petitioner's capacity to perceive and relate information and when combined with Petitioner's

18 other conditions or impairments "would most likely render [him] severely impaired in many

19 areas of functioning." (Pet. Ex. 2 at Ex. H at 2.) She found that "[Petitioner's] ability to

20 accurately perceive, retain and relate even basic information is severely impaired." (Pet. Ex. 2

21 at Ex. H at 23.)

22     Dr. Khazanov went on to opine that:

23

24     Given his history of victimization, the combined stress of protracted legal
       proceedings, as well as the courtroom setting itself, could have produced further
       mental decompensation. In particular, [Petitioner's] organic brain damage and
25     underlying mental illnesses contributed directly to his incompetency to proceed
       at the penalty phase of the trial. [Petitioner] was unable to assist his counsel in
26     a rational manner in the presentation and defense of the penalty phase of the
       trial. [Petitioner's] mental illnesses and brain impairments directly impacted his
27     decisions to absent himself and to discontinue communicating with his defense
       counsel and his ability to assist in his defense in any way.
28

94

1  (*Id.* at 24.)

2       However, the state supreme court reasonably could find Dr. Khazanov's opinions

3  subject to discount.  She examined Petitioner fourteen years after trial.  Her findings appear

4  unsupported in Petitioner's prior mental health history and contravene the opinions of the

5  mental health professionals who actually examined Petitioner at the time of trial and the

6  demeanor evidence from Petitioner's conduct prior to and during trial.  Significantly, Schultz

7  did not find Petitioner's behavior and demeanor to raise question as to his competency; nor did

8  the trial court.

9       Moreover, Dr. Khazanov's conclusions were conclusory and equivocal.  She stated that

10  "while it is difficult to ascertain [Petitioner's] mental status at the time of trial in 1991,

11  combined disabilities identified by my assessment *suggest that the possibility exists* that his

12  ability to assist his attorney in conducting his defense was hindered."  (*Id.*, emphasis added.)

13  *See Leavitt v. Arave*, 646 F.3d 605, 614 (9th Cir. 2011) (holding, in pre-AEDPA case, that

14  mental health opinions that "couch results in tentative language" are "simply not enough to

15  show prejudice").

16       Furthermore, to the extent Petitioner relies upon Dr. Counter, the psychologist who

17  prepared a habeas psychosocial history for Petitioner (*see* Pet. Ex. 2), Dr. Counter seems to

18  have assembled the noted opinions of others without herself opining on Petitioner's mental

19  state at the time of trial.  *See Runningeagle v. Ryan*, 825 F.3d 970, 987 (9th Cir. 2016)

20  (discounting mental health declaration that "gave no affirmative diagnosis").  Apart from Dr.

21  Khazanov, none of the sources cited by Dr. Counter seem to opine upon Petitioner's

22  incompetency at the time of trial.  Dr. Counter did not herself opine on Petitioner's

23  incompetency.  (*Id.*)

24       Petitioner's statements to Dr. Counter during their 2007 interview suggest he was

25  oriented and well able to articulate his thoughts.  For example, he told Dr. Counter that the

26  abuse he suffered at home "annihilated my self-esteem" such that "I didn't interact normally.  I

27  was so afraid to express myself.  I had this mortal fear to interact with people.  Social

28

anxiety…I couldn't act in a normal way…The beatings, I could have gotten past that. But the emotional beatings were the worst." (Pet. Ex. 2 at 54.) The state supreme court reasonably could find such retrospection not indicative of incompetency.

Dr. Counter observed that Petitioner sometimes struggled in school. (*See* Pet. Ex. 2 at 52, 78; Pet. Ex. 23 at SH002065, SH002085.) Yet the record suggests some level of academic achievement. In June of 1983 at age 18, Petitioner graduated from Tulare Union High School 182nd in a class of 291. (Pet. Ex. 2 at 95.) While in prison in Nevada, Petitioner was able to successfully program. (Pet. Ex. 2 at 101.) Upon release, Petitioner successfully completed truck driving school at the top of his class. (*Id.* at 103.) He also was able to maintain employment in an auto parts store and in the roofing trade. (*Id.* at 105.)

The habeas proffered institutional mental state experts did not find Petitioner incompetent upon his arrival on death row following the capital conviction. In 1992, Petitioner was examined by San Quentin staff psychologist Dr. M. Lyons, who observed "no signs or symptoms of psychosis, organicity or serious psychological impairment in social functioning." Dr. Lyons observed that "[Petitioner's] cognitive functions were adequately developed, and [ ] his level of conceptual thinking and reasoning was adequate for the formation of good judgment." (Pet. Ex. 2 at 128; *id.*, Ex. 23 at SH002798.) Subsequent examinations by prison mental health professionals concluded Petitioner presented "no psych considerations." (*Id.* at 129; *see also* Pet. Ex. 23 at SH003128-29.) Thereafter, Petitioner was able to successfully navigate death row administrative procedures and adjust to institutional life. (Pet. Ex. 2 at 136-45.)

ii.     *Prejudice*

Petitioner argues that absent Schultz's deficient conduct, there is a reasonable probability he would not have been subject to penalty phase proceedings while incompetent, not personally present, and unable to assist counsel, and thereby avoided a death sentence. (Doc. No. 51-1, ¶ 432, citing *Deere v. Woodford*, 339 F.3d 1084, 1086 (9th Cir. 2003) (remanding capital habeas case for evidentiary hearing on competence where petitioner

96

presented expert testimony in habeas that his "multiple impairments, exacerbated by pressures from his former girlfriend and the conditions of his confinement [at the time of his arrest], rendered him incompetent to rationally comprehend his trial proceedings or to aid and assist counsel.").) Particularly, Petitioner suggests his absence from the penalty phase was taken by jurors as a sign of disinterest and lack of remorse. (Doc. No. 51-1 at ¶ 430.)

However, the state supreme court reasonably could find Petitioner failed to demonstrate on the factual record that he was incompetent at the time of the penalty trial, for the reasons stated. Based thereon, that court reasonably could find no structural error and conclude there was no reasonable probability of a more favorable sentencing outcome.

Moreover, Petitioner has not demonstrated his absence from the penalty trial impacted the fullness of his mitigation defense. (*See* the discussion of claims VI and VII, below.) Petitioner was on record as not wanting to present any mitigation defense. (*Id.*)

Additionally, the jury was specifically instructed that "you are not to consider for any purpose, the reason that [Petitioner] is not here. He's free to make the election that he has made and you're not to, in any way at all, use it in your decision-making in this phase of the case." (RT 5124.) The state supreme court reasonably could find the jury understood and followed that instruction. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

### iii.    *Conclusions*

A fair-minded jurist could find that Petitioner failed to establish counsel's performance fell below an objective standard of reasonableness and that absent counsel's alleged deficiencies, there remains a reasonable probability of a different outcome. *Strickland*, 466 U.S. at 694.

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim III(B) shall be denied.

1          7.       Claim III(F)

2          Petitioner alleges that Schultz was ineffective by presenting an incompetent penalty

3   phase closing argument, violating his rights under the Fifth, Sixth, Eighth and Fourteenth

4   Amendments.  (Doc. No. 51-1 ¶¶ 569-603.)

5          **a.       Supplemental Legal Standards**

6          "There can be no doubt that closing argument for the defense is a basic element of the

7   adversary factfinding process in a criminal trial."  *Herring v. New York*, 422 U.S. 853, 858

8   (1975).

9          **b.       State Court Direct and Collateral Review**

10         Petitioner presented claim III including all subclaims in the second state exhaustion

11  petition (Lod. Doc. No. 30 at 200-302) and it was summarily denied on the merits (Lod. Doc.

12  No. 31, Order Denying Cal. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

13         Petitioner also claimed on direct appeal that counsel was ineffective based upon the

14  brevity of the penalty phase closing argument; the California Supreme Court denied the claim.

15  *Dickey*, 35 Cal. 4 th at 927.

16         **c.       Analysis**

17         *i.       Deficient Performance*

18         Petitioner argues Schultz's five-minute closing argument was incomprehensible,

19  ineffective, and entirely unsupported by any evidence at the penalty phase.  (*Id.*; *see also* Doc.

20  No. 142 at 144-45.)  He characterizes Schultz's closing summation, which comprised two and

21  one-half pages of transcript, as "incomprehensible . . . [and] marred by erroneous statements of

22  fact and law."  (Doc. No. 51-1, ¶ 569.)

23         According to Petitioner, Schutz unreasonably failed to: discuss the law on mitigation;

24  present any evidence in mitigation; argue mitigating effect of the guilt phase evidence;

25  investigate and address the aggravating evidence consisting of Petitioner's prior felony

26  conviction for second degree burglary and the autopsy photographs of the slain victims (*see* RT

27  5127-31); and argue lingering doubt.  (Doc. No. 51-1 ¶573; Doc. No. 142 at 140; *see also* RT

28

1   5127-31; CT 479.)

2          Particularly, Petitioner argues Schultz omitted important facts and misstated and failed

3   to state the important aspects of the instructions the jury would be given to weigh the

4   aggravating and mitigating factors.  He argues Schultz improperly conceded the absence of

5   mitigation.  (*See* Doc. No. 51-1 ¶¶ 575-78.)  He argues Schultz failed to argue available

6   mitigating facts under CALJIC 8.85 including: (i) his role in the murders was as a mere

7   accomplice and aider and abettor (Pen. Code § 190.3 (a); *see also* RT 5135-36); (ii) his prior

8   conviction for non-residential burglary was a non-violent felony (Pen. Code § 190.3 (c)); (iii)

9   his relatively young age (26 years) at the time of the capital crime (Pen. Code § 190.3 (i)); his

10  minor role in what he believed was to be only a robbery (Pen. Code § 190.3 (j)); and his

11  impairment by substance abuse at the time of the capital crime and remorse after the crime

12  (Pen. Code § 190.3 (k)).

13         The record shows that Schultz's penalty phase closing argument in its entirety was as

14  follows:

15

16        Colin will die in prison. You vote to kill him or he will just never get out. The
          trial was conducted on an aider and abettor theory. The prosecutor told you in
17        his first argument the statement of Colin was, "while we were there R.C. flipped
          out and killed two people; what should I do, should I roll over on R.C.?"

18        You were told that the -- in order to find a special circumstance that the death
          had to be in the course of a robbery and not incidental to it, somebody just shot
19        somebody because that's what they wanted to do, intentionally walked up to
          somebody and shot them, they would look at 25 to life with the possibility of
20        parole. On a felony murder where the intent was to steal and R.C. flipped out,
          we get into the two most severe and treacherous penalties the law allows. Life
21        without the possibility of parole is not leniency, is not condoning conduct; it's
          not ignoring the conscious [sic] of the community.
22
          And you are not the conscience of the community. You are 12 separate people.
23        And each of you has to pull the switch. You can't pass the buck to anybody else.
          You can't say, "Take a poll."
24
          The absence of any mitigating factor on that chart is not an aggravating factor.
25        The law does not require you to vote for death. The instruction will be that the
          aggravating factors must substantially -- substantially outweigh the mitigating
26        factors and then -- and then you still have to decide between life and death.
          There is nothing that tells you that law favors death. If the factors were equal, it
27        would be life. If the factor -- if mitigating outweighs the aggravating, it's life.

28

                                             99

We're all subject to human frailty, anything -- anything in the back of your mind during the guilt phase that wasn't sufficient to amount to a reasonable doubt, any lingering thought you have is sufficient for mitigation.

If you accept Gene and Gail then you have to accept the remorse.

Three people are dead. This crime could never have occurred without R.C. Nobody knew where the money was, nobody knew how to get in to [sic] the house, nobody had the other information, nobody could get over there without R.C.; it couldn't have occurred. Three people are dead, the State says, "Make it four and that's appropriate, if we get four dead that's appropriate." The option is the second most severe penalty the law allows. He'll never get out. It means what it says.

The second opportunity that Mr. Hahus had to talk to you, he said that Colin was shook, he was upset; a robbery had been planned, nothing but a burglary -- of the home for cash and he ended up riding a murder beef. R.C. told Colin about his grandmother's house; the money was in the house, they'd go over there and take it and the burglary went sideways.

They refer to you -- whether or not -- in number ["e"] whether or not the victim participated in the defendant's homicidal act or consented. Well, obviously that's not true, there is no concept that it is true. But the only theory that was presented in the prosecution was an aider and abettor, that the homicidal act was done by R.C. He referred to the defendant's act.

The appropriateness of the penalty -- in terms of worst cases or better cases or more serious cases or more aggravated cases -- there's one burglary, that's it, that's it, and they want him to die, they want you to kill him. They point to a burglary in 1983 and say, "He didn't learn."

You're going to teach him by killing him? Is death really going to solve this? The punishment boggles the mind, never getting out of prison, never. Is one more death the solution? Thank you.

(RT 5138-40.)

The California Supreme Court, in denying claimed ineffectiveness of counsel arising from the brevity of the closing argument stated that:

Defendant next contends defense counsel was ineffective because his penalty phase argument was brief. It was brief; in transcript, three pages long. (The prosecutor's argument was longer by only a page.) However, the effectiveness of an advocate's oral presentation is difficult to judge accurately from a written transcript, and the length of an argument is not a sound measure of its quality. (*Weaver, supra*, 26 Cal. 4th at p. 979, 111 Cal.Rptr.2d 2, 29 P.3d 103; *People v. Cudjo* (1993) 6 Cal. 4th 585, 634–635, 25 Cal.Rptr.2d 390, 863 P.2d 635.)

Defense counsel argued the trial was conducted on an aider and abettor theory; that Richard Cullumber was the actual killer; that defendant had expressed remorse as he told his story to Goldman and Buchanan; that the prosecutor in argument had acknowledged only a burglary had been planned; that life imprisonment without possibility of parole meant that defendant would never

100

get out of prison; that sending another man to his death was not an appropriate response to this tragedy; that sentencing defendant to life imprisonment without possibility of parole was the second most severe penalty the law allowed and would not serve to condone defendant's crime; that the aggravating factors had to substantially outweigh the mitigating factors to warrant the death penalty; and that any lingering doubt the jurors may have had during the guilt phase, even though not amounting to a reasonable doubt, was sufficient for mitigation.

We conclude defense counsel's argument, though brief, did not fall below the standard of reasonably competent representation, and we find no reasonable probability that a different argument would have convinced the jury to vote for life over death. (*Weaver, supra,* 26 Cal. 4th at p. 979, 111 Cal.Rptr.2d 2, 29 P.3d 103; *People v. Lewis* (2001) 25 Cal. 4th 610, 675, 106 Cal.Rptr.2d 629, 22 P.3d 392 [penalty phase argument two pages in length not inadequate representation]; *Mayfield, supra,* 5 Cal. 4th at pp. 186–187, 19 Cal.Rptr.2d 836, 852 P.2d 331 [brief, "perfunctory" penalty phase argument not inadequate representation].)

*Dickey*, 35 Cal. 4th at 927.

The state supreme court reasonably denied the claim, as discussed below.

(1)    **The Penalty Defense and Trial Tactics**

Mitigating Evidence and Sentencing Factors

Petitioner faults Schultz for failing to argue the mitigating value of guilt phase evidence (*see* Doc. No. 51-1, ¶¶ 569-603; *see also* CT 498-499) and the habeas proffered mitigation evidence. (Doc. No. 51-1 ¶¶ 579, 592, citing CALJIC 8.84, 8.85.) He argues Schultz lacked any strategic basis for his failure to do so.

However, the state supreme court reasonably could find Schultz's closing touched upon evidence in the record supporting the primary penalty defense theory that Petitioner played only a minor role in the theft portion of the crime; that he did not intend to harm anyone and did not do so. (*See* RT 5138.)

Schultz alluded to the mitigating aspects of lingering doubt as to Petitioner's involvement in the crime; that he was a mere aider and abettor of a planned burglary gone wrong; that R.C. was the principal in the crime and killed both victims. (RT 5139-40.) Moreover, the jury knew the prosecutor conceded the absence of direct evidence that Petitioner aided the killings or formed an intent to kill before seeing victim Freiri apparently dead. (*See* RT 4975-80.)

101

1    Schultz argued Petitioner's confession to his roommates, apparently accepted by the

2    jury, suggested remorse by his emotional recounting of the crime and questioning whether to

3    turn himself in to authorities.  (RT 4357-62, 5139; *see also* Doc. No. 51-1, ¶¶ 579, 590-597;

4    Doc. No. 142 at 148; Doc. No. 135 regarding guilt phase claims (II(B-C, L).)  He argued

5    Petitioner's involvement in the crime was not highly aggravated on its facts, highlighting for

6    the jury the severity of the felony murder rule.  (RT 5138.)  He argued the 1983 burglary

7    conviction lacked aggravating weight.  (RT 5140.)  He argued that life without the possibility

8    of parole (hereinafter "LWOP") was a proportionate and appropriate punishment and that

9    Petitioner would never be released from prison if sentenced to LWOP.  (RT 5138-39.)

10            As to the brevity of the defense closing, Schultz stated on habeas his reasoning that "a

11    very concise statement to the jury would have the most positive effect."  (Pet. Ex. 12 ¶ 14.)

12    He averred that "I emphasized the defendant's limited role as aide and abettor to the underlying

13    felonies and his insubstantial criminal history.  My final argument lasted for approximately

14    five minutes."  (*Id.*)  The state supreme court reasonably could according strategic weight to

15    Schultz's reasoning.

16                    Petitioner's Other Arguments

17            Petitioner's additional arguments that Schultz was deficient in his penalty phase closing

18    reasonably appear unpersuasive.  Schultz did not concede "an absence of any mitigating

19    factor."  Instead, Schultz argued that "t]he absence of any mitigating factor on that [Penal Code

20    section 190.3] chart [of sentencing factors discussed by the prosecutor] was not an aggravating

21    factor."  (RT 5139.)  The state supreme court reasonably could find this to be a correct

22    statement of the law and not a concession that the evidence before the jury had no mitigating

23    weight.  Petitioner argument otherwise based upon a passage lifted out of context is at best

24    unpersuasive.  (*See e.g.* Doc. No. 144 at 30-31.)

25            The state supreme court could reasonably find Schultz was not deficient by failing to

26    argue each of the CALJIC 8.85 factors in mitigation.  Any failure by Schultz to link the

27    CALJIC 8.85 sentencing factors to mitigating aspects of the trial record was ameliorated by

28

jurors' awareness of these factors from the prosecutor's earlier penalty phase closing argument and the illustrative chart in the courtroom. (*See* RT 5134-38; CT 498-499 (regarding CALJIC 8.85).) Schultz told the jury that "the aggravating factors must substantially outweigh the mitigating factors." (RT 5139.) The jury specifically was instructed on the Penal Code section 190.3 sentencing factors. (CT 498-503.) Jurors are presumed to understand the court's instructions and follow them. *Weeks*, 528 U.S. at 234.

Moreover, the jury was aware Petitioner had no prior history of violent crime; the prosecutor conceded as much. (RT 5134.) The jury knew Petitioner was only 26 years-of-age at the time of the crime; the prosecutor had stated as much. (RT 4871.) The jury knew that "[Petitioner was young" when the capital crime occurred (RT 5136).

Petitioner has not pointed to facts in the record that he was under the influence of drugs at the time of the capital crimes.

For the reasons stated, the state supreme court reasonably could find Schultz argued the mitigating evidence and factors and discounted the aggravating evidence and factors consistent with the trial defense theory and the possibility of lingering doubt and his reasonable trial strategy of keeping Petitioner's criminal history from the penalty phase jury. *See Gentry*, 540 U.S. at 4 (deference accorded to counsel's decisions in closing argument).

### ii. *Prejudice*

Petitioner argues that absent Schultz's deficient conduct there is a reasonable probability the result of the sentencing trial would have been different. (Doc. No. 51-1 ¶ 603.)

However, the state supreme court reasonably could find otherwise. The jury was instructed that argument is not evidence (RT 5146; CT 488). They were adequately instructed at the penalty phase (*see* discussion of claims III(G) and XII(D-H) below), including instruction that they could consider evidence from the entire trial unless instructed otherwise. (RT 5145.) For the reasons stated, Petitioner has not shown on the factual record that the jury was precluded from considering any and all mitigating evidence. (*See* the discussion of claim III(A) above and claim III(G) below); *see also Lockett*, 438 U.S. at 604.

*iii.    Conclusions*

A fair-minded jurist could find Petitioner failed to establish that counsel's performance fell below an objective standard of reasonableness, and that absent counsel's alleged deficiencies there remains a reasonable probability of a different outcome.  *Strickland*, 466 U.S. at 694.

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim III((F) shall be denied.

8.    Claim III(G)

Petitioner alleges that Schultz was ineffective by failing to object to inappropriate penalty phase instructions and request appropriate penalty phase instructions, denying him a fair and reliable sentence determination, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.[10]  (Doc. No. 51-1, ¶¶ 604-616.)

a.    **Supplemental Legal Standards**

The Constitution requires that the jury must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Lockett*, 438 U.S. at 604.

Any error in the state court's determination of whether state law supported an instruction in this case cannot form the basis for federal habeas relief.  *See McGuire*, 502 U.S. at 71 ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules").  "Failure to give [a jury] instruction which might be proper as a matter of state law, by itself, does not merit federal habeas relief."  *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005), *quoting Miller v. Stagner*, 757

_____

[10] Claim III(G) does not include argument that counsel failed to object to penalty phase instructions.  (*See* Doc. No. 51-1 ¶¶ 604-614.)

1  F.2d 988, 993 (9th Cir. 1985).

2  　　　The Supreme Court has stated instead that a claim that a court violated a petitioner's

3  due process rights by omitting an instruction requires a showing that the error "so infected the

4  entire trial that the resulting conviction violate[d] due process." *Henderson v. Kibbe*, 431 U.S.

5  145, 154 (1977). The burden on petitioner is especially heavy "where ... the alleged error

6  involves the failure to give an instruction." *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006).

7  　　　Even if constitutional instructional error has occurred, the federal court must still

8  determine whether petitioner suffered actual prejudice, that is, whether the error "had

9  substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507

10  U.S. at 637. A "substantial and injurious effect" means a "reasonable probability" that the jury

11  would have arrived at a different verdict had the instruction been given. *Clark*, 450 F.3d at

12  916.

13  　　　In evaluating a claim of instructional error, a single instruction is not viewed in

14  isolation, but rather in the context of the overall charge. *Spivey v. Rocha*, 194 F.3d 971, 976

15  (1999). "[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has

16  applied the challenged instruction" in an unconstitutional manner. *Boyde,* 494 U.S. at 380.

17  　　　Additionally, a reviewing court does not engage in a technical parsing of the

18  instruction's language, but instead approaches the instructions in the same way that the jury

19  would -- with a "commonsense understanding of the instructions in the light of all that has

20  taken place at the trial." *Johnson v. Texas*, 509 U.S. 350, 368 (1993). Lastly, federal courts

21  presume that juries follow instructions, including cautionary instructions. *Weeks*, 528 U.S. at

22  234; *see also Boyde*, 494 U.S. at 381-85; *Tan v. Runnels*, 413 F.3d 1101, 1115 (2005).

23  　　　**b.      State Court Direct and Collateral Review**

24  　　　Petitioner presented claim III including all subclaims in the second state exhaustion

25  petition (Lod. Doc. No. 30 at 200-302) and it was summarily denied on the merits with certain

26  subclaims including subclaim G denied on procedural grounds (Lod. Doc. No. 31, Order

27  Denying Cal. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

28

1          **c.     Analysis**

2          *i.     Deficient Performance*

3          Petitioner faults counsel for failing to prepare and request special case law-based

4  instructions appropriate for his penalty defense.  (*See* Doc. No. 142 at 159-60.)

5          However, Petitioner does not point to any clearly established Supreme Court law as a

6  basis for relief.  *See Blystone*, 494 U.S. at 305 (it is sufficient that "jury be allowed to consider

7  and give effect to all relevant mitigating evidence"); *id.* at 308 (no general Eighth Amendment

8  requirement for a mercy instruction); *Brown*, 479 U.S. at 543 (instructing the jury that they

9  cannot consider mere sympathy for the defendant at penalty determination does not violate the

10 United States Constitution).

11         Petitioner's specific arguments, discussed below, were reasonably rejected by the state

12 supreme court.

13         **(1)    Lingering Doubt**

14         Petitioner argues Schultz failed to request instruction that the jury may consider

15 lingering doubt.  (*See* RT 5107-08.)  Petitioner argues that under California law lingering doubt

16 can be a factor in mitigation such that an instruction on lingering doubt would have been

17 available to highlight an important mitigation factor.  (*See* Doc. No. 51-1, ¶¶ 606-08, citing

18 *People v. Kaurish*, 52 Cal. 3d 648, 705 (1990) (trial court instructed jury that it could consider

19 lingering doubt of defendant's guilt to be a factor in mitigation); *see also* Doc. No. 144 at 32,

20 citing *People v. Terry*, 61 Cal. 2d 137, 145 (1964) ("[T]he lingering doubts of jurors in the

21 guilt phase may well cast their shadows into the penalty phase and in some measure affect the

22 nature of the punishment."), *overruled on other grounds by People v. Laino*, 32 Cal. 4 th 878,

23 893 (2004).)  Petitioner argues the standard instructions given by the trial court "did not

24 provide adequate guidance on this mitigation factor."  (Doc. No. 144 at 34.)

25         However, Petitioner has not pointed to clearly established law that a trial court is

26 required to instruct a jury to consider lingering doubt as a mitigating factor.  The California

27 Supreme Court has found no such requirement.  *See People v. Jackson*, 1 Cal. 5th 269, 369-70

28

(2016) (neither state nor federal law requires a trial court to instruct a penalty jury to consider lingering doubt as a factor in mitigation).

The record shows the jury was instructed to consider "all of the evidence received during any part of the trial in this case," and "[w]hether or not the defendant was an accomplice to the offense and his participation in the commission of the offenses was relatively minor" and "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime [. . . .]" (CT at 498-499.)

Additionally, Schultz argued for lingering doubt, that:

> We're all subject to human frailty, anything -- anything in the back of your mind during the guilt phase that wasn't sufficient to amount to a reasonable doubt, any lingering thought you have is sufficient for mitigation.

(RT 5139.)

Accordingly, the state supreme court reasonably could have found the instructions given and the arguments of counsel relative thereto sufficiently covered these areas raised by Petitioner.

### (2)    Sympathetic Evidence

Petitioner argues Schultz failed to request instruction regarding the propriety of considering sympathy. (Doc. No. 142 at 164, citing RT 5108.) He points out the jury was instructed at the guilt phase not to be influence by sympathy or pity (CT 388) and argues no contrary instruction was given at the penalty phase. (Doc. No. 142 at 162.)   He argues the jury was entitled to consider sympathy. (*See* Doc. No. 142 citing *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982).) He argues that California's death penalty statute includes an inherent right in the jury to afford mercy to a capital defendant. (*See* Doc. No. 51-1, ¶ 610, citing *Gregg*, 428 U.S. at 199; *People v. Gallego*, 52 Cal. 3d 115, 199 (1990) (defendant entitled to instruction necessary to convey to jury its authority to consider and act on defendant's mitigating evidence).)

Relatedly, Petitioner argues Schultz failed to request instruction that the jury may vote

for LWOP even in the absence of mitigating factors. (Doc. No. 51-1 ¶¶ 609-614, citing *People v. Bonin*, 46 Cal. 3d 659, 698 (1988), *overruled on other grounds by People v. Hill*, 17 Cal. 4th 800, 823 (1998) (no *sua sponte* requirement to instruct on the meaning of LWOP); *Penry v. Lynaugh*, 492 U.S. 302 (1989), *abrogated by Atkins v. Virginia*, (jury must be able to consider and give effect to mitigating evidence relevant to defendant's background, character, or circumstances of crime); *People v. Murtishaw*, 48 Cal. 3d 1001, 1027 (1989) (each juror must assign whatever moral or sympathetic value he deems appropriate to the relevant sentencing factors, singly and in combination [he/she] must believe aggravation is so relatively great, and mitigation so comparatively minor, that the defendant deserves death rather than society's next most serious punishment, life in prison without parole); *see also* Doc. No. 142 at 161, citing *People v. Duncan*, 53 Cal. 3d 955, 978 (1991) (jury may decide, even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death).

Petitioner points out that although the trial court stated outside the jury's presence its intention to instruct the penalty phase jury that they could consider sympathy for Petitioner (RT 5072), Schultz failed to ensure that was done. (RT 5108.) He argues Schultz's failure to request such instruction was not motivated by trial tactics. (Doc. No. 142 at 163-64.)

Petitioner also argues that given death qualification bias and Schultz's failure to present mitigating evidence, Schultz should have requested an instruction that jurors were not required to impose the death penalty. (Doc. No. 51-1, ¶¶ 609, 612; *see also* Doc. No. 142 at 159-60, citing *People v. Brown*, 40 Cal. 3d 512, 541 (1985) *reversed in part by California v. Brown*, 479 U.S. 538 (1987) (sentencing factor "k" allows jury's consideration of any mitigating evidence).

However, the Court observes that the California Supreme Court has considered and rejected these allegations in the context of trial court error, stating that:

> Defendant contends the trial court erroneously refused instructions informing the jurors in various terms that sympathy, pity, compassion, and mercy were factors in deciding the appropriate sentence. We find no error. "We have

1    repeatedly held that a jury told it may sympathetically consider all mitigating
     evidence need not also be expressly instructed it may exercise 'mercy.'"
2    [Citations] Here, the trial court gave the standard instruction to take into account
     "any other circumstance which extenuates the gravity of the crime even though
3    it is not a legal excuse for the crime and any sympathetic or other aspect of the
     defendant's character or record that the defendant offers as a basis for a
4    sentence less than death, whether or not related to the offense for which he is on
     trial." The court also told the jury "to assign whatever moral or sympathetic
5    value you deem appropriate to each and all of the various factors you are
     permitted to consider." No additional instruction was required.

6    *People v. Bolin*, 18 Cal. 4th 297, 343-44 (1998).

7           In reviewing penalty phase instructions, the test is "whether there is a reasonable

8    likelihood that the jury has applied the challenged instruction in a way that prevents the

9    consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380. Further, a single

10   instruction "may not be judged in artificial isolation," but must be considered in light of the

11   instructions as a whole and the entire trial record. *McGuire*, 502 U.S. at 72.

12          Petitioner has not identified clearly established authority from the United States

13   Supreme Court holding that a jury must be instructed in a particular manner. Accordingly,

14   since the Supreme Court has not decided the issue, the state supreme court's decision could not

15   be contrary to or an unreasonable application of United States Supreme Court precedent.

16   *Musladin*, 549 U.S. at 76.

17          The California Supreme Court has found no requirement that a jury be instructed that it

18   may vote for LWOP even in the absence of mitigating factors. *People v. Watson*, 43 Cal. 4th

19   652, 704 (Cal. 2008) (citing *People v. Cunningham*, 25 Cal. 4th 926 (2001)) (California's death

20   penalty statute is not unconstitutional for failing to require a jury instruction as to which factors

21   are aggravating and which are mitigating, or an instruction that the absence of mitigating

22   factors does not constitute aggravation). Notably, that court on direct appeal in this case stated

23   that "[t]he jury is not constitutionally required to presume life imprisonment without possibility

24   of parole is the appropriate punishment." *Dickey*, 35 Cal. 4 th at 931.

25          Here, the state supreme court reasonably could find the jury was not precluded from

26   considering constitutionally relevant mitigating and sympathetic evidence during their sentence

27   deliberations. The Supreme Court has never required a sentencing court to instruct a jury on

28

                                              109

how to weigh and balance factors in aggravation and mitigation. In *Tuilaepa*, the Supreme

Court stated, "[a] capital sentencer need not be instructed how to weigh any particular fact in

the capital sentencing decision." 512 U.S. at 979. "Once the jury finds that the defendant falls

within the legislatively defined category of persons eligible for the death penalty, . . . the jury

then is free to consider a myriad of factors to determine whether death is the appropriate

punishment." *Id.* (quoting *Ramos*, 463 U.S. at 1008.)

> In *Kansas v. Marsh*, the Supreme Court stated:

> In aggregate, our precedents confer upon defendants the right to present
> sentencers with information relevant to the sentencing decision and oblige
> sentencers to consider that information in determining the appropriate sentence.
> The thrust of our mitigation jurisprudence ends here. *"[W]e have never held
> that a specific method for balancing mitigating and aggravating factors in a
> capital sentencing proceeding is constitutionally required."*

548 U.S. 163, 175 (2006) (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988)).

> Petitioner's argument that such an instruction was nonetheless available at the time of

his trial fails to address instruction given to his jury that it may consider:

> [A]ny other circumstance which extenuates the gravity of the crime even though
> it is not a legal excuse for the crime. And any sympathetic or other aspect of the
> defendant's character or record that the defendant offers as a basis for a
> sentence less than death, whether or not related to the offense for which he is on
> trial. You must disregard any jury instruction given to you in the guilt or
> innocence phase of this trial which conflicts with this principle.

(RT 5152.)

> Moreover, considerations of sympathy, mercy, and pity were addressed in instructions

given and Schultz argued in favor of such at the penalty closing. The jury was instructed that,

unlike in the guilt phase, it could consider sympathy during penalty phase deliberations. (Doc.

142 at 163 [quoting RT at 5072]; *see* CT at 502-03 [regarding CALJIC 8.88] describing juror's

duty to weigh aggravating and mitigating factors under California law and allowing the jurors

to "assign whatever moral or sympathetic value you deem appropriate".) The jury was

instructed "to disregard all other instructions given to you in other phases of this trial." (CT

486); *see Bolin*, 18 Cal. 4th at 343 (special instruction on sympathy not required).

110

The jury was aware that from other instructions given that it was not required to vote for death.  (*See* CT at 494 [individual opinion], CT 498-99 [consider all evidence and applicable factors], 502-03 [consider all evidence, applicable factors, and appropriateness of death to determine which penalty is justified].)  Petitioner's argument that the penalty phase instructions mislead the jury by omitting the possibility of a hung jury is unpersuasive for reasons discussed in claim XII(D) below.  (*See also* section of claim XII(E) below; RT 5145.)  Moreover, the record reflects that counsel for both sides touched on the issue of sympathy during penalty phase closing argument.  (RT 5134-40.)

Accordingly, the state supreme court reasonably could have found the instructions given and the arguments of counsel sufficiently covered these areas raised by Petitioner.

### (3)    Special Circumstances

Petitioner argues Schultz failed to request instruction that the jury is not permitted to double-count special circumstances.  (*See* Doc. No. 51-1, ¶611, citing *People v. Melton,* 44 Cal. 3d 713, 768-69 (1988) (since statutory special circumstances are a subset of the circumstances of the crime, a jury given no clarifying instructions might conceivably double-count any such circumstances which were also special circumstances[;] on defendant's request, the trial court should admonish the jury not to do so).)

Petitioner argues instruction with CALJIC 8.85 (regarding Penal Code section 190.3)(a)) that "in determining the appropriate penalty [the jury may consider] … the circumstances of the crime of which the defendant was convicted in … the present proceeding and the existence of any special circumstances found to be true") allowed double-counting of the special circumstances.  (Doc. No. 142 at 164-65; CT 498-99.)  He argues a clarifying instruction should have been given.  (*Id.*, citing *Melton*, 44 Cal. 3d at 774 (conc. opn. of Broussard, J.) ("I believe we should adhere to the policy of prior decisions and interpret Penal Code section 190.3 to avoid duplicative aggravating factors derived from a single, indivisible course of conduct.").

However, the same claim was rejected by the United States Supreme Court, as follows:

At the penalty phase, the jury is instructed to consider numerous other factors listed in § 190.3 in deciding whether to impose the death penalty on a particular defendant. Petitioners contend that three of those § 190.3 sentencing factors are unconstitutional and that, as a consequence, it was error to instruct their juries to consider them. Both Proctor and Tuilaepa challenge factor (a), which requires the sentencer to consider the "circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true." Tuilaepa challenges two other factors as well .... We conclude that none of the three factors is defined in terms that violate the Constitution.

Petitioners' challenge to factor (a) is at some odds with settled principles, for our capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty. *See, e.g., Woodson*, 428 U.S., at 304, 96 S. Ct., at 2991 ("consideration of ... the circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of death"). We would be hard pressed to invalidate a jury instruction that implements what we have said the law requires. In any event, this California factor instructs the jury to consider a relevant subject matter and does so in understandable terms. The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence.

*Cornwell v. Warden, San Quentin State Prison*, No. 2:06-CV-00705 TLN KJN, 2018 WL 934542, at *104–05 (E.D. Cal. Feb. 15, 2018), citing *Tuilaepa*, 512 U.S. at 975–76.

Accordingly, Petitioner cannot point to clearly established federal law that duplicative aggravating circumstances violate federal rights.

Furthermore, the California Supreme Court has found that "[f]actor (a) of section 190.3 … does not impermissibly result in 'double-counting' or automatically create a bias in favor of a death verdict." *People v. Tully*, 54 Cal. 4th 952, 1068 (2012).  According to that court, no such clarifying instruction is required.  *People v. Tafoya*, 42 Cal. 4th 147, 188 (2007) (trial court is not required "to instruct the jury not to 'double count' the same facts as circumstances of the crime and as special circumstances.").

Accordingly, the state supreme court reasonably could find the instructions given and the arguments of counsel sufficiently covered these areas raised by Petitioner.

(4)    Definition of LWOP and Execution of Sentence

Petitioner faults Schultz for failing to request instructions defining LWOP and that the

jury may assume the penalty selected would be carried out.  (Doc. No. 51-1, ¶ 613; Doc. No. 142 at 166, citing *People v. Thompson*, 45 Cal. 3d 86, 131 (1988) (trial court may address issue whether sentence would be carried out if raised by the jury).)  He argues such instructions would have reduced the risk that the jury would impose a death sentence merely to ensure that Petitioner was not released back into society.  (*See* Doc. No. 142 at 167.)

Claims of instructional error will constitute a violation of due process under the Fourteenth Amendment only where the alleged error by itself infects the entire trial to such an extent that the resulting conviction violates due process.  *Cupp v. Naughten,* 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Where the alleged error is the failure to give an instruction, the burden on the Petitioner is "especially heavy."  *Kibbe*, 431 U.S. at 155; *see also Clark,* 450 F.3d at 904.

Here, the California Supreme Court has found instruction relating to whether the sentence imposed, LWOP or death, would be carried out is not required but rather disfavored. *People v. Letner and Tobin*, 50 Cal. 4th 99, 203-07 (2010).]  Petitioner's reliance upon *Thompson* is misplaced as that case is not authority otherwise.  *See* 45 Cal. 3d. at 130-31.

Additionally, Petitioner acknowledges the jury was instructed at the penalty phase to "[d]isregard all other instructions given to you in the other phases of this trial," and not to be "influenced" by "bias" toward Petitioner.  (CT 486; *see also* Doc. No. 142 at 162 n.30.)

Any error in the state court's determination of whether state law supported an instruction in this case cannot form the basis for federal habeas relief.  *See McGuire*, 502 U.S. at 71 ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules").]

### *ii.  Prejudice*

Petitioner argues these instructional errors undermined the reliability of his death sentence.

In evaluating a claim of instructional error, a single instruction is not viewed in isolation, but rather in the context of the overall charge.  *Spivey*, 194 F.3d at 976.  "[T]he

1    proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the

2    challenged instruction" in an unconstitutional manner.  *Boyde,* 494 U.S. at 380.  Additionally, a

3    reviewing court does not engage in a technical parsing of the instruction's language, but

4    instead approaches the instructions in the same way that the jury would -- with a

5    "commonsense understanding of the instructions in the light of all that has taken place at the

6    trial."  *Johnson,* 509 U.S. at 368.  Lastly, federal courts presume that juries follow instructions,

7    including cautionary instructions.  *Weeks*, 528 U.S. at 234; *see also Boyde*, 494 U.S. at 381-85;

8    *Tan*, 413 F.3d at 1115.

9            Even if the trial court erred as alleged, the California Supreme Court reasonably could

10   find such error had no substantial and injurious effect on the jury's penalty selection.  *Brecht*,

11   507 U.S. at 620.  Petitioner has not demonstrated on the evidentiary record any reasonable

12   likelihood the jury applied the trial court's total instructional charge so as to preclude

13   consideration of constitutionally relevant evidence.  A common-sense application of the

14   instructions given to  the facts and circumstances of this case suggests the possibility of

15   prejudice from the omitted instructions is only remote.

16           The omitted instructions likely would not have been helpful to the jury.  The requested

17   instructions readily appear cumulative of the instructions given by the trial court.  (See CT

18   483-503; discussion below of claims XII(D-H), XXV(E, J).)  A federal court can presume that

19   jurors follow all the instructions given them.  *Weeks*, 528 U.S. at 234.

20           Accordingly, the California Supreme Court reasonably found that such omitted

21   instructions would not have provided any necessary guidance, such that their omission was not

22   prejudicial.

23           *iii.    Conclusions*

24           A fair-minded jurist could find that Petitioner failed to establish counsel's performance

25   fell below an objective standard of reasonableness and that absent counsel's alleged

26   deficiencies, there remains a reasonable probability of a different outcome.  *Strickland*, 466

27   U.S. at 694.

28

114

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim III(G) shall be denied.

**B.     Claims Relating to Trial Court Error**

1.     Legal Standards

Trial court error violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers v. Mississippi*, 410 U.S. 284, 294, 303 (1973).

2.     Claim V

Petitioner alleges that during the period between the guilt and penalty phases, the trial court erred by failing to hold a *Marsden* hearing and thereupon appointing new counsel, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 51-1 ¶¶ 627-651.)

**a.     Supplemental Legal Standards**

It is clearly established that the right to the assistance of counsel, as guaranteed by the Sixth Amendment of the United States Constitution entitles a defendant to representation that is free from conflict. *Wood*, 450 U.S. at 271; *see also* discussion of claim II(I) above.

**b.     State Court Direct and Collateral Review**

Petitioner presented claim on direct appeal and it was denied on the merits. *Dickey*, 35 Cal. 4th at 917-22.

The same claim was presented in the first state exhaustion petition (*see* Lod. Doc. No. 7 at 142-55) and denied on the merits (*see* Lod. Doc. No. 10.)

**c.     Analysis**

*i.     Trial Court Error*

Petitioner revisits his claim II(I) (ineffective assistance of counsel) allegations that a complete breakdown of the attorney-client relationship was sufficient to trigger pre-penalty

phase proceedings under *Marsden*, recast here as trial court error.

Petitioner argues that he made a motion for substitute counsel and demonstrated irreconcilable conflict with Schultz and that the trial court erred by wrongly denying the motion. (*See* Doc. No. 142 at 168-69, citing *Smith*, 6 Cal. 4th at 696 (substitute counsel should be appointed where representation is or likely will become ineffective); *Sanchez v. Chappell*, No. 1:97-CV-06134-AWI, 2015 WL 4496379, at *49 (E.D. Cal. July 23, 2015) ("[t]he overarching constitutional question is whether the attorney-client conflict has become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment."); *see also* Doc. No. 144 at 40-41.)

However, the state supreme court reasonably could find the trial court did not err as alleged, for the reasons the follow.

### (1)    Petitioner's Substitute Counsel Request Related to New Trial Motion

Petitioner argues the trial court wrongly construed his *Marsden* request for substitute counsel for the penalty phase as a request applicable only to the new trial motion. (Doc. No. 51-1 ¶ 646.)

Petitioner faults the trial court for delaying until the conclusion of the penalty phase the replacement of Schultz with Katherine Hart, who represented Petitioner on the motion for new trial. (RT 5175-76.) He argues the trial court, when informed of his irreconcilable conflict with Schultz and his desire for substitute counsel, erred in refusing to hold a *Marsden* hearing prior to the penalty phase. (*See* Doc. No. 142 at 175, citing *Schell,* 218 F.3d at 1025 ("the Sixth Amendment requires . . . that the matter be resolved on the merits before the case goes forward.")); *Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) ("To determine whether a conflict rises to the level of 'irreconcilable,' a court looks to three factors: 1) the extent of the conflict; 2) the adequacy of the inquiry by the trial court; and 3) the timeliness of the motion for substitution of counsel.").

No *Marsden* Motion Before the Trial Court

116

The state supreme court reasonably could find Petitioner did not seek

*Marsden* counsel for the penalty trial.

Petitioner argues the state supreme court unreasonably determined facts in the record

for purposes of 28 U.S.C. § 2254(d)(2) when it rejected his claim that he was entitled to a

*Marsden* hearing prior to the penalty phase. He argues that court ignored evidence (i) he was

dissatisfied with Schultz's guilt phase performance, (ii) Schultz was incompetent, (iii) Schultz

failed to advise him as to the *Marsden* process and the consequences of not personally

attending the penalty phase proceedings, and (iv) he did not trust Schultz even to prepare the

form waiver of personal appearance at the penalty phase. (*See* Doc. No. 142 at 170-74; *see*

*also* RT 5045-48, 5115-18.)

Petitioner suggests the trial court, when appointing Ms. Hart to represent Petitioner

following the penalty verdict, acknowledged improper postponement of substitute counsel by

stating that "[Petitioner] had indicted at the conclusion of the guilt phase that he was - he

wanted somebody else to continue with the representation of him in this case." (RT 5175.)

He suggests the trial court intentionally avoided a *Marsden* inquiry in the middle of trial as a

matter of judicial expediency. (Doc. No. 142 at 176.)

Still, based on the record discussed in claim II(I) above, summarized here, the state

supreme court reasonably could find Petitioner's request for substitute counsel related to the

motion for new trial rather than the penalty phase. *See Dickey*, 35 Cal. 4th at 921; *see also*

*United States v. Robinson,* 913 F.2d. 712, 716 (9th Cir. 1990) (defendant's anger over

counsel's failure to present frivolous defenses not a motion for substitute counsel; *cf. Schell*,

218 F.3d at 1025 (a motion for new counsel should be resolved on the merits before the case

moves forward).

The state supreme court reasonably could find the record to suggest Petitioner took

issue with Schultz's guilt phase tactics, rather than raising *Marsden* rights regarding Schultz's

continued representation at the penalty phase. (*See* Doc. No. 142 at 51, citing *Schell*, 218 F.3d

at 1025 ("It is well established and clear that the Sixth Amendment requires on the record an

117

1    appropriate inquiry into the grounds for such a [*Marsden*] motion, and that the matter be

2    resolved on the merits before the case goes forward.").)

3          The trial court, on the motion for new trial, conceded that it "used the wrong words"

4    when telling Petitioner that "we don't conduct *Marsden* hearing in the middle of the trial."

5    (RT 5533.)  Yet the trial court went on to observe that it did not appear "[Petitioner] was really

6    asking for a *Marsden* type hearing.  (RT 5533); that although that court "used the words

7    *Marsden* hearing [ ] in truth it doesn't appear [ ] that he was asking for a *Marsden* hearing."

8    (*Id.*)  The noted record suggests that was the case.

9          The state supreme court found as a matter of state law "[w]e do not find *Marsden* error

10   where complaints of counsel's inadequacy involve tactical disagreements."  *Dickey*, 35 Cal. 4th

11   at 922.  That court could reasonably find that Petitioner did not motion under *Marsden* for

12   substitute counsel, but rather sought substitute counsel to raise guilt phase ineffective

13   assistance claims on a new trial motion to be heard after the penalty trial, such that Schultz's

14   failure to request a *Marsden* hearing was not deficient.  (Doc. No. 51-1 at ¶¶ 346-347, citing

15   *Schell*, 218 F.3d at 1026; *see also* RT 5045-49, 5533; CT 571-576; Pet. Ex. 12 ¶ 12.)

16          <u>No Constructive Denial of Counsel at the Penalty Phase</u>

17          The state supreme court reasonably could find Petitioner was effectively represented by

18   Schultz at the penalty phase proceeding.  Based on the record discussed in claim II(I) above,

19   summarized here, the state supreme court reasonably could find the noted breakdown in

20   relationship between Schultz and Petitioner did not deny him effective assistance of counsel

21   thereafter.

22          A breakdown in the attorney-client relationship can result in a denial of the right to

23   effective assistance of counsel.  *Frazer*, 18 F.3d at 782-83, 785; *see also Brown*, 424 F.2d. at

24   1169-70 (trial court's failure to conduct inquiry into irreconcilable conflict arising from the

25   client's refusal to communicate or cooperate with counsel resulted in denial of effective

26   assistance of counsel); *Schell*, 218 F.3d at 1026, citing *Smith,* 923 F.2d at 1320 (the

27   overarching constitutional question is whether the attorney-client conflict has become so great

28

118

1  that "[i]t resulted in a total lack of communication or other significant impediment that resulted

2  in turn in an attorney-client relationship that fell short of that required by the Sixth

3  Amendment."). "The court must consider: (i) the extent of the conflict; (ii) whether the trial

4  judge made an appropriate inquiry into the extent of the conflict; and (iii) the timeliness of the

5  motion to substitute counsel." *Daniels*, 428 F.3d at 1197-98 (citing *United States v. Moore*,

6  159 F.3d 1154, 1159 n.3 (9th Cir. 1998).

7          The record reflects that at the beginning of the penalty phase, Schultz advised the trial

8  court *in limine* that Petitioner believed Schultz made incompetent decisions during the guilt

9  phase (RT 5045) and that Petitioner did not want to be personally present in court during

10  penalty proceedings (RT 5100).

11          Petitioner confirmed his tactical disagreements with Schultz's guilt phase

12  representation (RT 5048) and that he did not want to attend the penalty phase and did not want

13  to present a penalty defense (RT 5100-02). After colloquy with the trial court, Petitioner

14  waived personal presence at the penalty trial. (RT 5100-18.)

15          Petitioner argues as he did above that the breakdown in communication with Schultz

16  and the latter's unwillingness to advise Petitioner regarding waiver of personal presence at

17  penalty proceedings suggested a total breakdown in the attorney-client relationship and

18  abandonment by Schultz. (Doc. No. 51-1 ¶¶ 642-647; *see also* RT 5045-49; 5114-20; Doc.

19  No. 144 at 42.) He points to his alleged refusal to communicate with Schultz and continue

20  with him as counsel and waiving personal presence at the penalty phase proceedings. He

21  points to his questioning Schultz's competence, citing to the latter's decisions regarding

22  presentation of the guilt phase defense including issues raised, witnesses called, and witness

23  examination. (RT 5048.)

24          Petitioner contends he was unequivocal in his request for *Marsden* counsel prior to the

25  penalty trial and that the trial court erred by denying him a *Marsden* hearing. (*Id.*; Doc. No.

26  51-1 ¶ 639, citing *Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003) (*Marsden*

27  hearing appropriately requested after guilt phase and prior to penalty phase). He notes his

28

1  mistrust of Schultz after the guilt phase verdicts as manifest in his refusal to sign a form waiver

2  prepared by Schultz.

3        However, mere disagreements over trial tactics, as here, do not alone require a *Marsden*

4  hearing. *Schell*, 218 F.3d at 1025. The state supreme court, on the facts and circumstances of

5  this case, reasonably could find any conflict or disagreement between Petitioner and Schultz as

6  to handling of the guilt phase defense did not precipitate a total breakdown in the attorney-

7  client relationship rendering Schultz ineffective as penalty phase counsel.

8        When a trial court is informed of a conflict between trial counsel and a defendant, "the

9  trial court should question the attorney or defendant 'privately and in depth,' and examine

10  available witnesses [. . . .]" *United States v. Nguyen,* 262 F.3d 998, 1004 (9th Cir. 2001)

11  (quoting *Moore,* 159 F.3d at 1160). A conflict inquiry is adequate if it "ease[s] the defendant's

12  dissatisfaction, distrust, and concern" and "provide[s] a 'sufficient basis for reaching an

13  informed decision.' " United States v. *Adelzo–Gonzalez,* 268 F.3d 772, 777 (2001). The state

14  supreme court reasonably could find the trial court's noted *in limine* inquiry and colloquy

15  sufficed in these regards. (*See* discussion of claim II(I), above.)

16        Particularly, Schultz's advised Petitioner on legal issues and recourse relating to the

17  latter's concerns of the poor guilt phase result. Schultz advised him to seek substitute counsel

18  on a new trial motion. (*See* RT 5045-47.) Schultz disclosed Petitioner's concerns at an *in*

19  *limine* hearing. The trial court questioned both Schultz and Petitioner regarding the nature and

20  extent of the breakdown in communications and based thereon determined it related to issues

21  right for new trial motion.

22        The record reflects that Schultz continued to advise Petitioner. Schultz was present

23  when the trial court took Petitioner's oral waiver of personal presence. (RT 5102-03.)

24  Subsequently, when it became apparent state law required a written waiver and Petitioner

25  refused Schultz's proffered form waiver, (RT 5114-15), Schultz nonetheless approved as

26  defense counsel the written waiver provided by the trial court and signed by Petitioner. (CT

27  475-476; *see also* Penal Code § 977(b)(2); RT 5116-20.) Schultz advised Petitioner regarding

28

1   his stipulation to the prior Nevada conviction charged in the information. (RT 5073-74.)

2   Schultz also represented Petitioner in court at the penalty trial. (RT 5124-41.)

3          The state supreme court reasonably could find Petitioner's absenting himself from the

4   penalty trial was not a manifestation of an irreconcilably broken relationship with Schultz, but

5   rather of dissatisfaction at being convicted and of disinclination to present a penalty defense.

6   (*See* claims III(B), VI and VII, *post*.)   Following his waiver of personal presence, Petitioner

7   monitored proceedings from a hold cell and had ready access to the courtroom and to Schultz.

8   (*See* RT 5101.)

9          Likewise on these facts, Petitioner's expressed distrust of Schultz and doubts as to his

10  competency appear equivocal.  While Petitioner questioned guilt phase trial tactics and refused

11  to sign a form waiver of personal presence prepared by Schultz, he nonetheless agreed to

12  proceed to the penalty phase with Schultz as his attorney and accepted representation by

13  Schultz, reserving the issue of substitute counsel for the new trial motion.  *See Daniels*, 428

14  F.3d at 1197 (citing *Morris v. Slappy,* 461 U.S. 1, 3-4 (1983)) ("[T]he right to counsel does not

15  guarantee a right to counsel with whom the accused has a 'meaningful attorney-client

16  relationship.").

17         Significantly, Petitioner has not demonstrated that he had any objection to the penalty

18  defense, evidence, and argument or that he was denied opportunity to consult with Schultz

19  thereon.  The penalty defense theory did not involve contesting the aggravating evidence

20  placed before the jury, i.e. the fact of Petitioner's felony burglary conviction and the five

21  autopsy photographs.  As noted, during pretrial interviews with the defense team, Petitioner

22  expressed his desire that facts underlying his burglary conviction be kept from the jury.  (*See*

23  Pet. Ex. 23 at SH002091-94.)

24         Petitioner participated in the penalty phase proceedings by audio and video feed to his

25  holding cell and had the option of returning to court and consulting Schultz at any time.  (RT

26  5101-02; *see also* Lod. Doc. No. 8, Response to SHCP, at 123-26); *see Morris,* 461 U.S. at 13-

27  14 (holding that the Sixth Amendment requires only competent representation and does not

28

                                             121

guarantee a meaningful relationship between a defendant and counsel).  Petitioner allowed
Schultz to continue advising and representing him through sentencing.

Additionally, for the same reasons discussed above, the state supreme court reasonably
could find the alleged conflict as not serious enough to justify delaying the penalty trial for
substitute counsel.  *See Moore*, 159 F.3d at 1161; *Adelzo-Gonzalez*, 268 F.3d at 780.

ii.      *Any Error Was Non-Structural and Harmless*

Even assuming arguendo the trial court erred as alleged, the California Supreme Court
reasonably could find the error not structural and harmless.

(1)      Structural Error

Petitioner argues structural error; that prejudice is presumed from constructive denial of
counsel during the critical penalty phase proceedings.  (Doc. No. 142 at 176-77 citing *Cronic*,
466 U.S. at 667.)

Structural error is error that permeates "[t]he entire conduct of the trial from the
beginning to end" or "affect[s] the framework within which the trial proceeds." *Campbell,* 408
F.3d at 1171, *citing Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991).  The list of structural
errors is short and includes "total deprivation of the right to counsel at trial."  *See id.*, at 1172.

As noted, a "serious conflict" between Petitioner and counsel may give rise to a
presumption of prejudice.  *Perry*, 488 U.S. at 278-79; *see also Schell*, 218 F.3d 1027.

However, the state supreme court reasonably could find Petitioner was not
constructively denied counsel at the penalty phase entitling him to a presumption of prejudice,
for the reasons discussed above.  *See Perry*, 488 U.S. at 278-79.  In sum, that court reasonably
could find on the record before it that Petitioner did not request substitute counsel for the
penalty phase; continued with Schultz as penalty phase counsel and had access to those
proceedings and to Schultz; and did not object to the penalty defense and argument or
demonstrate such was constitutionally inadequate or that he was denied participation therein.

(2)      Harmless Error

Petitioner argues in the alternative the alleged trial court error was more than harmless

1  because it had a substantial and injurious effect or influence in the jury's determination of his

2  sentence.

3        Where the constitutional error in issue is not structural, habeas relief is unavailable

4  unless the error had a substantial and injurious effect on the verdict.  *Brecht*, 507 U.S. at 637.

5        Petitioner argues the trial court's error was more than harmless because it is highly

6  likely a *Marsden* hearing would have resulted in appointment of substitute counsel and an

7  effective penalty defense consistent with his habeas proffer evidence discussed above.  (*See*

8  Doc. No. 51-1 ¶ 650.)

9        However, for the reasons stated, the state supreme court reasonably could find

10  Petitioner was not denied counsel at and participation in the penalty phase defense.  (*See* e.g.,

11  discussion of claim II(I) above and claim VI and VII below.)  Notably, Petitioner assisted the

12  mitigation defense investigation by providing identities of witnesses and life history

13  information and discussing mitigation phase tactics with the defense team.  He waived personal

14  presence at the penalty trial following advisement of rights, the written approval of Schultz,

15  and subject to audio and video monitoring from a cell adjacent to the courtroom and the ability

16  to return to court and consult with Schultz who continued to represent him.  *See Sullivan*, 446

17  U.S. at 346 (reasonably appeared that counsel and defendant accepted any conflict by

18  proceeding).

19        The state supreme court reasonably could have determined that Schultz, by leaving to

20  Petitioner the decision whether to attend the penalty trial, did not deny Petitioner's right to

21  counsel during that portion of the proceeding.  Particularly, the trial court confirmed in

22  colloquy with Petitioner that he was aware of the nature of the penalty phase trial as well as the

23  rights he sought to waive.  (*See* RT 5115-18.)  Petitioner engaged the trial court in a discussion

24  of the terms of the waiver and demanded edits limiting the waiver to "personal presence only"

25  and to the "balance of the penalty phase."  (*Id.*)  Petitioner specified the waiver applied only

26  while the audio video feed was working.  (RT 5103.)  He ultimately signed a personal presence

27  waiver prepared by the trial court (RT 5120) and approved by Schultz as Petitioner's attorney

28

1 (CT 475-476).

2      Moreover, seemingly apart from his issues with Schultz, Petitioner stated his desire that

3 no evidence in mitigation be presented.  (RT 5101-02.)  Petitioner has not shown his anti-

4 mitigation defense position, which he appeared to attribute to the jury's verdict of conviction

5 (*see* RT 5201-02), would have changed had substitute counsel been appointed.  Even if

6 Petitioner might have changed his mind upon appointment of substitute counsel, it remains the

7 totality of the mitigating evidence appears outweighed by the aggravating and rebuttal

8 evidence, for the reasons stated.  (*See* claim III(C-E), above.)  In short, Petitioner has not

9 shown how substitute counsel, had one been appointed, would have enabled a more favorable

10 outcome on these facts and circumstances.

11      For the reasons stated, the state supreme court reasonably could find any error was not

12 more than harmless.

13      *iii.      Conclusions*

14      The California Supreme Court was not unreasonable in denying allegations the trial

15 court prejudicially erred by failing to hold a *Marsden* hearing and appoint new counsel during

16 the period intervening the guilt and penalty phase.

17      Accordingly, the California Supreme Court's rejection of this claim was not contrary

18 to, or an unreasonable application of, clearly established federal law, or an unreasonable

19 determination of the facts in light of the evidence presented in the state court proceeding.  28

20 U.S.C. § 2254(d).

21      Claim V shall be denied.

22      3.      Claims VI and VII

23      Petitioner revisits incompetency allegations in claim III(B) above, here recast as claims

24 the trail court erred by (i) failing to inquire into his competency (i.e. claim VI) and (ii)

25 accepting his incompetent waiver of personal presence at the penalty phase trial (i.e. claim

26 VII), violating his rights under Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No.

27 51-1 ¶¶ 652-677.)

28

1        **a.      Supplemental Legal Standard**

2            The trial or conviction of a person who is legally incompetent is a substantive due

3   process violation.  *Cooper*, 517 U.S. at 354; *see also* section VII, A, 6, a, *ante*.

4            "[T]he standard for competence to stand trial is whether a defendant has sufficient

5   present ability to consult with his lawyer with a reasonable degree of rational understanding

6   and has a rational as well as factual understanding of the proceedings against him."  *Moran*,

7   509 U.S. at 396, citing *Dusky*, 362 U.S. at 402); *see also Clark*, 769 F.3d at 729.

8        **b.      State Court Direct and Collateral Review**

9            Petitioner presented claim VI in his second state exhaustion petition (Lod. Doc. No. 30

10  at 305-12) and it was denied on the merits and on procedural grounds (Lod. Doc. No. 31, Order

11  Denying Cal. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

12           Petitioner presented claim VII on direct appeal and it was denied on the merits.  *Dickey*,

13  35 Cal. 4th at 922-24.

14       **c.      Analysis**

15       *i.      Trial Court Error*

16           Petitioner argues the trial court had before it evidence of incompetence sufficient to (i)

17  raise a reasonable doubt triggering the need for a state law competency hearing (*see* Penal

18  Code sections 1368 providing the trial court may *sua sponte* order a competency hearing when

19  "a doubt arises in the mind of the judge as to the mental competence of the defendant") and (ii)

20  call in question the validity of his purported waiver of personal presence at the penalty phase

21  trial.  (*See* Doc. No. 142 at 178-93.)  His specific arguments are considered below.

22       **(1)     Failure to Hold Competency Hearing**

23           Petitioner argues that due process required the trial court to inquire *sua sponte* whether

24  he was competent for the penalty trial.  He points to his precarious mental state, breakdown in

25  communication with Schultz, absence from the courtroom during the penalty trial, and sleep

26  deprivation caused by untenable conditions of confinement during trial.  (*See* claims II(I),

27  III(B); *see also Moran*, 509 U.S. at 400-01; Doc. No. 135 at 109-12 [regarding guilt claim

28

XXIV].)  Petitioner characterizes as "suicidal" his decisions to absent himself from the penalty trial and break off all communication with Schultz.  (Doc. No. 144 at 43-44.)

Petitioner also points to habeas proffered expert opinion that after the guilt verdicts, he lost all hope and his cognitive limitations and psychiatric impairments impacted his ability to assist his attorney in conducting his defense.  (Pet. Ex. 2 Ex. H at 24.)  As noted, Dr.  Kharanov found that Petitioner's "history of victimization, the combined stress of protracted legal proceedings, as well as the courtroom setting itself, could have produced further mental decompensation", leaving him unable to consult with his attorney and assist in his defense and thus incompetent at the penalty phase.  *(Id.*; *see also* Doc. No. 142 at 180-81); *Godinez*, 509 U.S. at 396.

Petitioner argues the foregoing circumstances should have suggested to the trial court "a change [in his mental state] that would render [him] unable to meet the standards of competence" and the need for a competency hearing.  *Drope*, 420 U.S. at 181; (*see also* Doc. No. 51-1 ¶¶ 660-661; Doc. No. 144 at 43.)  He argues that had such a hearing been held, he would have been found incompetent for the penalty trial.

However, the state supreme court reasonably could find Petitioner failed to demonstrate indicia in incompetency sufficient to support the claim, for the reasons stated.  (*See* discussion of claims II(I) and III(B) above; *see also* Doc. No. 135 at 109-12 [regarding guilt phase claim XXIV allegations that petitioner's conditions of confinement impaired his ability to concentrate and left him incompetent for the penalty trial].)  Notably, the record reflects that shortly after Petitioner's colloquy with the trial court regarding issues with Schultz's competency, he admitted his prior felony conviction based upon consultation and advisement by Schultz.  (RT 5073-79.)  Schultz did not raise a doubt as to Petitioner's competency.

Petitioner himself proceeded to delineate the parameters of his desired waiver of presence from the penalty phase; that he was waiving presence only at "tomorrow's court proceedings", i.e. the "sentencing phase" and for "no other proceeding, no other court is to be conducted out of my presence[.]"  (RT 5115-16.)  He directed preparation of the written waiver

of personal presence by the trial court containing such limitations.  (RT 5115-19.)  He expressly conditioned his waiver of personal presence upon being able to view and hear the proceedings and refused to enter a waiver if the audio/video feed failed during the penalty proceedings.  (*Id.*; *see also* RT at 5103.)

As noted above, Schultz's failure to observe and raise issues of competency, while not dispositive, *Odle*, 238 F.3d at 1088-89, are nonetheless significant evidence of Petitioner's competency.

Furthermore, Petitioner's alleged indicia of incompetency are not on par with those in *United States v. Loyola-Dominguez*, a case upon which he relies.  125 F.3d 1315, 1318-19 (9th Cir. 1997) (inadequately explained attempted suicide on the eve of trial); *cf. Amaya-Ruiz v. Stewart*, 121 F.3d 486, 489 (9th Cir. 1997) (no bona fide doubt as to competency where defendant was evaluated by mental health professional who determined his alleged irrational behavior appeared the result of a strategy of non-cooperation, and in absence of any history of erratic behavior).

Accordingly, the state supreme court reasonably could find the trial court was not chargeable with a reasonable doubt as to Petitioner's penalty phase competency.

### (2)    Acceptance of Personal Presence Waiver

Petitioner argues the trial court erred by failing to raise a doubt whether he had the competency to waive personal presence at the penalty trial and did so voluntarily, intelligently, and knowingly.  (*See* discussion of claims II(I) and III(B) above; *see also Moran*, 509 U.S. at 400-01; Doc. No. 135 at 109-12 [regarding claim XXIV].)

The state supreme court reasonably could find Petitioner's specific arguments, discussed below, to be unpersuasive.

Penalty Trial as a Critical Stage of Proceeding

Petitioner argues the penalty trial was a critical stage of his proceeding at which his right to counsel and personal presence were constitutionally required.  (Doc. No. 51-1 ¶ 669; Doc. No. 142 at 189-90, citing *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (a defendant is

1    guaranteed the right to be present at any stage of the criminal proceeding that is critical to its

2    outcome if his presence would contribute to the fairness of the procedure); *see also Gerlaugh*

3    *v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997) (Reinhardt, J., concurring and dissenting)

4    (penalty phase is the most critical stage of the proceeding).

5        "It has long and clearly been held that criminal defendants are entitled to effective

6    assistance of counsel during all critical stages of the criminal process." *Nunes*, 350 F.3d at

7    1052. "[I]t is counsel's dut[y] to consult with the defendant on important decisions and to keep

8    the defendant informed of important developments in the course of the prosecution. Those

9    obligations ensure that the ultimate authority remains with the defendant to make certain

10   fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in

11   his or her own behalf, or take an appeal." *Id.* at 1053. Relatedly, a criminal defendant has the

12   right to be present for all critical stages of his trial. *United States v. Gagnon*, 470 U.S. 522,

13   526 (1985).

14       However, Petitioner has not demonstrated clearly established federal law that the

15   penalty phase represented a critical phase of his trial. *See Moore v. Campbell*, 344 F.3d 1313,

16   1323 (11th Cir. 2003) ("the issue of whether a defendant must be present at all times in a

17   capital trial has not yet been settled by the Supreme Court").

18       A criminal defendant has the right to be present at trial "whenever his presence has a

19   relation, reasonably substantial, to the fullness of his opportunity to defend against the charge."

20   *Stincer*, 482 U.S. at 745. The Supreme Court has not clearly established what would contribute

21   to the fairness of the procedure at a stage critical to [the criminal proceeding's] outcome for

22   purposes of a due process violation). *See Stincer*, 482 U.S. at 745. Still a defendant need not

23   be present "when presence would be useless, or the benefit but a shadow." *Id., quoting Snyder*

24   *v. Massachusetts,* 291 U.S. 97, 106-07 (1934) (*overruled in part on other grounds by Malloy v.*

25   *Hogan*, 378 U.S. 1 (1964)); *see also Rice v. Wood*, 77 F.3d 1138, 1140 at n.2 (listing cases

26   finding right to presence not violated).

27       The California Supreme Court has "repeatedly rejected the argument that the Sixth

28

Amendment [C]onfrontation [C]lause of the United States Constitution or the due process clause of the California Constitution prevents a criminal defendant from waiving the right of presence at a critical stage of a capital trial." *Bolin*, 18 Cal. 4th at 325.  In California, a capital defendant may validly waive his presence at critical stages of the trial, at least where evidence is not taken.  *See e.g.*, *People v. Weaver* 26 Cal. 4th 876, 966 (2001); *People v. Jackson* 13 Cal. 4th 1164, 1209–1210 (1996).  Such a waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.  *Johnson*, 304 U.S. at 464.

In California, a defendant's "absence from various court proceedings, even without waiver, may be declared non-prejudicial in situations where his presence does not bear a reasonably substantial relation to the fullness of his opportunity to defend against the charge." *People v. Johnson*, 6 Cal. 4th 1, 18 (1993), *citing People v. Garrison*, 47 Cal. 3d 746, 782 (1989), *quoting People v. Bloyd*, 43 Cal. 3d 333, 359-60 (1987), *abrogated on other grounds by People v. Rogers*, 39 Cal. 4th 826, 879 (2006).

The state supreme court, on the facts and circumstances of this case, reasonably could find Petitioner has not demonstrated that his physical presence in the courtroom could have contributed to the fairness of his penalty trial; or that his physical presence would have impacted the sentence determination.  The penalty defense theory did not involve contesting the aggravating evidence placed before the jury, i.e. the fact of Petitioner's felony burglary conviction and the five autopsy photographs.  Petitioner has not demonstrated that he had any objection to the evidence or was denied opportunity to consult with counsel thereon.

Moreover, Schultz was present at the penalty trial and represented Petitioner without apparent objection.  *See* discussion of claim II(I) above; *Campbell*, 408 F.3d at 1173 (defendant's absence from chambers conference regarding defense counsel's potential conflict of interest not a due process violation where no denial of fair and impartial trial).  Petitioner participated in the penalty phase proceedings by audio and video feed to his holding cell and had the option of returning to court and presumably consulting Schultz at any time.

Penalty Trial as an Evidentiary Stage of Proceeding

129

Petitioner argues an unwaivable state law right in a capital defendant to personal presence at every portion of a proceeding where evidence is taken. (Doc. No. 51-1 ¶ 676, citing *People v. Frye*, 18 Cal. 4th 894, 1010-12 (1998); *see also* Doc. No. 142 at 193, citing Penal Code §§ 977, 1043.) Petitioner argues deprivation of this state right made his penalty trial fundamentally unfair, denying him due process. (*Id.*, citing *Hicks v. Oklahoma*, 447 U.S. 343, 346-47 (1980)).

Under California law, "[i]n all cases in which a felony is charged, the accused shall be present . . . during those portions of the trial when evidence is taken before the trier of fact[.]" Penal Code § 977.

The state supreme court conceded Petitioner was denied his state law right to personal presence when evidence was taken. *See Dickey*, 35 Cal. 4th 923-24. That court found the trial court erred in this regard, but that the error was harmless, as discussed below. (*See* also, *id.*)

<u>Competent, Voluntary, Knowing and Intelligent Waiver</u>

Petitioner revisits his noted arguments and evidence that he was incompetent at the penalty phase and unable to waive rights such that any purported waiver was not voluntary, knowing and intentional. (Doc. No. 142 at 50, citing *Brady v. United States*, 397 U.S. 742, 748 (1970)) ("[W]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."); *see also Drope*, 420 U.S. at 181; Doc. No. 51-1 ¶¶ 660-661; Doc. No. 144 at 43.) Based thereon, he argues incompetence to waive rights to personal presence at the penalty phase.

Petitioner suggests that Schultz then was unable to assist him given that the waiver followed on the heels of the breakdown in communication with Schultz and the trial court's improper denial of a *Marden* hearing. (Doc. No. 142 at 192-93.) Petitioner argues he was not informed as to the circumstances and consequences surrounding the waiver of personal presence. (*See* Doc. No. 51-1 ¶ 671.) He argues the only advice he received was the trial court's admonition that "I do want to let you know, however, that it probably would be wiser to

130

be in the courtroom during the taking of testimony[.]" (RT 5101.)

However, the state supreme court reasonably could find Petitioner was not incompetent at the penalty trial, for the reasons stated. (*See* the discussion of claims II(I) and III(B) above.)

Additionally, the state supreme court reasonably could find Petitioner's personal presence waiver was voluntary, knowing and intelligent. The record shows that Petitioner waived personal presence orally on the record and in writing. Before doing so, the trial court engaged him in a colloquy regarding the nature and extent of the waiver and his understanding of it. (*See* RT 5100-03, 5113-20; *see also* Doc. No. 51-1 ¶¶ 671-674.) As noted, in the course thereof, Petitioner was advised by the trial court that "it would probably be wiser to be in the courtroom". (RT 5101.)

At that time, the trial court provided specific advisement regarding waiver of rights consistent with Penal Code section 977 and discussed Petitioner's requests for modification of the court's proposed form waiver language. (*See* RT 5113-20.) Petitioner requested and received changes to the form waiver including that he be provided with an audio and video feed of penalty phase proceedings and that the waiver be limited to presence at the penalty trial. (*Id.*; CT 475-76.)

During the personal presence waiver proceedings, Petitioner acknowledged his understanding of the nature of the penalty phase; that it was his opportunity to avoid the death penalty by presenting evidence evoking sympathy and pity, and stated that he had no desire to present a mitigation defense, to wit that:

> [He] would just as soon that the defense not even say nothing, just rest. I don't intend to plead nothing to the jury. I'd just as soon sit in the cell. I have no intentions or desire to try to have any sympathy or pity from the jury that convicted me of these crimes. I don't intend to be present, neither; I don't wish to be.

(RT 5201-02); *see also Dickey*, 35 Cal. 4th at 923; *see also* Doc. No. 51-1 ¶¶ 671-674; *Campbell v. Rice*, 408 F.3d 1166, 1173 (1991) (defendant's absence from chambers conference regarding defense counsel's potential conflict of interest not a due process violation where no

131

1   denial of fair and impartial trial). Relatedly, during pre-trial defense interviews, Petitioner

2   stated that he was not interested in anyone saving his life if a jury should be so stupid as to

3   convict him. (Pet. Ex. 23 at SH002137.)

4         Petitioner argues that his written waiver of personal presence was invalid and coerced

5   because it was procured without the advice of counsel (*see* RT 5047) and based upon

6   misinformation provided by Schultz regarding entitlement to a *Marsden* hearing. (*See* Doc.

7   No. 142 at 185-86, citing *Schell*, 218 F.3d at 1025 (9th Cir. 2000) (*Marsden* motion to be

8   resolved before the case moves forward); *see also* the discussion of Claim V above.) He

9   argues that trial court erred by failing to explore the obvious breakdown in the attorney-client

10   relationship when it was raised by Petitioner prior to the penalty phase. (Doc. No. 142 at 187,

11   citing RT 5048, 5100-15.)

12         However, these conclusory arguments fail because the state supreme court reasonably

13   could find Petition was not denied assistance of counsel at the penalty phase, for the reasons

14   stated. (*See* discussion of claims II(I) and III(B) above; *see also Campbell*, 18 F.3d at 672).

15   Notably, Petitioner has not shown Schultz failed to advise him regarding waiver of personal

16   presence at the penalty trial including the consequences thereof. The records reflect only that

17   Schultz told Petitioner the decision was "up to him" and that Schultz "was not going to make a

18   recommendation one way or the other." (RT 5100.) Schultz and Petitioner acquiesced in

19   Petitioner's absence from the penalty phase following the latter's colloquy by the trial court

20   and the trial court's determination that a *Marsden* motion was not then before it. Petitioner

21   received an audio and video feed from a room off the courtroom. Petitioner had the option of

22   returning to the courtroom, and presumably consulting with Schultz who continued to represent

23   him during the entirety of the penalty trial. The state supreme court reasonably could reject

24   claimed coercion of the waiver on these facts. Petitioner has not demonstrated otherwise on

25   the factual record.

26         To the extent Petitioner argues his waiver was possibly impaired by his conditions of

27   confinement including medication, lack of sleep, and anxiety (*see* Doc. No. 51-1 at 188, 191,

28

citing *Johnson*, 304 U.S. at 464-65), the argument fails for the same reasons discussed by this Court in denying guilt phase claim XXIV. (*See* Doc. No. 135 at 109-12.) Significantly, Petitioner does not point to facts suggesting confusion, disorientation, or problems understanding and participating in court proceedings. His demeanor and conduct in court, especially in negotiating his limited waiver of personal presence, reasonably suggest no such impairment.

>    ii.    *Any Error Was neither Structural nor More Than Harmless*

Petitioner argues his asserted incompetency raises structural error such that meeting the *Brecht* standard of harm is not required. (*See* Doc. No. 51-1 at ¶ 665; Doc. No. 142 at 183, citing *Brecht,* 507 U.S. at 637-38 & n.9.) Alternatively, he argues the allegations in these claims raise errors that are more than harmless under *Brecht* because the errors made his penalty trial unfair. (*See Id.*)

However, Petitioner has not demonstrated structural error because the state supreme court reasonably rejected his competency allegations, for the reasons stated.

Moreover, the state supreme court reasonably could find Petitioner's personal presence at the penalty trial to be waivable to the extent his presence did not bear "a substantial relation to the fullness of his opportunity to defend against the charge." *Johnson*, 6 Cal. 4th at 18. The state supreme court on direct appeal found harmless the trial court's state law error in accepting Petitioner's personal presence waiver, stating that:

> A capital defendant cannot voluntarily waive his rights under sections 977 and 1043 to be present at trial. (*Weaver, supra,* 26 Cal. 4th at pp. 967–968, 111 Cal.Rptr.2d 2, 29 P.3d 103; *Jackson, supra,* 13 Cal. 4th at p. 1210, 56 Cal.Rptr.2d 49, 920 P.2d 1254.) However, permitting defendant to waive those rights was merely statutory error, and thus we should reverse the judgment on this ground only if we conclude the error was prejudicial. (*Weaver,* at p. 968, 111 Cal.Rptr.2d 2, 29 P.3d 103; *Jackson,* at p. 1211, 920 P.2d 1254.) The standard for reviewing error in permitting a defendant to absent himself from the *penalty* phase of a capital case is whether there is a " 'reasonable *possibility* ' " the jury would have reached a different result had the error not occurred. (*People v. Hernandez* (2003) 30 Cal. 4th 835, 877, 134 Cal.Rptr.2d 602, 69 P.3d 446, italics added; *People v. Brown* (1988) 46 Cal. 3d 432, 448, 250 Cal.Rptr. 604, 758 P.2d 1135.) *Weaver* and *Jackson* were also capital cases, and we used the reasonable *probability* standard in those cases. (*Weaver,* at p. 968, 111 Cal.Rptr.2d 2, 29 P.3d 103; *Jackson,* at p. 1211, 56 Cal.Rptr.2d 49, 920 P.2d

1254.) However, the error in *Weaver* occurred in the sanity phase of the trial (*Weaver,* at p. 965, 111 Cal.Rptr.2d 2, 29 P.3d 103), and in the guilt phase in *Jackson* (*Jackson,* at p. 1209, 56 Cal.Rptr.2d 49, 920 P.2d 1254).

We conclude it is not reasonably possible a result more favorable to defendant would have been reached in the absence of the error. First, the television monitor in the holding room enabled defendant to see and hear the proceedings, and the court made it clear defendant would be brought back into the courtroom the moment defendant decided he wanted to return. Second, the only witness who testified during the penalty phase was the detective who provided the foundation for the admission of the autopsy photographs of the victims. The admissibility of the autopsy photographs had already been vigorously contested by defense counsel, and it is not apparent what value defendant's presence during the detective's testimony would have been to defense counsel. (See *Weaver, supra,* 26 Cal. 4th at p. 968, 111 Cal.Rptr.2d 2, 29 P.3d 103.) Third, given defendant's professed lack of any desire to receive "sympathy or pity from that jury that convicted me of these crimes," his demeanor, had he been present in the courtroom, might have undermined his counsel's argument. Finally, the court advised the jury that defendant had exercised his option of not being present, but that he was following the proceedings on a television screen in the holding cell, and that they were not to consider his absence in their deliberations.

*Dickey*, 35 Cal. 4th at [923–24.

The state supreme court reasonably found harmless error for the reasons stated by the court and those discussed above. *Brecht*, 507 U.S. at 637. A defendant's "absence from various court proceedings, even without waiver, may be declared non-prejudicial in situations where his presence does not bear a reasonably substantial relation to the fullness of his opportunity to defend against the charge." *Johnson*, 6 Cal. 4th at 18.

The state supreme court reasonably could find Petitioner was not denied sufficient opportunity to assist in his penalty phase defense or that he might have raised concerns that could have been addressed by the trial court. As noted, Petitioner stated on the record that he did not want to present mitigation evidence and defense. (RT 5101-02) Even so, the defense team investigated and developed a mitigation defense. Schultz's decision not to present mitigating evidence was informed by adequate investigation and based upon tactical considerations. Petitioner had access to audio and video feed of the penalty trial from a room adjacent to the courtroom and was free to consult with Schultz and return to the courtroom at any time.

Petitioner's suggestion his waiver of presence was related to the trial court's refusal to convene a *Marsden* hearing (see Doc. No. 51-1 ¶ 675) is inference unsupported by the record, and fails for reasons discussed in claims II(I) and V above.

### iii.    *Conclusions*

The California Supreme Court was not unreasonable in denying allegations the trial court prejudicially erred by failing to inquire into his competency at the penalty phase and in waiving personal presence at the penalty phase.

Accordingly, the California Supreme Court's rejection of the claims was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or an unreasonable determination of facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).[11]

Claims VI and VII shall be denied.

### 4.    Claim IX

Petitioner alleges the trial court erred by denying Schultz's motion to discharge the jury following the emotional outburst in court by Lavelle Garratt, the daughter of victim Marie Caton, following the guilt verdict, violating his rights under Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 51-1 ¶¶ 683-687.)

### a.    **Supplemental Legal Standards**

Due process requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *see also United States v. Plache*, 913 F.2d 1375, 1377-78 (9th Cir. 1990) ("It is well-settled that a single partial juror deprives a defendant of his Sixth Amendment right to a trial by an impartial jury.").

### b.    **State Court Direct and Collateral Review**

Petitioner presented this claim on direct appeal and it was denied on the merits. *Dickey*,

---

[11] Petitioner's further allegation that all prior counsel were ineffective for failing to raise these claims fails for the reasons stated. (*See* Doc. No. 51-1 ¶ 666; *see also* Doc. No. 142 at 183.)

35 Cal. 4th at 916-17.

     **c.**    **Analysis**

     *i.*    *Trial Court Error*

Petitioner revisits allegations (of ineffective assistance of counsel) in claim II(U) *ante*, relating to the outburst in court by Ms. Garratt and other family members following rendition of the guilt phase verdicts, here recast as claimed trial court error. (*See* Doc. No. 142 at 194.)

As discussed above, following reading of the guilt phase verdicts relatives of victim Marie Caton reacted in support of the conviction. Ms. Garrett stated "yes, yes" and other family members embraced, cried, and whispered amongst themselves. (RT 5051.) The trial court immediately directed Ms. Garratt to "keep it down, ma'am." (RT 5053, 5051.) Prosecutor Hahus told Ms. Garratt to "remain silent." (RT 5053.)

Schultz moved for discharge of the jury four days later relying upon Penal Code 190.4(c) and *Booth v. Maryland*, 482 U.S. 496 (1987). (*See* CT 470-71.) The trial court denied the motion (*see* CT 470-71), proposing instead to "instruct the jury to disregard any display by any spectators in the courtroom and any – the statement made by any spectator in the courtroom when the verdicts were being read, unless the defendant does not want me to do that." (Doc. No. 142 at 195, citing RT 5072-73.)

Schultz did not accept the trial court's offer of an ameliorative admonition that the jury "disregard any display by any spectators in the courtroom and any – the statement made by any spectator in the courtroom when the verdicts were being read…." (RT 5072.) Petitioner observes that no such admonition was given. (*See* Doc. No. 142 at 195.)

As discussed in claim II(U) above, the state supreme court denied the claim (couched as ineffective assistance of counsel), stating that:

> At the conclusion of the guilt phase of the trial, when the jury's verdicts and findings were read in open court, Lavelle Garratt, the daughter of victim Marie Caton, said in a loud voice, "Yes, yes." The court admonished her to "[k]eep it down, ma'am"; and the prosecutor also loudly instructed her to remain silent. Other members of Mrs. Caton's family embraced one another, cried, and whispered among themselves.

The following week defense counsel moved to discharge the jury on the ground it had been exposed to constitutionally impermissible victim impact evidence under *Booth v. Maryland* (1987) 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440. In denying the motion, the court expressed doubt as to whether any prejudice occurred, but offered to admonish the jury to disregard the outburst and not let it influence their penalty deliberations, unless the defense preferred that an admonition not be given, as it might serve to highlight the incident in the minds of the jurors. Defense counsel said he would have to decide whether to ask for such an admonition. As it turned out, no admonition was given. While the record does not reflect whether defense counsel expressly declined the court's offer, it strongly suggests he did. The next day the court stated that "some matters had been discussed in chambers and we've gone over" the penalty phase instructions. After the court listed the instructions it intended to give, it asked whether either counsel wanted other instructions. Defense counsel stated, "I have no other requests." Earlier, defense counsel had stated he felt no admonition could be effective—that the proverbial bell could not be unrung.

Assuming arguendo an admonition would have cured any prejudice, defendant contends his trial counsel was ineffective in failing to request an admonition. Again, we disagree.

The brief, spontaneous reaction of the members of Marie Caton's family to the jury verdicts did not constitute victim impact *evidence* of the sort proscribed in *Booth v. Maryland, supra,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440. Moreover, while this case has been on appeal, the United States Supreme Court, partially overruling *Booth* and *South Carolina v. Gathers* (1989) 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876, held that "[i]n a capital trial, evidence showing the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendments to the federal Constitution. (*Payne v. Tennessee* (1991) 501 U.S. 808, 825–827 [111 S.Ct. 2597, 115 L.Ed.2d 720] [(*Payne* )].)" (*People v. Pollock* (2004) 32 Cal. 4th 1153, 1180, 13 Cal.Rptr.3d 34, 89 P.3d 353.) *Payne* applies retroactively. (*People v. Clair* (1992) 2 Cal. 4th 629, 672, 7 Cal.Rptr.2d 564, 828 P.2d 705 (*Clair* ).)

"Under California law, victim impact evidence is admissible at the penalty phase under section 190.3, factor (a), as a circumstance of the crime, provided the evidence is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case. (*People v. Boyette, supra,* 29 Cal. 4th at p. 444 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Edwards* (1991) 54 Cal. 3d 787, 835–836 [1 Cal.Rptr.2d 696, 819 P.2d 436].)" (*People v. Pollock, supra,* 32 Cal. 4th at p. 1180, 13 Cal.Rptr.3d 34, 89 P.3d 353.) It would come as no surprise to a jury that a victim's family was anguished by her murder, relieved that part of the trial was over, and satisfied with the guilty verdicts. The relatively muted reaction of Marie Caton's family to the jury verdicts was certainly not "so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case." (*Ibid.*) Finally, defense counsel may have made a reasonable tactical decision that an admonition was not, on balance, desirable, because it would remind the jury of the incident.

*Dickey*, 35 Cal. 4th at 916–17.

Petitioner concedes Schultz decided not to revisit the issue for fear of reminding the jury of the outburst. (Doc. No. 142 at 195.) Still, he argues there was good cause for the trial court to discharge the jury under Penal Code section 190.4(c) because Ms. Garratt's outburst was entirely audible, inflammatory, unduly prejudicial and prevented the jury from performing its function – making his penalty phase trial unfair. (Doc. No. 142 at 194-95.) He emphasizes the gravity of the outburst by pointing out the trial court conceded its failure to admonish spectators not to display emotions during the reading of the verdicts. (*See* RT 5051.) He argues the outburst was akin to unconfronted evidence.

Petitioner supports these arguments by pointing out that Ms. Garratt's private reward fund instigated his prosecution and that she was a key witness such that her outburst served to bias jurors in favor of victims at the penalty phase. (RT 4238, 4308; Doc. No. 142 at 196-97.)

However, the state supreme court was not unreasonable in denying the claimed trial court error on grounds the outburst was not so inflammatory as to make the subsequent penalty proceeding unfair. *See Musladin*, 549 U.S. at 77 (observing that lack of clearly established Supreme Court holdings regarding the potentially prejudicial effect of spectators' courtroom conduct). A reasonable juror might anticipate that members of the victim's family would support a guilt verdict. Moreover, the outburst occurred between the guilt trial and the penalty trial, and was not evidence considered by the jury at the penalty phase. The record shows the outburst was brief and immediately rebuked by the trial court and the prosecutor.

Although the habeas proffered declaration of Schultz was not before the state supreme court on direct appeal, his reasoning in not requesting the admonition, i.e. to avoid again ringing the bell, was otherwise apparent in the noted record. (*See* RT 5052-53); *Dickey*, 35 Cal. 4th at 916-17. The state supreme court reasonably could have viewed Schultz's decision to be a matter of trial tactics given the admonition would have re-directed the jurors' attention to an event no longer in the forefront, an event that occurred days before.

Additionally, Petitioner has not demonstrated his right to confront evidence was implicated must less violated. He has not shown the penalty phase outburst constituted

138

evidence against him or impeded his ability to present a complete penalty defense. *See Maryland v. Craig*, 497 U.S. 836, 845 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)) (the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense.").

Even if arguendo the outburst was evidentiary in nature, Petitioner has not explained how the non-testimonial outburst could have been effectively confronted at the penalty trial.[12] A reasonable juror could find it unremarkable that a murder victim's child might agree with a verdict for the prosecution, such constituting evidence of specific harm caused by the crime as countenanced by the Supreme Court in *Payne*. 501 U.S. at 825.

Petitioner does not support with facts in the record his further argument that "estrange[ment]" from Schultz left [Petitioner] unable to "evaluat[e]" the trial court's admonition offer, leaving the jury unable to perform its function. (*See* Doc. No. 142 at 196.) Nor does he support with facts in the record his further argument that he was denied effective assistance of counsel in this regard, actually or constructively. (*See* discussion of claims II(I), II(U) and III(B) above.)

### ii. *Any Error was Harmless*

Petitioner argues the trial court's errant failure to discharge the jury raised a reasonable probability of a different sentencing outcome and thus was more than harmless under *Brecht*. He argues the showing in aggravation was so minimal that Ms. Garratt's outburst must have adversely affected the sentencing determination. (Doc. No. 51-1 ¶ 686; *see also* Doc. No. 142 at 198-99.) He points to Ms. Garratt's pivotal role in the trial proceedings and that the outburst was unrebutted and unconfronted. (Doc. No. 142 at 196-97.) He suggests the outburst was not "relatively muted', but instead significant and load. (*See* RT 5051.)

---

[12] *See* n.8, *ante*.

1    Petitioner goes on to argue that even the pro death jury assembled by Schultz (*see* Doc.

2    No. 135 at 21-29 [regarding guilt phase claim I]) must have found the sentencing determination

3    to be a close call because they deliberated five hours over two days during the course of which

4    they submitted questions to the trial court and had testimony re-read.  (CT 477-480.)   This

5    even though the prosecution presented only minimal evidence in aggravation (i.e. the brief

6    testimony by detective Douglas Stokes authenticating autopsy photos [*see* RT 5126-33; CT

7    478-79], the five autopsy photographs (*id.*), and a stipulation that Petitioner committed a

8    burglary in 1983 (CT 479)), and the defense presented no mitigation evidence (RT 5134).

9    Petitioner observes the parties' penalty phase presentations together lasted a mere sixteen

10   minutes.  (CT 478.)

11       However, the state supreme court was not unreasonable in rejecting the claimed trial

12   court error.  The outburst occurred four days prior to the start of the penalty trial; appeared to

13   span no more than a few seconds; was relatively subdued; and was quickly condemned by the

14   trial court and the prosecutor.  To the extent the outburst reflected the impact of Petitioner's

15   crime, the jury could properly have considered such as an aggravating circumstance of the

16   crime.  *See Payne,* 501 U.S. at 825-827.

17       Furthermore, Petitioner merely surmises prejudice from the alleged trial court error.

18   The jury was instructed at the penalty phase that it should not be influenced by "bias nor

19   prejudice against the defendant, nor swayed by public opinion or public feelings."  (CT 486.)

20   Petitioner's jurors presumably understood and followed their instructions.  *Weeks*, 528 U.S. at

21   234; *see also Boyde*, 494 U.S. at 381-85; *Tan* 413 F.3d at 1115.

22       *iii.     Conclusions*

23       The California Supreme Court was not unreasonable in denying allegations the trial

24   court erred by failing to discharge the jury following the outburst by victim family members.

25       Accordingly, the California Supreme Court's rejection of this claim was not contrary

26   to, or an unreasonable application of, clearly established federal law, or an unreasonable

27   determination of the facts in light of the evidence presented in the state court proceeding.  28

28

140

U.S.C. § 2254(d).

Claim IX shall be denied.

5.      Claim X

Petitioner alleges the trial court erred by admitting, over Schultz's objection, post-mortem (i.e. autopsy) photos of the victims, violating his rights under Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 51-1 ¶¶ 688-693.)

### a.      Supplemental Legal Standards

Trial court error violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers*, 410 U.S. at 294, 303.  *See also Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) (due process claim can be stated where graphic photos of victims make the trial fundamentally unfair).

### b.      State Court Direct and Collateral Review

Petitioner presented this claim on direct appeal and it was denied on the merits. (*Dickey*, 35 Cal. 4th at 924-25.)

### c.      Analysis

#### i.      *Trial Court Error*

Petitioner argues the trial court erred in admitting as aggravating circumstances of the crime (under Penal Code section 190.3(a)) five autopsy photos of victims Freiri and Caton. The trial court admitted the photos over the objection of Schultz on grounds that: (i) the photos were not relevant to Petitioner's conviction as a mere aider and abetter who did not participate in the killings, and (ii) the photos were more prejudicial than probative under Evidence Code section 352.  (Doc. No. 51-1 ¶¶ 688, 691; *see also* Doc. No. 142 at 199; RT 5085-98.)

Particularly, Petitioner argues the photos made his trial unfair because they show beating and stabbing injuries inflicted not by him, but rather by R.C., the actual killer.  (*See* RT 5091-92.)  He argues the photos caused the jury to punish him for the brutality inflicted by R.C.  (Doc. No. 142 at 201, citing CT 486.)

The trial court found the circumstances of the crime including photographs not

admitted at the guilt phase to be equally admissible against the aider and abettor and his co-conspirator. (RT 5093-94.)

The trial court also found the photos relevant to the circumstances of the crime, showing the nature and seriousness of the wounds. (RT 5098-99.) The trial court found the photos prejudicial, but concluded their probative value outweighed the prejudice. (RT 5098.) The trial court did direct that one of the photos be modified to "crop" out non-probative or prejudicial matter. (*Id.*)

The California Supreme Court considered and denied the claim on direct appeal, stating that:

> "We repeatedly have determined that photographs of victims' bodies may be admissible at the penalty phase to demonstrate graphically the circumstances of the crime, a factor relevant to the issues of aggravation and penalty. (E.g., *People v. Lucas* [(1995)] 12 Cal. 4th [415,] 490 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *People v. Sanchez* (1995) 12 Cal. 4th 1, 63–65 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; *People v. Medina* (1995) 11 Cal. 4th 694, 775 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Wader* (1993) 5 Cal. 4th 610, 655 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *People v. Raley* (1992) 2 Cal. 4th 870, 914 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People v. Hardy* (1992) 2 Cal. 4th 86, 199–200 [5 Cal.Rptr.2d 796, 825 P.2d 781].)" (*People v. Smithey* (1999) 20 Cal. 4th 936, 990, 86 Cal.Rptr.2d 243, 978 P.2d 1171.)

> Defendant contends the photographs should not have been admitted against him because he was merely an aider and abettor. However, we have upheld the admission of autopsy photographs in the penalty phase of the trial of a defendant convicted on an aiding and abetting theory. (*People v. Sanchez, supra,* 12 Cal. 4th at pp. 63–65, 47 Cal.Rptr.2d 843, 906 P.2d 1129.) Defendant notes there was more evidence in *Sanchez* of the defendant's direct involvement in the murderous acts. (*Id.* at p. 22, 47 Cal.Rptr.2d 843, 906 P.2d 1129.) That is beside the point. The "circumstances of the crime of which the defendant was convicted in the present proceeding" (§ 190.3, factor (a)), which include the brutality of its commission, and whether the defendant's "participation in the commission of the offense was relatively minor" (§ 190.3, factor (j)) are separate sentencing factors. The circumstances of the offense here, as evidenced by the photographs of the victims, were arguably an aggravating factor, and the prosecutor made that argument. The nature of defendant's involvement, that he was an aider and abettor, was arguably a mitigating factor, and defense counsel made that argument. The jury was properly instructed. No error appears.

*Dickey*, 35 Cal. 4th at 924–25.

The California Supreme Court reasonably found the trial court did not abuse its discretion in admitting this evidence. *See Wood v. Alaska*, 957 F.2d 1544, 1550 (9th Cir. 1992)

142

1  (trial judges have broad discretion both to determine relevance and to determine whether

2  prejudicial effect or other concerns outweigh the probative value of the evidence).

3      "[T]he Constitution leaves to the judges who must make these decisions 'wide latitude'

4  to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of

5  'harassment, prejudice, [or] confusion of the issues.'"  *Crane*, 476 U.S. at 689-90 (quoting

6  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *see also Taylor v. Illinois*, 484 U.S. 400,

7  410-11 (1988) (defendant's right to present evidence is not absolute for defendant must comply

8  with established rules of evidence and procedure).  In California, the trial court enjoys "wide

9  discretion" in determining the relevancy of evidence.  *People v. Green*, 27 Cal. 3d 1, 19

10 (1980), *abrogated on other grounds by People v. Martinez*, 20 Cal. 4th 225 (1999).

11     The "admissibility of evidence in a state trial is matter of state law," which is binding

12 on the federal court unless there is a due process violation. *Clark*, 16 F.3d at 963-64.  Only if

13 no permissible inferences can be drawn from admitted evidence will due process be violated.

14 *Jammal*, 926 F.2d at 920; *cf. McGuire*, 502 U.S. at 67 (Ninth Circuit erroneously "relied in part

15 on its conclusion that the [prior injury] evidence was 'incorrectly admitted . . . pursuant to

16 California law' in ruling that McGuire's due process rights were violated by admission of the

17 evidence.").

18     Here, the trial court found the photos to be relevant and more probative than prejudicial

19 evidence of the circumstances of the crime.  (RT 5098.)   As that court noted, the autopsy

20 photos depicted injuries sustained in the attack that led to death and capital charges; evidence

21 of the circumstances surrounding the crime in which Petitioner participated as an aider and

22 abettor of felony murder.  *See Villafuerte v. Stewart*, 111 F.3d 616, 627 (9th Cir. 1997) (photos

23 depicting blood at crime scene and victim injuries relevant to crimes charged are admissible).

24     The state supreme court reasonably could find as a matter of state law that the autopsy

25 photos were relevant and more probative than prejudicial evidence of the circumstances of the

26 charged crimes.  As was the case above in the discussion of claim IX, Petitioner merely

27 surmises the photos must have been more prejudicial than probative given the summary nature

28

                                        143

of his penalty proceedings and sparse evidence admitted thereat. He fails to discuss and give weight to the aggravating and highly probative facts from the guilt phase surrounding his participation in the capital crime, reflected in the photos. (*See e.g.* Doc. 135 discussion denying guilt claims XXVI & XXVIII.) Photographs that are relevant to charged crimes are generally admissible. *Villafuerte*, 111 F.3d 627. In California, "photographs which disclose the manner in which the victim was wounded are relevant on the issues of malice and aggravation of the crime and the penalty." *People v. Thompson*, 50 Cal. 3d 134, 182 (1990).

       *ii.     Any Error was Harmless*

Assuming arguendo the photos were errantly admitted, the state supreme court reasonably could find Petitioner has not shown more than harmless error, i.e. an error that substantially influenced the sentencing outcome. *Brecht*, 507 U.S. at 637-39.

Petitioner argues the alleged error must have been more than harmless given the scant showing in aggravation; the brevity of penalty proceedings; and the relative length of penalty deliberations. (Doc. No. 142 at 201-02; *see als*o Doc. No. 144 at 48, citing 5098; RT 5126-33; CT 477-480.)

Still, the guilt phase evidence of the crimes and surrounding circumstances and Petitioner's involvement therein was before the penalty phase jury. The photos reasonably could be seen as relevant and probative evidence depicting the victims in circumstances already known to the jury; circumstances relating to Petitioner's guilt phase defense that he merely aided and abetted a burglary gone wrong and that it was R.C. who committed the killings in the photos.

The jury was properly instructed on weighing aggravating and mitigating factors and presumably understood and followed their instructions. (*See* CT 498-99, 502-03; *see also* the discussion of claims XII(E, F), XXV(E), *post*.)

       *iii.     Conclusions*

The California Supreme Court was not unreasonable in denying allegations the trial court erred by admitting over objection the post-mortem photos of the victims.

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim X shall be denied.

6.     Claim XI

Petitioner alleges the trial court erred by denying his motion for modification of the verdict, violating his rights under Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 51-1 ¶¶ 694-700.)

a.     **Supplemental Legal Standards**

Trial court error violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers*, 410 U.S. at 294, 303; *Jammal*, 926 F.2d at 919.

b.     **State Court Direct and Collateral Review**

Petitioner presented this claim on direct appeal and it was denied on the merits. *Dickey*, 35 Cal. 4th at 932-33.

c.     **Analysis**

i.     *Trial Court Error*

Petitioner argues the trial court denied him due process because it "failed to apply the proper [i.e. independent] standard of review, failed to state reasons for its findings and ruling, failed to consider important mitigating circumstances, and gave undue weight to claimed aggravating circumstances." (Doc. No. 51-1 ¶ 694; *see also* Doc. No. 142 at 202-03, citing Penal Code § 190.4(e)); *see also Hicks*, 447 U.S. at 346.

Appellate review of California's capital cases is authorized by California Penal Code sections 190.4(e) and 1239(b). Section 190.4 provides an automatic application for modification of a verdict imposing the death penalty, by which the trial judge reviews the evidence and reweighs the section 190.3 aggravating and mitigating circumstances before imposing sentence based on the jury's verdict.

145

Denial of modification of a verdict of death is reviewed on the automatic appeal pursuant to section 1293(b). Such review includes the "evidence relied on by the [trial] judge." *Pulley*, 465 U.S. at 53 (quoting *People v. Frierson*, 25 Cal. 3d 142, 179 (1979)) ("the statutory requirements that the jury specify the special circumstances which permit imposition of the death penalty, and that the trial judge specify the reasons for denying the modification of the death penalty, serve to assure thoughtful and effective appellate review, focusing upon the circumstances present in each particular case.").

At the time of Petitioner's trial, section 1239(b) provided, "[w]hen upon any plea a judgment of death is rendered, an appeal is automatically taken by the defendant without any action by him or his counsel." Even where defendant's counsel takes no action, the California Supreme Court has a duty to examine the complete trial record to "ascertain[] whether defendant was given a fair trial." *People v. Perry*, 14 Cal. 2d 387, 392 (1939).

Aside from the state statutory duty to examine the complete trial record for fairness and the federal constitutional requirement that an appeal be available to indigent appellants, there are no obligations placed on the California Supreme Court that could cause a violation of an appellant's federal constitutional rights. Sections 190.4(e) and 1239(b), and the cases construing them, provide the mechanism for meaningful appellate review.

The California Supreme Court denied this claim, stating that:

> Defendant contends the trial court, in ruling on the automatic motion to modify the verdict (§ 190.4, subd. (e)), failed to apply the proper standard, properly consider the aggravating and mitigating factors, adequately state the reasons for its findings, or direct the clerk to record its reasons in the minutes. Only the last point has merit, and the error with regard to it was not, we conclude, prejudicial.
>
> In ruling upon an automatic motion to modify the verdict under section 190.4, subdivision (e), the trial court "shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings. [¶] The judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes."
>
> Section 190.4, subdivision (e) requires a court ruling upon a motion for

146

modification to reweigh independently the evidence of aggravating and mitigating circumstances and then determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict. (*Catlin, supra,* 26 Cal. 4th at p. 177, 109 Cal.Rptr.2d 31, 26 P.3d 357; *People v. Crittenden* (1994) 9 Cal. 4th 83, 150, 36 Cal.Rptr.2d 474, 885 P.2d 887.)

Defendant contends the court erroneously applied a deferential standard of review appropriate to appellate proceedings. To the contrary, the court expressly stated, "I do understand and agree that the Court must use its independent judgment in reweighing the evidence of mitigating and aggravating circumstances in determining what the penalty ought to be in this case and whether or not this Court agrees with the jury's verdict."

And contrary to defendant's claims, the court carefully reviewed the evidence bearing on each of the aggravating and mitigating factors and clearly explained why it found the aggravating factors substantially outweighed the mitigating factors. Defense counsel urged defendant's culpability was only that of an aider and abettor. The court agreed Cullumber was the "major culprit," but noted the evidence showed defendant's role was "not minor." Defense counsel brought up defendant's "drug use." However, there was no evidence, the court observed, defendant was under the influence of drugs at the time of the offenses. Defense counsel noted the remorse defendant had shown when confessing to Gail Goldman. However, the court observed that defendant's expression of remorse on that occasion was triggered by the television story concerning the crime, and that he had shown no remorse immediately after the murders, but rather had grandly purchased drugs for all of his housemates with the money he had stolen. The circumstances of the crime—that defendant participated in the brutal murders of his elderly victims to obtain money to buy drugs—was, the court stated, the most significant aggravating factor.

Apparently, the court did neglect to direct the clerk to enter the reasons for its ruling on the application in the minutes. However, the reporter's transcript provides an entirely adequate basis for review, and so it is not reasonably possible that this failure to comply with a statutory directive prejudiced defendant.

*Dickey*, 35 Cal. 4th at 932–33. That court reasonably denied the claim, as follows.

<u>Standard of Review</u>

Petitioner argues the trial court failed to "independently" reweigh the evidence of aggravating and mitigating circumstances and determine whether the weight of the evidence supports the jury verdict. (Doc. No. 51-1 ¶ 697-698, citing *People v. Burgener*, 29 Cal. 4th 833, 890 (2003) (section 190.4(e) requires the judge make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and applicable law"); *see also* Doc. No. 142 at 203, citing Penal Code § 190.4(e).)

He argues the prosecution asserted and the trial court used an improper standard of review, i.e.,

147

1   a more deferential standard of "substantial evidence." (*Id.* at 204.)  He argues "the trail court's

2   assessment of aggravating versus mitigating factors was being done through the eyes of the

3   jury, not independently."  (Doc. No. 144 at 50.)

4          However, Petitioner merely surmises the trial court failed to independently reweigh the

5   evidence of aggravating and mitigating circumstances and determine whether, in the judge's

6   independent judgment, the weight of the evidence supported the jury's verdict.  He points to

7   argument by the prosecution which he contends advocated that the section 190.4 standard of

8   review was a more deferential "substantial evidence" standard.  (*See* RT February 21, 1992 at

9   14, 20-21.)  He argues that although the trial court recited the proper standard, it did not

10  understand and apply that standard.  (*See* Doc. No. 144 at 50.)  He also faults the trial court for

11  failing to state the reasons for its findings on the record.  Penal Code § 190.4(e).

12         Petitioner argues the trial court's error led it to "[give] undue weight to factor (a)

13  aggravating evidence [primarily the conduct of R.C.] and failed properly to consider available

14  mitigating evidence [of Petitioner's minor participation, remorse and drug use], thereby

15  depriving Petitioner of the individualized assessment of the appropriateness of the death

16  penalty required by the Eighth Amendment."  (Doc. No. 144 at 51, citing RT Feb. 21, 1992 at

17  24-25.)

18         Petitioner relies upon inference arising from his reargument of Petitioner's limited role

19  as an aider and abettor of felony murder.  According to Petitioner, the trial court unduly

20  credited aggravating circumstances of the crimes directly attributable to perpetrator R.C. and

21  discounted the mitigating circumstances and Petitioner's minor involvement in the crimes.

22  (Doc. No. 142 at 206.)

23         Still, as the state supreme court noted, the trial court considered the proper standard by

24  stating "[I] do understand and agree that the Court must use its independent judgment in

25  reweighing the evidence of mitigating and aggravating circumstances in determining what the

26  penalty ought to be in this case and whether or not this Court agrees with the jury's verdict.'"

27  (RT February 21, 1992 at 24; *see also Dickey*, 35 Cal. 4 th at 932-33.  The trial court proceeded

28

                                                148

1  to state on the record its reasoning regarding the sentencing factors in the context of the

2  aggravating and mitigating evidence before the jury.  (RT February 21, 1992 at 24-30.)

3          The trial court discussed sentencing factor "a" "circumstances of the crime of which the

4  Defendant was convicted in this proceeding."  (*Id.* at 24.)  That court noted that Petitioner and

5  R.C. "got together for the purpose of burglarizing the home of Mrs. Caton"   (*id.* at 25), that the

6  victims were particularly vulnerable (*id.* at 26), that the killings were brutal, and the injuries

7  inflicted were severe (*id.* at 26).

8          The trial court discussed sentencing factor "j," "whether or not the Defendant was an

9  accomplice to the offense and his participation in the offense was relatively minor."  (*Id.* at 28.)

10  That court considered that Petitioner was tried as an aider and abettor of felony murder; that

11  "[Petitioner] was not the principal culprit in the case; [R.C.] was and that is something that I

12  accept; that "all the evidence points to [R.C.] being the major culprit."  (*Id.* at 28-29.)   Even

13  so, the trial court noted that Petitioner's participation in the crime "was not minor", that "he

14  was seen . . . cutting a piece of cord . . . similar to that  . . . found around the neck of Mr.

15  Freiri" and that Petitioner "shared in the ill-gotten gains from that burglary and robbery."  (*Id.*)

16          The trial court found that "[h]aving considered the factors in aggravation and

17  mitigation, it is clear . . . the factors in aggravation do substantially outweigh the mitigating

18  factors."  (*Id.* at 30.)

19          For the reasons stated, the state supreme court was not unreasonable in rejecting

20  Petitioner's asserted  improper weighing of sentencing factors.

21          <u>Written Statement of Findings</u>

22          Petitioner faults the trial court to the extent the clerk's minutes of the proceedings did

23  not include the reasons for its ruling, but stated only that the matter was "argued, submitted,

24  and denied."  (*See* CT 609.)

25          The California procedure requires the trial judge to provide a written statement

26  upholding or overturning the jury's verdict.  Penal Code § 190.4(e).  The California procedure

27  was approved by the Supreme Court in *Pulley v. Harris*, where it was stated:

28

149

1

2　　　　　If the jury finds the defendant guilty of first-degree murder and finds at least
　　　　one special circumstance, the trial proceeds to a second phase to determine the
3　　　　appropriate penalty. Additional evidence may be offered and the jury is given a
　　　　list of relevant factors. § 190.3. "After having heard all the evidence, the trier of
4　　　　fact shall consider, take into account and be guided by the aggravating and
　　　　mitigating circumstances referred to in this section, and shall determine whether
5　　　　the penalty shall be death or life imprisonment without the possibility of
　　　　parole." *Ibid.* If the jury returns a verdict of death, the defendant is deemed to
6　　　　move to modify the verdict. § 190.4(e). The trial judge then reviews the
　　　　evidence and, in light of the statutory factors, makes an "independent
7　　　　determination as to whether the weight of the evidence supports the jury's
　　　　findings and verdicts." *Ibid.* The judge is required to state on the record the
8　　　　reasons for his findings. *Ibid.* If the trial judge denies the motion for
　　　　modification, there is an automatic appeal. §§ 190.4(e), 1239(b). The statute
9　　　　does not require comparative proportionality review or otherwise describe the
　　　　nature of the appeal. [Footnote omitted.] It does state that the trial judge's
10　　　　refusal to modify the sentence "shall be reviewed." § 190.4(e). This would seem
　　　　to include review of the evidence relied on by the judge. As the California
11　　　　Supreme Court has said, "the statutory requirements that the jury specify the
　　　　special circumstances which permit imposition of the death penalty, and that the
12　　　　trial judge specify his reasons for denying modification of the death penalty,
　　　　serve to assure thoughtful and effective appellate review, focusing upon the
13　　　　circumstances present in each particular case." *People v. Frierson*, 25 Cal. 3d
　　　　142, 179, 158 Cal. Rptr. 281, 302, 599 P.2d 587, 609 (1979)….

14　　　　　The jury's "discretion is suitably directed and limited so as to minimize the risk
　　　　of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189, 96 S.Ct., at
15　　　　2932. Its decision is reviewed by the trial judge and the California Supreme
　　　　Court. On its face, this system … cannot be successfully challenged under
16　　　　*Furman* and our subsequent cases.

17　465 U.S. at 51-53.

18　　　　All that is federally required is an "adequate basis for appellate review." *Id.* In

19　California, the trial court's express reasons for its findings in ruling on the automatic motion

20　for modification provide the "adequate basis" for appellate review. *Id.*; *see Diaz*, 3 Cal. 4th at

21　571-573. Nothing more is constitutionally required and Petitioner cannot point to any clearly

22　established Supreme Court precedent stating otherwise. *Williams*, 52 F.3d, at 1484

23　(California's statute "ensures meaningful appellate review") (citing *Brown*, 479 U.S. at 543);

24　*Bonin v. Vasquez*, 794 F. Supp. 957, 987-88 (C.D. Cal. 1992), *aff'd sub nom. Bonin v.*

25　*Calderon,* 59 F.3d 815 (9th Cir. 1995) (the trial judge's determinations on the record pursuant

26　to section 190.4(e) provide ample basis for appellate review).

27　　　　Here, Petitioner correctly notes the trial court failed to make a clerk's record of his

28
　　　　　　　　　　　　　　　　　　　　150

findings and rulings on the motion for modification of the verdict.  (Doc. No. 142 at 205; CT 609.)

Even so, the state supreme court reasonably found the trial court's reasoning as stated in the trial record was sufficient written support for its independent reweighing of the evidence of aggravation and mitigation toward an individualized assessment of the jury's sentencing determination.  (*See* RT Feb. 21, 1992 at 2-52.)  As the state supreme court observed, the "reporter's transcript provides an entirely adequate basis for review, and so it is not reasonably possible that this failure to comply with a statutory directive prejudiced defendant."  *Dickey*, 35 Cal. 4th at 933.

The death penalty is constitutional if it "is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances."  *Blystone*, 494 U.S. at 305.  To the extent automatic modification under California's capital sentencing statute was part of the manner by which California fulfills its constitutional duty to tailor and apply its death sentencing scheme in a rational manner, *see Pulley*, 465 U.S. at 52, the evidentiary record shows the trial court reviewed the verdict, considered and discussed the aggravating and mitigating circumstances and factors and made an individualized determination of whether death was the proper punishment.  (*See* RT Feb. 21, 1992 at 2-52; *see Turner v. Calderon*, 281 F.3d 851, 871 (9th Cir. 2002).

The California Supreme Court's conclusion that the trial court's review was proper under state law is binding on this Court.  *Wainwright v. Goode*, 464 U.S. 78, 84 (1983).

ii.    *Any Error was Harmless*

Petitioner argues the trial judge prejudicially erred in reweighing the evidence of aggravating and mitigating circumstances.  He argues the trial judge failed to consider important mitigating circumstances and gave undue weight to claimed aggravating circumstances.  (Doc. No. 142 at 206.)  He points to the trial court's statement that Penal Code section 190.3(a) factor "circumstances of the crime" factor was most important the jury

1   considered (Doc. No. 142 at 206, citing RT 24-25 [Feb. 21, 1992]) and argues error given that

2   R.C., not Petitioner, was the actual killer.  He argues this error caused the trial court to discount

3   the mitigating effect of Penal Code section 190.3(j) factor "whether or not the defendant was

4   an accomplice to the offense and his participation in the commission of the offense was

5   relatively minor."  (*See* Doc. No. 142 at 207.)

6       However, the trial court referred to the evidence supporting its findings and rulings on

7   these and the other Penal Code section 190.3 factors.  (*See* RT Feb. 21, 1992 at 2-52.)

8   Petitioner concedes the trial judge "discussed each of the aggravating and mitigating factors

9   listed in Penal Code section 190.3" and "the evidence presented at the penalty phase by each

10  side." (Doc. No. 142 at 205.)

11      Still, Petitioner faults the trial judge for failing to specifically indicate whether the

12  evidence was interpreted as aggravating or mitigating.  (Doc. No. 142 at 205, citing RT 24-31

13  (Feb. 21, 1992).)  But the trial court reviewed and analyzed on the record each factor and the

14  evidence offered by the parties and concluded that "the aggravating factors do substantially

15  outweigh the mitigating factors."  (*Id*.)  The state supreme court reasonably was unpersuaded

16  that more is necessary or required.

17      Petitioner argues the trial court improperly discounted mitigating evidence of his

18  remorse under Penal Code section 190.3(k), and his drug use on the day of the murders under

19  Penal Code section 190.3(h).  (Doc. No. 142 at 208-09.)  But the trial court found "no

20  evidence, at the moment the crime was committed, [that Petitioner] was under the influence of

21  drugs. (RT Feb. 21, 1992 at 27.)  That court also observed Petitioner's absence of remorse in

22  the aftermath of the killings, when he used money taken from the victims to buy and share

23  drugs.  (RT Feb. 21, 1992 at 29-30.)  The record reflects the trial court's independent judgment

24  in reviewing and reweighing the evidence relative to these factors and its determination the

25  jury's findings and verdicts were not contrary to law or the evidence presented.  (RT Feb. 21,

26  1992 at 27-28.)  Petitioner's disagreement with the trial court's findings and ruling is not a

27  basis for error.

28

152

Petitioner also argues prejudice from the trial court's failure to direct that the clerk's minutes of proceedings include reasons for the court's ruling. However, the state supreme court reasonably found on direct appeal that "[the] reporter's transcript provides an entirely adequate basis for review, and so it is not reasonably possible that this failure to comply with a statutory directive prejudiced defendant." *Dickey*, 35 Cal. 4th at 933.

Petitioner's further argument that the trial court's record lacked specificity as to whether evidence was aggravating or mitigating and does not show "thoughtful and effective appellate review" (see Doc. No. 142 at 205) is unpersuasive, for the reasons stated.

Even if the state court did err as a matter of state law, such is not alone a basis for federal habeas relief. *McGuire*, 502 U.S. at 72-73.

Petitioner has not demonstrated constitutional error from alleged failure of the trial to adhere to the directive of Penal Code section 190.4(e) that it "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and [ ] make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented."

iii.     *Conclusions*

The California Supreme Court was not unreasonable in denying allegations the trial court erred by denying Petitioner's motion for modification of the verdict.

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim XI shall be denied.

7.     Claim XII(D)

Petitioner alleges the trial court erred by instructing the jury it must return a verdict either for LWOP or death, omitting instruction in the event of a hung jury, violating his rights

153

under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 51-1 ¶ 711-713.)

### a. Supplemental Legal Standards

A jury must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604.

Any error in the state court's determination of whether state law supported an instruction in this case cannot form the basis for federal habeas relief. *See McGuire*, 502 U.S. at 71 ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules").

The Supreme Court has stated instead that a claim that a court violated a petitioner's due process rights by omitting an instruction requires a showing that the error "so infected the entire trial that the resulting conviction violate[d] due process." *Kibbe*, 431 U.S. at 154. The burden on petitioner is especially heavy "where ... the alleged error involves the failure to give an instruction." *Clark*, 450 F.3d at 904.

In evaluating a claim of instructional error, a single instruction is not viewed in isolation, but rather in the context of the overall charge. *Spivey*, 194 F.3d at 976. "[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an unconstitutional manner. *Boyde*, 494 U.S. at 380.

Even if constitutional instructional error has occurred, the federal court must still determine whether petitioner suffered actual prejudice, that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. A "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given. *Clark*, 450 F.3d at 916.

### b. State Court Direct and Collateral Review

Petitioner presented this claim in his second state exhaustion petition (Lod. Doc. No. 30 at 312-14) which the California Supreme Court denied on the merits and on procedural

154

grounds (Lod. Doc. No. 31, Order Denying Cal. Exh. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

### c.    Analysis

#### i.    *Trial Court Error*

Petitioner argues the trial court erred by failing to instruct the jury of the consequences of not reaching a unanimous verdict of either LWOP or death, i.e. that in the event of a hung jury a new penalty phase jury would be empaneled pursuant to Penal Code section 190.4(b). (Doc. No. 51-1 at ¶ 711, citing *People v. Huggins*, 38 Cal. 4th 175, 186 (2006) (a new jury was empaneled following mistrial); *see also* Doc. No. 142 at 210, citing RT 5145.)

The record shows the jury was instructed that "[i]t is the law of this state that the penalty for a defendant found guilty of murder of the first degree shall be death or confinement in the state prison for life without possibility of parole … you must now determine which of said penalties shall be imposed on [the] defendant."  (CT 485; *see also* CT 502.)

Petitioner complains his jury was instructed that "it must return a verdict of either life or death" (Doc. No. 142 at 210, citing RT 5145), and that "to return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."  (Doc. No. 142 at 211, citing RT 5154.)  He argues this instructional error misinformed the jury on its true sentencing options (*see* Doc. No. 144 at 53) and misled jurors on the consequences of deadlock (Doc. No. 142 at 211, citing *Morris v. Woodford*, 273 F.3d 826, 842 (9th Cir. 2001) (when penalty phase instructions mislead the jury and evidence suggests that the jury was confused by the instruction, the instruction is constitutionally improper)).  He argues the jury should have been instructed that "if unable to reach a verdict, a new jury would be empaneled to try the penalty phase of the case."  (Doc. No. 142 at 211.)

Petitioner argues the error created a risk of arbitrary and capricious sentencing that must have been realized here because "record indicates that the jury was not in immediate agreement on imposition of the death penalty" and may have felt forced to reach a verdict or

155

1    speculated on the consequences of failing to do so.  (Doc. No. 142 at 211-12.)

2         However, the California Supreme Court reasonably could have rejected Petitioner's

3    claim the penalty instructions were misleading and confusing because they failed to include

4    instruction on state law that a new jury would be empaneled upon inability to reach a

5    unanimous sentencing determination.  (Doc. No. 51-1 ¶¶ 711-712; *see also* Doc. No. 142 at

6    210-11, citing Penal Code 190.4(b).)

7         Petitioner makes no showing that clearly established federal law required instruction on

8    empanelment of a new jury in the event of a failure to reach a sentencing verdict.  Rather, the

9    Ninth Circuit has found no constitutional error by a trial court's refusal to inform the jury of

10   the consequences of deadlock.  *See Rich v. Calderon*, 187 F.3d 1064, 1069 (9th Cir. 1999).

11   This is not a case like *Morris,* where the jury actually was confused by a misleading instruction

12   and asked the trial court for clarity.

13        Furthermore, Petitioner has not demonstrated his desired instruction was required as a

14   matter of state law.  Penal Code section 190.4(b) provides in pertinent part that "[i]f the trier of

15   fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be,

16   the court shall dismiss the jury and shall order a new jury impaneled to try the issue as to what

17   the penalty shall be."  This language suggests enpanelment of a new jury represents a

18   contingency to be addressed if at all by the trial court.

19        Petitioner has not demonstrated state law required instruction on deadlock or that

20   empanelment of a new jury was a sentencing option available to his jury under state law.  *See*

21   *People v. Memro,* 11 Cal. 4th 786, 882 (1995) (a court is not required to educate the jury on the

22   consequences of a deadlock).

23        Notably, the state supreme court considered on direct appeal the trial court's giving the

24   standard sentencing instructions CALJIC 8.85 and 8.88, which include death or LWOP as the

25   sentencing options available to the jury, and found no error.  *Dickey*, 35 Cal. 4th at 927-31.

26        Whether or not the penalty instructions given by the trial court were a correct statement

27   of California law is not a basis for federal relief.  *See McGuire*, 502 U.S. at 67 (whether some

28

                                              156

action violated a state's law forms "no part" whatsoever [i.e., not a little, not at all] of an inquiry whether that action violated the Constitution); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law ... binds a federal court sitting in federal habeas"); *Mitchell*, 878 F.2d at 324 ("In the absence of a federal constitutional violation, no relief can be granted even if the instruction given might not have been correct as a matter of state law.").

For the reasons stated, the state supreme court reasonably could have found the alleged instructional error did not result in a failure to guide the jury's discretion and the risk of arbitrary and capricious action and that Petitioner was not denied due process. (Doc. No. 142 at 212, citing *Gregg*, 428 U.S. at 193.)

ii.    *Any Error was Harmless*

Petitioner argues the failure to give this instruction was prejudicial. He observes the jury was unable to reach an immediate verdict, deliberating for five hours (CT 477-479), and suggests the jurors must have been confused by the possibility they might be unable to reach a verdict. He concludes that had the jury been properly instructed as to the consequences of deadlock, at least one juror would have held out for LWOP. (*See* Doc. No. 144 at 54.) But the argument is supported only by speculation.

Assuming arguendo that the trial court erred as alleged, the California Supreme Court reasonably could have found that Petitioner had not shown a resulting substantial and injurious effect or influence in the jury's determination of his verdict. *Brecht*, 507 U.S. at 62; *see also Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998) (*Brecht* harmless error standard applies to instructional error). The jurors were able to return a unanimous verdict on the sentencing alternatives before them. (*See* CT 477-482.) At no point did the jury indicate an inability to reach a verdict or request instruction thereon. Even if they had, Petitioner has not demonstrated that Penal Code section 190.4(b) is a sentencing option for the jury, for the reasons stated.

It follows that the sentencing discretion of Petitioner's jury was "suitably directed and

limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189. Petitioner has not shown the jury was prevented from considering LWOP and mitigating evidence. *Brecht*, 507 U.S. at 637; *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (*Brecht* standard applicable to instructional error).

### iii. Conclusions

The California Supreme Court was not unreasonable in denying allegations the trial court prejudicially erred by failing to instruct the jury it must return a verdict either for LWOP or death, omitting instruction in the event of a hung jury.

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim XII(D) shall be denied.

8. Claim XII(E)

Petitioner alleges the trial court erred by failing to instruct the jury on the standard for weighing aggravating and mitigating factors, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 51-1 ¶¶ 714-715.)

**a. Supplemental Legal Standards**

See section VII, B, 7, a, *ante*.

**b. State Court Direct and Collateral Review**

Petitioner presented this claim on direct appeal and it was denied on the merits. *Dickey*, 35 Cal. 4th at 927-28.

**c. Analysis**

### i. Trial Court Error

Petitioner argues that CALJIC 8.85, given in this case to instruct jurors on Penal Code section 190.3 factors in aggravation and mitigation (*see* CT 498-99), is unconstitutionally vague, overbroad and misleading with respect to the manner in which aggravating and

mitigating factors are to be weighed, denying meaningful consideration of all mitigating evidence. (Doc. No. 142 at 212-13, citing *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 247 (2007), citing *Lockett*, 438 U.S. at 640 (the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death); *Eddings*, 455 U.S. at 113-114 (adopting rule in *Lockett*); *see also* Doc. No. 144 at 55.)

"The standard against which we assess whether jury instructions satisfy the rule of *Lockett* and *Eddings* was set forth in *Boyde*, 494 U.S. 370 (1990)." *Johnson*, 509 U.S. at 367-68. In *Boyde*, the Supreme Court held that "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" 494 U.S. at 377 (quoting *Franklin*, 487 U.S. at 181).

In evaluating the instructions, the "reviewing court must determine 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" *Johnson*, 509 U.S. at 367 (quoting *Boyde*, 494 U.S. at 380). "[W]e do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a commonsense understanding of the instructions in the light of all that has taken place at the trial." *Id.* at 368 (quoting *Boyde*, 494 U.S. at 381). Further, a single instruction "may not be judged in artificial isolation but must be considered in light of the instructions as a whole and the entire trial record." *McGuire*, 502 U.S. at 72.

The jury was instructed on the Penal Code 190.3 sentencing factors pursuant to the standard CALJIC 8.85 instruction, that:

> In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case. You shall consider, take into account and be guided by the following factors, if applicable:

159

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance[s] found to be true.

(b) The presence or absence of criminal activity by the defendant, other than the crime[s] for which the defendant has been tried in the present proceedings, which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

(c) The presence or absence of any prior felony conviction, other than the crimes for which the defendant has been tried in the present proceedings.

(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.

(i) The age of the defendant at the time of the crime.

(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime [and any sympathetic or other aspect of the defendant's character or record [that the defendant offers] as a basis for a sentence less than death, whether or not related to the offense for which he is on trial.] You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle.

(CT 498-499; *see also* RT 5150-5152.)

The California Supreme Court considered and denied the claim on direct appeal, stating that:

Defendant contends the standard instruction given here with regard to the factors the jury might take into account in determining the penalty (§ 190.3; CALJIC No. 8.85) failed to adequately guide its discretion, in violation of defendant's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Defendant's various attacks on CALJIC No. 8.85 have been repeatedly rejected by this court, and we conclude he gives us no compelling reason to reconsider our decisions.

CALJIC No. 8.85 does not encourage the double-counting of aggravating factors. (*People v. Lewis, supra,* 25 Cal. 4th at p. 669, 106 Cal.Rptr.2d 629, 22 P.3d 392; *People v. Ayala* (2000) 24 Cal. 4th 243, 288–289, 99 Cal.Rptr.2d 532, 6 P.3d 193.)

The federal Constitution does not bar consideration of unadjudicated criminal activity. (*Tuilaepa v. California* (1994) 512 U.S. 967, 976–977, 114 S.Ct. 2630, 129 L.Ed.2d 750; *People v. Marks* (2003) 31 Cal. 4th 197, 237, 2 Cal.Rptr.3d 252, 72 P.3d 1222; *People v. Anderson, supra,* 25 Cal. 4th at p. 601, 106 Cal.Rptr.2d 575, 22 P.3d 347.) Moreover, defendant seems to complain the jury was permitted to consider prior criminal activity involving use or attempted use of force, whereas the prosecutor candidly acknowledged to the jury, "There is no evidence at all of any previous violent activity on the part of [defendant]."

"[A] reasonable juror would readily have identified" the "emotional disturbance" and "diminished capacity" factors as mitigating. (*People v. Benson* (1990) 52 Cal. 3d 754, 802, 276 Cal.Rptr. 827, 802 P.2d 330; see *People v. Williams* (1997) 16 Cal. 4th 153, 268–269, 66 Cal.Rptr.2d 123, 940 P.2d 710; *People v. McPeters* (1992) 2 Cal. 4th 1148, 1191, 9 Cal.Rptr.2d 834, 832 P.2d 146.) "The presumption that the jurors in this case understood and followed the mitigation instruction supplied to them is not rebutted by empirical assertions to the contrary based on research that is not part of the present record and has not been subject to cross-examination. [Citation.]" (*Welch, supra,* 20 Cal. 4th at p. 773, 85 Cal.Rptr.2d 203, 976 P.2d 754.)[17]

---------------------------------------FOOTNOTE---------------------

n.17 As here, the defendant in *Welch* relied upon an article "claiming that interviews with former jurors or with randomly selected subjects show that many of the subjects failed to properly understand the concept of mitigation correctly after they had been given CALJIC No. 8.88. [Citations.]" (*Welch, supra,* 20 Cal. 4th at pp. 772–773, 85 Cal.Rptr.2d 203, 976 P.2d 754.)

-----------------------------------END FOOTNOTE------------------

Finally, failure to delete inapplicable statutory sentencing factors from CALJIC No. 8.85 as given did not violate defendant's rights under the federal Constitution. (*People v. Box* (2000) 23 Cal. 4th 1153, 1217, 99 Cal.Rptr.2d 69, 5 P.3d 130; *People v. Turner* (1994) 8 Cal. 4th 137, 207–208, 32 Cal.Rptr.2d 762, 878 P.2d 521.) Likewise, the failure to identify which factors were aggravating and which mitigating was not error; the aggravating or mitigating nature of the factors is self-evident within the context of each case. (*People v. Hillhouse* (2002) 27 Cal. 4th 469, 509, 117 Cal.Rptr.2d 45, 40 P.3d 754; see *Box,* at p. 1217, 99 Cal.Rptr.2d 69, 5 P.3d 130.)

*Dickey*, 35 Cal. 4th at 927-28.

Petitioner does not identify clearly established authority from the United States Supreme Court holding that a jury must be instructed in a particular manner. The Eighth Amendment does not require that a jury be instructed on particular statutory mitigating factors. *Buchanan*, 522 U.S. at 275-77. Since the Supreme Court has not decided the issue, the state supreme court's decision could not be contrary to or an unreasonable application of United States Supreme Court precedent. *Musladin*, 549 U.S. 76.

The state supreme court reasonably denied Petitioner's specific arguments, as follows.

### (1)    Double Counting Aggravating Circumstances

Petitioner recasts as trial court error his claim III(G) (ineffective assistance of counsel) allegations, *ante*, that CALJIC 8.85, factor (a), instructing on Penal Code section 190.3(a) "circumstances of the crime" and "special circumstances found to be true" encourages jurors to double count aggravating circumstances, resulting in an arbitrary and capricious verdict.

Petitioner argues the California Supreme Court's rejection of the claim ignores that jury confusion was likely given the two first degree felony murder convictions and five special circumstances found true, arising from Petitioner's status as an aider and abettor of felony murder. (Doc. No. 142 at 214.) He revisits his theme the errant instruction allowed the jury to emphasize aggravating evidence and de-emphasize mitigating evidence that "Petitioner did not harbor any intent to kill either victim, and did not participate, encourage, or endorse the murders." (Doc. No. 144 at 56.)

However, as was the case in the above denial of claim III(G), Petitioner cannot demonstrate clearly established federal law that duplicative aggravating circumstances violate federal rights. The same claim was rejected by the United States Supreme Court in *Tuilaepa*, where the Court concluded that:

> [T]he sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty . . . this California factor instructs the jury to consider a relevant subject matter and does so in understandable terms. The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence.

162

*Tuilaepa*, 512 U.S. at 975-76.

The Supreme Court has examined the language in California's jury instruction on mitigation several times and upheld it against constitutional challenges. *See Belmontes*, 549 U.S. at 24; *Brown v. Payton*, 544 U.S. 133, 142 (2005); *Boyde*, 494 U.S. at 386. Particularly, the Supreme Court has stated that "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa*, 512 U.S. at 978-79 (1994). Similarly, in *Marsh*, the Supreme Court stated:

> In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and obligate sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here. "[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."

548 U.S. at 175 (quoting *Franklin*, 487 U.S. at 179) (citing *Stephens,* 462 U.S. at 875–876, n.13).

Likewise, the state supreme court has repeatedly rejected this claim. *See People v. Lewis,* 25 Cal. 4th 610, 669 (2001); *People v. Ayala,* 24 Cal. 4th 243, 288-289 (2000). That court has found "[f]actor (a) of section 190.3 … does not impermissibly result in 'double-counting' or automatically create a bias in favor of a death verdict." *Tully*, 54 Cal. 4th at 1068.

In any event, Petitioner offers nothing more than surmise in support of the claim, for the reasons stated.

**(2)    Identifying Aggravating and Mitigating Factors**

Petitioner argues that CALJIC 8.85 fails to instruct jurors that Penal Code section 190.3 factors (a, b, c, and i) are to be considered aggravating and all other factors are to be considered mitigating. (Doc. No. 142 at 215, citing *People v. Coffman*, 34 Cal. 4th 1, 108 (2004) ("[Aggravating evidence must pertain to the circumstances of the capital offense (§ 190.3, factor (a)), other violent criminal conduct by the defendant (*id.,* factor (b)) or prior felony convictions (*id.,* factor (c)); only these three factors, and the experiential or moral implications of the defendant's age (*id.,* factor (i)), are properly considered in aggravation of penalty.")

163

1    Petitioner argues this error kept the jury from appreciating that his minor participation

2    the crimes committed by R.C. could only be mitigating and not aggravating. (Doc. No. 144 at

3    56-57.) He observes in this regard the prosecution argument that being an accomplice "was

4    just as bad as personally committing the murders." (Doc. No. 144 at 57.)

5    The California Supreme Court rejected the claim as it has in other cases, finding "self-

6    evident within the context of each case" the aggravating or mitigating nature of the sentencing

7    factors. *Dickey*, 35 Cal. 4th at 928.

8    That court was not unreasonable in rejecting the claim. Petitioner's suggestion CALJIC

9    8.85 prevented the jury from meaningfully considering his minor participation the crime as a

10   mere accomplice ignores the plain language of the instruction.

11   Additionally, the failure to identify whether factors are aggravating or mitigating is not

12   contrary to or an unreasonable application of Supreme Court authority. In *Pulley*, the Supreme

13   Court reviewed California's sentencing system, including the manner in which the jury

14   considered relevant factors in deciding the penalty. 465 U.S. at 51. The Supreme Court noted

15   that the 1977 death penalty law (like the 1978 law applicable in this case) did not identify or

16   separate the aggravating or mitigating factors. *Id.,* at 53 n.14. The Court nonetheless found

17   California's death penalty law to be constitutional. *Id.*, at 51 ("Assuming that there could be a

18   capital sentencing system so lacking in other checks on arbitrariness that it would not pass

19   constitutional muster without comparative proportionality review, the 1977 California statute is

20   not of that sort."). *Pulley* was clearly established authority at the time Petitioner's conviction

21   became final on May 23, 2005.

22   In *Tuilaepa*, the Supreme Court revisited California's death penalty sentencing scheme.

23   The Supreme Court rejected the argument that California's "single list of factors" was

24   unconstitutional. The Court stated:

25

26        This argument, too, is foreclosed by our cases. A capital sentencer need not be
          instructed how to weigh any particular fact in the capital sentencing decision. In
27        California v. Ramos, for example, we upheld an instruction informing the jury
          that the Governor had the power to commute life sentences and stated that "the
28        fact that the jury is given no specific guidance on how the commutation factor is

to figure into its determination presents no constitutional problem." [Citation] Likewise, in Proffitt v. Florida, we upheld the Florida capital sentencing scheme even though "the various factors to be considered by the sentencing authorities [did] not have numerical weights assigned to them." [Citation] In Gregg, moreover, we "approved Georgia's capital sentencing statute even though it clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances." [Citation] We also rejected an objection "to the wide scope of evidence and argument" allowed at sentencing hearings. [Citation] In sum, "discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. [Citation] "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." [Citation] Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." [Citations] In contravention of those cases, petitioners' argument would force the States to adopt a kind of mandatory sentencing scheme requiring a jury to sentence a defendant to death if it found, for example, a certain kind or number of facts, or found more statutory aggravating factors than statutory mitigating factors. The States are not required to conduct the capital sentencing process in that fashion. [Citation]

Accordingly, Petitioner has not demonstrated the trial court erred by instructing the jury with the 190.3 factors to consider in determining the penalty pursuant to CALJIC 8.85.

*ii.    Any Error was Harmless*

Petitioner argues the jury applied the erroneous instruction in an extra-aggravating manner. (Doc. No. 142 at 214-14, citing *Boyde*, 494 U.S. at 388. He argues, as he did above, that the unique facts of this case raise a reasonable likelihood the jury applied the instruction so as to prevent consideration of constitutionally relevant evidence. (Doc. No. 142 at 215, citing *Boyde*, 494 U.S. at 371.) Particularly, he argues that the error "prohibited the jury from giving 'meaningful consideration and effect to' the fact that Petitioner was an accomplice and his purported participation in the crime was relatively minor." (Doc. No. 142 at 217, citing *Abdul-Kabir*, 550 U.S. at 247.)

Petitioner supports the argument by pointing to CALJIC factor "j", a mitigating factor, and contends the prosecution's argument that Petitioner's culpability as a mere aider and abettor was on par with that of R.C., the actual killer, allowed the jury to convert factor "j" into an aggravating factor. He points to the prosecutor's argument that although "[Petitioner] was

165

1  an accomplice, both he and R.C. did the burglary, did the robbery, committed the conduct that

2  resulted in these deaths."  (*See* RT 5137.)

3        Yet the California Supreme Court reasonably found that the instructions were adequate

4  to permit jurors to consider all the relevant mitigating evidence, *Boyde*, 494 U.S. at 381-82

5  (1990), and that on the facts and circumstances of this case Penal Code section 190.3(d)(g) did

6  not limit the jurors' discretion in this regard.  *See Richter*, 562 U.S. at 101 (state court finding

7  that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could

8  disagree on the correctness of the state court's decision); *see also* the discussion of claim

9  XXV(E) below.

10       That court reasonably could find the sentencing discretion of Petitioner's jury was

11  "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious

12  action."  *Gregg*, 428 U.S. at 189.  So even if California's death penalty statute is infirm as

13  alleged, Petitioner has not demonstrated on the factual record any "substantial and injurious

14  effect or influence in determining [the] jury's verdict," under *Brecht*.  *Coleman*, 525 U.S. at

15  145-46.

16       In sum, Petitioner has not demonstrated that the instructions given in this case in any

17  way foreclosed the jury from considering any relevant mitigating evidence.

18       *iii.*     *Conclusions*

19       For the reasons stated, the California Supreme Court was not unreasonable in denying

20  allegations the trial court erred by failing to instruct the jury on the standard for weighing

21  aggravating and mitigating factors.

22       Accordingly, the California Supreme Court's rejection of this claim was not contrary

23  to, or an unreasonable application of, clearly established federal law, or an unreasonable

24  determination of the facts in light of the evidence presented in the state court proceeding.  28

25  U.S.C. § 2254(d).

26       Claim XII(E) shall be denied.

27       9.      Claim XII(F)

28

Petitioner alleges the trial court's use of CALJIC 8.88 regarding weighing of aggravating and mitigating factors violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 51-1 ¶¶ 716-717.)

### a. Supplemental Legal Standards

See section VII, B, 7, a, *ante*.

### b. State Court Direct and Collateral Review

Petitioner presented this claim on direct appeal and it was denied on the merits. *Dickey*, 35 Cal. 4th at 929.

### c. Analysis

#### i. *Trial Court Error*

Petitioner argues that CALJIC 8.88, given in this case to instruct the jurors on weighing of aggravating and mitigating factors was vague and improperly reduced the prosecution's burden of proof and inadequately defined mitigating circumstances.  (Doc. No. 142 at 217.)

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. 586 at 604; *Eddings*, 455 U.S. at 113-114 (adopting rule in *Lockett*).

"The standard against which we assess whether jury instructions satisfy the rule of *Lockett* and *Eddings* was set forth in *Boyde*, 494 U.S. 370 (1990)."  *Johnson*, 509 U.S. at 367-68.  In *Boyde*, the Supreme Court held that "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" 494 U.S. at 377 (quoting *Franklin*, 487 U.S. at 181.

In evaluating the instructions, the "reviewing court must determine 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" *Johnson*, 509 U.S. at 367 (quoting

167

*Boyde*, 494 U.S. at 380).  "[W]e do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a commonsense understanding of the instructions in the light of all that has taken place at the trial." Id. at 368 (quoting *Boyde*, 494 U.S. at 381).  Further, a single instruction "may not be judged in artificial isolation but must be considered in light of the instructions as a whole and the entire trial record."  *McGuire*, 502 U.S. at 72.

The jury was instructed pursuant to CALJIC 8.88 and in pertinent part that:

> The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them.  You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.  In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.
>
> To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.

(CT 502-503; RT 5154.)

The California Supreme Court in denying the claim stated that:

> Defendant contends giving the standard instruction on the weighing of aggravating and mitigating factors (CALJIC No. 8.88) violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We have repeatedly rejected similar claims, and defendant gives us no compelling reason to reconsider our decisions.
>
> "Defendant contends that the standard instruction on the weighing of mitigating and aggravating factors was impermissibly vague and misleading in that it failed to inform the jury that unless it found that the factors in aggravation outweighed the factors in mitigation, it could not impose a sentence of death, and in that it failed to inform the jury that if factors in mitigation outweighed those in aggravation, it must impose a sentence of life in prison without the possibility of parole. He also complains that the instruction's direction that before the jury may return a verdict of death, it must find that the aggravating circumstances are 'so substantial' as to warrant a sentence of death and not life imprisonment without possibility of parole, was vague and led to arbitrary decision-making. He claims violation of his right to due process of law and to a reliable and nonarbitrary penalty determination under the Eighth Amendment of the United States Constitution. [¶] We repeatedly have rejected identical claims and decline defendant's invitation to reconsider our prior rulings. [Citations.]" (*People v. Catlin* (2001) 26 Cal. 4th 81, 174, 109 Cal.Rptr.2d 31, 26 P.3d 357 (*Catlin* ).)

168

> Defendant also contends the standard instruction, in referring to the "totality" of the aggravating and mitigating circumstances, erroneously implied a single mitigating circumstance could not outweigh any and all aggravating circumstances. However, the instruction was not susceptible of this interpretation. (*People v. Berryman* (1993) 6 Cal. 4th 1048, 1099–1100, 25 Cal.Rptr.2d 867, 864 P.2d 40.)
>
> Finally, no instruction defining life imprisonment without possibility of parole was required. (*People v. Hughes* (2002) 27 Cal. 4th 287, 405, 116 Cal.Rptr.2d 401, 39 P.3d 432 (*Hughes* ).)

*Dickey*, 35 Cal. 4th at 929.

Petitioner does not identify clearly established authority from the United States Supreme Court holding that a jury must be instructed in a particular manner. The Eighth Amendment does not require that a jury be instructed on particular statutory mitigating factors. *Buchanan*, 522 U.S. at 275-77. Since the Supreme Court has not decided the issue, the state supreme court's decision could not be contrary to or an unreasonable application of United States Supreme Court precedent. *Musladin*, 549 U.S. 76.

The Supreme Court has examined the language in California's jury instruction on mitigation multiple times and upheld it against constitutional challenges every time. *See Belmontes*, 549 U.S. at 24; *Payton*, 544 U.S. at 142; *Boyde*, 494 U.S. 370, 386.

The state supreme court reasonably denied Petitioner's specific arguments, as follows.

### (1) Weighing Process

Petitioner argues that on the facts and circumstances of this case, CALJIC 8.88 improperly suggested that jurors use a quantitative weighing process. He points to that portion of CALJIC 8.88 instructing that "[i]n weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." (CT 502-503; RT 5154; *see also* Doc. No. 142 at 219.) He argues this language is inherently quantitative and implicitly weighs in favor of death because it addresses the weight of the totality of circumstances rather than the weight of any one circumstance.

However, Petitioner concedes the jury was instructed against "mere mechanical

counting" of factors and that they could assign "whatever moral and sympathetic value" they deemed appropriate to any of the factors. (Doc. No. 142 at 219.) The jury was instructed that "[i]n weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." (RT at 5154.)

Given the foregoing, the totality of the instructions given, and the presumption that jurors understand and follow their instructions, the state supreme court's rejection of the claim was not unreasonable.

### (2)    Ambiguous Terminology

Petitioner argues that on the facts and circumstances of this case, the definitions of "aggravating" and "mitigating" provided in CALJIC 8.88 created juror confusion. (Doc. No. 142 at 220.)

The jury was instructed pursuant to CALJIC 8.88 and in pertinent part that:

> An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself.
>
> A mitigating circumstance is any fact, condition or event which as such, does not constitute justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.

(CT 502; RT 5153-54.) Petitioner argues particularly that terms used in the definition of "mitigating circumstance" such as "extenuating" are not plain language terms and required further definition. (Doc. No. 142 at 221.)

As noted, the proper inquiry when an instruction is challenged as ambiguous is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Payton*, 544 U.S. at 143 (quoting *Boyde*, 494 U.S. at 380). The Supreme Court further emphasized:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process,

170

with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Payton*, 544 U.S. at 143 (quoting *Boyde*, 494 U.S. at 380-81).

Here again, the state supreme court reasonably could find the challenged language to be plain on its face. That court could reasonably find Petitioner has not demonstrated a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.

Moreover, the Eighth Amendment does not require that a jury be instructed on particular statutory mitigating factors. *Buchanan*, 522 U.S. at 275-77.

Given the foregoing, the totality of instructions given, and the presumption that jurors understand and follow their instructions, the state supreme court's rejection of the claim was not unreasonable.

### (3)  Burden of Proof

Petitioner argues that CALJIC 8.88 fails to incorporate the standard of proof stated in Penal Code section 190.3.

The jury was instructed pursuant to CALJIC 8.88 and in pertinent part that:

After having heard and received all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.

(CT 502.)

Petitioner argues that CALJIC 8.88 unfairly omits language contained in section 190.3 which provides that:

---

[A]fter having heard and received all of the evidence, and after having heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances

171

1
2
3

referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole.

_____

4

5

(Doc. No. 142 at 218; *see also* CT 502-03.)

6

7

8

9

10

11

12

13

Petitioner argues that on the facts and circumstances of this case, the term "so substantial" is ambiguous and impermissibly prevented the jury from selecting LWOP where a single mitigating factor was found. (*Id.*) He argues these errors left the jury impermissible "open-ended discretion" regarding imposition of the death penalty, reducing the prosecution's burden of proof. (Doc. No. 142 at 219, citing *Maynard v. Cartwright*, 486 U.S. 356, 361–62 (1988) (channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action).)

14

15

16

17

However, upon consideration of the entire instructional charge to the jury and related argument, the state supreme court reasonably could find it is unlikely the alleged vagueness prevented consideration of constitutionally relevant evidence in the sentence determination. *Boyde*, 494 U.S. at 380.

18

19

20

Furthermore, for the reasons stated in the discussion of claim XII(G), below, California's penalty phase process is moral and normative and does not place a burden of proof upon the prosecution. Petitioner's argument to the contrary is unavailing.

21

22

23

24

For the reasons stated, the California Supreme Court reasonably rejected the claim as it has in other cases, finding that CALJIC 8.88 did not prevent proper weighing of aggravating and mitigating evidence. *Dickey*, 35 Cal. 4th at 929 (finding the aggravating or mitigating nature of the factors to be self-evident within the context of each case).

25

_____

26

*ii.     Any Error was Harmless*

27

Petitioner argues the erroneous instruction led to juror confusion in the process of

28

weighing aggravating and mitigating evidence and prevented the jury from giving full meaning

and effect to all evidence in mitigation. Especially so here, he argues, given that he was

charged and convicted as a mere accomplice. *See Boyde*, 494 U.S. at 381 (the term

"extenuate" was defined for the jury removing the possibility of confusion by the jury in

applying factor (k)). Petitioner argues this confusion denied him an individualized and reliable

penalty determination.

Here again, the California Supreme Court reasonably could find the instructions were

adequate to permit jurors to consider all the relevant mitigating evidence, *Boyde*, 494 U.S. at

381-82 (1990), and did not limit the jurors' discretion in this regard. *See Richter*, 562 U.S. at

101 (state court finding that a claim lacks merit precludes federal habeas relief so long as fair-

minded jurists could disagree on the correctness of the state court's decision). The sentencing

discretion of Petitioner's jury was "suitably directed and limited so as to minimize the risk of

wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

It can be presumed the jury followed the instructions, including the cautionary

instructions, *Weeks*, 528 U.S. at 234, applying a "commonsense understanding of the

instruction in the light of all that has taken place at the trial." *Johnson*, 509 U.S. at 368; see the

discussion of claim III(G), *ante*.

---

### iii.    Conclusions

The California Supreme Court was not unreasonable in denying allegations the trial

court erred by using CALJIC 8.88 regarding weighing of aggravating and mitigating factors.

Accordingly, the California Supreme Court's rejection of this claim was not contrary

to, or an unreasonable application of, clearly established federal law, or an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding. 28

U.S.C. § 2254(d).

Claim XII(F) shall be denied.

10.    Claim XII(G)

Petitioner alleges the trial court erred by failing to instruct the jury that a "reasonable doubt" standard was applicable to their determinations at the penalty phase, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. No. 51-1 ¶¶ 718-719.)

**a.      Supplemental Legal Standards**

See section VII, B, 7, a, *ante*.

**b.      State Court Direct and Collateral Review**

Petitioner presented this claim on direct appeal and it was denied on the merits.  *Dickey*, 35 Cal. 4th at 929-31.

**c.      Analysis**

*i.      Trial Court Error*

Petitioner argues the trial court prejudicially erred by failing to instruct the jury that a "beyond a reasonable doubt" burden of proof applied at the penalty phase.  (Doc. No. 142 at 221-24.)

The California Supreme Court in denying the claim stated that:

> Defendant contends failure to instruct the jury that the reasonable doubt standard governs the penalty determination violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. We have rejected the identical contention, and defendant gives us no reason to reconsider our decision.
>
> Defendant claims that it is unconstitutional to impose a sentence of death unless the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. This claim was first rejected by our court in *People v. Rodriguez* [(1986)] 42 Cal. 3d [730,] 777–779 [230 Cal.Rptr. 667, 726 P.2d 113], and has been rejected ever since. (See, e.g., [*People v.*] *Snow* [(2003)] 30 Cal. 4th [43,] 125–127 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *Burgener, supra,* 29 Cal. 4th at p. 884, fn. 7 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Gutierrez* (2002) 28 Cal. 4th 1083, 1150–1151 [124 Cal.Rptr.2d 373, 52 P.3d 572]; *Clair, supra,* 2 Cal. 4th at p. 691 [7 Cal.Rptr.2d 564, 828 P.2d 705].) As we recently stated: 'The Constitution does not require the jury to find beyond a reasonable doubt that a particular factor in aggravation exists, that the aggravating factors outweighed the mitigating factors, or that death was the appropriate penalty.' (*Burgener, supra,* 29 Cal. 4th at p. 884 [129 Cal.Rptr.2d 747, 62 P.3d 1].) (*People v. Cox* (2003) 30 Cal. 4th 916, 971, 135 Cal.Rptr.2d 272, 70 P.3d 277.)
>
> Defendant acknowledges this court has previously rejected similar arguments. However, as did the defendant in *Cox,* defendant "asks us to reconsider this position in light of two recent United States Supreme Court cases, *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435], and *Ring v.*

*Arizona* (2002) 536 U.S. 584 [122 S.Ct. 2428, 153 L.Ed.2d 556]. Specifically, defendant argues that the two cases read together mandate that the aggravating circumstances necessary for the jury's imposition of the death penalty be found beyond a reasonable doubt. We disagree. As this court recently stated in [*People v.*] *Snow, supra,* 30 Cal. 4th at page 126, footnote 32 [132 Cal.Rptr.2d 271, 65 P.3d 749]: 'We reject that argument for the reason given in *People v. Anderson* [, *supra,*] 25 Cal. 4th [at pp.] 589–590, footnote 14 [106 Cal.Rptr.2d 575, 22 P.3d 347]: "[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without possibility of parole. (§ 190.2, subd. (a).) Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi.*" The high court's recent decision in *Ring v. Arizona* [, *supra,*] 536 U.S. 584 [122 S.Ct. 2428, 153 L.Ed.2d 556] does not change this analysis. Under the Arizona capital sentencing scheme invalidated in *Ring,* a defendant convicted of first-degree murder could be sentenced to death if, and only if, the trial court first found at least one of the enumerated aggravating factors true. (*Id.* at p. 603 [122 S.Ct. 2428].) Under California's scheme, in contrast, each juror must believe the circumstances in aggravation substantially outweigh those in mitigation, but the jury as a whole need not find any one aggravating factor to exist. The final step in California capital sentencing is a free weighing of all the factors relating to the defendant's culpability, comparable to a sentencing court's traditionally discretionary decision to, for example, impose one prison sentence rather than another. Nothing in *Apprendi* or *Ring* suggests the sentencer in such a system constitutionally must find any aggravating factor true beyond a reasonable doubt.' (Accord, *People v. Smith* (2003) 30 Cal. 4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Prieto* (2003) 30 Cal. 4th 226, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123] [(*Prieto* )].)" (*People v. Cox, supra,* 30 Cal. 4th at pp. 971–972, 135 Cal.Rptr.2d 272, 70 P.3d 277.)

*Dickey*, 35 Cal. 4th at 929-31.

Petitioner complains that with the exception of the charged prior conviction as to which the jury was instructed a "proof beyond a reasonable doubt" standard applied, no penalty phase burden of proof instruction was given. (Doc. No. 142 at 221-22.) He argues this was error because the penalty phase requires Penal Code section 190.3 fact finding as an element of capital murder and imposition of a sentence greater than that authorized by the guilt phase verdict. (Doc. No. 142 at 223, citing *Apprendi v. New Jersey*, 530 U.S. 466, 478 (2000); *Ring v. Arizona*, 536 U.S. 584, 589 (2002).) He argues the jury should have been instructed that before a death verdict could be returned, the jury was required to find that: (i) any aggravating factors upon which it relied were true beyond a reasonable doubt; and (ii) the aggravating factor or factors outweighed the mitigating factors beyond a reasonable doubt. (Doc. No. 142

1    at 223.)

2         Particularly, Petitioner takes issue with the California Supreme Court's finding that:

3

4         [O]nce the defendant has been convicted of first-degree murder and one or more
          special circumstances has been found true beyond a reasonable doubt, death is
5         no more than the prescribed statutory maximum for the offense; the only
          alternative is life imprisonment without possibility of parole. (§ 190.2, subd.
6         (a).) Hence, facts which bear upon, but do not necessarily determine, which of
          these two alternative penalties is appropriate do not come within the holding of
7         *Apprendi*.

8    *Dickey*, 35 Cal. 4th at 931.  Petitioner argues this finding is contrary to *Ring's* requirement that

9    findings of fact which increase the punishment authorized must be found by a jury beyond a

10   reasonable doubt.  (Doc. No. 142 at 224, citing *Ring*, 536 U.S. at 602.)

11        However, the California Supreme Court reasonably denied the claim.  State and federal

12   courts have rejected the claim.  *See, e.g. Williams v. Calderon*, 52 F.3d 1465, 1484-85 (9th Cir.

13   1995) (failure to require a specific finding that death is the appropriate penalty beyond a

14   reasonable doubt does not render California's death penalty statute unconstitutional); *People v.*

15   *Webb*, 6 Cal. 4th 494, 536 (1993).  Under California law "neither death nor life is

16   presumptively appropriate or inappropriate under any set of circumstances, but in all cases the

17   determination of the appropriate penalty remains a question for each individual juror."  *People*

18   *v. Samayoa*, 15 Cal. 4th 795, 853 (1997).

19        Petitioner's argument that the Constitution requires the jury to determine beyond a

20   reasonable doubt that death is the appropriate penalty runs contrary to the conclusion of a

21   plurality of the Supreme Court that a defendant may constitutionally be required to establish

22   the existence of mitigating circumstances by only a preponderance of the evidence standard.

23   *See Walton*, 497 U.S. at 649-651.

24        In California, for a defendant to be eligible for the death penalty, the jury must, beyond

25   a reasonable doubt, find him guilty of murder in the first degree, and must find true one of the

26   special circumstances set forth in Penal Code section 190.2.  *Tuilaepa*, 512 U.S. at 975.  But

27   once a defendant is convicted, "the prosecution has no burden of proof that death is the

28
                                                    176

1  appropriate penalty, or that one or more aggravating factors or crimes exist, in order to obtain a

2  judgment of death." *People v. Anderson*, 25 Cal. 4th 543, 589 (2001).  Instead, the clearly

3  established law at the time Petitioner's conviction became final vested the jury with "unbridled

4  discretion in determining whether the death penalty should be imposed after it has found that

5  the defendant is a member of the class made eligible for that penalty." *Tuilaepa*, 512 U.S. at

6  979-80.

7       Further, "the United States Supreme Court has never stated that a beyond a reasonable

8  doubt standard is required when determining whether a death penalty should be imposed."

9  *Harris v. Pulley*, 692 F.2d 1189, 1195 (1982), *rev'd on other grounds by Pulley v. Harris,* 465

10  U.S. 37, 41 (1984).  Nor is there any Supreme Court authority requiring a burden of proof or

11  persuasion be assigned to any of the jury's penalty phase determinations.  On the contrary, the

12  Supreme Court has held that no "specific method for balancing mitigating and aggravating

13  factors in a capital sentencing proceeding is constitutionally required." *Marsh*, 548 U.S. at

14  175.  California's death penalty sentencing scheme has been consistently upheld as

15  constitutional by the Supreme Court.  *Tuilaepa*, 512 U.S. at 975-80; *Pulley*, 465 U.S. at 53.

16       In these regards, the California Supreme Court has held that:

17

18       We also reject defendant's contention that the California death penalty law
         violates the Eighth and Fourteenth Amendments because the jury is not
         instructed as to *any* burden of proof in selecting the penalty to be imposed. As
19       we have explained, '[u]nlike the guilt determination, "the sentencing function is
         inherently moral and normative, not factual" … and, hence, not susceptible to a
20       burden-of-proof quantification.' … The instructions as a whole adequately
         guide the jury in carrying out their 'moral and normative' function." (*People v.
21       Jenkins, supra,* 22 Cal. 4th at pp. 1053–1054, 95 Cal. Rptr. 2d 377, 997 P.2d
         1044.) The death penalty statute is not unconstitutional because it fails "to
22       impose a burden of proof on either party, even if only proof by a preponderance
         of the evidence, or, alternatively, in failing to instruct the jury on the absence of
23       a burden of proof. [Citations]." (*People v. Vines* (2011) 51 Cal. 4th 830, 891,
         124 Cal. Rptr. 3d 830, 251 P.3d 943.)
24

25  *Tully*, 54 Cal. 4th at 1068.

26       Here, the jury was instructed that an aggravating criminal conviction must be proved

27  beyond a reasonable doubt.  (RT 8940-41; CT 500.)  They were instructed to consider the

28

                                                    177

1  applicable factors of aggravating and mitigating circumstances and that in order to find for

2  death each juror must be persuaded that the aggravating evidence and/or circumstances is so

3  substantial in comparison with the mitigating circumstances that it warrants death instead of

4  life without parole.  (RT 8942-43; *see also* CT 502-503 (CALJIC 8.88).)  Due process requires

5  no more.  *Harris*, 692 F.2d at 1194.

6      California is not required to adopt specific standards for instructing the jury on

7  consideration of aggravating and mitigating circumstances.  *Stephens*, 462 U.S. at 890; s*ee also*

8  *Ortiz*, 149 F.3d at 944 (citing *Stephens*, 462 U.S. at 880) (the Constitution requires only that a

9  state provide procedures to guide the sentencer's discretion generally).  The Ninth Circuit has

10  rejected argument otherwise.  *See Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998).  As to

11  Petitioner's claim that the jury must determine that death is the appropriate penalty beyond a

12  reasonable doubt, this too has been rejected.  *Harris*, 692 F.2d at 1195.

13      For the reasons stated, the state supreme court reasonably could find the requirement

14  under California's death penalty statute, that the jury weigh aggravating and mitigating factors

15  before imposing the death penalty, adequately guarantees the jury's discretion will be guided

16  and its considerations deliberate.

17      *ii.     Any Error Was neither Structural nor More Than Harmless*

18      Petitioner argues the allegedly erroneous failure to instruct that the reasonable doubt

19  standard governed sentence selection denied him rights to due process, a fair trial, effective

20  assistance of counsel, and a reliable sentence.  He argues this error was structural and

21  reversable per se.  (Doc. No. 142 at 224.)

22      However, the state supreme court reasonably could find no structural error because the

23  claimed burden of proof at the penalty phase was reasonably rejected, for the reasons stated.

24      Alternatively, Petitioner argues the alleged trial court error was more than harmless

25  because it had a substantial and injurious effect or influence in the jury's determination of his

26  verdict.  (*See* Doc. No. 142 at 222.)

27      Where the constitutional error in issue is not structural, habeas relief is unavailable

28

unless the error had a substantial and injurious effect on the verdict. *Brecht,* 507 U.S. at 637.

Here, the state supreme court reasonably could find that if the state court erred as alleged, Petitioner's penalty trial was nonetheless fair and his sentence reliable. As noted, in reviewing penalty phase instructions, the test is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380. Further, a single instruction "may not be judged in artificial isolation," but must be considered in light of the instructions as a whole and the entire trial record. *McGuire*, 502 U.S. at 72.

The state supreme court reasonably could find on the facts and circumstances of this case that the jury was not precluded from considering constitutionally relevant mitigating and sympathetic evidence during their sentence deliberations. The sentencing discretion of Petitioner's jury was "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

The Supreme Court has never required a sentencing court to instruct a jury on how to weigh and balance factors in aggravation and mitigation. In *Tuilaepa*, the Supreme Court stated, "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." 512 U.S. at 979. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Id.* (quoting *Ramos*, 463 U.S. at 1008.)

In *Marsh*, the Supreme Court stated:

> In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here. "[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."

548 U.S. at 175 (quoting *Franklin*, 487 U.S. at 179).

It can be presumed the jury followed the instructions, including the cautionary

instructions, *Weeks*, 528 U.S. at 234, applying a "commonsense understanding of the instruction in the light of all that has taken place at the trial." *Johnson*, 509 U.S. at 368; see also the discussion of claim III(G), *ante*.

For the reasons stated, the state supreme court reasonably could find any alleged error to be non-structural and harmless.

### iii.    Conclusions

The California Supreme Court was not unreasonable in denying allegations the trial court erred by failing to instruct the jury that a "reasonable doubt" standard was applicable to their determinations at the penalty phase.

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim XII(G) shall be denied.

11.    Claim XII(H)

Petitioner alleges the trial court erred by failing to instruct the jury that unanimity was required for findings of aggravating factors, denying his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 51-1 ¶¶ 720-721.)

### a.    Supplemental legal Standards

### i.    Sentencing Discretion

See section VII, B, 7, a, *ante*.

### b.    State Court Direct and Collateral Review

Petitioner presented this claim on direct appeal and it was denied on the merits.  *Dickey*, 35 Cal. 4th at 931.

### c.    Analysis

### i.    Trial Court Error

Petitioner revisits his claim XII(G) argument above that Penal Code section 190.3

requires fact finding as to aggravating and mitigating circumstances as an element of capital murder, contending here that unanimity is required on such findings. (Doc. No. 142 at 225; *see also* Doc. No. 144 at 225.)

The California Supreme Court in denying the claim on direct appeal stated that:

> Nor is the jury constitutionally required to achieve unanimity as to aggravating factors. (*Brown, supra,* 33 Cal. 4th at p. 402, 15 Cal.Rptr.3d 624, 93 P.3d 244; *People v. Jenkins* (2000) 22 Cal. 4th 900, 1053, 95 Cal.Rptr.2d 377, 997 P.2d 1044.)

*Dickey*, 35 Cal. 4 th at 931.

As he did above in claim XII(G), Petitioner relies upon *Apprendi* and *Ring*, arguing that the jury likely did not reach agreement on the reasons for imposing the death penalty. (Doc. No. 142 at 225.)

However, the state supreme court was not unreasonable in denying the claim for the reasons stated, summarized here. (*See* discussion of claim XII(G) above. )

In California, for a defendant to be eligible for the death penalty, the jury must, beyond a reasonable doubt, find him guilty of murder in the first degree, and must find true one of the special circumstances set forth in Penal Code section 190.2. *Tuilaepa*, 512 U.S. at 975. But once a defendant is convicted, "the prosecution has no burden of proof that death is the appropriate penalty, or that one or more aggravating factors or crimes exist, in order to obtain a judgment of death." *Anderson*, 25 Cal. 4th at 589. Instead, the clearly established law at the time Petitioner's conviction became final vested the jury with "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." *Tuilaepa*, 512 U.S. at 979-80.

Here, the jury was instructed that an aggravating criminal conviction must be proved beyond a reasonable doubt. (RT 5152.) They were instructed to consider the applicable factors of aggravating and mitigating circumstances and that in order to find for death each juror must be persuaded that the aggravating evidence and/or circumstances is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without

1  parole.  (RT 5154; *see also* CT 502-503 (CALJIC 8.88).)  Due process requires no more.

2  *Harris*, 692 F.2d at 1194.

3          California is not required to adopt specific standards for instructing the jury on

4  consideration of aggravating and mitigating circumstances.  *Stephens*, 462 U.S. at 890; s*ee also*

5  *Ortiz*, 149 F.3d at 944 (citing *Stephens*, 462 U.S. at 880) (the Constitution requires only that a

6  state provide procedures to guide the sentencer's discretion generally).  The Ninth Circuit has

7  rejected argument otherwise.  *See Smith*, 140 F.3d at 1272.  As to Petitioner's claim that the

8  jury must determine that death is the appropriate penalty beyond a reasonable doubt, this too

9  has been rejected.  *Harris*, 692 F.2d at 1195.

10          For the reasons stated, the state supreme court reasonably could find the requirement

11  under California's death penalty statute, that the jury weigh aggravating and mitigating factors

12  before imposing the death penalty, adequately guarantees the jury's discretion will be guided

13  and its considerations deliberate.

14          *ii.      Any Error was Harmless*

15          If arguendo the trial court erred as alleged, the state supreme court reasonably could

16  find the error to be harmless.

17          Petitioner argues that absent an unanimity instruction at the penalty phase, "it is highly

18  probable that the jury could have been divided with respect to both the number and weight of

19  the aggravating factors, and that a sentence to death was imposed without any basis for

20  agreement regarding the reasons therefor."  (Doc. No. 51-1 ¶720.)

21          Petitioner argues the alleged trial court error was more than harmless because it had a

22  substantial and injurious effect or influence in the jury's determination of his verdict.  He

23  argues this error denied him due process, a fair trial, effective assistance of counsel, and a

24  reliable sentence determination. (*Id.*, at ¶ 721.)

25          Where the constitutional error in issue is not structural, habeas relief is unavailable

26  unless the error had a substantial and injurious effect on the verdict.  *Brecht*, 507 U.S. at 637.

27          Here, the state court reasonably could have found that the jury was not precluded from

28

                                                    182

considering constitutionally relevant mitigating and sympathetic evidence during their sentence deliberations. *Boyde*, 494 U.S. at 380. For the reasons stated, the sentencing discretion of Petitioner's jury was "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189. Petitioner has not demonstrated on the factual record any "substantial and injurious effect or influence in determining [the] jury's verdict," under *Brecht*. *Coleman*, 525 U.S. at 145-46. The Supreme Court has never required a sentencing court to instruct a jury on how to weigh and balance factors in aggravation and mitigation.

In *Tuilaepa*, the Supreme Court stated, "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." 512 U.S. at 979. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Id.* (quoting *Ramos*, 463 U.S. at 1008.)

In *Marsh*, the Supreme Court stated:

> In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here. "[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."

548 U.S. at 175 (quoting *Franklin*, 487 U.S. at 179).

It can be presumed the jury followed the instructions, including the cautionary instructions, *Weeks*, 528 U.S. at 234, applying a "commonsense understanding of the instruction in the light of all that has taken place at the trial." *Johnson*, 509 U.S. at 368.

*iii.*     *Conclusions*

The California Supreme Court was not unreasonable in denying allegations the trial court erred by failing to instruct the jury that unanimity was required for findings of

aggravating factors.

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim XII(H) shall be denied.

### C. Claims Relating to Jury Misconduct

#### 1. Legal Standards

Due process requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it." *Smith*, 455 U.S. at 217; *see also Plache*, 913 F.2d at 1377-78 ("It is well-settled that a single partial juror deprives a defendant of his Sixth Amendment right to a trial by an impartial jury.").

On collateral review, juror misconduct claims "are generally subject to a 'harmless error' analysis, namely, whether the error had 'substantial and injurious' effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638; *Fields v. Brown*, 503 F.3d 755, 781 n.19 (noting that *Brecht* provides the standard of review for harmless error in cases involving unconstitutional juror misconduct); *Jeffries v. Blodgett*, 5 F.3d 1180, 1190 (9th Cir. 1993) (a habeas petitioner must show that the alleged error "had substantial and injurious effect or influence in determining the jury's verdict.").

#### 2. Claim XX

Petitioner alleges that his jury engaged in prejudicial misconduct by considering extraneous evidence during deliberations, giving rise to a presumption of prejudice, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 51-1 ¶¶ 850-856.)

#### a. Supplemental Legal Standards

A jury's consideration of extraneous evidence violates a criminal defendant's right to trial by jury. *Turner v. Louisiana,* 379 U.S. 466, 471-73 (1965).

The introduction of prejudicial extraneous influences into the jury room constitutes misconduct which may result in the reversal of a conviction. *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966).

A claim that jurors were exposed to extrajudicial evidence is considered based on an objective standard - whether the evidence would have affected a reasonable juror's consideration of the evidence. *Fields*, 503 F.3d, at 781 n.22.

**b.    State Court Direct and Collateral Review**

Petitioner raised this claim in his second state exhaustion petition (Lod. Doc. No. 30 at 335-38) and it was summarily denied on the merits and on procedural grounds (Lod. Doc. No. 31, Order Denying Cal. Exh. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

**c.    Analysis**

*i.    Consideration of Extraneous Evidence*

Petitioner argues that during penalty phase deliberations the jurors considered and were biased by "extrajudicial evidence regarding the facts underlying Petitioner's prior conviction for burglary." (Doc. No. 51-1 ¶ 855; *see also* Doc. No. 142 at 226-28, citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors); *Sassounian v. Roe*, 230 F. 3d 1097, 1108-11 (9th Cir. 2000) (jury's consideration of extrinsic evidence found prejudicial under *Brecht*).

Specifically, Petitioner argues that during deliberations, the jury had access to and likely considered newspaper accounts before and during trial of extrinsic facts underlying the prior felony burglary conviction to which he had stipulated. (Doc. No. 142 at 228-29, citing RT 5133.) He argues the jury was not entitled to consider these facts which involved the theft and sexual assault upon the body of a seven-year-old girl from a funeral home in Reno, Nevada. (*See* RT 5081.)

However, the state supreme court reasonably denied the claim. Petitioner speculates upon but does not point to facts in the record demonstrating the jury was aware of and considered facts underlying the felony burglary conviction.

Petitioner argues the state supreme court unreasonably denied the claim "despite its obligation to accept as true that the jury improperly considered the facts underlying the burglary conviction in rendering its verdict." (Doc. No. 144 at 63.)  But as this Court previously pointed out, in cases of summary denial it appears that state supreme court "generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also review the record of the trial ... to assess the merits of the Petitioner's claims." (Doc. No. 135 at 14.)  This is not a case where facts in the record supported a prima facie claim.  *Cf. Cannedy v. Adams*, 706 F.3d 1148, 1161 (9th Cir. 2013) (counsel ineffective for failure to adequately investigate colorable claim).

Moreover, the jury was instructed to consider only evidence developed at trial and that they must "neither be influenced by bias nor prejudice against the defendant, nor swayed by public opinion or public feelings." (CT 486, 489; *see also* RT 5146.)  They were instructed "not to make any independent investigat[ion] of the facts or the law or consider or discuss facts as to which there is no evidence." (RT 5146-47.)  The jurors presumptively understood and followed their instructions.  *Weeks*, 528 U.S. at 234; *see also Boyde*, 494 U.S. at 381-85; *Tan*, 413 F.3d at 1115.

*ii.     Any Error was Non-Structural and Harmless*

Petitioner argues the error is structural and reversible per se.  (Doc. No. 51-1 ¶856; *see also* Doc. No. 142 at 230.)

However, Petitioner has not demonstrated structural error because the state supreme court reasonably could have found the jury was unaware of and did not consider during deliberations facts underlying the felony burglary conviction, for the reasons stated.

Petitioner argues alternatively that the trial court's error was more than harmless because the alleged juror misconduct "so infected the integrity of the proceedings that the error cannot be deemed harmless." (Doc. No. 51-1 ¶ 856; *see also* Doc. No. 142 at 230.)  Where the constitutional error in issue is not structural, habeas relief is unavailable unless the error had a substantial and injurious effect on the verdict.  *Brecht*, 507 U.S. at 637-38.

Specifically, Petitioner argues the facts of the burglary and necrophilia were highly inflammatory and prejudicial and likely biased the jury against Petitioner. (Doc. No. 142 at 230, citing *McGuire*, 425 U.S. at 505.)

If arguendo the jury considered extraneous evidence as alleged, Petitioner has not shown on the factual record that absent that misconduct there is a reasonable probability he would have avoided the death penalty. The state supreme court reasonably could find Petitioner failed to identify specific facts underlying the prior felony burglary conviction to which the jury allegedly was exposed and support inference of prejudice and bias arising therefrom.

Moreover, the jury expressly was instructed to consider only evidence admitted at court, (RT 5146), and presumably followed their instructions, *Weeks*, 528 U.S. at 234.

*iii.*      *Conclusions*

The California Supreme Court was not unreasonable in denying allegations the jurors engaged in prejudicial misconduct by considering extraneous evidence during deliberations.

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim XX shall be denied.

**D.**      **Claims Relating to the Constitutionality of California's Death Penalty Statute**

1.      Legal Standards

A state capital sentencing system must: "(1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Marsh*, 548 U.S. at 173-74. If the "state system satisfies these requirements," then the "state enjoys a range of discretion in imposing the death penalty,

including the manner in which aggravating and mitigating circumstances are to be weighed."

*Id.,* (citing *Franklin*, 487 U.S. at 179), (*Stephens*, 462 U.S. at 875-876, n.13).

A state may narrow the class of murderers eligible for the death penalty by defining degrees of murder. *Sawyer v. Whitley*, 505 U.S. 333, 342 (1992). A state may further narrow the class of murderers by finding "beyond a reasonable doubt at least one of a list of statutory aggravating factors." *Id.*; *see also Gregg*, 428 U.S. at 196-97.

If the reviewing court finds constitutional error, it must additionally decide whether the error had "had substantial and injurious effect or influence in determining [the] jury's verdict," the test announced in *Brecht*. *Coleman*, 525 U.S. at 145-46.

State law error is not alone a basis for federal habeas relief. *See Pulley*, 465 U.S. at 41 ("A federal court may not issue the writ on the basis of a perceived error of state law.").

### 2. Review of Claim XXV(A)

Petitioner alleges that California's death penalty review process is influenced by political and economic pressures resulting in arbitrary and capricious outcomes. (Doc. No. 51-1 ¶ 902.)

### a. Supplemental Legal Standards

Due process guarantees include the right to a fair trial by an impartial and unbiased judge. *Tumey v. Ohio,* 273 U.S. 510, 535 (1927); *see also In re Murchison,* 349 U.S. 133, 136 (1955) (A "fair trial in a fair tribunal is a basic requirement of due process.")

There is a "presumption of honesty and integrity in those serving as adjudicators" that one must overcome in order to establish a claim of bias. *Withrow v. Larkin,* 421 U.S. 35, 47 (1975).

### b. State Court Direct and Collateral Review

Petitioner presented this claim in the second state exhaustion petition (Lod. Doc. No. 30 at 357) and it was summarily denied on the merits (Lod. Doc. No. 31, Order Denying Cal. Exh. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

### c. Analysis

Petitioner argues "the California Supreme Court and federal courts have labored under political and economic pressures which do not permit it to decide death penalty cases in a fair and impartial manner, resulting in a capital sentencing scheme which is applied in an arbitrary and capricious manner."  (Doc. No. 51-1 ¶ 902; *see also* Doc. No. 142 at 232.)

However, Petitioner does not point to clearly established law that political and economic pressures result in arbitrary and capricious outcomes in death penalty cases.

Moreover, the claim is entirely conclusory.  Petitioner does not identify on the factual record political and economic pressures that made his trial unfair.

Petitioner's related arguments lack merit.  The California Supreme Court reasonably determined that California's death penalty scheme did not fail to genuinely narrow the class of murderers eligible for the death penalty.  As noted, California's scheme, which narrows the class of death eligible offenders to less than the definition of first-degree murder and permits consideration of all mitigating evidence, has been approved by the Supreme Court, *Tuilaepa*, 512 U.S. at 972-79; *Pulley*, 465 U.S. at 38.  *See McKenzie v. Risley*, 842 F.2d 1525, 1540-41 (1988) (noting that the Supreme Court has upheld the constitutionality of the death sentence for felony murder where the defendant killed, attempted to kill or intended that lethal force be used); *Karis*, 283 F.3d 1117 at 1141 n.11 (California's sentencing scheme adequately narrows the class of persons eligible for death).

In *California v. Ramos*, the United States Supreme Court stated that "once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty" the jury's consideration of a myriad of factors and exercise of "unbridled discretion" in determining whether death is the appropriate punishment is not arbitrary and capricious.  463 U.S. at 1008-09.

The sentencing discretion of Petitioner's jury was "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Gregg*, 428 U.S. at 189.  The jury expressly was instructed to consider only evidence admitted at court, (RT 5146), and presumably followed their instructions, *Weeks*, 528 U.S. at 234.

Petitioner has not demonstrated on the factual record any "substantial and injurious effect or influence in determining [the] jury's verdict," under *Brecht*. *Coleman*, 525 U.S. at 145-46.

The state supreme court reasonably could find Petitioner failed to rebut the presumption of honesty and integrity in those serving as adjudicators. *Larkin,* 421 U.S. at 47.

### d.    Conclusions

The California Supreme Court was not unreasonable in denying allegations California's death penalty process is unconstitutional due to political and economic pressures.

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim XXV(A) shall be denied.

3.    Review of Claim XXV(B)

Petitioner alleges that execution following lengthy confinement on death row would constitute cruel and unusual punishment and violate international covenants, treaties, and norms.  (Doc. No. 51-1 ¶¶ 903-910.)

### a.    Supplemental Legal Standards

"[T]he Cruel and Unusual Punishments Clause prohibits the infliction of uncivilized and inhuman punishments.  The State, even as it punishes, must treat its members with respect for their intrinsic worth as human beings.  A punishment is 'cruel and unusual,' therefore, if it does not comport with human dignity."  *Furman*, 408 U.S. at 270.

The mental suffering, demoralization, uncertainty and consequent psychological hurt inherent in the punishment must be considered in interpreting Eighth Amendment.  *Id. at* 271-72.

An execution "cannot be so totally without penological justification that it results in the gratuitous infliction of suffering."  *Gregg*, 428 U.S. at 183.

1    The assessment should be whether punishment is cruel and unusual in consideration of

2    the standards of decency that mark the progress of a maturing society, or standards of decency

3    that are more or less universally accepted. *Id.*

4          **b.**      **State Court Direct and Collateral Review**

5          Petitioner presented this claim in the second state exhaustion petition (Lod. Doc. No. 30

6    at 357-60) and it was denied on the merits (Lod. Doc. No. 31, Order Denying Cal. Exh. Pet., *In*

7    *re Colin Raker Dickey*, No. S165302 (Cal. May 29, 2012)).

8          **c.**      **Analysis**

9          Petitioner argues that execution following his 1989 arrest and continuous confinement

10   thereafter would amount to cruel and unusual punishment and violate international laws,

11   covenants, treaties, and norms.  (Doc. No. 142 at 232.)

12         Petitioner argues the passage of time is not attributable to him.  (Doc. No. 142 at 232-

13   33, citing *Lackey v. Texas*, 514 U.S. 1045 (1995) (mem. den. cert. Stevens, J.) (issue whether

14   execution following lengthy confinement violates the Eighth Amendment's prohibition against

15   cruel and unusual punishment would benefit from further study); *see also Jones v. Chappell*,

16   31 F. Supp. 3d, at 1050 (C.D. Cal. 2014), *rev'd sub nom. Jones v. Davis*, 806 F.3d 538 (9th Cir.

17   2015) (finding systemic delay in the administration of California's death penalty renders any

18   ensuing executions arbitrary and violative of the Eighth Amendment).

19         Petitioner argues the passage of time has negated any penological and social benefit

20   from carrying out his death sentence.  (*Id.*, citing *McKenzie v. Day*, 57 F.3d 1461, 1484-89 (9th

21   Cir. 1995) (Norris, J., dissenting) (noting penological goals of retribution and deterrence are

22   attenuated by the passage of time, and the extraordinary psychological duress and extreme

23   physical and social restrictions on death row); *see also* Doc. No. 51-1 ¶ 909, citing *Furman*,

24   408 U.S. at 312 (White, J., concurring) ("[A] major goal of the criminal law - to deter others by

25   punishing the convicted criminal - would not be substantially served where the penalty is so

26   seldom invoked that it ceases to be the credible threat essential to influence the conduct of

27   others"); *Gregg,* 428 U.S. at 183 ("The sanction imposed cannot be so totally without

28

1 | penological justification that it results in the gratuitous infliction of suffering").

2 | However, the California Supreme Court's rejection of this claim was not unreasonable.

3 | Petitioner does not cite any clearly established Supreme Court authority that a prolonged

4 | detention is cruel and unusual punishment.  *See Allen v. Ornoski*, 435 F.3d 946, 958-59 (9th

5 | Cir. 2006) ("The Supreme Court has never held that execution after a long tenure on death row

6 | is cruel and unusual punishment . . . Allen cannot credibly claim that there is any clearly

7 | established law, as determined by the Supreme Court, which would support this . . . claim")*;*

8 | *see also McKenzie*, 57 F.3d at 1494 (casting doubt that delays caused by satisfying the Eighth

9 | Amendment can violate it); *Smith v. Mahoney*, 611 F.3d 978, 997-98 (9th Cir. 2010) (citing

10 | *McKenzie* and finding *Lackey* claim barred by *Teague v. Lane*, 489 U.S. 299, 316 (1989));

11 | *People v. Taylor* 26 Cal. 4th 1155, 1176-77 (2001) (rejecting claim that relatively lengthy

12 | period of incarceration constitutes cruel and unusual punishment on grounds such delay is

13 | necessary to permit careful appellate review).

14 | As noted, Justice Stevens, in his memorandum respecting denial of certiorari in *Lackey*

15 | suggested this issue needed further study.  514 U.S. 1045.  *Lackey* indicates that the issue has

16 | never been squarely addressed by the Supreme Court, nor have lower courts in the United

17 | States given the issue ample consideration.  *Id.*

18 | Four years later, Justice Thomas stated in concurring on a denial of certiorari that:

19 |

20 | I am unaware of any support in the American constitutional tradition or in this
   | Court's precedent for the proposition that a defendant can avail himself of the
21 | panoply of appellate and collateral procedures and then complain when his
   | execution is delayed.

22 |

23 | *Knight v. Florida*, 528 U.S. 990 (1999); *see also Allen*, 435 F.3d, at 958-59.

24 | Since the Supreme Court has not decided the issue, the state court's decision could not

25 | be contrary to or an unreasonable application of Supreme Court precedent.  *Musladin*, 549 U.S.

26 | at 77; *Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005) (same).

27 | At least one other circuit has held that the time consumed by a petitioner's direct and

28 |

192

collateral review proceedings "is a function of the desire of our courts, state and federal, to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's life." *Johns v. Bowersox*, 203 F.3d 538, 547 (8th Cir. 2000) (quoting *Chambers v. Bowersox*, 157 F.3d 560, 570 (8th Cir. 1998)).

### d.     Conclusions

The California Supreme Court was not unreasonable in denying allegations that execution following lengthy confinement on death row is unconstitutional.

Accordingly, the California Supreme Court's rejection of these allegations was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d).  Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *Id.*

Claim XXV(B) shall be denied.

### 4.     Review of Claims XXV(C-D)

Petitioner alleges that California's death penalty process fails to sufficiently narrow the class of offenders who are eligible for death penalty and denies due process because: (i) county prosecutors have unbounded discretion to charge the death penalty (i.e. claim XXV(C)), and (ii) there is no distinguishing between death and non-death eligible first-degree murders (i.e. claim XXV(D)).  (Doc. No. 51-1 ¶¶ 911-934.)

### a.     Supplemental Legal Standards

A state capital sentencing system must rationally narrow the class of death-eligible defendants and permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime.  *Marsh*, 548 U.S. at 173-74.

"Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious

1  action." *Gregg*, 428 U.S. at 189.

2      If the reviewing court finds constitutional error, Petitioner must show the error had a

3  substantial and injurious effect or influence on the jury's verdict pursuant to Brecht. *Coleman*,

4  525 U.S. at 145-46.

5      **b.      State Court Direct and Collateral Review**

6      Petitioner presented claims XXV(C-D) on direct appeal and these claims were denied

7  on the merits. *Dickey*, 35 Cal. 4th at 931-32.

8      **c.      Analysis**

9      Petitioner argues California's statute is unconstitutionally vague, overbroad and

10  arbitrary, lacks proportionality, fails to narrow the class of death-eligible murderers, and vests

11  unbounded discretion in prosecutors. (Doc. No. 142 at 234-43, citing *Stephens*, 462 U.S. at

12  878; *Furman*, 408 U.S. at 249-57, 306-14; *Lockett*, 438 U.S. at 600-01.)

13      Petitioner points to California's nearly thirty special circumstances as evidence that it

14  fails to "distinguish death-eligible and non-death-eligible first-degree murders in a meaningful

15  and non-arbitrary way." (Doc. No. 142 at 242.)

16      Petitioner points to California's lack of guidelines for its District Attorneys regarding

17  when to seek the death penalty as evidence the state has eliminated any "meaningful basis for

18  distinguishing the few cases in which it is imposed from the many cases in which it is not."

19  (Doc. No. 51-1 ¶ 926, citing *Furman*, 408 U.S. at 313 (conc. opn. of White, J).)

20      The California Supreme Court, in denying these allegations on direct appeal stated that:

21

22      The death penalty law adequately narrows the class of death-eligible offenders.
        (*People v. Brown* (2004) 33 Cal. 4th 382, 401, 15 Cal.Rptr.3d 624, 93 P.3d 244

23      (*Brown* ); *Prieto, supra,* 30 Cal. 4th at p. 276, 133 Cal.Rptr.2d 18, 66 P.3d
        1123.)

24

25      […]

26

27      Nor is it defective in failing to require intercase proportionality review. (*Brown,
        supra,* 33 Cal. 4th at p. 402, 15 Cal.Rptr.3d 624, 93 P.3d 244; *Prieto, supra,* 30

28      Cal. 4th at p. 276, 133 Cal.Rptr.2d 18, 66 P.3d 1123; *People v. Lewis* (2001) 26

Cal. 4th 334, 394–395, 110 Cal.Rptr.2d 272, 28 P.3d 34.)

> The law is not constitutionally defective because the prosecutor retains discretion whether or not to seek the death penalty. (*Brown, supra,* 33 Cal. 4th at p. 403, 15 Cal.Rptr.3d 624, 93 P.3d 244; *Hughes, supra*, 27 Cal. 4th at p. 404, 116 Cal.Rptr.2d 401, 39 P.3d 432.)

*Dickey*, 35 Cal. 4th at 931-32.

That court reasonably denied the claims, for the reasons discussed below.

### i.    Failure to Narrow

Petitioner argues that California's statute fails to ensure "only the most deserving of execution are put to death." *Atkins*, 536 U.S. at 319. He revisits his argument California's death penalty scheme is contrary to *Furman* because it defines death eligibility so broadly that it fails to ensure the constitutionally required "narrowing" function is performed. *See* Doc. No. 51-1 ¶¶ 915, 930, *citing People v. Adcox,* 47 Cal. 3d 207, 275-76 (1988) (dis. opn of Broussard, J.); *Gregg*, 428 U.S. at 189 ("D]iscretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.")

A death penalty law must narrow the class of death-eligible defendants and provide for individualized penalty determination. *McCleskey*, 481 U.S. at 308.

However, under California's death penalty statute, a defendant may be sentenced to death for first degree murder if the trier of fact finds the defendant guilty and finds true one or more of special circumstances listed in Penal Code section 190.2. As relevant here, one of the circumstances is a robbery-murder special circumstance, which when applied to an aider and abettor of the actual killer having a homicidal mens rea. (*See* CT 422-425; Penal Code 190.2(a)(17)); *see also McKenzie*, 842 F.2d at 1540-41 (noting that the Supreme Court has upheld the constitutionality of the death sentence for felony murder where the defendant killed, attempted to kill or intended that lethal force be used).

The California Supreme Court was not unreasonable in finding this sentencing scheme satisfies clearly established constitutional requirements. *See Karis*, 283 F.3d at 1141 n.11 (California's sentencing scheme adequately narrows the class of persons eligible for death). First, the subclass of defendants eligible for the death penalty is rationally narrowed to those

who have the predicate felony of robbery. *Tuilaepa*, 512 U.S. at 969-73. The robbery special circumstance sufficiently guides the sentencer and is not unconstitutionally vague. *See Godfrey*, 446 U.S. at 428 (the sentencer's discretion must be guided by "clear and objective standards.").

At the penalty phase, an individualized sentence includes consideration of the character and record of the defendant, the circumstances of the crime, and an assessment of the defendant's culpability. *Tuilaepa*, 512 U.S. at 972-73. The jury "need not be instructed how to weigh any particular fact in the capital sentencing decision." *Id.* at 979.

Similarly, the Supreme Court in *California v. Ramos* stated that "once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty" the jury's consideration of a myriad of factors and exercise of "unbridled discretion" in determining whether death is the appropriate punishment is not arbitrary and capricious. 463 U.S. at 1008-09.

The California Supreme Court reasonably determined that California's death penalty scheme did not fail to genuinely narrow the class of murderers eligible for the death penalty. California's scheme, which narrows the class of death eligible offenders to less than the definition of first-degree murder and permits consideration of all mitigating evidence, has been approved by the Supreme Court. *Tuilaepa*, 512 U.S. at 972-79; *Pulley*, 465 U.S. at 38.

*ii.    Proportionality*

Petitioner argues California's death penalty statute is arbitrary due to lack of proportionality review.

"Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

The California Supreme Court considered and rejected Petitioner's intercase proportionality claim, stating that:

> Nor is [California's death penalty statute] defective in failing to require intercase proportionality review. (*Brown, supra,* 33 Cal. 4th at p. 402, 15 Cal.Rptr.3d 624, 93 P.3d 244; *Prieto, supra,* 30 Cal. 4th at p. 276, 133 Cal.Rptr.2d 18, 66 P.3d 1123; *People v. Lewis* (2001) 26 Cal. 4th 334, 394–395, 110 Cal.Rptr.2d 272, 28 P.3d 34.)

*Dickey,* 35 Cal. 4th at 931.

For the reasons stated in claims XXV(G, L) *post,* summarized here, the proportionality allegation fails. The state supreme court reasonably could find Petitioner's alleged limited participation in the crime as an aider and abettor of felony murder was not alone a basis to find his death sentence arbitrary and disproportionate and not in furtherance of societal goals of retribution and deterrence. (*See* Doc. No. 51-1 ¶ 957; Doc. No. 142 at 255-56.)

The Supreme Court, in *Pulley v. Harris,* found that the Eighth Amendment did not require a "state appellate court, before it affirms a death sentence, to compare the sentence in the case before it with the penalties imposed in similar cases if requested to do so by the prisoner." 465 U.S. at 43-44. The Supreme Court also held that "on its face, [California's] system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under *Furman v. Georgia,* [408 U.S. 238 (1972)] and our subsequent cases." *Pulley,* 465 U.S. at 53.

The California Supreme Court specifically has rejected the intra-case and inter-case proportionality claim in numerous cases. *Lewis,* 26 Cal. 4th, at 394-95; *see also People v. Sanchez,* 12 Cal. 4th 1, 83-85 (1995), *disapproved on other grounds by People v. Doolin,* 45 Cal. 4th 390, 421 n.22 (2009); *People v. Cox,* 53 Cal. 3d 618, 690-91 (1991), *disapproved on other grounds by People v. Doolin,* 45 Cal. 4th 390, 417 (2009).

Furthermore, Petitioner has not demonstrated that the jury in considering his aider and abettor and lingering doubt defenses was prevented from considering all potential mitigating factors. (*See* discussion of claims XII(E-H).)

For the reasons stated, the California Supreme Court was not unreasonable in denying allegations that California's death penalty statute and his death sentence are constitutionally

197

infirm due to alleged lack of proportionality.

   *iii.*      *Prosecutorial Discretion*

Petitioner argues that the unrestricted discretion in individual prosecutors may allow reliance upon constitutionally irrelevant and impermissible considerations like race, impermissible victim characteristics, and economic status. (Doc. No. 51-1 ¶¶ 915-918.) He argues prosecutors may use their unrestricted discretion so as to violate separations of powers and intrude upon the judicial prerogative of imposing sentences and exercising sentencing discretion. (Doc. No. 51-1 ¶¶ 918-919, citing *People v. Lang*, 49 Cal. 3d 991, 1045 (1989), *abrogated by People v. Diaz on other grounds*, 60 Cal. 4 th 1176, 1190 (2015) (discussing trial court authority to impose sentence); *see also* Doc. No. 142 at 238, citing *People v. Navarro*, 497 P.2d 481, 487 (1972) (imposition of sentence and the exercise of sentencing discretion are fundamentally and inherently judicial functions)); Cal. Const. Arts. 3, 6, § 1.

However, the Supreme Court has held that the mere existence of prosecutorial discretion over charging decisions does not deny equal protection or render a capital punishment scheme unconstitutional absent some showing that a particular decision was based on a discriminatory standard. In rejecting a petitioner's argument that the Georgia capital punishment system operated in a discriminatory manner, the Supreme Court held, "absent a showing that Georgia's capital punishment system operates in an arbitrary and capricious manner, [the petitioner] cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty." *McCleskey*, 481 U.S. at 306-07.

Further, the Court has held that prosecutorial charging decisions are "particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985); *see also Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

Prosecutorial discretion "is essential to the criminal justice process", *McCleskey*, 481 U.S. at 297, and does not violate the federal Constitution. The Constitution forbids only "purposeful discrimination" in the exercise of that prosecutorial discretion, *id.* at 292-93, and in order to prevail in that regard, the Supreme Court emphasized that "we would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id.* at 297. It follows that the fact California's statutory scheme gives the prosecutor discretion does not violate the United States Constitution. *See* 28 U.S.C. § 2254(a); *Gregg*, 428 U.S. at 225.

Petitioner does not suggest the prosecutor exercised discretion in a discriminatory manner in his case. (Doc. No. 51-1 ¶¶ 911-927.) His reliance upon a concurring and dissenting opinion by Justice McKeown in *Morales v. Woodford,* 388 F.3d 1159, 1185-88 (9th Cir. 2004) relating to overbreadth of the lying-in-wait special circumstance (*see* Doc. No. 142 at 242), is not authority supporting his challenge to prosecutorial discretion.

### d.    Conclusions

The California Supreme Court was not unreasonable in denying allegations that California's death penalty statute fails to sufficiently narrow the class of offenders who are eligible for death penalty.

Accordingly, the California Supreme Court's rejection of these claims was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claims XXV(C-D) shall be denied.

5.    Review of Claim XXV(E)

Petitioner alleges the Penal Code section 190.3 sentencing factors as stated in CALJIC 8.85 are vague and ambiguous and devoid of any burden of proof, leaving the jury's sentencing discretion unguided, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 51-1 ¶¶ 935-944.)

Specifically, Petitioner challenges CALJIC 8.85 to the extent it: (i) included

199

inapplicable sentencing factors, (ii) included vague and limiting mitigation terms such as "extreme" and "substantial," (iii) considered the existence of a special circumstance to be an aggravating circumstance, (iv) failed to identify which factors were aggravating and which were mitigating, and (v) failed to include any burden of proof.  (Doc. No. 51-1 ¶ 936.)

### a.      Supplemental Legal Standards

A claim of instructional error requires a showing that the error "so infected the entire trial that the resulting conviction violate[d] due process."  *Kibbe*, 431 U.S. at 154.

"[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an unconstitutional manner.  *Boyde,* 494 U.S. at 380.  A reviewing court does not engage in a technical parsing of the instruction's language, but instead approaches the instructions in the same way that the jury would -- with a "commonsense understanding of the instructions in the light of all that has taken place at the trial."  *Johnson*, 509 U.S. at 368.  In evaluating a claim of instructional error, a single instruction is not viewed in isolation, but rather in the context of the overall charge.  *Spivey*, 194 F.3d at 976.  Federal courts presume that juries understand and follow instructions.  *Weeks*, 528 U.S. at 234; *see also Boyde*, 494 U.S. at 381-85; *Tan*, 413 F.3d at 1115.

A state capital sentencing system must: "(1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime."  *Marsh*, 548 U.S. at 173-74.  If the "state system satisfies these requirements," then the "state enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed."  *Id.,* (citing *Franklin*, 487 U.S. at 179; *Stephens*, 462 U.S. at 875-876, n.13).

Even if constitutional instructional error has occurred, the federal court must still determine whether petitioner suffered actual prejudice, that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637.  A "substantial and injurious effect" means a "reasonable probability" that the jury

would have arrived at a different verdict had the instruction been given.  *Clark*, 450 F.3d at 916.

**b.    State Court Direct and Collateral Review**

Petitioner presented this claim on direct appeal and it was denied on the merits.  *Dickey*, 35 Cal. 4th 928.

**c.    Analysis**

Petitioner revisits his claim XII(E) (ineffective assistance of counsel) argument that the CALJIC 8.85 instruction on Penal Code section 190.3 sentencing factors is unconstitutional on multiple grounds.  (*See* the discussion of claim XII(E) above; Doc. No. 142 at 243.)

As noted, the jury was instructed on the Penal Code 190.3 sentencing factors pursuant to the standard CALJIC 8.85 instruction, that:

> In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case. You shall consider, take into account and be guided by the following factors, if applicable:
>
> (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance[s] found to be true.
>
> (b) The presence or absence of criminal activity by the defendant, other than the crime[s] for which the defendant has been tried in the present proceedings, which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.
>
> (c) The presence or absence of any prior felony conviction, other than the crimes for which the defendant has been tried in the present proceedings.
>
> (d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
>
> (e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.
>
> (f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.
>
> (g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.
>
> (h) Whether or not at the time of the offense the capacity of the defendant to

201

appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.

(i) The age of the defendant at the time of the crime.

(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle.

(CT 498-499; *see also* RT 5150-5152.)

The California Supreme Court in denying the claim stated that:

Defendant contends the standard instruction given here with regard to the factors the jury might take into account in determining the penalty (§ 190.3; CALJIC No. 8.85) failed to adequately guide its discretion, in violation of defendant's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Defendant's various attacks on CALJIC No. 8.85 have been repeatedly rejected by this court, and we conclude he gives us no compelling reason to reconsider our decisions.

CALJIC No. 8.85 does not encourage the double-counting of aggravating factors. (*People v. Lewis, supra,* 25 Cal. 4th at p. 669, 106 Cal.Rptr.2d 629, 22 P.3d 392; *People v. Ayala* (2000) 24 Cal. 4th 243, 288–289, 99 Cal.Rptr.2d 532, 6 P.3d 193.)

The federal Constitution does not bar consideration of unadjudicated criminal activity. (*Tuilaepa v. California* (1994) 512 U.S. 967, 976–977, 114 S.Ct. 2630, 129 L.Ed.2d 750; *People v. Marks* (2003) 31 Cal. 4th 197, 237, 2 Cal.Rptr.3d 252, 72 P.3d 1222; *People v. Anderson, supra,* 25 Cal. 4th at p. 601, 106 Cal.Rptr.2d 575, 22 P.3d 347.) Moreover, defendant seems to complain the jury was permitted to consider prior criminal activity involving use or attempted use of force, whereas the prosecutor candidly acknowledged to the jury, "There is no evidence at all of any previous violent activity on the part of [defendant]."

"[A] reasonable juror would readily have identified" the "emotional disturbance" and "diminished capacity" factors as mitigating. (*People v. Benson* (1990) 52 Cal. 3d 754, 802, 276 Cal.Rptr. 827, 802 P.2d 330; see *People v. Williams* (1997) 16 Cal. 4th 153, 268–269, 66 Cal.Rptr.2d 123, 940 P.2d 710; *People v. McPeters* (1992) 2 Cal. 4th 1148, 1191, 9 Cal.Rptr.2d 834, 832 P.2d 146.) "The presumption that the jurors in this case understood and followed the mitigation instruction supplied to them is not rebutted by empirical assertions to the contrary based on research that is not part of the present record and has not been subject to cross-examination. [Citation.]" (*Welch, supra,* 20 Cal. 4th at p.

773, 85 Cal.Rptr.2d 203, 976 P.2d 754.)[17]

--------------------------------------FOOTNOTE--------------------

n.17 As here, the defendant in *Welch* relied upon an article "claiming that interviews with former jurors or with randomly selected subjects show that many of the subjects failed to properly understand the concept of mitigation correctly after they had been given CALJIC No. 8.88. [Citations.]" (*Welch, supra,* 20 Cal. 4th at pp. 772–773, 85 Cal.Rptr.2d 203, 976 P.2d 754.)

-----------------------------------END FOOTNOTE------------------

Finally, failure to delete inapplicable statutory sentencing factors from CALJIC No. 8.85 as given did not violate defendant's rights under the federal Constitution. (*People v. Box* (2000) 23 Cal. 4th 1153, 1217, 99 Cal.Rptr.2d 69, 5 P.3d 130; *People v. Turner* (1994) 8 Cal. 4th 137, 207–208, 32 Cal.Rptr.2d 762, 878 P.2d 521.) Likewise, the failure to identify which factors were aggravating and which mitigating was not error; the aggravating or mitigating nature of the factors is self-evident within the context of each case. (*People v. Hillhouse* (2002) 27 Cal. 4th 469, 509, 117 Cal.Rptr.2d 45, 40 P.3d 754; see *Box,* at p. 1217, 99 Cal.Rptr.2d 69, 5 P.3d 130.)

*Dickey*, 35 Cal. 4th at 927-28.

The California Supreme Court reasonably rejected the claim for the reasons discussed below.

### i.    *Inapplicable sentencing factors*

Petitioner argues that instructing his jury on sentencing factors that were inapplicable on the facts and circumstances of his case was prejudicial error.

However, Petitioner does not point to clearly established federal law that a jury may not be instructed with all sentencing factors.  The Supreme Court stated in *Gregg v. Georgia:*

The petitioner objects, finally, to the wide scope of evidence and argument allowed at [penalty] hearings. We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. So long as the evidence introduced and the arguments made at the [penalty] hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.

428 U.S. at 203–04.

1    In addition, the Ninth Circuit has repeatedly rejected this claim. In *Williams v.*

2 *Calderon,* the Ninth Circuit stated:

3          Williams argues that it was error to read to the jury the entire list of factors the
           state considered relevant to the sentencing decision, even when some did not
4          apply. To the contrary, the jury instructions expressly indicated that the jury was
           to consider each factor only "if applicable." Moreover, "[i]t seems clear ... that
5          the problem [of jury inexperience] will be alleviated if the jury is given
           guidance regarding the factors about the crime and the defendant that the State,
6          representing organized society, deems particularly relevant to the sentencing
           decision." *Gregg v. Georgia,* 428 U.S. 153, 192, 96 S.Ct. 2909, 2934, 49
7          L.Ed.2d 859 (1976) (plurality opinion). The reading of the complete list gave
           the jury more guidance, not less. We find nothing in the Constitution prohibiting
8          the very practice *Gregg* encouraged.

9    52 F.3d at 1481.

10         Petitioner has not demonstrated any requirement that a trial court redact the instructions

11   to include only those factors deemed applicable.  Moreover, the instruction itself advises the

12   jury to consider the factors "if applicable."  (CT 498); *see Bonin,* 59 F.3d 815, 848 (9th Cir.

13   1995) ("the cautionary words 'if applicable' warned the jury that not all of the factors would be

14   relevant and that the absence of a factor made it inapplicable rather than an aggravating

15   factor.").

16         For the reasons stated, the California Supreme Court was not unreasonable in denying

17   allegations that California's death penalty statute and his death sentence are constitutionally

18   infirm due to instruction on inapplicable sentencing factors.

19              *ii.     Vague and Limiting Mitigation Terms*

20         Petitioner argues that CALJIC factor "d" (relating to Penal Code section 190.3(d))

21   provides that only "extreme" mental and emotional disturbance is mitigating (*see* CT 498)

22   thereby unconstitutionally limiting the mitigation defense where the evidence supports a lesser

23   level of disturbance.[13]  (Doc. No. 142 at 244.)  He argues jurors would have understood the

24   instructions in their totality to exclude mitigating evidence of non-severe mental or emotional

25   distress.

26   _____
     [13] Penal Code section 190.3 provides in pertinent part that: "[I]n determining which penalty is to be imposed on
27   defendant, you shall consider … take into account and be guided by the following factors, if applicable … (d)
     whether or not the offense was committed while the defendant was under the influence of extreme mental or
28   emotional disturbance."

Petitioner further argues the catchall language in CALJIC factor "k", which instructs the jury pursuant to Penal Code section 190.3(k) that it may consider any extenuating circumstance as well any sympathetic aspect of defendant's character, does not cure this deficiency because the jury might have understood factor "k" itself to be aggravating rather than mitigating.  (*Id.* at 244-45.)

The state supreme court presumably observed the jury received multiple pertinent instructions.  In addition to CALJIC 8.85 factor "d", jurors were instructed: (i) to consider "whether or not the defendant acted under extreme duress or under the substantial domination of another person" (CALJIC 8.85(g); CT 499); *see also* Penal Code § 190.3(g)); (ii) that "in determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case . . ." (CALJIC 8.85; CT 498); (iii) that "a mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty" (CALJIC 8.88; CT 502); (iv) that they may consider "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial" (CALJIC 8.85; CT 499); and (v) to consider the penalty phase instructions as a whole (CALJIC 1.09; CT 487).

The Supreme Court has reviewed these instructions on several occasions and consistently rejected claims they restrict the jury's consideration of mitigating evidence.  *See, e.g., Belmontes*, 549 U.S. at 24; *Brown*, 544 U.S. at 133; *Boyde*, 494 U.S. at 370.  Particularly, the Supreme Court has stated that factor (k) directed the jury to consider "any other circumstance that might excuse the crime. . . ." *Boyde*, 494 U.S. at 382.

The Ninth Circuit also has rejected this allegation where, as here, the jury was advised it could consider any other mitigating matter.  *See Hendricks*, 974 F.2d at 1109.  Moreover, the

190.3 factors are not read in isolation.  For example, factor (k) on its face allows the jury to consider non-extreme mental or emotional conditions when read in conjunction with instructions on factor (d).  *See Sanchez*, 12 Cal. 4th, at 80.

"[T]he factor (k) instruction is consistent with the constitutional right to present mitigating evidence in capital sentencing proceedings." *Belmontes*, 549 U.S. at 24.  Contrary to Petitioner's contention, the factor (k) instruction made it clear to the jurors that they should consider any evidence of mental or emotional disturbance of any degree, if they believed there was such evidence presented.  *See id.* at 19-20 (same instructional language permitted consideration of *Belmontes*'s mitigating evidence).

The state supreme court reasonably could find jurors would have understood the instructions as a whole not to exclude mitigating evidence of non-severe mental or emotional distress.  As noted above, in evaluating a claim of instructional error, a single instruction is not viewed in isolation, but rather in the context of the overall charge.  *Spivey*, 194 F.3d at 976.  "[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an unconstitutional manner.  *Boyde,* 494 U.S. at 380.

As noted, the Supreme Court has never required a sentencing court to instruct a jury on how to weigh and balance factors in aggravation and mitigation.  The Supreme Court has stated that "a capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa*, 512 U.S. at 979; see also *Marsh*, 548 U.S. at 175 (quoting *Franklin*, 487 U.S. at 179) (citing *Stephens,* 462 U.S. at 875–876, n.13) (defendants have the right to present relevant mitigating circumstances; although sentencers must consider such circumstances, they need not be instructed on a specific method for balancing aggravating and mitigating circumstances).

Additionally, Petitioner has not shown that the instructions in issue here precluded the jury from considering mitigating value of evidence from the guilt phase.  *See Blystone,* 494 U.S. at 307; *Boyde,* 494 U.S. at 377; *see also McGuire*, 502 U.S. at 72 (quoting *Boyde*, 494 U.S. at 380).  Particularly, the facts and circumstances of Petitioner's conviction as an aider

and abettor of felony murder were before the penalty phase jury.

The state supreme court reasonably could find Petitioner's habeas proffer mental state evidence, subject to discount for the reasons stated, lacked mitigating weight relating to whether at the time of the crimes Petitioner suffered significant mental or emotional disturbance. Nor does the record suggest he was under duress or domination of another during the crime.

If the jury found the evidence showed that Petitioner's actions as aider and abettor were the result of mental or emotional disturbance of any degree, then CALJIC Nos. 8.85 and 8.88, and particularly factor (k) of CALJIC No. 8.85, allowed the jury to consider it. Petitioner has not demonstrated that the Constitution requires more. *See Buchanan,* 522 U.S. at 276 (as long as state does not preclude jury from considering any constitutionally relevant mitigating evidence, it need not "affirmatively structure in a particular way the manner in which juries consider mitigating evidence.").

### iii. *Special Circumstance as Aggravating Factor*

Petitioner finds error in CALJIC 8.85 factor "a" which instructs on Penal Code section 190.3(a) that "the existence of any special circumstances found to be true pursuant to Section 190.1 is an aggravating factor to be considered at penalty phase." He argues this language unconstitutionally limits the mitigation defense because there will always be one established aggravating factor. (Doc. No. 51-1 ¶ 937, citing *Penry*, 492 U.S. at 319 (jury must be able to consider and give effect to mitigating evidence relevant to defendant's background, character, or circumstances of crime); *see also* Doc. No. 142 at 243.)

However, as discussed in claim III(G) above, Petitioner cannot demonstrate clearly established federal law that duplicative aggravating circumstances violates his federal rights. The same claim was rejected by the Supreme Court in *Tuilaepa,* wherein the Court concluded that:

> [T]he sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty . . . this California factor instructs the jury to consider a relevant subject matter and does so in understandable terms. The

circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence.

512 U.S. at 975-76.

Furthermore, the California Supreme Court has found that "[f]actor (a) of section 190.3 … does not impermissibly result in 'double-counting' or automatically create a bias in favor of a death verdict." *Tully*, 54 Cal. 4th at 1068.

As above, the Supreme Court has never required a sentencing court to instruct a jury on how to weigh and balance factors in aggravation and mitigation. *Tuilaepa*, 512 U.S. at 978-79; *Marsh*, 548 U.S. at 175.

Likewise, the California Supreme Court has repeatedly rejected this claim, as noted above. *See Lewis,* 25 Cal. 4th at 669; *Ayala,* 24 Cal. 4th at 288-289.

Additionally, Petitioner has not shown "a reasonable likelihood that the jury applied the challenged instruction in a way that prevented consideration of constitutionally relevant evidence." *Johnson*, 509 U.S. at 367 (quoting *Boyde*, 494 U.S. at 380). The state supreme court reasonably could find "a commonsense understanding of the instructions in the light of all that has taken place at the trial" suggested otherwise. *Boyde*, 494 U.S. at 381.

### iv.    *Failure to identify aggravating and mitigating factors*

Petitioner argues the jury was confused which sentencing factors were aggravating and which were mitigating. (Doc. No. 142 at 243.)

Here again, states need not structure their jury instructions in any particular manner as long as juries are given the opportunity to consider relevant mitigating evidence. *Tuilaepa,* 512 U.S. at 979-80; *Lockett*, 438 U.S. 586 at 604. "There is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty." *Boyde*, 494 U.S. at 377 (quoting *Franklin*, 487 U.S. at 181). "[I]t must be recognized that the States may adopt capital sentencing processes that rely upon the jury, in its sound judgment, to exercise wide discretion." *Tuilaepa*, 512 U.S. at 974.

Petitioner fails to show clearly established authority from the United States Supreme Court holding that a jury must be instructed in a particular manner. The Supreme Court has upheld California's instruction against constitutional challenge. *See Belmontes*, 549 U.S. at 24; *Payton*, 544 U.S. at 141, 142; *Boyde*, 494 U.S. at 382.

The California Supreme Court also has consistently rejected this allegation. *See, e.g., People v. Osband*, 13 Cal. 4th 622, 705 (1996) (noting it has "regularly rejected the contention that the court must specify which factors of section 190.3 apply in mitigation and which in aggravation").

For the reasons stated, the California Supreme Court reasonably found it clearly established that a sentencing court need not identify which factors are aggravating and which are mitigating. *Pulley,* 465 U.S. at 51 and 53 n.14; *Tuilaepa*, 512 U.S. at 975-80. It follows that the failure to identify whether factors are aggravating or mitigating is not contrary to or an unreasonable application of Supreme Court authority. *Id.; see also Musladin*, 549 U.S. at 77; *Sims*, 414 F.3d, at 1153.

The Ninth Circuit so concluded in *Williams v. Calderon, i.e.* that "the death penalty statute's failure to label aggravating and mitigating factors is constitutional." 52 F.3d, at 1484-1485. The Ninth Circuit has found California's death penalty statute does not violate due process by failure to label factors as aggravating or mitigating. *Id.*

  v.     *Failure to Provide Burden of Proof*

Petitioner argues the failure to provide the jury with a penalty phase standard of proof was constitutional error. (Doc. No. 142 at 243; *see* claim XII(G), *ante*.)

However, the California Supreme Court reasonably rejected these allegations. "[A] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa,* 512 U.S. at 979. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Id.* (quoting *Ramos,* 463 U.S. at 1008).

1    *Apprendi* is not implicated by California's death penalty scheme because once a

2    California jury convicts of first-degree murder with a special circumstance "the defendant

3    stands convicted of an offense whose maximum penalty is death." *People v. Ochoa*, 26 Cal. 4th

4    398, 454 (2001), *abrogated on other grounds by People v. Harris*, 43 Cal. 4th 1269, 1306,

5    1310 (2008); *see also People v. Prieto*, 30 Cal. 4th 226, 263 & n.14 (2003) (same). *Ring* is

6    inapposite for the same reasons *Apprendi* is inapplicable.

7        Notably, federal and state courts have rejected this allegation. *See, e.g. Williams*, 52

8    F.3d, at 1485; *Carriger*, 971 F.2d, at 334; *Webb*, 6 Cal. 4th, at 536; *People v. Cudjo,* 6 Cal. 4th

9    585, 634 (1993).

10        As discussed in claim XII(G) above, summarized here, under California law "neither

11   death nor life is presumptively appropriate or inappropriate under any set of circumstances, but

12   in all cases the determination of the appropriate penalty remains a question for each individual

13   juror." *Samayoa*, 15 Cal. 4th, at 853. In *Walton v. Arizona*, a plurality of the United States

14   Supreme Court concluded that a defendant may constitutionally be required to establish by a

15   preponderance of the evidence the existence of mitigating circumstances. 497 U.S. at 649-651,

16   *rev'd on other grounds by Ring*, 536 U.S. at 589. This conclusion appears to militate against a

17   beyond a reasonable doubt standard. *See, e.g.*, *Carriger*, 971 F.2d at 334 (citing *Walton* in

18   rejecting allegation that beyond a reasonable doubt standard applies in determining

19   appropriateness of death sentence and absence of mitigating circumstances).

20        The California Supreme Court has consistently rejected Petitioner's argument because

21   as noted above the maximum penalty for one convicted of first-degree murder with a special

22   circumstance is death, *see* Penal Code section 190.2(a); *see also Anderson*, 25 Cal. 4th, at 589,

23   and the penalty phase findings regarding aggravating and mitigating circumstances do not

24   increase that maximum statutory penalty. *See Prieto*, 30 Cal. 4th, at 263; *People v. Navarette*

25   30 Cal. 4th 458, 520-21 (2003) (noting California Supreme Court repeatedly has rejected this

26   claim notwithstanding *Ring*).

27        The penalty phase findings in California are in the nature of moral and normative

28

1  determinations. The Supreme Court in upholding the constitutionality of California's death

2  penalty scheme noted that at the penalty phase, the jury merely weighs the aggravating and

3  mitigating factors to determine whether a defendant eligible for the death penalty should be

4  sentenced to death. *See Tuilaepa*, 512 U.S. at 972. "Once the jury finds that the defendant

5  falls within the legislatively defined category of persons eligible for the death penalty . . . the

6  jury then is free to consider a myriad of factors to determine whether death is the appropriate

7  punishment." *Ramos,* 463 U.S. at 1008). The jury is presumed to understand and follow the

8  trial court's instructions. *Weeks*, 528 U.S. at 234.

9       For the reasons stated, the California Supreme Court reasonably found Petitioner was

10  not denied a fair trial by any failure to instruct on a burden of proof at the penalty phase. See

11  *Dunckhurst*, 859 F.2d at 114 (instructional error must so infect the entire trial that the

12  defendant was deprived of his right to a fair trial guaranteed by the due process clause of the

13  fourteenth amendment).

14       **d.      Conclusions**

15       The California Supreme Court was not unreasonable in denying allegations 190.3

16  sentencing factors as stated in CALJIC 8.85 violated his federal rights.

17       Accordingly, the California Supreme Court's rejection of this claim was not contrary

18  to, or an unreasonable application of, clearly established federal law, or an unreasonable

19  determination of the facts in light of the evidence presented in the state court proceeding. 28

20  U.S.C. § 2254(d).

21       Claim XXV(E) shall be denied.

22       6.      Review of Claim XXV(F)

23       Petitioner alleges that his death sentence violates international law, treaties and precepts

24  of fundamental human rights, denying his rights under the Eighth and Fourteenth

25  Amendments. (Doc. No. 51-1 ¶¶ 945-951.)

26       **a.      Supplemental Legal Standards**

27       Federal habeas relief lies for violations of the Constitution, laws, and treaties of the

28

United States.  28 U.S.C. § 2254(a).  Federal courts may grant habeas relief to persons who are in state custody as a result of judgment rendered in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2241(c)(3).

"[T]he Cruel and Unusual Punishments Clause prohibits the infliction of uncivilized and inhuman punishments.  The State, even as it punishes, must treat its members with respect for their intrinsic worth as human beings.  A punishment is 'cruel and unusual,' therefore, if it does not comport with human dignity."  *Furman*, 408 U.S. at 270.

The mental suffering, demoralization, uncertainty and consequent psychological hurt inherent in the punishment must be considered in interpreting Eighth Amendment.  *Id. at* 271, 272.

An execution "cannot be so totally without penological justification that it results in the gratuitous infliction of suffering."  *Gregg,* 428 U.S. at 183.

The assessment should be whether punishment is cruel and unusual in consideration of the standards of decency that mark the progress of a maturing society, or standards of decency that are more or less universally accepted.  *Id.*

### b.    State Court Direct and Collateral Review

Petitioner presented this claim on direct appeal and it was denied on the merits.  *Dickey*, 35 Cal. 4th at 932.)

### c.    Analysis

Petitioner argues that his death sentence violates international treaties and norms. (Doc. No. 142 at 246.)

The California Supreme Court in denying the allegation stated that:

> Finally, "we need not consider whether a violation of state or federal constitutional law would also violate international law, 'because defendant has failed to establish the premise that his trial involved violations of state and federal constitutional law....' ( [*People v. Jenkins, supra,* 22 Cal. 4th at p.] 1055 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) Moreover, had defendant shown prejudicial error under domestic law, we would have set aside the judgment on that basis without recourse to international law." (*People v. Hillhouse, supra*, 27 Cal. 4th at p. 511, 117 Cal.Rptr.2d 45, 40 P.3d 754; see *Brown, supra,* 33 Cal. 4th at pp. 403–404, 15 Cal.Rptr.3d 624, 93 P.3d 244; *Burgener, supra,* 29 Cal.

4th at p. 885, 129 Cal.Rptr.2d 747, 62 P.3d 1.)

*Dickey*, 35 Cal. 4th at 932.

Petitioner argues his death sentence is unconstitutional because it violates treaties ratified by the United States as well as international legal norms underlying his federal rights. (Doc. No. 51-1 ¶¶ 945-949; Doc. No. 142 at 246-48; *see also* AOB at claim XXXIII.)

Petitioner point to Articles VI (prohibiting the arbitrary deprivation of life) and VII (prohibiting cruel, inhuman or degrading treatment or punishment) of the International Covenant of Civil and Political Rights (hereinafter "ICCPR") that was ratified by the United States in 1990. (Doc. No. 142 at 246.) He argues the ICCPR prohibits his death sentence given the improprieties in the capital sentencing process, conditions of incarceration, excessive delays between sentencing and appointment of appellate counsel, and excessive delays between sentencing and execution that are apparent in his case. (*Id.*; *see also* Doc. No. 51-1 ¶ 947.)

Petitioner argues international norms are incorporated into the Fifth, Eighth, and Fourteenth Amendments (*see* Doc. No. 142 at 247; *see also Pratt & Morgan v. Attorney General for Jamaica,* 3 SLR 995, 2 AC 1, 4 All ER 769 (Privy Council 1993)) as guidance for interpreting federal and state constitutional provisions, including the Eighth Amendment. *See Thompson v. Oklahoma,* 487 U.S. 815, 830-31, 851-52 (1988); *Soering v. United Kingdom,* 161 Eur. Ct. H.R. (ser. A), at 34 [reprinted in 11 Eur. Hum. Rts. Rep. 439]. The European Court in *Soering*, facing a decision whether to extradite an EU national to Virginia to face capital murder charges, held that the protracted delays in carrying out death sentences in Virginia, which it averaged at six to eight years, constituted inhuman and degrading punishment in violation of Article 3 of The European Human Rights Convention Charter, a provision that "enshrines one of the fundamental values of the democratic societies making up the Council of Europe." *Soering,* 161 Eur. Ct. H.R. (ser. A) at 26.

However, the California Supreme Court reasonably rejected the claim. Petitioner does not point to clearly established federal law that the California death penalty violates

international law and that this alleged violation creates a cognizable claim on federal habeas review. *See Rowland v. Chappell*, 902 F. Supp. 2d 1296, 1339 (N.D. Cal. 2012) (there is no clearly established federal law holding that the California death penalty violates international law, and that this alleged violation creates a cognizable claim on federal habeas review). To the contrary, it appears that such challenges to imposition of the death penalty have been repeatedly rejected, as follows:

> In *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001), for instance, the Sixth Circuit explained that "the claim that international law completely bars this nation's use of the death penalty is unsupportable since the United States is not party to any treaty that prohibits capital punishment per se, and since total abolishment of capital punishment has not yet risen to the level of customary international law." *Id., at* 443 n.12. In *Carter v. Chappell*, 2013 WL 781910, (C.D. Cal. Mar. 1, 2013), the district court noted that "[c]learly established federal law does not hold the death penalty to violate international law or the federal Constitution." Similarly, in *Rowland v. Chappell*, 902 F. Supp. 2d 1296, 1339 (N.D. Cal. 2012), the district court rejected an essentially identical claim, stating that "Petitioner cannot demonstrate that any claim of a violation of international law is even cognizable on federal habeas review, given that such review is designed to address claims that a Petitioner is in custody in violation of the Constitution or laws or treaties of the United States." "International law is not United States law, and Petitioner does not demonstrate that the International Covenant of Civil and Political Rights creates a form of relief enforceable in United States courts." *Id.*

*Ervin v. Davis*, No. 00-CV-01228-LHK, 2016 WL 3253942, at *12 (N.D. Cal. June 14, 2016); *see also Buell v. Mitchell*, 274 F.3d 337, 370-76 (6th Cir. 2001) (rejecting challenge to death sentence based international laws such as the noted American Declaration, International Covenant, and customary international law norms); *Am. Baptist Churches in the U.S.A. v. Meese*, 712 F. Supp. 756, 770 (N.D. Cal. 1989) (treaties that are not self-executing do not provide a basis for private lawsuit absent appropriate implementing legislation); *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas Petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law.").

Furthermore, Petitioner lacks standing to invoke the jurisdiction of international law.

214

The principles of international law apply to disputes between sovereign governments and not between individuals. *Hanoch Tel-Oren*, 517 F. Supp. at 545-47. It is only when a treaty is self-executing, that is, when it prescribes rules by which private rights may be determined, that it may be relied on for the enforcement of such rights. *Dreyfus v. Von Finck*, 534 F.2d 24, 30 (2d Cir. 1976) (*disavowed on other grounds by Filaratiga v. Pena-Irala*, 630 F.2d 876, 884-85 (2d Cir. 1980)).

In determining whether a treaty is self-executing, courts look to the following factors: (i) the language and purpose of the agreement as a whole, (ii) the circumstances surrounding its execution, (iii) the nature of the obligations imposed by the agreement, (iv) the availability and feasibility of alternative enforcement mechanisms, (v) the implications of permitting a private right of action, and (vi) the capability of the judiciary to resolve the dispute. *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir. 1985); *see also People of Saipan v. United States Dept. of Interior*, 502 F.2d 90, 97 (9th Cir. 1974) ("The extent to which an international agreement establishes affirmative and judicially enforceable obligations without implementing legislation must be determined in each case by reference to many contextual factors: the purposes of the treaty and the objectives of its creators, the existence of domestic procedures and institutions appropriate for direct implementation, the availability and feasibility of alternative enforcement methods, and the immediate and long-range social consequences of self- or non-self-execution.").

The California Supreme Court reasonably could find unpersuasive Petitioner's inferential argument the treaty upon which he relies is self-executing. (*See* 28 U.S.C. § 2254(a); *Medellin*, 544 U.S. at 664; *see also Sosa*, 542 U.S. at 734-35; *Jamison*, 100 F. Supp. 2d at 766 (International Covenant on Civil and Political Rights is not self-executing); *People v. Ghent*, 43 Cal. 3d 739, 778-79 (1987) (United Nations charter does not supersede domestic legislation); *Brown*, 33 Cal. 4th, at 404 ("International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. [Citations.]").

The California Supreme Court specifically has rejected international law as a basis for finding unconstitutional capital punishment and the lengthy delays it can entail. *See People v. Bolden* 29 Cal. 4th 515, 567 (2002) ("[W]e are not persuaded that international law prohibits a sentence of death rendered in accordance with state and federal constitutional and statutory requirements."

Even if the ICCPR were viewed as self-executing, its provisions do not prohibit the death penalty, but rather merely limit its application including as to arbitrary deprivation of life and execution of the severely mentally ill. *See e.g.*, *Atkins*, 536 U.S. at 316 n.21 (death penalty held unconstitutional for the intellectually disabled); *see also Roper v. Simmons*, 543 U.S. 551, 575 (2005) (in holding death penalty unconstitutional for minors, the Court noted that it has "referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'").

Finally, to the extent Petitioner supports alleged international law violations with the claims stated in this proceeding, those claims all fail for the reasons stated above and below.

### d.    Conclusions

The California Supreme Court was not unreasonable in denying allegations that Petitioner's death sentence violates international law, treaties and precepts of fundamental human rights, denying his federal rights.

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim XXV(F) shall be denied.

### 7.    Review of Claims XXV(G, L)

Petitioner alleges that California's death penalty process is unconstitutional on its face because it does not provide for inter-case and intra-case proportionality review (i.e. claim XXV(G)), and unconstitutional as applied to him because his death sentence is not proportional

to his personal responsibility and moral guilt (i.e. claim XXV(L)), violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments (Doc. No. 51-1 ¶¶ 952-958, 977-980).

### a. Supplemental Legal Standards

"Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189. A death penalty law must narrow the class of death-eligible defendants and provide for individualized penalty determination. *McCleskey*, 481 U.S. at 308.

If the reviewing court finds constitutional error, it must additionally decide whether the error had "[a] substantial and injurious effect or influence in determining [the] jury's verdict," under *Brecht*. *Coleman*, 525 U.S. at 145-46.

### b. State Court Direct and Collateral Review

Petitioner presented claim XXV(G) on direct appeal and it was denied on the merits. *Dickey*, 35 Cal. 4th at 931. This claim also was presented in the second state exhaustion petition as a part of claim XIV(C) (Lod. Doc. No. 30 at 360-64) and denied on the merits. (Lod. Doc. No. 31, Order Denying Cal. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

Petitioner presented claim XXV(L) on direct appeal and it was denied on the merits. *Dickey*, 35 Cal. 4th at 931.

### c. Analysis

Petitioner argues that the failure of California's death penalty statute to provide for a proportionate sentence violates the Constitution on multiple grounds. (Doc. No. 142 at 248.) He argues the lack of proportionality review denies him: (i) equal protection because proportionality review is afforded California's non-capital defendants (Doc. No. 51-1 ¶ 953; *see also* Penal Code § 1170(f) [repealed]), (ii) a fair and reliable sentence following the jury's consideration of all potential mitigating factors and meaningful appellate review (Doc. No. 142 at 248), and (iii) a sentence proportionate to his personal responsibility and moral guilt (*see*

Doc. No. 142 at 255).

The California Supreme Court considered and rejected these allegations, stating:

> Nor is [California's death penalty statute] defective in failing to require intercase proportionality review. (*Brown, supra,* 33 Cal. 4th at p. 402, 15 Cal.Rptr.3d 624, 93 P.3d 244; *Prieto, supra,* 30 Cal. 4th at p. 276, 133 Cal.Rptr.2d 18, 66 P.3d 1123; *People v. Lewis* (2001) 26 Cal. 4th 334, 394–395, 110 Cal.Rptr.2d 272, 28 P.3d 34.)

*Dickey*, 35 Cal. 4th at 931.

Petitioner supports the claims by pointing to the facts and circumstances of this case including his limited role as an aider and abettor whose intent was only to "aid R.C. to perpetrate a simple robbery/burglary upon the two elderly victims – one who freely dispensed cash to R.C. on a regular basis." (Doc. No. 142 at 255.) He argues there is no proof that he undertook any act in aid of the killings. (*See* Doc. No. 51-1 ¶ 978.) He also points to the possibility of third-party liability and suggests that he showed remorse for the crime. (*Id.*)

Based thereon, Petitioner argues his death sentence does not further societal goals of retribution and deterrence and is arbitrary and disproportionate. (*Id.; see also* Doc. No. 51-1 ¶ 957; Doc. No. 142 at 250.)

However, the California Supreme Court reasonably could find Petitioner's claims foreclosed by the Supreme Court's decision in *Pulley v. Harris*. Therein, the Supreme Court reviewed California's death penalty procedure and considered the fact that California did not require any sort of comparative proportionality review. The Supreme Court found that the Eighth Amendment did not require a "state appellate court, before it affirms a death sentence, to compare the sentence in the case before it with the penalties imposed in similar cases if requested to do so by the prisoner." *Pulley*, 465 U.S. at 43-44.

The Supreme Court also held that "on its face, [California's] system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under *Furman v. Georgia*, [408 U.S. 238 (1972)] and our subsequent cases." *Pulley*, 465 U.S. at 53. The Supreme Court considered and upheld California's 1977 scheme

218

where "a person convicted of first-degree murder is sentenced to life imprisonment unless one or more special circumstances are found, in which case the punishment is either death or life imprisonment without parole", *Pulley*, 465 U.S. at 51; "the judge is required to state on the record the reasons for his findings [denying a] motion for modification [of the verdict]", *id.* at 53; and "there is an automatic appeal [from denial of a motion for modification]", *id.* at 53.

The California Supreme Court specifically has rejected the intra-case and inter-case proportionality claim in numerous cases. *Lewis*, 26 Cal. 4th at 394-95; *see also Sanchez*, 12 Cal. 4th at 83-85; *Cox*, 53 Cal. 3d at 692.

As discussed above, California's 1978 death penalty satisfies constitutional requirements by narrowing the class of death-eligible defendants and providing for an individualized penalty determination. *McCleskey*, 481 U.S. at 308; *Rodriguez*, 42 Cal. 3d 730, 777-779 (1986). The Supreme Court and the California Supreme Court have rejected proportionality review.

Additionally, Petitioner has not demonstrated constitutional error in his death eligibility (*see* Doc. No. 135 denying guilt phase claims) or that he was denied an individualized death sentence, for the reasons stated *ante* and *post*.

### d.  Conclusions

The California Supreme Court was not unreasonable in denying Petitioner's allegations that California's death penalty statute and his death sentence are constitutionally infirm due to alleged lack of proportionality.

The state supreme court's rejection of these claims was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was that court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claims XXV(G, L) shall be denied.

8.    Review of Claims XXV(H-I)

Petitioner alleges that California's death penalty process is unconstitutional because it

1  fails to require that the jury's sentence determination (i.e. claim XXV(H)) and weighing of

2  aggravating and mitigating factors (i.e. claim XXV(I)) be made unanimously and beyond a

3  reasonable doubt.  (Doc. No. 51-1 ¶¶ 959-970.)

4       **a.    Supplemental Legal Standards**

5       "[T]he Due Process Clause protects the accused against conviction except upon proof

6  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

7  charged*." In re Winship*, 397 U.S. 358, 364 (1970).

8       Claims of instructional error will constitute a violation of due process under the

9  Fourteenth Amendment only where the alleged error by itself infects the entire trial to such an

10 extent that the resulting conviction violates due process.  *Naughten,* 414 U.S. at 147; *see also*

11 *DeChristoforo*, 416 U.S. at 643.

12      "[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has

13 applied the challenged instruction" in an unconstitutional manner.  *Boyde,* 494 U.S. at 380.  A

14 reviewing court does not engage in a technical parsing of the instruction's language, but

15 instead approaches the instructions in the same way that the jury would -- with a

16 "commonsense understanding of the instructions in the light of all that has taken place at the

17 trial."  *Johnson*, 509 U.S. at 368.  In evaluating a claim of instructional error, a single

18 instruction is not viewed in isolation, but rather in the context of the overall charge.  *Spivey,*

19 194 F.3d at 976.  Federal courts presume that juries understand and follow instructions.  *Weeks*,

20 528 U.S. at 234; *see also Boyde*, 494 U.S. at 381-85; *Tan*, 413 F.3d at 1115.

21      A state capital sentencing system must: "(1) rationally narrow the class of death-

22 eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing

23 determination based on a death-eligible defendant's record, personal characteristics, and the

24 circumstances of his crime."  *Marsh*, 548 U.S. at 173-74.  If the "state system satisfies these

25 requirements," then the "state enjoys a range of discretion in imposing the death penalty,

26 including the manner in which aggravating and mitigating circumstances are to be weighed."

27 *Id.,* (citing *Franklin*, 487 U.S. at 179; *Stephens*, 462 U.S. at 875-876, n.13).

28

Even if constitutional instructional error has occurred, the federal court must still determine whether petitioner suffered actual prejudice, that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. A "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given. *Clark*, 450 F.3d at 916.

**b.     State Court Direct and Collateral Review**

Petitioner presented claims XXV(H) and XXV(I) on direct appeal and the claims were denied on the merits. *Dickey*, 35 Cal. 4th at 929-31.

**c.     Analysis**

Petitioner argues as he did in claims XII(G-H) and XXV(E), *ante*, that the failure to require sentencing findings be made unanimously and beyond a reasonable doubt denied him federal rights. (Doc. No. 142 at 250-53.)

Petitioner supports the argument by pointing to: (i) alleged ambiguity in the weighing instructions (CALJIC 8.85, 8.88), and (ii) *Ring v. Arizona* and *Apprendi v. New Jersey* which he contends require the jury make sentencing findings unanimously and beyond a reasonable doubt (i.e. finding beyond a reasonable doubt that at least one aggravating factor exists and that such aggravating factor(s) outweigh any and all mitigating factors and that death is the appropriate punishment).[14]

However, the California Supreme Court was not unreasonable in denying these allegations.

*i.     Weighing Instructions Were Not Ambiguous*

Petitioner argues CALJIC 8.88: (i) improperly suggested that jurors use a quantitative weighing process, (ii) confused jurors on the definitions of "aggravating" and "mitigating"; and (iii) used ambiguous terminology preventing the jury from selecting LWOP where a single mitigating factor was found. (Doc. No. 142 at 218-20; *see also* CT 502-503.) He argues these

---

[14] The jury was instructed that an aggravating prior criminal conviction must be proven beyond a reasonable doubt. (*See* CT 500.)

221

errors left the jury impermissible "open-ended discretion" regarding imposition of the death penalty, reducing the prosecution's burden of proof. (Doc. No. 142 at 218-20); *see also Cartwright*, 486 U.S. at 361-62 ("Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman*.").

Here, the trial court instructed the jury on CALJIC 8.88, in pertinent part as follows:

> [[To] "return a judgment of death, each of you must be persuaded that the aggravating evidence and/or circumstances is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."]

(CT 502-503.)

> [I]n weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.

(CT 502-503; *see also* Doc. No. 142 at 219.)

> An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself.
>
> A mitigating circumstance is any fact, condition or event which as such, does not constitute justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.

(CT 502.)

The California Supreme Court found CALJIC 8.88 was not impermissibly vague and did not improperly reduced the prosecution's burden of proof, stating that:

> Defendant contends giving the standard instruction on the weighing of aggravating and mitigating factors (CALJIC No. 8.88) violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We have repeatedly rejected similar claims, and defendant gives us no compelling reason to reconsider our decisions.

222

"Defendant contends that the standard instruction on the weighing of mitigating and aggravating factors was impermissibly vague and misleading in that it failed to inform the jury that unless it found that the factors in aggravation outweighed the factors in mitigation, it could not impose a sentence of death, and in that it failed to inform the jury that if factors in mitigation outweighed those in aggravation, it must impose a sentence of life in prison without the possibility of parole. He also complains that the instruction's direction that before the jury may return a verdict of death, it must find that the aggravating circumstances are 'so substantial' as to warrant a sentence of death and not life imprisonment without possibility of parole, was vague and led to arbitrary decision-making. He claims violation of his right to due process of law and to a reliable and nonarbitrary penalty determination under the Eighth Amendment of the United States Constitution. [¶] We repeatedly have rejected identical claims and decline defendant's invitation to reconsider our prior rulings. [Citations.]" (*People v. Catlin* (2001) 26 Cal. 4th 81, 174, 109 Cal.Rptr.2d 31, 26 P.3d 357 (*Catlin* ).)

Defendant also contends the standard instruction, in referring to the "totality" of the aggravating and mitigating circumstances, erroneously implied a single mitigating circumstance could not outweigh any and all aggravating circumstances. However, the instruction was not susceptible of this interpretation. (*People v. Berryman* (1993) 6 Cal. 4th 1048, 1099–1100, 25 Cal.Rptr.2d 867, 864 P.2d 40.)

Finally, no instruction defining life imprisonment without possibility of parole was required. (*People v. Hughes* (2002) 27 Cal. 4th 287, 405, 116 Cal.Rptr.2d 401, 39 P.3d 432 (*Hughes* ).)

*Dickey*, 35 Cal. 4th at 929.

Here, the California Supreme Court reasonably denied the allegations of ambiguity in the weighing process. CALJIC 8.88 is not inherently quantitative and does not implicitly weigh in favor of death because it addresses the weight of the totality of circumstances rather than the weight of any one circumstance. (*See* Doc. No. 142 at 219; *see also* CT 502-03.) The jury was instructed against "mere mechanical counting" of factors; they were instructed that they could assign "whatever moral and sympathetic value" they deemed appropriate to any of the factors. (CT 502-503; RT 5154.) The jury was instructed that "[i]n weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." (*Id.*)

CALJIC 8.88 is not unconstitutionally vague and confusing because it uses the terms "aggravating," "mitigating," "mitigating circumstance," and "extenuating." (*See* Doc. No. 142

at 220.)  The state supreme court reasonably could find the plain meaning of these terms as argued to the jury made it unlikely vagueness prevented consideration of constitutionally relevant evidence in sentence determination.  (See RT 5134-40; *Boyde*, 494 U.S. at 377, 380; *Blystone*, 494 U.S. at 307.

As noted, a reviewing court approaches the instructions in the same way that the jury would, with a "commonsense understanding of the instructions in the light of all that has taken place at the trial."  *Johnson*, 509 U.S. at 368.  It can be presumed that the jury followed the instructions, including the cautionary instructions. *Weeks*, 528 U.S. at 234.  Notably, the jury did not ask the trial court to clarify the meaning of these terms.

There is no clearly established authority from the United States Supreme Court holding that a jury must be instructed in a particular manner.  The Eighth Amendment does not require that a jury be instructed on particular statutory mitigating factors.  *Buchanan*, 522 U.S. at 275-77.

For the reasons stated, the California Supreme Court reasonably rejected Petitioner's allegations relating to ambiguity in the weighing instruction.

ii.     *No Requirement to Instruct on Burden of Proof*

Petitioner argues CALJIC 8.88 failed to instruct the jury that the prosecution must prove the relative substantiality of the aggravating circumstances beyond a reasonable doubt. He argues as he did above in claim XII(G) that the presence of an aggravating factor equates to an element of capital murder in California, subject to the protections of *Ring*.  (*See* Doc. No. 51-1 ¶ 960.)  Based thereon, he argues the jury should have been instructed that before a death verdict could be returned, the jury was required to find that: (i) any aggravating factors upon which it relied were true beyond a reasonable doubt; and (ii) the aggravating factor or factors outweighed the mitigating factors beyond a reasonable doubt.  (Doc. No. 142 at 223.)

The California Supreme Court in denying the claim stated that:

Defendant contends failure to instruct the jury that the reasonable doubt
standard governs the penalty determination violated his rights under the Fifth,
Eighth, and Fourteenth Amendments to the United States Constitution. We have

rejected the identical contention, and defendant gives us no reason to reconsider our decision.

"Defendant claims that it is unconstitutional to impose a sentence of death unless the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. This claim was first rejected by our court in *People v. Rodriguez* [(1986)] 42 Cal. 3d [730,] 777–779 [230 Cal.Rptr. 667, 726 P.2d 113], and has been rejected ever since. (See, e.g., [*People v.*] *Snow* [(2003)] 30 Cal. 4th [43,] 125–127 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *Burgener, supra,* 29 Cal. 4th at p. 884, fn. 7 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Gutierrez* (2002) 28 Cal. 4th 1083, 1150–1151 [124 Cal.Rptr.2d 373, 52 P.3d 572]; *Clair, supra,* 2 Cal. 4th at p. 691 [7 Cal.Rptr.2d 564, 828 P.2d 705].) As we recently stated: 'The Constitution does not require the jury to find beyond a reasonable doubt that a particular factor in aggravation exists, that the aggravating factors outweighed the mitigating factors, or that death was the appropriate penalty.' (*Burgener, supra,* 29 Cal. 4th at p. 884 [129 Cal.Rptr.2d 747, 62 P.3d 1].)" (*People v. Cox* (2003) 30 Cal. 4th 916, 971, 135 Cal.Rptr.2d 272, 70 P.3d 277.)

Defendant acknowledges this court has previously rejected similar arguments. However, as did the defendant in *Cox,* defendant "asks us to reconsider this position in light of two recent United States Supreme Court cases, *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435], and *Ring v. Arizona* (2002) 536 U.S. 584 [122 S.Ct. 2428, 153 L.Ed.2d 556]. Specifically, defendant argues that the two cases read together mandate that the aggravating circumstances necessary for the jury's imposition of the death penalty be found beyond a reasonable doubt. We disagree. As this court recently stated in [*People v.*] *Snow,* 30 Cal. 4th at page 126, footnote 32 [132 Cal.Rptr.2d 271, 65 P.3d 749]: 'We reject that argument for the reason given in *People v. Anderson* [, *supra,*] 25 Cal. 4th [at pp.] 589–590, footnote 14 [106 Cal.Rptr.2d 575, 22 P.3d 347]: "[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without possibility of parole. (§ 190.2, subd. (a).) Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi.*" The high court's recent decision in *Ring v. Arizona* [, *supra,*] 536 U.S. 584 [122 S.Ct. 2428, 153 L.Ed.2d 556] does not change this analysis. Under the Arizona capital sentencing scheme invalidated in *Ring,* a defendant convicted of first-degree murder could be sentenced to death if, and only if, the trial court first found at least one of the enumerated aggravating factors true. (*Id.* at p. 603 [122 S.Ct. 2428].) Under California's scheme, in contrast, each juror must believe the circumstances in aggravation substantially outweigh those in mitigation, but the jury as a whole need not find any one aggravating factor to exist. The final step in California capital sentencing is a free weighing of all the factors relating to the defendant's culpability, comparable to a sentencing court's traditionally discretionary decision to, for example, impose one prison sentence rather than another. Nothing in *Apprendi* or *Ring* suggests the sentencer in such a system constitutionally must find any aggravating factor true beyond a reasonable doubt.' (Accord, *People v. Smith* (2003) 30 Cal. 4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Prieto* (2003) 30 Cal. 4th 226, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123] [(*Prieto*)].)" (*People v. Cox, supra,* 30 Cal. 4th at pp. 971–972, 135 Cal.Rptr.2d 272, 70 P.3d 277.)

*Dickey*, 35 Cal. 4th at 929-31.

The California Supreme Court reasonably denied the claim because the holdings in *Ring* and *Apprendi* are not implicated by California's death penalty scheme. As that court observed, once a California jury convicts of first-degree murder with a special circumstance "the defendant stands convicted of an offense whose maximum penalty is death." *Ochoa*, 26 Cal. 4th at 454. It follows that the penalty phase findings regarding aggravating and mitigating circumstances do not increase that maximum statutory penalty. *See Navarette* 30 Cal. 4th at 520-21 (noting California Supreme Court repeatedly has rejected this claim notwithstanding *Ring*).

As discussed in claim XXV(E), *ante*, in California the determination of the appropriate penalty remains a question for each individual juror, *Samayoa*, 15 Cal. 4th, at 853, militating against a beyond a reasonable doubt standard. *See Walton*, 497 U.S. at 649-651, *rev'd on other grounds by Ring*, 536 U.S. at 589; *Carriger*, 971 F.2d at 334 (citing *Walton* in rejecting allegation that beyond a reasonable doubt standard applies in determining appropriateness of death sentence and absence of mitigating circumstances).

The penalty phase findings in California are in the nature of moral and normative determinations. The Supreme Court in upholding the constitutionality of California's death penalty scheme noted that at the penalty phase, the jury merely weighs the aggravating and mitigating factors to determine whether a defendant eligible for the death penalty should be sentenced to death. *See Tuilaepa*, 512 U.S. at 972. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Ramos,* 463 U.S. at 1008).

For the reasons stated, the California Supreme Court reasonably rejected Petitioner's allegations relating to the failure to instruct on a burden of proof at the penalty phase.

### iii.      *No Requirement to Instruct on Unanimity*

Petitioner argues CALJIC 8.88 failed to instruct the jury that unanimity is required on

sentencing findings.  (Doc. No. 142 at 251-53.)  He again relies upon *Ring* and *Apprendi* in arguing that findings in aggravation serve to increase the penalty beyond the statutory maximum and therefore must be confirmed by unanimous vote of all jurors.

The California Supreme Court in denying the claim on direct appeal stated that:

> Nor is the jury constitutionally required to achieve unanimity as to aggravating factors. (*Brown, supra,* 33 Cal. 4th at p. 402, 15 Cal.Rptr.3d 624, 93 P.3d 244; *People v. Jenkins* (2000) 22 Cal. 4th 900, 1053, 95 Cal.Rptr.2d 377, 997 P.2d 1044.)

*Dickey*, 35 Cal. 4th at 931.

The California Supreme Court reasonably denied the claim because *Ring* and *Apprendi* are not implicated by California death penalty process, for the reasons stated.  Petitioner was not being tried for the conduct adduced at the penalty phase.  Thus, the unanimity safeguard was unnecessary.  Aggravating circumstances are not separate penalties but are standards to guide the making of the moral and normative choice between death and life imprisonment.  A factor set forth in Penal Code section 190.3 does not require a "yes" or "no" answer to a specific question but points the sentencer to the subject matter guiding the choice between the two punishments.  *Tuilaepa,* 512 U.S. at 975.  Again, a jury may exercise unbridled discretion at the sentencing phase.  *Ramos*, 463 U.S. at 1008 n.22 (quoting *Stephens*, 462 U.S. at 875).

The California Supreme Court has repeatedly rejected the contention that unanimity is required as to aggravating circumstances.  *See, e.g.*, *Prieto,* 30 Cal. 4th, at 265 (*Ring* does not require jury to unanimously make such finding beyond reasonable doubt because *Ring* does not affect California's death penalty scheme); *Brown*, 33 Cal. 4th at 402 (jury unanimity as to aggravating circumstances, including unadjudicated criminal activity involving force or violence, is not constitutionally required, *Ring* and *Apprendi* have not altered the California Supreme Court's conclusions regarding burden of proof or jury unanimity).

### d.    Conclusions

Petitioner has not demonstrated federal constitutional error arising from the failure to require the jury's death determination and weighing of aggravating and mitigating factors to be

227

made unanimously and beyond a reasonable doubt.

Accordingly, the state court rejection of these claims was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claims XXV(H-I) shall be denied.

9.     Review of Claim XXV(J)

Petitioner alleges the penalty phase jury instructions in their entirety were unconstitutionally vague, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 51-1 ¶¶ 971-972.)

**a.     Supplemental Legal Standards**

A claim of instructional error requires a showing that the error "so infected the entire trial that the resulting conviction violate[d] due process." *Kibbe*, 431 U.S. at 154.

"[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an unconstitutional manner. *Boyde,* 494 U.S. at 380. A reviewing court does not engage in a technical parsing of the instruction's language, but instead approaches the instructions in the same way that the jury would -- with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Johnson*, 509 U.S. at 368.

In evaluating a claim of instructional error, a single instruction is not viewed in isolation, but rather in the context of the overall charge. *Spivey*, 194 F.3d at 976. Federal courts presume that juries understand and follow instructions. *Weeks*, 528 U.S. at 234; *see also Boyde*, 494 U.S. at 381-85; *Tan*, 413 F.3d at 1115.

"Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

228

1    A state capital sentencing system must: "(1) rationally narrow the class of death-

2    eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing

3    determination based on a death-eligible defendant's record, personal characteristics, and the

4    circumstances of his crime." *Marsh*, 548 U.S. at 173-74.  If the "state system satisfies these

5    requirements," then the "state enjoys a range of discretion in imposing the death penalty,

6    including the manner in which aggravating and mitigating circumstances are to be weighed."

7    *Id.* (citing *Franklin*, 487 U.S. at 179; *Stephens*, 462 U.S. at 875-876, n.13).

8        Even if constitutional instructional error has occurred, the federal court must still

9    determine whether petitioner suffered actual prejudice, that is, whether the error "had

10   substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507

11   U.S. at 637.  A "substantial and injurious effect" means a "reasonable probability" that the jury

12   would have arrived at a different verdict had the instruction been given. *Clark*, 450 F.3d at 916.

13       **b.    State Court Direct and Collateral Review**

14       Petitioner presented this claim on direct appeal and it was denied on the merits.  *Dickey*,

15   35 Cal. 4th at 928-32.

16       **c.    Analysis**

17       Petitioner revisits allegations in claims III(G), XII(D-H), XXV(E, G, H, I & L) *ante*,

18   and re-argues and relitigates the penalty phase instructional claims.  Particularly, he argues

19   CALJIC 8.85 provided impermissibly vague direction and failed to properly guide juror

20   discretion in sentence selection.  (Doc. No. 51-1 ¶ 972; *see also* Doc. No. 142 at 253-54.)  He

21   suggests the errant instructions allowed the jury to assign aggravating weight to mitigating

22   evidence, consider less than all the mitigating evidence, and deny him a reliable and

23   individualized sentence.

24       However, the California Supreme Court was not unreasonable in rejecting the claim for

25   the reasons stated above in the discussion of claims III(G), XII(D-H), XXV(E, G, H, I & L).

26   Particularly, the case law-based instructions omitted were not constitutionally required; the

27   instructions given were not unconstitutionally vague, arbitrary and capricious; and the jury's

28

229

sentencing determinations need not have been unanimous and beyond a reasonable doubt.

States need not structure their jury instructions in any particular manner provided juries are given the opportunity to consider relevant mitigating evidence. *Tuilaepa,* 512 U.S. at 979-80 ("[S]entencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty."); *Buchanan,* 522 U.S. at 276 (as long as state does not preclude jury "from giving effect to any relevant mitigating evidence," it need not "affirmatively structure in a particular way the manner in which juries consider mitigating evidence."). The state supreme court reasonably could find the penalty instructions in their entirety did not prevent Petitioner's jury from considering relevant mitigating evidence, for the reasons stated.

### d.    Conclusions

The California Supreme Court was not unreasonable in denying allegations that the penalty phase jury instructions in their entirety were unconstitutionally vague.

Accordingly, the state supreme court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claim XXV(J) shall be denied.

10.    Review of Claim XXV(K)

Petitioner alleges that California's death penalty statute is unconstitutional because it does not require written findings of aggravating circumstances, preventing meaningful appellate review, violating his rights under the Fifth, Eighth, and Fourteenth Amendments. (Doc. No. 51-1 ¶¶ 973-976.)

### a.    Supplemental Legal Standards

See section VII, D, 9, a, *ante*.

### b.    State Court Direct and Collateral Review

Petitioner presented this claim on direct appeal and it was denied on the merits. *Dickey,*

35 Cal. 4th at 931.

     **c.**    **Analysis**

Petitioner argues that without written findings the reliability of the sentencing verdict cannot be meaningfully tested on appeal. (Doc. No. 142 at 254-55.) He argues that "[w]ithout some memorialization of the basis for the jury's exercise of its discretion, courts cannot "reconstruct the findings of the state trier of fact." (Doc. No. 142 at 255, citing *Townsend*, 372 U.S. at 315 (1963).) He argues the error was more than harmless. (Doc. No. 142 at 255.)

The California Supreme Court in denying the claim on direct appeal stated that:

> The absence of a requirement that the jury make written findings does not render the law unconstitutional. (*Brown, supra,* 33 Cal. 4th at p. 402, 15 Cal.Rptr.3d 624, 93 P.3d 244; *Prieto, supra,* 30 Cal. 4th at p. 275, 133 Cal.Rptr.2d 18, 66 P.3d 1123; *People v. Ochoa* (2001) 26 Cal. 4th 398, 462, 110 Cal.Rptr.2d 324, 28 P.3d 78.)

*Dickey*, 35 Cal. 4th at 931.

The California Supreme Court was not unreasonable in denying the claim. Written findings by the jury regarding the death penalty are not required by the United States Constitution. *Walton*, 497 U.S. at 647-48, *overruled on other grounds in Ring*, 536 U.S. 584; *see also Williams*, 52 F.3d, at 1484-85. Especially so as "the United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed." *Harris*, 692 F.2d at 1195. The California Supreme Court "has repeatedly held that [written findings on aggravating factors] are not required." *Sanchez*, 12 Cal. 4th, at 82; accord *Harris*, 692 F.2d at 1195-96.

Rather, all that is federally required is an "adequate basis for appellate review." *Harris*, 692 F.2d 1196. As discussed above in claim XI, in California the trial court's express reasons for its findings in ruling on the automatic motion for modification provide the "adequate basis" for appellate review. *Id.*; *see also Diaz*, 3 Cal. 4th at 571-573; claim XI, *ante*. That was the case here. The California Supreme Court noted the adequacy of the sentencing findings in the record on the motion for modification, stating that:

And contrary to defendant's claims, the court carefully reviewed the evidence bearing on each of the aggravating and mitigating factors and clearly explained why it found the aggravating factors substantially outweighed the mitigating factors. Defense counsel urged defendant's culpability was only that of an aider and abettor. The court agreed Cullumber was the "major culprit," but noted the evidence showed defendant's role was "not minor." Defense counsel brought up defendant's "drug use." However, there was no evidence, the court observed, defendant was under the influence of drugs at the time of the offenses. Defense counsel noted the remorse defendant had shown when confessing to Gail Goldman. However, the court observed that defendant's expression of remorse on that occasion was triggered by the television story concerning the crime, and that he had shown no remorse immediately after the murders, but rather had grandly purchased drugs for all of his housemates with the money he had stolen. The circumstances of the crime—that defendant participated in the brutal murders of his elderly victims to obtain money to buy drugs—was, the court stated, the most significant aggravating factor.

Apparently, the court did neglect to direct the clerk to enter the reasons for its ruling on the application in the minutes. However, the reporter's transcript provides an entirely adequate basis for review, and so it is not reasonably possible that this failure to comply with a statutory directive prejudiced defendant.

*Dickey*, 35 Cal. 4th at 933.

Thus, the California procedure provides a sufficient record for appellate review by requiring the judge to provide a written statement upholding or overturning the jury's verdict without requiring written findings by the jury on the aggravating circumstances. The California procedure was approved by the Supreme Court in *Pulley v. Harris*, where it was stated:

If the jury finds the defendant guilty of first-degree murder and finds at least one special circumstance, the trial proceeds to a second phase to determine the appropriate penalty. Additional evidence may be offered and the jury is given a list of relevant factors. § 190.3. "After having heard all the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole." *Ibid*. If the jury returns a verdict of death, the defendant is deemed to move to modify the verdict. § 190.4(e). The trial judge then reviews the evidence and, in light of the statutory factors, makes an "independent determination as to whether the weight of the evidence supports the jury's findings and verdicts." *Ibid*. The judge is required to state on the record the reasons for his findings. *Ibid*. If the trial judge denies the motion for modification, there is an automatic appeal. §§ 190.4(e), 1239(b). The statute does not require comparative proportionality review or otherwise describe the nature of the appeal. [Footnote omitted.] It does state that the trial judge's refusal to modify the sentence "shall be reviewed." § 190.4(e). This would seem

to include review of the evidence relied on by the judge. As the California Supreme Court has said, "the statutory requirements that the jury specify the special circumstances which permit imposition of the death penalty, and that the trial judge specify his reasons for denying modification of the death penalty, serve to assure thoughtful and effective appellate review, focusing upon the circumstances present in each particular case." *People v. Frierson*, 25 Cal. 3d 142, 179, 158 Cal. Rptr. 281, 302, 599 P.2d 587, 609 (1979)....

The jury's "discretion is suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189, 96 S.Ct., at 2932. Its decision is reviewed by the trial judge and the California Supreme Court. On its face, this system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under *Furman* and our subsequent cases.

465 U.S. at 51-53.

The state supreme court reasonably could find that nothing further is constitutionally required, and Petitioner does not point to any clearly established Supreme Court precedent stating otherwise. *Williams*, 52 F.3d, at 1484 (California's statute "ensures meaningful appellate review"); *see also Brown*, 479 U.S. at 543; *Bonin,* 794 F. Supp. at 987-88.

To the extent Petitioner relies upon *Townsend* in surmising that absent written findings the jury could have rested its decision to impose death on improper considerations, he fails to demonstrate that case holds a jury is required to make written findings regarding aggravating circumstances. 372 U.S. 293.

### d.    Conclusions

The California Supreme Court was not unreasonable in denying allegations California's death penalty statute is unconstitutional because it does not require written findings of aggravating circumstances.

Accordingly, the state court rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claim XXV(K) shall be denied.

### E.    Claims Relating to Sufficiency of the Evidence

1.    Legal Standards

A federal habeas court reviews challenges to the sufficiency of the evidence by determining whether in "viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990); *see also Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992).

"A reviewing court must consider all of the evidence admitted by the trial court, regardless whether that evidence was admitted erroneously." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010).

Sufficiency of the evidence claims raised in § 2254 proceedings must be measured with reference to substantive requirements as defined by state law. *Jackson v. Virginia*, 443 U.S. 307, 324 n.16 (1979); *see also Richey*, 546 U.S. at 76 (federal court is bound by "a state court's interpretation of state law[.]").

In cases where the evidence is unclear or would support conflicting inferences, the federal court "must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflict in favor of the prosecution and must defer to that resolution." *Jackson*, 443 U.S. at 326.

AEDPA adds another layer of deference over the already deferential *Jackson* standard. Under AEDPA, the federal court may not grant a habeas petition unless it finds that the state court unreasonably applied the principles underlying the *Jackson* standard when reviewing the Petitioner's claim. *See, e.g., Juan H. v. Allen*, 408 F.3d 1262, 1275 n.12 (9th Cir. 2005); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997) (recognizing that "unreasonable application" standard applies to insufficient evidence claim). "Expressed more fully, this means a reviewing court faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution." *McDaniel*, 558 U.S. at 133.

  2.  Review of Claim XXVII

234

Petitioner argues that his death sentence is unconstitutional because it is based on inaccurate, unreliable and insufficient evidence presented at both the guilt phase and the penalty phase. (Doc. No. 51-1 ¶¶ 990-994; Doc. No. 142 at 256-58.)

### a. State Court Direct and Collateral Review

Petitioner raised this claim in his second state exhaustion petition (Lod. Doc. No. 30 at 364-66) which was summarily denied on the merits and on procedural grounds (Lod. Doc. No. 31, Order Denying Cal. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

### b. Analysis

#### i. *Insufficient Evidence at the Guilt Phase*

Petitioner argues his conviction and special circumstance findings were supported by insufficient evidence. Particularly, he points to alleged "false testimony of two drug-addicted witnesses and an incomplete presentation of the exculpatory physical evidence" (Doc. No. 51-1 ¶ 993), and "scientifically suspect expert testimony [and] self-serving testimony by police officers." (Doc. No. 142 at 257.)

However, this Court previously considered and denied guilt phase claims alleging: (i) ineffectiveness of Schultz and Hart; (ii) inadequate guilt phase defense; (iii) insufficient evidence supporting the prosecution's guilt phase case; and (iv) actual innocence. (*See e.g.*, Doc. No. 135 discussing guilt claims II(A), II(B), II(C)], XII, XVIII, XIX, XXII, XXVI, and XXVIII.) The Court, in its prior order stated that:

> [T]he state supreme court could reasonably have concluded that the crimes resulted from the joint motive of R.C. and petitioner to obtain money and property from victims Caton and Freiri (RT 4325, 4352, 4360-62); that R.C. and petitioner armed themselves (RT 4343-50) with the intent to kill victims who were frail and aged, (RT 4239-41); that the victims knew the perpetrators and could have identified them to authorities (RT 4311-13); and that the jury was properly instructed on the charges. (*See* claims XII and XXVI, *post*.)
>
> Accordingly, the state supreme court was not unreasonable in finding a rational trier of fact could have found the essential elements of the crimes charged beyond a reasonable doubt.

(Doc. No. 135 at 40.)

The Court went on to state that:

> [I]t is not likely any reasonable juror would have reasonable doubt that the essential elements of the criminal counts could have been found beyond a reasonable doubt, for reasons stated in claims XXVI and XXVIII. Petitioner's allegations that false evidence was presented, evidence was suppressed and destroyed and third parties were involved in the crimes appear insufficiently supported in the evidentiary record at a level greater than harmless error. (*See* claims II(B), II(C), II(S), XIII.) Moreover, no facts or discrepancies in the testimony and physical evidence establish or compel the conclusion that Buchanan was motivated to and did testify falsely or inaccurately (*see* claims II(E), XIII and XVII), or that Goldman, by virtue of her alleged substance addiction, was motivated to and did testify falsely or inaccurately (*see* claims II(L), XXI).
>
> Significantly, petitioner's confession to Buchanan and Goldman and the uncontroverted testimony of Buchanan and Goldman inculpating petitioner is consistent with the noted physical evidence (*see* claims II(B), II(C), II(L), II(S), XIII, XIV, XXI, XXVI and XXVIII).

(Doc. No. 135 at 40-41.)

For the reasons previously stated, Petitioner allegations of insufficient evidence at the guilt phase lack merit.

### ii. Insufficient Evidence at the Penalty Phase

Petitioner argues insufficient evidence at the penalty phase. He argues mitigating value of lingering doubt arising from insufficiently supported aggravating circumstances of the crime, rendering his death sentence constitutionally unreliable. (*See* Doc. No. 142 at 257.) However, the state supreme court reasonably could reject Petitioner's claimed insufficiency of the guilt phase evidence recast as a penalty phase claim, for the reasons stated.

Petitioner goes on to argue the balance of aggravating circumstances presented by the prosecution, i.e. evidence of five autopsy photos and the stipulated 1983 burglary conviction, was insufficiency supported in the trial record. (Doc. No. 51-1 ¶ 993). Petitioner supports the argument by pointing to: (i) the mitigation proffer evidence that was not presented to the jury, (ii) the jury's alleged improper consideration of Lavelle Garratt's outburst, (iii) the prejudicial nature of the autopsy photographs, and (iv) the breakdown in communication between Petitioner and Schultz allegedly resulting in a lack of representation at the penalty phase. (*See*

236

Doc. No. 142 at 257, citing *Johnson v. Mississippi*, 486 U.S. 578, 585-86 (1988) (vacated conviction found insufficient as aggravating evidence).) Petitioner argues the jury's failure to reach immediate agreement on a sentence as suggesting prejudice. (CT 477-482.)

However, Petitioner does not point to clearly established federal law that the prosecution bears a burden of proof at the sentencing phase subject to review for sufficiency of evidence. For the reasons stated, the prosecution bears no burden of proof at the sentencing phase. *Williams*, 52 F.3d, at 1485; *Cudjo*, 6 Cal. 4th at 634. The jury's sentencing determination was wholly moral and normative. *See Prieto*, 30 Cal. 4th at 275 ("[T]he penalty phase determination in California is normative, not factual. It is therefore analogous to a sentencing court's traditionally discretionary decision to impose one prison sentence rather than another.").

As discussed more fully in claim XXV(E, H, I) above, a capital murder defendant in California does not have the right to proof beyond reasonable doubt of sufficient facts to support the selected sentence. The facts supporting death eligibility were determined, constitutionally, at the guilt phase. (*See* Doc. No. 135 denying guilt phase claims.) Petitioner's disagreement with the jury's sentencing determination and the trial court's denial of his motion for new trial and modification of the verdict is not alone a basis for relief.

Furthermore, Petitioner has failed to demonstrate constitutional error in the state supreme court's rejection of his predicate penalty phase claims relating to Lavelle Garratt's outburst, the autopsy photographs, and the breakdown in communication with Schultz and related *Marsden* allegations. (*See* discussion of claims II(I, U), IX, X, *ante*.) Reargument alone is not persuasive.

Additionally, the claim fails as a cumulative error claim for the reasons stated in the discussion of claims III(H) and XXIX , *post*.

### c. Conclusions

A fair-minded jurist could find that Petitioner failed to establish his death sentence is unconstitutional because it rests upon inaccurate, unreliable and insufficient evidence.

237

The state supreme court rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claim XXVII shall be denied.

## F. Claims Relating to Cumulative Error

### 1. Legal Standards

The Ninth Circuit has stated "the Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (citing *DeChristoforo*, 416 U.S. at 643). In the Ninth Circuit, the cumulative effect of trial errors can be a basis for habeas relief in certain circumstances.

Although individual errors looked at separately may not rise to the level of reversible error, their cumulative effect may nevertheless be so prejudicial as to require reversal. *U.S. v. Necoechea*, 986 F.2d 1273, 1282 (1993); *see also Alcala v. Woodford*, 334 F.3d 862, 883 (9th Cir. 2003) ("[E]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.").

However, the fact that errors have been committed during a trial does not mean that reversal is required. "While a defendant is entitled to a fair trial, [she] is not entitled to a perfect trial, for there are no perfect trials." *United States v. Payne*, 944 F.2d 1458, 1477 (9th Cir. 1991).

Errors of state law, such as whether instructions were correct under state law, are not cognizable in federal habeas, *McGuire*, 502 U.S. at 71-72, and therefore should play no part in cumulative error analysis. *See Parle,* 387 F.3d, at 1045 (citing *Jeffers*, 497 U.S. at 780) (no habeas relief for state law errors whose combined effect does not violate the federal

constitution).

2.      Review of Claims III(H) and XXIX

Petitioner alleges the cumulative effect of errors by counsel at the penalty phase (i.e. claim III(H)) and at the guilt and penalty phases together (i.e. claim XXIX), violated his rights under the Fifth, Sixth, Eight and Fourteenth Amendments.  (Doc. No. 51-1, ¶¶ 615-16, 1006-1017; Doc. No. 142 at 258, citing *Ceja v. Stewart*, 97 F.3d 1246, 1254 (9th Cir. 1996; *see also Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (finding cumulative prejudice under *Strickland*); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (same).[15]

**a.      State Court Direct and Collateral Review**

Claim III(H) was raised in the second state exhaustion petition alleging cumulative penalty phase ineffective assistance (Lod. Doc. No. 30 at 302) and denied on the merits and on procedural grounds (Lod. Doc. No. 31, Order Denying Cal. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

Claim XXIX was raised in the second state exhaustion petition alleging cumulative error in trial proceedings (Lod. Doc. No. 30 at 368-73) and denied on the merits and on procedural grounds (Lod. Doc. No. 31, Order Denying Cal. Pet., *In re Colin Raker Dickey*, No. S165302 (May 29, 2012)).

Petitioner also alleged in his direct appeal the cumulative impact of penalty phase errors which the California Supreme Court denied on the merits.  *Dickey*, 35 Cal. 4th at 933.

**b.      Analysis**

Petitioner argues the cumulative effect of trial errors and prosecutorial misconduct acknowledged by the California Supreme Court and found not to be prejudicial by that court; and the cumulative effect of the balance of errors alleged in the federal petition.

As to the former, Petitioner points to the following errors acknowledged in the record: (i) the trial court's self-admitted failure to issue *sua sponte* an instruction that Petitioner's alleged oral confession should be viewed with caution, (ii) the trial court's acceptance of

---

[15] Petitioner argues in favor of claim III(H) only in his reply brief.  (*See* Doc. No. 144 at 39.)

239

1  petitioner's waiver of personal presence at the penalty phase in violation of state law, (iii) the

2  prosecutor's failure to correct the false impression that the state had not done any favors for its

3  witness Gene Buchanan, and (iv) the prosecutor's likely vouching for Gene Buchanan's

4  credibility.  (*See* Doc. No. 142 at 259.)

5      As to the balance of constitutional errors alleged in the federal petition, Petitioner

6  emphasizes the alleged weakness of the aggravating circumstances of the crime and that his

7  prior felony conviction for burglary was not a violent crime.  (*See e.g.* Doc. No. 142 at 259-60,

8  citing *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) ("In those cases where

9  the government's case is weak, a defendant is more likely to be prejudiced by the effect of

10  cumulative errors."); see also RT 5134-38.)

11      Petitioner also argues the cumulative impact of all these alleged errors is apparent in the

12  jury's failure to reach an immediate penalty verdict.  (CT 477-479); *see also Frederick*, 78

13  F.3d at 1381.

14      The California Supreme Court on direct appeal denied alleged cumulative guilt phase

15  error, stating simply:

16

17      Defendant contends "the cumulative effect of numerous errors occurring during
        the guilt phase compels reversal."  The contention has no merit.

18  *Dickey*, 35 Cal. 4th at 915.

19      That court also denied on direct appeal the allegation of cumulative penalty phase error,

20  stating that:

21

22      Defendant contends the cumulative impact of errors in the penalty phase
        compels reversal of the death penalty. We disagree.

23

24  *Dickey*, 35 Cal. 4th at 933.

25      The California Supreme Court reasonably denied these cumulative error claims.

26  Petitioner fails to show the cumulative effect of alleged errors at the guilt and penalty phases

27  deprived him of due process.  Petitioner's guilt phase claims fail for the reasons stated in the

28

1  Court's prior order denying those claims.  (Doc. No. 135.)  Petitioner's penalty phase claims

2  fail for the reasons stated, *ante*.

3      Particularly, the state supreme court reasonably could find errors allegedly

4  acknowledged by the state court to be harmless and otherwise unsupported in the record.  (Doc.

5  No. 135 at 33-54, 57-61, 96-99, 98-101, 178-82; *see* the discussion of claims VI and VII

6  above); *see also Dickey*, 35 Cal. 4th at 905-11, 913-14, 922-24.

7      To the extent errors may be discerned, Petitioner has failed to demonstrate their

8  combined effect was prejudicial by rendering his defense "far less persuasive" so as to exert a

9  "substantial and injurious effect or influence" on the verdict.  *Parle*, 505 F.3d, at 928 (citing

10  *Chambers*, 410 U.S. at 294, and *Brecht*, 507 U.S. at 637); *see also Thompson v. Calderon,* 86

11  F.3d 1509, 1521 (9th Cir. 1996) (reversed on other grounds by *Calderon v. Thompson*, 523

12  U.S. 538 (1998) ("finding no prejudice from the errors considered separately, we also find no

13  cumulative prejudice.").

14      Cumulative error warrants habeas relief only where the errors have "so infected the trial

15  with unfairness as to make the resulting conviction a denial of due process."  *Parle*, 505 F.3d,

16  at 927-28; *see also United States v. Karterman*, 60 F.3d 576, 580 (9th Cir. 1995) ("Because

17  each error is, at best, marginal, we cannot conclude that their cumulative effect was 'so

18  prejudicial' to [defendant] that reversal is warranted.").

19      Here, for the reasons stated, there is nothing to accumulate to a level of reversible error.

20  Petitioner was "entitled to a fair trial but not a perfect one, "for there are no perfect trials."

21  *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (quoting *Brown*

22  *v. United States*, 411 U.S. 223, 231-232 (1973)).

23      Moreover, apart from arguing *Strickland* error, Petitioner has not demonstrated and

24  does not appear to argue clearly established Supreme Court precedent that cumulative error is a

25  basis upon which habeas relief may be granted.

26      **c.    Conclusions**

27      A fair-minded jurist could find that Petitioner failed to establish his death sentence is

28

unconstitutional due to the cumulative effect of errors by counsel at both phases of this trial.

The state supreme court rejection of these claims was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

Claims III(H) and XXIX shall be denied.

## VIII. CERTIFICATE OF APPEALABILITY

Because this is a final order adverse to the Petitioner, Rule 11 of the Rules Governing Section 2254 Cases ("Rule 11") requires this Court to issue or deny a Certificate of Appealability ("COA"). Accordingly, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. 28 U.S.C. § 2253(c); *Turner*, 281 F.3d at 864-65.

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. *Miller-El*, 537 U.S. at 335–36 (2003). The controlling statute in determining whether to issue a COA is 28 U.S.C. § 2253, which provides that:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

The Court may issue a COA only "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

In the present case, the Court finds that, with respect to the following claims, reasonable jurists could disagree with the Court's resolution or conclude that the issues presented are adequate to deserve encouragement to proceed further:

    1)    Claims I, II(E), II(I), V, and XIII.

Therefore, a COA is granted as to these five claims.

As to the remaining claims, the Court concludes that reasonable jurists would not find the Court's determination that Petitioner is not entitled to relief debatable, wrong, or deserving of encouragement to proceed further. The Court hereby declines to issue a COA as to the remaining claims.

## IX. ORDER

Accordingly, for the reasons stated:

1.    The petition for writ of habeas corpus (Doc. Nos. 51, 51-1) is DENIED, guilt phase claims I, II (portions), IV, VIII, XII (portions), XIII, XIV, XV, XVI, XVII, XVIII, XIX, XXI, XXII, XXIII, XXIV, XXVI, and XXVIII were denied on the merits by order issued January 13, 2017 (Doc. No. 135), penalty phase claims herein II(I), II(U), III(A), III(B), III(C), III(D), III(E), III(F), III(G), III(H), V, VI, VII, IX, X, XI, XII(D), XII(E), XII(F), XII(G), XII(H), XX, XXV(A), XXV(B), XXV(C), XXV(D), XXV(E), XXV(F), XXV(G), XXV(H), XXV(I), XXV(J), XXV(K), XXV(L), XXVII, XXIX are denied on the merits,

2.    A Certificate of Appealability is ISSUED as to the Court's resolution of claims I, II(E), II(I), V, and XIII, and DECLINED as to the remaining claims,

1    3.    Petitioner's motion for stay, partial judgment and certificates of appealability

2          (Doc. No. 145) is DENIED as moot,

3    4.    Any and all scheduled dates are VACATED, and

4    5.    The Clerk of the Court is directed to substitute RON DAVIS, Warden of San

5          Quentin State Prison, as the Respondent warden in this action, and to enter

6          judgment accordingly.

7

IT IS SO ORDERED.

8

Dated:   September 12, 2019          _____

9                                             SENIOR  DISTRICT  JUDGE